1   Stuart G. Gross (State Bar No. 251019)
    sgross@grosskleinlaw.com
2   Travis H.A. Smith (State Bar No. 331305)
    tsmith@grosskleinlaw.com
3   Ross A. Middlemiss (State Bar No. 323737)
    rmiddlemiss@grosskleinlaw.com
4   **GROSS KLEIN PC**
    The Embarcadero
5   Pier 9, Suite 100
    San Francisco, CA 94111
6   t (415) 671-4628
    f (415) 480-6688
7

Steven N. Williams (State Bar No. 175489)
swilliams@saverilawfirm.com
Ronnie S. Spiegel (WSBA No. 33721)
rspiegel@saverilawfirm.com
Elissa A. Buchanan (State Bar No. 249996)
eabuchanan@saverilawfirm.com
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
t (415) 500-6800
f (415) 395-9940

8

9   *Counsel for Plaintiff*

10

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13               **SAN FRANCISCO DIVISION**

14

15

16   **BRAND LITTLE**, Individually and on Behalf       Case No.  23-1098
     of All Others Similarly Situated
17                                                      **CLASS ACTION COMPLAINT**
                    Plaintiff,
18          v.
19   **PACIFIC SEAFOOD PROCUREMENT,**
     **LLC; PACIFIC SEAFOOD PROCESSING,**
20   **LLC; PACIFIC SEAFOOD FLEET, LLC;**               **DEMAND FOR JURY TRIAL**
     **PACIFIC SEAFOOD DISTRIBUTION,**
21   **LLC; PACIFIC SEAFOOD USA, LLC;**
     **DULCICH, INC.**; and **DOES 1-30**
22
                    Defendants.
23

24

25

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

JURISDICTION AND VENUE ...................................................................................... 8

INTRADISTRICT ASSIGNMENT .............................................................................. 9

PARTIES ......................................................................................................................... 9

I.   Plaintiff ................................................................................................................. 9

II.  Defendants ......................................................................................................... 10

AGENTS AND CO-CONSPIRATORS ..................................................................... 12

CLASS ALLEGATIONS ............................................................................................. 13

INTERSTATE TRADE AND COMMERCE ............................................................ 17

FACTUAL ALLEGATIONS ....................................................................................... 18

I.   Background ......................................................................................................... 18

     A.  Harvesting Dungeness Crab and the Dungeness Crab Market .......................... 18

     B.  Pacific Seafood's Concerted and Successful Effort to Dominate Seafood Processing and Distribution on the West Coast ............................................ 22

     C.  Pacific Seafood Has Engaged in a Scheme to Obtain, Maintain, and Exert Monopoly Power in the Live Dungeness Crab Wholesale-Input Market, Including Through Coerced Combinations with Other Buyers and with Crabbers ................................. 24

          1.   Pacific Seafood Has Absorbed and Shut Down All Competition in the Dungeness Crab Processing Space, Positioning Itself as the Dominant Dungeness Crab Processor and the Dominant Purveyor of Frozen Dungeness Crab ............................................. 28

          2.   Pacific Seafood Uses Tying Arrangements, Group Boycotts, and a Significant In-House Fleet to Create a Captive Supply of Live Crab that It Uses to Manipulate Ex Vessel Prices on the Front End and Punish Non-Compliant Buyers on the Backend via Dumping .................................................................................. 33

          3.   Pacific Seafood Falsifies Ex Vessel Prices Paid to Its Boats in Order to Perpetuate Its Scheme to Fix and Maintain the Ex Vessel Wholesale Price for Dungeness Crab in the Pacific NW Area ............................................................. 37

          4.   Pacific Seafood Maintains, Enhances, and Exerts Its Monopsony Power In the Pacific NW Live Wholesale Dungeness Crab Market Through the Above Described and Other Unfair and Illegal Anticompetitive Tactics ................................. 38

               a.   Acquiring and Limiting Dungeness Crab Processing Capacity and Then Using that Dominance to Coerce Other Buyers in the Market to Comply with Its Ex Vessel Pricing Dictates .......................................... 38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

b.  Creating a Captive Supply of Live Crab Through Illegal Means And Using that Captive Supply to Manipulate the Ex Vessel Market Price ................................... 39

c.  Punishing Non-Compliant Buyers Through Refusals to Deal in Markets that Pacific Seafood Has Dominance and Dumping ...................................................... 39

d.  Abusing Its Dominance of the Wholesale Live Dungeness Crab Market In Order to Limit Competition to Frozen Processed Crab from Live and Fresh Cooked Crab and Lower the Price of Live Crab as an Input for that Frozen Processed Crab ..... 40

D.  Barriers to Entry ......................................................................................................... 40

1.  Natural Barriers to Entry ..................................................................................... 40

2.  Barriers to Entry Created by Pacific Seafood .............................................. 42

PLAINTIFF, CLASS MEMBERS, AND CONSUMERS HAVE BEEN HARMED AND SUFFERED, AND WILL SUFFER, ANTITRUST INJURY AS A DIRECT AND PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS .......................................................... 43

I.   Crabbers Are Paid Artificially Suppressed Prices for Ex Vessel Dungeness Crab ................ 43

II.  Consumers Receive Lower Quality Product Because of Defendants' Conduct ...................... 44

III. Defendants' Conduct Causes Anticompetitive Effects Without Any Procompetitive Benefits ............................................................................................................................. 44

CLAIMS FOR RELIEF .................................................................................................... 45

FIRST CAUSE OF ACTION (Monoposinzation in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2) ....................................................................................................................... 45

SECOND CAUSE OF ACTION (Attempted Monoposinzation in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2) ............................................................................................. 46

THIRD CAUSE OF ACTION (Unlaw Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1) ............................................................... 47

FOURTH CAUSE OF ACTION (Restraint of Trade in Violation of the California Cartwright Act (Cal. Bus. and Prof. Code Sections 16720, *et seq.*)) ........................................... 48

FIFTH CAUSE OF ACTION (Violations of the Unfair Practices Act (Cal. Bus. and Prof. Code, § 17000, et seq.)) .................................................................................................... 50

SIXTH CAUSE OF ACTION (Violation of the California Unfair Competition Law (Cal. Bus and Prof. Code Section 17200, *et seq.*)) ........................................................................ 51

SEVENTH CAUSE OF ACTION (For Declaratory Relief Under 28 U.S.C. § 2201) ............ 53

PRAYER FOR RELIEF .................................................................................................... 53

DEMAND FOR JURY TRIAL .......................................................................................... 55

1    Plaintiff Brand Little ("Little" or "Plaintiff") on behalf of himself and all others similarly

2    situated (collectively, the "Class"), allege, on information and belief based upon the investigation

3    of counsel, except where based on personal knowledge, against Defendants Pacific Seafood

4    Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific

5    Seafood USA, LLC, Dulcich, Inc., which collectively do business and are commonly known as a

6    single entity named "Pacific Seafood" (collectively, "Pacific Seafood"), as well as Does 1-30,

7    which include other companies owned by foregoing entities and/or are controlled by Dulcich, Inc.

8    or its 100% owner, Frank Dulcich and which are involved in the conduct alleged herein

9    (collectively with each other and Pacific Seafood, "Defendants"), as follows:

**INTRODUCTION**

10

11    1.    Plaintiff and the Class are the approximately 1,400 independent commercial

12   crabbers who land Dungeness crab in California, coastal Washington (which excludes Puget

13   Sound), and Oregon (collectively the "Pacific NW Area").

14   2.    Before that crab makes it to consumers' plates it passes through two markets. The

15   first market, and the one at issue in this action, is the Pacific NW Area's wholesale-input market in

16   which Class members sell the live crab they have caught to what are known in the industry as

17   "buyers," both directly, which is referred to as "ex vessel," and indirectly, which involves a

18   secondary transaction wherein the ex vessel buyer sells the crab to a further buyer. The second

19   market, which is not at issue in this action, is the wholesale-retail market in which buyers sell

20   crab—either live, fresh cooked (i.e. not frozen or canned), cooked and frozen, or cooked and

21   canned—to restaurants, retailers (such as grocery stores), and the like.

22   3.    For at least the last four years, and likely substantially longer, Pacific Seafood has

23   illegally fixed the price paid to crabbers (the "ex vessel price") for Dungeness crab landed in the

24   "Pacific NW Area, dramatically reducing the amounts received by crabbers for their labors and

25   preventing consumers from receiving reasonably priced fresh Dungeness crab during periods when

26   demand for the product is highest, leaving most consumers to buy frozen Dungeness crab from the

27   previous year supplied by… Pacific Seafood.

28

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

4.    Pacific Seafood has achieved this control over Dungeness crab ex vessel prices in the Pacific NW Area through a multi-pronged illegal strategy of (a) monoposinzation of the Pacific NW Area's Dungeness crab wholesale-input market, (b) coercive combinations with other Dungeness crab wholesale buyers, (c) and coercive combinations with certain Dungeness crabbers.

5.    Pacific Seafood has monopsonized the Pacific NW Area's Dungeness crab wholesale-input market through a concerted and willful acquisition and maintenance of that power via the aforementioned coercive combinations—which involve illegal refusals to deal, group boycotts, dumping, tying, and falsification of official ex vessel price records—as well as its own illegal unilateral conduct, rather than through the development of a superior product, business acumen, or historic accident.

6.    Integral to Pacific Seafood's effort in this regard has been making itself the overwhelmingly dominant processor of Dungeness crab in the Pacific NW Area. This, critically and intentionally, has transformed Pacific Seafood's relationship with other buyers, making Pacific Seafood the only purchaser of crabs that those other buyers cannot sell to retail, restaurant, and similar customers. This, in turn, has provided it extraordinary control over companies that, at the ex vessel level, should (and, at least, nominally are) Pacific Seafood's competitors. This power allows Pacific Seafood to dictate to other buyers the ex vessel prices those buyers will pay for Dungeness crabs to Class members and to punish any buyer who does not comply with refusals to deal (i.e., refusals to purchase the crabs those buyers cannot sell to retail, restaurant, and similar customers) that can have devastating financial consequences. It has also resulted in Pacific Seafood becoming the ultimate buyer of at least 50% of all the Dungeness crab sold in the Pacific NW Area Dungeness crab wholesale-input market and very likely much more than that.

7.    Pacific Seafood did not become the only significant processor of Dungeness as a result of its delivery of superior service, payment of premium price, or any other type of innovation or competition, but rather through a concerted effort to eliminate competition from other processors through a strategy of acquiring its erstwhile processing competitors (or their facilities) and, in many cases, shutting down their former facilities, while simultaneously erecting barriers to the entry of any new competing processor.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

8.      Over approximately the last 40 years, Pacific Seafood (directly or through its owner Frank Dulcich) has purchased and, in several cases, shut down, all of the other significant Dungeness crab processors in the Pacific NW Area, starting with Pacific Coast Seafood in Warrenton, OR, in 1983, which was then followed by a string of crab processors up and down the coast, including:

- Pacific Choice Seafood in Eureka, CA, in 1986;

- Pacific Choice Seafood in Charleston, OR, in 1990;

- Washington Crab Processors in Westport, WA, in 1993;

- Eureka Fisheries, which operated processing plants from Fort Bragg, CA to Neah Bay, WA, as well as important refrigeration plants, and other facilities in various locations, including Bodega Bay and the East Bay, in 2001;

- Ocean Gold Seafood  in Westport, WA, in a series of transactions consummating in the late 2010s;

- North Coast Fisheries in Santa Rosa, CA, in 2019; and

- Pezzolo Seafood in San Francisco, in 2022.

9.      Because of the structure of the Dungeness crab industry—in which buyers contract with crabbers, prior to the season, in a manner that generally results in the buyers having more crab than is necessary to fill the orders of their retail, restaurant, and similar customers—and the nature of the product—which can only be sold live, fresh cooked, or cooked and frozen (i.e. processed)—Pacific Seafood's position as the only significant processor of Dungeness crab purchased ex vessel by other buyers, and thus the only significant purchaser from such buyers of crab not purchased by retailers, restaurants, or similar customers, gives Pacific Seafood extraordinary control over the ex vessel price those buyers pay to crabbers … or whether those buyers offer crabbers any price at all.

10.     First of all, Pacific Seafood's position as virtually the only purchaser of Dungeness crabs that other buyers cannot sell to retailers, restaurants, or similar customers allows Pacific Seafood to unilaterally determine the price paid to those buyers for such crabs. And Pacific Seafood through explicit arrangements with other buyers and less explicit arrangements has set that price at approximately $.15-$.25 per pound above the ex vessel price it dictates for the market. Indeed,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

many buyers make no pretense of even trying to sell much (and, in some cases, any) the Dungeness crab that they purchase ex vessel to anyone other than Pacific Seafood according to such an arrangement, effectively becoming just a middleman between Pacific Seafood and the crabbers.

