UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAND LITTLE,<br><br>        Plaintiff,<br><br>    v.<br><br>PACIFIC SEAFOOD PROCUREMENT, LLC, et al.,<br><br>        Defendants. | Case No. 23-cv-01098-AGT<br><br>**ORDER ON MOTION TO DISMISS**<br>Re: Dkt. No. 21 |

The Court grants Pacific Seafood's motion to dismiss, with leave to amend all claims except Brand Little's standalone claim for declaratory relief.

\* \* \*

1. <u>Sherman Act § 1</u>. Little, a crabber who catches Dungeness crab off the West Coast of the United States, contends that Pacific Seafood has conspired with other direct purchasers of Dungeness crab to fix and suppress the prices they offer crabbers.

Little bases his claim in part on allegations of parallel conduct. He alleges that other direct purchasers wait to set the prices they offer crabbers for fresh crab until Pacific Seafood sets its price, and that most (if not all) direct purchasers set prices that are substantially similar to Pacific Seafood's. *See* Compl. ¶¶ 82–83, 106–110, 191–92, 216–18.

Parallel conduct is consistent with conspiracy, but it is insufficient on its own to state a § 1 claim. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015). This is especially so when allegations reveal a legitimate business reason

for the parallel conduct. *See id.* at 1194 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation.") (simplified). So it is here.

Direct purchasers have an economic rationale for tracking Pacific Seafood's pricing decisions. Commercial crabbers catch close to 80 percent of the Dungeness crab they catch during the entire fishing season in the season's "first few weeks." Compl. ¶ 104. Consumers don't consume this haul as quickly; so at the season's start, the supply of fresh crab "signif-icant[ly]" outpaces demand. *Id.*

Crabbers shift the risk of being stuck with too much fresh crab to direct purchasers, who act as middlemen. Each direct purchaser contracts with one or more crabbers "to purchase all of the Dungeness crabs that a crabber catches during the season." *Id.* ¶ 73. The direct purchasers resell as much crab as they can to restaurants and similar retailers. *See id.* Then, for a discounted price, direct purchasers sell the leftover fresh crab to a processor, who cooks and either cans or freezes the crab, lengthening its shelf life. *See id.* ¶¶ 74–77.

Pacific Seafood is one of many direct purchasers of Dungeness crab. But critically, Pacific Seafood is also the "only significant processor" of Dungeness crab on the West Coast. *Id.* ¶¶ 7, 9; *see also id.* ¶¶ 8, 75, 102. Pacific Seafood, then, is not merely a competing direct purchaser of fresh crab; Pacific Seafood is a critical second-level buyer of other direct purchasers' leftover fresh crab. At the beginning of the season, when direct purchasers have more fresh crab than they can sell to restaurants and similar retailers, they end up selling "a huge portion" of their fresh crab to Pacific Seafood for processing. *Id.* ¶ 17.

When direct purchasers (other than Pacific Seafood) are about to set the prices they will pay crabbers for freshly caught crab, they sensibly will consider the price they will

obtain from Pacific Seafood for the excess crab they can't sell to restaurants and similar retailers. If direct purchasers pay too high a price to crabbers, they may be forced to sell their excess crab to Pacific Seafood for a loss. *See id.* ¶ 11 ("[O]ther buyers know that if they offer a higher [price to crabbers], the crabs that they do not sell to their retail, restaurant, and similar customers will only be sellable at [a] loss to Pacific Seafood . . . ."). It is no surprise, then, that other direct purchasers wait for Pacific Seafood to set its prices before they set theirs, and that their prices converge. "[E]conomically rational resellers account for expected resale prices when deciding how much to pay for inputs." Reply, Dkt. 48 at 8.

Little insists that something more sinister is going on. He says Pacific Seafood punishes direct purchasers who don't follow its pricing decisions or who start buying crab from crabbers before Pacific Seafood does. He offers two examples, both from the 2022–2023 season. Pacific Seafood "refused to purchase 1.3 million pounds of crab from a buyer in San Francisco as punishment for its failure to comply on ex vessel prices." Compl. ¶ 13. (The "ex vessel" price is the price that direct purchasers pay to crabbers for freshly caught Dungeness crab. *See id.* ¶¶ 2–3.) Pacific Seafood also "dumped whole fresh cooked crabs," at a price below cost, "in the San Francisco Bay Area and elsewhere to punish buyers who offered ex vessel prices to crabbers at a time [when] Pacific Seafood was refusing to state a price . . . ." *Id.* ¶ 16; *see also id.* ¶¶ 114–16, 135.

The above allegations suggest that Pacific Seafood attempted to coerce certain direct purchasers into following its pricing decisions. If direct purchasers gave into that pressure and adopted a fixed price, they could be considered conspirators in a price-fixing scheme. *See City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) (explaining that a conspiracy to restrain trade may exist "even where one of the conspirators participates

involuntarily or under coercion").

Little runs into a pleading problem, however. He alleges that all, or substantially all, direct purchasers of fresh crab on the West Coast are part of a price-fixing conspiracy. There are hundreds of these direct purchasers, *see* dkt. 23 at 9–10, and Little must plausibly allege that Pacific Seafood coerced substantially all of them into the alleged conspiracy. He hasn't done so. He pleads only a couple of instances of coercion, impacting direct purchasers in only some geographic areas along the West Coast. From these occurrences, it's a big jump to conclude that hundreds of direct purchasers up and down the West Coast were coerced into joining a price-fixing conspiracy.

Little's complaint does include more expansive coercion allegations than those identified above, but the more expansive allegations are too general or conclusory. Little alleges that Pacific Seafood retaliates against direct purchasers who don't follow its pricing decisions by failing to "pick up the phone" when these direct purchasers want to sell crab to Pacific Seafood for processing. Compl. ¶ 133. He also alleges that Pacific Seafood "punishes non-compliant crab buyers on the *sell*-side by denying non-compliant crab buyers access to other fish products whose supply Pacific Seafood controls." *Id.* ¶ 14.

It's far from clear how often Pacific Seafood has failed to pick up the phone or denied direct purchasers access to other fish products. It's also uncertain how many direct purchasers know about Pacific Seafood's coercive tactics. Here again, the jump is considerable from Little's allegations to a plausible inference that hundreds of direct purchasers have been coerced into joining a price-fixing conspiracy.

Antitrust discovery "can be expensive," and "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual

controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (simplified). So it is here. Little's allegations, while not bare bones, aren't specific enough to support a plausible "multi-hundred-member buyer's cartel." Reply, Dkt. 48 at 23. He needs to offer more detail before the Court will allow him to proceed with a § 1 claim that could involve hundreds of non-parties in discovery.

The Court dismisses Little's § 1 claim, with leave to amend.

2. Sherman Act § 2. Under § 2, Little seeks to maintain monopsony and attempted monopsony claims. Monopsony is a "market situation in which there is a single buyer or a group of buyers making joint decisions." *United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (quoting another source). "Just as a monopolist may use its market power as a seller to charge customers above-market prices, so a monopsonist may use its market power as a buyer to pay suppliers lower prices than it would pay in a truly competitive market." *Whaley v. Pac. Seafood Grp.*, 2012 WL 13047314, at *1 (D. Or. Jan. 31, 2012). To plead monopsony, Little must plausibly allege that Pacific Seafood has "monopsony power" and uses it to "exclude[] its rivals." *Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, 767 F. App'x 348, 351 (3d Cir. 2019).

In the market for *processing* Dungeness crab, Pacific Seafood plausibly has monopsony power. Pacific Seafood "owns or controls substantially all of the Dungeness crab processing capacity" along the West Coast. Compl. ¶ 102. It is conceivable that Pacific Seafood could use that market power "to pay suppliers," i.e., direct purchasers who want to sell their Dungeness crab to Pacific Seafood for processing, "lower prices than it would pay in a truly competitive market." *Whaley*, 2012 WL 13047314, at *1.

Little, though, doesn't sell crab to processors. He sells crab to direct purchasers, who

resell the crab to retailers such as restaurants (when possible) and processors (when not). *See* Compl. ¶¶ 73–77. It is thus doubtful that Little would have standing to pursue a monopsony claim focused on the processing market. *Cf. Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("The bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.").

Perhaps for this reason, Little bases his monopsony claims on a different market, which he refers to as the "wholesale-input market." *E.g.*, Compl. ¶ 2. In this market, crabbers such as Little are sellers, while direct purchasers of the crabbers' catch are buyers; but in the same market, the direct purchasers are also *sellers* when they resell crab to processors but *not* when they resell crab to restaurants and similar retailers. *See id.* ¶ 2; Opp'n, Dkt. 41 at 21–22. In the wholesale-input market, Little alleges that Pacific Seafood is the "ultimate buyer of at least 50% of all the Dungeness crab sold," Compl. ¶ 6, a market share he suggests can support a monopsony claim.

If readers find the Court's summary of the wholesale-input market confusing, they are likely not alone. The wholesale-input market is a market of Little's invention, which stitches together portions of separate markets in an attempt to establish monopsony power. It is a "gerrymandered market," as Pacific Seafood puts it. Reply, Dkt. 48 at 14.

When a "combination reflects commercial realities," different products or services may be "combine[d] . . . into a single market" to state a Sherman Act claim. *Ohio v. Am. Express Co.*, 585 U.S. 529, 544 (2018) (simplified). But Little hasn't persuasively articulated

how his proposed wholesale-input market reflects commercial realities. To the contrary, the pleaded commercial realities evidence that Little is melding two markets into one.

Little alleges that Pacific Seafood leverages its processing power to control the prices that direct purchasers offer crabbers for freshly caught crab. *See, e.g.*, Compl. ¶ 133 (alleging that Pacific Seafood uses the processing "chokepoint strategically to coerce other seafood buyers into using the ex vessel price that Pacific Seafood sets for Dungeness crab"); *see also id.* ¶¶ 97, 131–32. Leveraging implies that there must be two separate markets—an ex vessel market and a processing market—because leveraging is predicated upon "the existence of two separate product or service markets." *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982); *see also id.* at 1305–06 ("[A] firm violates § 2 by using its monopoly power in one market to gain an unwarranted competitive advantage in another.").

Little tries to have it both ways, relying on leveraging but asserting that the cause and effect of the leveraging are felt in the same market, the wholesale-input market. If leveraging is the commercial reality, as Little alleges, there must be two markets.

Given that Little bases his § 2 claims on a leveraging theory, which requires "the existence of two separate product or service markets," *id.* at 1306, his market definition, which combines the two relevant markets into one, is "facially unsustainable." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

"Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). Finding such a shortcoming here, the Court dismisses Little's § 2 claims, with leave to amend.

3. Cartwright Act. Little pleads three state-law claims. The first of which is under the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* Conduct can violate the Cartwright

Act without violating the Sherman Act. *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014). But often the claims rise or fall together. *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Here, Little hasn't articulated why, in light of the Court's analysis of his Sherman Act claims, his Cartwright Act claim should fare differently. Lacking such an explanation, the Court treats the claims similarly and concludes that Little hasn't stated a Cartwright Act claim either.

    4. Unfair Practices Act (UPA). Little next alleges that Pacific Seafood violated two sections of California's Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17043, 17045. He hasn't plausibly alleged either violation.

    Section 17043 prohibits selling "any article or product at less than the cost thereof . . . for the purpose of injuring competitors or destroying competition." *Id.* § 17043. To plead a section 17043 claim, Little "must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business." *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309, 322 (2003). Little hasn't satisfied this standard. He alleges that Pacific Seafood dumped live crab at prices "below cost," Compl. ¶¶ 115–16, but he hasn't adequately alleged Pacific Seafood's "cost of doing business," *Fisherman's Wharf*, 114 Cal. App. 4th at 322, including what it costs Pacific Seafood "to cook and ship crab." Reply, Dkt. 48 at 26.

    As for section 17045, it prohibits "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . to the injury of a competitor." Cal. Bus. & Prof. Code § 17045. Pacific Seafood moved to dismiss Little's section 17045 subclaim (*see* dkt. 21 at 45), and Little didn't address Pacific's arguments in opposition. "A plaintiff who makes a claim in his complaint, but fails to raise the issue in response to a defendant's motion

to dismiss, has effectively abandoned his claim . . . ." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010) (simplified).

The Court dismisses Little's UPA claim, with leave to amend.

5. <u>Unfair Competition Law (UCL)</u>. Little's final state-law claim is for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, which prohibits "any unlawful, unfair or fraudulent business act or practice."

Little hasn't plausibly alleged an "unlawful" business act or practice, for the reasons identified above. Nor has he plausibly alleged a "fraudulent" business act or practice. His complaint isn't, at its core, premised on fraud; and stray references to fraud therein, *see e.g.*, Compl. ¶ 24 (alleging that Pacific Seafood "defraud[ed] the market by publicly indicating that it [was] only paying its boats price 'x' . . . but then actually paying them substantially more"), lack the "who, what, when, where, and how of the misconduct alleged," as necessary to plead fraud. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).

As for unfairness, Little points again to price-fixing and monopsony. *See* Compl. ¶ 239. But as explained above, Little's allegations aren't specific enough to support a "multi-hundred-member buyer's cartel," dkt. 48 at 23, and his monopsony market definition is facially unsustainable.

Conduct may be unfair under the UCL without violating the Sherman Act. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023). But when, as here, the plaintiff grounds his Sherman Act and UCL claims on the same conduct, and when that conduct isn't well pled, the claims fall together. *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and

harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' . . . .").

The Court dismisses Little's UCL claim, with leave to amend.

6. <u>Declaratory Judgment</u>. Little's final claim is for declaratory relief, under 28 U.S.C. § 2201. "[T]he Declaratory Judgment Act does not provide an affirmative cause of action where none otherwise exists." *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022). The Court thus dismisses Little's standalone declaratory judgment claim, without leave to amend. Should Little state a plausible claim for relief under another law, his ability to seek declaratory relief in connection with that law won't be foreclosed by this dismissal.

\* \* \*

The Court grants Pacific Seafood's motion to dismiss, with leave to amend all claims except Little's standalone claim for declaratory judgment.

If Little chooses to file an amended complaint, he must file it by August 20, 2024. If he believes some targeted discovery would improve his pleading without begetting a "massive factual controversy" at the pleading stage, *Twombly*, 550 U.S. at 558 (quoting another source), he may request it in a joint letter brief, not to exceed five pages, by June 6, 2024.

**IT IS SO ORDERED.**

Dated: May 21, 2024

_____
Alex G. Tse
United States Magistrate Judge