Stuart G. Gross (SBN 251019)
Travis H.A. Smith (SBN 331305)
Ross A. Middlemiss (SBN 323737)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628

Matthew W. Ruan (SBN 264409)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500

Steven N. Williams (SBN 175489)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear St, Suite 1100
San Francisco, CA 94105
(415) 671-4628

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE COTTRELL KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **BRAND LITTLE** and **ROBIN BURNS**, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> **PACIFIC SEAFOOD PROCUREMENT, LLC; PACIFIC SEAFOOD PROCESSING, LLC; PACIFIC SEAFOOD FLEET, LLC; PACIFIC SEAFOOD DISTRIBUTION, LLC; PACIFIC SEAFOOD USA, LLC; DULCICH, INC.; PACIFIC SEAFOOD – EUREKA, LLC; PACIFIC SEAFOOD – CHARLESTON, LLC; PACIFIC SEAFOOD – WARRENTON, LLC; PACIFIC SEAFOOD – NEWPORT, LLC; PACIFIC SEAFOOD – BROOKINGS, LLC; PACIFIC SEAFOOD – WESTPORT, LLC; PACIFIC SURIMI – NEWPORT LLC; BLUE RIVER SEAFOOD, INC.; SAFE COAST SEAFOODS, LLC; SAFE COAST SEAFOODS WASHINGTON,** | Case No. 3:23-cv-01098-AGT <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> Judge:  Honorable Alex G. Tse <br><br> <u>**DEMAND FOR JURY TRIAL**</u> <br><br> REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED |

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  LLC; OCEAN GOLD SEAFOODS, INC.;
2  NOR-CAL SEAFOOD, INC.; AMERICAN
   SEAFOOD EXP, INC.; CALIFORNIA
3  SHELLFISH COMPANY, INC.; ROBERT
   BUGATTO ENTERPRISES, INC.;
4  ALASKA ICE SEAFOODS, INC.; LONG
   FISHERIES, INC.; CAITO FISHERIES,
5  INC.; CAITO FISHERIES, LLC;
6  SOUTHWIND FOODS, LLC;
   FISHERMEN'S CATCH, INC.; GLOBAL
7  QUALITY FOODS, INC.; GLOBAL
   QUALITY SEAFOOD LLC; OCEAN
8  KING FISH INC.; SOUTH BEND
   PRODUCTS LLC; SWANES SEAFOOD
9  HOLDING COMPANY LLC;
   BORNSTEIN SEAFOODS, INC.;
10 ASTORIA PACIFIC SEAFOODS, LLC;
11 and DOES 29-60,

12           Defendants.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 2

PARTIES ....................................................................................................................... 4

I.      Plaintiffs ............................................................................................................ 4

II.     Defendants ......................................................................................................... 5

        A.    Pacific Seafood Defendants ................................................................... 5

        B.    Safe Coast Defendants ......................................................................... 10

        C.    Ocean Gold Defendant ......................................................................... 12

        D.    Nor-Cal Defendants ............................................................................. 13

        E.    ASE Defendant ..................................................................................... 14

        F.    Hallmark Defendants ........................................................................... 14

        G.    Fathom Defendants .............................................................................. 15

        H.    Caito Defendants .................................................................................. 16

        I.     Fishermen's Catch Defendant ............................................................. 17

        J.     Global Quality Defendants .................................................................. 17

        K.    Ocean King Defendant ......................................................................... 18

        L.    South Bend Defendants ........................................................................ 18

        M.   Bornstein Defendants ........................................................................... 19

        N.    Doe Defendants .................................................................................... 20

III.    Agents and Co-Conspirators ........................................................................... 20

JURISDICTION, VENUE, AND COMMERCE ........................................................ 21

INTRADISTRICT ASSIGNMENT ........................................................................... 22

FACTUAL ALLEGATIONS ..................................................................................... 22

I.      Pacific NW Area Ex Vessel Dungeness Crab Industry .................................. 22

II.     Defendants' Price-Fixing Cartel ..................................................................... 25

A.   Defendants' Cartel Arose Out of a Marked Increase in Dungeness Ex Vessel Prices Being Paid to Crabbers in the Pacific NW Area that Started in 2006/2007 Season and Continued Through the 2014/15 Season ........................................................ 25

B.   Defendants Have Agreed to Allow Pacific Seafood to Set the Opening Price, which Has Resulted in Delayed Opening and a Lower Opening Price, which Is the Price at which a Large Portion of the Season's Catch Is Traditionally Sold and Which Sets the Baseline Price for the Remainder of the Season ........................................................ 28

1.   2019/20 Pacific NW Area Dungeness Crab Season ............................................. 29

2.   2020/21 Pacific NW Area Dungeness Crab Season ............................................. 30

3.   2021/22 Pacific NW Area Dungeness Crab Season ............................................. 32

4.   2022/23 Pacific NW Area Dungeness Crab Season ............................................. 32

5.   2023/24 Pacific NW Area Dungeness Crab Season ............................................. 35

C.   After the Opening, Defendants Closely Coordinate With One Another on Ex Vessel Prices ........................................................ 37

D.   Defendants Have Consolidated Their Control of the Pacific NW Area Ex Vessel Dungeness Crab Market by Purchasing and in Many Cases Shutting Down Erstwhile Competitors, Entering Into Exclusivity Arrangements with Port Operators, and Limiting Non-Cartel Members' Access to Hoists ........................................................ 38

1.   Pacific Seafood ........................................................ 38

2.   Ilwaco Landing Fishermen ........................................................ 40

3.   Trinidad ........................................................ 41

4.   Eureka ........................................................ 42

E.   To Eliminate Price Pressure Formerly Created by Out of Port Buyers, Defendants Have Agreed to Buy and Sell "Out the Back Door" ........................................................ 42

1.   South Bend ........................................................ 43

2.   Caito ........................................................ 43

3.   San Francisco ........................................................ 44

4.   Crescent City ........................................................ 45

F.   Defendants Aggressively Coerce Compliance by Each Other by and by Other Buyers with the Agreed Upon Pricing ........................................................ 45

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1. During the 2022/23 and 2023/24 Seasons, a New Buyer Sought to Capture Market Share by Offering Higher Prices; Defendants Sought to Bring Him into the Cartel and When This Failed Inflicted Repeated Punishments ........................................ 45

2. Other Buyers Have Also Been Threatened by Defendants About Breaking Ranks on Price and Have Been Punished for Doing So .................................................... 57

3. As a Result, When Defendants and Other Buyers Pay Ex Vessel Prices Above the "Fixed Price" They Seek to Hide that Fact, Which Doesn't Make Economic Sense Absent a Price-Fixing Agreement .......................................................... 59

G. In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Crabbers who Sell Crab Ex Vessel for Prices Higher than the Cartel Price ........................................ 61

1. Pacific Seafood ............................................................................ 62

2. Hallmark ...................................................................................... 63

3. Ocean Gold .................................................................................. 65

III. Buyers Who Are Not Part of the Cartel, Nonetheless, Generally Obey Its Pricing Dictates in Order to Avoid Retaliatory Actions by Defendants ............................................ 65

Antitrust Injury ........................................................................................ 65

Delayed Discovery/Fraudulent concealment ............................................ 71

CLAIMS for Relief ................................................................................... 72

FIRST CAUSE OF ACTION .................................................................... 72

SECOND CAUSE OF ACTION ................................................................ 74

THIRD CAUSE OF ACTION .................................................................... 75

FOURTH CAUSE OF ACTION ................................................................. 76

PRAYER FOR RELIEF ............................................................................. 76

DEMAND FOR JURY TRIAL ................................................................... 77

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Plaintiffs Brand Little ("Little") and Robin Burns ("Burns") (collectively, "Plaintiffs") on behalf of themselves and all others similarly situated (collectively, the "Class"), allege, on information and belief based upon the investigation of counsel, except where based on personal knowledge, against Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood – Eureka, LLC; Pacific Seafood – Charleston, LLC,  Pacific Seafood – Warrenton, LLC, Pacific Seafood – Newport, LLC, Pacific Seafood – Brookings, LLC, Pacific Seafood – Westport, LLC, and Pacific Surimi – Newport LLC, which collectively do business and are commonly known as a single entity named "Pacific Seafood" (collectively, "Pacific Seafood"), Blue River Seafood, Inc.; Safe Coast Seafoods, LLC; Safe Coast Seafoods Washington, LLC, which collectively do business and are commonly known as a single entity named "Safe Coast" (collectively, "Safe Coast"), Ocean Gold Seafoods, Inc. ("Ocean Gold"), Nor-Cal Seafood, Inc. "Nor-Cal"), American Seafood Exp, Inc. ("ASE"), California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc., which collectively do business and are commonly known as a single entity named "Hallmark" (collectively, "Hallmark"), Alaska Ice Seafoods, Inc. and Long Fisheries, Inc., which collectively do business and are commonly known as a single entity named "Fathom Seafood" (collectively, "Fathom Seafood"), Caito Fisheries, Inc., Caito Fisheries, LLC, and Southwind Foods, LLC, which collectively do business and are commonly known as a single entity named "Caito" (collectively, "Caito"), Fishermen's Catch, Inc. ("Fishermen's Catch"), Global Quality Foods, Inc. and Global Quality Seafood LLC, which collectively do business and are commonly known as a single entity named "Global Quality Seafood" (collectively, "Global Quality"), Ocean King Fish Inc. ("Ocean King"), South Bend Products LLC and Swanes Seafood Holding Company LLC, which collectively do business and are commonly known as a single entity named "South Bend" (collectively, "South Bend"), Bornstein Seafoods, Inc. and Astoria Pacific Seafoods, LLC, which collectively do business and are commonly known as a single entity named "Bornstein" (collectively, "Bornstein"), as well as Does 29-60, (collectively, "Defendants"), as follows:

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**INTRODUCTION**

1.      Plaintiff Brand Little and the Class are the approximately 1,400 independent commercial crabbers who land Dungeness crab in California, coastal Washington (which excludes Puget Sound), and Oregon (collectively the "Pacific NW Area"). Plaintiff Robin Burns was married to one of those crabbers, Kenny Burns, who died in 2021 after years spent earning his living from the sea.

2.      Over the decades, the Dungeness crab fishery has become the most important fishery for Pacific NW Area commercial fishers and the families and communities that depend on them.

3.      In the mid-2000s, the prices paid by Defendants and other buyers to Pacific NW Area crabbers for their crab—what is referred to in the fishing industry and herein as the "ex vessel price," which means the price off the boat—started to climb as increased demand for Dungeness crab in Asia and elsewhere translated into higher ex vessel prices.

4.      Defendants are effectively middlemen between crabbers and consumers who enjoy the crab that the crabbers risk their lives to catch and deliver to the port.

5.      They do not risk their lives on the Pacific Ocean in 12-oots long-period winter swells bearing down from the Bering Sea. They do not go into debt to pay for million-dollar boats and hundreds of thousands of dollars of gear. They do not catch the crabs.

6.      Rather, for the most part, Defendants simply write a check to crabbers, have someone truck or fly the crabs to another middleman buyer or retail outlet customer like a grocery store or restaurant.

7.      Nonetheless, in advance of the 2015/16 Pacific NW Area Dungeness crab season, Defendants decided to form a cartel of Pacific NW Area Dungeness crab buyers that had the purpose and effect of driving down the ex vessel price of Dungeness crab in the Pacific NW Area, so that the Defendants could earn higher profits. . . so the middlemen can make even more money than the people doing the work and risking their lives.

8.      As in detail alleged herein, Defendants, led by Pacific Seafood, have created a pricing cartel that has artificially fixed, depressed, and controlled the ex vessel price paid to

crabbers in the Pacific NW Area since the beginning of the 2015/16 season, through the employment of a variety of means, including, without limitation:

    a.  agreeing not to compete with each other on the price offered to crabbers at the opening of the Dungeness crab season, instead, giving Pacific Seafood the authority to set that price for all Defendants at artificially low levels;

    b.  agreeing to delay the opening of some Dungeness crab seasons until later in the year when consumer demand would be lower and cause less upward pressure on early-season prices, which in turn set a benchmark and starting point for prices that would be paid for the rest of the season;

    c.  coordinating the ex vessel prices they pay to crabbers in the Pacific NW Area as the season progresses;

    d.  policing compliance by Defendants and other buyers with the artificially low ex vessel price set by the cartel; and

    e.  agreeing not to purchase Dungeness crab directly from crabbers in ports where they lack a presence but rather, instead, to acquire such crab "out the backdoor" from their fellow Defendants with a presence in the port (thereby eliminating what had previously been one of the principal drivers of in-season price increases).

9.    These allegations are based *inter alia* on text messages and other documents produced by Defendants, detailed records from the California, Washington, and Oregon Departments of Fish and Wildlife, and percipient information provided by industry participants, including an individual whose recent entrance into the Pacific NW Area Dungeness crab ex vessel market was met first by concerted attempts by Defendants to bring the new entrant into their pricing cartel and, when that failed, with threats and retaliation.

10.    Defendants' actions as alleged herein constitute a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 in violation of the California Cartwright Act, Cal. Bus. and Prof. Code, §§ 16720, *et seq*., and California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200, *et seq.*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

11.     Plaintiffs, on behalf of themselves and those similarly situated, respectfully seek remedies for this illegal conduct including compensation for their injuries suffered as a result and appropriate injunctive relief.

## PARTIES

### I.     Plaintiffs

12.     Plaintiff **BRAND LITTLE** ("Little") is an individual residing in Auburn, California. Little has been a commercial fisherman since 2004 and fishes for Dungeness crab, black cod, salmon, and other species in the waters off the coast of California, landing fish from his fishing vessel, the Pale Horse and his previous vessels, in various California ports, including San Francisco and Crescent City. In addition to his fishing business, Mr. Little operates a seafood retail business that operates at farmers markets and through which he sells both fish he has caught himself and fish purchased from other sources, including Pacific Seafood. During the proposed class period of January 1, 2016 to the present (the "Class Period"), Mr. Little sold Dungeness crab ex vessel to Defendant Pacific Seafood-Eureka, LLC, Unnamed Co-conspirator #1, and Unnamed Co-conspirator #2 in the Pacific NW Area. This includes sales to Defendant Pacific Seafood-Eureka, LLC during the 2018/19 Dungeness crab season, sales to Unnamed Co-conspirator #1, in four of the last five seasons, and Unnamed Co-conspirator #2, in the 2023/24 season. Prior to Pacific Seafood's acquisition of Pezzolo Seafood, in 2022, during the period of January 2021 through February 2022, Little sold crab to Pezzolo Seafood. After Pacific Seafood acquired Pezzolo, he agreed to sell his Dungeness crab to Pacific Seafood, as Pezzolo's successor in interest, during the 2022/2023 season. However, like some other members of the Class, Little was made the subject of a group boycott by Pacific Seafood when he refused this season to comply with Pacific Seafood with regard to ex vessel prices. In reaction to statements by Little protesting Pacific Seafood's manipulation of the Dungeness crab market and refusal to offer a price during negotiations, Pacific Seafood's General Manager for Processing Southern Division, Joe Cincotta, made clear that Pacific Seafood would not purchase crab (or anything else) from him; Pacific Seafood also instructed other fish buyers in the Pacific NW Area not to purchase crab from Little.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

During the Class Period, Plaintiff Little caught and sold Dungeness crab ex vessel in the Pacific NW Area at ex vessel prices that were artificially depressed by Defendants' unfair and illegal anticompetitive activities.

13.     Plaintiff **ROBIN BURNS** ("Burns") is an individual residing in Eureka, California. Plaintiff Burns' late husband, Kenneth Burns, was a life-long fisherman who fished for Dungeness crab, in addition to other species, throughout California and Oregon up until his passing in September of 2021. Ms. Burns stands in the place of her late husband and asserts the claims contained herein on his behalf. During the Class Period, Kenneth Burns sold Dungeness crab in the Pacific NW area to: Defendant Ocean Gold Seafoods, Inc. in the 2015/16 season; Defendant Robert Bugatto Enterprises, Inc. in the 2017/18 season; Defendant Pacific Seafood – Eureka LLC in the 2016/17, 2018/19, and 2019/20 seasons; Defendant Nor-Cal Seafood Inc. in the 2019/20 season, and Defendant American Seafood Express Inc. in the 2020/21 season. During the Class Period until his death in September of 2021, Mr. Burns caught and sold Dungeness crab ex vessel in the Pacific NW Area at ex vessel prices that were artificially depressed by Defendants' unfair and illegal anticompetitive activities.

## II. Defendants

### A.     Pacific Seafood Defendants

14.     Defendant **PACIFIC SEAFOOD PROCUREMENT, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Procurement is Defendant Dulcich, Inc. Pacific Seafood Procurement, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "procurement of fresh and frozen seafood products."

15.     Defendant **PACIFIC SEAFOOD PROCESSING, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Processing is Defendant Dulcich, Inc. Pacific Seafood Processing, in its most recent annual report filed with the Oregon Secretary of State, describes its business as the "purchase, manufacture, and sale of seafood products." Pacific Seafood Processing, LLC is the sole owner of a number of limited liability companies associated with

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

particular processing plants that Pacific Seafood has acquired in the NW Pacific Area, including: Pacific Seafood - Brookings, LLC; Pacific Seafood - Charleston; Pacific Seafood - Eureka, LLC; Pacific Seafood - Newport, LLC; Pacific Seafood -Warrenton, LLC; Pacific Seafood – Westport, LLC; and Pacific Seafood – Woodland, LLC.

16.     Defendant **PACIFIC SEAFOOD FLEET, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Fleet is Defendant Dulcich, Inc. Pacific Seafood Fleet, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "ownership of commercial fishing vessels."

17.     Defendant **PACIFIC SEAFOOD DISTRIBUTION, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Distribution is Defendant Dulcich, Inc. Pacific Seafood Distribution, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "distribution of fresh and frozen seafood products." Pacific Seafood Distribution is the sole member of a number of limited liability companies in the NW Pacific Area, including: Pacific Seafood – Los Angeles, LLC; Pacific Seafood – Portland, LLC; Pacific Seafood – Seattle, LLC;

18.     Defendant **PACIFIC SEAFOOD USA, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood USA is Defendant Dulcich, Inc. Pacific Seafood USA, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "domestic sale of fresh and frozen seafood products."

19.     Defendant **DULCICH, INC**. is an Oregon corporation with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The president and 100% owner of Dulcich, Inc. is Frank Dulcich.

20.     Defendant **PACIFIC SEAFOOD – EUREKA, LLC** is a California limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood-Eureka is Defendant Pacific Seafood Processing, LLC.

During the relevant time period, all ex vessel purchases of Dungeness crab before ███ by Pacific Seafood from class members in ███████ were conducted through Pacific Choice Seafood Company, the predecessor in interest to Pacific Seafood-Eureka. During the relevant time period, all ex vessel purchases of Dungeness crab during or after ███ by Pacific Seafood from class members in ████████ were conducted through Pacific Seafood-Eureka.

21.     Defendant **PACIFIC SEAFOOD – CHARLESTON, LLC** is an Oregon limited liability company with a principal place of business of 63501 Boat Basin Road, Charleston, OR. The sole member of Pacific Seafood Charleston is Defendant Pacific Seafood Processing, LLC. Pacific Seafood - Charleston, LLC in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing and distribution." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in ████████████████████ were conducted through Pacific Seafood – Charleston, LLC.

22.     Defendant **PACIFIC SEAFOOD – WARRENTON, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Warrenton is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Warrenton, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in ██████████ ████████████ were conducted through Pacific Seafood – Warrenton, LLC.

23.     Defendant **PACIFIC SEAFOOD – NEWPORT, LLC** is an Oregon limited liability company with a principal place of business of 623 SW Bay Blvd, Newport, OR. The sole member of Pacific Seafood Newport is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Newport, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "purchase, manufacture, and sale of seafood products." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in ███████████ were conducted through Pacific Seafood – Newport, LLC.

24.     Defendant **PACIFIC SEAFOOD – BROOKINGS, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Brookings is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Brookings, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in ████ ████ were made through Pacific Seafood – Brookings, LLC.

25.     Defendant **PACIFIC SEAFOOD – WESTPORT, LLC** is a Washington limited liability company with a principal place of business of 1980 N. Nyhus St., Westport, WA. The governing entity of Pacific Seafood Westport is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Westport, in its most recent annual report filed with the Washington Secretary of State, describes its business as "seafood processing and distribution." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in ████ were made through Pacific Seafood – Westport, LLC.

26.     Defendant **PACIFIC SURIMI – NEWPORT LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Surimi Newport is Defendant Pacific Seafood Processing, LLC. Pacific Surimi Newport, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "manufacture and sale of surimi seafood products." During the relevant time period, ex vessel purchases of Dungeness crab by Pacific Seafood from class members in various ████ ports were made through Pacific Surimi – Newport, LLC.

27.     Does 1 through 7 are substituted with Defendants Pacific Seafood - Eureka, LLC, Pacific Seafood - Charleston, LLC, Pacific Seafood - Warrenton, LLC, Pacific Seafood - Newport, LLC, Pacific Seafood - Brookings, LLC, Pacific Seafood - Westport, LLC, Pacific Surimi - Newport LLC.

28.     Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood - Eureka, LLC, Pacific Seafood - Charleston, LLC, Pacific Seafood - Warrenton, LLC,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Pacific Seafood - Newport, LLC, Pacific Seafood - Brookings, LLC, Pacific Seafood - Westport, LLC, Pacific Surimi - Newport LLC, collectively and through wholly owned subsidiaries do, and/or have done during the relevant period, business and are commonly known as a single entity referred to by their employees, customers, and suppliers (including Dungeness crab fishers) as "Pacific Seafood," "Pacific Choice," "Choice," and "No Choice." The defendants described in the paragraph are collectively referred to herein as "Pacific Seafood."

29. When doing business with crabbers, other fishers, and the public, the various entities making up Pacific Seafood present themselves as a single vertically integrated company. Pacific Seafood's website, www.pacificseafood.com, accordingly describes itself as a single "family owned" company, "employing more than 3,000 team members across 41 facilities in 11 states."  It further states "Pacific Seafood manages all parts of the supply chain from harvesting/fishing to processing, and distribution." The website also touts the breadth of Pacific Seafood's footprint in the seafood industry—listing more than 40 species sold by it.

30. Pacific Seafood was started in 1941 by the grandfather of Frank Dulcich, who ultimately owns and controls all the named Pacific Seafood-related Defendants.

31. Pacific Seafood refuses to participate in industry rankings that have traditionally been conducted by fishing industry publications, such as SeafoodSource, or to publicly provide information regarding its sales. However, in 2012, it was identified by the Portland Business Journal as the nation's largest seafood company with revenues of more than $1 billion that year.

32. Since 2012, Pacific Seafood has only grown larger, engaging in an aggressive acquisition strategy that has included—in addition to the former Dungeness crab processing companies discussed below—acquisitions of, and/or substantial investments in, by Pacific Seafood entities or Mr. Dulcich himself, large former competitors, such as Defendant Ocean Gold, Inc. and American Seafood, as well as smaller companies, such as Keltic Seafood, with an apparent focus on seafood processors.

33. Thus, while the same article from 2012 cited above describes Pacific Seafood as employing 2,500 people at seven locations, Pacific Seafood's website now describes it as employing 3,000 people at 41 locations. And the same Portland business journal reported that, in

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

2021, Pacific Seafood "enjoyed record profits."

34.     Following his acquisition of Pacific Seafood from his family in 1994, Mr. Dulcich's mother was forced to sue him to receive the money promised in the transaction and other family members sued him alleging fraud and other financial misconduct.

35.     Among those in the seafood industry not related to Mr. Dulcich, he and Pacific Seafood have become known for brazen and ruthless anticompetitive tactics. In particular, Mr. Dulcich and Pacific Seafood have used their size and ability to withstand substantial discrete losses to inflict significant financial consequences on those who do things contrary to Mr. Dulcich's or Pacific Seafood's desires or instruction.

36.     Indeed, Mr. Dulcich has been clear for years about his ambitions and his methods. Mr. Dulcich is known to instruct his managers to "use and abuse" rival companies and "kill our allies last." He has also been explicit about his willingness to use unfair and illegal practices to achieve his aims. When a crabber complained to Dulcich about Pacific Seafood's cheating on the agreed-upon price for Dungeness crab, Dulcich responded: "I'm going to fuck you on the price or fuck you on the weight, which one do you want?"

37.     This attitude has resulted in repeated litigation by fishers and competing fish processors against Pacific Seafood, including one, *Whaley v. Pac. Seafood Grp.*, No. 1:10-CV-3057-MC (D. Or.) ("*Whaley*"), in which—following certification of a litigation class—the class's Sherman Act (§§ 1 & 2) were resolved, in 2012, through a settlement that required Pacific Seafood to take certain actions and refrain from others for a period of five years.

38.     It has also resulted in successful criminal prosecutions of Pacific Seafood for both environmental crimes and theft from fishers, as well as thousands of cited regulatory violations.

39.     Pacific Seafood's principal representatives in the Pacific NW Dungeness crab ex vessel market include Frank Dulcich, Dan Obradovich, Rick Harris, Brett Hester, John Moody, and Joe Cincotta.

### B.     Safe Coast Defendants

40.     Defendant **BLUE RIVER SEAFOOD, INC.** is a California corporation with a principal place of business of 25447 Industrial Blvd., Hayward, CA. Chris Lam is Blue River

1    Seafood's Chief Executive Officer and Chief Financial Officer. Ha Lam is the company's

2    Secretary.

3         41.    Defendant **SAFE COAST SEAFOODS, LLC** is a California limited liability

4    company with a principal place of business of 25447 Industrial Blvd., Hayward, CA. Safe Coast

5    Seafood's manager and CEO is Christopher Lam.

6         42.    Defendant **SAFE COAST SEAFOODS WASHINGTON, LLC** is a Washington

7    limited liability company with a principal place of business of 25447 Industrial Blvd., Hayward,

8    CA. Safe Coast Seafood Washington's Governor is Christopher Lam.

9         43.    Defendant Blue River Seafood, Inc., which does business as Pucci Foods, owns

10   100% of Safe Coast Seafood and Safe Coast Seafood Washington.

11        44.    Blue River Seafood, Inc., Safe Coast Seafood, LLC, and Safe Coast Seafood

12   Washington, LLC, collectively, do, and/or have done during the relevant period, business as Safe

13   Coast, Safe Coast Seafood, Safe Coast Seafood WA, Jessie's Ilwaco Fish Co Inc, Pucci Foods,

14   and Pucci, and are collectively referred to herein as "Safe Coast."

15        45.    Confidential Buyer Informant #1 has done frequent business with Safe Coast

16   during the relevant period. The checks he receives from Safe Coast in the course of such business

17   are from Pucci Foods.

18        46.    Safe Coast's principal representatives in the Pacific NW Dungeness crab ex vessel

19   market include its General Manager, Max Boland, who also worked in that position for Safe

20   Coast's predecessor in interest, Alber Seafood. Safe Coast acquired Alber Seafood in early 2021.

21        47.    Safe Coast's Max Boland described Pucci Foods as Safe Coast's parent in an

22   exchange with Confidential Fish Buyer #1.

23        48.    Jessie's Ilwaco Fish Co Inc. went into receivership in 2020, after which landings

24   stopped. Following the receivership, Safe Coast started making landings in ▮▮▮▮▮▮▮▮

25        49.    Before going into receivership, Jessie's Ilwaco Fish Co Inc. received a substantial

26   investment from Frank Dulcich.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

50. During the relevant time period, ex vessel purchases of Dungeness crab by Safe Coast from class members in ██████████████████████████ were made through Safe Coast Seafood, LLC.

51. During the relevant time period, ex vessel purchases of Dungeness crab by Safe Coast from class members in ████████████████████████████████ ██████████████████ were made through Safe Coast Seafood Washington., LLC.

52. Does 8, 9, and 10 are substituted with Safe Coast Seafood, LLC and Safe Coast Seafood Washington, LLC.

**C.**     **Ocean Gold Defendant**

53. Defendant **OCEAN GOLD SEAFOODS, INC.** is a Washington corporation with a principal place of business of 1804 N Nyhus St, Westport, WA. Ocean Gold Seafoods, Inc. does, and/or has done in the relevant period, business as Ocean Gold and is referred to herein as "Ocean Gold."

54. The 2012 settlement of the *Whaley* case—which alleged *inter alia* that Pacific Seafood and Ocean Gold conspired to fix ex vessel prices of Pacific whiting—prohibited Pacific Seafood, during the five years of the settlement's term, from renewing an agreement by which Pacific Seafood acted as the exclusive marketer of Ocean Gold's seafood products and required an existing agreement to be amended to remove Pacific Seafood's control over Ocean Gold's ex vessel pricing. These prohibitions ended in 2017, and Ocean Gold's website now states: "Our markets are primarily international in Eastern Europe and Asia. Our marketing partner, ***Pacific Seafoods, manages the sales piece of our business***."

55. Ocean Companies Holding Co., LLC, a Washington LLC, lists Frank Dulcich as its governor, the principal office address is 16797 SE 130th Ave, Clackamas, OR, and the email address is legal@pacificseafood.com. Ocean Companies Holding Co., LLC owns 49% of Ocean Gold.

56. Ocean Gold's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Mark Rydman.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

57.     During the relevant time period, Ocean Gold made ex vessel purchases of Dungeness crab from class members in ███████████████████████████████ ████████████ Ocean Gold also made ex vessel purchases from class members in ██████████████████████████████████

58.     Doe 11 is substituted with Ocean Gold Seafoods, Inc.

**D.      Nor-Cal Defendants**

59.     Defendant **NOR-CAL SEAFOOD, INC.** is a California corporation with a principal place of business of 2810 E 7th St., Oakland, CA.

60.     Defendant Kevin Lee is a California resident residing in the Eastern portion of the San Francisco Bay Area in California. Kevin Lee founded Nor-Cal Seafood, Inc. with his wife, Kathy Lee, in 1992 and has since that time controlled and directed operations of the company.

61.     Nor-Cal Seafood, Inc. and Kevin Lee collectively do, and/or have done in the relevant period, business as Nor-Cal and are collectively referred to herein as "Nor-Cal."

62.     Nor-Cal's principal representatives in Pacific NW Area Dungeness crab ex vessel market include Kevin Lee.

63.     During the relevant time period, Nor-Cal made ex vessel purchases of Dungeness crab from class members in ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

64.     Plaintiff Brand Little issued a subpoena to Nor-Cal, on June 12, 2024, pursuant to this Court's order, Dkt. 61, and served it on Nor-Cal's counsel who represented he was authorized to accept service of it. Nor-Cal did not respond to the subpoena, despite several attempts by Plaintiff to elicit a response, resulting in the Court's issuance of an order compelling Nor-Cal's compliance with the subpoena, on August 13, 2024, Dkt. 73. Despite having been served the order, Nor-Cal still has not responded to the subpoena and is in contempt of the Court's order.

65.     At a gathering held on or around August 14, 2024, Nor-Cal's principal Kevin Lee bragged at a social gathering that he just "sold" Nor-Cal to evade liability from the instant

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   lawsuit. He stated further that he did so because this was what others in the group recommended

2   he do and what others had done, citing Pacific Seafood and Caito as examples.

3       66.     Doe 12 is substituted with Nor-Cal Seafood, Inc.

4   **E.     ASE Defendant**

5       67.     Defendant **AMERICAN SEAFOOD EXP, INC.** is a California corporation with

6   a principal place of business of 2029 Ingalls St., San Francisco, CA.

7       68.     American Seafood Exp, Inc.'s predecessor in interest is American Seafood

8   Express, LLC. American Seafood Exp does, and/or has done in the relevant period, business as

9   ASE and is referred to herein as "ASE."

10      69.     ASE's principal representatives in the Pacific NW Area Dungeness crab ex vessel

11  market include Kevin Zheng.

12      70.     During the relevant time period, ASE made ex vessel purchases of Dungeness crab

13  from class members in ███████████████████████████████████████

14  ██████████████████

15  ███   ██████████   substituted with American Seafood Exp, Inc.

16  **F.     Hallmark Defendants**

17      72.     Defendant **CALIFORNIA SHELLFISH COMPANY, INC.** is a California

18  corporation with a principal place of business of 505 Beach Street, Suite 200, San Francisco, CA.

19      73.     Defendant **ROBERT BUGATTO ENTERPRISES, INC.** is a California

20  corporation with a principal place of business of 835 Highway One, Bodega Bay, CA.

21      74.     Robert Bugatto Enterprises, Inc. lists Eugene Bugatto as CEO and Michael

22  Bugatto as Secretary. California Shellfish Company, Inc. lists Eugene Bugatto as CEO and

23  Michael Bugatto as Secretary, and is the registered owner of Hallmark Fisheries and Point Adams

24  Packing. California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc. collectively do,

25  and/or have done during the relevant period, business as Hallmark Seafood, Point Adams

26  Packing, and The Tides and are collectively referred to herein as "Hallmark."

27      75.     Hallmark's principal representatives in Pacific NW Area Dungeness crab ex vessel

28  market include Scott Adams and Crystal Adams.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

76.     During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in ███████████████████████████████ through Hallmark Fisheries.

77.     During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in ████████████ through Adams Point Packing Co. – Hammond.

78.     During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in ██████████████ through Robert Bugatto Enterprises, Inc. and ████████████████ through California Shellfish Company Inc.

79.     Does 14 and 15 are substituted with California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc.

**G.     Fathom Defendants**

80.     Defendant **ALASKA ICE SEAFOODS, INC**. is a Washington corporation with a principal place of business of 1690 Marine View Dr. Ste C, Tacoma, WA. Cody Mills and Solon Fowler are two of three governors of Alaska Ice Seafood, Inc. listed with the Washington Secretary of State. The contact email and physical address listed with the Washington Secretary of State for Alaska Ice Seafood, Inc. are accounting@fathomseafood.com and 1690 Marine View Dr. Ste C, Tacoma, WA.

81.     Defendant **LONG FISHERIES, INC.** is an Oregon corporation with a principal place of business of 63469 Kingfisher Rd., Coos Bay, OR, and an official mailing address of 1690 Marine View Dr. Ste C, Tacoma, WA. Cody Mills and Solon Fowler are listed with the Oregon Secretary of State as Long Fisheries, Inc.'s President and Secretary, respectively.

82.     Fathom Seafood is registered as a DBA for Alaska Ice Seafood, Inc. with the Washington Department of Revenue. Long Fisheries is registered as a DBA for both Alaska Ice Seafood, Inc. and Fathom Seafood with the Washington Department of Revenue.

83.     Alaska Ice Seafood, Inc. and Long Fisheries collectively do, and/or have done during the relevant period, business as Fathom Seafoods and are collectively referred to herein as "Fathom" and "Fathom Seafood."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    84.    Fathom Seafood's principal representatives in Pacific NW Area Dungeness crab

2    ex vessel market include Nick Mareno and Cody Mills.

3    85.    During the relevant time period, Fathom Seafood made ex vessel purchases of

4    Dungeness crab from class members in ████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████ through Fathom Seafood, Inc.

7    86.    During the relevant time period, Fathom Seafood made ex vessel purchases of

8    Dungeness crab from class members ████████████████████████████████████

9    ████ through Long Fisheries, Inc.

10    87.    During the relevant time period, Fathom Seafood made ex vessel purchases of

11    Dungeness crab from class members in ████████████████████████ through

12    Alaska Ice Seafood, Inc.

13    88.    Does 16 and 17are substituted with Alaska Ice Seafood, Inc. and Long Fisheries,

14    Inc.

15    **H.    Caito Defendants**

16    89.    Defendant **CAITO FISHERIES, INC.** is a California corporation with a principal

17    place of business of 19400 S Harbor Dr., Fort Bragg, CA.

18    90.    Defendant **CAITO FISHERIES, LLC** is a California limited liability company

19    with a principal place of business of 20644 Fordyce Avenue, Carson, CA.

20    91.    Defendant **SOUTHWIND FOODS, LLC** is a California limited liability company

21    with a principal place of business of 20644 Fordyce Avenue, Carson, CA

22    92.    Southwind Foods, LLC purchased Caito Fisheries, including all its subsidiary

23    entities, in or around April of 2023, within a month or two of Plaintiff's filing his initial class

24    action complaint alleging anti-trust violations in the Dungeness crab fishery in which Caito has

25    long been a significant player, and while the Pacific NW Area Dungeness crab season was still in

26    full swing. Southwind Foods, LLC and Caito Fisheries Inc. collectively do, and/or have done in

27    the relevant period, business as Caito and are referred to herein as "Caito."

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

93.     John Caito told Confidential Buyer Informant #1 that the sale to Southwind was done in reaction to the filing of the instant case.

94.     Caito's principal representatives in Pacific NW Area Dungeness crab ex vessel market include John and Joe Caito.

95.     During the relevant time period, Caito made ex vessel purchases of Dungeness crab from class members in ██████████████████████████████████████. Ex vessel purchases up to and including ████████████ were made through Caito Fisheries Inc., and ex vessel purchases beginning on ████████████ were through Caito Fisheries LLC.

96.     Does 18, 19, and 20 are substituted with Caito Enterprises, LLC, Caito Fisheries, Inc., Caito Fisheries, LLC, and Southwind Foods, LLC, respectively.

**I.     Fishermen's Catch Defendant**

97.     Defendant **FISHERMEN'S CATCH, INC**. is a California corporation with a principal place of business of 31 Marina Blvd, Pittsburg, CA.

98.     Fishermen's Catch, Inc. does, and/or has done in the relevant period, business as Fishermen's Catch and is referred to herein as "Fishermen's Catch."

99.     Fishermen's Catch's principal representatives in Pacific NW Area Dungeness crab ex vessel market include Peter Nguyen and Leon Gavin.

100.    During the relevant time period, Fishermen's Catch made ex vessel purchases of Dungeness crab from class members in ██████████████████████████████████████████

101.    Doe 21 is substituted with Fishermen's Catch, Inc.

**J.     Global Quality Defendants**

102.    Defendant **GLOBAL QUALITY FOODS, INC.** is a California corporation with a principal place of business of 100 Big Break Road, Oakley, CA. Its initial registration address was 3524 Investment Blvd, Hayward, CA.

103.    Defendant **GLOBAL QUALITY SEAFOOD LLC** is a California limited liability company with a principal place of business of 3524 Investment Blvd, Hayward, CA.

104.    Global Quality Foods, Inc. and Global Quality Seafood LLC collectively do, and/or have done in the relevant period, business as Global Quality Seafood and are referred to herein as, collectively, "Global Quality."

105.    Global Quality's principal representatives in Pacific NW Area Dungeness crab ex vessel market include Tony (last name not known at this time).

106.    During the relevant time period, Global Quality made ex vessel purchases of Dungeness crab from class members in ███████████████████████████ through Global Quality Foods Inc. until ██████████.

107.    During the relevant time period, beginning in █████████████, Global Quality made ex vessel purchases of Dungeness crab from class members in ██████████████████ ███████████████████████ through Global Quality Seafood LLC.

108.    Does 22 and 23 are substituted for Global Quality Foods, Inc. and Global Quality Seafood LLC, respectively.

**K.    Ocean King Defendant**

109.    Defendant **OCEAN KING FISH INC.** is a California corporation with a principal place of business of 2165 Yates Ave, Commerce, CA.

110.    Ocean King Fish Inc. does, and/or has done in the relevant period, business as Ocean King and is referred to herein as "Ocean King."

111.    Ocean King's principal representatives in Pacific NW Area Dungeness crab ex vessel market include George Lay.

112.    During the relevant time period, Ocean King made ex vessel purchases of Dungeness crab from class members ████████████████████████████████████ ██████████████████████████████████.

113.    Doe 24 is substituted with Ocean King Fish Inc.

**L.    South Bend Defendants**

114.    Defendant **SOUTH BEND PRODUCTS LLC** is a Washington limited liability company with a principal place of business of 237 W. Robert Bush Dr, South Bend, WA.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

115.     Defendant **SWANES SEAFOOD HOLDING COMPANY LLC** is a Washington limited liability company with a principal place of business of 5440 S Proctor, Tacoma, WA.

116.     South Bend Products LLC and Swanes Seafood Holding Company LLC collectively do, and/or have done in the relevant period, business as South Bend and are collectively referred to herein as "South Bend."

117.     During the relevant time period, South Bend made ex vessel purchases of Dungeness crab from class members in ███████████████████████████ ████████████████ through Swanes Seafood Holding Company LLC.

118.     During the relevant time period, South Bend made ex vessel purchases of Dungeness crab from class members in ███████████████████████████ through South Bend Products Inc.

119.     Does 25 and 26 are substituted with South Bend Products LLC and Swanes Seafood Holding Company LLC, respectively.

**M.     Bornstein Defendants**

120.     Defendant **BORNSTEIN SEAFOODS, INC**. is a Washington corporation with a principal place of business of 1001 Hilton Ave, Bellingham, Washington.

121.     Defendant **ASTORIA PACIFIC SEAFOODS, LLC** is a Washington corporation with a principal place of business of 1001 Hilton Ave, Bellingham, Washington. Bornstein Seafoods, Inc. is listed as the governor of Astoria Pacific Seafoods, LLC.

122.     Bornstein Seafood, Inc. and Astoria Pacific Seafood, LLC collectively do, and/or have done in the relevant period, business as Bornstein and Bornstein Newport and are collectively referred to herein as "Bornstein."

123.     Bornstein's principal representatives in Pacific NW Area Dungeness crab ex vessel market include Andrew Bornstein and Mike Shirley.

124.     During the relevant time period, Bornstein made ex vessel purchases of Dungeness crab from class members in ███████████████████████████ ██████████ through Bornstein Seafoods Inc.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

125.   During the relevant time period, Bornstein made ex vessel purchases of Dungeness crab from class members in ██████████ through Astoria Pacific Seafoods, LLC.

126.   Does 27 and 28 are substituted with Bornstein Seafoods Inc. and Astoria Pacific Seafoods, LLC, respectively.

**N.   Doe Defendants**

127.   Does 29-60 are defendants whose true names are unknown to Plaintiff. Each of these fictitiously named defendants is in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

**III.   Agents and Co-Conspirators**

128.   Various co-conspirators, some known and some unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

129.   Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein throughout the Pacific NW Area and in this District.

130.   Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

131.   At all relevant times, other known and unknown individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the court of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objections of the scheme to benefit Defendants and themselves through the manipulation of ex vessel Dungeness crab prices.

132.   Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's, corporation's, or other entity's business or affairs.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

133.    The officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

134.    Each Defendant, and its respective subsidiaries, affiliates, and agents operated as a single unified entity.

135.    Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Each Defendant's entities and their agents all affirmatively and collectively represent themselves as one respective corporate family, rather than separate subsidiaries and parents.

136.    Various persons, businesses, or fictitious persons not named as Defendants herein may have participated as co-conspirators in the scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as defendants at a later date.

## JURISDICTION, VENUE, AND COMMERCE

137.    The Court has jurisdiction over Plaintiffs' claims for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

138.    This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs suffered antitrust injury within this jurisdiction.

139.    Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

140.    Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

141. By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the members of the proposed Classes (as defined below). Defendants, directly and through their agents, engaged in activities affecting multiple states, that were designed to fix prices, unreasonably restrain trade, and adversely affect competition in ex vessel Dungeness crab market.

## INTRADISTRICT ASSIGNMENT

142. Pursuant to Civil Local Rule 3.2 (c) and (d), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because a substantial part of the events giving rise to the claim occurred in San Francisco County. Furthermore, several Defendants maintain facilities and execute operations within this Division.

## FACTUAL ALLEGATIONS

### I.  Pacific NW Area Ex Vessel Dungeness Crab Industry

143. Dungeness crab is a species of shellfish that is found only in the eastern North Pacific Ocean. Dungeness crabs are prized for their size and sweet meat. A classic commodity product, Dungeness crab is fungible, with no meaningful difference between crab landed by one crabber or another (or, for that matter, resold by one buyer or another).

144. They are traditionally enjoyed fresh all along the West Coast, especially around the holidays (Thanksgiving, Christmas, the Western New Year, and Chinese New Year) when demand is highest and which traditionally corresponds with the opening of the seasons in the Pacific NW Area. In the past two decades, a very substantial portion of the catch is also exported live to Asian markets, particularly China, but also Korea, Vietnam and other countries.

145. Commercial Dungeness crab fishing requires a permit (in California, technically a "registration"), which is tied to a specific vessel and allows crabbers to have a certain number of traps on that vessel. Rather than being organized by quotas that limit the total amount a crabber can catch, the Dungeness crab fishery is what is known as a "derby" fishery: crabbers are entitled to use the maximum number of crab traps allowed by their vessel permit to catch as many

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Dungeness crabs as possible during the season.[1] Because the total amount of Dungeness crab available to catch is limited and decreases throughout the season, this arrangement incentivizes crabbers to go out as soon as the season opens, when there is also the highest volume of Dungeness crab. Missing the early days of a given season can therefore have serious ramifications on a crabber's bottom line for that season.

146.    The Dungeness crab season for most of the Pacific NW Areas opens on December 1, unless delayed. However, in California's District 10 (aka Central California), the season starts on November 15, unless delayed.

147.    The November 15 opening date in Central California has meant that fresh Dungeness crab has long been available and has been a highly desirable product for Thanksgiving and Christmas, as well as for New Year's and Chinese New Year's. Dungeness crab has therefore become a staple on these holidays, and non-export demand for fresh Dungeness crab is at its highest in November and December. This synergy means that consumer demand for fresh Dungeness crab has traditionally peaked at the same time as supply.

148.    The Dungeness crab season for all regions in the Pacific NW Area has historically closed in the summer or very early fall.

149.    Those who buy Dungeness crab directly from fishers for resale, (i.e., ex vessel), are required to hold a fish buyer or receiver license from the state in which they make ex vessel purchases.

150.    Once purchased, Defendants and other buyers resell Dungeness crab either live, fresh cooked, frozen (often in sections), or canned. While freezing or canning crab prevents spoilage, in terms of taste and texture, frozen and canned Dungeness crab are inferior products compared with live or fresh cooked Dungeness crab. When given the choice, consumers strongly prefer live or fresh cooked Dungeness crab to frozen or canned.

151.    During the 2023/24 season, approximately 55,650,00 lbs. of Dungeness crab was purchased, in the Pacific NW Area, by 239 licensed fish buyers, for a total reported price of

---

[1] Overfishing of the species has been successfully managed since the 1980s by limiting commercial crabbers to only male crabs.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

approximately $207 million. However, a vast majority of the crab was (and every season is) purchased by a small subset of these buyers. During the 2023-24 season, a group of 21 buyers purchased approximately 88% of the total crab landed in the Pacific NW Area by volume, while the remaining 218 buyers accounted for the remaining 12%; and this group of 218 small buyers includes many crabbers who are technically required to "purchase" crab they landed from themselves before selling the crabs to consumers, restaurants, and other retail purchasers.

152.    By way of contrast, during the 2023/24 season, Pacific Seafood, alone, directly purchased ex vessel 19.6% of the total crab landed in the Pacific NW Area by volume. Its co-defendants Ocean Gold, Bornstein, Safe Coast, South Bend, Hallmark, Caito, Fathom, Nor-Cal, ASE, Ocean King, and Fisherman's Catch directly purchased ex vessel 8.89%, 6.65%, 5.26%, 5.03%, 3.91%, 2.73%, 2.54%, 2.29%, 1.81%, 1.64%, and 1.20% of the total crab landed in the Pacific NW Area by volume, respectively.

153.    These figures do not include "out-the-backdoor" transactions in which Defendants purchase from other buyers who themselves have made the purchase ex vessel from crabbers. For example, Unnamed Co-Conspirator #1 operated, in 2023/24 as a front for Defendant Fishermen's Catch, which took all of the crab purchased by it. In this capacity, Unnamed Co-Conspirator #1 purchased 1.28% of the total crab landed in the Pacific NW Area by volume during the 2023/24 season. When this is added to the crab that Fishermen's Catch directly purchased ex vessel from Pacific NW Area crabbers, its total market share increases to 2.48%.

154.    Most of the largest buyers, including Defendants Bornstein, Caito, Hallmark, Ocean Gold, Pacific Seafood, and Safe Coast, are members of the West Coast Seafood Processors Association ("WCSPA"). The WCSPA describes itself as an industry trade group that represents the interests of members that process seafood in California, Oregon, and Washington.

155.    At the beginning of the season, when a large volume of crab is landed in a short period, most crabbers have no choice but to sell to one or more of the Defendants, as most of the smaller buyers do not have the capacity to purchase the quantities landed. Thus, as a result of market consolidation and Defendants' restricting access to many of the ports under their control,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

smaller, non-cartel member buyers cannot purchase enough crab to allow the season to open, even if they decided to bear the risk of crossing Pacific Seafood and the other Defendants.

156.    A delayed opener reduces or eliminates the availability of reasonably priced live crab during the period of peak domestic consumer demand, which benefits the processor Defendants in two ways. First, it eliminates competition during this period of peak demand that its frozen crab would otherwise have from superior live crab, allowing the processor Defendants to sell more of such frozen crab and at higher prices. Second, it keeps ex vessel Dungeness crab prices at an artificially low price by ensuring that crab won't be landed when domestic consumer demand is highest, allowing the processor Defendants to artificially create a buy-low sell-high situation that benefits only them.

157.    While Defendants that don't process crab don't reap the benefits of selling frozen crab while consumers are clamoring for holiday crab, they do greatly benefit from the suppressed ex vessel prices. And because a delayed opener denies the crabbers vital income before and during the holidays, a delay increases financial pressure on crabbers, making them more likely to go out for a lower opening price—which establishes a baseline for prices throughout the season—and continue crabbing even when the prices remain depressed, because at a certain point some money is ultimately better than no money.

## II.    Defendants' Price-Fixing Cartel

### A.    Defendants' Cartel Arose Out of a Marked Increase in Dungeness Ex Vessel Prices Being Paid to Crabbers in the Pacific NW Area that Started in 2006/2007 Season and Continued Through the 2014/15 Season

158.    For decades, the Pacific NW Area's ex vessel Dungeness crab market was dominated by processors, who canned or froze the crab, with a limited volume of crab being sold live and fresh-cooked to restaurants, grocery stores, and the like.

159.    Beginning in the late 1990s and accelerating in the mid-2000s, the market began to shift driven, in large part, by demand in Asia and the opening of live export markets there, with a greater and greater amount of crab being purchased ex vessel in the Pacific NW Area to sell live and fresh cooked.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

160.   While Pacific Seafood, who in August 2023 built a new facility in Shanghai to distribute live Dungeness crab, and other traditional processors are now significantly involved in the live export market, this was not the case in the early years of the market's transition.

161.   Rather, a new set of buyers – including Nor-Cal, Ocean King, and ASE, who primarily purchased Dungeness crab ex vessel in the Pacific NW Area to sell live in China and elsewhere came into the market.

162.   The effect of the entrance of these new purchasers into the Pacific NW Area ex vessel market was to raise ex vessel prices, just as basic economic theory would predict.

163.   Prior to this shift, when the Pacific NW Area ex vessel market was dominated by processors, ex vessel prices stayed in a narrow band of around $1.35 to $2 a pound.

164.   Starting in or around the 2006/07 season, ex vessel prices started climbing in the Pacific NW Area, as these new market entrants began competing to purchase Dungeness crab ex vessel from crabbers.

165.   Of particular importance in this dynamic were the roles played by what are sometimes referred to in the industry as "white van" buyers and the independent hoists that served them.

166.   These white van buyers, including Nor-Cal, Ocean King, and ASE, would drive their eponymous refrigerated white vans to various ports throughout the Pacific NW Area and purchase crab directly (i.e., ex vessel) from crabbers in those ports, paying the operators of independent hoists in those ports to offload the crab from the crabbers' boats.

167.   As independent hoist operators were paid according to the weight of the crab offloaded by the buyers, they had a strong financial incentive to encourage white van buyers to make ex vessel purchases using the operator's hoist and for crabbers to sell to the white van buyers. Thus, independent hoist operators would actively solicit white van buyers to come to their hoists, letting them know which boats were scheduled to come in when, and with how much crab. The white van buyers, in turn, would then compete with each other to secure the crab scheduled to be landed, calling the crabbers while they were still on the water and out-bidding each other for the crabbers' load.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

168.    Crabbers being who they are and dock talk being what it is, what a crabber was paid for a load of crab was soon widely known among other members of the fleet, who then demanded a similar price from the same or different buyers, thus raising market. In other words, the Pacific NW Area Dungeness crab ex vessel market behaved as economic theory would predict a free market would.

169.    Thus, by the 2014/15 season, ex vessel prices for Dungeness crab had climbed significantly in the Pacific NW Area, with crabbers getting as much as $14/lb.

170.    The increase in ex vessel prices, in turn, decreased the profit of buyers. As a result, in advance of the 2015/16 season it was agreed among Defendants that they would limit the amount that they paid for Dungeness crab in the Pacific NW Area ex vessel and work together to suppress the ex vessel price for Dungeness crab in the Pacific NW Area more generally.

171.    At or around the time that this agreement was made, one long-time crabber was told by George Lay of Ocean King, who had paid him $11 to $14/lb during the 2014/15 season, that Nor-Cal's Kevin Lee and ASE's Kevin Zhang both told him that he had paid the crabber too much the previous season.

172.    And once the 2015/16 season was underway, the same crabber was pointedly told by Ocean Gold's Gerald Schlaupitz while unloading a load of crab: "Heard you did well in Morro Bay last year. You will never see that price again."

173.    Mr. Schlaupitz's (informed) prediction was correct. As a result of Defendants' agreement to artificially depress ex vessel prices in the Pacific NW Area, the price growth previously seen in the market had been reversed. And now, as shown on the graph below, ex vessel prices in the Pacific NW Area, when adjusted for inflation, have fallen back to a level below the prices being paid in 2001.

174.    In contrast and as also shown on the graph below, ex vessel prices for Dungeness crab in the Puget Sound ex vessel market—which for a variety of reasons, including extensive participation in the market by tribal-owned buyers, has escaped Defendants' control and manipulation—have continued to grow and with it the delta between what buyers in Puget Sound

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

pay ex vessel for Dungeness crab and what buyers in the Pacific NW Area pay ex vessel for exactly the same product.



Average Inflation-Adjusted Price for Ex-Vessel Dungeness Crab
Pacific NW vs Puget Sound ($/lb)

Source: Fish Ticket Data from California, Oregon, Washington States' Departments of Fish and Wildlife;
CPI Series Federal Reserve Bank of St. Louis

**B.** **Defendants Have Agreed to Allow Pacific Seafood to Set the Opening Price, which Has Resulted in Delayed Opening and a Lower Opening Price, which Is the Price at which a Large Portion of the Season's Catch Is Traditionally Sold and Which Sets the Baseline Price for the Remainder of the Season**

175. Critical to Defendants' conspiracy to artificially fix, control, and suppress ex vessel prices in the Pacific NW Area has been their agreement, during the conspiracy period, to allow Pacific Seafood to set the opening ex vessel price for Dungeness crab in the Pacific NW Area, rather than offering competing opening prices. Indeed, Defendants not only refuse to pay any amount higher than the price dictated by Pacific Seafood but they will also refuse to even state a price until Pacific Seafood has stated what the price is.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

176.   The lack of competition results in both (a) an artificially lower opening price at which a large portion of Dungeness crab caught in the season is sold and (b) the establishment of an artificially depressed baseline for prices throughout the season. And, several times, it has delayed the opening of Dungeness crab season in some or all of the Pacific NW Area crab fishery. This, in turn, eliminates the ability of crabbers to sell ex vessel during the holiday season (*i.e.,* when consumer demand for crab is traditionally highest), which further decreases ex vessel prices.

177.   As Defendants well know, they could pay at least approximately $5-7/lb. ex vessel to crabbers at the opening of crab seasons in the Pacific NW Area, and still make a significant profit. Thus, basic economic logic would predict that, in an unmanipulated market, Defendants would compete with each other by offering crabbers higher ex vessel prices until this threshold was met.

178.   However, as a result of their illegal agreement not to compete with each other on opening price, Defendants have forced crabbers to accept far less than that, reaping huge illegal profits on crabbers' backs during the opening days of the season and beyond.

179.   Indeed, these illegal excess profits, in combination with the risks posed by punishments (discussed herein) that Defendants impose on those who refuse to obey their pricing dictates, are so significant that Defendants have, on several occasions in recent years, delayed the opening of the season. Thus, instead of offering a fair ex vessel opening price that would allow both them and crabbers to make a living, crabbers have lost the opportunity to sell Dungeness crab during periods of peak demand when prices otherwise would and should have been at their highest.

### 1.   2019/20 Pacific NW Area Dungeness Crab Season

180.   In a text exchange on January 1, 2020—the day after the Dungeness crab season opened in ports north of the Mendocino County line—Fathom's Nick Mareno indicated to Bornstein's Andrew Bornstein that Fathom had secured the purchase of a load of crab from a boat

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

in Crescent City on the following Monday and asked Mr. Bornstein, a representative of Borstein (a supposed competitor of Fathom), "What's price doing? Hearing Pacific is raising to $3.25."

181.   In response, Mr. Bornstein did not tell Mr. Mareno that he was not comfortable or allowed to discuss pricing with the representative of a competitor, but rather responded, "It's 3.00 still and will be Monday." To this, Mr. Mareno responded, "Roger."

182.   Three days later, Mr. Mareno texted back Mr. Bornstein to ask, "Still sounding like $3 boat price?" And to this, Mr. Bornstein responded, "Yup. Don't think anyone is gonna fish until tmrw at the earliest."

183.   Later the same day, Mr. Mareno complained to Mr. Bornstein, "Getting blasted on that $3 price…" "Might not work." To this, Mr. Bornstein responds, "I'm a hard pass on any dock price over 3.00."

184.   Mr. Bornstein then tells Mr. Mareno, "Pacific Seafood had 2 boats sell to a live guy in Newport today at 3.50 and they were just notified that they lost their bottom fish and shrimp markets and don't call for bait. Pacific Seafood is playing hard ball at 3.00."

185.   All of the Defendants were playing the same agreed-upon hardball: none of them paid more than $3 at the opening of any portion of the Pacific NW Area Dungeness crab fishery in the 2019/20 season.

### 2.   2020/21 Pacific NW Area Dungeness Crab Season

186.   At the start of the 2020/21 season, Defendants' conspiracy effectively blocked the Pacific NW Area crab season from opening until mid-January of 2021, substantially after the holiday season of peak demand. As state officials in California, Oregon, and Washington gave the green light to open the fishery in December of 2020, virtually all of the crabbers remained tied up in port, as Pacific Seafood stuck firm to an opening ex vessel price under $3/lb. Even without adjusting for inflation, this opening price was lower than what California crabbers received over twenty years before at the opening of the 1999/00 season, but, with the exception of ███████ which surreptitiously purchased crab in a relatively little-used port in Northern California, all of the other Defendants toed Pacific Seafood's line.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

187.    In a series of texts sent between January 8, 2021 and January 15, 2021, Ocean King's George Lay and Bornstein's Andrew Bornstein discussed the price fixing arrangement amongst cartel members and coordinated their response to demands by crabbers for higher ex vessel prices.

188.    On January 8, 2021, Mr. Lay texted: "Good morning Andrew. I just heard the fleet is going to be asking for $2.75 from you."

189.    In response, Mr. Borstein responded in part, "If we refuse are there other buyers who would pay that much?"

190.    Mr. Lay responded in part, "I know they are also bringing it to pac [Pacific Seafood] as well as hallmark (which is really one in the same). At the moment pac is still at $2.50." Mr. Lay further let him know that Ocean King and other SF buyers were willing to pay $2.75/lb, but that some crabbers were demanding $3/lb.

191.    Soon thereafter, Mr. Lay followed up with Mr. Bornstein to let him know that Pacific Seafood, in fact, was at $2.75/lb. as well, which Mr. Bornstein indicated was already known by him. Mr. Bornstein then texted Mr. Lay to confirm that Bornstein was offering $2.75 as well.

192.    For Pacific Seafood, this strategy made economic sense. Pacific Seafood knew that crabbers wouldn't accept such a low price. By refusing to move off its low price, Pacific Seafood kept the fishery closed, allowing it to sell frozen crab from the prior season before during the peak of consumer demand (the holiday season) without troublesome competition from far more desirable fresh caught crab.

193.    For the other Defendants, it made no economic sense to toe Pacific Seafood's line, *absent their overarching agreement to fix ex vessel prices*. In December 2020, the wholesale price of live Dungeness crab in the Pacific NW Area (i.e. the price that buyers sold to grocery stores, restaurants, and the like) was approximately $11/lb.; and once the season finally opened, prices stayed high, bouncing back to approximately $11/lb. in March 2021, and climbing to approximately $13.50/lb. in May 2021.

194.    As a matter of comparison, the wholesale price of live Dungeness crab in the Pacific NW Area, in both March and May of 2020, was approximately $7.70.

### 3.    2021/22 Pacific NW Area Dungeness Crab Season

195.    During the 2019/20 season, Pacific Seafood punished Nor-Cal for its failure to comply with Pacific Seafood's opening price dictates, reneging on a previous agreement to purchase a very large amount of crab from Nor-Cal, forcing it to sell the crab at a significant loss.

196.    Thus, at the start 2021/22 season, Nor-Cal, like other Defendants, got in line with Pacific Seafood on opening price.

197.    Accordingly, in late November of 2021 in advance of the opening of the season, a crabber texted Nor-Cal's Kevin Lee in an attempt to negotiate a price with him, stating: "PAC choice [Pacific Seafood]. 4.75. Nor cal 5 or better."

198.    In response, Mr. Lee refused to engage, instead responding: "Hihi" "NorCal just a little boy . Ha ha." "Will Matching the big boss."

199.    When the crabber responded, "If Frank [Dulcich] is big boss we have a problem," Mr. Lee responded, "Ha ha ha."

### 4.    2022/23 Pacific NW Area Dungeness Crab Season

200.    As one long-time crabber put it, at the beginning of the 2022/23 season, Pacific Seafood and the other Defendants went into "full-on attack mode" to crush the price of Dungeness crab, seeking to "drive the boot right in."

201.    Prior to the opening of the 2022/23 season, Pacific Seafood, instead of stating a low-ball ex vessel price, refused to state any price at all; and all the Defendants were similarly mum.

202.    For many weeks in advance of the season, during the period in which buyers in other years would be discussing the opening ex vessel prices with boats whose crabs they were trying to secure, Pacific Seafood's Joe Cincotta was in Eureka but refused to even discuss a price with crabbers who tried, nor would any other crabber.

203.    And the same was true in other ports in the Pacific NW Area, neither Pacific

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Seafood nor any other Defendant would even discuss an opening price. The other Defendants'
representatives, when asked by crabbers what opening price they were willing to pay, simply
demurred, saying that they would not state a price until Pacific Seafood did.

204.    Pacific Seafood, for its part, claimed that the reason it was not willing to state a
price was that there was no demand for live or fresh cooked crab. That was demonstrably false.

205.    In December of 2022, demand for live Dungeness crab was so high that Pacific
Seafood and other ex vessel buyers were selling live crab to their customers for approximately
$14/lb. And in Puget Sound—which because of significant tribal involvement and other factors
has not fallen within the ambit of Defendants' conspiracy—crabbers were receiving as much as
$10.50/lb. ex vessel from buyers there.

206.    Indeed, in December of 2022, Fathom—which joined other Defendants in refusing
to offer an opening price to crabbers in the Pacific NW Area—purchased ex vessel from crabbers
in Puget Sound almost 15,000 lbs. at $10/lb. and over 18,000 lbs. at $9.75.

207.    Nonetheless, despite this high consumer demand and the significant profits that
they could earn if they had live or fresh cooked crab to sell, Defendants refused to offer a price,
with non-Pacific Seafood Defendants and other buyers stating that, while they wanted the crab,
they could not offer a price until Pacific Seafood offered one, which it refused to do.

208.     On or around December 23, 2022, the California Department of Fish and Wildlife
announced that the Dungeness crab season for California ports would open, on December 31,
2022, with crabbers allowed to set their traps on December 28, 2022. Nonetheless, neither Pacific
Seafood nor any other Defendant would even discuss an opening price.

209.    Having already missed Thanksgiving and Christmas and the time around it, when
domestic consumer demand for live and fresh cooked crab is at its highest, crabbers were
infuriated by the prospect that because Pacific Seafood and the other Defendants would not even
offer them a price for crab, the fleet would stay tied up, unable to catch and deliver crab to eager
consumers looking to celebrate the Western and Chinese New Year. Thus, the fleet in San
Francisco, and elsewhere in District 10, which includes the Bay Area, began discussing taking the
extraordinary step of going out on an "open ticket," *i.e.*, without any commitment from any buyer

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    to take their crab at any price.

2        210.    On December 27, 2022, Pacific Seafood's Joe Cincotta held a meeting with

3    crabbers in San Francisco at which it again declined to give a price for Dungeness crab, asking

4    them what they were hearing from the fleet. He was informed that Half Moon Bay and Bodega

5    Bay had decided to just go fishing on an open ticket.

6        211.    When Mr. Cincotta heard what the fleet was doing, his response was "You mean

7    to tell me that for the first time in the history of this fishery, in horrible weather, and with half the

8    gear, this fleet has decided to go fishing on an open ticket?"

9        212.    When the crabbers responded that they'd be going out as well, Mr. Cincotta said,

10   "We'll do everything we can to try to help you out if we can sell them. It might only be a $1 or

11   something though."

12       213.    Once the crabbers were out on the water, Nor-Cal very briefly offered boats $5/lb.,

13   but *instructed them to keep it secret.* However, over the course of the day, Nor-Cal withdrew the

14   offer and dropped the price it was offering to that being paid by other Defendants, claiming it was

15   because people had been too public about it—in other words, other cartel members had

16   discovered Nor-Cal was cheating on their price-fixing agreement and threatened Nor=Cal with

17   retaliation.

18       214.    Crabbers in ports north of Bodega Bay in the Pacific NW Area did not follow the

19   lead of their colleagues to the South. Rather, despite having been given the same green light to

20   fish by the state, they remained tied up for two weeks, while Pacific Seafood stated $2.25/lb. was

21   the maximum they'd pay. No other Defendant broke ranks.

22       215.    Nor-Cal's Kevin Lee—who had very briefly paid crabbers $5/lb. at the opening of

23   the season in San Francisco before "too many people found out"—had clearly learned his lesson.

24       216.    On January 9, 2023, a crabber texted Mr. Lee, inquiring, "Any price offers for CC

25   [Crescent City]?"

26       217.    In response, Mr. Lee responded, "No idea yet. I'm waiting big boss give out

27   price." To this the crabber responded, "I remember when you were big boss. Those were the

28   days." Mr. Lee replied, "Ha ha ha."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

218.    Three days later, on January 12, 2023, the crabber texted Mr. Lee again, asking, "What are you offering. Really hard to do business like this."

219.    In response, Mr. Lee said, "I know. I just matching what ever price."

220.    Finally, on or around January 13, 2023, Pacific Seafood offered to pay $3.00/lb. for the first 400,000 lbs. with the price then dropping to $2.25, giving the crabbers twelve hours to accept the deal.  Having now been waiting for months to go fishing, the deal was accepted.

221.    For context, twelve years before, at the opening the 2010/11 season in Northern California, Pacific Seafood paid crabbers ▮▮▮▮ ex vessel, without adjusting for inflation.

222.    And in January of 2023, while Pacific Seafood and the other Defendants were insisting that crabbers in the northern portion of the Pacific NW Area accept Pacific Seafood's offer of $2.25/lb. ex vessel, buyers were selling live Dungeness crab caught elsewhere to their customers for approximately $8/lb.; and crabbers in Puget Sound were getting as much as $7/lb. ex vessel. Fathom (who was part of the cartel refusing to offer Pacific NW Area crabbers more than $2.25/lb.) was, at the time,  paying as much as ▮▮▮▮ ex vessel in Puget Sound.

### 5.    2023/24 Pacific NW Area Dungeness Crab Season

223.    In November of 2023, Safe Coast's Max Boland sent a series of texts to Confidential Buyer Informant #1—who, as discussed elsewhere herein, had run afoul of Defendants during the 2022/23 season by not obeying their pricing dictates—informing Confidential Buyer Informant #1 that Pacific Seafood would set the ex vessel price paid at the opening of Pacific NW Area's 2023/24 Dungeness crab season, and the price would likely be between $1.85/lb. and $2.00/lb., but maybe as high as $2.25/lb.

224.    When Confidential Buyer Informant #1's suggested to Mr. Boland that an ex vessel price in the range of $3/lb. was justified, Mr. Boland stated: "3 does not work 1.85-2.00 is the number and that is where PAC [Pacific Seafood] will be."

225.    When Confidential Buyer Informant #1 protested that $1.85-$2/lb. was not high enough to get most crabbers to go fishing, Mr. Boland replied: "PAC will make the decision. Could be as high as 2.25."

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

226.     At around the same time in or around November 2023, Confidential Buyer Informant #1 had a conversation with Caito's John Caito. During that conversation, Mr. Caito told Confidential Buyer Informant #1 that Caito would not set an opening ex vessel price until Pacific Seafood did.

227.     And, in early to mid-December of 2023, in advance of the opening of any portion of the Pacific NW Area's Dungeness crab fishery, Pacific Seafood's Brett Hester called Confidential Buyer Informant #1 and told him that the opening ex vessel price was going to be less than $2/lb.

228.     At approximately the same time, Confidential Buyer Informant #1 attended a meeting that included representatives of Pacific Seafood (Dan Obrador and Mike Moody), Bornstein (Mike Shirley), Fathom, Hallmark (Scott Adams) and Safe Coast. At that meeting, Defendants' representatives expressed a uniform position they did not want to offer crabbers more than $2.50/lb. as an opening ex vessel price.

229.     During the meeting, Dan Obrador claimed that the reason the price needed to be that low was that Pacific Seafood had one million pounds of frozen Dungeness crab in the freezers, thus there was no demand and the ex vessel price had to be low. Bornstein's Mike Shirley and Hallmark's Scott Adams concurred that they "need to keep the price down."

230.     The same claim that it had one million pounds in the freezer and that there was no demand for crab was also used by Pacific Seafood in its price negotiations with crabbers. However, in fact, Safeway had already paid for the one million pounds, and was just keeping it in Pacific Seafood's freezer temporarily. Thus, while technically true that Pacific Seafood had one million pounds in the freezer, that fact had no bearing on demand for crab, which, in fact, was very high.

231.     Indeed, in mid-December 2023, buyers were getting $9-$10/lb. for live crab and $19/lb. for whole cooked crabs from customers like Whole Foods, Safeway and Costco, and paying crabbers in Puget Sound upwards of $7.75/lb. ex vessel.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

C.    **After the Opening, Defendants Closely Coordinate With One Another on Ex Vessel Prices**

232.    Defendants' price coordination isn't limited to the opening of the season, rather it continues as the season progresses.

233.    As discussed elsewhere herein, prior to the formation of Defendants' cartel, Nor-Cal, ASE, Ocean King, and other live buyers would drive the price up as the season progressed, in large part, by having refrigerated "white vans" drive to various ports and actively soliciting crab from crabbers thereby offering higher ex vessel prices, which, in turn, forced other buyers in the visited ports to increase their prices and more generally raising the ex vessel market price in the Pacific NW Area.

234.    That no longer occurs. Rather, now, Nor-Cal, ASE, Ocean King, and the other Defendants, instead, share information and coordinate their price offers in order to minimize the extent to which ex vessel prices rise as the season goes on.

235.    Texts between Ocean King's George Lay and Bornstein's Andrew Bornstein from 2021 demonstrates how this is done in real time.

236.    On January 14, 2021, Mr. Lay texted Mr. Bornstein to let him know that some buyers in San Francisco had raised their offered ex vessel prices to $3/lb., asking: "What are you doing with your boats down there?"

237.    When Mr. Borstein responded with non-price related information, Mr. Lay followed up, "Will you be matching the price?" And Mr. Lay further told Mr. Bornstein that he was likely to "get a call from Ben soon so I'd like to know what to tell him."

238.    Mr. Borstein then reply, "More than likely." But he qualified that making clear that he would not explicitly tell crabbers that Bornstein would match and would not pay more than $5/lb.

239.    To this, Mr. Lay responded, "Exactly. I agree. I haven't said a word to my boats. It's unnecessary, they aren't even close to filling up and won't be coming in anyways. The guys in Sf are off their rockers."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

240.    The next day, Mr. Lay followed up with Mr. Bornstein, "Well, it's going crazy here. $4/lb yesterday."

241.    Moreover, as alleged in more detail *infra,* in many cases, Defendants won't even bother to directly purchase from crab ex vessel from crabbers, but, instead, will just purchase the crab "out the backdoor" of one of their co-conspirators, eliminating the ex vessel price competition that their independent ex vessel purchases would otherwise have created.

242.    Thus, for example, in February of 2022, a crabber who had sold to Kevin Lee of Nor-Cal for many years texted to tell him that he had a load of about 7,000 lbs. Mr. Lee asked how much the crabber wanted for the load and was told $7.00/lb. In response, Kevin Lee texted that $6.00/lb. was the dock price, and then ceased communications, rather than negotiate with the crabber as he would have done in the past. Later the crabber told his friend who operated the hoist at the Lucas Wharf in Bodega Bay about this exchange with Kevin Lee. In response, his friend told him that the reason Mr. Lee felt no need to negotiate with the crabber as he had in the past was that he could buy all the crab he wanted out of the back door from Hallmark at the Tides in Bodega Bay at or around the dock price.

**D.    Defendants Have Consolidated Their Control of the Pacific NW Area Ex Vessel Dungeness Crab Market by Purchasing and in Many Cases Shutting Down Erstwhile Competitors, Entering Into Exclusivity Arrangements with Port Operators, and Limiting Non-Cartel Members' Access to Hoists**

**1.    Pacific Seafood**

243.    In a process that began over 40 years ago, Pacific Seafood has acquired numerous companies that formerly participated as buyers in the Pacific NW Dungeness crab ex vessel market or the landing and/or processing assets of those companies, in many cases eliminating the acquired landing and processing capacity.

244.    As a result, Pacific Seafood now is by far the largest ex vessel buyer in the Pacific NW Area, there are fewer substantial ex vessel buyers in the Pacific NW Area, and fewer independent hoists in Pacific NW Area ports that out-of-port or "white van" buyers can utilize to purchase crab directly from crabbers, ex vessel.

245.    Its first acquisition was of Pacific Coast Seafood, in 1983, which operated a crab

1  processing plant in Warrenton, Oregon.

2      246.    This was followed by its acquisition of Pacific Choice Seafood, in 1986, which

3  operated a crab processing plant in Eureka, California.

4      247.    This was followed by its acquisition of Pacific Choice Seafood, in 1990, which

5  operated a crab processing plant in Charleston, Oregon.

6      248.    Thereafter, Pacific Seafood acquired Washington Crab Processors, in 1993, which

7  operated a crab processing plant in Westport, Washington.

8      249.    Then, in 2001, Pacific Seafood acquired the processing and distribution assets of

9  Eureka in 2001. Eureka Fisheries operated processing plants from Fort Bragg, California to Neah

10  Bay, Washington, as well as important refrigeration plants, and hoists in Eureka, Bodega Bay,

11  and the East San Francisco Bay Area. Eureka Fisheries provided Dungeness crab processing and

12  hoist services to fish buyers in facilities throughout the Pacific NW Area. Pacific Seafood ended

13  this practice and shut down many of the assets acquired from Eureka Fisheries, including the

14  hoists.

15      250.    This was followed by a series of further acquisitions of erstwhile processing

16  competitors in the 2010s and 2020s.

17      251.    In the mid to late 2010s, Pacific Seafood took a 49% interest in Ocean Gold, and

18  entered into contracts with it that gave Pacific Seafood control over its ex vessel pricing and sell

19  side of its business

20      252.    Ocean Gold's large processing facility, the largest on the west coast, and freezing

21  plant in Westport, Washington, has the capacity to store 20-25 million pounds of product at any

22  given time.

23      253.    Then, in 2018, Pacific Seafood purchased North Coast Fisheries, a company

24  formerly operating in Santa Rosa, California, which had substantial Dungeness crab processing

25  capacity and would frequently purchase crab from other buyers that it would then process and

26  freeze. Rather than continue to operate the business or incorporate the facilities into its own

27  business, however, Pacific Seafood shut down North Coast's processing facilities and routed all

28  of North Coast's former accounts through Pacific Seafood's other processing facilities.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

254.     Subsequently, in 2022, Pacific Seafood purchased Pezzolo's Seafood, one of the last remaining seafood processors that could handle Dungeness crab and had any appreciable freezer capacity in San Francisco. Pezzolo Seafood, moreover, had the only significant processing capacity (i.e., cooking) in Central California and would engage in contract processing for other buyers and crabbers who, like Brand, also sell direct to consumer. This cooking capacity for permitting and other reasons is very difficult for another company to establish. When Pacific Seafood acquired Pezzolo Seafood, it did not shut down its processing capacity, but it ceased to provide contract processing to other buyers.

255.     Pacific Seafood also currently leases a portion of a Fishermen's Terminal facility, a fish processing facility in Eureka which was funded by federal Economic Development Agency grant money. Pacific Seafood attempted to buy the facility, despite the intended public use and benefit, but the City of Eureka backed out after the public learned of the plan to sell a facility worth approximately $8 million to Pacific Seafood for $1.5 million.

256.     Pacific Seafood does not use the Fishermen's Terminal facility to process crab or other seafood and does not permit others to use the processing facilities. Instead, Pacific Seafood uses it for storage related to Coast Seafoods, an oyster and shellfish business owned by Pacific Seafood.

**2.     Ilwaco Landing Fishermen**

257.     Ilwaco Landing Fishermen was founded by Mike Shirley and Scott Kastengren in 2015 and operated as a seafood buyer and distributor with bases of operation in Garibaldi, Oregon and Ilwaco, Washington. In 2017, Ilwaco Landing Fishermen merged with Fishpeople Seafood, and the new entity continued to purchase ex vessel Dungeness crab under the Fishpeople Seafood name and operate its existing facilities, including the processing warehouse in Ilwaco Landing. Fishpeople Seafoods was acquired by Bornstein Seafoods Inc. on or around February 25, 2022.

258.     Prior to the acquisition by Bornstein, Mike Shirley, running operations at Fishpeople, made a significant purchase of ex vessel crab and processed it in hopes of selling it to retail accounts for a substantial profit. Mr. Shirley was unable to sell the crab, because the accounts he'd planned to sell to were approached by Bornstein Seafoods and Pacific Seafood,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

who undercut Mr. Shirley's prices. Unable to sell all the crab, for which a significant financial outlay had been made, Mr. Shirely was forced to sell the crab at a loss, to Hallmark Fisheries. The loss incurred by Fishpeople, and Mr. Shirley personally, precipitated the sale to Bornstein.

259.   Shortly after Bornstein acquired Fishpeople, including the facility on Ilwaco Landing and the associated pier and hoist, Mike Shirley went to work as Manager for Bornstein in Ilwaco, a position he still occupies.

260.   After Bornstein's acquisition of Fishpeople and its facilities in Ilwaco, Bornstein and Safe Coast are now the only entities with a presence in Ilwaco.

**3.   <u>Trinidad</u>**

261.   The dock and hoist in Trinidad, California are operated by the Trinidad Rancheria. The Rancheria controls which buyer can take the crab unloaded in Trinidad. Ocean Gold and Nor-Cal Seafood have an agreement with the Rancheria whereby they are the only buyers that can unload any significant amount, and they get to set the ex vessel price of crab unloaded there. Ocean Gold pays the tribe approximately $1 million each season for this exclusivity agreement. During the 2022/23 season, as part of its deal where it paid the Rancheria $1 million, Ocean Gold set the ex vessel price at $2.25/lb.

262.   Confidential Buyer Informant #1 has been prevented from unloading crab in Trinidad, for which he would pay above what Ocean Gold and Nor-Cal offer, during recent seasons because of the agreement that Ocean Gold and Nor-Cal have with the Rancheria.

263.   Pursuant to the exclusivity agreement with the Rancheria, Ocean Gold buys nearly all of the ex vessel crab in the early part of the season, and once it is done, or if it is unable to take available crab, Kevin Lee of Nor-Cal comes in to take the remaining crab. During the relevant period, over ███ of the crab in Trinidad was landed by Ocean Gold and Nor-Cal in each year except in the 2020/21 season, when they combined to land ███ of the total volume.

264.   Prior to Ocean Gold being the sole early-season buyer, Hallmark Fisheries had exclusive access to crab landed in Trinidad, with Nor-Cal playing the same secondary role it plays currently with Ocean Gold.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4.     **Eureka**

265.     In Eureka, California, prior to approximately 2016, the public hoist was run by Humboldt Seafood Unloaders ("HSU"). HSU's owner, Manuel Silveira, was aggressive in bringing in multiple live buyers from outside Eureka, including Nor-Cal Seafood, ASE, Next Seafood (managed at that time by Peter Nguyen, who is the current buyer for and owner of Fishermen's Catch) and Ocean King, among others, to buy from Eureka crabbers. Mr. Silveira would coordinate the buyers' arrival in port with the return of crabbers with loads of crab. Mr. Silveira would charge a poundage fee, a price per pound he unloaded with the hoist, for crab landed in Eureka. A standard practice among hoist operators.

266.     In or around 2016, the City of Eureka terminated HSU's lease and pushed them out of the main harbor area to a distant and dilapidated dock, a move that was orchestrated by Pacific Seafood and Bill Carvalho, who ran Wild Planet Seafood, which, along with Pacific Seafood, already had a presence in Eureka. Wild Planet leased the hoist from the City after HSU was moved out.

267.     Wild Planet Seafood sold its Dungeness crab business to South Bend Products in early 2020, and thereafter South Bend took over the lease of the hoist and related facilities on the dock. South Bend has since limited the buyers it unloads crab for, charging prohibitively expensive unloading fees to non-favored buyers.

268.     South Bend leases a portion of the Fishermen's Terminal facility, but – like the facility's other tenant, Pacific Seafood – South Bend does not use the processing capacity, instead using the facility for storage.

269.     In addition to the public hoist in Eureka, there's a private hoist in Fields Landing, in the southern portion of Humboldt Bay, that Ocean Gold controls, and is the only buyer allowed to unload crab there.

E.     **To Eliminate Price Pressure Formerly Created by Out of Port Buyers, Defendants Have Agreed to Buy and Sell "Out the Back Door"**

270.     While Defendants were limiting the amount and type of buyers that could access a given port by dominating key infrastructure, such as hoists, Defendants agreed that, instead of

traveling up to ports where they did not have a presence and driving ex vessel prices up by purchasing crab directly from crabbers there, they would, instead, simply buy "out of the back door" from other cartel member buyers with a presence in the port.

271.    As discussed elsewhere herein, before implementation of this part of Defendants' agreement, white van buyers, such as Nor-Cal, Ocean King, and ASE, played a significant role in driving up the market price for Dungeness crab. The agreement amongst Defendants to instead buy and sell from each other "out the back door" has eliminated this price pressure by allowing former white van buyers to fill their supply needs without having to compete with their cartel co-members on ex vessel prices.

### 1.    South Bend

272.    In or around February of 2020, South Bend Products acquired Wild Planet Seafood's Dungeness crab business and took over Wild Planet's lease of the public hoist in Eureka, California. As the City of Eureka's "Designated Public seafood Unloader" South Bend Products controls operation of the only hoist in Eureka. South Bend has infrastructure in place at the hoist to unload crab for both the live market and processing.

273.    South Bend lands significant amounts of crab in Eureka, landing over ▮▮▮ of the port's total volume during the 2024 season. South Bend does not keep the crab it lands for itself, rather South Bend sells it all directly to other buyers "out the back door." Other buyers, primarily Nor-Cal and ASE, provide South Bend with their own totes prior to the crab being landed, whereafter the crab is loaded directly into those totes and loaded into a waiting Nor-Cal or ASE truck. Prior to 2020, both Nor-Cal and ASE regularly landed crab under their own names in Eureka. But after 2020 those landings ceased except for a small handful of low-volume Nor-Cal landings in June and July of 2023. If South Bend does not sell its landed crab to Nor-Cal or ASE, it sells to Southern California Seafood or Ocean King.

### 2.    Caito

274.    Caito Fisheries purchased significant amounts of ex vessel crab, buying under Caito Fisheries Inc., from crabbers in San Francisco, Fort Bragg, Eureka, and Crescent City for at least the last 25 years. Caito Fisheries was acquired by Southwind Foods in the Spring of 2023.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Caito Fisheries has continued to buy ex vessel crab, as Caito Fisheries LLC, since its acquisition by Southwind.

275.    Caito Fisheries landed approximately ███████ pounds of crab in Eureka (███ of the port's total landings) and ████ pounds of crab in San Francisco (████ of the port's total landings) in 2024. The crab landed by Caito in Eureka and San Francisco amounts to approximately ███ of the total crab Caito Fisheries landed in California in 2024. Caito sold a significant portion of this crab "out the back door" to Ocean Gold, instead of processing it and selling it to any of its retail accounts. In both ports, Caito Fisheries was observed on multiple occasions landing crab and loading it into Ocean Gold totes which were then put on Ocean Gold's trucks and transported out of the landing port.

276.    On or about August 7, 2024, John Caito contacted Confidential Buyer Informant #1 and told him that Caito Fisheries, and by extension Southwind, had an agreement with Pacific Seafood whereby Ocean Gold would receive a significant portion of the Dungeness crab that Caito Fisheries lands in California in the upcoming seasons, just as in 2024. In exchange for Caito Fisheries securing increased volumes of ex vessel crab for Ocean Gold, Pacific Seafood would give Caito Fisheries increased control over the California groundfish market, via near-exclusive access to the volume that Pacific Seafood now controls. Specifically, Pacific Seafood agreed to direct the fishers currently selling groundfish to Pacific Seafood to sell their fish to Caito.

**3.    San Francisco**

277.    Unnamed Co-conspirator #1 purchases a large portion of the total amount of crab landed in San Francisco and transfers almost all of it out the back door to Peter Nguyen, who currently owns and runs Fishermen's Catch, but who formerly bought for Global Quality and before that was with Next Seafood.

278.    Indeed, Mr. Nguyen dictates the ex vessel price that Unnamed Co-conspirator #1 pays to crabbers, including Plaintiff Little—with Unnamed Co-conspirator #1's representative literally telling Mr. Little and other crabbers that he'd like to pay them more, but Mr. Nguyen has directed him to pay a lesser amount, which he does.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4. Crescent City

279. There are 12 hoists in Crescent City, and each is effectively controlled by cartel members who coordinate to control the ex vessel price that is paid for any crab unloaded in the port.

280. Global Quality controls 2 hoists, Safe Coast controls 2 hoists, Fishermen's Catch controls 2 hoists, Pacific Seafood controls 2 hoists, Caito controls 2 hoists, and LCZ Unloaders controls two hoists, with on that exclusively serving Nor-Cal and one exclusively serving ASE.

281. In February of 2023, which was early in the season following a delayed opening, Confidential Buyer Informant #1 made arrangements with numerous boats in Crescent City, California to purchase ex vessel crab for $2.45/lb. The buyers that were already present and active in Crescent City – Global Quality, Fishermen's Catch, Safe Coast, Pacific Seafood, Nor-Cal, ASE, and Caito – all told Confidential Buyer Informant #1 their agreed ex vessel price in Crescent City was $2.25/lb., and told Confidential Buyer Informant #1 to stay away.

282. Wes Taylor, who runs the LCZ Unloaders hoists for Nor-Cal and ASE, and Leon Gavin, who runs the Fishermen's Catch hoists, told Confidential Buyer Informant #1 that the group of buyers didn't want him to come in with a higher price, and therefore they would charge him an exorbitant unloading fee if he offered to pay crabbers anything more than the $2.25/lb ex vessel price that the cartel had set. This effectively prevented Confidential Buyer Informant #1 from buying crab in Crescent City for an ex vessel price that was higher than what the cartel members there had agreed to pay; exactly the result those cartel members desired.

**F.  Defendants Aggressively Coerce Compliance by Each Other by and by Other Buyers with the Agreed Upon Pricing**

**1.  During the 2022/23 and 2023/24 Seasons, a New Buyer Sought to Capture Market Share by Offering Higher Prices; Defendants Sought to Bring Him into the Cartel and When This Failed Inflicted Repeated Punishments**

283. In the 2022/23 and 2023/24 seasons, when, as one crabber put it, Defendants were seeking to "drive the boot right in," a new significant buyer, Confidential Buyer Informant #1, sought to make inroads into the Pacific NW Area Dungeness crab ex vessel market. And he did

so by offering higher ex vessel prices to crabbers. Confidential Buyer Informant #1's reasoning was simple: if he offered a higher price, he got the crab.

284.    Defendants greeted his arrival first with efforts to bring him into their cartel. When that failed, Defendants threatened him. And when that failed, Defendants took actions aimed at destroying his fish-buying business.

        **a.**    **January 2023: Nor-Cal's Kevin Lee and Pacific Seafood's Frank Dulcich Solicited Confidential Buyer Informant #1 to Participate in Cartel, Then Punished him When He Refused**

285.    On or around January 13, 2023, Confidential Buyer Informant #1 was called by Frank Dulcich of Pacific Seafood and Kevin Lee of Nor-Cal, and told that if he agreed to only pay an ex vessel price of $2.25/lb to crabbers in the various ports in Oregon and California he serviced, Nor-Cal would buy all of Confidential Buyer Informant #1's excess crab at $3/lb.

286.    After the call, Kevin Lee texted Confidential Buyer Informant #1 to relay a threat from Frank Dulcich: small buyers come and go, and that it's easy for a buyer like Pacific Seafood to take a loss of $1 million to teach a guy a lesson. After Confidential Buyer Informant #1 refused the offer, a large number of Confidential Buyer Informant #1's retail accounts in the San Francisco Bay Area that had pre-ordered crab pulled out of their agreements to buy from him after Nor-Cal sold them crab at less than $2/lb.

287.    During the period in which this occurred, Nor-Cal was paying at least ███. ex vessel for Dungeness crab; more than a dollar less than what Nor-Cal charged Confidential Buyer Informant #1's retail accounts.

288.    These retail accounts that were sold Dungeness crab by Nor-Cal at $2/lb included at least the following: Lucky's Seafood Market; California Fish Market SF; Seafood Center SF; Fresh Meat Seafood SF; Liangs Seafood; Long Ling Supermarket Oakland; New Century Seafood Market; and San Bruno Market.

289.    Around the same time in January of 2023, Nor-Cal's Kevin Lee called Confidential Buyer Informant #1's uncle, who had long been involved in the commercial fishing industry, hoping to get him to convince Confidential Buyer Informant #1 to drop the ex vessel price he was offering. Kevin Lee told Confidential Buyer Informant #1's uncle that it was too

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

early in the season for such high prices, and that Confidential Buyer Informant #1 was screwing things up for Nor-Cal and the other cartel members.

**b.**     **In Early 2023, Safe Coast's Max Boland Tried to Get Confidential Buyer Informant to Toe the Cartel's Line on Ex Vessel Prices Set by Pacific Seafood**

290.    In early 2023, Max Boland of Safe Coast told Confidential Buyer Informant #1 that Safe Coast won't pay an ex vessel price for Dungeness crab higher than what Pacific Seafood's Frank Dulcich wants paid.

291.    Once Boland found out Confidential Buyer Informant #1 was paying crabbers more than the ex vessel price that Pacific Seafood had set, Boland called Confidential Buyer Informant #1 and warned him that Confidential Buyer Informant #1 wouldn't be able to offer those prices in Crescent City because the port was "locked down" by people working with Pacific Seafood.

**c.**     **February/March 2023: In Response to Confidential Buyer Informant #1's Publicized Offer of a Higher Ex Vessel Price, Multiple Cartel Members Told Confidential Buyer Informant #1 to Lower His Ex Vessel Price**

292.    In and around February/March of 2023, Confidential Buyer Informant #1 posted in a Facebook group frequented by crabbers and buyers in the Pacific NW Area that he was paying between $3.00 and $3.50 per pound ex vessel for Dungeness crab.

293.    In response, Scott Adams of Hallmark Fisheries called and told him to stop offering $3 to $3.50 per pound ex vessel for Dungeness crab—which was substantially above the ex vessel price of around $2.50/lb. that Hallmark, Pacific Seafood and others were offering—and drop his price.

294.    Pacific Seafoods' Brett Hester, Nor-Cal's Kevin Lee, also called him and told him to stop offering $3 to $3.50 and drop his price.

**d.**     **April/May 2023: More Cartel Members Tell Confidential Buyer Informant to Lower His Ex Vessel Price**

295.    In the period of April/May 2023, Confidential Fish Buyer #1 was paying $4/lb. ex vessel.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

296.   In response to the problems this created for the cartel, the following representatives of Defendants called and told Confidential Fish Buyer that he was screwing things up for everyone else and needed to lower the ex vessel price he was offering: Max Boland of Safe Coast, John Caito of Caito, Nick Mareno of Fathom Seafood, and Brett Hester of Pacific Seafood.

e.   **July/August 2023: Pacific Seafood Interfere in Confidential Informant's Effort to Establish a Buyer Operation in Eureka**

297.   In and around July and August of 2023, Pacific Seafood intervened in Confidential Buyer Informant #1's efforts to secure a lease on facilities on the Eureka, CA waterfront in retaliation for his failure to obey the cartel's ex vessel pricing dictates and to hinder his ability to offer higher ex vessel prices to crabbers.

298.   This included aggressive petitioning of city staff by Pacific Seafood's legal team to deny or limit the lease sought by Confidential Buyer Informant #1.

299.   As a result of this pressure, the terms of Confidential Buyer Informant #1's lease agreement for the facility he took on in the summer of 2023 limited his use of the public hoist in Eureka from 9 am-4 pm. Due to the nature of the fishery, this is untenable, as crabbers come in at all hours, and can't wait around.

300.   Simultaneously with this pressure, Pacific Seafood employees spread unfounded rumors about Confidential Buyer Informant #1 to area crabbers in order to dissuade them from doing business with him. This includes one instance in which a Pacific Seafood employee confronted Confidential Buyer Informant #1 in front of Eureka-area crabbers and falsely claimed that Confidential Buyer Informant #1 lacked the right to use the premises in Eureka to which Confidential Buyer Informant #1 holds a lease and that Confidential Buyer Informant #1was homeless.

f.   **August 2023: Bornstein's Andrew Bornstein and Mike Shirley Offer Confidential Buyer Informant Significant Benefits if He Joins the Cartel in the up Coming Season**

301.   On or around August 8-11, 2023, Confidential Buyer Informant #1 received a call from Mike Shirley and Andrew Bornstein of Bornstein Seafood and several follow-up texts. These Bornstein representatives offered to buy from Confidential Buyer Informant #1 300,000 – 400,000

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

pounds of albacore at $2500/ton ($500 over the market at that time) and as much black cod as Confidential Buyer Informant #1 had (knowing that Confidential Buyer Informant #1 was getting large quantities of black cod from fishers), in exchange for Confidential Buyer Informant #1 getting crabbers to accept a lower price for crab during the first 28 days of the 2023/24 season, which they referred to euphemistically as a "cooked price."

302.    This constituted a request by these representatives of Bornstein that Confidential Buyer Informant not offer a price above that offered by the cartel during the first 28 days of the 2023/24 season, which is how Confidential Buyer Informant #1 understood the request.

303.    After Confidential Buyer Informant #1 refused, Bornstein took actions to punish him for his refusal.

### g.    Early/Mid-December 2023: Pacific Seafood's Brett Hester Threatened Confidential Buyer Informant #1 After He Did Not Comply With Pacific Seafood's Opening Price Instruction

304.    As discussed elsewhere herein, in early to mid-December of 2023, Pacific Seafood's Brett Hester called Confidential Buyer Informant #1 and told him that the opening ex vessel price for the 20223/24 season was going to be less than $2/lb.

305.    Instead of complying with that dictate, soon after the first portion of the Pacific NW Area's Dungeness crab fishery opened for the season, Confidential Buyer Informant #1 posted to a Facebook group frequented by buyers and crabbers in the Pacific NW Area that he was paying $3.75/lb. for crab ex vessel, which was substantially above what Pacific Seafood and other Defendants were paying.

306.    In response, Mr. Hester sent Confidential Buyer Informant #1 a series of texts that started with a picture of Confidential Informant #1's post advertising the $3.75 ex vessel price offer, followed by "Damnit man," a picture of Confidential Buyer Informant #1's facility in Eureka, and a series of emojis that suggested a threat of violence.



**h.** **Late December 2023: Nor-Cal's Kevin Lee Again Sought to Bring Confidential Buyer Informant #1 into the Cartel**

307.   On or around December 25, 2023, Kevin Lee of Nor-Cal Seafoods called Confidential Buyer Informant #1. Confidential Buyer Informant #1 was in his car with three of his

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  employees and his brother when the call came in; and he took the call on the car's speaker phone,

2  resulting in these persons hearing the contents of the call.

3  308.   Kevin Lee asked Confidential Buyer Informant #1 to "participate," by bringing

4  down the ex vessel price he was paying. At this point, Confidential Buyer Informant #1 had already

5  purchased approximately one million pounds for $3.75 - $4.00 per pound.

6  309.   Mr. Lee, more specifically, told Confidential Buyer Informant #1 to keep the price

7  the same as Nor-Cal's, and that they could help each other out in this and other ways, like making

8  sure the other always has the crab or fish he needs.

9  310.   Mr. Lee further told Confidential Buyer Informant #1 that Hallmark was doing the

10  same with Nor-Cal, matching ex vessel prices and taking care of each other.

11  **i.   December 2023/January 2024: Pacific Seafood Instructs Other
       Defendants Not to Do Business With Confidential Buyer
12     Informant #1**

13  311.   In and around the end of December 2023 and the beginning of January 2024,

14  Confidential Buyer Informant #1 was buying large quantities of Dungeness crab at ex vessel prices

15  higher than that dictated by the cartel.

16  312.   Around the same time, representatives of Fisherman's Catch, Hallmark, and Global

17  Quality Seafood, to whom Confidential Buyer Informant #1 was selling crab, told Confidential

18  Buyer Informant #1 that they were getting calls from high-level individuals at Pacific Seafood,

19  including Frank Dulcich, asking them not to do business with Confidential Buyer Informant #1.

20  313.   At or around the time of these calls, Confidential Buyer Informant #1 was informed

21  that Caito, who prior to the season's opening had agreed to purchase a very large amount of crab

22  from Confidential Buyer Informant #1, had reneged on the deal. Instead, Caito had purchased the

23  crab from Hallmark. Previously, Hallmark employees had sought from Confidential Buyer

24  Informant #1 information about where he was selling all his crab.

25

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**j.**   **Early-January 2024: Confidential Buyer Informant #1 Is Threatened by Cartel Members for Raising Ex Vessel Prices and Has Business Deals Interfered With as Punishment**

314.    On or around January 3, 2024, Max Boland of Safe Coast drove to Port Charleston, where Confidential Buyer Informant #1 was purchasing crab, to meet with him.

315.    In the meeting, Mr. Boland told Confidential Buyer Informant #1, in the presence of Confidential Buyer Informant #1's employees and brother, that Frank Dulcich had called Mr. Boland asking why Confidential Buyer Informant #1 was raising the price, and stating that "[Confidential Buyer Informant #1] is going to end up in trouble."

316.    Mr. Boland also told Confidential Buyer Informant #1 that Pacific Seafood, Ocean Gold, and Hallmark were angry about the higher ex vessel price Confidential Buyer Informant #1 was paying crabbers.

317.    Around this same time, Confidential Buyer Informant #1 got a call from Nick Mareno of Fathom Seafood. In the call, Mr. Mareno pushed Confidential Buyer Informant #1 to tell him to whom Confidential Buyer Informant #1 was selling crab and for how much. Confidential Buyer Informant #1 refused to share this information. Mr. Mareno then told Confidential Buyer Informant #1 that if he didn't bring his ex vessel prices down, there would be "repercussions."

318.    Soon after this call, Mr. Mareno called Global Quality, Fisherman's Catch, and Safe Coast in an effort to get them to stop buying from Confidential Buyer Informant #1 so that Confidential Buyer Information #1 would not have anywhere to sell his crab and would be forced out of the market, thus eliminating the pressure Confidential Buyer Informant #1 was putting on the artificially low ex vessel price agreed upon by Defendants.

319.    Soon after the call from Mr. Mareno, Confidential Buyer Informant #1 learned that Caito Fisheries, who had agreed to buy a large quantity of crab from Confidential Buyer Informant #1, had instead bought that crab from Ocean Gold.

**k.**   **January 2024: Defendants Take a Series of Actions in Charleston, OR to Punish Buyer Informant #1 and Drive Him Out of Port**

320.   At around the same time in early January 2024, Pacific Seafood and Fathom pressured the Charleston, Oregon harbormaster, Ray Dyer, to deny Confidential Buyer Informant #1 use of the public hoist.

321.   Nick Mareno of Fathom falsely told Mr. Dyer that the crabbers didn't want Confidential Buyer Informant #1 in the port, when in reality Confidential Buyer Informant #1's efforts to buy more crab at higher prices were creating significant benefits to the crabbers.

322.   Ultimately, as a result of Mr. Mareno's pressure, the public hoist was shut down for 48 hours.

323.   At the time the hoist was shut down, two boats waiting to be unloaded had 130,000 lbs. of crab to sell to Confidential Buyer Informant #1. These boats had previously only sold to Pacific Seafood, but because Confidential Buyer Informant #1 was offering a far better price, they decided to instead sell to Confidential Buyer Informant #1.

324.   However, because Confidential Buyer Informant #1 couldn't unload the crab, and the crabbers had nowhere else to turn, Pacific Seafood bought the crab for less than what Confidential Buyer Informant #1 had agreed to pay the two boats, using its private hoist at the port to unload the crab.

325.   In addition to these two large boats that Confidential Buyer Informant #1 was denied from unloading, there were 5-6 smaller boats ready to sell approximately 100,000 lbs. total to Confidential Buyer Informant #1. When Confidential Buyer Informant #1 was shut out of the hoist, those crabbers were forced to sell to Fathom and Hallmark for substantially less per pound than what Confidential Buyer Informant #1 was offering.

326.   In addition to the longtime Pacific Seafood boats that were about to sell to him in Charleston, about 50% of Newport boats were ready to work with Confidential Buyer Informant #1. In order to stymie that trend, Pacific Seafood started reaching out to Confidential Buyer Informant #1's live customers and telling them that Pacific Seafood would service them by setting up live stations everywhere.

327.     Following the closure of the public hoist, there was an uproar from crabbers who wanted to sell their crab to Confidential Buyer Informant #1, as well as engagement by state elected officials and the Oregon Dungeness Crab Commission. Harbormaster Dyer ultimately relented, reopened the public hoist, and allowed Confidential Buyer Informant #1 access approximately 48 hours after he had shut it down.

328.     However, once reopened, Confidential Buyer Informant #1 was only able to use the public hoist if he paid, in addition to the hourly rate of $27, a per pound surcharge of $0.10 for all crab he off-loaded (which was reduced to $0.09 after more protest from crabbers), make a $2,000 deposit and pay $120 per month for a business license. Confidential Buyer Informant #1 is unaware of any other buyers being required to pay these fees to use the public hoist.

329.     Once the public hoist was reopened and Confidential Buyer Informant #1 and his crew were again unloading crab, the public hoist was tampered with. Potentially serious injury, or death, was only avoided because Confidential Buyer Informant #1 and his crew saw the issue and stopped the hoist before it began the next loading process. In addition to the tampering with the hoist, the brake lines of the old forklift that Confidential Buyer Informant #1 had to use were tampered with, making the use of the already sub-par forklift even more unsafe and inefficient. Earlier, Confidential Buyer Informant #1 had arranged to use a nearly new forklift but was prevented from doing so, without explanation, by Harbormaster Dyer.

330.     Once Confidential Buyer Informant #1 was able to get live crab off boats and was loading it into trucks, Oregon state police showed up and blocked access to the parking lot where Confidential Buyer Informant #1's trucks were parked, awaiting live crab, blocking their ability to depart despite not issuing any citation or providing any reason for their actions. As a result, Confidential Buyer Informant #1 lost 4,000 lbs. of crab that died on the dock because they couldn't be loaded on the trucks in time.

331.     Nick Mareno of Fathom, who Confidential Buyer Informant #1 understands is close to Oregon state police, was seen in his car making a phone call shortly before the police showed up.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

332.   Soon thereafter, on January 5, 2024, nails were placed under the tires of a truck holding crab belonging to Confidential Buyer Informant #1 and one of his customers parked in Charleston. The nails caused the tires of the truck to flatten, which in turn caused a delay that resulted in the loss of approximately 2,000 lbs. of live crab.

333.   These various actions prevented Confidential Buyer Informant #1 from making ex vessel purchases at a higher price, while simultaneously resulting in sales to Defendants at lower ex vessel prices. It also resulted in Confidential Buyer Informant #1 terminating his buying in Charleston on or around January 6, 2024, leaving crabbers there to sell principally to Hallmark, Pacific Seafood, and Fathom, with Fathom, in particular, purchasing a large volume of crab ex vessel after Confidential Buyer Informant #1 left Charleston at a lower price than that which Confidential Buyer Informant #1 had been paying crabbers.

l.   **Mid/Late-January 2024: Representatives of Defendants and Other Co-Conspirators Met at San Francisco's Pier 45 and Devised a Plan to Run Confidential Buyer Informant #1 Out of Business**

334.   On and around January 20, 2024, Max Boland of Safe Coast, Tony of Global Quality, Peter Nguyen of Fishermen's Catch, Frank Dulcich of Pacific Seafood, Mr. Bugatto of Hallmark, and representatives of Unnamed Co-conspirators #1 and #2 met at Pier 45 in San Francisco.

335.   After the meeting, Max Boland told Confidential Buyer Informant #1 that the group was upset with Confidential Buyer Informant #1 for broadcasting to crabbers a higher opening price than what Pacific Seafood and the other big buyers wanted, and that there would be repercussions.

336.   Following the January 20, 2024 meeting, Defendants who were at the meeting all took actions to undercut Confidential Buyer Informant #1's accounts, reneged on agreements to buy crab from Confidential Buyer Informant #1, and stopped paying Confidential Buyer Informant #1 for crab he had already delivered to them.

337.   Specifically, Confidential Buyer Informant #1 had already made ex vessel purchases of over 75,000 lbs. of crab at $3.75/lb. that Global Quality had agreed to buy from him for around $4.00/lb. After the January 20th Pier 45 meeting, however, Global Quality reneged on the deal,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

pursuant to the agreement among the other buyers to punish Confidential Buyer Informant #1 for raising the price earlier in the season. This resulted in Confidential Buyer Informant #1 having to sell the crab at a loss to Ocean Gold and Safe Coast, for $3.00/lb., $.75 less than what Confidential Informant Buyer #1 had paid ex vessel for the crab.

338.    Global Quality additionally owes Confidential Buyer Informant #1 approximately $200,000 and has refused to engage with Confidential Buyer Informant #1 or return his calls since the January 20th meeting.

339.    Fisherman's Catch similarly owes Confidential Buyer Informant #1 approximately $100,000 and, since the January 20th meeting, is not responding to Confidential Buyer Informant #1's attempts to collect.

340.    Safe Coast also owes Confidential Buyer Informant #1 approximately $20,000 as the result of underpayments. Specifically, Safe Coast has refused to pay the prices it has previously negotiated with Confidential Buyer Informant #1, only paying the ex vessel price that Confidential Buyer Informant #1 paid ex vessel to crabbers for the crab, and not the amount stated on the bill of lading when Confidential Buyer Informant #1 delivers the crab to it.

341.    Since the January 20th meeting, Safe Coast's Mr. Boland has also required that Confidential Buyer Informant #1 meet him in an ally when selling Safe Coast crab, so that no one would see him buying from Confidential Buyer Informant #1, which would get Safe Coast in trouble with other members of the cartel.

342.    More generally, after the January 20th meeting, Pacific Seafood and Ocean Gold broadcast to other buyers that they would take everyone's crab, as long as no one sold to or bought from Confidential Buyer Informant #1.

343.    Subsequently, Southern California Seafood, previously one of Confidential Buyer Informant #1's biggest customers, told Confidential Buyer Informant #1 that it would be working exclusively with Pacific Seafood from here on out.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

2.    **Other Buyers Have Also Been Threatened by Defendants About Breaking Ranks on Price and Have Been Punished for Doing So**

a.    **Early-January 2023: Nor-Cal and Unnamed Co-conspirator #1 Dropped the Ex Vessel Prices They Were Offering After Being Warned By Defendants to Toe the Line**

344.    As discussed elsewhere herein, when crabbers went out in District 10 on an open ticket, Nor-Cal, after briefly offering $5/lb., withdrew the offer after it was threatened by Defendants for doing so, a threat whose effectiveness was clearly increased by the punishment that Pacific Seafood had previously meted out on Nor-Cal, as discussed elsewhere herein.

345.    Unnamed Co-conspirator #1's principal representative was delivered a similar threat by Pacific Seafood's Joe Cincotta. In January of 2023, Unnamed Co-conspirator #1's ex vessel price was higher than that being paid by Pacific Seafood. To correct this, Pacific Seafood's Joe Cincotta paid Unnamed Co-conspirator #1's principal representative a visit and pointedly told him Pacific Seafood was only paying $2.25 ex vessel. He got the message and Unnamed Co-conspirator #1 lowered the price it was offering as well.

b.    **Mid-January 2023: Pacific Seafood Flooded the Sell-Side Markets of Non-Compliant Buyers with Cheap Crabs**

346.    Once Defendants successfully brought ex vessel prices down to $2.25/lb. in the Pacific NW Area in mid-January 2023—an ex vessel price barely seen in California for over a decade—Pacific Seafood made sure that buyers in Central California who had not complied with Defendants' "no price" and then later "$2.25/lb." dictates were punished for their lack of compliance.

347.    Pacific Seafood shipped at least six truckloads, approximately 200,000 lbs. of fresh, whole cooked crab from points north, and sold them to central California buyers' customers at a price of $3.99 to $4.50/lb. This price was not only way below what buyers had been selling to those customers, but it was substantially below these buyers' costs for fresh, whole cooked crab when the substantial weight loss associated with processing and the cost of processing are factored in.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

348.    Pacific Seafood also sold large volumes of live crab into the Chinese market for $4.50, free on board. This was, again, not only way below the price at which other buyers were selling live crab into the Chinese market, but also significantly below their costs.

**c.      Late-December 2023: Pacific Seafood Sent Buyers, Including Non-Cartel Members, a Warning About Paying Over the Ex Vessel Price Set By It**

349.    On or around December 25, 2023, when Nor-Cal's Kevin Lee sought to convince Confidential Buyer Informant #1 to toe the line on the ex vessel price set by the cartel, Pacific Seafood sent an email to a number of buyers, including Anna Svedise of Anna's Seafood, instructing them to keep the ex vessel price at or below $3/lb.

350.    The email to Ms. Svedise warned her, in a threatening manner, not to continue her practice of paying ~$.50 over the "dock price" (*i.e.*, the price set by Pacific Seafood and other cartel members). As a result, Anna's Seafood, unlike previous seasons, didn't come up to Eureka a single time; and crabbers from Eureka who in past seasons had regularly sold to Anna's Seafood, sold to cartel members, including South Bend, for the artificially low price of $2.25-2.50/lb.

**d.      Pacific Seafood Uses Its Dominance in Other Areas of Seafood to Enforce Compliance with the Cartel's Dungeness Crab Pricing Dictates**

351.    Pacific Seafood also punishes non-compliant crab buyers on the sell-side by denying non-compliant crab buyers access to other fish products whose supply Pacific Seafood controls.

352.    As a result of Pacific Seafood's self-vaunted vertically integrated dominance of the West Coast's supply of fish products, it is for many other types of fish and fish products effectively the only source. And most Dungeness crab buyers do not limit themselves to Dungeness crab, but rather sell to their customers a wide range of fish, many types of which they do not directly purchase ex vessel from fishers, but rather from other suppliers, often Pacific Seafood. Thus, other fish buyers are dependent on Pacific Seafood for such products and related lines of business. And if those buyers do not toe the line with regards to ex vessel pricing of Dungeness crab, Pacific Seafood can and will deny them access to such products in retaliation.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**3.** **As a Result, When Defendants and Other Buyers Pay Ex Vessel Prices Above the "Fixed Price" They Seek to Hide that Fact, Which Doesn't Make Economic Sense Absent a Price-Fixing Agreement**

353.    Absent the market manipulation alleged herein, buyers would be in competition with each other for available crab. Thus, basic economic logic would dictate that, if a buyer had sell-side demand that justified offering a higher price, he or she would widely publicize his or her offer to pay a higher ex vessel price to crabbers to lure more crabbers to sell to him or her. Economic logic would also predict that the increased sell-side demand created by such publication of his or her offer to pay more would, in turn, allow the buyer to ultimately lower his or her offered price, increasing his or her profits.

354.    This is especially the case in a situation such as that presented by buyers in the Pacific NW Area Dungeness crab market where, like the product that crabbers are selling to them (freshly caught Dungeness crab), there is no meaningful difference between buyers beyond price. As the saying goes, all money is green.

355.    Accordingly, critical to Confidential Buyer Informant #1's strategy to capture market share in the Pacific NW Area has been to widely broadcast his willingness to pay higher ex vessel prices for crab than Defendant cartel members.

356.    Defendants, on the other hand, do the exact opposite: they actively hide when they pay crabbers ex vessel prices that are higher than the price fixed by the cartel.

357.    While this does not make basic economic sense in a free market, it makes complete sense in the context of a price-fixing cartel. In a price-fixing cartel, there is always a strong incentive by cartel members to cheat, so as to both gain the benefit of the artificially depressed price created by the cartel but also to gain some advantage on their fellow cartel members. As another saying goes, there is no honor amongst thieves. And for this reason, as alleged elsewhere herein, Defendants aggressively seek to police compliance with their agreed-upon pricing and to punish non-compliance.

358.    This dynamic has resulted in Defendants commonly hiding instances where they have paid ex vessel prices in violation of the price set by the cartel.

359.   The most simplistic tactic that Defendants use to hide their cheating is to simply put a lower price on the official landing record of a sale than what they pay the crabber, generally splitting the payment into two checks: one for the lower price on the landing record, and one for the amount above this.

360.   Nor-Cal commonly uses this tactic to hide its cheating on the fixed ex vessel price.

361.   For example, on February 11, 2021, a crabber texted Nor-Cal's Kevin Lee, "Hi Kevin, [Redacted] said that you would pay $5.00 plus $1.00 bonus per pound. When he unloaded Larry wrote $5.00 plus .50 bonus. Just making sure that it was supposed to be total of $6.00 per pound. Thanks, [Redacted]."

362.   In response, Mr. Lee responded, "Yes . I changed here."

363.   California Department of Fish and Wildlife landing records show that Nor-Cal entered ███ as the purchase price for the referenced transaction on February 10, 2021.

364.   ASE also has, for many years, paid crabbers in a similar way: one check for the price on the official landing receipt, and one check for an additional amount.

365.   Ocean Gold is also known to enter lower ex vessel prices on landing receipts than what was actually paid to the crabber.

366.   Confidential Buyer Informant #1 was recently told by an Ocean Gold worker that Ocean Gold was entering prices on landing receipts that were $1/lb. less than what was paid, which made the worker nervous he would get in trouble for doing so.

367.   Another tactic to hide cheating is to pay crabbers a "bonus" later in or at the end of the season, which is also sometimes referred to as a "retro."

368.   Pacific Seafood, which paid Plaintiff Little such a "bonus" when he was crabbing for them, and Hallmark are among the Defendants who frequently use this tactic.

369.   In a text exchange between Fathom's Nick Mareno and Bornstein's Andrew Bornstein from January 1, 2020, Mr. Mareno expressed his concern that Pacific Seafood was going to cheat on the agreed-upon cartel opening price of $3.00/lb., by making (and promising) a retroactive payment of an additional $.25/lb.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

370.     Mr. Mareno stated, "I got 30k-$40k coming into crescent [city] tomorrow… Just worried about Pacific retro." "Retro to $3.25."

371.     In response, Mr. Bornstein said, "Always a risk."

372.     An additional tactic used by Defendants to hide their cheating on the fixed ex vessel price is to pay the crabbers the fixed ex vessel price, but then give bait at no charge, which would otherwise cost the crabber a substantial amount.

373.     Thus, in a text message between Mr. Lee and a crabber last season, Mr. Lee indicated that he was willing to pay more than the fixed ex vessel price but could not pay it directly for fear it would be discovered; thus, he offered instead to give the crabber bait of an equivalent value.

374.     Defendants also frequently will publicly say that they are paying one ex vessel price but, in fact, pay more.

375.     Buyers will also simply refuse to put in writing or publicly state the ex vessel price they are offering, so as to avoid discovery of their cheating on the agreement to fix prices.

376.     Thus, for example, when Plaintiff Little texted the principal representative of Unnamed Co-conspirator #2, during the 2023/24 season to ask what price Unnamed Co-conspirator #2 would pay for a load of crab that Mr. Little was looking to sell, the principal representative of Unnamed Co-conspirator #2 responded, "Bring them over."

377.     Mr. Little responded, "lol. Is that the only way to find out?"

378.     To this, the principal representative of Unnamed Co-conspirator #2 responded with a laughing face emoji.

G.     **In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Crabbers who Sell Crab Ex Vessel for Prices Higher than the Cartel Price**

379.     In response to this sort of price cheating by their fellow cartel members and to prevent non-cartel members from disrupting their agreement to fix ex vessel prices at an artificially low level, Defendants punish crabbers who sell to other buyers by refusing to purchase crab and other fish from such "disloyal" crabbers.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

380.    This tactic has the additional salutatory effect for Defendants of assisting them in maintaining their share of the ex vessel market without the need to raise ex vessel prices to a level disallowed by the cartel.

381.    In a competitive market, Defendants would have to use the carrot of higher ex vessel prices to maintain market share—as the "service" they perform for crabbers (buying their crab) is fundamentally fungible because, again, all money is green. Basic economic logic predicts that, if Defendants competed with each other, they would end up in a "race to the top," offering higher and higher ex vessel prices in competition with one another, and squeezing their profit margins (essentially the inverse of the "race-to-the-bottom" problem that often leads *sellers* of commodity products to enter into price-fixing arrangements).

382.    By agreeing to fix prices at an artificially low level, Defendants have fixed this "race-to-the-top" problem and protected their profit margin, but they have lost the carrot that could otherwise be used to ensure that they have Dungeness crab to sell as a profit. In reaction, they have replaced this carrot with a stick, punishing disloyal crabbers who stray from them.

### 1.    Pacific Seafood

383.    As discussed elsewhere herein, the season for Dungeness crab in the Pacific NW Area is only open for certain months of the year, which is the case with many other fisheries, as well. As a result, commercial fishers generally maintain a portfolio of different fisheries in order to allow them to generate income throughout the year. When fishers discuss selling any of their product to Pacific Seafood, they are told that, if they want Pacific Seafood to buy one of their species, they are going to have to sell all of their species to Pacific Seafood. For some fishers— particularly those who harvest coldwater shrimp, the Pacific NW Area ex vessel market for which Pacific Seafood entirely controls—the risk of not complying with this requirement can be existential, as there are essentially no other purchasers for this species in the Pacific NW Area. Thus, if a fisher wants to sell his or her coldwater shrimp *at all*, they need to agree to sell their Dungeness crab to Pacific Seafood exclusively.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

384.     Pacific Seafood uses the power this gives them over crabbers to prevent those who have agreed to sell it crab at the artificially low price set by the cartel from going to a non-cartel member (or cheating cartel member) who is offering a higher price and to make an example of those crabbers that violate this dictate.

385.     In a January 4, 2020 text to Fathom's Nick Mareno, Bornstein's Andrew Bornstein described how Pacific Seafood used this technique to make an example out of two crabbers who sold to non-cartel members (or cheating cartel members) who were paying more than the $3/lb. that the cartel had fixed as the opening price for the 2019/20 Pacific NW Area Dungeness crab season. He said, "Pacific [Seafood] Newport had 2 boats sell to a live guy in Newport today at 3.50 and they were just notified that they lost their bottom fish and shrimp markets and don't call for bait. Pacific is playing hardball at 3.00."

386.     Pacific Seafood will, moreover, initiate boycotts of non-compliant crabbers by other cartel members, effectively blackballing those crabbers in retaliation for having sold to a non-compliant buyer at a higher price or refusing to accept the cartel price.

387.     As discussed elsewhere herein, when Pacific Seafood's Joe Cincotta told San Francisco crabbers who agreed to sell to Pacific Seafood in the 2022/23 season that Pacific Seafood would try to help them out by paying maybe $1/lb., Plaintiff Little reacted in anger telling him, in part, that Pacific Seafood should "take their thumb off" the market "and let it play its course." Mr. Cincotta replied that "our boats don't talk bad about us," and in retaliation Pacific Seafood made clear that it would not purchase crab (or anything else) from Plaintiff Little and instructed other fish buyers not to purchase crab from him either.

## 2.     **Hallmark**

388.     Hallmark and Nor-Cal have for several years been the dominant buyers of Dungeness crab landed in Port Orford, Oregon, purchasing, on average approximately 93% of the Dungeness crab landed there during the period from 2016 to present. Hallmark, moreover, is virtually the only buyer of black cod in the port.

389. Hallmark uses the leverage this creates over crabbers in Port Orford to pressure them to exclusively sell Dungeness crab to it and to punish crabbers who sell to non-cartel members (and cheating cartel members) who offer higher ex vessel prices.

390. During the 2021/22 Dungeness crab season, a long-time Port Orford crabber and black cod fisher, having learned that a non-Defendant buyer, in Charleston, Oregon was paying substantially more than Hallmark and Nor-Cal were paying in Port Orford and motored the approximately 60 nautical miles there to sell his crab to that buyer.

391. Later, in advance of the 2022/23 Dungeness crab season, the crabber spoke by phone with Crystal Adams of Hallmark, who expressed her anger at him for having sold the non-Defendant buyer the previous season and told him that he either had to sell everything to Hallmark or Hallmark would buy nothing from him, which was particularly problematic on the black cod side.

392. Then, at the beginning of the 2022/23 season, Hallmark and Nor Cal were only offering the cartel price of $2/lb. ex vessel in Port Orford and kept their prices artificially low for the season.

393. In contrast, Confidential Buyer Informant #1 was publicly advertising on a Facebook group frequented by crabbers and buyers that he was offering substantially more, and so the crabber sold a significant amount of crab to him, instead of Hallmark or Nor-Cal.

394. When Hallmark found out, the crabber was told by Chrystal Adams that because of his disloyalty Hallmark would not purchase anything from him, including black cod.

395. At the beginning of the 2023/24 season, Hallmark sought to apply this strategy more broadly when Confidential Buyer Informant #1 came to Port Orford and started paying crabbers substantially more than the cartel-set ex vessel price being offered by Hallmark and Nor-Cal.

396. In response, Hallmark threatened crabbers that if they sold to Confidential Buyer Informant #1, Hallmark wouldn't buy any crab from them and that Confidential Buyer Informant #1 wouldn't be able to buy all of their crab, leaving them nowhere to sell it. When this threat did not successfully discourage crabbers from taking the higher ex vessel price being offered by

Confidential Informant #1, Hallmark shut the doors of its Port Orford facility from 12/21 to 1/7, during a period of traditionally high demand and landings in the fishery.

### 3.   Ocean Gold

397.   Ocean Gold applied the same strategy when crabbers in Charleston, Oregon began taking up Confidential Buyer Informant #1 on his offer of higher ex vessel prices.

398.   It told all the crabbers that if they didn't stop buying from Confidential Buyer Informant #1, they'd close their doors, and crabbers would be left without a market because Confidential Buyer Informant #1 wouldn't be able to buy all their crab. When this threat didn't work, on December 23, 2023, Ocean Gold stopped purchasing crab in Charleston, Oregon, and did not restart purchasing crab there during the rest of the season.

## III.   Buyers Who Are Not Part of the Cartel, Nonetheless, Generally Obey Its Pricing Dictates in Order to Avoid Retaliatory Actions by Defendants

399.   The measures described herein that Defendants take to enforce compliance with their pricing dictates amongst themselves are also applied against non-cartel members, as the experience of Confidential Buyer Informant makes clear.

400.   Moreover, most other buyers buy a far smaller quantity of Dungeness crab in the Pacific NW Area ex vessel than Defendants.

401.   As a result, these buyers are particularly vulnerable to actions like selling below-cost crab to their customers and the other retaliatory actions by Defendants described herein.

402.   Thus, the overwhelming bulk of these buyers keep their heads down and toe the line on ex vessel prices set by Pacific Seafood and its co-defendants.

### ANTITRUST INJURY

403.   During the Class Period, Defendants' anticompetitive conduct had the following effects, among others, throughout the Pacific NW Area:

    a.   competition has been restrained or eliminated with respect to ex vessel prices paid to crabbers for Dungeness crab;

    b.   crabbers have been deprived the benefits of free and open competition for the purchase of their product;

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

c.  ex vessel prices paid for Dungeness crab in the Pacific NW Area have been fixed, lowered, stabilized, or maintained at artificially depressed levels; and

d.  commercial crabbers were paid artificially depressed ex vessel prices for their sales of Dungeness crab.

404.  The purpose and effect of this anticompetitive course of conduct was to exclude competition and to lower, fix, or maintain the purchase price for ex vessel Dungeness crab throughout the Pacific NW Area. As a direct and foreseeable result, during the Class Period, Plaintiffs and the proposed Class were paid lower prices for the Dungeness crab they sold ex vessel than they would have been paid in an unrestrained market.

405.  As noted above, ex vessel sales of Dungeness crab in Puget Sound have been largely unaffected by Defendants' conspiracy because that geographic area is dominated not by Defendants but by tribal nation market participants. As the table and graph below demonstrate, contrary to what would be expected if the Pacific NW Area were an unmanipulated market free from anticompetitive restraints, the divergence in prices between those paid in the Pacific NW Area and those paid in Puget Sound widens during the conspiracy period—*i.e.*, beginning with the 2015/2016 season.

Price Difference Between Ex Vessel Dungeness Crab Prices
Paid in Pacific NW Area vs. Puget Sound ($/lb)

|  | Pacific NW Area | Puget Sound | Difference | % Difference |
|---|---|---|---|---|
| *Pre-Conspiracy Period (2010-2015)\** | $2.86 | $3.72 | $0.87 | 30.3% |
| *Post-Conspiracy Period (2016-2024)\** | $3.63 | $5.01 | $1.38 | 38.1% |

*Year is defined as November of previous year through October to account for crab seasons.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111



16    406.    The artificial suppression of ex vessel Dungeness crab prices in the Pacific NW Area

17    affected not only sales made to Defendants but also those sales made to non-conspiring ex vessel

18    purchasers. This is because non-conspiring ex vessel purchasers are disincentivized from offering

19    higher prices for Dungeness crab under cover of Defendants' fixed, artificially depressed prices.

20    As a result, all sellers of ex vessel Dungeness crab in the Pacific NW Area—whether the transaction

21    involves Defendants or non-Defendant purchasers—suffered harm during the Class Period.

22    407.    By reason of the antitrust violations alleged herein, Plaintiffs and the proposed Class

23    have sustained injury to their businesses or property, and as a result have suffered damages. Such

24    injuries, which result from the price effects caused by Defendants' conduct, are precisely the type

25    that the antitrust laws were intended to forestall.

26
27
28

**CLASS ACTION ALLEGATIONS**

408.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of themselves and as representatives of a class of other commercial crabbers (the "Sherman Act Class") defined as follows:

> Commercial crabbers who, during the Class Period, sold ex vessel Dungeness crab they caught off the coast of, or landed in, California, Oregon, and/or Washington seeking damages and injunctive relief for violations of § 1 of the Sherman Act.

409.    Plaintiffs bring this action on behalf of himself and as a representative of a class of crabbers under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) (the "California Class") defined as follows:

> Commercial crabbers who, during the Class Period, sold ex vessel Dungeness crab they caught off the coast of, and/or landed in, California seeking damages and injunctive relief for violations of California state law.

410.    Excluded from the proposed Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; Defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges and jurors assigned to this case.

411.    The members of the proposed Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims.

412.    Plaintiffs' claims are typical of the members of the proposed Classes. Plaintiffs and all members of the proposed Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived Plaintiffs and the members of the proposed Classes of the benefits of competition that would have raised ex vessel prices for Dungeness crab. Although the precise number of such individuals is unknown to Plaintiffs, Plaintiffs believe that the number of members in the proposed Classes is, at minimum, in the thousands, and that the members reside or are located throughout Oregon, Washington, and California, including in this District.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

413.  Plaintiffs will fairly and adequately protect and represent the interests of the proposed Classes. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other proposed Class members.

414.  **The Sherman Act Class.** Common questions of law and fact exist as to all members of the Sherman Act Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the members of the Class, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Sherman Act Class include, but are not limited to:

a.  whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, lower, maintain, or stabilize the ex vessel price of Dungeness crab in the Pacific NW Area;

b.  the duration of the combination or conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance thereof;

c.  whether such combination or conspiracy violated Section 1 of the Sherman Act;

d.  whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Sherman Act Class;

e.  whether Defendants caused Plaintiffs and the members of the Sherman Act Class to suffer damages in the form of lower prices received in connection with the ex vessel sale of their Dungeness crab to Defendants, their co-conspirators, and other ex vessel buyers;

f.  the effect of Defendants' combination or conspiracy on ex vessel Dungeness crab prices in the Pacific NW Area;

g.  the appropriate measure of class-wide damages for the Sherman Act Class; and

h.  the propriety of declaratory and injunctive relief.

415.  **The California Class.** Common questions of law and fact also exist as to all members of the California Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the California Class members, thereby making class-wide

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

adjudication and relief appropriate. Such questions of law and fact common to the California Class include, but are not limited to:

      a.  whether Defendants have illegally combined to fix and suppress the ex vessel price for Dungeness crab in California and to control when the season for Dungeness crab opens in violation of the California Cartwright Act;

      b.  whether Defendants coerced other Dungeness crab buyers to combine in this way;

      c.  whether the means employed by Defendants to coerce that combination included implicitly and explicitly threatening or retaliating against non-compliant buyers;

      d.  whether the foregoing and other conduct by Defendants violates the California Cartwright Act and/or the California Unfair Competition Law;

      e.  whether Defendants' actions alleged herein caused injury to Plaintiffs and the California Class members by causing them to receive artificially depressed ex vessel prices for Dungeness crab during the Class Period;

      f.  the appropriate measure of damages; and

      g.  the propriety of declaratory and injunctive relief.

416.    Plaintiffs are more than adequate representatives of the Sherman Act and California Classes, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive, and are committed, to prosecuting this action for the benefit of the proposed Classes. Plaintiffs have no interests that are antagonistic to those of the proposed Classes. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

417.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action.

418.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**DELAYED DISCOVERY/FRAUDULENT CONCEALMENT**

419.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and other Class Members.

420.    Plaintiffs and other Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaging in the illegal and unlawful conduct as alleged herein until shortly before this litigation was commenced. Specifically, Plaintiffs only discovered the identity of the presently identifiable participants in Defendants' scheme to fix prices, from which all of Plaintiffs' and other Class Members' claims derive, when information was provided by Confidential Buyer Informant #1 after the filing of the instant action and documents were produced by certain Defendants.

421.    Nor could Plaintiffs and other Class Members, in the exercise of reasonable diligence, have discovered the violations earlier than that time because Defendants secretly engaged in their wrongdoing, concealing the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

422.    For example, Defendants substantially memorialized their agreements concerning pricing orally and via text messages sent and received on the personal devices of Defendants' employees, principals, and owners. Furthermore, these discussions were held in private in order to prevent discovery of the conspiracy by members of the class. And Defendants have, by and large, aggressively resisted Plaintiffs' efforts to gain access to records of these discussions through discovery in this litigation, including, in the case of Nor-Cal, simply ignoring a subpoena issued by Plaintiff Little for the communications and an order by this Court ordering its compliance.

423.    Furthermore, Defendants affirmatively sought to mislead Plaintiffs and other Class Members into believing that there was price competition between them and, by extension, to hide the existence of the conspiracy from Plaintiffs and other Class Members, and provided false explanations to Class Members for their actions, including without limitation that the ex vessel

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  prices for Dungeness crab offered by them in the Pacific NW Area were the result of external

2  market conditions and that they allowed Pacific Seafood to set the opening price for the

3  Dungeness crab season for factors unrelated to their conspiracy and agreement.

4       424.   Plaintiffs and other Class Members could not have discovered the unlawful

5  conduct at an earlier date through the exercise of reasonable diligence because of Defendants'

6  active and purposeful concealment of their unlawful activities.

7       425.   As a result of Defendants' fraudulent concealment of their wrongful acts,

8  Plaintiffs' delayed discovery of those wrongful acts, and the continuing nature of Defendants'

9  conspiracy, Plaintiffs asserts the tolling of any applicable statute of limitations affecting the rights

10  of action of Plaintiffs and other Class Members.

11

12                        **CLAIMS FOR RELIEF**

13                        **FIRST CAUSE OF ACTION**

14  **Unlawful Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act,**
    **15 U.S.C. § 1**

15

16  **(Against All Defendants on Behalf of Plaintiffs and the Sherman Act Class)**

17       426.   Plaintiffs reallege and incorporate by reference all the allegations above as though

18  fully set forth herein.

19       427.   Beginning no later than the start of the Class Period and continuing through the

20  present, Defendants and their co-conspirators entered into a continuing agreement, understanding,

21  and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22       428.   This agreement, understanding, and conspiracy has included concerted action and

23  undertakings by Defendants and their co-conspirators with the purpose and effect of: (a) fixing,

24  lowering, and stabilizing ex vessel prices for Dungeness crab in the Pacific NW Area at

25  artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants

26  and their co-conspirators with regards to ex vessel Dungeness crab prices in the Pacific NW Area.

27       429.   In formulating and carrying out the alleged agreement, understanding, and

28  conspiracy, Defendants and their co-conspirators did those things that they combined and

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, lowering, and stabilizing of ex vessel prices of Dungeness crab in the Pacific NW Area.

430.     The acts done by Defendants and their co-conspirators as part of, and in furtherance of, their agreement, understanding, and conspiracy were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

431.     The unlawful agreement, understanding, and conspiracy among Defendants and their co-conspirators has had the following effects, among others:

      a.   competition in the Pacific NW Area among Defendants, their co-conspirators, and other ex vessel buyers of Dungeness crab has been suppressed, restrained, and eliminated;

      b.   ex vessel prices for Dungeness crab have been fixed, lowered, maintained, and stabilized at artificially low levels throughout the Pacific NW Area; and

      c.   those who sold Dungeness crab ex vessel in the Pacific NW Area have been deprived of the benefits and free and open competition.

432.     As a result, during the Class Period, Plaintiffs and the members of the Sherman Act Class have received lower prices for their Dungeness crab from Defendants, their co-conspirators, and other ex vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

433.     Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiffs and the members of the Sherman Act Class have suffered injury to their property.

434.     Defendants' contract, combination, and conspiracy is a *per se* violation of Section 1 of the Sherman Act.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

435.     Plaintiffs and the members of the Sherman Act Class will continue to be subjected to Defendants' scheme alleged herein and will continue to suffer injury unless Defendants' unlawful conduct is enjoined.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**Combination in Restraint of Trade in Violation of the California Cartwright Act, Cal. Bus. and Prof. Code Sections 16720, *et seq*.**

**(Against All Defendants on Behalf of Plaintiffs and the California Class)**

436.     Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

437.     Defendants have entered into an unlawful combination in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce.  Each Defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, stabilize, and maintain ex vessel prices for Dungeness crab throughout the Pacific NW Area, including in California.

438.     The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, maintain, and stabilize ex vessel prices for Dungeness crab in California. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and fixing, lowering, and stabilizing the ex vessel price of Dungeness crab in California.

439.     Defendants' combination and conspiracy had the following purpose and effects: (1) ex vessel price competition for Dungeness crab was restrained, suppressed, and eliminated throughout California; (2) ex vessel Dungeness crab prices in California were fixed, lowered, maintained, and stabilized at artificially low levels; and (3) crabbers have been deprived of free and open competition in the ex vessel Dungeness crab market in California. During the Class

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

Period, Defendants' illegal conduct substantially affected California commerce and consumers. These anticompetitive effects outweigh any beneficial effect on competition.

440.    As a result, during the Class Period, Plaintiffs and the members of the California Class have received lower prices for their Dungeness crab from Defendants, their co-conspirators, and other ex vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

441.    Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiffs and the members of the California Class have suffered injury to their property

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**Violation of the California Unfair Competition Law,
Cal. Bus and Prof. Code § 17200, *et seq*.**

**(Against All Defendants on Behalf of Plaintiff Little and the California Class)**

442.    Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

443.    Defendants have intentionally and wrongfully engaged and continue to engage in the practices above, which are unlawful, fraudulent, and/or constitute unfair competition within the meaning of section 17200 of the California Business and Professions Code.

444.    These practices include but are not limited to:

a.   Defendants' combination and agreement to fix, lower, maintain, and stabilize ex vessel Dungeness crab prices in California, and to control when the Dungeness crab season opens; and

b.   Defendants' efforts to police and enforce their combination and agreement, and to punish or coerce compliance from those ex vessel Dungeness crab purchasers who have not joined Defendants' combination and conspiracy.

445.    The purpose and effect of these practices is to harm competition and suppress ex vessel prices for Dungeness crab in California.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

446.    Plaintiffs and the members of the California Class suffered harm as a direct and proximate result of Defendants' practices as described above.

447.    The practices alleged above are unfair, irrespective of the violation of any other law, and constitute unfair competition within the meaning of section 17200 of the California Business and Professions Code. They are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and the harm caused by such practices—including in the form of artificially depressed ex vessel prices for Dungeness crab—greatly outweighs any possible utility therefrom.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### For Declaratory Relief Under 28 U.S.C. § 2201

### (Against All Defendants on Behalf of Plaintiff and All Classes)

448.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

449.    Plaintiffs and the members of the Sherman Act and California Classes, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 of the Sherman Act and violates California's Cartwright Act.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, prays for judgment and further relief as follows:

1.    Determining that this action may be maintained as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, certifying each of the four proposed Classes, and directing that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Classes, and appoint Plaintiff as the named representatives of the Classes;

2.      Awarding Plaintiff and the Classes treble damages in an amount to be determined at trial, plus interest in accordance with law;

3.      Award Plaintiff and the Class injunctive relief including an order barring Defendants from continuing to engage in the illegal combinations with other ex vessel buyers of Dungeness carab alleged herein;

4.      Entering judgments against Defendants in favor of Plaintiff and the Classes;

5.      Awarding Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

6.      Awarding such further additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: August 20, 2024

By:                                              */s/ Stuart G. Gross*
_____
                                                   Stuart G. Gross (SBN 251019)
                                                   Travis H.A. Smith (SBN 331305)
                                                   Ross A. Middlemiss (SBN 323737)
                                                   **GROSS KLEIN PC**
                                                   The Embarcadero
                                                   Pier 9, Suite 100
                                                   San Francisco, CA 94111
                                                   (415) 671-4628
                                                   *sgross@grosskleinlaw.com*
                                                   *tsmith@grosskleinlaw.com*
                                                   *rmiddlemiss@grosskleinlaw.com*

                                                   Matthew W. Ruan (SBN 264409)
                                                   **FREED KANNER LONDON & MILLEN LLC**
                                                   100 Tri-State International, Suite 128
                                                   Lincolnshire, IL 60069
                                                   (224) 632-4500
                                                   *mruan@fklmlaw.com*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steven N. Williams (SBN 175489)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear St, Suite 1100
San Francisco, CA 94105
(415) 671-4628
*swilliams@stevenwilliamslaw.com*

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE COTTRELL
KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100
*mweiler@schneiderwallace.com*

*Counsel for Plaintiffs and the Proposed Classes*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT