1  Stuart G. Gross (SBN 251019)
2  Ross A. Middlemiss (SBN 323737)
   Travis H.A. Smith (SBN 331305)
3  **GROSS KLEIN PC**
   The Embarcadero
4  Pier 9, Suite 100
   San Francisco, CA 94111
5  (415) 671-4628

6  *Attorneys for Plaintiffs and the Proposed Classes*
7  [additional counsel listed on signature page]

8                  **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN FRANCISCO DIVISION**

11

12  **BRAND LITTLE** and **ROBIN BURNS**,             Case No. 3:23-cv-01098-AGT
    Individually and on Behalf of All Others Similarly
13  Situated,                                          **PLAINTIFFS' OPPOSITION TO**
                                                       **DEFENDANTS' OMNIBUS AND**
                    Plaintiffs,                        **INDIVIDUAL MOTIONS TO**
14                                                     **DISMISS**
            v.
15
    **PACIFIC SEAFOOD PROCUREMENT, LLC;**
16  **PACIFIC SEAFOOD PROCESSING, LLC;**               Date:     January 24, 2025
    **PACIFIC SEAFOOD FLEET, LLC; PACIFIC**            Time:     10:00 a.m.
17  **SEAFOOD DISTRIBUTION, LLC; PACIFIC**             Courtroom: A, 15th Floor
    **SEAFOOD USA, LLC; DULCICH, INC.;**               Judge:    Alex G. Tse
18  **PACIFIC SEAFOOD – EUREKA, LLC;**
    **PACIFIC SEAFOOD – CHARLESTON, LLC;**
19  **PACIFIC SEAFOOD – WARRENTON, LLC;**
    **PACIFIC SEAFOOD – NEWPORT, LLC;**
20  **PACIFIC SEAFOOD – BROOKINGS, LLC;**
    **PACIFIC SEAFOOD – WESTPORT, LLC;**
21  **PACIFIC SURIMI – NEWPORT LLC; BLUE**
    **RIVER SEAFOOD, INC.; SAFE COAST**
22  **SEAFOODS, LLC; SAFE COAST SEAFOODS**
    **WASHINGTON, LLC; OCEAN GOLD**
23  **SEAFOODS, INC.; NOR-CAL SEAFOOD,**
    **INC.; KEVIN LEE; AMERICAN SEAFOOD**
24  **EXP, INC.; CALIFORNIA SHELLFISH**
    **COMPANY, INC.; ROBERT BUGATTO**
25  **ENTERPRISES, INC.; ALASKA ICE**
    **SEAFOODS, INC.; LONG FISHERIES, INC.;**
26  **CAITO FISHERIES, INC.; CAITO**
    **FISHERIES, LLC; SOUTHWIND FOODS,**
27  **LLC; FISHERMEN'S CATCH, INC.;**
    **GLOBAL QUALITY FOODS, INC.; GLOBAL**
28  **QUALITY SEAFOOD LLC; OCEAN KING**

*(left margin, vertical text)* GROSS KLEIN PC / THE EMBARCADERO / PIER 9, SUITE 100 / SAN FRANCISCO, CA 94111

1    **FISH INC.; SOUTH BEND PRODUCTS LLC;**
     **SWANES SEAFOOD HOLDING COMPANY**
2    **LLC; BORNSTEIN SEAFOODS, INC.;**
     **ASTORIA PACIFIC SEAFOODS, LLC; and**
3    **DOES 29-60,**

4                          Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 1

I.    Defendants Have Conspired Since at Least January 2016 to Artificially Depress the Ex Vessel Price for Dungeness Crab in the Pacific NW Area ......................................... 1

A.    Allowing Pacific Seafood to Set the Opening Price and Coordinating on Price Thereafter ................................................................................................. 2

B.    Purchasing "Out the Back Door" from Each Other Rather than Ex Vessel from Each Other in Ports Where the Purchaser Doesn't Have a Presence ................................. 3

C.    As a Result of Defendants Conspiracy, Ex Vessel Prices for Dungeness Crab in the Pacific NW Area Have Substantially Dropped Relative to Ex Vessel Prices in a Neighboring Market ................................................................................................. 3

II.    Operation of Defendants' Conspiracy ................................................................... 4

A.    Defendants' Explicit Statements Describe and Further Their Agreement to Fix Prices.. 4

B.    Defendants Seek to Recruit Other Buyers into the Cartel with Offers, Threats, and Punishments. ................................................................................................. 6

C.    Defendants Police Each Other's Compliance with the Conspiracy Via Threats and Punishments for Violations, Leading Defendants to Hide When They Pay or Offer Ex Vessel Prices Higher than the Agreed Levels .......................................................... 9

D.    Defendants Threaten and Punish Crabbers Who Sell to Non-Cartel Members. ............ 11

III.    Other Economic and Contextual Factors Corroborate the Conspiracy's Existence ...... 12

A.    The Refusals by Individual Defendants to Break Ranks on Opening Price Are Contrary to the Economic Interest of Most, Absent the Conspiracy, Given the High Demand for Crab at That Time. ................................................................................................. 12

B.    Several Characteristics of the Pacific NW Area Dungeness crab Ex Vessel Market Makes It Highly Susceptible to a Conspiracy to Restrain Pricing Competition among Buyers. 13

LEGAL STANDARD ................................................................................................. 14

ARGUMENT ................................................................................................. 16

I.    Plaintiffs Have Adequately Alleged Their Price-Fixing Claims Under Sherman § 1 ....... 16

A.    Plaintiffs Plead Direct Evidence of An Agreement to Fix Ex Vessel Prices. ................. 16

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

B.    Defendants' Contentions Concerning Plaintiffs' Direct Evidence Fail. ........................ 20

C.    The FAC's Allegations of Circumstantial Evidence Further Supports the Plausible Existence of a Conspiracy to Fix and Depress the Ex Vessel Prices Paid to Crabbers in the Pacific NW Area ................................................................................................................... 25

D.    The Individualized Challenges by Certain Defendants to the Adequacy of Allegations Against Them, in Particular, also Fail .................................................................................. 36

II.    Plaintiffs Have Also Adequately Alleged Their Cartwright Act and UCL Claims ........... 42

III.    Plaintiffs Timely Seek Damages For The Entire Period Of Defendants' Conspiracy ... 45

A.    Defendants Fraudulently Concealed Their Scheme From Plaintiffs, Tolling the Statute of Limitations Such that They Can Maintain Claims for Injuries Suffered During the Entirety of the Class Period ................................................................................................................ 45

IV.    Defendants' Challenges to Plaintiffs' Standing Fall Flat .................................................. 51

A.    Little's Standing Is Adequately Alleged Based on Sales to Members of the Cartel ...... 51

B.    Burns Has Standing as a Matter of Law Based on Sales by Her Deceased Husband to Members of the Cartel ........................................................................................................ 52

V.    The Court Has Personal Jurisdiction Over Swanes .......................................................... 52

VI.    Leave Should Be Granted in the Event that Court Finds Any Deficiency in Plaintiffs' Allegations ......................................................................................................................... 55

CONCLUSION ............................................................................................................................ 55

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3    *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004) ....... 52, 53, 54

4    *Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) ............................................ 16

5    *Ariz. v. Maricopa County Medical Soc.*, 57 U.S. 332 (1982) ..................................... 30

6
7    *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358 (9th
        Cir. 1998) ......................................................................................................... 40

8    *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010
9        (N.D. Cal. Sept. 30, 2016)................................................................................ 18, 33

10   *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167
        (N.D. Cal. 2010)................................................................................................ 23

11   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ........................................ passim

12
13   *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022).................................................. 23

14   *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011)........................... 22

15   *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295 (D. Utah 1999) .................... 19

16   *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97
        (1980) ............................................................................................................ 23, 24

17   *Catalano v. Target Sales, Inc.*, 446 U.S. 643 (1980) ............................................ 30

18
19   *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)................. 43

20   *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001)....................................... 43

21   *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499 (9th Cir. 1988).................... 48

22   *Cont'l Ore v. Union Carbide*, 370 U.S. 690 (1962)................................. 15, 20, 29, 36

23   *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ............................... 16

24   *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)............................ 43, 44

25   *Erickson v. Pardus*, 551 U.S. 89 (2007) ............................................................... 14

26   *Esco Corp. v. United States*, 340 F.2d 1000 (9th Cir. 1965) .................................. 22

27   *F.T.C. v. Ticor Title Ins. Co.,* 504 U.S. 621 (1992) ................................................. 24

28   *Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*, 95 Cal.App.4th 1182 (2002) ...................... 40

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895
(E.D. Cal. 2024) ..................................................................................................... 17, 18

*Flextronics Int'l USA, Inc. v. Murata Mfg. Co.*, No. 5:19-CV-00078-EJD, 2020
WL 5106851, at *15 (N.D. Cal. Aug. 31, 2020) ............................................... 28, 37

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, No. 22-15231, 2023 WL
4677017 (9th Cir. July 21, 2023) ................................................................................ 27

*Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) ....................... 51

*Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020) ............................................... 22

*FTC v. Phoebe Putney Health System, Inc.*, 568 U.S. 216 (2013) .......................................... 24

*Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016) ................................ 47, 48

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ............................................. 30

*Gibson v. MGM Resorts Int'l*, No. 2:23-CV-00140-MMD-DJA, 2023 WL 7025996
(D. Nev. Oct. 24, 2023) ........................................................................................... 29

*Go-Video Inc. v. Akai Elec. Co.*, 885 F.2d 1406 (9th Cir. 1989) ........................................ 53

*Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F3d 1122 (9th
Cir. 2003) ............................................................................................................. 53, 55

*Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012) ...................................... 45

*Hightower v. Celestron Acquisition, LLC*, No. 5:20-CV-03639-EJD, 2021 WL
2224148 (N.D. Cal. June 2, 2021) ............................................................................. 45

*Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984) ............................................................ 49, 50

*Hogan v. Cleveland Ave Rest., Inc.*, No. 2:15-CV-2883, 2018 WL 1475398 (S.D.
Ohio March 26, 2018) ................................................................................................. 19

*Hogan v. Pilgrim's Pride Corp.*, No. 16-CV-02611-RBJ, 2018 WL 1316979, at *7
(D. Colo. Mar. 14, 2018) ........................................................................................... 29

*Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809 (N.D. Cal. 2019) ....................................... 39

*Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813 (9th Cir. 2023) ................................... 22

*Howes v. Yankton Med. Clinic, P.C.*, 2016 WL 4385898 (D.S.D. Aug. 17, 2016) .................. 52

*Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310 (6th Cir. 2014) ...................................... 22

*In re Aftermarket Filters Antitrust Litig.*, No. 08–4883, 2009 WL 3754041 (N.D.
Ill. Nov. 5, 2009) ....................................................................................................... 16

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) ..................... 49

*In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012) ................................... 51

*In re Automobile Antitrust Cases I & II*, 1 Cal. App. 5th 127 (2016) ................................ 19, 20

*In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. Aug. 23, 2010) ............................................................................. 16

*In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1041 (N.D. Cal. 2021) .......... passim

*In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................... 48

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ............................................................................. passim

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,* 28 F.4th 42 (9th Cir. 2022) ................................................. 22, 25

*In re Dynamic Random Access Memory Indirect Purchaser Litig.,* No. 4:18-CV-2518-JSW-KAW, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ........................ 35

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................... 14

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) .................................... 31

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ................................ 14

*In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092 (N.D. Cal. May 6, 2021) ........................................................................ 45, 50

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................................... 22, 40, 41

*In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002) ................ 30

*In re High-Tech Employees Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............... 16

*In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................... 28

*In re Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .................................... 14, 15, 36, 37

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ................................................ 38

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ..... 26, 28, 36

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019) ............................................................................. 51

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*In re Nine West Antitrust Litig.*, 80 F. Supp. 2d 181 (S.D.N.Y. 2000) ........................50

*In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ...........................................................................................................................16

*In re Petroleum Prods. I*, 906 F.2d 432 (1988).........................................................17

*In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ...................................................................................................29

*In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) ..............46, 50

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008)..........................................................................................................37

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) ......................15, 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* 586 F. Supp. 2d 1109 (N.D. Cal. 2008) .........................................................................................................................37

*In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145 (D. Kan. 2012)......................45

*Interstate Cir., Inc. v. U.S.*, 306 U.S. 208 (1939) .....................................................16

*Jacob Blinder & Sons, Inc. v. Gerber Prods. Co. (In re Baby Food Antitrust Litig.),166 F.3d 112 (3d Cir. 1999).* ..................................................................31

*Kjessler v. Zaappaaz, Inc.*, No. CV 4:18-0430, 2019 WL 3017132 (S.D. Tex. April 24, 2019) ...................................................................................................................18

*Kleen Prod., LLC v. Packaging Corp. of Am.,* 775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...........................................................................................................................34

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000)............15, 20

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ................................................29, 36

*Lambrix v. Tesla, Inc.,* No. 23-CV-01145-TLT, --- F.Supp.3d.---, 2024 WL 3403777 (N.D. Cal. June 17, 2024) ......................................................................42

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)...........52

*Markson v. CRST Int'l, Inc.*, No. 517CV01261VAPSPX, 2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) ......................................................................................................17

*Martinez v. Aero Caribbean*, 764 F3d 1062 (9th Cir. 2014)......................................53

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) ..............................................................................................................22

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*McKell v. Washington Mut., Inc*., 142 Cal.App.4th 1457 (2006) ................................................ 44

*Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976, 985 (C.D. Cal. 2000) ............................ 49

*Monsanto Co. v. Spray–Rite Serv. Corp*., 465 U.S. 752 (1984) ................................................ 16

*Mosaic Health Inc. v. Sanofi-Aventis U.S.,* LLC, No. 6:21-CV-06507 EAW, 2022
    WL 4017895 (W.D.N.Y. Sept. 2, 2022) ................................................................................. 28

*N. Carolina State Bd. of Dental Examiners v. F.T.C*., 574 U.S. 494 (2015) ............................. 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651
    (9th Cir. 2022) ....................................................................................................................... 42

*Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, 2008 WL 4183916 (S.D. Cal. Sept.
    8, 2008) .................................................................................................................................. 40

*Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987) ................................ 50

*Patrick v. Burget*, 486 U.S. 94 (1988) ....................................................................................... 24

*Petersen v. Boeing Co*., 715 F.3d 276 (9th Cir. 2013) ............................................................... 55

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co*., 998 F.2d 1224 (3d Cir.
    1993) ...................................................................................................................................... 31

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) 15, 22, 30, 31

*Progressive W. Ins. Co. v. Superior Ct.*, 135 Cal. App. 4th 263 (2005) ..................................... 43

*Ray v. Alad Corp.*, 19 Cal.3d 22 (1977) ..................................................................................... 40

*Real Est. Exch., Inc. v. Zillow, Inc.*, No. C21-0312 TSZ, 2023 WL 5278115 (W.D.
    Wash. Aug. 16, 2023) ....................................................................................................... 16, 22

*Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480 (D.C. Cir. 1989) ............................................... 46

*Robinson v. U.S.*, No. 08–CV–2280, 2009 WL 175032 (C.D. Ill. Jan. 21, 2009) .................... 48

*S.A. by Allen v. E.I. du Pont de Nemours and Company*, 2023 WL 6976507 (N.D.
    Ind. Oct. 20, 2023) ................................................................................................................ 26

*Samsung Elecs. Co. v. Panasonic Corp.* 747 F.3d 1199 (9th Cir. 2014) ................................... 50

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) .................................... 28

*Securities Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985) ....................................... 53

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) ...................................... passim

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Spectators' Commun. Network, Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) ........................................................................................... 18

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2011 WL 2678879 (E.D. Cal. July 7, 2011) ........................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ........................................... 15

*U.S. v. Paramount Pictures, Inc*., 334 U.S. 131 (1948).......................................................... 16

*United Brotherhood of Carpenters & Joiners of America v. Building & Construction Trade Department, AFL-CIO* ("*Carpenters*"), 770 F.3d 834 (9th Cir. 2014) ........................................................................................... 38

*United States v. Container Corp. of Am.*, 393 U.S. 333 (1969).................................................... 17

*United States v. Gen. Motors Corp*., 384 U.S. 127 (1966) ........................................................ 19

*United States v. Livoti*, 756 Fed. Appx. 841 (11th Cir. 2018) ............................................... 48

*United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150 (1940) ................................... 28, 30, 31

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010)................. 15, 16, 19

*White v. R.M. Packer Co*., 635 F.3d 571 (1st Cir. 2011) ............................................. 22

*X Corp. v. Center for Countering Digital hate Ltd.*, 724 F.Supp.3d 921 (N.D. Cal. 2024) ........................................................................................... 54

**STATUTES**

15 U.S.C. § 22 ............................................................................................. 53

Cal. Code of Civ. Pro. § 377.11 ........................................................................ 52

Or. Rev. Stat. Ann. § 646.739(2)(a) .................................................................... 23

Or. Rev. Stat. Ann. § 646.739(d) ....................................................................... 24

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**INTRODUCTION**

Plaintiffs Brand Little and Robin Burns allege ample facts in support of a price-fixing conspiracy that suppressed the prices crabbers in the Pacific NW Area received for sales of live, ex vessel Dungeness crab—the fruits of their labor. In granting Plaintiffs leave to amend, the Court noted "[i]f direct purchasers gave into that pressure and adopted a fixed price, they could be considered conspirators in a price-fixing scheme." Dkt. 59, at 3. The First Amended Complaint ("FAC") describes in detail exactly this scheme. The communications cited therein confirm the existence of the horizontal price-fixing conspiracy, show how the agreements were enforced, and demonstrate that each Defendant played some role. Pacific Seafood, the conspiracy's ringleader, set the prices Defendants paid for ex vessel crab, pressured other Defendants to agree, and monitored and enforced compliance.

The FAC contains dozens of evidentiary facts that fall into five broad categories: (1) explicit statements by Defendants' representatives evidencing an agreement to fix ex vessel prices; (2) Defendants' efforts to recruit other crab buyers into the price-fixing cartel; (3) Defendants' efforts to punish one another and other crab buyers for violating the terms of the agreement; (4) Defendants' consolidation of port control and "out the back door" purchasing from one another; and (5) Defendants punishing crabbers that don't follow the cartel's price scheme. Plaintiffs also allege significant circumstantial facts (*i.e.*, parallel conduct and plus factors) that further corroborate the plausibility of an illegal conspiracy to fix prices. The parallel conduct here includes dozens of communications setting opening prices (*see e.g.* FAC ¶¶ 175-76, 180-85), as well as Defendants' compliance with the low prices set by Pacific Seafood. *See id.* at ¶¶ 200-226.

Defendants' Motion to Dismiss does not grapple with these well-pled allegations. Instead, Defendants mischaracterize the FAC, offer their own alternative facts that contradict those actually pled, and improperly parse Plaintiffs' allegations.

**BACKGROUND**

**I.** **Defendants Have Conspired Since at Least January 2016 to Artificially Depress the Ex Vessel Price for Dungeness Crab in the Pacific NW Area[1]**

---

[1] "Pacific NW Area" refers to California, coastal Washington (which excludes Puget Sound), and Oregon. FAC ¶ 1.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

A.     **Allowing Pacific Seafood[2] to Set the Opening Price and Coordinating on Price Thereafter**

A central component of Defendants' price-fixing agreement is to allow Pacific Seafood to set opening prices for ex vessel[3] crab in the Pacific NW Area, which has the purpose and effect of both: (a) directly depressing the ex vessel price Defendants pay for crab landed at the beginning of the season, which constitutes a very large portion of the total amount of crab that is landed all season; and (b) indirectly depressing the price paid by Defendants for the remainder of the season, given the strong benchmarking role that the opening price plays. FAC ¶¶ 145, 175-77; *see also id.,* ¶¶ 180-231 (describing in detail Defendants strict coordination on opening price during the 2019/20 through 2023/24 seasons). As Kevin Lee of Nor-Cal[4] colorfully put it when asked by a crabber what Nor-Cal would pay at the 2022/2023 season opening: "No idea yet. I'm waiting big boss give out price." *Id.*, ¶ 217.

Defendants collectively control over 60% of the ex vessel market by purchase volume; most other buyers (218 of the 239 buyers in 2023/24 season) purchase a relatively tiny volume of (collectively 12% of the total in the 2023/24 season), *see id.* ¶¶ 151-52.[5] This makes Defendants' conspiracy to suppress the opening price effective, as *non-cartel* members lack the buying capacity, individually or collectively, to buy all the crab landed in the first few weeks of the opening. In other words, these non-cartel buyers, despite being willing to pay significantly more than the artificially low ex vessel price collusively offered by Defendants at the opening (or offer a price at all, when Defendants collectively refuse to even do so), don't have the capacity to buy all the crab landed at the opening. *Id.*, ¶¶ 155-57 Thus, as long as larger buyers like Defendants, who do have that capacity, stick together in not offering a higher ex vessel price, crabbers ultimately must accept the artificially

---

[2] "Pacific Seafood" refers collectively to Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood - Eureka, LLC, Pacific Seafood - Charleston, LLC, Pacific Seafood - Warrenton, LLC, Pacific Seafood - Newport, LLC, Pacific Seafood - Brookings, LLC, Pacific Seafood - Westport, LLC, Pacific Surimi - Newport LLC. FAC ¶¶ 14-28.

[3] "Ex vessel" refers to purchases of crab by Defendants and other buyers in the Pacific NW Area from crabbers. FAC ¶ 3.

[4] "Nor-Cal" refers collectively to Defendants Kevin Lee and Nor-Cal Seafood, Inc. FAC ¶¶ 59-61.

[5] Several larger Defendants are members of West Coast Seafood Processors Association ("WCSPA"), which gives them an opportunity to meet and a reach agreements on ex vessel prices. *Id.*, ¶ 154.

1    low opening price collusively set by Defendants. *Id.*, ¶¶ 155-57, 175-79.

2           Once the crab season is underway, Defendants continue coordinating on price, ensuring that

3    market forces of supply and demand do not push ex vessel prices of Dungeness crab in the Pacific

4    NW Area too high. *Id.*, ¶¶ 223-42.

5           **B.    Purchasing "Out the Back Door" from Each Other Rather than Ex Vessel from
                    Each Other in Ports Where the Purchaser Doesn't Have a Presence**

6

7           Prior to the conspiracy period, ex vessel prices would get driven up throughout the Pacific

8    NW Area by what are known in the industry as "white van buyers," who would drive to various ports

9    along the coast from their home bases (often in large urban areas like the Bay Area and the Los

10   Angeles basin) and purchase large volumes of Dungeness crab ex vessel from crabbers in those ports

11   and competing with other "white van buyers" and port-resident buyers for available crab. *Id.*, ¶¶ 158-

12   69; *see also id.*, ¶¶ 59, 67, 109 (places of business of Defendants ASE,[6] Nor-Cal, and Ocean King,[7]

13   who formerly were key "white van" players in this dynamic).

14   During the last season of this "white van" phenomenon, the 2014/15 season, ex vessel prices for

15   Dungeness crab in the Pacific NW Area climbed to levels that were as much as seven times higher

16   than they had been just eight years before, catalyzing Defendants' agreement to suppress and stabilize

17   those prices. *Compare id.* ¶ 163 *with id.* ¶ 169. As a result, in ports where Defendants do not have a

18   presence, Defendants agreed to purchase "out the back door" from each other rather than from the

19   crabbers themselves, effectively preventing "white van" purchases from driving up crab prices. *Id.*, ¶¶

20   270-82; *see also id.*, ¶¶ 243-81 (describing how Defendants have consolidated their control of port

21   infrastructure necessary to land and process crab, which has facilitated this process). Thus, when

22   Ocean Gold's Gerald Schlaupitz told a crabber while unloading crab from him during the 2015/16

23   season that the crabber would "never see that price again," he was speaking from information.

24          **C.    As a Result of Defendants Conspiracy, Ex Vessel Prices for Dungeness Crab in
                    the Pacific NW Area Have Substantially Dropped Relative to Ex Vessel Prices in
                    a Neighboring Market**

25

26          For various reasons, including significant tribal involvement, Defendants' price-fixing

27   conspiracy has not affected the ex vessel Dungeness crab market in Puget Sound. *Id.*, ¶ 174.

28   _____
     [6] "ASE" refers to Defendant American Seafood Exp, Inc. FAC ¶¶ 67-68.
     [7] "Ocean King" refers to Defendant Ocean King Inc. FAC ¶¶ 109-10.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    Comparing price trends in Puget Sound with price trends in the Pacific NW Area, starkly

2    demonstrates the effect that Defendants' conspiracy has had on ex vessel prices in the Pacific NW

3    Area. While ex vessel prices in the two markets were virtually identical in the early part of the new

4    millennium and stayed closely aligned until the 2014/15 season, starting in the 2015/16 season, the

5    price trends take different tacks, with relative and absolute delta between pricing in the two markets

6    increasing each season. *Id.* ¶¶ 173-74, 405 & accompanying charts and table.

7    **II.    Operation of Defendants' Conspiracy**

8        After the filing of the original complaint in this action, Plaintiffs' counsel was contacted

9    by several industry participants, including a new buyer, who entered the Pacific NW Area ex

10   vessel market at the beginning of the 2022/23 season and sought to capture significant market

11   share by paying higher ex vessel prices than cartel members; he is referred to in the FAC as

12   "Confidential Buyer Informant #1" and herein as "CI#1". *Id.* ¶ 283. Based on information and

13   documents provided by CI#1 and other informants, as well as the very limited discovery

14   responses received from Defendants, several of whom simply refused to produce documents or

15   respond to Plaintiffs' subpoenas, Plaintiffs show how Defendants' conspiracy to suppress the ex

16   vessel prices for Dungeness crab in the Pacific NW Area operates through, at least, four separate

17   components.

18       **A.    Defendants' Explicit Statements Describe and Further Their Agreement to Fix
             Prices.**
19
         First, Plaintiffs identify dozens of communications among Defendants that reflect and further
20
     agreements to fix or suppress prices of ex vessel crab. *See, e.g.,* FAC ¶¶ 171, 180-84, 186-91, 197-99,
21
     213-20, 223-31, 236-40, 280-81, 285, 291, 349.[8]
22
         ***Nor-Cal – ASE – Ocean King (2015/16).*** Nor-Cal's Kevin Lee and ASE's Kevin Zhang both
23
     told Ocean King's George Lay that the *ex vessel* price he paid for crab was too much the previous
24
     season. *Id.* ¶ 171.
25

26

27

28   _____
     [8] The unredacted version of the First Amended Complaint ("FAC") is filed at Dkt. 218.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

***Fathom*[9] – *Bornstein*[10] *(January 2020).*** Fathom's Nick Mareno texted Bornstein's Andrew Bornstein, on January 1, 2020, before the season had opened, asking "what's price doing? Hearing Pacific is raising to $3.25" to which Mr. Bornstein responded Pacific Seafood was "playing hard ball at 3.00," punishing crab boats for selling to non-cartel members for over Pacific Seafood's stated price, and that Bornstein would also be paying $3.00/lb. FAC ¶¶ 180-84.

***Ocean King – Bornstein (January 2021).*** Over several days before the season opened, Ocean King's George Lay texted Andrew Bornstein, informing him that crabbers were asking for $2.75/lb. and that Pacific Seafood and Hallmark were offering $2.50. *Id.* ¶¶ 186-90. Soon thereafter Mr. Lay texted Mr. Bornstein informing him that Pacific Seafood was now offering $2.75; Mr. Bornstein indicated he already knew this, and Bornstein was offering the same price. *Id.* ¶ 191.

***Ocean King – Bornstein (January 2021).*** On January 14, 2021, once the season was underway, George Lay texted Andrew Bornstein again letting him know what prices were being offered by buyers in San Francisco, and asking Mr. Bornstein if he would be "matching the price" to which Mr. Bornstein responded "more than likely" but that he certainly wouldn't pay more than $5.00/lb. *Id.* ¶¶ 236-38. Mr. Lay, responded: "Exactly, *I agree. Id.*, ¶ 239 (emphasis added).

***Pacific Seafood – Nor-Cal - CI#1 (January 2023).*** Nor-Cal's Kevin Lee and Pacific Seafood's Frank Dulcich, together, called CI#1asking him to agree to only pay $2.25/lb. FAC ¶ 285.

***Global Quality*[11] *- Pacific Seafood - Safe Coast*[12] *- Fishermen's Catch*[13]*- Caito*[14]*- Nor-Cal – ASE - CI#1 (February 2023).*** Representatives of Pacific Seafood, Global Quality, Safe Coast, Fishermen's Catch, Caito, Nor-Cal and ASE, who controlled the hoists in Crescent City, each told CI#1 that they had all agreed to an ex vessel price of $2.25/lb. for Crescent City. *Id.* ¶¶ 280-81. At or around the same time, Safe Coast's Max Boland informed CI#1 that Safe Coast "won't pay an ex

---

[9] "Fathom" refers collectively to Defendants Alaska Ice Seafoods, Inc., Long Fisheries, Inc. FAC ¶¶ 80-83.
[10] "Bornstein" refers collectively to Defendants Bornstein Seafoods, Inc. and Astoria Pacific Seafoods, LLC. FAC ¶¶ 120-22.
[11] "Global Quality" refers collectively to Defendants Global Quality Foods, Inc. and Global Quality Seafood LLC. FAC ¶¶ 102-4.
[12] "Safe Coast" refers collectively to Defendants Blue River Seafood, Inc. dba Pucci Foods, Safe Coast Seafoods, LLC and Safe Coast Seafoods Washington, LLC. FAC ¶¶ 40-44.
[13] "Fishermen's Catch" refers to Defendant Fishermen's Catch, Inc. FAC ¶¶ 97-98.
[14] "Caito" refers collectively to Defendants Caito Fisheries, Inc., Caito Fisheries, LLC and Southwind Foods, LLC. FAC ¶¶ 89-92.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

vessel price for Dungeness crab higher than what Pacific Seafood's Frank Dulcich wants paid" and that CI #1 would be prevented from paying more because the port was "locked down" by Pacific Seafood and its allies. *Id.* ¶¶ 290-291.

*Safe Coast – CI#1 (November 2023)*. Safe Coast's Max Boland told CI#1 2023 that Pacific Seafood would set the price, and it would be between $1.85/lb. and $2.00/lb., maybe as high as $2.25/lb. *Id.* ¶¶ 223-25.

*Caito – CI#1 (November 2023)*. Caito's John Caito told CI#1 that Caito would not set its opening price until Pacific Seafood did. *Id.* at ¶226.

*Pacific Seafood – CI#1 (Early/Mid December 2023)*. Pacific Seafood's Brett Hester told CI#1 that the opening price was going to be less than $2.00/lb. *Id.* ¶ 227.

*Pacific Seafood – Bornstein – Fathom – Hallmark[15] – Safe Coast – CI#1 (December 2023)*. Representatives of Pacific Seafood, Bornstein, Fathom, Hallmark, Safe Coast, and CI#1 attended a meeting in which they expressed the uniform position that they did not want to offer crabbers more than $2.50/lb., based on what they (falsely) claimed was a lack of demand, with representatives of Pacific Seafood, Hallmark, Bornstein all concurring that they "need to keep the price down." *Id.* ¶¶ 228-31.

## B.  Defendants Seek to Recruit Other Buyers into the Cartel with Offers, Threats, and Punishments.

Second, Plaintiffs identify numerous instances in which Defendants sought to recruit CI#1 and other buyers into their price-fixing conspiracy through carrots, sticks, and the promise and threat thereof, respectively. *See id.* 200-12, 284-350.

*Pacific Seafood – Various Buyers (January 2023)*. In the runup to the opening of the 2022/23 season, no Defendant would even offer an opening price, with the non-Pacific Seafood Defendants stating that they would not offer a price until Pacific Seafood did so. *Id.,* ¶¶ 200-03. Given the very high demand for crab from buyers' customers that existed at the time, this was a transparent attempt to create sufficient desperation among crabbers that they would ultimately accept

---

[15] "Hallmark" refers collectively to Defendants California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc. FAC ¶¶ 72-74.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   the very low $2.25/lb. price the cartel planned to offer. *Id.* ¶¶ 201-08; *see also id.* ¶¶ 155-57.

2   Ultimately, the crabbers in Central California ports took the unprecedented move of going out fishing

3   without an offer from any buyer to purchase their crab at any price, a move that Pacific Seafood

4   strongly protested. *Id.* ¶ 209-212. Reflecting the actual high demand for crab, buyers quickly

5   purchased the landed crab. Later in the season, Pacific Seafood punished those buyers by (a) shipping

6   approximately 200,000 lbs. of fresh cooked crab into the central California retail market and selling it

7   for $3.99 to $4.50/lb., well below what fresh cooked crab cost the other buyers in the area, *id.* ¶¶ 346-

8   47, and (b) importing large volumes of live crab from China and selling it at $4.50/lb. free on board,

9   which was well below the costs of other buyers, *id.* ¶ 348.

10          ***Pacific Seafood – Nor-Cal – CI#1 (January 2023).*** In January 2023 once the season was

11   open, Pacific Seafood's Dulcich and Nor-Cal's Lee told CI#1 that the cartel price was $2.25/lb and

12   that Nor-Cal would buy all of CI#1's excess crab at $3/lb., if he would agree to pay the cartel price of

13   $2.25/lb. *Id.* ¶ 285. Soon thereafter, Mr. Lee relayed a threat from Mr. Dulcich to CI#1 that it would

14   not be a problem for a buyer like Pacific Seafood to lose $1 million to teach a small guy like CI#1 a

15   lesson. FAC ¶¶ 285-86. Mr. Lee, around the same time, called CI#1's uncle—a long-time industry

16   participant—asking him to convince CI#1 to lower his ex vessel price. *Id.* ¶ 289.

17          After CI#1 refused, both Nor-Cal and Pacific Seafood punished him: Nor-Cal went to CI#1's

18   retail accounts in San Francisco and sold them crab at $2/lb.—approximately $1.00 less than what

19   Nor-Cal was paying ex vessel at that time—causing those accounts to back out of agreements they

20   already had with CI#1. *Id.* ¶¶ 286-88. Later in 2023, when CI#1 attempted to lease facilities in the

21   City of Eureka's port area, Pacific Seafood intervened, functionally precluded CI#1 from using the

22   public hoist during the 2023-24 season, and spread false rumors among crabbers to dissuade them

23   from doing business with CI#1. *Id.* ¶¶ 297-300.

24          ***Hallmark – Pacific Seafood – Nor-Cal – Safe-Coast – Caito – Fathom – CI#1 (April/May***

25   ***2023).*** As the season progressed in 2023, CI#1 was advertising ex vessel prices that were $0.50-

26   1.00/lb. higher than Defendants' prices. Representatives of Hallmark, Pacific Seafood, Nor-Cal, Safe-

27   Coast, Caito, and Fathom all contacted CI#1 telling him to lower his prices, indicating that it would

28   be better for everyone if he did so. *Id.* ¶¶ 292-96.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

***Bornstein – CI#1 (August 2023).*** Bornstein's Mike Shirley and Andrew Bornstein, in advance of the 2023-24 season, offered to CI#1 that they would buy all his albacore at an inflated price and all his black cod, if CI#1 agreed to offer the cartel's crab price for the first four weeks of the upcoming season. *Id.* ¶¶ 301-03.

***Pacific Seafood - Various Buyers (December 2023).*** On or around Christmas 2023, in advance of the opening, Pacific Seafood emailed other buyers, telling them to keep their prices below $3/lb., when the season opened and threatening them if they paid more. *Id.* ¶ 349. The email to one buyer specifically warned her, in a threatening manner, to stop her practice of paying $0.50 over the "dock price" set by Pacific Seafood and other cartel members. *Id.* ¶ 350.

***Pacific Seafood – CI#1 (December 2023).*** After CI#1 posted an ad in a Facebook group frequented by commercial Pacific NW Area commercial crabbers that he was offering a price substantially higher than that offered by cartel members, Pacific Seafood's Brett Hester texted CI#1, indicating his unhappiness with the price being offered by CI#1, along with a series of photos and emojis that intoned a threat of violence and damage to CI#1's facility. *Id.* ¶¶ 304-06.

***Nor-Cal – CI#1 (December 2023).*** Nor-Cal's Lee contacted CI#1 asking him to "participate" by bringing his price down and match what Nor-Cal was paying. In exchange, he offered to assist CI#1 in various ways and indicated that Nor-Cal had a similar arrangement with Hallmark. *Id.* ¶¶ 307-10.

***Fisherman's Catch – Hallmark – Global Quality – Pacific Seafood – Caito – CI#1 (December 2023/January 2024).*** Representatives of Fisherman's Catch, Hallmark and Global Quality informed CI#1 that Frank Dulcich and others at Pacific Seafood were calling them instructing them to stop doing business with CI#1. *Id.* ¶ 312. At around the same time, Caito backed out of a previously arranged deal to buy crab from CI#1, and, instead, purchased from Hallmark. *Id.* ¶ 313.

***Safe Coast – Pacific Seafood – Hallmark – Ocean Gold[16] – CI#1 (January 2024).*** Safe Coast's Boland relayed a threat to CI#1 from Pacific Seafood's Dulcich that "[CI#1] is going to end up in trouble" for paying higher ex vessel prices, and told CI#1 that Hallmark and Ocean Gold were also angry at him for the same. *Id.* ¶¶ 314-16.

[16] "Ocean Gold" refers to Defendant Ocean Gold Seafoods, Inc. FAC ¶ 53.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Fathom – Global Quality – Fishermen's Catch – Safe Coast – Caito – Ocean Gold – Hallmark – CI#1 (January 2024).* Fathom's Mareno threatened CI# that if he didn't bring his ex vessel prices down, there would be "repercussions," and asked CI#1, in the same call, to disclose whom CI#1 was selling crab. *Id.* ¶ 317. Soon after this call, Mr. Mareno told Global Quality, Fisherman's Catch, and Safe Coast to stop buying crab from CI#1, *id.* ¶ 318, and Caito backed out of a deal to buy a large amount of crab from CI#1, instead purchasing it from Ocean Gold, *id.* ¶ 319. Mr. Mareno also intervened with Port Charleston harbor authorities to deny CI#1 access to the facilities there that were necessary to unload crab (ultimately resulting in Fathom and Hallmark purchasing, at a lower price, substantial amounts of crab that had been destined for purchase by CI#1). *Id.* ¶¶ 320-25. After significant pressure from crabbers, CI#1 was granted access to the necessary facilities to unload crab in the port, but, among other things, had his equipment sabotaged and the egress of his trucks blocked, resulting in thousands of pounds of losses and his ultimate departure from the port. *Id.* ¶¶ 327-33.

*Safe Coast – Global Quality – Fishermen's Catch – Pacific Seafood – Hallmark – Unnamed Co-Conspirator #1 – Unnamed Co-Conspirator #2 (January 2024).* On or around January 20, 2024, representatives of Safe Coast, Global Quality, Fishermen's Catch, Pacific Seafood, Hallmark, and Unnamed Co-conspirators #1 and #2 held a meeting in San Francisco at which it was decided that CI#1 would be punished for offering higher ex vessel prices to the crabbers than the cartel. *Id.* ¶¶ 334-35. Soon after the meeting, its participants backed out of preexisting deals to buy crab from CI#1 and refused to pay the amounts they owed CI#1. *Id.* ¶¶ 336-40. Pacific Seafood and Ocean Gold (in which Pacific Seafood and/or its ultimate owner, Frank Dulcich holds a 49% interest, *id.*, ¶ 55) broadcast that they would buy any crab that other buyers wanted to sell, so long as the buyer didn't do business with CI#1. *Id.* ¶ 342. Soon thereafter, CI#1 lost one of his biggest customers, who informed him that it would be purchasing crab exclusively from Pacific Seafood going forward. *Id.* ¶ 343.

**C.** **Defendants Police Each Other's Compliance with the Conspiracy Via Threats and Punishments for Violations, Leading Defendants to Hide When They Pay or Offer Ex Vessel Prices Higher than the Agreed Levels.**

Third, Plaintiffs also identify similar measures that Defendants have taken to police each other

and the resulting phenomena in which Defendants will try to hide when they are offering higher ex

vessel prices, contrary to basic economic logic. *See id.*, ¶¶ 186, 195-99, 213-19, 353-78.

***Nor-Cal.*** Likely reflecting its origin as a white van buyer (and the related fact that it can make

a lot of money selling live crab purchased at ex vessel prices significantly higher than that dictated by

the cartel), Nor-Cal frequently "cheats" on the conspiracy, becoming a classic free-rider. In at least

two instances, Nor-Cal has been caught by its co-conspirators, and, in at least one instance, was

punished as a result. During the 2019-20 season Nor-Cal didn't comply with the agreed opening price

and was punished by Pacific Seafood, who reneged on a deal to purchase a large volume of crab from

Nor-Cal, forcing it to sell the crab at a significant loss. *Id.* ¶ 195. And at the beginning of the 2022/23

season when crabbers took the unprecedented decision to go out on an open ticket from central

California ports, *id.* ¶ 209, Nor-Cal's Kevin Lee briefly offered $5/lb., over two times the opening

price that the cartel was seeking to impose, *id.* ¶ 213. However, Mr. Lee told crabbers to keep it a

secret he was paying this price, and, over the course of the same day, he withdrew the offer after

getting threats from Defendants, who had found out as a result of crabbers being to public with the

information. *Id.* This is in marked contrast to how Nor-Cal and other white van buyers conducted

themselves before the formation of the conspiracy, to whit being quite vocal in their willingness to

pay crabbers higher prices in order to get the inventory they desired. *See id.* ¶ 165-69. However, since

the formation of the conspiracy, Nor-Cal has gone to great lengths to hide the fact that it was paying

crabbers ex vessel prices higher than the cartel's dictated price. *See id.* ¶¶ 186, 360-63, 372-73.

***Ocean Gold***, another buyer with white van roots, is also well known for taking measures to

hide its cheating on the cartel, often simply writing a lower ex vessel price on the fish tickets than

what it actually paid crabbers. *Id.* ¶ 365-66.

***ASE***, another former white van buyer, is known to hide its cheating by paying with two

checks, one for ex vessel price and the other a secret bonus. *Id.* ¶ 364.

***Ocean Gold*** is known to simply write a lower ex vessel price on the fish tickets than what it

actually pays crabbers. *Id.* ¶ 365-66.

***Unnamed Co-Conspirator #1***. In January of 2023, around the same time Nor-Cal offered and

then withdrew an ex vessel price that was substantially higher than that set by the cartel, Unnamed

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   Co-Conspirator #1 was also offering more. This elicited a visit from Pacific Seafood's Joe Cincotta,

2   who pointedly told him that Pacific Seafood was only paying $2.25/lb. ex vessel. *Id.* ¶ 345. In

3   response, when during the 2023/24 season, Plaintiff Little texted to ask a representative of Unnamed

4   Co-Conspirator #1 what ex vessel price the buyer was offering, he refused to provide it by text,

5   making Plaintiff motor to his unloading dock to find out. *Id.* ¶ 375-78.

6       ***Pacific Seafood.*** Even Pacific Seafood, the chief policeman of the cartel, cheats on the cartel

7   and takes measures to hide its cheating. Its preferred strategy is to pay what is known as "retro,"

8   where a crabber is paid the cartel price at the dock, but then is given a bonus later in the season. *Id.* ¶

9   367-68. So common is this form of cheating by Pacific Seafood that, in a text exchange between

10  Fathom's Mareno and Bornstein's Bornstein at the beginning of the 2019/20 season, they voiced their

11  concern that Pacific Seafood, while claiming to be only paying the cartel price of $3/lb., would be

12  secretly promising crabbers an additional $.25/lb. later. *Id.* ¶ 369-71.

13      ***Hallmark*** is another Defendant well known to employ the retroactive bonus strategy to cheat

14  on the cartel price without detection. *Id.* ¶ 368.

15  **D.  Defendants Threaten and Punish Crabbers Who Sell to Non-Cartel Members.**

16      Fourth, as identified in the FAC, Defendants also protect their cartel by punishing crabbers

17  that sell to non-cartel members, including but not limited to, refusing to buy other fish species, of

18  which Defendants are often the only major purchasers in a port, unless a crabber agrees to sell all

19  their crab to the particular Defendant at the cartel price. *See id.* ¶¶ 379-398.

20      ***Hallmark*** is the only buyer of black cod in Port Orford, Oregon. *Id.* ¶ 388. After hearing that

21  a crabber had sold crab to a non-Defendant buyer in Charleston, Oregon during the 2021/22 season,

22  for a price higher than that set by the cartel, Hallmark's Crystal Adams told the crabber, in advance of

23  the 2022/23 season, that if he wanted to sell anything he caught to Hallmark (i.e., black cod) then he

24  had to sell everything he caught to Hallmark. *Id.* ¶¶ 390-91. When that crabber, nonetheless sold

25  Dungeness crab to CI#1 that season, at a price higher than what Hallmark and Nor-Cal were offering

26  in Port Orford, he was informed by Crystal Adams that Hallmark would no longer buy anything from

27  him. *Id.* ¶¶ 392-94. Hallmark used a similar tactic across the board for crabbers in Port Orford in

28  2023/24, threatening crabbers that if they sold to CI#1 at all, Hallmark would not buy any crab from

them. *Id.* ¶ 396. When that failed, Hallmark closed their doors during the Christmas and New Year period, despite high demand. *Id.*

*Ocean Gold* did the same thing during the 2023/24 season. It threatened crabbers that if they didn't stop selling to CI#1 at higher than the cartel price in Charleston, Ocean Gold would stop buying crab in the port, leaving them with no market because, according to Ocean Gold, CI#1 did not have sufficient capacity to purchase their crab. *Id.* ¶¶ 397-98.[17] When crabbers went on selling to CI#1, Ocean Gold followed through on its threat. *Id.* ¶ 398.

*Pacific Seafood* also blacklists crabbers who sell to non-cartel members at higher prices, in particular, using its position as the only buyer of cold-water shrimp in the Pacific NW Area to punish crabbers. *Id.* ¶¶ 383-87. In a January 2020 text exchange, Fathom's Mareno and Bornstein's Bornstein describe how Pacific Seafood punished two crabbers for selling crab to a non-cartel buyer for $0.50/lb. over the cartel price, by informing them that Pacific Seafood would no longer buy their shrimp or groundfish and would no longer sell them bait. *Id.* ¶¶ 383-86. Plaintiff Little also experienced Pacific Seafood's punishment first-hand, when he was blacklisted for calling out Pacific Seafood's market manipulation during the 2022/23 season. *Id.* ¶¶ 12, 387.

### III. Other Economic and Contextual Factors Corroborate the Conspiracy's Existence

Plaintiffs also allege a variety of other economic and contextual factors that corroborate the existence of Defendants' conspiracy circumstantially.

### A. The Refusals by Individual Defendants to Break Ranks on Opening Price Are Contrary to the Economic Interest of Most, Absent the Conspiracy, Given the High Demand for Crab at That Time.

Absent the cartel, it is not in the interest of most Defendants to refuse to state an opening price until Pacific Seafood does so and to stay in line with the price stated by Pacific Seafood once it does so. *See id.* ¶¶ 144-47, 150, 156-57, 192-94, 201-22.

The most dramatic example of this was in the run-up to the opening of the 2023/24 season. Pacific Seafood, and all other Defendants, refused to even state an opening price for the 2022/23 season, let alone a low one, which ultimately resulted in crabbers from central California ports taking the unprecedented step of going out on an "open ticket," i.e. without any price or purchase

---

[17] FAC ¶ 398 has a typo, stating "buying from" when it should state "selling to."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

commitments from any buyer. *Id.* ¶¶ 201-03, 208-12. At this time, buyers were reselling Dungeness crab for approximately $14/lb. to their retail customers in the Pacific NW Area and buyers (including Pacific Seafood and Fathom), were paying crabbers ex vessel prices of as much as $10/lb. for Puget Sound crab. *Id.* ¶¶ 205-06. Thus, as was demonstrated by Nor-Cal's brief secretive offer of $5/lb. ex vessel to crabbers who went out on an open ticket, substantial profits could have been earned by Defendants if they had broken ranks and offered an opening price. *Id.* ¶ 213. The fact that they did not do so then and that they have toed the line in other seasons is highly probative of the cartel and its power.[18]

**B.** **Several Characteristics of the Pacific NW Area Dungeness crab Ex Vessel Market Makes It Highly Susceptible to a Conspiracy to Restrain Pricing Competition among Buyers.**

The FAC describes three main characteristics of the Pacific NW Area Dungeness crab ex vessel market that make it highly susceptible to Defendants' conspiracy.

***Fungibility of Buyers.*** All money is green; thus, the only basis on which buyers can meaningfully compete with one another is on price. FAC ¶ 381. As demonstrated during the pre-cartel "white van" period, this creates a high upward pressure on prices that buyers must offer in competition with one another, and the countervailing strong incentive to regulate that competition to protect profit margins. *Id.* ¶¶ 382.

***Concentration of Buying Power.*** Buying power in the Pacific NW Area Dungeness crab ex vessel market is concentrated among a group of 20-25 buyers who purchase all but a tiny sliver of the total volume landed each season, with Pacific Seafood purchasing far more crab than any other buyer and other Defendants occupying the other top spots. For example, in the 2023/24 season, while 239 licensed crab buyers made purchases, 218 were very small buyers, including crabbers themselves (who are required to effectively purchase from themselves crab that they want to sell directly to consumers, restaurants, etc.), who collectively purchased only 12% of the total. Among the 21 buyers who purchased the remaining 88% of the season total, Pacific Seafood, alone purchased nearly 20%

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

---

[18]Prior to the benefit of the limited discovery that Plaintiffs were granted, including Pacific Seafood's production of records showing their Dungeness crab purchases from other buyers, *see* Dkt. 60-1, and receipt of other information from CI#1 and other sources, Plaintiffs alleged a different explanation for this conduct. Those prior allegations are not relevant in evaluating the adequacy of the FAC. *PAE Gov't Servs., Inc. v. MPRI, Inc*., 514 F.3d 856, 860 (9th Cir. 2007)

1    of the season total, and the other Defendants collectively purchased approximately 40% of the total

2    crab landed (and likely more when purchases out of the back door are factored in). *Id.* ¶¶ 151-53; *see*

3    *also id.* ¶¶ 243-56 (detailing how Pacific Seafood has positioned itself as by far the most dominant ex

4    vessel buyer of Dungeness crab in the Pacific NW Area through an aggressive strategy of

5    acquisitions).  As detailed in the FAC, this concentration of buying power is critical in allowing

6    Defendants' cartel to function, in particular, at the beginning of the season, when the smaller (non-

7    cartel) buyers simply don't have the capacity to purchase all of the crab landed, leaving crabbers at

8    the mercy of the cartel's opening price dictates. *Id.* ¶ 155.

9        ***Consolidation at Port Level***. During the cartel period, the number of buyers who directly

10    purchase ex vessel from crabbers in each port has dramatically dwindled, as the number of buyers

11    that have a permanent presence in ports, the number of "white van" buyers coming to ports, and

12    the number of independent hoists to service those "white van" and other independent buyers have

13    all shrunk. *Id.* 243-82. This, in combination with other factors described in the FAC (including

14    the aggressive efforts that Defendants take to recruit other buyers to the cartel and to punish

15    crabbers who sell to non-cartel members) greatly increases the effectiveness of Defendants' price

16    fixing agreements.

17                              **LEGAL STANDARD**

18        To withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must merely move beyond the

19    conceivable and allege "'enough facts to state a claim to relief that is plausible on its face.'" *In re*

20    *Lithium Ion Batteries Antitrust Litig.,* No. 13-MD-2420 YGR, 2014 WL 309192, at *9 (N.D. Cal. Jan.

21    21, 2014) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see also In re Gilead Scis.*

22    *Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (a Rule 12(b)(6) motion should be denied "so long as

23    the plaintiff alleges facts to support a theory that is not facially implausible"). "Specific facts are not

24    necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the

25    grounds upon which it rests." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1141 (N.D.

26    Cal. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted).

27    A court must deny a Rule 12(b)(6) motion even if the complaint establishes only a "nonnegligible

28    probability that the claim is valid; . . .the probability need not be as great as such terms as

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

'preponderance of the evidence' connote." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

"In ruling on such a motion, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (cleaned up). The court must further refuse invitations by defendants to ignore, or accept the defendants' recasting of, the plaintiff's allegations. *Id.* at 989-90. And the court does "not consider the [defendant's] competing facts at the pleadings stage." *SmileDirectClub,* 31 F.4th at 1121.

There is no special or "'heightened'" pleading standard in antitrust cases. *W. Penn Allegheny Health Sys., Inc. v. UPMC* ("*W. Penn*"), 627 F.3d 85, 98 (3d Cir. 2010) (quoting *Twombly*, 550 U.S at 569 n. 14). Rather, pleading an antitrust conspiracy only "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made" and "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556–57. And when the alleged unlawful objective of an illegal agreement is to "'fix prices'" . . ., that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable *per se* under the Sherman Act." *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960).

In determining whether an antitrust plaintiff has met this not particularly demanding standard to plausibly allege illegal contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, the court should assess the plausibility of the alleged conspiracy based on the allegations taken as a whole, not assessing each one in isolation. *Cont'l Ore v. Union Carbide*, 370 U.S. 690, 699 (1962); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007).  Thus, "courts [should not] indulge antitrust defendants who move to dismiss by tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *In re Cal. Bail Bond Antitrust Litig*. ("*Cal. Bail Bond II*"), 511 F. Supp. 3d 1031, 1041 (N.D. Cal. 2021); *Lithium Ion I*, 2014 WL 309192, at *11  (same); *In re High-Tech*

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    *Employees Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (same); *CRT*, 738 F. Supp.

2    2d at 1019 (same); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *3-4 (N.D. Cal.

3    Apr. 19, 2012) (same); *see also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630-31

4    (E.D. Pa. Aug. 23, 2010) ("[d]efendants may not 'cherry pick' specific allegations in the complaint

5    that might be insufficient standing alone") (quoting *In re Aftermarket Filters Antitrust Litig.*, No. 08–

6    4883, 2009 WL 3754041, at *3 (N.D. Ill. Nov. 5, 2009)).

7    <u>**ARGUMENT**</u>

8    I.    <u>**Plaintiffs Have Adequately Alleged Their Price-Fixing Claims Under Sherman § 1**</u>

9    "The contract, combination, or conspiracy element of a Section 1 claim is not particularly

10   demanding." *Real Est. Exch., Inc. v. Zillow, Inc.*, No. C21-0312 TSZ, 2023 WL 5278115, at *6 (W.D.

11   Wash. Aug. 16, 2023). For purposes of Section 1 of the Sherman Act, an illegal agreement consists of

12   a "conscious commitment to a common scheme designed to achieve an unlawful objective."

13   *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Copperweld Corp. v. Indep. Tube*

14   *Corp.*, 467 U.S. 752, 771 (1984) ("A § 1 agreement may be found when 'the conspirators had a unity

15   of purpose or a common design and understanding, or a meeting of minds in an unlawful

16   arrangement.'") (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). Accordingly,

17   "an agreement [is] sometimes also referred to as a 'conspiracy' or 'concerted action,'" *W. Penn,* 627

18   F.3d at 99 (quoting *Twombly*, 550 U.S. at 553); and it is actionable, whether "tacit or express,"

19   *Twombly*, 550 U.S. at 553. "[N]o formal agreement is necessary." *Am. Tobacco*, 328 U.S. at 809; *see*

20   *also U.S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948) ("It is not necessary to find an

21   express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated

22   and that the defendants conformed to the arrangement."); *Interstate Cir., Inc. v. U.S.*, 306 U.S. 208,

23   227 (1939) (same).

24   A.    <u>**Plaintiffs Plead Direct Evidence of An Agreement to Fix Ex Vessel Prices.**</u>

25   Facts establishing direct evidence of an agreement "include sufficient facts supporting the

26   existence of a conspiracy, beyond the conclusory allegation that a conspiracy did exist." *Stanislaus*

27   *Food Prod. Co. v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2011 WL 2678879, at *5 (E.D.

28   Cal. July 7, 2011). To plead direct evidence, "plaintiff is not required to plead what exactly was said

or happened" when agreements were reached, but can simply allege "meetings in sufficient detail for defendants to establish who agreed to do what activity, when it was supposed to be done and how the activity was to be accomplished." *Id*. at *7. Plaintiffs identify Defendants' own statements agreeing to fix or suppress ex vessel prices, coerce participants to the agreements, punish violations of the agreements by crab buyers, and punish crabbers who don't follow the cartel's price scheme.

### 1.   <u>Explicit statements by Defendants' representatives describing Defendants' agreement to fix prices directly show agreement.</u>

The FAC contains detailed allegations of Defendants communicating with each other about the ex vessel price they currently offer, or plan to offer, to crabbers; this is direct evidence of an agreement to fix prices. *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition"); *In re Petroleum Prods. I*, 906 F.2d at 447 n.13 ("[i]nformation exchanges help to establish an antitrust violation . . . when . . . the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices"); *Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895, 911 fn. 5 (E.D. Cal. 2024) (text messages among defendants noting "the question is when and at what price[,]" the group would sell constituted direct evidence of an agreement); *Markson v. CRST Int'l, Inc.*, No. 517CV01261VAPSPX, 2019 WL 6354400, at *3 (C.D. Cal. Mar. 7, 2019) ("Plaintiffs plead sufficient facts regarding Defendants' communications and maintenance of the conspiracy [to collude on hiring decisions][.] … that Defendants communicate with each other concerning all new trucker applicants") (citations omitted). The FAC enumerates over 12 separate instances where representatives of 11 Defendant groups communicated price information, plausibly supporting the existence of their price-fixing agreements with one another. *See* FAC ¶¶ 180-84, 186-91, 197-99, 213-20, 223-31, 236-40, 280-81, 285, 291, 349.

Plaintiffs' direct evidence here is similar to that in *Flannery Assocs. LLC*, where text messages discussed when and for how much defendants would sell land to plaintiff. Although the court acknowledged the "statements do not reveal Defendants mutually agreed not to sell below a particular price per acre, these statements do reveal there was some sort of agreement among

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Defendants to fix the price of land in Solano County." *Id.* at 911. These discussions were more than enough to "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id.* (quoting *Twombly*, 550 U.S. at 556). Plaintiffs here go further, detailing communications over the precise prices to be paid, and direct evidence of agreements to offer the same price. FAC ¶¶ 171, 180-84, 186-91, 197-99, 213-20, 223-31, 236-40, 280-81, 285, 291, 349.

The FAC also details a meeting at which multiple Defendants met and discussed the price they would offer crabbers, further direct evidence of the alleged price-fixing agreement. *See B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010, at *6-7 (N.D. Cal. Sept. 30, 2016) (Allegations of defendants "get[ting] everyone in a room to work together" constituted direct evidence of an illegal agreement) (internal citations omitted); *accord Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895, 910-11 (E.D. Cal. 2024) (allegations of text messages reflecting a meeting to form an agreement, even without alleged texts showing the terms of that agreement, found direct evidence of an illegal agreement);  FAC ¶¶ 228-31, 349.

### 2.    Defendants' communications recruiting competitors to join the conspiracy demonstrates its existence.

Communications showing efforts to bring other competitors into a price fixing arrangement are prima facie evidence of agreement. *See Kjessler v. Zaappaaz, Inc.*, No. CV 4:18-0430, 2019 WL 3017132, at *3-4, 9, 11 (S.D. Tex. April 24, 2019) (messages "to recruit the competitor to the group" show agreement in violation of Section 1); *see also Spectators' Commun. Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) ("[T]here can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive."). Plaintiffs allege additional communications among would-be competitors over price, including recruitment to join the group agreements, further direct evidence of the price-fixing agreement. FAC ¶¶ 283-85, 289-296, 307-311 (efforts to bring CI#1 and other buyers into the price-fixing cartel).

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

**3.    Defendants' efforts to punish one another and other crab buyers who have violated terms of price-fixing agreement.**

Plaintiffs allege, in detail, that Defendants maintain their price-fixing agreement by threatening, and following through on those threats, to punish those who break ranks from prior agreements, which is further evidence of the price-fixing agreement. *W. Penn,* 627 F.3d 85, 100 (3d Cir. 2010) (allegations of direct evidence of a co-conspirator threatening retaliation against another co-conspirator if it broke their agreement "are sufficient to survive a motion to dismiss on the agreement element"); *see also United States v. Gen. Motors Corp*., 384 U.S. 127, 136 (1966) (courts have long-recognized that even explicit agreements require policing and, in fact, such policing is often anticipated at the outset of the conspiracy). Plaintiffs allege specific incidents during the Class Period of cartel members, particularly Pacific Seafood, punishing one another and non-cartel members, in order to enforce and maintain the price fixing agreement and to broadcast to non-cartel members the ramifications of disobeying their fixed price. *See* FAC ¶¶ 195, 285-88, 297-300, 312-52, 399-402. The FAC is replete with allegations of specific instances of Pacific Seafood and other Defendants policing their agreement to fix ex vessel prices, including ruthlessly punishing those that don't toe the line. *Id.*

**4.    Defendants punish crabbers that don't follow the cartel's price scheme show an agreement**

The practice of "blacklisting" is also direct evidence of an agreement because it shows competitors agreeing to exclude market participants that decide not to participate in price fixing. *See Hogan v. Cleveland Ave Rest., Inc.*, No. 2:15-CV-2883, 2018 WL 1475398, at *3-4 (S.D. Ohio March 26, 2018) (a "blacklisting system" and price-fixing evidence are direct evidence such that the court need not consider circumstantial evidence); *accord In re Automobile Antitrust Cases I & II*, 1 Cal. App. 5th 127, 167-68 (2016) (possible direct evidence of agreement included "meetings and calls … '(expressing) general support for the approach' of trying to keep Canadian vehicles in Canada," including blacklisting); *c.f. Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1303, 1315 (D. Utah 1999) (competitor software incompatibility through blacklisting "the most direct evidence" of conspiracy.). Plaintiffs allege that Defendants enforce the price-fixing agreement by punishing, often by blacklisting, crabbers who don't comply with the suppressed ex

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

vessel price established by the cartel. *See In re Automobile Antitrust Cases I & II*, 1 Cal. App. 5th at 167-68; FAC ¶¶ 384-98.  In addition to deterring a crabber's future deviation from the cartel's price, punishing crabbers is another check on co-conspirators that might attempt to cheat on the cartel price, FAC ¶ 379, and it also allows Defendants to maintain their market share without offering higher prices, *id*. ¶ 380-82 (maintenance of market share using a stick, instead of the carrot of higher prices); *see also id*. ¶¶ 383, 388-96.

**B.    Defendants' Contentions Concerning Plaintiffs' Direct Evidence Fail.**

**1.    Defendants ignore material allegations.**

Repeatedly and throughout their motions to dismiss, Defendants improperly ask the Court to ignore the allegations in the FAC, either explicitly or by falsely claiming that certain allegations are not made when they are. *Contra Knevelbaard*, 232 F.3d at 984. Defendants ignore a slew of allegations by either baldly claiming they don't exist or by omitting them from stated categories of allegations. For example, Defendants falsely claim that the only reference in the FAC to Defendants discussing ex vessel pricing was at a December 2023 meeting. Dkt. 189 at 3:10-12. However, the FAC contains a multitude of specific allegations wherein Defendants discussed ex vessel pricing.  *See* FAC ¶¶ 180-84, 334-36, 187-91, 349-50.

Defendants portray Plaintiffs' price fixing allegations as sporadic but they are not. Defendants falsely claim that there were no allegations price negotiations, pricing decisions, or any concerted action during the 2015 to 2019 seasons. Dkt. 189 at 8:1-3; This is wrong *See* FAC, ¶¶ 7-8, 54, 170-74, 250-52, 266, 388 (discussing Defendants' agreement to work together to reduce competition previously driven by "white van" buyers, which resulted in a drop in ex vessel prices compared to Puget Sound market during the 2015-2019 seasons). Similarly, Defendants assert the only allegations concerning the 2020/21 season are that Bornstein told Ocean King that it would be offering the same price as Pacific Seafood and there are no facts alleged to show that this was not the result of a unilateral decision by Bornstein. Dkt. 189 at 8:23-9:3; *but see, e.g.,* FAC, ¶¶ 186-94, 235-40, 267, 272-73, 361-63; *but see also* FAC, *passim* (alleging over 400 additional paragraphs of facts that together support the conclusion this was not a unilateral decision by Bornstein); *accord Cont'l Ore*, 370 U.S. at 699 (allegations must be considered holistically). Finally, Defendants' argument that the

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

1  only allegations concerning the 2021/22 season are communications from Nor-Cal to a crabber that

2  Nor-Cal would be matching Pacific Seafood's opening price, Dkt. 189 at 9:6-13, is wrong. *See* FAC,

3  ¶¶ 195-96, 390-91.

4      Defendants characterize Plaintiffs' evidence of price fixing as limited to isolated incidents, but

5  this too is false. Defendants argue there is no allegation of price coordination or matching prices by

6  any Defendants, other than two text exchanges, after the start of any season, or allegation about any

7  of other 20 Defendants' purchasing following the season opening. MTD 12:14-25 (citing FAC, ¶¶

8  124-25, 232-42). The allegations of price fixing are not cabined, as Defendants allege, and the price

9  effects alleged by Plaintiffs show a sustained period of deflation. *See* FAC, ¶¶ 180-85, 213, 215, 261-

10  64, 270-71, 273, 275-78, 281-82, 285-87, 289-96, 301-02, 304-12, 314-19, 334-45, 349-50, 385. [

11              **2.    <u>Defendants improperly argue the facts.</u>**

12      It is axiomatic that courts evaluating a Rule 12(b)(6) motion to dismiss must accept all factual

13  allegations as true; as such, a motion to dismiss cannot  argue the facts. *See SmileDirectClub,* 31

14  F.4th at 1121. Nonetheless, Defendants repeatedly argue against the facts alleged in the FAC. First,

15  Defendants argue that the price fixing led by Pacific Seafood is merely "price leadership, Dkt. 189 at

16  27, 29, despite the ample communications showing Defendants met Pacific Seafood's price in a series

17  of text messages reflecting conscious deliberation. *See supra* Background § II.A. Second, Defendants

18  argue, contrary to Plaintiffs' allegations, that there is "no mechanism" to monitor and punish

19  Defendants' price agreements. MTD at 25; *see supra* Background § II.C, D. (showing Defendants'

20  efforts to monitor and punish). Third, Defendants claim that the reason why the other Defendants

21  follow Pacific Seafood's price dictates is that they want to sell excess crab to Pacific Seafood, despite

22  the fact that this is nowhere alleged in the FAC. Dkt. 189 at 28[19]; *see also id.* at 29:10 (claiming that

23  the "opening price is based on supply," which they admit is "contrary to Plaintiffs' allegations").

24  ─────────────
   [19] Citing FAC ¶¶ 145, 155, Defendants claim: "Plaintiffs acknowledge that Dungeness crab is a
25  derby fishery with excess supply at the season opening." Dkt. 189 at 29:16-17. Neither cited
   paragraph alleges that there is excess supply at the season opening. Rather, their gravamen is that
26  because Defendants collectively control over 60% of the ex vessel market by purchase volume
   and most of the other buyers (i.e. 218 of the 239 buyers in 2023/24 season) purchase a tiny
27  volume of crab relative to the Defendants (collectively 12% of the total in the 2023/24 season),
   see FAC ¶¶ 151-52, Defendants' conspiracy to suppress the opening price is effective, because
28  non-cartel members do not, on their own, have the buying power to provide crabbers an ex vessel
   market for their crab at the opening of the season.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

### 3. Defendants apply an overly narrow definition of what constitutes a conspiracy to fix prices and direct evidence of it.

Defendants claim that Plaintiffs fail to plead "direct evidence of a horizontal price-fixing conspiracy." Dkt. 189 at 18 (cleaned up). Defendants ignore that "The 'crucial question' prompting Section 1 liability is 'whether the challenged anticompetitive conduct stems from lawful independent decision or from an agreement, *tacit or express*.'" *DRAM*, 28 F.4th at 46 (quoting *Twombly*, 550 U.S. at 553) (cleaned up and emphasis added). "A tacit agreement [is] one in which only the conspirators' actions, and not any express communications, indicate the existence of an agreement." *White v. R.M. Packer Co*., 635 F.3d 571, 576 (1st Cir. 2011); *accord Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) ("A knowing wink can mean more than words" in the formation of an illegal agreement.).  Furthermore, "[w]hen the term 'fix prices' is used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable per se under the Sherman Act." *Plymouth*, 279 F.2d at, 132.

Defendants' suggestion that the opposite is true—i.e., that the only way to allege direct evidence of price-fixing is to allege communications between competitors in which they memorialize their explicit agreement to buy (or sell) something at a certain price—not only conflicts with the foregoing binding law, it is without support, including in the decisions cited in their motion.[20]

---

[20] *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813 (9th Cir. 2023) and *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 319 (6th Cir. 2014) are inapposite as they are summary judgment decisions. In any event, in *Honey Bum* there were no price fixing allegations and the supposed agreement was only "conscious parallelism" because vertical restraints challenged as a boycott were imposed unilaterally. The other cases cited by Defendants are similarly unhelpful to them. *In re Text Messaging Antitrust Litig.* concerned a price fixing conspiracy based entirely on "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion," which the court referred to as "the kind of 'parallel plus' behavior." 630 F.3d 622, 627 & 628 (7th Cir. 2010). In *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc*. the court also found that the plaintiff failed to plausibly allege a price-fixing agreement based on circumstantial evidence. 709 F.3d 129, 138 (2d Cir. 2013) ("In this case, . . . Plaintiffs have essentially pleaded only parallel conduct, with little more."). *Frost v. LG Elecs., Inc*., 801 F. App'x 496 (9th Cir. 2020) is inapplicable as it concerned no communications between competitors whatsoever. Similarly *Burtch v. Milberg Factors, Inc*. considered only a "mere exchange of future information," which the court had previously found did not, without some other evidence of an agreement, constitute a violation of the Sherman Act §1. 662 F.3d 212, 226 (3d Cir. 2011); *see also Real Est. Exch., Inc. v. Zillow, Inc*., No. C21-0312 TSZ, 2023 WL 5278115 (W.D. Wash. Aug. 16, 2023) (concerning only information exchange); *In re Graphics Processing Units Antitrust Litig*., 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (concerning only opportunities to collude).

**4.**     **Defendants' Affirmative Defense of State Immunity Fails.**

Pivoting from their position that Plaintiffs have alleged no price fixing agreements at all, Defendants argue that Oregon state law immunizes their price fixing under *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 98 (1980) ("*Midcal*"). Dkt. 189 at 21. As a threshold matter, immunity is an affirmative defense that cannot be resolved on a Rule 12 motion. *See Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010) ("[a]n affirmative defense … does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."); *Boquist v. Courtney*, 32 F.4th 764, 784 (9th Cir. 2022) ("[A]n affirmative defense is grounds to dismiss [a] claim only if [the] complaint, on its face, 'admits all the ingredients' of the defense.").

**a.**     **ORS 646.739 only provides for immunity in limited circumstances where the State "Actively Supervises" price negotiations.**

The Oregon law, ORS 646.739, under which Defendants assert immunity is expressly limited in scope: "It is the intent of this section … to displace competition with a regulatory program in the Oregon seafood harvesting industry ***to a limited degree***.  The regulatory program is intended to grant immunity from federal and state antitrust laws to Oregon seafood harvesters and dealers ***for the limited purpose of allowing the harvesters and the dealers to bargain collectively and to arrive at a negotiated season starting price***."  Or. Rev. Stat. Ann. § 646.739(2)(a) (emphasis added).  The implementing regulations promulgated by the ODA further make clear this immunity does not apply to every price negotiation, nor is it the default.  *See* Gross Dec., Ex. A, ODA Regulations, Chapter 603, Division 76, §§ 0051(7) ("active supervision" is where the ODA oversees negotiations aimed at establishing a negotiated opening price), 0051(8) (negotiated price means one agreed upon by participants ***at*** a supervised meeting).

There are two independent bases for rejecting the application of Section 646.739. First, the bounds of the immunity apply only to negotiations that take place under the active supervision of the state. There are no such supervised activities here.[21] *Midcal* only applies where the immunized

---

[21] Bringing this point home, the forms signed by participants at the meeting in question state explicitly that "state action immunity does not apply outside of an actively supervised context." Snyder Dec., Ex. 4, p. 18.  Thus, this immunity cannot apply to the agreements made between

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   activity is "'actively supervised by the State.'"  *N. Carolina State Bd. of Dental Examiners v. F.T.C.*,

2   574 U.S. 494, 504 (2015) (*quoting FTC v. Phoebe Putney Health System, Inc.*, 568 U.S. 216, 225

3   (2013)). There is no allegation Defendants' price-fixing was so supervised. Defendants' argument

4   fails for this reason alone.

5          Second, the supervised negotiation process will only take place where 51% of the catch

6   harvesters are convened. *Id.*, §§ 0052(2) (a negotiation meeting shall only be convened when

7   requested by harvesters who process 51% or more of the catch volume and crabbers who harvest 51%

8   or more of the catch volume), 0052(4)(a-c) (spelling out the three ways the ODA's involvement may

9   be terminated after the negotiations). There are no allegations the 51% threshold was met for any of

10  the allegations.[22]

11                   **b.   State involvement cannot sanitize a private price-fixing conspiracy, as that which is alleged here.**

12          Aside from the specific language of the Oregon statute, Defendants' arguments fail under

13  federal law for the same reason. Supreme Court precedent is clear that the "[t]he active supervision

14  prong of the *Midcal* test requires that state officials have and exercise power to review particular

15  anticompetitive acts of private parties and disapprove those that fail to accord with state policy."

16  *Patrick v. Burget*, 486 U.S. 94, 101 (1988).  "In the absence of active supervision in fact, there can be

17  no state-action immunity for what were otherwise private price-fixing arrangements."  *F.T.C. v. Ticor*

18  *Title Ins. Co.,* 504 U.S. 621, 638 (1992). As shown there is no active supervision alleged here, nor

19  can there be. *Midcal* says nothing different. *See Midcal*, 445 U.S. at 98 ("The national policy in favor

20  of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is

21  essentially a private price-fixing arrangement.").

22

23  _____

    Defendants before this meeting, nor can it apply to the enforcement of said agreements after this

24  meeting.
    [22] Finally, even if there were some immunity conferred on Defendants beyond this meeting (there

25  is not), it would only apply to those parties who participated in the negotiations, not to all
    fishermen or all processors.  Or. Rev. Stat. Ann. § 646.739(d) ("Any agreements that arise from

26  negotiations conducted under this section are binding only on the parties that participate in the
    negotiations and agree to be bound."). Thus, Defendants Ocean Gold, Nor-Cal, Kevin Lee, ASE,

27  Caito Fisheries, Southwind Foods, Fisherman's Catch, Global Quality Foods, Global Quality
    Seafood, Ocean King, and South Bend, who did not have representatives at this meeting, can in

28  no event benefit from this supposed immunity, nor would it apply to untold class members who
    did not participate in these negotiations.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**c.**     **Fact Disputed Preclude Application of Immunity.**

Plaintiffs do not allege that an opening price was set at the December 2023 meeting attended by representatives of Pacific Seafood, Bornstein, Fathom, SafeCoast, and Hallmark. *Id.*, ¶ 228. Instead, Plaintiffs allege that Defendants had been plotting amongst themselves to fix prices for the 2032/2024 season—and force Confidential Buyer Information #1 to go along with them—for at least a month before this meeting. *Id.*, ¶¶ 223-226.

Defendants, on the other hand, counter by asserting that the conduct at the meeting is subject to immunity because the meeting was held by ODA and by suggesting that the conduct in question was, in fact, "supervised" by ODA. Dkt. 189 at 10:9-13. [23]  This information is not contained in the Complaint, and, for the reasons discussed in the accompanying Opposition to Defendant's Request for Judicial Notice, it is not the proper subject of judicial notice.  Moreover, even if the Court were to take judicial notice of a) the documents in Defendants' Request for Judicial Notice and b) the facts contained in those documents, as requested by Defendants (which it should not), these would only raise factual questions about the applicability of this defense, and would not establish its applicability here.[24]

**C.**     **The FAC's Allegations of Circumstantial Evidence Further Supports the Plausible Existence of a Conspiracy to Fix and Depress the Ex Vessel Prices Paid to Crabbers in the Pacific NW Area**

As demonstrated above, Plaintiffs have demonstrated direct evidence of agreement. Accordingly, the Court need not consider circumstantial evidence. *C.f. DRAM*, 28 F.4th at 47. Nonetheless, the FAC also contains substantial allegations of circumstantial evidence that further corroborates (and so makes even more plausible) that Defendants conspired to fix and depress the ex vessel prices paid to crabbers in the Pacific NW Area.

It is not uncommon for plaintiffs, especially at the pleading stage, to have little to no direct

---

[23] Despite Defendant's suggestion to the contrary at MTD 21:6, the conduct alleged in paragraph 227 of the FAC did not take place at this meeting, where the participants were required to turn in their cell phones for the duration of the meeting, and cannot be covered by this immunity.

[24] The facts of which Defendants ask the court to take judicial notice, for example, do not—and cannot—include information about whether pressure was applied to certain buyers or crabbers outside of the supervision of ODA employees in the context of this meeting, whether all participants in in the negotiations in fact signed the Pre-Negotiation Agreement, and/or whether the parties complied with the agreement without assuming the veracity of the statements in the documents, which is improper without an evidentiary hearing.

1  evidence of a conspiracy to restrain trade, given the tendency of conspirators to hide their conduct

2  and the rarity of the benefit of an informant as Plaintiffs have here. Thus, concerted action in

3  violation of the Sherman Act may be "infer[red]" from "circumstantial evidence." *Twombly*, 550 U.S.

4  at 553. By far the most common type of such evidence is of parallel conduct along with what are

5  usually referred to as "plus factors." *Musical Instruments*, 798 F.3d at 1194

6  [P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral
   conduct but largely consistent with explicitly coordinated action. If pleaded, they can place
7  parallel conduct "in a context that raises a suggestion of preceding agreement."

8  *Id.* (quoting *Twombly*, 550 U.S. at 557 & n. 4) (cleaned up). Importantly, as the plausibility standard

9  is not analogous to a preponderance of evidence standard, this does not mean that allegations of such

10  plus factors must "exclude the possibility," that the actions and outcomes are the result of unilateral

11  conduct. *SmileDirectClub*, 31 F.4th at 1121; *see also S.A. by Allen v. E.I. du Pont de Nemours and*

12  *Company*, 2023 WL 6976507, at *4 (N.D. Ind. Oct. 20, 2023) (the plausibility standard is distinct,

13  and far lower, than the preponderance of the evidence standard).. The FAC alleges both parallel

14  conduct and plus factors that meets this standard.

15  **1.    The Complaint Alleges Substantial Parallel Conduct Among Defendants.**

16  "Allegations that members of this industry adopted similar policies around the same time

17  in response to similar market conditions establish parallel conduct for the purpose of *Twombly.*"

18  *Cal. Bail Bond*, 2020 WL 3041316, at *12 (cleaned up). The FAC alleges at least four types of

19  conduct by Defendants that meets this standard.

20  ***Parallel Price Movements.*** The FAC shows graphically and amply describes how, once

21  Defendants' conspiracy began in 2016, the ex vessel prices paid for Dungeness crab in the Pacific

22  NW Area (in which Defendants collectively hold an over 60% market share) diverged, in parallel,

23  relative to the ex vessel prices paid in the Puget Sound market. *See supra* Background § I.C.

24  (citing FAC, ¶¶ 173-74, 405 & accompanying charts and table). [25]

25  _____

26  [25] The authority to which Defendants cite for the proposition that "[a]llegations based on average
    prices are insufficient to plausibly establish that each individual defendant's prices moved in
27  parallel," do not establish that rule. Dkt. 189 at 24. Indeed, the Ninth Circuit in recent decision, in
    the *Flextronics* case, reversed a decision by the district court to grant a motion to dismiss on the
    ground that parallel conduct had not been adequately alleged; and, in so doing it found that

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

***Pacific Seafood Sets the Opening Price for All Defendants.*** The most starkly obvious parallel conduct alleged by Plaintiffs is that Pacific Seafood sets the opening price for not only themselves but all for all of the Defendants, who will not even state a price until Pacific Seafood does so and then explicitly match it. *See supra* Background § I.A. (citing FAC ¶¶ 145, 151-52, 175-77, 180-231).

***Defendants Coordinate Their Pricing as Seasons Progress.*** Plaintiffs also allege that Defendants coordinate their pricing as seasons progress, discussing price movements and reaching *ad hoc* agreements about how to respond to those movements. *See supra* Background § I.A. (citing FAC ¶¶ 223-42).[26]

***Defendants Shifted to Buying "Out the Back Door" at Around the Same Time.*** The other type of parallel conduct that Plaintiffs allege was the shift that occurred around the beginning the 2015/16 season, in which Defendants, rather than buying directly from crabbers ex vessel in ports in which they did not have a permanent presence, instead purchased out the backdoor from Defendants that had permanent presences in those ports. *See supra* Background § I.B. (citing FAC ¶¶ 59, 67, 109, 158-69, 243-82).

Defendants argue that Plaintiffs have not alleged parallel pricing because, " [t]o state a price-fixing claim, a complaint must contain factual allegations to show how the prices paid by each defendant compare with one another over time and demonstrate a pattern of uniform pricing from which (with plus factors) it is plausible to infer that the Defendants entered into an unlawful price-fixing conspiracy." Dkt. 189 at 24. This is just is not the law.

First, as discussed above, where plaintiffs have alleged direct evidence of price-fixing—as Plaintiffs have here, *see supra* Background § I—they need not allege any parallel conduct, as parallel conduct is just one of several types of "circumstantial evidence of anticompetitive behavior." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir.

---

allegations of parallel pricing based on "median" pricing were sufficient. *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, No. 22-15231, 2023 WL 4677017, at *1 (9th Cir. July 21, 2023).

[26] Of course, these discussions and *ad hoc* agreements are also directly probative of Defendants' conspiracy. *See supra* Argument § I.A.1.

1    2015); *see DRAM*, 28 F.4th at 47; *Sea Pines,* 679 F.3d at 290.

2           Second, parallel conduct that can constitute circumstantial evidence of anticompetitive

3    behavior is not limited, as Defendants suggest, to evidence of "uniform pricing." Rather, "[u]nder

4    Twombly, parallel conduct, [is a broad concept that includes a range of behaviors,] such as

5    competitors adopting similar policies around the same time in response to similar market conditions."

6    *Musical Instruments,* 798 F.3d at 1193 (citing 550 U.S. at 553–54). Further that "[c]onduct need not

7    be completely uniform in order to qualify as parallel." *Mosaic Health Inc. v. Sanofi-Aventis U.S.,*

8    LLC, No. 6:21-CV-06507 EAW, 2022 WL 4017895, at *5 (W.D.N.Y. Sept. 2, 2022); *see also United*

9    *States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("Nor is it important that the prices paid

10   by the combination were not fixed in the sense that they were uniform and inflexible."); *SD3, LLC v.*

11   *Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29,

12   2015), *cert denied* 579 U.S. 917 (2016) ("parallel conduct need not be exactly simultaneous and

13   identical in order to give rise to an inference of agreement") (cleaned up); *In re Int. Rate Swaps*

14   *Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("Unanimity of action, however, is not

15   required. At the pleading stage, the issue is whether the inference of conspiracy, viewing the well-

16   pled allegations holistically, is plausible . . . Conspiracies, particularly when alleged among a large

17   group, are not always tidy and symmetric. Conspirators may aid the common venture via techniques

18   and stratagems that are consistent and reinforcing but not entirely overlapping").

19          As discussed above, the FAC is replete with allegations that Defendants "adopted similar

20   policies around the same time in response to similar market conditions [which is sufficient to]

21   establish parallel conduct for the purpose of *Twombly*." *Cal. Bail Bond I*, 2020 WL 3041316, at *12.

22   [27] And Defendants' suggestion otherwise asks the Court to adopt a standard for parallel conduct that

23

24   [27] The allegations concerning parallel conduct found insufficient in the cases to which Defendants
     cite are all easily distinguishable from Plaintiffs'. In *Flextronics Int'l USA, Inc. v. Murata Mfg.*
     *Co.*, the "[p]laintiff d[id] not dispute that it has failed to allege parallel conduct." No. 5:19-CV-
25   00078-EJD, 2020 WL 5106851, at *15 (N.D. Cal. Aug. 31, 2020). In *Mosaic Health*, the
     plaintiffs alleged the "[d]efendants adopted four distinct policies regarding contract pharmacies
26   and 340B drug discounts over the course of several months in mid-to-late 2020." 2022 WL
     4017895, at *6. In *Hogan v. Pilgrim's Pride Corp.*, the plaintiffs alleged a "general list of
27   methods used to cut production [that did] little to establish what exactly [the defendant] actually
     did to cut production and when, or how its actions compared with those of its co-conspirators."
28

1    restricts it to "uniform pricing," which is contrary to the law.

2        Defendants' further suggestion that Plaintiffs' allegations that certain Defendants cheated on

3    the price-fixing arrangement by, on occasion, paying some crabbers more than the agreed upon price,

4    asks the Court: (1) to analyze certain allegations in isolation rather than as a whole, *contra*

5    *Continental Ore*, 370 U.S. at 699; (2) to ignore basic antitrust law; and (3) to apply the holdings of

6    decisions on summary judgment that have no applicability to a *Twombly* 12(b)(6) motions and which

7    don't actually support Defendants' argument.

8        First, as discussed elsewhere herein, absent a price-fixing agreement, it doesn't make

9    economic sense for Defendants to hide the fact that they are paying crabbers higher prices; thus the

10    secretive manner in which they engage in this price cheating is circumstantially probative of the

11    existence of a price-fixing agreement, *see infra* Argument § I.C.2., and the actions that Defendants

12    have taken to punish such cheating is directly probative of that agreement, *see supra* Argument §

13    I.A.3. Defendants are not entitled on a motion to dismiss to have, instead, their preferred inference

14    from these allegations adopted by the Court, or to make the factual argument that, in fact, they aren't

15    able to police their conspiracy. *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

16        Second, as discussed above, parallel pricing does not require uniform pricing; thus, the fact

17    that sometimes the defendants cheated on the agreed upon price does not defeat this allegation.

18    Indeed, even if *a jury* ultimately determined that price differences were not the result of cheating on

19    an agreement but rather were an understood component of Defendants' price-fixing agreement—in

20    which, for example, Defendants were allowed to vary a bit from an agreed upon ex vessel benchmark

21    price—that would not defeat Plaintiffs Sherman or Clayton Act claims. "When the term 'fix prices' is

22    used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and

23    No. 16-CV-02611-RBJ, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018). In *In re Pork
24    Antitrust Litig.*, "[t]o attempt to show that [the] [d]efendants engaged in parallel conduct by
       decreasing the total production of pork, Plaintiffs rely on industry-wide data and public
       statements made by some of the individual [d]efendants," without anything more. *In re Pork
25    Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019).
       An appeal is pending of the district court's decision in *Gibson v. MGM Resorts Int'l*, No. 2:23-
26    CV-00140-MMD-DJA, 2023 WL 7025996 (D. Nev. Oct. 24, 2023), in which the U.S.
       Department of Justice has filed an amicus brief requesting that the Ninth Circuit reverse the
27    decision, including, in particular on the parallel pricing issue, Gross Dec, Ex C; however the
       appeal is resolved, *Gibson* is an algorithmic price-fixing case, involving a third party algorithmic
28    pricing software provider, that has nothing to do with the garden variety price-fixing alleged here.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in

2    interstate commerce is unreasonable per se under the Sherman Act." *Plymouth*, 279 F.2d at 132.

3    Accordingly, the per se prohibition on price fixing applies with full force to concerted action by

4    competitors on any "formula underlying price policies." *Socony-Vacuum*, 310 U.S. at 222, 226 n.59;

5    *see also id.* at 223 ("an artificial stimulus applied to (or at times a brake on) market prices, a force

6    which distorts those prices, a factor which prevents the determination of those prices by free

7    competition alone"). That includes any formula used to fix benchmark or "starting point" prices—

8    even if end prices ultimately vary. *Plymouth*, 279 F.2d at 132; *see also*, *e.g.*, *Catalano v. Target*

9    *Sales, Inc.*, 446 U.S. 643, 648 (1980); *Ariz. v. Maricopa County Medical Soc.*, 57 U.S. 332, 349

10   (1982); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 771 (2d Cir. 2016). Accordingly, in *In re*

11   *High Fructose Corn Syrup Antitrust Litigation*, the Seventh Circuit rejected the argument that there

12   could be no horizontal price-fixing conspiracy if "many of the actual sales" occurred below fixed list

13   prices. 295 F.3d 651, 656 (7th Cir. 2002). Rather, because the defendants agreed to fix "the starting

14   point for the bargaining," their agreement was "a per se violation of the Sherman Act even if most or

15   for that matter all transactions occur at lower prices." *Id.* Similarly, in *Gelboim*, the Second Circuit

16   held that a horizontal conspiracy to fix LIBOR rates was subject to the per se rule even though

17   "LIBOR is not itself a price" paid by anyone. 823 F.3d at 765, 771. The fact that "none of the

18   appellants' financial instruments paid interest *at* LIBOR" was "immaterial" because well-established

19   antitrust precedent "allows an antitrust claim based on the influence that a conspiracy exerts on the

20   starting point for prices." *Id.* at 771, 776 (emphasis in original).

21        Accordingly, Defendants' repeated pointing out that the FAC does not allege "that each

22   Defendant paid the *same ex vessel prices*" at the opening of various seasons is inapposite. Dkt. 189 at

23   25:7-8 (emphasis in original). Actionable price fixing does not require uniformity and so a plaintiff

24   need not allege it to state a Sherman Act §1 price-fixing claim.

25        In the face of this law and the bedrock rule that inferences are to be granted in the plaintiff's

26   favor on a motion to dismiss, Defendants ask the Court to grant them the inference that the

27   "allegation that the effective ex vessel price paid by buyers frequently differs from their quoted prices

28   means that there is no mechanism for the alleged cartel members to monitor one another's prices and

punish noncompliance, making Plaintiffs' alleged conspiracy implausible," Dkt. 189 at 25:28-26, citing two *summary judgment* decision that do not support this argument.   As an initial matter, that another court found <u>evidence</u> of certain facts insufficient on summary judgment to maintain a price-fixing case has no bearing on whether the *allegation* of those facts is sufficient on a motion to dismiss. *See, e.g., Cal. Bail Bond II*, 511 F. Supp. 3d at 1046–47 (rejecting an argument by the defendants that was based on decision granting summary judgment, and noting that the court, in that case, had found allegations of the same facts sufficient on a 12(b)(6) motion to support a plausible inference of price-fixing based on circumstantial evidence). Regardless, neither case supports any sort of "matter of law" proposition that a plaintiff must prove an effective ability to enforce a price-fixing agreement in order to maintain a Sherman §1 price-fixing claim.

As an initial matter, black-letter antitrust law prohibits horizontal price-fixing agreements without regard to whether the agreement is carried out at all. The agreement itself is the violation. *Socony-Vacuum*, 310 U.S. at 222; *id*. at 225 n.59; *Plymouth*, 279 F.2d at 132 ("It is immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry the object of the conspiracy into effect.") (cleaned up); *In re Flat Glass Antitrust Litig*., 385 F.3d 350, 362-63 (3d Cir. 2004) (similar). Thus, even if Defendants can ultimately show at trial (a question that has zero bearing on a 12(b)(6) motion) that their conspiracy to fix-prices was ineffective because of cheating, they would not escape liability.

Furthermore, the discussion of an agreement's enforceability in the cases cited by Defendants are highly case specific, have no apparent application here, and do not support Defendants' suggestion that plaintiffs must allege an effective enforcement mechanism in order for their price-fixing allegations to be found plausible in the face of 12(b)(6) motion. The statement from *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co*. quoted by Defendants was made by the court there to explain why evidence of predatory pricing (the alleged enforcement mechanism) was sufficient to send market-allocation (not price-fixing) claims to a jury. 998 F.2d 1224, 1233 (3d Cir. 1993). And the quoted statement from *In re Baby Food Antitrust Litig*. was just to the effect that, *in light of* other evidence presented (and not presented) by the plaintiffs and the defendants, the lack of evidence of an

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    effective enforcement mechanism for the alleged price-fixing conspiracy was fatal, on summary

2    judgment *in that case*. The Court should reject the Defendants invitation to translate these case-

3    specific decisions on summary judgment into a generally applicable pleading requirement that is

4    contrary to basic law.

5                    **2.    Plaintiffs Have Adequately Alleged Several "Plus Factors"**

6            Plaintiffs make factual allegations that support the existence of at least [four] plus factors that

7    further corroborate the existence of a conspiracy amongst Defendants to fix ex vessel Dungeness

8    Crab prices in the Pacific NW Area.

9            ***Changes in Historical Pricing Structure.*** The Court in *Twombly* held that complex and

10   historically unprecedented changes in pricing structure made at the very same time by multiple

11   competitors, and made for no other discernible reason . . . support a plausible inference of

12   conspiracy." *Twombly*, 550 U.S. at 556 n.4. As laid out in the FAC, ex vessel prices paid to crabbers

13   in the Pacific NW Area and those paid to crabbers in Puget Sound started to diverge in the 2015/16

14   season, in a way that doesn't make economic sense, and have continued to diverge at an accelerating

15   rate since. *See* FAC ¶¶ 164-74, 405 & accompanying table and graphs. There is no difference

16   biologically or in the marketplace between a Dungeness crab caught in the Puget Sound and a

17   Dungeness crab caught further down the coast in Washington or in Oregon or California. *Id.* ¶¶ 143.

18   And while there may be factors like relative seasonal scarcity or the like that might explain a

19   difference in ex vessel prices between the two markets, those factors are static between seasons and

20   so do not explain why the divergence in pricing has increased over time. *See Id.* ¶¶ 143-46, 164-74,

21   405 & accompanying table and graphs. These allegations, thus, not only support the general

22   plausibility that Defendants' have conspired to depress prices in the Pacific NW Area, but also

23   sufficiently refute at this stage Defendants' suggestion that any price-fixing engaged in by them was

24   limited to particular instances for which Plaintiffs have direct evidence now, before meaningful

25   discovery has commenced. *See, e.g.,* Dkt. 189 at 8:2-3, 12:10-12.

26           ***Changes in Buying Patterns.*** Within an analogous category are the FAC's allegations of the

27   changes in buying patterns among Defendants that emerged staring with the 2015/16 season. *See*

28   FAC ¶¶ 164-74, 233-34, 270-71, 405. While it might be expected that a "white van" buyer defendant

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

might unilaterally decide to knock on Hallmark's, Pacific Seafood's, Bornstein's, or another Defendant's door at some point to see if they might have some extra crab laying around to sell, the fact that in near simultaneous fashion these buyers shift their buying patterns, starting in the 2015/16 season, to buy out the backdoor "raises a suggestion of preceding agreement." *Twombly*, 550 U.S. at 557. This especially so when placed in the context with other allegations, including without limitation: that ex vessel prices had risen to all-time highs the previous season, *id.*, ¶¶ 169-70; that Nor-Cal and ASE, two of the major "white van" buyers, told the other major "white van" buyer, Ocean King, in advance of the beginning of the 2015/16 season that the ex vessel prices it paid the season before were too high, *id.*, ¶ 171; that a crabber who received those prices from Ocean King was told by a representative of Ocean Gold, during the 2015/16 season that he would never see those prices again, *id.*, ¶ 172; that, starting in the 2015/16 season, the relationship between ex vessel prices paid in the Pacific NW Area and in Puget Sound began to diverge in a way that does not make economic sense; and of direct evidence of the conspiracy's operation, *see* Argument § I.A. *supra.*

***Actions Against Economic Interest #1.*** Allegations that one or more defendants "would or should have broken ranks and offered merchants a break on any number of terms in a truly competitive market" supports a plausible inference of a price-fixing agreement. *B & R Supermarket, Inc.* 2016 WL 5725010, at *8. The FAC alleges in detail how, absent Defendants' conspiracy to fix prices (including the various policing measures attendant therewith), it is not in the economic interest for many of (if not all) the Defendants other than Pacific Seafood to have the opening of the crab season delayed by virtue of Pacific Seafood having been given sole authority to dictate the opening price and its decision to wield that authority so as to delay its opening. *See supra* Background § I.A. (citing FAC ¶¶ 223-42, III.A. (citing FAC ¶¶ 144-47, 150, 156-57, 192-94, 201-22). Plain and simple, the economic data shows that these Defendants would make significant profit if they stated a price themselves and received inventory in exchange that they could sell, but they do not do so (at least openly) because of the terms of the agreement they have made to fix prices.

***Actions Against Economic Interest #2.*** The FAC also alleges extensive efforts by numerous Defendants to hide the fact that they are paying higher ex vessel prices, despite that fact that doing so would, in a properly functioning market, allow them to gain market share by enticing more crabbers

1    to deal with them, in turn lowering the amount that they had to pay through the operation of basic

2    laws of supply and demand. *See supra* Background § II.C. (citing FAC ¶¶ 186, 195-99, 213-19, 353-

3    78). While this doesn't make economic sense in a free market, it does make sense when there exists a

4    price fixing conspiracy, in which cheating is aggressively policed and punished, which is exactly

5    what is alleged here. *See* FAC ¶¶ 195, 213, 345, 349-50, 379-98.

6      ***Market Characteristics.*** The FAC also alleges several characteristics of the Pacific NW Area

7    ex vessel Dungeness crab market makes it highly susceptible to a conspiracy to restrain pricing

8    competition among buyers. These include: (a) the fungibility of the "service" that Defendants offer

9    crabbers in which the only potential differentiating factor, in a free market, is the price they are

10   willing to pay crabbers; (b) the high concentration of buying power in Defendants that, in

11   combination with fishery dynamics, gives Defendants the ability to control, in particular, the opening

12   price (which in turn largely determines prices the whole season); and (c) the concentration, at the port

13   level, of access to the infrastructure needed to unload crab and capacity to purchase other fishes

14   landed by fishers, which greatly increases the ability of Defendants to guard against non-cartel

15   members, like CI#1, driving up ex vessel prices. *See supra* Background § III.B. (citing FAC ¶¶ 151-

16   55 161-74, 243-82, 381).

17     ***Regular Inter-Defendant Communication.*** The FAC alleges not only that the largest

18   Defendants by share of the Pacific NW Area Dungeness crab ex vessel market are members of a

19   trade association, giving them an opportunity to meet and collude, *see* FAC ¶ 154, but alleges

20   several communications and meetings of Defendants' representatives, which indicate that

21   Defendants' representatives are in regular communication with one another, *see, e.g.,* FAC ¶¶

22   171, 180-85, 187-91, 235-40, 285-86, 312, 315, 318, 334, 349-50, 385.

23     While Defendants simply ignore a number of these plus factors, as they ask the court to do

24   more generally throughout their motions, when they address them, Defendants ask the Court to grant

25   inferences from such allegations in their favor, as opposed to Plaintiffs'. *Contra Knievel*, 393 F.3d at

26   1072. When pleading plus factors, plaintiffs are not required to "exclude every plausible

27   interpretation of the facts that does not support their theory of liability." *Kleen Prod., LLC v.*

28   *Packaging Corp. of Am.,* 775 F. Supp. 2d 1071, 1078 (N.D. Ill. 2011) (cleaned up). Thus, the fact that

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    a defendant can offer an alternative "plausible" (non-collusive) interpretation of facts that a plaintiff

2    claims are circumstantially suggestive of collusion does "not negate the plausibility of [the plaintiff's]

3    competing version." *Id.* at 1079. Rather, as long as "another explanation for the parallel [conduct], in

4    the context of . . . plus factors . . . is collusion[,]" the plaintiff has met its burden to plausibly allege a

5    violation Sherman Act §1 based on circumstantial evidence. *Cal. Bail Bond II*, 511 F. Supp. 3d at

6    1046. Defendants' attacks on Plaintiffs' plus factor allegations are, at best, merely alternative

7    interpretations of those allegations that may be plausible (especially if you ignore all of the

8    allegations of direct evidence of collusion) but do not negate plausibility of Plaintiffs' interpretation

9    of them as circumstantial evidence of collusion.

10        The alternative interpretation on which Defendants spill the most ink is what they term "price

11    leadership." Dkt. 189 at 27. They assert, "The central allegation in the FAC is that the other

12    Defendants wait for Pacific Seafood to offer a season-opening price and then match it." *Id.* As an

13    initial matter, it is hard to square this assertion with Defendants' argument that Plaintiffs have not

14    sufficiently alleged parallel conduct. More to the point, none of the alternative interpretations that

15    Defendants offer for them all adopting similar policies at the beginning of the Dungeness crab

16    seasons *negates* the plausibility of Plaintiffs' interpretation that it is the result of an *a priori*

17    agreement to do so, especially in light of the FAC's allegations of the direct evidence of that

18    agreement. Indeed, where "an *a priori* agreement" exists that a certain market-participant will be the

19    first mover and others will match, such an agreement "eliminate[s] [the] risk" that can otherwise be

20    attendant with playing the first mover role." *See In re Dynamic Random Access Memory Indirect*

21    *Purchaser Litig.,* No. 4:18-CV-2518-JSW-KAW, 2020 WL 8459279, at *6, n. 9 (N.D. Cal. Nov. 24,

22    2020)*, aff'd sub nom. DRAM,* 28 F.4th 42.

23        Thus, while Defendants may believe, and in their brief posit, that "there are other good

24    reasons why buyers *might* decide, independently and in each's own economic self-interest, to wait for

25    Pacific Seafood to set an opening price and then match it," that is fundamentally inapposite on motion

26    dismiss. Dkt. 189 at 28:13-15 (emphasis). Because "another explanation for the parallel [conduct], in

27    the context of the alleged market factors as well as the other plus factors [and extensive allegations of

28    direct evidence] discussed above, is collusion," it is of no moment that Defendants are able to

theorize about other possible "good reasons" that "might" explain their conduct. *Cal. Bail Bonds II*, 511 F.Supp.3d at 1046. Indeed, as Defendants freely admit, their alternative theories for why the Defendants act in parallel with regards to opening price and how that price is set "contrary to Plaintiffs' allegations." Dkt. 189 at 29:10. In other words, these alternative theories not only ask the Court to make impermissible inferences in Defendants' favor they rest on impermissible disputes of the facts Plaintiffs allege. *See Knievel*, 393 F.3d at 1072.

Finally, Defendants incorrectly assert that the only type of conduct that can be considered a plus factor is that which "is inherently against economic self-interest, not to mention so perilous that no reasonable firm would make the challenged move without an anticompetitive agreement." Dkt. 189 at 31:17-19. That is simply not the law. *See Musical Instruments*, 798 F.3d at 1194. And Plaintiffs adequately allege parallel conduct and plus factors that further corroborate the plausible existence of price fixing that is adequately supported by their direct evidence allegations alone.

**D.** **The Individualized Challenges by Certain Defendants to the Adequacy of Allegations Against Them, in Particular, also Fail**

**1.** **Plaintiffs Allege Each Defendant Played a Role in the Conspiracy.**

Certain Defendants argue that Plaintiffs fail to plead a claim against them in part because Plaintiffs purportedly rely on improper group pleading. Dkt. 189 at 17. Not so. Moreover, Defendants again fail to engage in the required evaluation of the "'character and effect'" of the FAC's antitrust conspiracy allegations "as a whole." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (quoting *Continental Ore*, 370 U.S. at 699). Instead, they attempt to "atomiz[e]" the conspiracy claims, implying that the plausibility of Plaintiffs' allegations should be measured by the number of times each Defendant's name appears in the FAC, which is inappropriate. *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *11; *see also Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result").

"Although Plaintiffs will need [at summary judgment or trial] to provide evidence of each Defendants' participation in any conspiracy, they now [at the pleading stage] only need to make

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re*

2  *Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008);

3  *see also CRT*, 738 F. Supp. 2d at 1019 (N.D. Cal. 2010); *In re TFT-LCD (Flat Panel) Antitrust Litig.*

4  ("*TFT-LCD II*"), 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009). Thus, Plaintiffs "are not required to

5  identify exactly how, when, and through whom each Defendant joined the conspiracy" but must only

6  plead that the defendants "joined the conspiracy and played some role in it." *In re Lithium Ion*

7  *Batteries Antitrust Litig.*, 2014 WL 309192, at *13 (cleaned up); *see also In re TFT-LCD (Flat Panel)*

8  *Antitrust Litig.* ("*TFT-LCD I*"), 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (a complaint alleging a

9  conspiracy to fix prices "need not contain detailed 'defendant by defendant' allegations").[28]

10      The cases cited by Defendants—*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119 (9th

11  Cir. 2022); *Cal. Bail Bond II*, 511 F. Supp. 3d at 1047; *In re TFT-LCD (Flat Panel) Antitrust Litig.*

12  ("*TFT-LCD I*"), 586 F. Supp. 2d 1109, 117 (N.D. Cal. 2008); and *Flextronics Int'l USA, Inc. v.*

13  *Murata Mfg. Co*., No. 19-cv-00078-EJD, 2020 WL 5106851, at *13 (N.D. Cal. Aug. 31, 2020)—do

14  not establish any ban on what Defendants describe as "group pleading." Rather, they merely stand for

15  the unremarkable proposition that "some showing—direct or circumstantial—that the defendants

16  actively participated in an individual capacity in the scheme" is required. *SmileDirectClub,* 31 F.4th

17  at 1119. Indeed, the cases recognize that a complaint "need not plead each defendant's involvement in

18  the alleged conspiracy in elaborate detail, but must simply include allegations specific to each

19  defendant alleging that defendant's role in the alleged conspiracy." *Cal. Bail Bond II*., 511 F. Supp.

20  3d at 1047 (quoting *TFT-LCD I,* 586 F. Supp. 2d at 1117); *Flextronics*, 2020 WL 5106851, at *13

---

[28] The portion of *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) from which
Defendants selectively quote, *see* MTD at 16, addresses antitrust claims based on
"anticompetitive conduct by membership organizations," which is not at issue here, and holds:
"Ultimately, we require some showing—direct or circumstantial—that the defendants [who are
members of the organization] actively participated in an individual capacity in the scheme." *Id.* at
1119. Similarly, the portion of *Flextronics Int'l USA, Inc. v. Murata Mfg. Co*., No. 19-cv-00078-
EJD, 2020 WL 5106851 (N.D. Cal. Aug. 31, 2020) that Defendants quote simply reiterates the
principle that detailed defendant by defendant allegations are not required at the pleading stage,
citing to the same portion of *TFT-LCD I,* 586 F. Supp. 2d at 1117; and the portion of *In re
California Bail Bond Antitrust Litig.* that Defendants selectively quote states in full: "The
complaint 'need not plead each defendant's involvement in the alleged conspiracy in elaborate
detail, but must simply include allegations specific to each defendant alleging that defendant's
role in the alleged conspiracy." 511 F. Supp. 3d 1031, 1047 (N.D. Cal. 2021) (quoting *TFT-LCD
I,* 586 F. Supp. 2d at 1117).

1    (same).

2            In making defendant-specific allegations, a complaint may refer to all defendants collectively.

3    *Cf. SmileDirectClub,* 31 F.4th at 1119 (faulting the plaintiff for *only* alleging "anticompetitive

4    conduct by membership organizations," without *any* allegations regarding what each defendant, who

5    were members of the organizations, did); *Cal. Bail Bond II*, 511 F.Supp.3d at 1049 (faulting the

6    plaintiffs—not for collectively pleading  facts regarding certain defendants—but rather for failing to

7    *also* include allegations specific to each of those defendants).

8            Other cases Defendants cite for the proposition that the Court should simply disregard

9    whatever Defendants have labeled a "group pleading" in the FAC—*Twombly*, 550 U.S. at 565 n.10

10   and *United Brotherhood of Carpenters & Joiners of America v. Building & Construction Trade

11   Department, AFL-CIO* ("*Carpenters*")*,* 770 F.3d 834, 842 (9th Cir. 2014)—merely stand for the

12   equally unremarkable proposition that a plaintiff cannot meet its plausibility burden solely through

13   formulaic recitations and conclusory statements, like "defendants conspired to fix prices." As

14   described in detail above, far from relying on bare conclusory allegations, the FAC provides ample

15   direct and circumstantial evidence plausibly suggesting the existence of a conspiracy and each

16   Defendant's participation.  *See* Argument § I.A., I.C., *supra.*

17           Plaintiffs allege sufficient facts concerning each of the named Defendants, including the

18   entities included in their corporate families, and Defendants' arguments to the contrary fall short.

19   "Where an antitrust complaint names multiple members of a corporate 'family,' adequately pleading

20   a conspiracy claim against a particular corporate defendant does not require detailed defendant by

21   defendant allegations, only enough to draw a plausible conclusion that the individual defendant

22   joined the conspiracy and played some role in it." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-

23   MD-2420 YGR, 2014 WL 4955377, at *30 (N.D. Cal. Oct. 2, 2014) ("*Lithium Ion II*") (cleaned up).

24   Thus, for example, once plaintiffs identify senior representatives of a corporate family who

25   participated in collusive conduct, plaintiffs can plausibly allege that the various members of the

26   corporate family joined in the conspiracy. *CRT*, 738 F. Supp. 2d at 1022. After all, the senior

27   representatives can act on behalf of more than one corporate entity at the same time. Defendants

28   suggest, in a footnote, that the Court should, more generally, find that Plaintiffs inadequately allege

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the involvement of each corporate family named as a defendant. Dkt. 189 at 17, n. 7. Setting aside whether it is sufficient or proper to bury an argument for a 12(b)(6) dismissal in a footnote, *cf. Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 834 (N.D. Cal. 2019) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived and need not be considered") (citations omitted), the argument lack any merit (likely explaining why it was relegated to a footnote). Plaintiffs allege facts concerning each Defendants' involvement in the price-fixing agreement that are more than sufficient to meet the standards set by the controlling authority.

Plaintiffs' allegations against Defendants—including those asserting individualized challenges to the adequacy of the allegations against them—easily meet that standard. And the individualized challenges ignore the foregoing law, as well as the foundational requirement that a court, in evaluating a Rule 12(b)(6) motion grant inferences in the plaintiff's favor; instead, Defendants ask the Court to examine certain allegations against them in isolation from all other allegations in the FAC and grant *them* the inference that their alleged actions were simply unilateral conduct, rather than part of the larger pattern of collusive conduct that Plaintiffs describe.

### 2.    South Bend and Swanes Seafood Holding Company LLC Participated in the Conspiracy.

As detailed above, Plaintiffs allege that South Bend controls the public hoist and other infrastructure in Eureka, uses that control to enforce the cartel price while excluding buyers that pay more, and sells its crab out the back door to "white van" buyers like Nor-Cal and ASE. FAC ¶¶ 266-68, 272-73, 350. These allegations, when considered together with the FAC as a whole, show that South Bend furthered the conspiracy and support a plausible inference of South Bend's involvement in the price-fixing scheme. *See CRT*, 738 F. Supp. 2d at 1019.

As for Swanes, Plaintiffs allege that South Bend and Swanes do business collectively, where South Bend purchases ex vessel crab—landed at the hoist and facilities it leases in Eureka—through Swanes. FAC ¶¶ 116-17, 267-68. Plaintiffs allege a price-fixing conspiracy in the ex vessel crab market, and allege that Swanes is a related entity that was integral to South Bend's participation in the conspiracy.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

3.    **Southwind Foods and Caito Fisheries LLC Participated in the Conspiracy.**

Plaintiffs allege not only that the Southwind Defendants are Caito's successor in interest, Plaintiffs also allege Southwind's direct involvement in the price-fixing agreement based on actions taken after its acquisition of the Caito business. Successor liability is governed by state law and applies where (a) the successor expressly or impliedly agrees to assume the subject liability, (b) the transaction amounts to a consolidation or merger of the two entities, (c) the successor is a mere continuation of the predecessor, or (d) the transfer of assets is for the fraudulent purpose of escaping liability. *Ray v. Alad Corp.*, 19 Cal.3d 22, 28 (1977); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1998). The pleading burden with respect to successor liability is therefore low. *See Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, 2008 WL 4183916, at *3 (S.D. Cal. Sept. 8, 2008) (holding that a plaintiff's simple allegation that the defendants were "liable for [the] alleged material non-disclosures as [the lender's] successor's-in-interest" was sufficient to meet the "liberal requirements of Rule 8(a)(2)"). Moreover, determining whether successor liability applies is "extremely fact sensitive." *Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*, 95 Cal.App.4th 1182, 1188 (2002) (citation and internal quotations omitted). As a result, successor liability issues are typically "not appropriate" for resolution on a motion to dismiss. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1032 (noting that because of "uncertainty in the form of the acquisition . . . granting [defendant's] motion to dismiss is not appropriate at this time").

Here, Plaintiffs allege Southwind's acquisition was made to avoid Caito's liability in the instant action.  The FAC alleges, and the Southwind Defendants tellingly mention only in passing, *see* ECF 205 at 1:27-2:1, that John Caito told Confidential Buyer Informant that the sale to Southwind was done in reaction to this lawsuit being filed, FAC ¶¶ 92-93, and Plaintiffs further allege that Kevin Lee was counseled by other cartel members to take the same step as Caito—transferring ownership of Nor-Cal before the FAC was filed—in an attempt to insulate himself from liability related to this lawsuit, *id.* ¶ 65. Plaintiffs have met their low burden concerning successor liability, and the Southwind Defendants' references to purported facts outside the FAC concerning the timing of various entity formations do not undermine Plaintiffs' allegations—even if such a

1  factual inquiry were appropriate at this stage, which it is not, *see In re Graphics Processing Units*

2  *Antitrust Litig.*, 527 F. Supp. 2d at 1032.

3       The FAC further alleges conduct from the period after the acquisition sufficient to show the

4  Southwind Defendants' involvement in the price-fixing agreement. *See SRAM*, 580 F. Supp. 2d at

5  904. Plaintiffs allege, as detailed above, that Southwind continued to buy ex vessel crab, through

6  Caito Fisheries LLC, after the acquisition,and that much of those ex vessel purchases was sold out the

7  back door to Ocean Gold per agreement with Pacific Seafood—both of whom are supposed

8  competitors of Southwind. FAC ¶¶ 274-76. Furthermore, since the acquisition John Caito has been

9  acting as Caito/Southwind's agent and has been, in that capacity, engaged in conduct that furthered

10  Defendants' conspiracy. *Id.* ¶¶ 94, 226, 276.The Southwind Defendants assumed Caito's liability

11  when the business was acquired in the spring of 2023, and have since been involved in the alleged

12  price-fixing conspiracy.

13              **4.    Ocean Gold Participated in the Conspiracy.**

14       The FAC provides robust details of Ocean Gold's involvement in the alleged price-fixing

15  scheme, many of which are ignored by the Omnibus MTD, *compare* Dkt. 189 at 18:10-15 (citing ¶¶

16  172, 261-64, 269, 397-98) with FAC ¶¶ 251-52, 275-76, 342, 365-66, and the allegations that are

17  referenced are mischaracterized, *compare* Dkt. 189 at 18:12-13 (Ocean Gold "has rights to use three

18  hoists in Trinidad and Eureka") with FAC ¶¶ 261-64 (Ocean Gold pays the Trinidad Rancheria for

19  exclusive use of the Trinidad hoist, sets the ex vessel price, and excludes buyers who try to pay more

20  than its ex vessel price), and improperly presented Plaintiffs' allegations in isolation. Notably, the

21  Omnibus MTD omits the allegations that Pacific Seafood holds a significant ownership interest in

22  Ocean Gold, and the two companies work so closely that Pacific Seafood, as its marketing partner,

23  manages Ocean Gold's sales. *Id.* ¶ 54. Plaintiffs allege that Ocean Gold was deeply involved in the

24  alleged price-fixing agreement, more than enough to reject Defendants' unsupported request for

25  dismissal.

26              **5.    Ocean King, ASE, Fishermen's Catch, Global Quality and Nor-Cal
                        Participated in the Conspiracy.**

27

28       As detailed above, and when considering the FAC as a whole, Plaintiffs allege that

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Defendants Ocean King, ASE, Fishermen's Catch, Global Quality and Nor-Cal were deeply involved in the price-fixing scheme. Defendants' attempt to parse and downplay the involvement of Ocean King and Nor-Cal strains credibility, as Plaintiffs allege direct evidence of multiple instances where those Defendants actively discussed the price-fixing agreement. FAC ¶¶ 171, 187-91, 195-99, 234-42, 262-64, 285-89, 307-10. For example, as "white van" buyers, Ocean King, ASE and Nor-Cal play an integral role in the scheme, abstaining from competition in various ports and instead buying out the back door from their co-Defendants. *See e.g.*, FAC ¶¶ 232-34. Fishermen's catch is alleged to buy, and dictate lower prices for, a significant portion of crab landed in San Francisco out the back door from Unnamed Co-conspirator #1. *Id*. ¶¶ 277-78. Fishermen's Catch and Global Quality, along with other Defendants, also control hoists in Crescent City and worked with other Defendants to exclude CI#1 from offering a price over what they and other Defendants **agreed** to pay crabbers. *Id*. ¶¶ 279-82. Both Defendants also participated in punishing CI#1 when he ran afoul of the cartel. *Id*. ¶¶ 312, 318, 334-339.

Viewing the FAC as a whole, Plaintiffs sufficiently allege that each of the individual Defendants, and their related corporate entities, were involved in the price-fixing scheme to suppress ex vessel prices.

## II.    Plaintiffs Have Also Adequately Alleged Their Cartwright Act and UCL Claims

On the same bases that Plaintiffs adequately plead their Sherman Act §1 claim, they also adequately plead their Cartwright Act and UCL claims. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666, n. 8 (9th Cir. 2022), *cert. denied sub nom*. 143 S. Ct. 424 (2022); *Lambrix v. Tesla, Inc.,* No. 23-CV-01145-TLT, --- F.Supp.3d.---, 2024 WL 3403777, at *16 (N.D. Cal. June 17, 2024).

Independently, Plaintiffs adequately plead a violation of the UCL's prohibition of "unfair" business practices. Defendants incorrectly assert that if Plaintiffs have failed to adequately allege a Sherman Act or Cartwright Act claim (Plaintiffs adequately allege both), the Court *cannot* find that Plaintiffs have adequately alleged a UCL claim. Dkt. 189 at 37-38. However, as this Court recognized in its order on the first motion to dismiss, "[c]onduct may be unfair under the UCL without violating the Sherman Act." Dkt. 59 at 9 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir.

2023)). As explained in *Epic Games*, only where "a *categorical* antitrust rule form[s] the basis of the decision" to dismiss a Sherman Act or Cartwright Act claim, does the UCL's "safe harbor" provision preclude a plaintiff from maintaining a UCL claim based on the same conduct underlying the antitrust claim. 67 F.4th at 1001 (emphasis in original) (noting *inter alia* that *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 367 (2001) involved a UCL claim based on conduct that was insulated from antitrust law liability by the "*Colgate* doctrine."). On the other hand, where the antitrust claim "suffers from a *proof deficiency*, rather than a *categorical legal bar*," the *Epic Games* court recognized that California law allows pursuit of a UCL claim, notwithstanding a finding that the underlying conduct does not violate antitrust laws, as a contrary rule would "collaps[e] the 'unfair' and 'unlawful' prongs [of the UCL] into each other." *Id.* (emphasis in original).

In such circumstances, a court must independently determine whether the conduct meets one or both the tests for "unfairness" under the UCL. The first is known as the "balancing test," which "entails examination of the impact of the practice or act on its victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Progressive W. Ins. Co. v. Superior Ct.*, 135 Cal. App. 4th 263, 285 (2005); *accord Epic Games,* 67 F.4th at 1000. Prior to the California Supreme Court's decision in *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163 (1999), the balancing test was the only test. *See id.* However, in *Cel-Tech*, a different test was introduced for "unfairness" claims by competitors, which examines whether the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 187 (1999); *accord Epic Games,* 67 F.4th at 1000. Here, because Plaintiffs are not competitors of Defendants the default balancing test applies.[29] However, under either test,

---

[29] While *Epic Games* refers to the balancing test as applicable to unfairness UCL claims brought by "consumers," 67 F.4th at 1000, this is properly understood as a shorthand for all unfair UCL claims that are *not* brought by competitors. As explained by the *Progressive W. Ins.* court, prior to *Cel-Tech*, the balancing test was the only test, but in *Cel-Tech*, the California Supreme Court determined that "in the context of a dispute between business competitors, this balancing test was

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

1    Plaintiffs state a UCL claim, independent of their Sherman Act and Cartwright Act claims.

2         Applying the balancing act test, if Defendants' conduct as detailed in the FAC does not

3    violate antitrust laws (it does), its harms outweigh any legitimate business interest that Defendants

4    have in engaging it. Plaintiffs allege in the FAC that as a result of Defendants' conduct, since 2016,

5    Plaintiffs received substantially less for their crabs than they would have, but for Defendants'

6    conduct, and in several seasons, Defendants' conduct prevented Plaintiffs from earning any money at

7    all during the critical period of the year when the crab season should have opened but did not due to

8    Defendants' conduct. FAC ¶¶ 155-57, 173-79, 186, 192-93, 200-22. On the other hand, it is hard to

9    conceive of any legitimate upside to the conduct, and certainly none exists on the face of the FAC,

10   thus requiring the motion to dismiss this claim be denied.[30]

11        The same is true if the competitor test is used. If explicitly or tacitly agreeing that one buyer

12   will set the opening price and engaging in all of the other conduct alleged in the FAC (e.g., sharing

13   price information and coordinating their actions in connection therewith, pressuring other buyers to

14   toe the cartel's pricing dictates through threats of punishment for non-compliance, punishing such

15   non-compliance—including through violence—etc.) does not plausibly state a violation of antitrust

16   laws (it does), at the very least, it "threatens an incipient violation of an antitrust law, or violates the

17   policy or spirit of one of those laws because its effects are comparable to or the same as a violation of

18   the law, or otherwise significantly threatens or harms competition." *Epic Games*, 67 F.4th at 1000

19   (internal quotation omitted). Defendants' bald claim (like many made in their motion to dismiss) that

20   Plaintiffs "fail to plead that such conduct threatens to harm competition" is a plain misstatement. Dkt.

21   189 at 38:7-9. The FAC—reading the allegations, which are detailed above, together as a whole as

22   the law requires—pleads at length that Defendants' conduct resulted in a lack of price competition in

23   the Pacific NW Area Dungeness crab *ex vessel* market, particularly at the beginning of the season, but

24

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

25   'too amorphous and provide[d] too little guidance to courts and businesses,'" and so crafted a
     special test for such claims. 135 Cal. App. 4th 263, 285 (quoting *Cel-Tech*, 20 Cal.4th at 185).

26   Furthermore, from a certain perspective, Plaintiffs and proposed class members occupy a position
     vis-à-vis Defendants that is closely analogous to that of a consumer services, in this case, the

27   "service" being the purchase of their crabs.
     [30] For related reasons, determining whether alleged conduct is unfair under the UCL "cannot

28   usually be made on demurrer." *McKell v. Washington Mut., Inc*., 142 Cal.App.4th 1457, 1473
     (2006).

1    also during its remainder, causing crabbers significant financial hardship.

2        Accordingly, not only for the reasons stated above concerning their Sherman Act §1 claim,

3    Plaintiffs have stated a claim under the Cartwright Act and UCL; they have also stated an

4    independently actionable UCL claim against Defendants based on unfairness under the law.

5    **III.    Plaintiffs Timely Seek Damages For The Entire Period Of Defendants' Conspiracy**

6        **A.    Defendants Fraudulently Concealed Their Scheme From Plaintiffs, Tolling the
             Statute of Limitations Such that They Can Maintain Claims for Injuries Suffered
7            During the Entirety of the Class Period**

8        Plaintiffs' claims are timely because Defendants fraudulently concealed the existence of their

9    anticompetitive scheme to fix the prices of ex vessel Dungeness crab. A limitations period will be

10   tolled where defendants affirmatively concealed their unlawful conduct and plaintiffs, acting

11   reasonably, had neither actual nor constructive knowledge. *In re Glumetza Antitrust Litig.*, No. C 19-

12   05822 WHA, 2021 WL 1817092, *15 (N.D. Cal. May 6, 2021) (citing *Hexcel Corp. v. Ineos*

13   *Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)); *accord In re Urethane Antitrust Litig.*, 913 F.

14   Supp. 2d 1145, 1163 (D. Kan. 2012) (affirmative acts that constitute concealing include "leaving the

15   office to have conversations, submitting false reports, demanding secrecy"). Precisely so, here.

16   Plaintiffs squarely allege Defendants' affirmative acts to conceal the underlying cause of action and

17   that Plaintiffs could not have, by exercising reasonable diligence, discovered the cause of action.

18       Plaintiffs' allegations are sufficient to plead fraudulent concealment, especially in light of the

19   fact that the facts concerning falsity are in Defendants' hands. *See CRT*, 738 F. Supp. 2d at 1024 ("[I]t

20   is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the

21   motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment

22   is alleged to be largely in the hands of the alleged conspirators"). Defendants' arguments to the contrary

23   are baseless.

24       **1.    Defendants made affirmative misrepresentations about market conditions
                 and demand for Dungeness crab.**

25       Allegations of affirmative misrepresentations of fact alone are sufficient to toll the limitations

26   period. *Hightower v. Celestron Acquisition, LLC*, No. 5:20-CV-03639-EJD, 2021 WL 2224148, at *7-8

27   (N.D. Cal. June 2, 2021). All the more forceful are alleged misrepresentations regarding "pretextual

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    justifications for [manipulated] prices" paired with "agreement not to publicly discuss the nature of the

2    scheme" and "secret meetings" among co-conspirators. *See In re Rubber Chems. Antitrust Litig.*, 504 F.

3    Supp. 2d 777, 788 (N.D. Cal. 2007); *see also Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1492

4    (D.C. Cir. 1989) ("affirmative misrepresentations … constituted 'additional acts of concealment' and

5    thus tolled the statute of limitations"). Plaintiffs have alleged exactly that.

6        Defendants made numerous false statements about the market for Dungeness crab, including

7    "that the ex vessel prices for Dungeness crab offered by them in the Pacific NW Area were the result of

8    external market conditions and that they allowed Pacific Seafood to set the opening price for the

9    Dungeness crab season for factors unrelated to their conspiracy and agreement." FAC ¶ 423.

10       Plaintiffs identify numerous false statements about market prices that concealed the existence of

11   a conspiracy to suppress prices.

12       Prior to the start of the 2022-23 season, Pacific Seafood falsely "claimed that the reason it was

13   not willing to state a price was that there was no demand for live or fresh cooked crab. That was

14   demonstrably false." *Id.* ¶ 204. In reality, "[i]n December of 2022, demand for live Dungeness crab was

15   so high that Pacific Seafood and other ex vessel buyers were selling live crab to their customers for

16   approximately $14/lb. And in Puget Sound—which because of significant tribal involvement and other

17   factors has not fallen within the ambit of Defendants' conspiracy—crabbers were receiving as much as

18   $10.50/lb. ex vessel from buyers there." *Id.* ¶ 205.

19       In December 2022, Pacific Seafood told crabbers demand was so weak that prices they could

20   pay "might only be a $1 or something though." *Id.* ¶ 212. Once out on the water, crabbers were told a

21   different story: "Nor-Cal very briefly offered boats $5/lb., but instructed them to keep it secret.

22   However, over the course of the day, Nor-Cal withdrew the offer and dropped the price it was offering

23   to that being paid by other Defendants, claiming it was because people had been too public about it . . ."

24   *Id.* ¶ 213. These statements by Nor-Cal falsely imply that it was the crabbers' "loose lips" –and not the

25   Defendants' conspiracy—that was keeping prices low.

26       When crabbers inquired about the ex vessel prices, they were invariably told that market

27   prices—as opposed to conspiracy—would determine what they were paid. For example, Mr. Lee of

28   Nor-Cal told crabbers in January 2023 that he would be "matching whatever price" his competitors

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

1    were independently offering. *Id.* ¶ 219.

2        Defendants also took measures to hide the prices they actually paid, to make it look like (in

3    some instances) they paid less than they did, or to otherwise obscure the price they actually paid. *Id.* ¶¶

4    353-378.  A "common tactic" Defendants used was to "put a lower price on the official landing record

5    of a sale than what they pay the crabber, generally splitting the payment into two checks: one for the

6    lower price on the landing record, and one for the amount above this." ¶¶ 359-66 (Nor-Cal, ASE, and

7    Ocean Gold all use this tactic).

8        Yet in the face of these detailed allegations, Defendants decry Plaintiffs' pleadings as "lacking"

9    for failure to "specify the time, date, or place of the allegedly misleading conversations." Dkt. 189 at

10   33:3-10, quoting *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1075 (N.D. Cal. 2016) (internal

11   quotation omitted). Not so.

12       Defendants' first error is on the law, implying that Plaintiffs must detail every facet of, and

13   name each participant in, Defendants' conspiracy at the *pleadings* stage prior to discovery. *Id.* This is

14   wrong. Indeed, "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent

15   concealment at the motion to dismiss stage," as the proof resides in *Defendants'* documents, not

16   Plaintiffs'. *See CRT Antitrust Litigation*, 738 F. Supp. 2d at 1024. Rather, "[a] plaintiff's knowledge of

17   the grounds for a suit must *generally* extend to an awareness of the persons responsible for plaintiff's

18   injury…. simply because a person knows he has been injured by one person cannot reasonably mean he

19   should be held to know of every other participant." *See Hobson v. Wilson*, 737 F.2d 1, 36 (D.C. Cir.

20   1984) (emphasis added).

21       Defendants' second error is on the facts, ignoring that Plaintiffs allege Defendants lied to

22   Plaintiffs about the cause of ex vessel crab prices by: 1) misrepresenting the demand for ex vessel crab

23   circa December 2022 of the 2022/23 Pacific NW Area crab season, including but not limited to

24   statements by Pacific Seafood's Joe Cincotta, FAC ¶¶ 204-05, 212, 423; 2) attributing the price of ex

25   vessel crab to general market conditions circa December 2022 of the 2022/23 Pacific NW Area crab

26   season, FAC ¶¶ 219; 3) misstating ex vessel prices on official landing sales records on at lease February

27   10 and 11, 2021, *id*. ¶¶ 359, 361-65; and 4) blaming Plaintiffs themselves for price manipulation, *id*. ¶¶

28   212-13.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Far from merely alleging a self-concealing scheme as in *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988), or alleging only false statements without "specify[ing] the identity of the parties who allegedly made false representations… beyond broad descriptors" as in *Garrison*, 159 F. Supp. 3d at 1075, Plaintiffs have identified specific statements, the contents of those statements, their declarants, and dates on which those statements were made. *See* FAC ¶¶ 204-05, 212, 359, 361-65, 423. Plaintiffs have alleged Defendants' affirmative false statements to Plaintiffs in fulsome detail. That alone is sufficient to toll the statute. But Plaintiffs allege more.

### 2.    Defendants' "back channel" communications between themselves constitute concealment.

Evidence of a furtive intent, including secret meetings, constitute acts of fraudulent concealment. *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1065 (N.D. Cal. 2015) ("generally 'agreed not to discuss publicly the nature of the scheme' and 'did not take or distribute official minutes or record' the meetings alleged"). Indeed, courts have found such backchannel coordination to be a fraudulent means of concealing communication. *C.f. United States v. Livoti*, 756 Fed. Appx. 841, 846 (11th Cir. 2018) (concealing fraudulent gift assignments by conveying them through a "special phone number that allowed employees to communicate with an insurance company" without revealing policy ownership); *accord Robinson v. U.S.*, No. 08–CV–2280, 2009 WL 175032, at *3, 6 (C.D. Ill. Jan. 21, 2009) (backchanneling fraudulent transactions through a personal cell phone warranted "sophisticated means" enhancement).

Plaintiffs amply demonstrate Defendants acted to conceal their conspiracy from Plaintiffs. Defendants hid evidence of their scheme by backchannelling communications through Defendants' employees' personal devices, keeping their agreements secret from Plaintiffs. FAC ¶ 422. In the event that Defendants offered a price that varied from the cartel-mandated terms, they were instructed to keep it secret. *Id.* ¶ 213 (Nor-Cal instructs crabbers to keep promise of higher prices secret).

Defendants' contrary authorities are unpersuasive. Plaintiffs identified a specific instance of efforts to keep the scheme *sub rosa*, namely, price-cutting retaliation on December 27, 2022 in response to Plaintiffs "be[ing] too public about ... [Nor-Cal] cheating on the[] price fixing arrangement." *Id.* ¶¶ 209-213. This is far more specific than general allegations of secret meetings,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

efforts to "minimize any written record of the conspiracy[,]" and efforts to hoodwink the public writ large. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1215 (N.D. Cal. 2015). Indeed, Plaintiffs allege this silencing-by-force alongside a pattern of backchanneling through employee devices, *Id.* ¶ 422, and affirmative false statements to Plaintiffs about price factors and demand for ex vessel crab – the latter of which is alone dispositive to toll the statute. *See Id.* ¶¶ 204-05, 212, 359, 361-65, 423.

Plaintiffs further alleged that Defendants concealed their conspiracy by unreasonably resisting discovery, particularly Defendant Nor-Cal, who has simply ignored Plaintiffs' subpoena and the Court's Order compelling Nor-Cal to produce documents pursuant to that subpoena. *See Id.* ¶ 422; *see also* Dkt. 73 (granting motion to compel with respect to Nor-Cal subpoena).

Defendants' efforts to conceal their conspiracy run from the inception of the conspiracy and continue to this day. Defendants' pattern of lies, continued backchanneling to conceal their conspiracy and dilatory – or in the case of Nor-Cal, outright defiant – discovery conduct more than qualifies as affirmative acts of fraudulent concealment. Plaintiffs have pleaded so with particularity.

### 3.    <u>Plaintiffs could not have discovered Defendants' scheme by exercising diligence through reasonable inquiry.</u>

The relevant test for Plaintiffs' diligence is whether a reasonable inquiry could have discovered facts—as distinct from suspicions—that showed the existence of a cause of action. *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984) ("By 'notice,' we …. do not mean the kind of notice--based on hints, suspicions, hunches or rumors--that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit."). "[T]he limitations period is tolled if the defendant precludes the plaintiff from finding the facts that would give notice of the particular claim." *Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976, 985 (C.D. Cal. 2000).

Defendants do not contest Plaintiffs' diligence in their Motion to Dismiss, conceding the issue. *See* Dkt. 189 at 32-34. This is wise on Defendants' part. Indeed, a plaintiff's "allegation that they had no knowledge of facts that would have led to discovery of the conspiracy by the exercise of reasonable due diligence is sufficient to establish, at the pleading stage, that there were no facts that would excite the inquiry of a reasonable person to trigger a duty to inquire." *In re Rubber Chems. Antitrust Litig.*,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

504 F. Supp. 2d, 789 (citing *In re Nine West Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000)). Plaintiffs allege at least this much. FAC ¶¶ 420-21.

  Plaintiffs further allege that Defendants concealed their conspiracy such that Plaintiffs[31] could not, through a reasonable inquiry, have discovered facts underlying Plaintiffs' cause of action. *See id.* ¶¶ 420-21; *see also Hobson*, 737 F.2d at 35. Defendants lied to Plaintiffs' faces about market demand and pricing causes for ex vessel Dungeness crab. *Id.* ¶¶ 204-05, 212, 359, 361-65, 423. Defendants punished those who spoke too publicly about their conspiracy by tanking the price of ex vessel Dungeness crab. *Id.* ¶¶ 209-213. Defendants backchanneled communications through employee personal devices and have resisted producing such communications in Court-ordered discovery. *See Id.*, ¶ 422; *see also* Dkt. 73. Only Court intervention has unveiled facts sufficient to reveal the underlying cause of action. Plaintiffs' diligence could not pierce Defendants' lockstep deception. Defendants' fraudulent concealment of the facts underlying Plaintiffs' cause of action tolls the statute of limitations beyond March 13, 2019.

### 4.   <u>Plaintiffs pleaded continuing violation tolling in the alternative.</u>

  In the alternative, Plaintiffs alleged "the continuing nature of Defendants' conspiracy" tolls the statute of limitations, pleading continuing violation tolling. *See* ECF 81, ¶ 425; *see also In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *16-18. Defendants do not contest this basis of tolling, and thus concede it. *See* Dkt. 189 at 32-34.

  To state a continuing violation of the antitrust laws, a plaintiff must allege that a defendant "completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Samsung Elecs. Co. v. Panasonic Corp.* 747 F.3d 1199, 1202-03 (9th Cir. 2014) (quoting *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

  Plaintiffs allege both. Defendants continue to squeeze buyers, including CI#1, by pressuring them to "keep the price down" on ex vessel Dungeness crab, and obfuscate the demand for ex vessel

---

[31] Nor could Plaintiffs' counsel have discovered those facts without discovery. Note that the first Complaint framed this action as a monopsony case, whereas after preliminary discovery, and only after that discovery, counsel discovered this was indeed a cartel action and considerably amended the pleadings. *Compare Dkt.* 1 *with* FAC.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Dungeness crab. *See* ¶¶ 223-31 (cartel continued through most recent 2023/24 Pacific NW Area Dungeness crab season). Indeed, as recently as January 2024, Defendants colluded to run CI#1 out of business for defecting from the cartel, undercutting his accounts, breaching agreements to buy crab from him, and ceasing payment on crab he already delivered. *Id.* ¶ 334-43 (Defendants forced CI#1 out of Charleston in 2023/24, resulting in crabbers there receiving lower ex vessel prices from Defendants). These are new, independent acts that inflict new injury on Plaintiffs – in the case of CI#1, a concerted threat to the existence of his business.

By their fraudulent concealment of Plaintiffs' cause of action and continued breach of antitrust laws, Defendants' conduct tolls the statute of limitations, rendering Plaintiffs' claims prior to March 13, 2019 timely.

## IV.    Defendants' Challenges to Plaintiffs' Standing Fall Flat

### A.    Little's Standing Is Adequately Alleged Based on Sales to Members of the Cartel

While recognizing that "a plaintiff who [sells directly to] a defendant or alleged co-conspirator may have antitrust standing under the Sherman Act," Defendants nonetheless argue that Plaintiff Little lacks standing here because he "does not allege that he ever sold crab ex vessel to any named Defendants on or after March 13, 2019" and purportedly does not sufficiently allege facts tying non-party Pezzolo Seafood and Unnamed Co-conspirators to the alleged conspiracy. (Dkt. 189 at 35:10-20, citing *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012).) To the contrary, the CAC specifically alleges that Little sold to both Unnamed Co-conspirator #1 and Unnamed Co-Conspirator #2 on or after March 19, 2019 and describes the involvement of various co-conspirators, both known and unknown. FAC ¶¶ 12, 128-36.[32]

As the Ninth Circuit recognizes, "[w]hen co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019). In *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022), the court addressed the very argument Defendants make here, albeit in the context of plaintiffs who alleged they

---

[32] Mr. Little further alleges that he directly sold to Defendant Pacific Seafood-Eureka, LLC during the proposed class period and attempted to sell directly to Pacific Seafood during the 2022/23 season but was subjected to a group boycott. (CAC at ¶¶ 12.)

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

were direct purchasers from unnamed co-conspirators that had entered into an anticompetitive

agreement with the named Defendant, and found no basis to deny antitrust standing. *See id.* at 984.

Like those plaintiffs, Mr. Little sufficiently alleges that he suffered the type of injury the antitrust laws

were designed to prevent as a result of his direct sales to alleged conspirators and he therefore satisfies

the requirements for antitrust standing.

**B.    Burns Has Standing as a Matter of Law Based on Sales by Her Deceased Husband to Members of the Cartel**

Defendants further contend that Plaintiff Burns lacks standing to pursue antitrust claims on

behalf of her deceased husband because she failed to allege any express assignment of such claims.

Dkt. 189 at 36. No such express assignment is necessary, however, because Burns stands in the shoes

of her late husband as both a successor in interest to his antitrust claims and as personal representative

of his estate. *See* Cal. Code of Civ. Pro. § 377.11 (defining "Decedent's successor in interest"); Cal.

Prob. Code § 58 (defining "Personal representative"); *Howes v. Yankton Med. Clinic, P.C.*, 2016 WL

4385898, at *4 (D.S.D. Aug. 17, 2016) (surviving spouse had standing to pursue antitrust claims as

personal representative of late husband's estate). Gross Dec., Ex. D.  In short, Defendants' "express

assignment" argument is irrelevant here and Plaintiff Burns satisfies the requirements for antitrust

standing, i.e., injuries [that] were proximately caused by [Defendants'] antitrust violations." *Lexmark

Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

**V.    The Court Has Personal Jurisdiction Over Swanes**

A court's exercise of personal jurisdiction must "accord with constitutional principles of due

process," principles which are "satisfied when the forum state has 'minimum contacts' with the

defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)

(internal citations omitted). Personal jurisdiction for federal antitrust claims is delineated by section 12

of the Clayton Act, which provides:

> "Any suit, or proceeding under the antitrust laws against a corporation may be brought not only
> in the judicial district whereof it is an inhabitant, but also in any district wherein it may be
> found or transacts business; and all process in such cases may be served in the district of which
> it is an inhabitant, or wherever it may be found."

15 U.S.C. § 22. In a suit brought under section 12 of the Clayton Act, which provides for nationwide

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

service of process, "the inquiry to determine 'minimum contacts' is thus 'whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this county.'" *Action Embroidery Corp.*, 368 F.3d at 1180 quoting *Securities Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985); *accord Go-Video Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1416 (9th Cir. 1989) ("when a statute authorizes nationwide service of process, national contacts analysis is appropriate"). Under the doctrine of pendent personal jurisdiction, courts in the Ninth Circuit may assert personal jurisdiction "over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id*. at 1180-81 (citations omitted).

When defendant makes a motion to dismiss as its initial response and the court decides the motion without conducting an evidentiary hearing, plaintiff need only make a prima facie showing that personal jurisdiction exists. *Martinez v. Aero Caribbean*, 764 F3d 1062, 1066 (9th Cir. 2014). In this context, a "prima facie" showing means that plaintiff has produced admissible evidence which, if believed, would be sufficient to establish the existence of personal jurisdiction. *See Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F3d 1122, 1129 (9th Cir. 2003). Moreover, until an evidentiary hearing or trial on the merits (a) the complaint's uncontroverted factual allegations must be accepted as true; (b) the court will draw "reasonable inferences" from the complaint in favor of plaintiff; and (c) any factual conflicts in the parties' declarations must be resolved in plaintiff's favor. *Id*. at 1129.

This Court has personal jurisdiction over Swanes concerning Plaintiffs' claims under section 1 of the Sherman Act. A district court's exertion of personal jurisdiction for federal antitrust claims is proper if a defendant "has acted within any district of the United States[.]" *Action Embroidery Corp.*, 368 F.3d at 1180 (citations omitted). The Ninth Circuit, in *Action Embroidery Corp.*, found a Virginia professional corporation that operated in the United States had sufficient minimum contacts, and thus the court's personal jurisdiction was proper. *Id*. Swanes satisfies the minimum contacts standard applied in *Action Embroidery Corp.*, as Swanes is a limited liability corporation incorporated in Washington with its principal place of business in Tacoma, Washington. FAC ¶ 115; Dkt. 201 at ¶ 2.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  Plaintiffs allege Swanes' contacts within the United States, and Swanes affirms those contacts in its

2  motion and supporting declaration.

3       While Swanes does not argue this court lacks personal jurisdiction over it concerning Plaintiffs'

4  state law claims, such an argument would be of no use under either of two analyses. First, as detailed

5  below, Swanes has sufficient minimum contacts with California to justify personal jurisdiction

6  concerning state law claims. But even if it didn't have those contacts, Swane's national contacts are

7  sufficient to warrant "pendant personal jurisdiction" because Plaintiffs' state law claims arise "out of a

8  common nucleus of operative facts with a claim in the same suit over which the court does have

9  personal jurisdiction." *Action Embroidery Corp.*, 368 F.3d at 1180-81 (finding pendant personal

10  jurisdiction for state law claims arising from the same facts as plaintiffs' Sherman Act claims).

11  Plaintiffs' claims under the California Cartwright Act and California Unfair Competition Law both

12  arise from Defendants price-fixing scheme, and the conduct in furtherance thereof. *See* FAC ¶¶ 436-

13  447. Setting aside Swanes' assertions that it does not have any contacts with California—which are

14  demonstrably false—this Court has personal jurisdiction over Swanes with regards to Plaintiffs' state

15  law claims that arise from the same facts as the federal claims.

16       The foregoing notwithstanding, this Court's personal jurisdiction over Swanes, for both

17  Plaintiffs' federal and state claims, is proper because Swanes has "purposefully avail[ed] himself of the

18  privilege of conducting activities" in California, and Plaintiffs' claims arise from those activities. *X*

19  *Corp. v. Center for Countering Digital hate Ltd.*, 724 F.Supp.3d 921, 935 (N.D. Cal. 2024) (citations

20  omitted)[33]. Plaintiffs allege that Swanes made ex vessel purchases in California during the relevant

21  period. FAC ¶¶ 116-117. In order to make ex vessel purchases, an entity must obtain a fish buyer

22  license from the state in which it makes such purchases. *Id.* ¶ 149. Swanes made ex vessel purchases of

23  Dungeness crab in California from 2020 to 2024 under the business identification number 85706, as

24  provided in California Department of Fish and Wildlife ("CDFW") landing records. Gross Dec., ¶ 9,

25  Ex. F. Between February 16, 2020 and June 17, 2024, Swanes made 1592 ex vessel purchases in

26  California ports, totaling 2,283,870 pounds. *Id.,* Ex. #. Plaintiffs allege class injuries resulting from a

---

[33] Once a plaintiff establishes the first two prongs, a defendant's activities directed at the forum and plaintiff's claims arising from the activities, the defendant must make a "compelling case" that the exercise of personal jurisdiction would not be reasonable. *Id.* (citations omitted).

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    price-fixing scheme by Swanes and other Defendants that suppressed the price of ex vessel crab.

2    Swanes' activities in California gave rise to Plaintiffs' claims, and thus Plaintiffs have alleged facts

3    sufficient to show this Court's jurisdiction over Swanes is proper.

4    Swanes' assertion of facts attempting to counter the Plaintiffs' allegations do not undermine this

5    Court's proper exercise of personal jurisdiction. Plaintiffs allege facts that lay out a prima facie case for

6    personal jurisdiction, for both Plaintiffs' federal and state law claims, despite Swanes' failure to

7    explicitly attack either, which is sufficient at this phase. *Martinez v. Aero Caribbean*, 764 F3d at 1066

8    (A plaintiff need only make a prima facie showing of personal jurisdiction at the motion to dismiss

9    phase). Even if Swanes' claim of no contacts with California were taken as true—they are not—any

10   factual conflicts in the parties' declarations are resolved in the Plaintiffs' favor. *See Harris Rutsky &*

11   *Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F3d at 1129. Plaintiffs allege Swanes purchased

12   crab in California during the relevant period, and Government records prove those allegations. Swanes'

13   assertions to the contrary should be discarded.

## VI.    Leave Should Be Granted in the Event that Court Finds Any Deficiency in Plaintiffs' Allegations

14

15   If the Court grants any portion of the Defendants' motions, Plaintiffs respectfully request leave to

16   amend. "[D]ismissal without leave to amend is improper unless it is clear . . . that the complaint

17   could not be saved by any amendment." *Petersen v. Boeing Co*., 715 F.3d 276, 280 (9th Cir.

18   2013). If there is any shortcoming in the FAC's allegations (Plaintiffs respectfully submit there is

19   none), it could not be a shortcoming that clearly cannot be remedied.

## CONCLUSION

20

21   For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

22   motions to dismiss in their entirety.

23   Respectfully Submitted,

24

25   Dated: December 6, 2024                    GROSS KLEIN PC

26

27

28

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

By:      /s/ Stuart G. Gross
STUART G. GROSS

Stuart G. Gross (SBN 251019)
Travis H. A. Smith (SBN 331305)
Ross A. Middlemiss (SBN 323737)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628
*sgross@grosskleinlaw.com*
*tsmith@grosskleinlaw.com*
*rmiddlemiss@grosskleinlaw.com*

Matthew W. Ruan (SBN 264409)
**FREED KANNER LONDON &**
**MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
*mruan@fklmlaw.com*

Steven N. Williams (SBN 175489)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear St, Suite 1100
San Francisco, CA 94105
(415) 671-4628
*swilliams@stevenwilliamslaw.com*

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE COTTRELL**
**KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100
*mweiler@schneiderwallace.com*

*Counsel for Plaintiffs and the Proposed Classes*

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111