BRIAN A. E. SMITH (SBN #188147)
bsmith@bartkolaw.com
JOSEPH J. FRARESSO (SBN #289228)
jfraresso@bartkolaw.com
BARTKO LLP
1100 Sansome Street
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Christopher J. Kayser, (OSB #984244, appearing *pro hac vice*)
cjkayser@lvklaw.com
Elizabeth E. Parker, (OSB #242424, *appearing pro hac vice*)
eparker@lvklaw.com
LARKINS VACURA KAYSER LLP
121 SW Morrison St, Suite 700
Portland, Oregon 97204
Telephone: 503-222-4424

Attorneys for Defendant *OCEAN GOLD SEAFOODS, INC.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAND LITTLE and ROBIN BURNS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFIC SEAFOOD PROCUREMENT, LLC; et al.,<br><br>Defendants. | Case No. C 3:23-cv-01098-AGT<br><br>**OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS**<br><br>Date:        Friday, May 1, 2026<br>Time:        10:00 a.m.<br>Judge:       Honorable Alex G. Tse<br>Courtroom: A, 15th Floor |

OCEAN GOLD SEAFOODS, INC.'S REPLY IN
SUPPORT OF ITS MOTION FOR APPROVAL TO
SERVE SUBPOENA ON PATRICK DAVIS

Page 1

3:23-cv-01098-AGT

**INTRODUCTION**

Ocean Gold seeks discovery from a single crabber, Patrick Davis, who is the undisputed source of multiple allegations in the Fifth Amended Complaint about Ocean Gold and whom Plaintiffs intend to rely on to support their claims because of his knowledge of the ex-vessel market for Dungeness crab. Pl.'s Initial Disclosures 17, Dkt. 646-4. Though Davis, like the multiple third-party witnesses Plaintiffs have subpoenaed, has relevant and discoverable information, Plaintiffs contend he must be treated differently because he is also a putative class member. Plaintiffs want to limit his testimony and production of documents to matters relevant to the allegations they believe support their claims. Ocean Gold's efforts to discover evidence relevant to its defenses outside of that arena are, according to Plaintiffs, off base. Even topics on which Plaintiffs specifically identified Davis as knowledgeable (i.e., the Dungeness crab market) are beyond the reach of discovery. And though Plaintiffs intend to rely on Davis as a witness to support their claims, issues related to his credibility would also be precluded. Those limitations are unreasonable, highly prejudicial, and without a legitimate legal basis.

Plaintiffs have made discovery particularly hard because they know so little about the identity of many of the fishermen who are the source of the bulk of their allegations, and their confidential informant, Ozzie Gregorio, has been difficult to get any discovery from. They are now compounding that difficulty by limiting discovery from the only fisherman they have identified as a source of the allegations against Ocean Gold. Indeed, Plaintiffs would not even allow inquiry into whether Davis knows the identity of crabbers who are the source of other allegations in the complaint—identities even Plaintiffs do not know—because, they ask, "Why would Mr. Davis know this?" Opp'n 11, Dkt. 664. Perhaps the better questions are these: Why do Plaintiffs not know the identity of the witnesses who are the sources of the allegations in the complaint? And

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS

Page 2

3:23-cv-01098-AGT

how can Ocean Gold find out those identities if not through the witnesses Plaintiffs have identified in their initial disclosures? That Davis also happens to be a putative class member is no justification for tying the hands of Ocean Gold's defense against and discovery related to Plaintiffs' claims against it.

**A. Davis's status as a putative class member does not immunize him from discovery that would otherwise be available from third-party witnesses.**

Plaintiffs understand that the scope of third-party discovery in a case like this can be broad, successfully enforcing a subpoena seeking documents for the entire ten-year period at issue because "seeking documents within the defined conspiracy period … is no basis to quash." Pl.'s Opp'n Mot. Quash 7–8, Dkt. 498. Their subpoenas for documents within this 10-year period have included demands for all emails, text messages, and other communications with any Dungeness crab fisher or buyer (whether or not they are a defendant), all communications with any state official concerning Dungeness crab, and any communications that are related to the purchase or sale of Dungeness crab. Decl. of Christopher J. Kayser, Ex. A at 12–14. But Ocean Gold's far more modest subpoena for information concerning the allegations in the Fifth Amended Complaint and the topics Plaintiffs claim will be supported by Davis's testimony is, according to Plaintiffs, off base simply because Davis also happens to be a putative class member.

Plaintiffs cannot use Davis's status as a putative class member as a sword and shield. Plaintiffs do not—and cannot—dispute that Davis possesses relevant and discoverable information. Indeed, Plaintiffs identified Davis as a witness they intend to rely on because of his broad knowledge regarding "landings and ex-vessel sales and/or purchases of Dungeness crab and other seafood species," as well as "Defendants' conduct concerning the ex-vessel Dungeness crab market and other seafood markets." Pl.'s Initial Disclosures 14, Dkt. 646-4.

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS

Page 3

3:23-cv-01098-AGT

That Davis happens to be a putative class member in addition to being a percipient witness is not a basis for treating him differently than other third parties with discoverable information. "An individual's status as an absent class member is not a blanket exemption from compliance with discovery." *Rosen v. Sec. Benefit Life Ins. Co.*, No. 25-mc-00036, 2025 LX 133592, at *7 (C.D. Cal. June 2, 2025). Discovery is allowed where, as here, "the proposed deponents have been identified as potential witnesses, or have otherwise 'injected' themselves into the litigation." *Brown v. Wal-Mart Store, Inc.*, No. 09-cv-03339, 2018 U.S. Dist. LEXIS 4027, at *3–4 (N.D. Cal. Jan. 9, 2018) (permitting depositions of eight putative class members who plaintiffs identified as rebuttal witnesses); *Withers v. eHarmony, Inc.*, 267 F.R.D. 316, 321 (C.D. Cal. 2010) (restrictions on discovery from absent class member do not apply to percipient witness with personal knowledge of underlying allegations).

In *Withers,* plaintiffs similarly sought to limit the topics and time for the deposition of a percipient witness who was also a putative class member. The defendant's subpoena sought "information relevant to … plaintiff's suitability and adequacy as a class representative, and plaintiff's 'personal stake' in the litigation." *Id.* at 322. Plaintiff moved for a protective order seeking to limit the duration of the deposition and the topics Defendant could cover because the witness was an absent class member. *Id.* at 320. The court denied the motion and allowed the subpoena without limitation, noting that the witness was "more than an absent or putative class member." *Id.* at 322.

Putative class members are often protected from engaging in discovery out of a concern that the discovery is sought to take undue advantage of or harass class members. *Moreno v. Autozone, Inc.*, No. C-05-4432, 2007 U.S. Dist. LEXIS 98618, at *2 (N.D. Cal. Aug. 3, 2007). That is not the case here. The discovery is sought not because Davis is a class member but because

he is a third party with information relevant, necessary, and important to Ocean Gold's ability to defend the allegations of the complaint.

**B. Defendants are entitled to discovery from Davis related to the adequacy of Plaintiffs as class representatives.**

Plaintiffs acknowledge that even putative class members like Davis may be deposed on issues relating to the adequacy of class representation. Opp'n 12, Dkt. 664. They nonetheless argue that Ocean Gold cannot question Davis on that topic because Ocean Gold does not yet know what he might say. *Id.* That argument turns the purpose of initial disclosures on its head. Initial disclosures exist to identify witnesses a party intends to rely upon and to permit discovery into what those witnesses may say. And fishermen like Davis, whom Plaintiffs identified as a witness because of his knowledge of the ex-vessel Dungeness crab market, Pl.'s Initial Disclosures 17, Dkt. 646-4, necessarily possess information directly relevant to the adequacy of Plaintiffs as representative class members.

Among crab fishermen, there are distinct factions with competing—and often conflicting—interests when it comes to ex-vessel price negotiations. Mark Rydman, a third-generation crab fisherman with more than two decades of experience in the Dungeness crab fishery and Ocean Gold's current president, explains that there are important differences in how ex vessel price factors into profitability between large and small vessels. Decl. of Mark Rydman ¶ 5. That is because price is a far more important factor in profitability for smaller boats that are less capable of harvesting large volumes of crab. *Id.* The largest vessels in the fleet have the greatest capacity to harvest a disproportionate share of the limited crab supply each season. *Id.* ¶ 6. In seasons when the supply is high but ex vessel price is lower as a result, the larger vessels do the best. *Id.* at 5.  For those vessels, profitability depends less on the nominal ex-vessel price and more

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS

on whether a processor—such as Ocean Gold—can purchase their full catch without volume restrictions. By contrast, in seasons where the supply of crab is down but the ex vessel price is higher, the smaller vessels do better because they have lower operating costs and can sustain themselves on a small volume of crab. *Id.* As a result, for a high-volume vessel, a buyer willing to purchase 100,000 pounds at $3.00 per pound presents a far more lucrative opportunity than one willing to purchase only 5,000 pounds at $10.00 per pound.

For the top-producing fishermen, Dungeness crab fishing is lucrative. During the nine-year period at issue in this case, the top 30 fishermen in California, Washington, and Oregon generated over $170 million in ex-vessel revenue:

| CA Vessel | CA 2015-2024 | OR Vessel | OR 2015-2024 | WA Vessel | Wa 2015-2024 |
|---|---|---|---|---|---|
| L46960 | $5,552,307 | 516428 | $8,555,553 | PD | $8,403,255 |
| L20421 | $4,847,880 | 1084528 | $7,894,641 | CB | $7,678,934 |
| L00839 | $4,667,949 | 590537 | $6,790,405 | AF | $7,626,059 |
| L39722 | $3,894,992 | 578930 | $6,478,227 | LM | $6,889,382 |
| L22483 | $3,858,601 | 545998 | $6,403,495 | GF | $6,415,221 |
| L20113 | $3,855,593 | 569611 | $6,320,811 | NK | $5,858,011 |
| L56714 | $3,721,775 | 613682 | $6,230,769 | INF | $5,590,785 |
| L48947 | $3,581,154 | 522171 | $6,112,229 | OS | $5,513,452 |
| L16767 | $3,511,337 | 617234 | $6,043,401 | AD | $5,449,824 |
| L50028 | $3,389,996 | 1244893 | $5,959,944 | TR | $5,351,960 |
| Total | $40,881,585 | | $66,789,476 | | $64,776,881 |

Kayser Decl. ¶ 2. Though these 30 fishermen have the most at stake in the outcome of the case, none of them are class representatives. Indeed, during the period at issue, Plaintiffs Burns and Little do not even come within the top 400 vessels, and Cherry Fisheries' two boats combined are barely within the top 150. *Id.* ¶ 4.

The distinction between high-volume and low-volume fishermen is important because, in addition to competing for the limited supply of crab, those groups often have conflicting economic interests in ex vessel price negotiations. *See* Rydman Decl. ¶¶ 5–6. There is always a tension

between the larger and smaller vessels. *Id.* Larger vessels have a higher level of capital investment, fuel costs and overhead that significantly impacts both profitability and fishing strategies. Rydman Decl. at 3¶5. To generate an adequate return on investment and maximize the time spent fishing, these vessels will often fish in multiple ports in different states and different fisheries. *Id.* Coast-wide strikes that reduce the amount of time on the water have substantially different opportunity costs for larger vessels. For example, many of the larger vessels that fish for Dungeness crab also participate in the pollock fishery in Alaska that begins around January 20. Any delay in opening the season – whether by strike, weather or otherwise – will impact the length of time they are able to fish for crab. For that reason, they are often willing to accept a lower price than go on strike and miss the opportunity to fish during the season at all. *Id.* ¶6.

An important issue for fisherman profitability is revenue per delivery, not price per pound. For example, in California over the 10-year period at issue, Plaintiff Brand Little averaged 2,425 pounds per delivery, while Rydman's vessel, the Anna Marie, averaged 20,483 pounds. Kayser Decl. ¶ 5. If Little receives $5 per pound ex vessel ($12,125 per delivery) he is still making far less per delivery than if Rydman accepts $3 per pound ex vessel ($61,449 per delivery).

Rydman—whose vessel ranks among the top 50 producers during the class period[1]— explains that he always believed that his negotiating leverage was far greater with a boat full of crab rather than on shore threatening a strike. Rydman Decl. ¶ 6. Other fishermen often not only disagreed with Rydman, they also threatened to cut his lines unless he complied with a strike and refused to go fishing. Decl. of Mark Rydman ¶ 9 (March 20, 2026), Dkt. 645-22. Smaller vessels,

---

[1]Rydman was no longer captaining his vessel during this time.

OCEAN GOLD SEAFOODS, INC.'S REPLY IN
SUPPORT OF ITS MOTION FOR APPROVAL TO
SERVE SUBPOENA ON PATRICK DAVIS                Page 7                3:23-cv-01098-AGT

which are also less capable of fishing safely in poor weather, frequently advocate for strikes as a means of leveling the competitive playing field against larger, more capable boats. *Id.* ¶ 10.

These distinctions between large and small vessels and how class members negotiate ex-vessel prices are important in analyzing the adequacy of representation. For instance, in *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 489–90 (N.D. Cal. 2008), the court found that the named plaintiffs, who purchased small volumes of graphics cards under certain negotiated terms, were not typical of larger wholesale purchasers, who used other negotiating strategies. Similarly, in *Optical Disk Drive Antitrust Litigation*, the court held that class representatives, who were three small companies and four individuals, were not adequate representatives of a class that included large companies who negotiated their prices differently. 303 F.R.D. at 317–18.  There are other distinctions between fishermen that are also important to adequacy of the class representatives. Some class members negotiate their ex-vessel prices through fishermen marketing associations; some do not. Some fish in multiple ports in multiple states; many do not. Some refuse to go fishing to hold out for higher ex-vessel prices while others do not.

These differences and divergent incentives in price negotiations demonstrate that fishermen do not have unified objectives. Instead, they pursue strategies that advance their own economic interests—often at the direct expense of others—underscoring why the smaller-volume Plaintiffs cannot adequately represent the interests of larger-volume putative class members. Defendants are entitled to discovery on these issues, particularly from the witnesses Plaintiffs intend to rely upon to support their claims.

**C. Defendants are entitled to discovery from Davis related to his knowledge regarding ex-vessel sales and price negotiations.**

Plaintiffs' Initial Disclosures identified Davis as having information "regarding landings and ex vessel sales and/or purchases of Dungeness crab." Pl's Initial Disclosures 17, Dkt. 646-4.

OCEAN GOLD SEAFOODS, INC.'S REPLY IN            Page 8            3:23-cv-01098-AGT
SUPPORT OF ITS MOTION FOR APPROVAL TO
SERVE SUBPOENA ON PATRICK DAVIS

But they now contend that Ocean Gold is barred from obtaining discovery from Davis related to "information about the market for Dungeness crab and how prices are negotiated." Opp'n 10, Dkt. 664. It is understandable why Plaintiffs are concerned.

A deeper dive into how fishermen use their collective bargaining power during the Dungeness crab pre-season negotiations exposes a fundamental weakness in the premise of Plaintiffs' entire case. That season opening prices are often the same is not because of a cartel of the 14 defendants agreed to fix it. It is because that is exactly what fishermen want. In fact, there is a long history in the industry of fishermen attempting to do precisely that. *See, e.g., Dooley v. Crab Boat Owners Ass'n*, No. C 02-0676, 2004 U.S. Dist. LEXIS 7117, at *6 (N.D. Cal. Apr. 26, 2004) (describing the use of threats and intimidation to enforce a strike); Defs.' Mot. Approval Serve Subpoenas 12–13, Dkt. 645 (citing articles reporting on strike tactics).

In 1997, the U.S. Department of Justice investigated and ultimately entered into consent decrees with a group of fishermen who collectively agreed to fix the ex-vessel price outside of their marketing associations and consequently the protections of the Fisherman's Collective Marketing Act. Criticizing those consent decrees, Nick Furman—the former director of the Oregon Crab Commission, which annually oversees the state-sponsored ex-vessel price negotiations, explained how those negotiations and the Dungeness crab market typically operate:

> Right or wrong, the process of crabbers collectively establishing an "asking price" prior to setting their gear, with buyers responding accordingly, has been going on for decades and actually helps to bring a certain amount of stability and order to a situation that can by nature, be intensely chaotic. Once fishing has commenced, stock abundance and consumer demand ultimately determine whether the starting price will hold, increase, or even drop as it has in some years.

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS

Page 9

3:23-cv-01098-AGT

Snider Decl., Ex. C at 5, Dkt. 645-4. That established practice, which had been going on for decades in 1997, continues. Defs.' Mot. Approval Serve Subpoenas 12–13, Dkt. 645. As just one example, an article reporting on the 2017 strikes reported that a commercial fisherman from Half Moon Bay said he was "tying up because they've asked us—other ports—to support them." *Id.* at 13. That fishermen want a uniform opening season price is not unique to the Dungeness crab fishery. After a similar antitrust conspiracy case related to Bristol Bay salmon concluded with a defense verdict, the jurors explained that they believed "the parallel prices existed because fishermen wanted the same prices as those their competitor fishermen were receiving." Snider Decl., Ex. K at 8, Dkt. 645-12.

Plaintiffs' Opposition nonetheless restates their theory that open-season prices are the same because of "an effort to coordinate among Defendants what they would pay crabbers at the opening of the seas," using the 2017/2018 season as an example. Opp'n 11 n.5, Dkt. 664.[2] That season was no different than the opening-season price discussions that came before it. In January of 2017, after the "entire West Coast Dungeness crab fleet" went on strike, it was widely reported that fishermen "reached a price settlement that everyone agreed to." Kayser Decl., Ex. B at 2. The settlement resulted in "[t]he entire West Coast fleet [] receiv[ing] $2.87 per pound for their crab," a price that was just shy of the $3.00 per pound they had wanted. *Id.*

When price negotiations resumed before the start of the 2017/2018 season later that year, fishermen got the $3.00 they had wanted in January. But it did not last long. That is because, as Nick Furman said, "once fishing has commenced, stock abundance and consumer demand

---

[2] Plaintiffs cite a misleadingly incomplete text with Rydman as evidence of a preseason price-fixing agreement. When the entire text is put into context, it is evident that is not what it is at all. Instead, it was an inquiry, two days before the season start, requesting confirmation of whether the fishermen had left port to set their pots for their preferred price of $3.00 a pound, which they had been attempting to get earlier in the year. *See* Rydman Decl. ¶¶ 3–4.

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS        Page 10        3:23-cv-01098-AGT

ultimately determine whether the starting price will hold, increase, or even drop." Snider Decl., Ex. C at 5, Dkt. 645-4. For the 2017/2018 season, the prices began going up the second day after the season opened and continued to do so, eventually climbing to as much as $4.00 within two weeks.

| Processor | 11/15 | 11/16 | 11/17 | 1/18 | 11/19 | 11/20 | 11/21 | 11/22 | 11/24 | 11/26 |
|---|---|---|---|---|---|---|---|---|---|---|
| AMERICAN SEAFOOD | 3 | 3.25 | 3.25 | 3.25 | 3.5 | 3.5 | | 3.5 | 3.5 | 3.65 |
| CAITO | 3 | | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | | 3.25 | |
| NOR CAL | 3 | 3.25 | 3.25 | 3.25 | 3.25 | 3.5 | 3.5 | 3.5 | | 4 |
| OCEAN GOLD | | | 3 | | | 3 | | 3.25 | | 3.5 |
| OCEAN KING FISH | | | 3.25 | 3.25 | 3.25 | 3.5 | 3.5 | 3.5 | 3.5 | 3.65 |
| PACIFIC CHOICE SEAFOOD | 3 | | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | | | |
| ROBERT BUGATTO | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | 3.26 | 3.4 | | 4 | 4 |

Kayser Decl. ¶ 3. This is reflective of a competitively healthy market, not one influenced by a purported price-fixing agreement among a cartel of 14 processors.

The reasons why fishermen often "reach[] a price settlement that everyone agree[s] to"—as was the case twice in 2017—are central and critical issues to the merits of Plaintiffs' claims. Ocean Gold and the other Defendants should not be deprived of discovery from witnesses like Davis, whom Plaintiffs have identified as having knowledge and information relevant to that important issue.

**D. The proposed discovery is not unduly burdensome and is proportionate to the needs of the case.**

Though Plaintiffs contend that the discovery would "severely burden Mr. Davis," they make no effort to explain how beyond pure speculation. They do not submit a declaration from Davis explaining what, if any, responsive documents he may have or why testifying in a deposition would be problematic. While it is true that it may require the assistance of an attorney, Plaintiffs'

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS

Page 11

3:23-cv-01098-AGT

counsel has fulfilled that role for Ozzie Gregorio and no doubt would be available to do so for Davis as well. Moreover, that third-party witnesses may at times need to retain counsel to respond to a subpoena is no basis for denying a subpoena. Order Mot. Quash, Dkt. 374 (noting that because the subpoenaed party was a corporation, it must retain counsel to respond).

The subpoena Ocean Gold seeks to serve on Davis is targeted to this litigation, the specific allegations against Ocean Gold that Plaintiffs attribute to him, and the topics on which Plaintiffs identified him as knowledgeable in their initial disclosures—namely, "information regarding landings and ex-vessel sales and/or purchases of Dungeness crab." They are far less burdensome than many of the third-party subpoenas Plaintiffs have served and sought to enforce. And the requests are proportional and well within the needs of this case, in which Plaintiffs are seeking nine-figure damages. The burden on Davis is minimal compared to what is at risk for Ocean Gold.

///

///

///

///

///

///

///

///

///

///

///

///

///

OCEAN GOLD SEAFOODS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR APPROVAL TO SERVE SUBPOENA ON PATRICK DAVIS　　　Page 12　　　3:23-cv-01098-AGT

**CONCLUSION**

This class action raises serious allegations of a price-fixing conspiracy and seeks damages that likely would spell the end for Ocean Gold. The allegations alone have already done significant and unnecessary damage to Ocean Gold's reputation. Ocean Gold's ability to fully and adequately defend itself and seek discovery—from the witnesses Plaintiffs have identified as supporting their claim—should not be hamstrung simply because the witness is also a putative class member.

Dated: April 16, 2026

LARKINS VACURA KAYSER LLP

s/ Christopher J. Kayser

Christopher J. Kayser, (OSB #984244, *appearing pro hac vice*)
Elizabeth E. Parker, (OSB #242424, appearing *pro hac vice*)

BARTKO LLP

Brian A. E. Smith, SNB #188147
bsmith@bartkolaw.com
Joseph J. Fraresso, SNB # 289228
jfraresso@bartkolaw.com

Attorneys for Defendants Ocean Gold Seafoods Inc.