11.     Thus, when Pacific Seafood states what will be the ex vessel price, the other buyers generally fall right in line, knowing that if they offer the same ex vessel price, they'll be rewarded with a $.15-$.25/lb. return when they sell those crabs along to Pacific Seafood. On the other hand, the other buyers know that if they offer a higher ex vessel price, the crabs that they do not sell to their retail, restaurant, and similar customers will only be sellable at loss to Pacific Seafood; and that is if Pacific Seafood agrees to buy them at all. And when Pacific Seafood refuses to even state an ex vessel price, as it did, this season, at the start of the seasons in California's District 10[1] and in California's Districts 6 & 7,[2] other buyers (despite their ability to earn a substantial profit, if they were to purchase crab ex vessel at a reasonable price and sell it to their retail, restaurant, and similar customers) generally won't offer an ex vessel price at all because of their fear of what Pacific Seafood may do to them if they get out ahead of the ex vessel price ultimately dictated by Pacific Seafood. This immobilizes the fishery, despite strong consumer demand for the product.

12.     Pacific Seafood, however, does not exclusively rely on the foregoing arrangements with other buyers to set the ex vessel price of Dungeness crab in the Pacific NW Area's Dungeness crab wholesale-input market but rather uses a variety of other illegal, anticompetitive, coercive, and fraudulent techniques to ensure compliance with its ex vessel price dictates.

13.     One such way is punishing buyers who do not comply with its pricing dictates through refusals to deal that can have devastating financial effects on those buyers. If Pacific Seafood determines that another buyer has not been sufficiently compliant on ex vessel prices, it

---

[1] District 10, which is also colloquially referred to as the "Central California" or "San Francisco" fishery, extends from Pigeon Point (near the border of San Mateo and Santa Cruz counties) north to border between Sonoma and Mendocino counties. Crabs caught in District 10 are generally landed in the following ports: Half Moon Bay, San Francisco, and Bodega Bay. District 10 traditionally has opened before the other portions of the Pacific NW Area.

[2] Districts 6 and 7, extend from the Mendocino-Sonoma county line to the Oregon border. Crabs caught in Districts 6 or 7 are generally landed in the following ports: Fort Bragg, Eureka, and Crescent City. Districts 6 and 7 are supposed to open at the same time as the other portions of the Pacific NW Area's Dungeness crab fishery.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

can (and historically has) punished that buyer by refusing to purchase the crab of that buyer which it cannot sell to retail, restaurant, or similar customers.  Such a refusal in combination with Pacific Seafood's overwhelming dominance of Dungeness crab processing can result in enormous losses for such buyers, who can end up with no place to sell some or all of the crabs not purchased by their restaurant, retail, or similar customers. This season, for example, Pacific Seafood refused to purchase 1.3 million pounds of crab from a buyer in San Francisco as punishment for its failure to comply on ex vessel prices.

14.     Pacific Seafood also punishes non-compliant crab buyers on the *sell*-side by denying non-compliant crab buyers access to other fish products whose supply Pacific Seafood controls. Pacific Seafood not only dominates the Dungeness crab market but, as a result of its self-vaunted vertically integrated dominance of the west coast's supply of fish products, is for many other types of fish and fish products effectively the only source. And most Dungeness crab buyers do not limit themselves to Dungeness crab, but rather sell to their customers a wide range of fish, many types of which they do not directly purchase ex vessel from crabbers, but rather from other suppliers, often Pacific Seafood. Thus, other fish buyers are dependent on Pacific Seafood for such products and related lines of business. And if those buyers do not toe the line with regards to ex vessel pricing, Pacific Seafood can and will deny them access to such products in retaliation.

15.     Another very important enforcement tool that Pacific Seafood uses to punish other buyers who do not comply with its pricing dictates is dumping. Pacific Seafood will dump cheap live Dungeness crab into the geographic areas of other buyers who have not complied with its pricing dictates, offering them for sale to retail, restaurant, and similar buyers for a price at or below what non-compliant buyers have paid ex vessel. This causes non-compliant buyers who paid more than the Pacific Seafood dictated ex vessel price to incur potentially enormous losses when the price they receive from their customers craters in reaction.

16.     For example, this season, Pacific Seafood dumped whole fresh cooked crabs, at prices between $3.99 and $4.50—which is below cost—in the San Francisco Bay Area and elsewhere to punish buyers who offered ex vessel prices to crabbers at a time that Pacific Seafood was refusing to state a price, and sold live crab in the Chinese market for $4.50, free on board

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

(FOB)—which is again below cost—to punish buyers serving that region who were similarly non-compliant. This has the further salutary effect for Pacific Seafood of eliminating other channels through which other buyers could sell their crab, compelling them to sell such crab to Pacific Seafood for processing at the price Pacific Seafood dictates.

17.     Pacific Seafood is able to punish non-compliant buyers in this way and to take other anticompetitive actions described herein to artificially set ex vessel prices for Dungeness crab and coerce other buyers into paying no more than the price, because it ultimately receives a huge portion of the crab other buyers purchase ex vessel and because of its effective direct capture of approximately 25% of the ex vessel supply of Dungeness crab landed (as opposed to supply acquired from other buyers) in the Pacific NW Area.

18.     A portion of this crab comes from large Dungeness crabbing vessels in the Pacific NW Area that are owned by Pacific Seafood, an arrangement that no other buyer has.

19.     The remainder comes from technically independent boats that Pacific Seafood is able to control via explicit tying arrangements that leverage Pacific Seafood's position as the only buyer of certain types of fish and via the threat of group boycotts that leverage Pacific Seafood's control over other buyers.

20.     Pacific Seafood requires that fishers who sell Pacific Seafood one type of fish caught by the fisher sell it all types of fish caught by the fisher, creating what are essentially "slave" vessels that must do Pacific Seafood's bidding with regards to ex vessel prices. This tying strategy is effective because of Pacific Seafood's dominance in other fisheries, particularly relevant here, the coldwater shrimp in which Pacific Seafood is the only buyer of any significance. Thus, if a crabber also fishes for coldwater shrimp, he or she has to sell those shrimp to Pacific Seafood, which, in turn, results in the fisher having to also sell to Pacific Seafood the Dungeness crab he or she catches.

21.     Pacific Seafood also uses its coercive control of other fish buyers to create a group boycotts of fishers who don't comply with it on pricing, effectively blackballing those fishers, and refusing to purchase from fishers who are willing to accept the price offered by Pacific Seafood in retaliation for having sold to a non-compliant buyer at a higher price.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

22.     This captive supply of Dungeness crab, together with the crab that Pacific Seafood acquires from other buyers, which together ultimately totals, at the very least, over 50% of the crab in the Pacific NW Area's Dungeness Crab wholesale-input market, facilitates its illegal control of ex vessel Dungeness crab prices in three ways.

23.     First, as discussed above, it provides Pacific Seafood with a large supply of crab that it can dump on buyers who were not compliant with its price dictates.

24.     Second, the captive supply also allows Pacific Choice to essentially defraud the market by publicly indicating that it is only paying its boats price "x" because of low demand or some other pretext, but then actually paying them substantially more. This is done by putting one price on the fish tickets that are legally required to be recorded at every ex vessel sale, and then later paying the crabbers an additional "bonus." Pacific Seafood does this to ensure that other buyers adopt its chosen ex vessel price (even if it is so low that most crabbers would not willingly go out for the price), which, in turn, controls what Pacific Seafood pays other buyers for crab purchased from them for processing (which, in terms of total tonnage, is several times the quantity that Pacific Seafood directly purchases from crabbers).

25.     Third, the captive supply allows Pacific Seafood to manipulate price negotiations with crabbers. Pursuant to provisions in the Pacific NW Area state law, port associations are allowed to collectively negotiate ex vessel prices for Dungeness crab and other fishes, as well as engage in collective action such as price strikes to support such negotiations. Pacific Seafood employs its captive ex vessel Dungeness crab supply to subvert the integrity of these negotiations by inducing its captive or owned boats to go out at a price that the rest of the fleet refuses to go out at, either by threats and coercion, secret deals to pay its crabbers more than is publicly or officially reported to the state, or both.  And given the "derby" nature of the fishery wherein the great bulk of the crab is caught in the first few weeks after its opener and the easy ability to ship crab by truck throughout the Pacific NW Area, when a sizeable contingent of crabbers from any port agrees on a price and goes out fishing, all other crabbers in the Pacific NW Area fishery are compelled to accept the price and go out.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

7

26.     Finally, Pacific Seafood, implicitly or otherwise, communicates threats to crabbers and other buyers that, if they diverge from its ex vessel Dungeness crab price dictates, Pacific Seafood will retaliate against them, including without limitation, in one or all of the above ways.

27.     Through these illegal means, Pacific Seafood has placed the Pacific NW Area Dungeness crab wholesale-input market in a pincher that allows it to fix the ex vessel price paid for Dungeness crab and control when and if crabbers even harvest crab.

28.     Pacific Seafood's apparent long-term goal is to transform all other participants in that market—including the approximately 1,400 independent crabbers who make up the Class—into effective employees of Pacific Seafood, with Pacific Seafood unilaterally dictating how much they do and do not earn. This would allow Pacific Seafood to dictate not only what everyone else in the production chain earns, but also what consumers pay for Dungeness crab, and—most importantly from Pacific Seafood's perspective—would allow it to extract all of the profits from the market for itself, and itself only.

29.     This would also destroy one of the last viable commercial fisheries in Oregon, California, and Washington and the coastal fishing communities that depend on it for their survival.

30.      Pacific Seafood's actions in this regard constitute illegal monopsonization and attempted monopsonization in violation of the Sherman Act § 2, illegal agreements in restraint of trade in violation of the Sherman Act § 1, and illegal combinations in restraint of trade in violation of the California Cartwright Act.

31.     Plaintiff on behalf of himself and all others similarly situated respectfully seek remedies for this illegal conduct including compensation for his injuries suffered as a result and appropriate injunctive relief, eliminating Pacific Seafood's capability to illegally control the Pacific NW Area Dungeness crab market.

## JURISDICTION AND VENUE

32.     The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

33. This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction and because Plaintiff's claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiff Little suffered antitrust injury within this jurisdiction.

34. Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

35. Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

36. By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the Class members in the Pacific NW Area. Defendants, directly and through their agents, engaged in activities affecting multiple states, to obtain and maintain monopolistic power in the relevant market, unreasonably restrained trade, and adversely affected the relevant market.

## INTRADISTRICT ASSIGNMENT

37. Pursuant to Civil Local Rule 3.2 (c) and (d), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because a substantial part of the events giving rise to the claim occurred in San Francisco County. Furthermore, Defendants maintain facilities and execute operations within this Division.

## PARTIES

### I. Plaintiff

38. Plaintiff **BRAND LITTLE** ("Little") is an individual residing in Auburn, California. Little has been a commercial fisherman since 2004 and fishes for Dungeness crab, black cod, salmon, and other species in the waters of California, landing fish from his fishing vessel, the Pale Horse and his previous vessels, in various California ports, including San Francisco and Crescent City. In addition to his fishing business, Mr. Little operates a seafood retail business that

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

operates at farmers markets and through which he sells both fish he has caught himself and purchased from other sources, including Pacific Seafood. Prior to Pacific Seafood's acquisition of Pezzolo Seafood, in 2022, Little had contracted with Pezzolo during several seasons to sell Dungeness crab landed by him in San Francisco. After Pacific Seafood acquired Pezzolo, his contract was effectively transferred to Pacific Seafood and he agreed to sell his Dungeness crab to Pacific Seafood during the 2022/2023 season after Pacific Seafood agreed to make an exception for him to its requirement that fishers who sell it one type of fish sell it all types of fishes caught by them. However, like some other members of the Class, Little was made the subject of a group boycott by Pacific Seafood when he refused this season to comply with Pacific Seafood with regard to ex vessel prices. In reaction to statements by Little protesting Pacific Seafood's manipulation of the Dungeness crab market and refusal to offer a price during negotiations, Pacific Seafood's General Manager for Processing Southern Division, Joe Cincotta, made clear that Pacific Seafood would not purchase crab (or anything else) from him; Pacific Seafood also instructed other fish buyers not to purchase crab from Little. Little also contracted with Pacific Seafood to sell the Dungeness crab he landed in Crescent City during the 2018/2019 Zone 1 season. In the years between, Little caught and sold Dungeness crab to other seafood buyers at a rate that was artificially depressed by Pacific Seafood's unfair and illegal anticompetitive activities.

## II.   **Defendants**

39.    Defendant **PACIFIC SEAFOOD PROCUREMENT, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Procurement is Defendant Dulcich, Inc. Pacific Seafood Procurement, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "procurement of fresh and frozen seafood products."

40.    Defendant **PACIFIC SEAFOOD PROCESSING, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Processing is Defendant Dulcich, Inc. Pacific Seafood Processing, in its most recent annual report filed with the Oregon Secretary of State, describes its business as the "purchase, manufacture, and sale of seafood products." Pacific Seafood Processing, LLC is the

sole owner of a number of limited liability companies associated with particular processing plants that Pacific Seafood has acquired in the NW Pacific Area, including: Pacific Seafood - Brookings, LLC; Pacific Seafood - Charleston; Pacific Seafood - Eureka, LLC; Pacific Seafood - Newport, LLC; Pacific Seafood -Warrenton, LLC; Pacific Seafood – Westport, LLC; and Pacific Seafood – Woodland, LLC.

41.     Defendant **PACIFIC SEAFOOD FLEET, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Fleet is Defendant Dulcich, Inc. Pacific Seafood Fleet, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "ownership of commercial fishing vessels."

42.     Defendant **PACIFIC SEAFOOD DISTRIBUTION, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Distribution is Defendant Dulcich, Inc. Pacific Seafood Distribution, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "distribution of fresh and frozen seafood products." Pacific Seafood Distribution is the sole member of a number of limited liability companies in the NW Pacific Area, including: Pacific Seafood – Los Angeles, LLC; Pacific Seafood – Portland, LLC; Pacific Seafood – Seattle, LLC;

43.     Defendant **PACIFIC SEAFOOD USA, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood USA is Defendant Dulcich, Inc. Pacific Seafood USA, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "domestic sale of fresh and frozen seafood products."

44.     **DULCICH, INC**., is an Oregon corporation with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The president and 100% owner of Dulcich, Inc. is Frank Dulcich.

45.     Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, and Dulcich, Inc., collectively and through wholly owned subsidiaries (including Does 1-15) do business and are

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

commonly known as a single entity named "Pacific Seafood." When doing business with crabbers, other fishers, and the public, the various entities making up Pacific Seafood present themselves as a single vertically integrated company. Pacific Seafood's website, www.pacificseafood.com, accordingly describes itself as a single "family owned" company, "employing more than 3,000 team members across 41 facilities in 11 states." It further states "Pacific Seafood manages all parts of the supply chain from harvesting/fishing to processing, and distribution."

46.     Does 1-10 are companies owned and controlled, directly or indirectly, by the named defendants and which operate under the Pacific Seafood name. Their true names are unknown to Plaintiff. Each of these fictitiously named defendants is in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

47.     Does 11-20 are companies controlled, through means including, without limitation, indebtedness, equity, or another means by one or more of the named defendants and/or Frank Dulcich, directly. Their true names are unknown to Plaintiff. Each of these fictitiously named defendants is in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

48.     Does 21-30 are individuals whose true names are unknown to Plaintiff but who are in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

## AGENTS AND CO-CONSPIRATORS

49.     The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by their officers, agents, employees, or representatives while actively engaged in the management, direction, or control of Defendants' business or affairs.

50.     The officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

51.     Each Defendant, and its respective subsidiaries, affiliates, and agents operated as a single unified entity.

52.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

53.     Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family, i.e., Pacific Seafood. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Pacific Seafood entities and their agents all affirmatively and collectively represent themselves as one corporate family, rather than separate subsidiaries and parents.

54.     Various persons, businesses, or fictitious persons not named as Defendants herein may have participated as co-conspirators in the scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as defendants at a later date.

## CLASS ALLEGATIONS

55.     Plaintiff brings this action on behalf of himself and as representative of crabbers under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) (the "Sherman Act Class") defined as follows:

> Commercial crabbers who, during the 4 years before the filing of the complaint to the resolution of this action (the "Class Period"), sold ex vessel Dungeness crab they caught off the coast of, or landed in, California, Oregon, and/or Washington seeking damages and injunctive relief for violations of § 2 of the Sherman Act.

56.     Plaintiff Little brings this action on behalf of himself and as a representative of a class of crabbers under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) (the "California Class") defined as follows:

> Commercial crabbers who, during the 4 years before the filing of the complaint to the resolution of this action (the "Class Period"), sold ex vessel Dungeness crab they caught off the coast of, and/or landed in, California seeking damages and injunctive relief for violations of California state law.

57.     Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; Defendants' attorneys in this case, federal

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

government entities and instrumentalities, states or their subdivisions, and all judges and jurors assigned to this case.

58. The members of the Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims.

59. Plaintiff's claims are typical of the members of the Classes. Plaintiff and all members of the Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived the members of the Classes of the benefits of competition that would have raised ex vessel prices for Dungeness crab and increased the amount of time for which Class members were able to gainfully fish for Dungeness crab. Although the precise number of such individuals is unknown to Plaintiff, Plaintiff believes that the number of Class members is, at minimum, in the thousands, and that the members reside or are located throughout Oregon and California, including in this District.

60. Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiff are aligned with, and not antagonistic to, those of the other Class members.

61. Common questions of law and fact exist as to all members of the Sherman Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the members of the Class, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether the Pacific NW Area wholesale-input market for Dungeness crab is the appropriate relevant market for analyzing the claims in this case;

b. Whether Defendants possess monopoly power in the relevant market;

c. Whether Defendants willfully acquired, maintained, and/or enhanced monopoly power in the relevant market;

d. Whether Defendants engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the relevant market and thereby foreclosed substantial competition in that market;

1          e.          Whether Defendants' anticompetitive activities maintained or enhanced

2   Pacific Seafood's monopoly power in the relevant market;

3          f.          Whether Defendants' activities had anticompetitive effects in the relevant

4   market;

5          g.          Whether Defendants' actions alleged herein caused injury to Plaintiff and

6   the Class members by causing them to receive artificially suppressed prices in the relevant market

7   during the Class Period;

8          h.          The appropriate measure of damages; and

9          i.          The propriety of declaratory and injunctive relief.

10          62.          Common questions of law and fact exist as to all members of the California Class.

11   Defendants' anticompetitive activities commonly implicated and were generally applicable to all

12   the Class members, thereby making class-wide adjudication and relief appropriate. Such questions

13   of law and fact common to the Class include, but are not limited to:

14          a.          Whether Defendants have illegally combined with other Dungeness crab

15   buyers to fix and suppress the ex vessel price for Dungeness crab in California and to control when

16   the season for Dungeness crab opens in violation of the California Cartwright Act.

17          b.          Whether Defendants coerced other Dungeness crab buyers to combine in this

18   way.

19          c.          Whether the means employed by Defendants to coerce that combination

20   included the illegal monopsonization of the Pacific NW Area Dungeness crab wholesale-input

21   market;

22          d.          Whether the means employed by Defendants to coerce that combination

23   included punishing buyers who diverge from Defendants' ex vessel pricing dictates, including by

24   (i) selling large quantities of Dungeness in the geographic area served by the non-compliant

25   buyer(s) at prices at or below what those buyers paid for the crab ex vessel, causing those buyers

26   enormous financial losses (dumping), (ii) refusing to purchase from non-compliant buyers

27   Dungeness crab that those buyers were not able to sell to restaurants, retailers, or similar customers

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

(refusal to deal, buy-side), and (iii) refusing to sell to non-compliant buyers other fish and fish products for which Pacific Seafood is the only practicable source (refusal to deal, sell-side).

e.      Whether the means employed by Defendants to coerce that combination included implicitly and explicitly threatening non-compliant buyers with these types of retaliation in order to gain their pricing obedience.

f.      Whether the means employed by Defendants to coerce that combination included misrepresenting the ex vessel Dungeness crab price paid by them, stating one price publicly to set the market but paying another price privately.

g.      Whether Defendants have illegally combined with crabbers to fix the ex vessel price for Dungeness crab in California to control when the season for Dungeness crab opens in violation of the California Cartwright Act.

h.      Whether Defendants coerced other crabbers to combine in this way.

i.      Whether the means employed by Defendants to coerce that combination included coercive tying arrangements that require that any fisher who sell them one type of fish, sell them all types of fishes caught by the fisher;

j.      Whether the means employed by Defendants to coerce that combination included initiation of group boycotts by Defendants and other buyers of non-compliant crabbers;

k.      Whether the means employed by Defendants to coerce that combination included threats of such group boycotts of non-compliant crabbers.

l.      Whether another element of the illegal combination with crabbers included falsification of the actual ex vessel price paid to crabbers by Defendants.

m.      Whether a purpose and effect of this illegal combination with Dungeness crabbers are to control a substantial portion of crabbers in fishery-wide price negotiations, who will accept and lobby others to accept Defendants' dictated prices and will even break fishery-wide price strikes.

n.      Whether a secondary purpose and effect of this illegal combination are to provide Defendants with a substantial ex vessel supply of Dungeness crab that it can use via dumping to punish non-compliant buyers.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

o.    Whether the foregoing and other conduct by Defendants violates the California Cartwright Act, the California Unfair Practices Act, and/or the California Unfair Competition Law.

p.    Whether Defendants' actions alleged herein caused injury to Plaintiff Little and the Class members by causing them to receive artificially suppressed prices in the relevant market during the Class Period;

q.    The appropriate measure of damages; and

r.    The propriety of declaratory and injunctive relief.

63.    Plaintiff is more than an adequate representative of the Classes, and his chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiff has the incentive, and is committed, to prosecuting this action for the benefit of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes. Plaintiff has retained counsel highly experienced in antitrust and class action litigation.

64.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action.

65.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

66.    Defendants' anticompetitive and unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate trade and commerce in the United States by:

a.    catching, buying, and processing Dungeness crab in the Pacific NW Area; and

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

b.       selling live and processed Dungeness crab to locations throughout the United States.

67.     The Challenged Conduct alleged herein affected approximately 1 billion dollars of commerce during the relevant period. During the Class Period, Pacific Seafood controlled, at the very least, over 50% of the wholesale-input market for Dungeness crab in the Pacific NW Area. Plaintiff and the proposed Class members collectively lost millions of dollars as a result of Defendants' anticompetitive activities. Defendants have inflicted antitrust injury by foreclosing competition by actual and potential rivals, artificially suppressing prices paid to Plaintiff and the Class members, all of whom have been engaged in commerce in the relevant market within the Class Period, and causing consumers to receive a product of inferior quality as a result of Defendants' anticompetitive and monopolistic behavior.

## FACTUAL ALLEGATIONS

### I.      Background

#### A.      Harvesting Dungeness Crab and the Dungeness Crab Market

68.     Dungeness crab is a species of shellfish that is found only in the eastern North Pacific Ocean. Dungeness crabs are prized for their size and sweet meat and are traditionally enjoyed fresh all along the West Coast, especially around the holidays (Thanksgiving and Christmas, in particular) when demand is highest and which traditionally corresponds with the opening of the seasons in the Pacific NW Area.

69.     Commercial Dungeness crab fishing requires a permit (in California, technically a "registration"), which is tied to a specific vessel and allows crabbers to have a certain number of traps on that vessel. Rather than being organized by quotas that limit the total amount a crabber can catch, the Dungeness crab fishery is what is known as a "derby" fishery: crabbers are entitled to use the maximum number of crab traps allowed by their vessel permit to catch as many Dungeness crabs as possible during the season.[3] Because the total amount of Dungeness crab available to catch is limited and decreases throughout the season, this arrangement incentivizes crabbers to go out as

_____

[3] Overfishing of the species has been successfully managed since the 1980s by limiting commercial crabbers to only male crabs.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

soon as the season opens, when there is also the highest volume of Dungeness crab. Missing the early days of a given season can therefore have serious ramifications on a crabber's bottom line for that season.

70.    The Dungeness crab season for most of the Pacific NW Areas opens on December 1, unless delayed. However, in California's District 10 (aka Central California), the season starts on November 15, unless delayed.

71.    The November 15 opening date in Central California has meant that fresh Dungeness crab has long been available and has been a highly desirable product for Thanksgiving and Christmas, as well as for New Year's and Chinese New Year's. Dungeness crab has therefore become a staple on these holidays, and demand for fresh Dungeness crab is at its highest in November and December. This synergy means that consumer demand for fresh Dungeness crab has traditionally peaked at the same time as supply.

72.    The Dungeness crab season for all regions in the Pacific NW Area has historically closed in the summer or very early fall, though by this time, the crab stock (the "biomass" of crabs available to catch) is a small fraction of what it is when the season opens.

73.    With the exception of Defendants, crab buyers purchase most of their crab live, directly from fishermen "ex vessel" (i.e., off the boat) and then resell live crab or fresh cooked (if they have the capacity) crab to restaurants, retailers, and similar buyers. Buyers contract, in advance of the season, to purchase all of the Dungeness crabs that a crabber catches during the season, and seek to do so with a sufficient number of crabbers that, even in a bad season, they will have an adequate supply of fresh Dungeness crab to satisfy their accounts at the time of peak demand.

74.    However, this arrangement frequently means that seafood buyers ultimately purchase more Dungeness crab than they can sell live or fresh cooked (if they have that capacity), especially at the opening of the season. This is because for various reasons—including the derby nature of the fishery and the nature of the resource, itself—a huge portion of the total amount of crab caught in a season is caught in the first few weeks of the opener.

75.    When Dungeness crabs cannot be sold live, the crabs must be cooked and processed, after which they can be sold immediately, frozen, or canned. If the crabs die before they are cooked,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

they must be discarded. And once they are cooked, crabs must be sold, frozen, or canned within a limited timeframe to avoid spoilage. Because, other than Defendants, no significant buyer has the facilities necessary to process and freeze or can crab, buyers who end up with more live crab than they can sell have a limited window in which they can sell their crab to a company that can cook, process, and freeze or can the crab before it loses its value.

76.     A limited and shrinking number of companies can cook, process, and freeze or can Dungeness crab. Pacific Seafood is essentially the only company on the West Coast that can purchase a significant amount of Dungeness crab when buyers are unable to sell it live, and thereafter cook, process, and freeze or can it. This has made Pacific Seafood far and away the largest seller of frozen Dungeness crab in the United States.

77.     While freezing crab prevents spoilage, in terms of taste and texture, frozen Dungeness crab is an inferior product compared with fresh Dungeness crab. When given the choice consumers strongly prefer live or fresh Dungeness crab to frozen or canned.

78.     Pursuant to provisions of state law crabbers are allowed to collectively agree, through their port associations, to a minimum price that each crabber must receive for his first load from his or her buyer; and crabbers will strike (collectively refuse to fish) if one of the crabbers in the association is not being offered a price at that or above that price. Or, as it is put in the industry, crabbers will collectively refuse to "untie," until all of their members "have a market."

79.     During the years prior to Defendants' manipulation of the market, this resulted in a number of separate negotiations between crabbers and their buyers, which would generally yield different first load price commitments from different buyers to different crabbers set according to the particular market forces at play in that relationship. The crabbers just collectively agreed in advance that no one would untie until everyone had a market, ensuring that no crabber was forced to go out and fish—because others were already fishing and the derby had begun—without the commitment of a buyer to purchase his or her first load at the minimum price.[4]

---

[4] The price agreed between crabbers and their buyers was generally honored by both only for the first load.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

80.     While this arrangement served to protect individual crabbers—who, for example, if only offered a price by their buyer below the minimum price might be connected by their fellow crabbers to a buyer offering above the minimum—more importantly, this arrangement prevented the buyers from strong-arming the entire fleet into accepting a lowball price by picking off a crabber or two willing to go out at a low price, thereby effectively forcing the entire fleet to go out before individual price negotiations had been completed.

81.     Pacific Seafood has corrupted this process by coercing other buyers into not offering a price any higher than what Pacific Seafood dictates will be the ex vessel price. Thus, if crabbers seek to negotiate a price with their buyers before Pacific Seafood has indicated its price, they are now met with explicit refusals to negotiate until Pacific Seafood has stated a price. And whereas, before, buyers paid crabbers a diversity of prices based on their needs and the market, now buyers for the most part only offer a price at or around that which Pacific Seafood has dictated. And, once one set of crabbers in a port in the Pacific NW Area accepts Pacific Seafood's dictated price, that becomes the price for the entire market for an extended period.

82.     Pacific Seafood, further, utilizes its control over other buyers to delay the opening of Dungeness crab season by either refusing to state a price at all or stating a price that it knows is too low to be accepted by crabbers. Because other buyers will not cross Pacific Seafood with regards to ex vessel Dungeness crab prices, this has the effect (and apparent purpose) of delaying the opening of the season until either the crabbers break—either honestly or as a result of Pacific Seafood's manipulation—or Pacific Seafood relents. It almost always is the former, rather than the latter.

83.     The delay reduces or eliminates the availability of reasonably priced live crab during the period of peak consumer demand, which benefits Pacific Seafood in two ways. First, it eliminates competition during this period of peak demand that its frozen crab would otherwise have from superior live crab, allowing Pacific Seafood to sell more of such frozen crab and at higher prices. Second, it helps Pacific Seafood keep ex vessel Dungeness crab prices at the artificially low price it has dictated by ensuring that crab won't be landed when consumer demand is high, allowing it to artificially create a buy low sell high situation that benefits only it.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

B.    **Pacific Seafood's Concerted and Successful Effort to Dominate Seafood Processing and Distribution on the West Coast**

84.    Pacific Seafood was started in 1941 by the grandfather of Frank Dulcich, who ultimately owns and controls all of the named Defendants.

85.    Pacific Seafood refuses to participate in industry rankings that have traditionally been conducted by fishing industry publications, such as SeafoodSource, or to publicly provide information regarding its sales. However, in 2012, it was identified by the business journal of Portland, OR, as the nation's largest seafood company with revenues of more than $1 billion that year.

86.    Since 2012, Pacific Seafood has only grown larger, engaging in an aggressive acquisition strategy that has included—in addition to the former Dungeness crab processing companies discussed below—acquisitions of, and substantial investments in by Pacific Seafood entities or Mr. Dulcich, of large former competitors, such as Ocean Gold and American Seafood, as well as smaller companies, such as Keltic Seafood, with an apparent focus on seafood processors.

87.    Thus, while the same article from 2012 cited above describes Pacific Seafood as employing 2,500 people at 7 locations, Pacific Seafood's website now describes it as employing 3,000 people at 41 locations.  And the same Portland business journal reported that, in 2021, Pacific Seafood "enjoyed record profits."

88.    On its website, Pacific Seafood touts the resulting breadth of its footprint in the seafood industry—listing more than 40 species sold by it—and its vertical integration, saying that "Pacific Seafood manages all parts of the supply chain from harvesting/fishing to processing, and distribution."

89.    Since acquiring Pacific Seafood from his family in 1994—in a transaction that resulted in his mother successfully suing him for failing to pay her the money promised in the transaction and lawsuits by other family members alleging fraud and other financial misconduct—Mr. Dulcich and Pacific Seafood have become known throughout the industry for brazen and ruthless anticompetitive tactics.

90.     And Mr. Dulcich has been clear for years about his ambitions and his methods. Mr. Dulcich instructed his managers to "use and abuse" rival companies and "kill our allies last." He has also been clear about his willingness to use unfair and illegal practices to achieve his aims. When a crabber complained to Dulcich about Pacific Seafood's cheating on the agreed-upon price for Dungeness crab, Dulcich responded "I'm going to fuck you on the price or fuck you on the weight, which one do you want?"

91.     This attitude has resulted in repeated litigation by fishers and competing fish processors against Pacific Seafood, including one, *Whaley v. Pac. Seafood Grp*., No. 1:10-CV-3057-MC (D. Or.), in which—following certification of a litigation class—the class's Sherman Act (§§ 1 & 2) were resolved, in 2012, through a settlement that required take certain actions and refrain from others for a period of five years.

92.     It has also resulted in successful criminal prosecutions of Pacific Seafood for both environmental crimes and theft from fishers, as well as thousands of cited regulatory violations.

93.     Despite these legal troubles, Pacific Seafood's dominance of the fishing industry has only increased, with this increasing dominance—in other markets and in the control of other aspects of the production chain—playing an integral role in Pacific Seafood's ability to extend its dominance into further areas…including, in the last five years, the Dungeness crab wholesale-input market.

94.     Most fishers need to maintain a portfolio of fisheries in order to make commercial fishing a viable livelihood. As a result, they often need to work with Pacific Seafood in various fisheries, in some of which Pacific Seafood is the only significant wholesale buyer. Because of this, fishers cannot afford to cross this behemoth.

95.     Pacific Seafood knows this and uses it to its advantage to suppress competition and manipulate markets to its advantage through various means, including through explicit tying arrangements with fishers.

96.     Pacific Seafood explicitly requires that when a fisher sells it one type of fish, they commit to selling it all types of fish they catch. Indeed, when Plaintiff Little was "acquired" by Pacific Seafood in its acquisition of Pezzolo Seafood, Pacific Seafood explicitly granted Little a

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

"special exception" to their standard tying requirement, allowing him to sell Dungeness crabs to them and other fishes to others. And because Pacific Seafood is practically the only buyer for certain types of fish, fishers who harvest those types of fish are effectively required to fish exclusively for Pacific Seafood.

97.    Pacific Seafood's control of other aspects of the production chain—such as processing and freezing—as well as distribution and sales situate the company at a strategic bottleneck in the industry that makes its competitors, in one area, heavily dependent on Pacific Seafood, in other areas. This gives Pacific Seafood such enormous leverage over those competitors that they are competitors with Pacific Seafood only nominally.

98.    Approximately fifteen years ago, an expose on Frank Dulcich and Pacific Seafood catalyzed by Pacific Seafood's effort to have a large portion of groundfish quotas issued directly to it, as opposed to fishers, was published in the Cascadia Times. In the expose, the executive director of the Coos Bay Trawler Association summed up the situation with regards to groundfish using words that are eerily familiar to Plaintiff, putative class members, and others involved in the Dungeness crab wholesale-input market:

> He said Pacific Seafood, which buys the vast majority of groundfish, "controls the market. No one comes out with a price until Frank (Dulcich, owner of Pacific Seafood) says what the price is." And yet, he adds, "We can't be in this business without him. If we stop selling to him we would have no other place to sell our fish."

**C.    Pacific Seafood Has Engaged in a Scheme to Obtain, Maintain, and Exert Monopoly Power in the Live Dungeness Crab Wholesale-Input Market, Including Through Coerced Combinations with Other Buyers and with Crabbers**

99.    In the successful antitrust action by fishers described above, the Plaintiff dismissed their claims against Pacific Seafood with regards to the "processed Dungeness crab market" because of their determination that Pacific Seafood did not have sufficient market share.

100.    Almost as though Pacific Seafood took that as a slight, it has since then engaged in a concerted and successful scheme to dominate and control the Dungeness crab wholesale-input market; and it has done so, not through skill, innovation, or good fortune. Instead, it obtained this advantage through a series of illegal and unfair anti-competitive activities.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

101.    The Dungeness crab wholesale-input market can roughly be divided into two parts based on how and when the crab is ultimately consumed. One part of the market goes to supply restaurants, retailers, and similar customers who sell the crabs to consumers who buy the crabs live or freshly cooked (i.e. crabs that were recently live), consuming them within a matter of days after they have been landed. The other part of the market goes to processors, who cook the crab and then either freeze or can it, ultimately delivering to consumers (or restaurant or retail intermediaries) a preserved product that may not have been alive for months.

102.    Through a series of acquisitions and other concerted actions, Pacific Seafood, directly and through entities controlled by it or Mr. Dulich, now owns or controls substantially all of the Dungeness crab processing capacity in the Pacific NW Area and, in particular, and have vastly more freezer space than any other crab processer in the Pacific NW Area. This has made Pacific Seafood by far the single largest processor and purveyor of frozen Dungeness crab in the Pacific NW Area and generally.

103.    It has also made other Dungeness crab buyers heavily dependent on and vulnerable to Pacific Seafood and created a huge incentive for Pacific Seafood to delay the opening of the Dungeness crab season, until after the holiday peak demand has subsided.

104.    As previously discussed, approximately 80% of the total amount of crab landed in a fishery will be landed in the first few weeks, which, in combination with other factors, results in most buyers having a significant oversupply of crab during this period. And Pacific Seafood, as a result of its concerted strategy to dominate Dungeness crab processing in the Pacific NW Area is effectively the only available buyer for that crab.

105.    As a result of those purchases, as well as the supply that it purchases directly from crabbers or which it acquires from its own fleet, Pacific Seafood ultimately takes possession of, at the very least, over 50% of all the Dungeness crab landed in the Pacific NW Area.

106.    This, together with its dominance in other markets and its well-known willingness to punish other buyers who cross its pricing dictates, means that Pacific Seafood has the ability to unilaterally set the price that is paid for ex vessel Dungeness crab, artificially raising its profits by artificially lowering the price of its inputs. Pacific Seafood also prevents other buyers from

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

offering a price altogether at the beginning of the season, when demand is highest, essentially putting the market on hold at its whim so that Pacific Seafood can sell the frozen Dungeness crab it has in its freezers without having to compete with fresh crab. This tactic further benefits Pacific Seafood by preventing a higher ex vessel price from being set in portions of the Pacific NW Area that open earlier than others, which could then otherwise form a basis for price "negotiations" there.

107.    Thus, for example, at the start of the 2020/21 season, despite extremely high retail demand from consumers who were stuck at home and eager to purchase live crab to cook at home, Pacific Seafood blocked the season from opening until after the holiday season of peak demand by only offering an ex vessel price intentionally lower than what it knew crabbers would accept. Not coincidentally, because of restaurant closures, Pacific Seafood had, at the time, an oversupply of frozen crab from the 2019/20 season…at least at the start of the holiday season, but did a brisk retail business while it had crabbers tied up at port, rather than harvesting and delivering superior fresh live crab.

108.    Other buyers, despite having no similar ability to gain from the delay in this way and who, in fact, could have earned substantial profits if they offered an ex vessel price high enough to induce their boats to go out, given the high level of consumer demand, sat on the sidelines and let Pacific Seafood dictate the price, terrified of what would happen if they did not comply.

109.    At the start of the 2022/23 season, Pacific Seafood took a slightly different tack. Prior to the opening of the season, instead of stating a low-ball ex vessel price, it refused to state one at all, falsely claiming that there was no demand for live or fresh cooked crab. That was demonstrably false; consumers were clamoring for live and fresh cooked crab. Indeed, at the same time, Pacific Seafood was claiming that demand for crab was so low that it could not even offer an ex vessel price, Pacific Seafood, itself, was buying Dungeness crab from the small Puget Sound fishery—which because of tribal involvement and other factors has so far escaped Pacific Seafood's control—for $12/lb. ex vessel and selling it wholesale for $14/lb.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

110.    Nonetheless, despite this high consumer demand and the significant profits that they could earn if they had live or fresh cooked crab to sell, the other buyers also refused to offer a price to their boats, explicitly stating that they could not offer a price until Pacific Seafood offered one.

111.    Ultimately, crabbers in District 10 took the extraordinary step of going out without a price commitment from their buyers, what is referred to in the industry as going out with an "open ticket." This was done in the face of the strenuous objections of Pacific Seafood's manager in charge of the region, who, in a final passive-aggressive attempt to stem the tide of revolt, indicated to Pacific Seafood's contracted boat captains, including Little, that if they went out, Pacific Seafood would "try to help them out" by giving them $1/lb.

112.    Once the crabbers were out on the water, buyers other than Pacific Seafood began offering prices ranging from approximately $3.50 to $5.00/lb. Pacific Seafood, clearly upset that its gambit had at least temporarily failed, publicly stated that it was paying $2.25/lb. (the ex vessel price that crabbers knew Pacific Seafood was angling to establish for the entire Pacific NW Area), and that it was getting lots of takers at that price. In fact, Pacific Seafood, while officially paying its boats $2.25/lbs. (i.e. putting that price on official fish tickets), was actually paying them more.

113.    This brief respite from Pacific Seafood's market manipulation did not last long, however. Crabbers in ports north of Bodega Bay in the Pacific NW Area did not follow the lead of their District 10 colleagues. Rather, they remained tied up while Pacific Seafood, having moved from offering no price,[5] stated $2.25/lb. was the maximum they'd pay; and no other buyers broke rank. Finally, Pacific Seafood offered to pay $3.00/lb for the first 400,000 lbs. to crabbers in the port of Newport, OR, and its boats under contract agreed to accept the deal. After the first 400,000 lbs. were landed, which quickly happened, the price dropped to $2.25/lb. previously dictated by Pacific Seafood.

---

[5] Indeed, for many weeks Pacific Seafood's representative in Eureka, CA, Joe Cincotta, refused to even meet with crabbers to discuss pricing.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

114.    This quickly collapsed the ex vessel price throughout the Pacific NW Area, and Pacific Seafood made sure that buyers in Central California who had not complied with its "no price" and then later "$2.25/lb" dictates were punished for their lack of compliance. Soon after the rest of the Pacific NW Area opened, Pacific Seafood flooded central California and southern California with cheap crab.

115.    This included at least six truckloads, approximately 200,000 lbs. of fresh whole cooked crab from points north, which Pacific Choice dumped in the central California region at a price of $3.99 to $4.50/lb. That price, when the substantial weight loss associated with cooking, the cost of cooking, and the cost of shipping are factored in, is substantially below cost if the ex vessel price is $2.50/lb.

116.    Pacific Seafood similarly dumped live crab in China for $4.50 FOB, which is below cost.

117.    Buyers who had not complied with Pacific Seafood's ex vessel price dictates were pummeled. Having committed to purchasing crab from crabbers at ex vessel prices now higher than the wholesale price that Pacific Seafood was offering to retail, restaurant, and similar customers, those buyers were forced to either renege on those commitments—thereby jeopardizing their ongoing ability to conduct business, as a buyer who has reneged on a price commitment will have a hard time recruiting boats going forward—or selling at a loss. Thus, most sold at a loss. This includes one buyer, who had previously offered crabbers an ex vessel price of $5/lb. and was forced to truck 100,000 lbs. of live crab from San Francisco to Crescent City, just to sell the crab for $2.25 to . . . Pacific Seafood.

1. **Pacific Seafood Has Absorbed and Shut Down All Competition in the Dungeness Crab Processing Space, Positioning Itself as the Dominant Dungeness Crab Processor and the Dominant Purveyor of Frozen Dungeness Crab**

118.    Integral to Pacific Seafood's successful scheme to dominate, control, and monopsonize the Pacific NW Area's Dungeness crab wholesale-input market has been making itself the only significant crab processor in the Pacific NW Area.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

119.    Through a series of aggressive acquisitions, Pacific Seafood has ensured that it is the only company with significant Dungeness crab processing and freezing capacity in the Pacific NW Area.

120.    Pacific Seafood has been in the process of taking over this portion of the Pacific NW Area's Dungeness crab wholesale-input market for approximately 40 years, through a series of acquisitions of crab processing companies and/or their physical processing plant assets.

121.    Its first acquisition was of Pacific Coast Seafood, in 1983, which operated a crab processing plant in Warrenton, Oregon.

122.    This was followed by its acquisition of Pacific Choice Seafood, in 1986, which operated a crab processing plant in Eureka, CA.

123.    This was followed by its acquisition of Pacific Choice Seafood, in 1990, which operated a crab processing plant in Charleston, OR.

124.    Thereafter, Pacific Seafood acquired Washington Crab Processors, in 1993, which operated a crab processing plant in Westport, WA.

125.    Then, in 2001, Pacific Seafood acquired the processing and distribution assets of Eureka Fisheries processing assets. Eureka Fisheries, operated processing plants from Fort Bragg, CA to Neah Bay, WA, as well as important refrigeration plants, and other facilities in various locations, including Bodega Bay and the East Bay, in 2001. Eureka Fisheries provided Dungeness crab processing, as well as a range of other services, to fish buyers in facilities throughout the Pacific NW Area.

126.    This was followed by a series of further acquisitions of erstwhile processing competitors in the 2010s and 2020s.

127.    In the mid to late 2010s, as a result of a series of transactions Pacific Seafood took a controlling interest in Ocean Gold, resulting importantly in its control of Ocean Gold's large processing facility, the largest on the west coast, and freezing plant in Westport, WA, which has the capacity to store 20-25 million pounds of product at any given time.

128.    Then, in 2018, Pacific Seafood purchased North Coast Fisheries, a company formerly operating in Santa Rosa, California, which had substantial Dungeness crab processing

capacity and would frequently purchase crab from other buyers that it would then process and freeze. Rather than continue to operate the business or incorporate the facilities into its own business, however, Pacific Seafood shut down North Coast's processing facilities and routed all of North Coast's former accounts through Pacific Seafood's other processing facilities.

129.    Subsequently, in 2022, Pacific Seafood purchased Pezzolo's Seafood, one of the last remaining seafood processors that could handle Dungeness crab and had any appreciable freezer capacity in San Francisco. Pezzolo Seafood, moreover, had the only significant processing capacity (i.e., cooking) in Central California and would engage in contract processing for other buyers and crabbers who, like Brand, also sell direct to consumer. This cooking capacity for permitting and other reasons is very difficult for another company to establish. When Pacific Seafood acquired Pezzolo Seafood, it did not shut down its processing capacity, but it ceased to provide contract processing to other buyers.

130.    Not only have these efforts allowed Pacific Seafood to control the vast majority of the business in frozen Dungeness crab, it also creates a strategic chokepoint that Pacific Seafood can use to manipulate the Dungeness crab market.

131.    The Dungeness crab market typically creates a situation in which buyers end up with an oversupply of live crab at the beginning of the season when there is peak supply. Pacific Seafood's control over the processing and freezing portion of the supply chain gives the company substantial leverage over other buyers, who now depend on Pacific Seafood to purchase their excess Dungeness crab. If these buyers cannot sell their excess crab to someone who can process and freeze it when the seafood buyers are unable to sell it fresh, the entire system by which they purchase crab ex vessel—i.e., the agreements to purchase all of the crabs from a given crabber in order to ensure they have adequate supply—falls apart, because buyers could end up taking a substantial loss if their crabs die before they are able to sell them. Thus, Pacific Seafood is necessary for seafood buyers who purchase Dungeness crab, because without their services seafood buyers could suffer tremendous losses.

132.    This has resulted in explicit and non-explicit arrangements with other buyers under which these buyers understand that if they comply with Pacific Seafood's dictated ex vessel price,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Pacific Seafood will purchase crab from them at approximately $.15-$.25 per pound above the ex vessel price it dictates for the market. Indeed, many buyers sell most or all of the crab that they purchase ex vessel to Pacific Seafood according to such an arrangement.

133.    Pacific Seafood, furthermore,  is well known in the industry to punish non-compliant buyers by refusing to purchase from them at all. Pacific Seafood uses this chokepoint strategically to coerce other seafood buyers into using the ex vessel price that Pacific Seafood sets for Dungeness crab, rather than a higher one, and sometimes to prevent other buyers from offering a price at all until Pacific Seafood is ready to do so. The company does this through retaliation. If another seafood buyer uses a higher price for crab than the one that Pacific Seafood offers, or offers a price before Pacific Seafood does, Pacific Seafood retaliates against it in the future by failing to "pick up the phone" when the buyer has more crab than he or she can sell to his or her non-processor accounts; and because there are effectively no processors other than Pacific Seafood available to purchase the product and Pacific Seafood has eliminated most "white label" or contract processing in the Pacific NW Area, a refusal by Pacific Seafood to purchase the crab a buyer cannot sell to his or her non-processor accounts results in the spoilage of unsold crab, which can result in hundreds of thousands of dollars of losses to the buyer. Losses of this scale cannot be absorbed by many buyers.

134.    For example, this season, Pacific Seafood refused to purchase 1.3 million pounds of crab from a buyer, not because it didn't want the crabs, but rather to punish the buyer for having diverged from it on pricing the previous season.

135.    Pacific Seafood, moreover, as discussed herein, punishes non-compliant buyers by dumping cheap crab in the geographic areas served by buyers—including at prices below cost—which drives down the price that these buyers can get from their non-processor accounts, including to levels at or below what the buyer paid ex vessel.

136.    Thus, this means that non-Pacific Seafood buyers have two choices: they can follow Pacific Seafood's pricing dictates or run the risk of potentially business-crushing losses resulting from crab they can't sell or can only sell at a loss. Risks that Pacific Seafood both implicitly and explicitly communicates to other buyers. For example, after the opening of the

central California season, Pacific Seafood's regional manager Joe Cincotta paid a visit to another local buyer who, at the time was paying his boats $3.00/lb., and pointedly told him Pacific Seafood was only charging $2.25; the buyer got the message and lowered the price he was offering as well. And the previously described decision by another buyer to withdraw his offer of $5/lb. because it became too well known is highly suggestive that he received a similar communication from Pacific Seafood.

137.     Thus, all but a handful of the very smallest buyers have chosen the option of compliance with Pacific Seafood, with many of the mid-sized buyers no longer operating with any true independence from Pacific Seafood with regards to Dungeness crab purchasing.

138.     Because Dungeness crab is a manufacturing input for Pacific Seafood, it is clearly advantageous for the company to pay a lower price for ex vessel Dungeness crab. But Pacific Seafood's position as the leading purveyor of frozen crab means that it also benefits from delaying the Dungeness crab season in certain cases.

139.     The preferred product at the time of peak demand (around the holidays) is live or fresh cooked crab. Around this time, however, Pacific Seafood often has remaining stock of frozen Dungeness crab from the season prior. And because consumers prefer live or fresh cooked crab instead of frozen if they are given the choice (and accordingly retailers, restaurants, and the like have the same preference), Pacific Seafood prefers that the two products are not in active competition during the peak demand. Thus, as with the 2020/21 and 2022/2023 seasons Pacific Seafood will delay giving a price for as long as possible or give a price so low that it knows crabbers won't unite, so that the season does not open and more people will be forced to either buy its frozen product or buy very expensive crab from Puget Sound or British Columbia (often still supplied by Pacific Seafood) during the holidays, rather than having the choice to go with reasonably priced fresh local crab.

140.     Buyers know the risks of crossing Pacific Seafood, and defections are accordingly rare. They may also be done in a way that seeks to avoid Pacific Seafood's notice. At the beginning of the 2022/2023 Dungeness crab season, when the season had opened but before Pacific Seafood had set a price, one very significant buyer in the San Francisco Bay Area—

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

reflecting the significant demand he had from his predominantly Asian restaurant and retail customers in the runup to the Chinese New Year—made a surreptitious offer of $5/lb. for Dungeness crab ex vessel, *on the condition that it was kept secret*. Over the course of the day, however, the buyer reversed course and withdrew his offer, claiming it was because people had been too public about it. And another buyer when asked publicly what his ex vessel price was stated it was $2.50/lb., but privately offered $5.00.

141.    Absent the market manipulation alleged herein, buyers are in competition with each other for available crab, and while buyers traditionally will commit to purchasing crab from certain boats at a certain price in the hope of attaining that boat's supply and loyalty, boats are not obligated to only sell to such buyers. Rather, they can and would sell to the buyer offering the best price. Thus, absent the market manipulation alleged herein, if a buyer had sell-side demand that justified offering a higher price, economic logic would demand that he or she widely publicize his or her offer to pay a higher price and thus lure more boats to sell to it. The fact that, instead, buyers feel the need to keep offers of such higher ex vessel prices secret is telling evidence of Pacific Seafood's corrupting influence.

142.    Top among the reason why other buyers would want to keep secret their non-compliance with Pacific Seafood's dictates is the fear that Pacific Seafood, if it finds out, will punish them by refusing to purchase any of their crab not sold to their restaurant, retailers, or similar customers and/or punish them by dumping cheap crab into the geographic area served by them.

143.    Pacific Seafood has the ability to dump crab in this manner to punish non-compliant buyers because of its large captive supply of Dungeness crab, which further, on the front end, provides Pacific Seafood an essential tool in price negotiations.

**2.    Pacific Seafood Uses Tying Arrangements, Group Boycotts, and a Significant In-House Fleet to Create a Captive Supply of Live Crab that It Uses to Manipulate Ex Vessel Prices on the Front End and Punish Non-Compliant Buyers on the Backend via Dumping**

144.    As indicated, Crabbers are not generally bound to sell to any particular buyer. Rather, crabbers are free to sell to whichever buyer offers them the best price or otherwise wins

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

their business. Thus, absent the manipulation alleged herein, buyers compete with each other on price, which consistent with traditional market logic, results in an ex vessel price that tracks consumer demand and other relevant factors.

145.    Pacific Seafood has devised a way around this by (a) forcing ostensibly independent crabbers to only sell crab to it through coercive tying arrangements; (b) using its control over other buyers to blackball crabbers (i.e. group boycotts) who don't fall in line with its pricing dictates; and (c) operating a fleet of large capacity crab boats owned by it, including the associated crabbing permit. To the latter, Pacific Seafood does not need to pay any ex vessel price, but rather only the costs of operation. To the latter, Pacific Seafood is free to dictate what ex vessel price it is willing to pay, without fear of defection.

146.    Pacific Seafood is able to impose tying arrangements in this way because it is the only non de minims buyer in the Pacific NW Area of certain other types of fish that these crabbers also catch, particularly coldwater or pink shrimp. And Pacific Seafood explicitly requires that any fisher who wants to sell it coldwater shrimp exclusively sell it all other fishes harvested by the fisher, including Dungeness crab.

147.    As a result, many of the crabbers that sell Dungeness crab to Pacific Seafood, despite being independent businesses, are in fact beholden to Pacific Seafood because of tying arrangements that the company imposes upon them. As discussed above, the season for Dungeness crab in the Pacific NW Area is only open for certain months of the year. This is the case with many other fisheries, as well. As a result, commercial fishers generally maintain a portfolio of different fisheries in order to allow them to generate income throughout the year. When fishers discuss selling any of their product to Pacific Seafood, they are told that, if they want Pacific Seafood to buy one of their species, they are going to have to sell all of their species to Pacific Seafood. For some fishers—particularly those who harvest coldwater shrimp, a market entirely controlled by Pacific Seafood—the risk of not complying with this requirement can be existential, as there are essentially no other purchasers for this species in the Pacific NW Area. Thus, if a fisher wants to sell his or her cold water shrimp *at all*, they need to agree to sell their Dungeness crab to Pacific Seafood exclusively. This creates a captive market for ex vessel

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Dungeness crab since these fishers in this situation have no choice but to sell their Dungeness Crab to Pacific Seafood, at the price Pacific Seafood dictates if they want to stay in business.

148.   Even those crabbers who are not subject to this type of illegal tying are not able to negotiate freely with Pacific Seafood.

149.   Pacific Seafood very publicly punishes boats that have committed to crab for it but then do not fall in line with its pricing dictates and/or sell to non-compliant buyers at higher prices.  Pacific Seafood punishes these crabbers by blackballing them, refusing to purchase any crab from them, and instructing other companies to do the same.

150.   Plaintiff Little suffered just such a recrimination. After Pacific Seafood purchased Pezzolo's in 2022, Little—who the previous season had sold to Pezzolo—entered into discussions with Pacific Seafood about selling his Dungeness crab to Pacific Seafood in the 2022/2023 season. He was immediately told that, if he wanted to sell his Dungeness crab to Pacific seafood, he would have to sell them his other species, as well. When he refused to sell them his salmon or his black cod, Pacific Seafood grudgingly told him that the company would make an exception for him, and would allow him just to sell them his Dungeness crab.

151.   Shortly thereafter, on December 27, 2022, the day before crabbers were allowed to set their traps, Pacific Seafood held a meeting at which it declined to give a price for Dungeness crab, prompting crabbers to suggest that they would go out on an "open ticket," i.e., without an agreed-upon price. Pacific Seafood's representative at this meeting, broadcasted that it is paying $2.25 per pound, and attempted to dissuade the crabbers from doing so, but told them that he would try to get the crabbers $1/lb. to help them out if the fleet did end up going out. After Little opined that Dulcich and Pacific Seafood should "take their thumb off" the market "and let it play its course," he was told that "our boats don't talk bad about us" and was subsequently blackballed. But Pacific Seafood did not just refuse to deal with Little itself. Pacific Seafood also contacted other seafood buyers and told them not to buy from Little.

152.   In addition to providing it with a ready supply of cheap crab that it can use to punish non-compliant buyers through dumping and the like, this captive supply gives Pacific Seafood a very important tool in both setting and maintaining ex vessel wholesale Dungeness

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

crab prices. During price "negotiations" at the beginning of the season, Pacific Seafood's captive vessels are not actually able to freely negotiate with it. Not only are there rarely other buyers to whom these crabbers could defect for a better price (or threaten to defect as a way of gaining leverage), Pacific Seafood's captive vessels have no such ability, greatly hobbling their ability to really negotiate with Pacific Seafood. And because the ex vessel price that Pacific Seafood sets is the price that other buyers comply with, this means, as a practical matter, that there is no actual negotiation concerning opening prices. Rather, Pacific Seafood states a price and it is either immediately accepted by their boats, forcing the rest of the fleet to go out at that price as well, or they accept it after a delay (that serves Pacific Seafood), again forcing the rest of the fleet to go out at that price as well.

153.   The market effect of this manipulation, however, is not only felt at the beginning of the season when opening prices are set, but also in the form of artificially stabilized ex vessel prices as the season progresses.

154.   Prior to Pacific Seafood's scheme to fix and manipulate ex vessel prices, ex vessel Dungeness crab prices generally rose throughout the season as quantities diminished. As elsewhere discussed, approximately 80% of each fishery's catch is landed during the first couple weeks of the season; thus, as basic market logic would suggest, once that initial supply was exhausted and crab became more scarce, buyers would increase their ex vessel prices in order to compete for and attain the limited inventory that exists.

155.   Pacific Seafood's captive fleet has allowed it to stymie this trend. As its boats are effectively foreclosed from defecting to a competitor offering higher prices, Pacific Seafood can simply continue to pay them what it dictates and use the cheap product attained from them and from Pacific Seafood's own vessels to keep the market price down, so that crab it purchases from other buyers—which represents the majority of the live crab purchased by it—will remain cheap even as supplied dwindle.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

3.   **Pacific Seafood Falsifies Ex Vessel Prices Paid to Its Boats in Order to Perpetuate Its Scheme to Fix and Maintain the Ex Vessel Wholesale Price for Dungeness Crab in the Pacific NW Area**

156.    A further tool that Pacific Seafood uses to fix and maintain the ex vessel wholesale price for Dungeness crab in the Pacific NW Area is by the public falsification of the prices it pays its crabbers.

157.    Pacific Seafood does this by publicly stating that it is paying one ex vessel price to its crabbers—and putting such price on the fish tickets that accompany each purchase from its crabbers—but, in fact, paying them more. These extra payments take several forms, including direct bonuses and giving its crabbers bait and the like for free, for which Pacific Seafood otherwise charges tens of thousands of dollars.

158.    Plaintiff Little received one such "bonus" when he was crabbing for Pacific Seafood. And at the opening of the 2022/23 central California season, while it was broadcasting that it was paying $2.25/lb., it was in fact paying its crabbers approximately $3/lb.

159.    Like the more coercive ways in which Pacific Seafood controls its boats, these under-the-table payments play an important role in its scheme to fix and maintain ex vessel prices. Indeed, these under-the-table payments are the carrot to those sticks.

160.    At the season's opening, if Pacific Seafood's state price is too low to induce its boats to untie, the promise of an additional under-the-table payment can provide the necessary impetus. And given the derby nature of the Dungeness crab fishery, once some boats go out, all boats must go fishing or risk losing all of their income for that season, as other crabbers scoop up the available biomass. Thus, even when these manipulated prices look unreasonable or untenable to crabbers, they have essentially no choice; they can either take the price and get in on the fishery or forego any income from the fishery.

161.    Then, once the season is underway, these under-the-table payments help Pacific Seafood keep ex vessel market prices stable, even as quantities decline, allowing them to broadcast to the market—and most importantly other buyers—that prices are not increasing, when in fact they are.

162.    While it might at first blush appear economically irrational for Pacific Seafood to make these secret under-the-table payments, their logic becomes clear when you recall Pacific Seafood's place in the Pacific NW Dungeness crab wholesale-input market. Given the supply it gets from the vessels it owns (and thus does not purchase for any price) and its overwhelmingly dominant position in Pacific NW Dungeness crab processing, Pacific Seafood purchases substantially more crab from other buyers than it directly purchases ex vessel. Thus, it gains far more economically from the depressed price in the wholesale-input market, as a whole, than it spends in under-the-table payments to its boats.

**4.     Pacific Seafood Maintains, Enhances, and Exerts Its Monopsony Power In the Pacific NW Live Wholesale Dungeness Crab Market Through the Above Described and Other Unfair and Illegal Anticompetitive Tactics**

163.    Pacific Seafood did not obtain its market dominance through skill, innovation, or good fortune. Instead, Pacific Seafood acquired monopoly power in the Pacific NW Dungeness crab wholesale-input market by using a host of tactics designed to harm competition, including those described above, which have the impact of artificially suppressing the prices paid to Dungeness crab fishermen and yielding an inferior product for consumers.

**a.     Acquiring and Limiting Dungeness Crab Processing Capacity and Then Using that Dominance to Coerce Other Buyers in the Market to Comply with Its Ex Vessel Pricing Dictates**

164.     Pacific Seafood has engaged in a concerted strategy of acquiring other competing crab processors in the Pacific NW Ara and then shutting down the facility or eliminating competing buyers' access to it.

165.    A principal purpose and effect of this strategy has been to make other buyers dependent on Pacific Seafood by becoming the only significant purchaser of Dungeness crab not sold to retail, restaurants, or similar customers.

166.    This has given Pacific Seafood dramatic control over other buyers in the Pacific NW Area, which it uses to artificially depress the ex vessel price for Dungeness crab and delay the opening of the Dungeness crab season so as to minimize competition that live and fresh cooked crab would otherwise pose to frozen process crab sold by Pacific Seafood.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

**b.**   **Creating a Captive Supply of Live Crab Through Illegal Means And Using that Captive Supply to Manipulate the Ex Vessel Market Price**

2

3      167.    Pacific Seafood has created a large captive supply of live crab by, in addition to

4    acquiring large capacity boats and their crab permits, forcing crabbers into illegal tying

5    arrangements that force them to sell their crab only to Pacific Seafood and initiating group

6    boycotts of crabbers who are not compliant on price. Pacific Seafood further falsifies the ex

7    vessel price that it pays its boats.

8      168.    These tactics enable Pacific Seafood's manipulation of the ex vessel price for

9    Dungeness crab in the Pacific NW Area Dungeness crab wholesale-input market, both at the

10   opening and as the season progresses; and the captive supply also enables Pacific Seafood to

11   engage in dumping and predatory pricing.

12      169.    The power that this illegally possessed captive supply gives Pacific Seafood, in

13   turn, perpetuates and increases the monopsony power it has in the Pacific NW Area Dungeness

14   crab wholesale-input market.

15

**c.**   **Punishing Non-Compliant Buyers Through Refusals to Deal in Markets that Pacific Seafood Has Dominance and Dumping**

16

17      170.    Pacific Seafood abuses and perpetuates its illegal monopsony power by exercising

its market dominance to punish other buyers who do not comply with its pricing dictates.

18      171.    Such punishment takes forms that include:

19

20      a.      Refusing to purchase, from non-compliant buyers, crab they could not sell

21   to their retail, restaurant, and similar customers, leaving such buyers—because of Pacific

Seafood's dominance of the Pacific NW Area's Dungeness crab processing capacity—without

22   any available channels to sell their product.

23      b.      Refusing to sell non-compliant buyers other seafood products of which

24   Pacific Seafood is the only practicable source.

25      c.      Dumping crab in the region of non-compliant buyers at prices below cost.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

**d.** **Abusing Its Dominance of the Wholesale Live Dungeness Crab Market In Order to Limit Competition to Frozen Processed Crab from Live and Fresh Cooked Crab and Lower the Price of Live Crab as an Input for that Frozen Processed Crab**

172.    A major purpose of Pacific Seafood's monopsonistic scheme is to limit the competition that live and fresh cooked crab poses to frozen processed crab and drive down the cost of live crab as input for that frozen processed crab.

173.    Pacific Seafood, as a result of its dominance of Dungeness crab processing, dominates the market for frozen processed crab. Pacific Seafood abuses its market power to prevent competition that reasonably priced live and fresh cooked crab would otherwise present to frozen processed crab during the time of peak demand. It further abuses its market dominance by artificially depressing the Dungeness crab wholesale-input market price so that it can purchase crab for processing at that price. This allows Pacific Seafood to yield illegal and artificially inflated profits.

**D.    Barriers to Entry**

174.    There are a number of barriers to entry to the Pacific NW Area Dungeness crab wholesale-input market, including many barriers created and reinforced by Pacific Seafood's anticompetitive conduct.

**1.    Natural Barriers to Entry**

175.    Numerous natural barriers exist to any person who wished to participate in the Pacific NW Area's Dungeness Crab wholesale-input market.

176.     In order to participate as a processor, someone would have to overcome numerous barriers. In order to process Dungeness crab, one must acquire or build a plant capable of processing Dungeness crab. Such a plant must have the capability to both cook and freeze many hundreds of thousands of pounds of Dungeness crab and be located close enough to ports where Dungeness crab are landed to make transport of live crab to the facility economically feasible.

177.    Because Pacific Seafood owns or controls all significant Dungeness crab processing facilities in the Pacific NW Area acquisition of an existing facility would require that

Pacific Seafood consent to the acquisition, which is highly unlikely, but if, hypothetically, it did so consent, the likely purchase price would be in the tens of millions of dollars.

178.    Construction of a Dungeness crab processing facility would be as expensive as acquiring one or more, but also highly difficult and very expensive from a permitting and environmental compliance perspective. In particular, processing Dungeness crab results in the creation of a significant amount of wastewater that must be properly disposed of, and such disposal is complicated the closer one is to water.

179.    Operation of a Dungeness crab processing facility is furthermore very expensive, requiring a large amount of energy, water, and seasonal labor inputs.

180.    Even if one did not wish to participate in the market as a processor, there are still very significant natural barriers to entry.

181.    On the equipment side, whether a buyer acts as a processor or deals entirely in live crab, a significant amount of expensive equipment is necessary, including a fleet of refrigerated trucks capable of shipping large amounts of live crab and onshore storage space for live crabs.

182.    And if one wished to purchase Dungeness crab ex vessel one would either need a hoist at port or ports where crab is landed or be able to make arrangements with existing hoists to land crab from boats on your behalf.

183.    There is no practicable way to gain the necessary approvals or entitlements to build a new hoist at most or all of the relevant ports in the Pacific NW Area; thus, one would have to acquire a hoist from an existing owner or negotiate usage rights from such an owner. If any existing owner was willing to sell it would only very likely be for a very high amount given the inherent scarcity in the market, and negotiating usage rights would also likely be very expensive during the periods of high usage when it would be needed.

184.    In addition to these economic barriers, there are also very significant business relationship barriers to entry. In order to secure an ex vessel supply from crabbers, a buyer has to establish relationships and trust with the crabbers; otherwise, crabbers will not place value in any purchase commitment the buyer makes. That sort of relationship and trust cannot be conjured out of thin air but must be built over time.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

185.    The sell side of the Dungeness crab market similarly requires relationships that cannot be conjured out of thin air. Restaurants, retailers, and similar customers will commit to buying from a buyer only if they trust the buyer can deliver high-quality product on time at a good price. Developing that trust takes time.

### 2.    Barriers to Entry Created by Pacific Seafood

186.    In addition to these natural barriers to entry Pacific Seafood and its abusive dominance of the Pacific NW Area's Dungeness crab wholesale-input market create additional barriers to entry.

187.    As indicated, because of the reasonable impracticability of constructing and permitting a new Dungeness crab processing facility in the Pacific NW Area, the only hypothetically practicable way to acquire such a facility is to purchase it from an existing owner. However, Pacific Seafood owns or controls all Dungeness crab processing facilities in the Pacific NW Area of any significance and thus can block any such acquisition by a potential competitor.

188.    Pacific Seafood, furthermore, owns and/or controls dock space on which new a processor could hypothetically relocate. This includes, for example, the municipal fishermen's terminal in Eureka. Though the terminal was constructed by the City of Eureka with the stated purpose of benefiting local fishers by providing space where processing and other value-added services could be performed, Pacific Seafood has taken possession of half the entire space and is using it as storage.

189.    Pacific Seafood's dominance of Dungeness crab processing in the Pacific NW Area also essentially gives it veto power over the entry of a new ex vessel buyer in the Pacific NW Dungeness crab wholesale-input market. Purchasing Dungeness crab ex vessel comes with the risk of purchasing more Dungeness crab than one can sell live. Prior to Pacific Seafood's elimination of other Dungeness crab processors in the Pacific NW Area, a new buyer would have had options from which to select a company with which to work in the event that the buyer needs to sell live crab for processing. But Pacific Seafood occupies the entirety of the sector. Thus, any seafood buyer who wants to deal in Dungeness crab must work with Pacific Seafood; and so if

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   Pacific Seafood does not want to work with a new buyer, that new buyer cannot participate in the

2   market.

3       190.    Furthermore, Pacific Seafood's control is so extensive that a new buyer who

4   attempted to offer a higher ex vessel price to compete with Pacific Seafood may not be able to

5   find anyone who will unload crab in connection with such a transaction. For example, this year a

6   potential new entrant to the market made arrangements to purchase crab at an ex vessel price of

7   $2.45/lb., but was told by the persons controlling the hoists in Crescent City that they would not

8   land crab for any price above the $2.25/lb. dictated by Pacific Seafood.

9   **PLAINTIFF, CLASS MEMBERS, AND CONSUMERS HAVE BEEN HARMED AND
    SUFFERED, AND WILL SUFFER, ANTITRUST INJURY AS A DIRECT AND
10  PROXIMATE RESULT OF DEFENDANTS' UNLAWFUL ACTIONS**

11  **I.    Crabbers Are Paid Artificially Suppressed Prices for Ex Vessel Dungeness Crab**

12      191.    As a result of Defendants' concerted efforts, Plaintiff and Class members have

13  been paid, and will continue to be paid absent the injunctive relief sought herein, an artificially

14  depressed ex vessel price Dungeness crab for at least the last four years. But for the intervention

15  of Defendants in the setting of the price—by coercing other buyers into complying with the

16  company's price dictates; using deceptive methods to falsify the price it pays; forcing fishers to

17  accept tying arrangements that require them to sell to Pacific Seafood; and blackballing fishers

18  who fall out of line; among others—the ex vessel price for Dungeness crab in the Pacific NW

19  Area would have been substantially higher at all times relevant to this action.

20      192.    Additionally, by preventing Plaintiff and Class members from crabbing and from

21  selling their crab at the time of highest demand, Pacific Seafood ensured that the only Dungeness

22  crab that was available to satisfy that demand was the frozen crab it supplies. But for Pacific

23  Seafood's manipulation of the market, the higher demand during the season that Plaintiff and

24  Class members were unable to crab would have resulted in their receipt of a higher per-pound

25  price for ex vessel Dungeness crab.

26      193.    Plaintiff and members of the class have further been harmed as a result of group

27  boycotts and/or illegal tying arrangements that Defendants have initiated or imposed, including

28  without limitation the depressed effect that this has on ex vessel prices paid to them.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**II.     Consumers Receive Lower Quality Product Because of Defendants' Conduct**

194.    A significant purpose and effect of Defendants' conduct is to limit the availability of reasonably priced live and/or fresh cooked crab and drive consumers to purchase and consume frozen processed crab sold by Defendants.

195.    The period of high demand around the holidays traditionally coincides with the most abundant supply of reasonably priced live and fresh cooked Dungeness crab, and this is the product that consumers seek. Consumers much prefer live or fresh cooked crab over frozen processed crab. Pacific Seafood's conduct in delaying the season makes it impossible for consumers to choose or obtain reasonably priced live or fresh cooked crab, and forces them to either forego crab during a period in which they traditionally consume it, purchase very expensive live or fresh cooked crab imported from Puget Sound or British Columbia, or purchase frozen processed crab, an inferior substitute.

196.    Defendants' conduct also results in crabbers, who would otherwise continue harvesting crab and delivering live and fresh cooked crab to the market until late in the season, stopping early because ex vessel prices do not increase in proportion to the scarcity of available crabs and the resulting additional per unit effort required to catch them. This results in the reduced availability of, in particular, reasonably priced live crab but also fresh cooked crab, leaving consumers, again, with fewer options and more likely to choose frozen processed crab, an inferior substitute.

**III.    Defendants' Conduct Causes Anticompetitive Effects Without Any Procompetitive Benefits**

197.    Defendants' conduct outlined herein has substantially reduced competition in the Pacific NW Area's Dungeness crab wholesale-input market and enables Pacific Seafood to obtain, enhance, and maintain its monopoly power in that market. As a result of this conduct, the prices paid to crabbers have been artificially depressed, and consumers have less choice in the market and are forced to accept an inferior product.

198.    There have been no procompetitive benefits from this conduct. Instead, competition with regard to the ex vessel price of Dungeness crab in the Pacific NW Market is sharply curtailed,

1  even when other buyers would, absent Defendants' abusive conduct, be willing to pay a higher ex

2  vessel price.

3      199.    As part of its campaign to control this market and exert its monopoly power, Pacific

4  Seafood has aggressively bought out its rivals and obtained a monopsony position in the Pacific

5  NW Area's Dungeness crab wholesale-input market.

6      200.    There are no legitimate procompetitive justifications or efficiencies for the conduct

7  alleged above, and any arguable procompetitive justifications or efficiencies are far outweighed by

8  the anticompetitive effects.

9                          **CLAIMS FOR RELIEF**

10                        **FIRST CAUSE OF ACTION**

11  **Monoposinzation in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

12                (On Behalf of Plaintiff and All Classes)

13      201.    Plaintiff incorporates by reference each preceding paragraph as though fully set

14  forth herein.

15      202.    The relevant market is the Pacific NW Area Dungeness crab wholesale-input

16  market.

17      203.    Defendants exert monopoly power over the relevant market, and have acquired,

18  enhanced, and maintained their monopoly power through the scheme alleged above, which conduct

19  is ongoing.

20      204.    Defendants have substantially foreclosed competition and have abused and continue

21  to abuse their market power in an unreasonable restraint of trade and commerce.

22      205.    During the Class period, Defendants engaged in a continuing scheme with respect

23  to the wholesale-input market for Dungeness crab in the Pacific NW, with the purpose and effect

24  of acquiring, enhancing, and maintaining monopoly power in that market in violation of the

25  Sherman Act, 15 U.S.C. §2.

26      206.    As a direct and proximate result of this continuing violation of Section 2 of the

27  Sherman Act, Plaintiff and the members of the Class have suffered and continue to suffer injury

28  and damages in that they have received and continue to receive artificially suppressed prices for ex

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   vessel Dungeness crab, from Defendants and others, and have suffered from other elements of

2   Defendants' scheme.

3        207.    Plaintiff and members of the Class will continue to be subject to Defendants' scheme

4   alleged above and will continue to suffer injury if Defendants' unlawful conduct is not enjoined.

5        WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

6   <u>**SECOND CAUSE OF ACTION**</u>

7   **Attempted Monoposinzation in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

8   (On Behalf of Plaintiff and All Classes)

9        208.    Plaintiff incorporates by reference each preceding paragraph as though fully set

10   forth herein.

11        209.    Even assuming Defendants did not have monopsony power in the Pacific NW Area

12   Dungeness crab wholesale-input market, at a minimum Defendants have a dangerous probability

13   of success in acquiring monopsony power in that market.

14        210.    Defendants willfully and intentionally engage in the predatory, exclusionary, and

15   anticompetitive conduct described herein with the design, purpose, and effect of attempting to

16   monopsonize the Pacific NW Area Dungeness crab wholesale-input market.

17        211.    Defendants' predatory, exclusionary, and anticompetitive conduct alleged herein

18   presents a dangerous probability that Defendants will succeed, to the extent it has not succeeded

19   already, in its attempt to monopsonize the Pacific NW Area Dungeness crab wholesale-input

20   market. The unlawful objective of Defendants' attempt to monopsonize the Pacific NW Area

21   Dungeness crab wholesale-input market is to control prices and restrain competition.

22        212.    As a direct and proximate result of this continuing violation of Section 2 of the

23   Sherman Act, Plaintiff and the members of the Class have suffered and continue to suffer injury

24   and damages in that they have received and continue to receive artificially suppressed prices for ex

25   vessel Dungeness crab, from Defendants and others, and have suffered from other elements of

26   Defendants' scheme.

27        213.    Plaintiff and members of the Class will continue to be subject to Defendants' scheme

28   alleged herein and will continue to suffer injury if Defendants' unlawful conduct is not enjoined.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

2                          **THIRD CAUSE OF ACTION**

3    **Unlaw Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15
4                                     U.S.C. § 1**

5                        (On Behalf of Plaintiff and All Classes)

6    214.    Plaintiff incorporates by reference each preceding paragraph as though fully set

     forth herein.

7    215.    Defendants entered into and engaged in unlawful agreements with other buyers in

8    restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act,

9    15 U.S.C. § 1. Beginning no later than January 2019 and continuing to the present, Defendants

10   engaged in continuing agreements with other buyers in restraint of trade and commerce in violation

11   of Section 1 of the Sherman Act.

12   216.    Defendants' agreement with other buyers has included concerted action and

13   undertakings by Defendants and others with the purpose and effect of: (a) fixing the ex vessel price

14   for Dungeness crab paid to Plaintiff and the Class at artificially low levels; and (b) eliminating, to

15   a substantial degree, competition among Defendants and other buyers with regards to ex vessel

16   prices.

17   217.    As a direct and proximate result of Defendants' combinations and contracts with

18   other buyers to restrain trade and eliminate competition on ex vessel prices for Dungeness crab,

19   members of the Class have suffered injury to their property and have been deprived of the benefits

20   of free and fair competition on the merits.

21   218.    The unlawful agreement among Defendants and other buyers has had the following

22   effects, among others:

23       a.    competition among Defendants and other buyers with regards to ex vessel

24   prices for Dungeness crab has been suppressed, restrained, and eliminated; and

25       b.    Plaintiff and Class members have received lower ex vessel prices from

26   Defendants and other buyers than they otherwise would have received in the absence of

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    Defendants' unlawful agreement, and, as a result, have been injured in their property and have

2    suffered damages in an amount according to proof at trial.

3          219.    The acts done by Defendants and other buyers as part of, and in furtherance of, their

4    contracts, combinations or conspiracies were authorized, ordered, or done by their respective

5    officers, directors, agents, employees, or representatives while actively engaged in the management

6    of each Defendant's affairs.

7          220.    Defendants' contracts, combinations and/or conspiracies are *per se* violations of

8    Section 1 of the Sherman Act.

9          221.    Plaintiff and members of the Class will continue to be subject to Defendants' scheme

10   alleged herein and will continue to suffer injury if Defendants' unlawful conduct is not enjoined.

11         WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

12                              **FOURTH CAUSE OF ACTION**

13   **Restraint of Trade in Violation of the California Cartwright Act (Cal. Bus. and Prof. Code Sections 16720, *et seq*.)**

14              (On Behalf of Plaintiff Little and the California Class)

15         222.    Plaintiff incorporates by reference each preceding paragraph as though fully set

16   forth herein.

17         223.    Defendants have intentionally and wrongfully engaged and continue to engage in a

18   combination with both other crab buyers and crabbers in restraint of trade intended to fix, maintain,

19   and suppress the ex vessel price of Dungeness crab paid to Plaintiff and Class members in

20   California, to create and/or carry out restrictions in the trade and commerce of Dungeness crabs in

21   California for their benefit, to prevent competition in the ex vessel price paid for Dungeness crabs

22   in California, to suppress competition that live Dungeness crab would otherwise present to

23   processed Dungeness crab, and to otherwise manipulate the wholesale-input market for Dungeness

24   crab in California in violation of the Cartwright Act.

25         224.    Defendants have illegally combined with other Dungeness crab buyers in order to

26   fix and suppress the ex vessel price paid to crabbers and to control when the season for Dungeness

27   crab opens through a coercive regime that has the purpose and effect of preventing other crab buyers

28   from offering an ex vessel price that is substantially higher than that offered by Pacific Seafood and

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

from offering a price at all if Pacific Seafood has declared that it will not offer an ex vessel price. This is despite the fact that, absent Pacific Seafood's coercive control, it would be in the other buyers' economic interest to offer crabbers a higher ex vessel (or a price at all), instead of following Defendants' dictates on price, which results in buyers not acquiring crab that could otherwise be sold by them for a substantial profit.

225.   Defendants use several means to coerce other Dungeness crab buyers to adopt their dictated price:

a.   Defendants have illegally monopsonized and control all significant Dungeness crab processing capacity in the Pacific NW Area. This allows Defendants to unilaterally determine what they will pay other buyers for live crab not sold by those buyers to restaurants, retailers, or similar customers. This forces other buyers to only offer artificially depressed ex vessel prices set by Defendants, as otherwise they would be forced to sell at a loss to Defendants any crab not sold to restaurants, retailers, or similar customers.

b.   Defendants punish buyers who diverge from Defendants' ex vessel pricing dictates by: (i) selling large quantities of Dungeness in the geographic area served by the non-compliant buyer(s) at prices at or below what those buyers paid for the crab ex vessel, causing those buyers enormous financial losses (dumping); (ii) refusing to purchase from non-compliant buyers Dungeness crab that those buyers were not able to sell to restaurants, retailers, or similar customers (refusal to deal, buy-side); and (iii) refusing to sell to non-compliant buyers other fish and fish products for which Pacific Seafood is the only practicable source (refusal to deal, sell-side).

c.   Defendants implicitly and explicitly threaten non-compliant buyers with these types of retaliation in order to gain their pricing obedience; and

d.   Defendants misrepresent the ex vessel Dungeness crab price paid by them, stating one price publicly to set the market but paying another price privately.

226.   Defendants have illegally combined with Dungeness crabbers in order to fix and suppress the ex vessel price paid to crabbers and to control when the season for Dungeness crab opens.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

227.    Through coercive tying arrangements, Defendants require that any fisher who sells them one type of fish, sell them all types of fish caught by the fisher; and Defendants are the only ex vessel buyer of any significance in the Pacific NW Area Dungeness crab wholesale-input market for several types of fish, including cold water shrimp. Thus, crabbers that also fish for species, such as cold water shrimp, must sell their Dungeness to Defendants at the price dictated by them.

228.    Defendants punish and threaten to punish crabbers who protest its actions and/or fail to fall in line with their pricing dictates by initiating group boycotts of that crabber with other buyers, which prevent the crabber from being able to sell its crabs to any or most buyers.

229.    Defendants also agree with their boats to put one public price on records submitted to the states, while in fact paying them more.

230.    A purpose and effect of this illegal combination with Dungeness crabbers is to control a substantial portion of crabbers in fishery-wide price negotiations, who will accept and lobby others to accept Defendants' dictated prices and will even break fishery-wide price strikes. A secondary purpose and effect of this illegal combination is to provide Defendants with a substantial ex vessel supply of Dungeness crab that it can use via dumping to punish non-compliant buyers.

231.    The above restraints have the purpose and effect of fixing the ex vessel prices paid for Dungeness crab in California to Plaintiff Little and members of the California Class and the anticompetitive effect of the above restraints outweighed any beneficial effect on competition.

232.    These activities alleged above were a direct and proximate cause of the harm suffered by Plaintiff Little and members of the California Class.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

**Violations of the Unfair Practices Act (Cal. Bus. and Prof. Code, § 17000, et seq.)**

(On Behalf of Plaintiff and the California Class)

233.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

234.    As part of the scheme alleged above, Defendants sold Dungeness crab at a price that was below cost in violation of California Business and Professions Code § 17043. Defendants did so in order to injure non-compliant buyers and destroy competition.

235.    In order to create the false impression that Defendants were paying a lower price for ex vessel Dungeness crab than they actually were, Defendants further secretly gave extra payments to some crabbers ex vessel Dungeness crab that were not given to other crabbers selling on like terms and conditions, in violation of California Business and Professions Code § 17045. This action harmed Plaintiff Little and members of the California Class for the reasons stated herein. The payments paid by Defendants have a tendency to destroy competition.

236.    Plaintiff Little and members of the California Class were harmed by the above conduct, and Defendants' conduct was a substantial factor in causing harm to Plaintiff and members of the Class.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law (Cal. Bus and Prof. Code Section 17200, *et seq*.)**

**(On Behalf of Plaintiff Little and the California Class)**

237.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

238.    Defendants have engaged, and continue to engage, in the practices alleged above, which are unlawful, fraudulent, and/or which constitute unfair competition within the meaning of section 17200 of the Business and Professions Code.

239.    These practices include but are not limited to:

a.      Monopolization and attempted monopsonization of the Pacific NW Area Dungeness crab market;

b.      Coercive combinations with other Dungeness crab buyers that have the purpose and effect of fixing ex vessel prices for Dungeness crab in California and controlling when Dungeness crab season opens, which Defendants have achieved through means including, without

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

limitation, the monopsonization of Dungeness crab processing capacity in the Pacific NW Area, selling large quantities of Dungeness crab in the geographic area served by the non-compliant buyer(s) at prices at or below what those buyers paid for the crab ex vessel, causing those buyers enormous financial losses (dumping), refusing to purchase from non-compliant buyers Dungeness crab that those buyers were not able to sell to restaurants, retailers, or similar customers (refusal to deal, buy-side),  refusing to sell to non-compliant buyers other fish and fish products for which Pacific Seafood is the only practicable source (refusal to deal, sell-side), implicitly and explicitly threatening non-compliant buyers with these types of retaliation in order to gain their pricing obedience, and misrepresenting the ex vessel Dungeness crab price paid by them, stating one price publicly to set the market but paying another price privately.

c.    Coercive combinations with Dungeness crabbers that have the purpose and effect of fixing ex vessel prices for Dungeness crab in California and controlling when the Dungeness crab fishery opens which Defendants have achieved through means including, without limitation, coercive tying arrangements by which Defendants require that any fisher who sell it one type of fish, sell it all types of fishes caught by the fisher; punishing crabbers who protest its actions and/or fail to fall in line with its pricing dictates by initiating group boycotts of that crabber with other buyers, which prevent the crabber from being able to sell its crabs to any or most buyers; agreeing with their boats to put one public price on records submitted to the states, while in fact paying them more.

240.    The effect and purpose of these practices are to harm competition, to further Defendants' monopoly, and to suppress the ex vessel price paid for Dungeness crab.

241.    Plaintiff Little and members of the California Class suffered harm as a result of the above practices, and Defendants' actions were a direct and proximate cause of this harm.

242.    The practices alleged above are unfair, irrespective of the violation of any other law, and constitute unfair competition within the meaning of section 17200 of the Business and Professions Code. They are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and the harm caused by Defendant's practices, including in the form of

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    artificially depressed prices ex vessel prices for Dungeness crab, greatly outweighs any possible

2    utility from the practices.

3        WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

4                            **SEVENTH CAUSE OF ACTION**

5                        **For Declaratory Relief Under 28 U.S.C. § 2201**

6                            (On Behalf of Plaintiff and All Classes)

7        243.    Plaintiff incorporates by reference each preceding and succeeding paragraph as

8    though fully set forth herein.

9        244.    Plaintiff and the members of the Classes, pursuant to Fed. R. Civ. P. 57 and 28

10   U.S.C. § 2201, hereby seek a declaratory judgment that Pacific Seafood's conduct in seeking to

11   prevent competition as described herein violates Sections 1 and 2 of the Sherman Act and violates

12   California's Cartwright Act.

13       WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

14

15                              **PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, prays for

17   judgment and further relief as follows:

18       1.    Determining that this action may be maintained as a class action pursuant to Rules

19   23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, certifying each of the four proposed

20   Classes, and directing that reasonable notice of this action, as provided by Rule 23(c)(2), be given

21   to members of the Classes, and appoint Plaintiff as the named representatives of the Classes;

22       2.    Awarding Plaintiff and the Classes treble damages in an amount to be determined at

23   trial, plus interest in accordance with law;

24       3.    Award Plaintiff and the Class injunctive relief including:

25           a.    An order barring Defendants from continuing to engage in the illegal

26   coercive combinations with other buyers alleged herein;

27           b.    An order barring Defendants from continuing to engage in the illegal

28   coercive combinations with other buyers alleged herein;

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1         c.     An order barring Defendants from purchasing Dungeness crab in the Pacific

2  NW Area both ex vessel from crabbers and for processing from other buyers;

3         d.     An order requiring Defendants to divest from and/or sell a number of

4  Dungeness crab processing facilities in the Pacific NW Area sufficient to reestablish competition

5  in that segment of the Pacific NW Dungeness crab wholesale-input market.

6      4.     Entering judgments against Defendants in favor of Plaintiff and the Classes;

7      5.     Awarding Plaintiff and the Classes their costs of suit, including reasonable

8  attorneys' fees as provided by law; and

9      6.     Awarding such further additional relief as the case may require and the Court may

10  deem just and proper under the circumstances.

11

12  Dated:  March 13, 2023      **GROSS KLEIN PC**

13

14               By:   */s/ Stuart G. Gross*

                      STUART G. GROSS

15                  *Counsel for Plaintiff*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

3    asserted in this Complaint so triable.

4

5

6    Dated:  March 13, 2023                    **GROSS KLEIN PC**

7

8                                              By:   */s/ Stuart G. Gross*
                                                     STUART G. GROSS
9                                              *Counsel for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT