Stuart G. Gross (SBN 251019)
Jan W. A. Jorritsma (SBN 326772)
Travis H. A. Smith (SBN 331305)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628

*Attorneys for Plaintiffs and the Proposed Classes*
[additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**BRAND LITTLE, ROBIN BURNS, AND CHERRY FISHERIES INC.,** Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

**PACIFIC SEAFOOD PROCUREMENT, LLC,** et al.,

Defendants.

Case No. 3:23-cv-01098-AGT

**PLAINTIFFS' OMNIBUS MOTION FOR AN ADVERSE INFERENCE AS A SANCTION AGAINST CERTAIN DEFENDANTS FOR SPOLIATION OF EVIDENCE**

Date: August 28, 2026
Time: 10:00 a.m.
Judge: Honorable Alex G. Tse
Courtroom: A, 15th Floor

REDACTED COPY OF DOCUMENT FILED UNDER SEAL



GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## TABLE OF CONTENTS

NOTICE OF MOTION ........ 1

RELIEF REQUESTED ........ 1

BACKGROUND ........ 1

A. Pacific Seafood ........ 3

B. Nor-Cal ........ 7

C. Hallmark ........ 8

D. Bornstein ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 12

I. Defendants' Lost and Destroyed Evidence After Their Obligation To Preserve Arose ........ 12

A. Pacific Seafood ........ 12

B. Nor-Cal ........ 13

C. Hallmark ........ 14

D. Bornstein ........ 14

II. Plaintiffs Are Prejudiced By The Spoliation Of These Documents ........ 15

III. Defendants Intentionally Deprived Plaintiffs of Relevant Information ........ 20

IV. An Adverse Inference is the Proper Remedy ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

## CASES

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337 (9th Cir. 1995) .............13, 15

*Apple Inc. v. Samsung Electronics Co.*, 881 F. Supp. 2d 1132 (N.D.Cal.2012).......13, 14, 15, 18

*Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067 (C.D. Cal. 2021) ................11, 12, 24, 25

*Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) .......................................................................................................21

*Dish Network L.L.C. v. Jadoo Tv, Inc.*, 2022 WL 11270394.........................................11, 12, 25

*Edwards v. Junior State of Am. Found.*, 2021 WL 1600282 (E.D. Tex. Apr. 23, 2021) .......................................................................................................21

*Est. of Schuck v. Cnty. of San Diego*, 2025 WL 2180987 (S.D. Cal. Aug. 1, 2025)............17, 21

*Fast v. GoDaddy.com LLC*, 340 F.R.D. 326 (D. Ariz. 2022) .............................................20, 23

*Hernandez v. Garcetti*, 68 Cal. App. 4th 675 (1998) ...............................................................12

*Hunters Capital, LLC v. City of Seattle*, 2023 WL 184208 (W.D. Wash. Jan. 13, 2023) .......................................................................................................17

*In re Cathode Ray Tube Antitrust Litig.*, 2023 WL 5667882 (N.D. Cal. Jan. 27, 2023) .......................................................................................................15

*In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981 (N.D. Cal. 2023) ................16, 25

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d at 1077 ............................................20, 24

*Jones v. Riot Hosp. Grp., LLC*, 95 F.4th 730 (9th Cir. 2024).......................................11, 20, 21

*Kearney v. Foley & Lardner, LLP*, 590 F.3d 638 (9th Cir. 2009) ............................................12

*Laub v. Horbaczewski*, 2020 WL 7978227 (C.D. Cal. Nov. 17, 2020) ...............................10, 11

*Lee v. Cnty. of Los Angeles*, 2025 WL 2505484 (C.D. Cal. Aug. 29, 2025) .................22, 23, 24

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006)...........................................15, 16, 22, 23

*Lopez v. Apple, Inc.*, 2024 WL 4561320 (N.D. Cal. July 17, 2024) ..............................12, 22, 25

*Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022).....................15

*MGA Ent., Inc. v. Harris*, , 2023 WL 2628225 (C.D. Cal. Jan. 5, 2023)...................................13

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Morehead v. City of Oxnard*, , 2023 WL 8143973 (C.D. Cal. Oct. 4, 2023)............................. 12

*Morford v. Wal–Mart Stores, Inc.*, 2011 WL 635220 (D.Nev. Feb. 11, 2011) .......................... 14

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543 (N.D. Cal. 2018) .................. 12

*Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226 (D. Minn. 2019) .......................... 17, 20

*Porter v. City & Cty. of San Francisco*, 2018 WL 4215602 (N.D. Cal. Sept. 5, 2018) ............................................................................................................ 11, 20

*Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 11108111 (N.D. Cal. June 1, 2021).... 21, 23, 24

*RG Abrams Ins. v. Law Offices of C.R. Abrams*, 342 F.R.D. 461 (C.D. Cal. 2022). 15, 20, 22, 23

Sanders v. Los Angeles Cnty., 2019 WL 12831725 (C.D. Cal. Aug. 1, 2019) .......................... 12

*Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290 (11th Cir. 2023) ......................................................................................................................... 17

*Skyline Advanced Tech. Serv's.*, 2020 WL 13093877 (N.D. Cal. July 14, 2020)........... 11, 20, 25

*Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997 (D. Ariz. 2011) .......................... 13, 14

*U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d 600 (9th Cir. 1988)........................................................................................................ 15

*Welter v. Hurt*, 2025 WL 1843263 (C.D. Cal. Apr. 1, 2025).................................................... 23

*Youngevity Int'l Corp. v. Smith*, 2020 WL 7048687 (S.D. Cal. July 28, 2020)........ 11, 15, 17, 19

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)........................................... 12

**RULES**

Fed. R. Civ. P. 37(e)............................................................................................. 11, 12, 25

Fed. R. Civ. P. 37(e)(2) ................................................................................................ 20, 24

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on August 28, 2026, or as soon thereafter as this matter may be heard in Courtroom A, 15th Floor, of the above-titled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs Brand Little, Robin Burns, and Cherry Fisheries ("Plaintiffs"), individually and on behalf of the putative class, will and hereby do move this Court for an order directing Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood – Eureka, LLC; Pacific Seafood – Charleston, LLC, Pacific Seafood – Warrenton, LLC, Pacific Seafood – Newport, LLC, Pacific Seafood – Brookings, LLC, Pacific Seafood – Westport, LLC, and Pacific Surimi – Newport LLC, which collectively do business and are commonly known as a single entity named "Pacific Seafood" (collectively, "Pacific Seafood"), Nor-Cal Seafood, Inc. ("Nor-Cal"), California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc., which collectively do business and are commonly known as a single entity named "Hallmark" (collectively, "Hallmark"), and Bornstein Seafoods, Inc. and Astoria Pacific Seafoods, LLC, which collectively do business and are commonly known as a single entity named "Bornstein" (collectively, "Bornstein" and together with Pacific Seafood, Nor-Cal, and Hallmark, the "Spoliating Defendants") to show cause why the Court should not impose an adverse inference against them to remedy the spoliation of evidence in this matter.

**RELIEF REQUESTED**

Plaintiffs respectfully submit the Court should impose the following adverse inference instruction against the Spoliating Defendants to remedy the loss of evidence:

> [Defendant]'s employee(s) [Name(s)] have deleted, lost, and/or destroyed relevant text message communications. [Defendant] did so by deleting, destroying, or failing to preserve relevant documents after it knew it had an obligation to do so. In your deliberations, you must assume that the evidence destroyed was harmful to their employer in this litigation.

**BACKGROUND**

Defendants in this case are seafood processors and distributors ("Buyers") involved in the ex vessel purchase and re-distribution of Dungeness crab. Defendants are middlemen between

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

commercial crab fishermen ("Crabbers") and direct-to-consumer retailers. Plaintiffs initiated this litigation on March 13, 2023, naming Pacific Seafood and several Does as defendants, alleging, *inter alia,* a scheme among Buyers to fix the ex vessel prices for Dungeness crab caught in the waters of California, Oregon, and coastal Washington (the "Pacific NW Area"). Dkt. 1, ¶¶ 214-32. Plaintiffs alleged, *inter alia,* "Pacific Seafood has illegally fixed the price paid to crabbers (the ex vessel price) for Dungeness crab landed in the Pacific NW Area." *Id.*, ¶ 3. Plaintiffs alleged it did so, in part, through "coercive combinations with other Dungeness crab wholesale buyers." *Id.*, ¶ 4.

On March 15, 2023, Pacific Seafood issued a litigation hold notice, "to employees who were identified to be relevant custodians at that time." Declaration of Stuart Gross ("Gross Dec."), Ex. 1 at 14. The "relevant custodians" included Joe Cincotta, Brett Hester, Brian McLarrin, Ashton Meier, Dan Obradovich, and Tyson Yeck. *Id.* The recipients were instructed to preserve all potentially relevant documents or communications, including documents or communications stored on "personal communication devices, such as tablets and smartphones." *Id.* at 15.

Soon after filing their original complaint, Plaintiffs served subpoenas directed to a number of now-Defendants, including Bornstein, Hallmark, and Nor-Cal, seeking, inter alia, communications between Buyers and between Buyers and Crabbers. *See* Gross Dec., Exs. 2-5. The Court subsequently granted Pacific Seafood's motion to stay discovery, holding, *inter alia*, "[i]n the interim, if plaintiff is concerned that certain third parties may lose or destroy potential evidence, plaintiff may provide those third parties with notice of this case and request that they preserve relevant information." Dkt. 38 at 1. Thereafter, Plaintiff did so, including to Bornstein, Hallmark, and Nor-Cal. *See* Gross Dec., ¶ 28 & Ex. 28. The Court, then, on June 10, 2024, allowed Plaintiffs to conduct limited discovery for the purpose of amending the complaint, including "subpoena[s] [on] five ex vessel buyers for communications concerning ex vessel prices, season opening dates, and purchases from buyers that control certain ports, during the last four seasons." Dkt. 61 at 2 (cleaned up). Soon thereafter, Plaintiffs did so, including subpoenas for such communications served on Bornstein, Hallmark, and Nor-Cal. Gross Dec., ¶ 11-13, Exs. 6-7.

Based, *inter* alia, on the results of that discovery, on August 21, 2024, Plaintiffs filed an amended complaint (the "FAC"), naming additional Defendants, including Nor-Cal, Hallmark, and

Bornstein. Dkt. 218. In the FAC, Plaintiffs expanded on their previous allegations of a price-fixing conspiracy between Buyers, dropping their monopsony claims against Pacific Seafood. *See, e.g.*, FAC, Dkt. 218, ¶¶ 158-398. This and each successive amended complaint has focused on these price fixing allegations and have specifically referenced numerous text message communications by and between Defendants' employees and other buyers fixing the ex vessel Dungeness Crab prices. *See, e.g.*, Dkt. 745 ("6AC"), *passim*. The communications produced in discovery by the Spoliating Defendants contain significant gaps, however; and Plaintiffs have learned that highly relevant text message communications of each of the four Spoliating Defendants have been lost or destroyed.

**A. <u>Pacific Seafood</u>**

Six Pacific Seafood custodians have destroyed relevant text message communications since Pacific Seafood was named as a defendant and it issued a litigation hold notice to these custodians.

***Joe Cincotta***—Joe Cincotta is Pacific Seafood's regional manager for the Central California region. In their original complaint, and in each successive amended complaint, Plaintiffs allege Mr. Cincotta was personally involved, *inter alia,* in instructing other buyers not to deviate from the agreed-upon ex vessel price. *See* Dkt. 1, ¶ 136; 6AC, ¶ 447. In connection therewith, Mr. Cincotta participated in relevant text message exchanges with other Defendants. [redacted]"[1] Gross Dec., Ex. 9 (emphasis added). Mr. Cincotta is also the Pacific Seafood employee who blacklisted Plaintiff Brand Little for speaking out against its market manipulation, 6AC, ¶ 12, and was offered up by Pacific Seafood as a declarant the first time spoliation issues arose, in the summer of 2024, *see* Dkt. 65-7. Two days after this action's filing, Pacific Seafood issued Mr. Cincotta a litigation hold notice, instructing him to preserve his text message communications. Gross Dec., Ex. 1. Nonetheless, all of Mr. Cincotta's text messages sent or received prior to March 23, 2025 have been destroyed. *See* Gross Dec., Ex. 1 at 16-17.

---

[1] [redacted]



GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

First, in October 2024—approximately two months after the FAC's filing—Mr. Cincotta's personal iPhone "fell into Humboldt Bay while he was working on the dock." *Id.* at 16. Pacific Seafood had not collected any documents from Mr. Cincotta's device in the intervening year and a half between the case's filing and the destruction of Mr. Cincotta's phone. And Mr. Cincotta had not backed up, synced, or otherwise preserved any of the messages contained on that device. As a result, all messages contained on Mr. Cincotta's original device have been permanently lost. *Id.*

Thereafter, Pacific Seafood did not attempt to make a collection from Mr. Cincotta's replacement iPhone or apparently take any actions to ensure that he was preserving messages in that phone, until April 22, 2025. *Id.* During that collection, Pacific Seafood discovered that Mr. Cincotta had an active 30-day auto-delete setting for text messages active on his replacement phone. *Id.* As a result, all messages sent or received between October, 2024 and March 23, 2025—during which Defendants' price-fixing continued unabated, *see*, e.g., 6AC, ¶¶ 268-276—have been deleted. Notably, the 30-day auto-delete function is not a default setting; thus, he must have affirmatively changed the settings on his iPhone to activate the auto-delete. Gross Dec., ¶ 10.

***Brett Hester***—Brett Hester was a Dock Manager at Pacific Seafood. He is referenced by name in the operative complaint and in prior complaints, in part, because of his efforts to recruit Confidential Fish Buyer #1, Ozzie Gregorio, into Defendants' price fixing conspiracy. *See* 6AC, ¶¶ 263, 406-408. In particular, the 6AC includes screenshots of text messages Mr. Hester sent Mr. Gregorio, threatening violence for paying more than the cartel price. 6AC, ¶ 408. These messages were only obtained from Mr. Gregorio—a third party—after a full ESI extraction from his device was conducted at Plaintiffs' expense. Gross Dec., ¶ 62. Hester's price coordination with Nor-Cal's Kevin Lee is also described in the 6AC. *Id.*, ¶ 396. Mr. Hester also texted about the ex vessel price of Dungeness crab, including buying out crab to squeeze out independent "white van" live buyers. [redacted] Gross Dec., Ex. 11. [redacted] *Id.*

Mr. Hester apparently replaced his iPhone in November 2024—approximately three months



GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

after Plaintiffs filed the FAC containing screenshots of his texts. *Id*, Ex. 1 at 18-19. Mr. Hester did not migrate any data to his new device, backup the data on his old phone, or sync his phone with any other devices—meaning he must have, at minimum, declined a prompt from his new device to migrate data from an existing phone during setup and, instead, proceeded through the setup manually, *see id.*, Ex. 12—and no representative or Pacific Seafood took any other steps to preserve his pre-November 2024 text messages. As a result, all of Mr. Hester's text messages sent or received prior to November 2024 have been permanently lost. *Id.*, Ex. 1 at 18-19.

***Brian McLarrin***—Brian McLarrin is Pacific Seafood's General Manager of Processing. He regularly participated in text message chats regarding ex vessel prices being paid to crabbers for Dungeness crab by Pacific Seafood and other buyers and was involved in efforts to bring independent buyers in line with Pacific Seafood's ex vessel pricing. In one exchange [redacted] *Id*, Ex. 13. In another exchange, [redacted] *Id.*, Ex. 14. On March 15, 2023, Mr. McLarrin was issued a litigation hold notice, but Pacific Seafood failed to make a collection of documents from him until May 22, 2025. During that collection, Pacific Seafood discovered Mr. McLarrin had a 30-day auto-delete setting (which, again, is not a default setting) for text messages active on his iPhone. *Id.*, Ex. 1 at 20.

***Ashton Meier***—Ashton Meier is Pacific Seafood's Vice President of Resource Sales. Mr. Meier regularly communicates about ex vessel Dungeness crab prices. [redacted] *Id.*, Ex. 15. On March 15, 2023, Pacific Seafood issued Mr. Meier a litigation hold notice but failed to collect documents from him until April 30, 2025. During that collection, Pacific Seafood discovered that Mr. Meier purchased a new Apple phone in April 2024, over a year after the first complaint was filed, and factory reset the old phone, before giving it to his daughter. Mr. Meier did not migrate any data to the new phone before factory resetting it and

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

did not make any backups of the data on that device. *Id.*, Ex. 1 at 20-21. As with Mr. Hester, configuring the new device without migrating any data from his old phone necessarily required Mr. Meier to opt-out of several set-up prompts to migrate data from an existing phone. *See id.,* Ex. 12.

***Dan Obradovich***—Dan Obradovich is Pacific Seafood's Dungeness Crab "Category Manager" and its Director of Business Development. Mr. Obradovich regularly communicates about setting ex vessel Dungeness crab prices. [redacted] *Id.*, Ex. 16. On March 15, 2023, Mr. Obradovich was issued a litigation hold notice by Pacific Seafood but, again, Pacific Seafood failed to collect documents from Mr. Obradovich until April 24, 2025. During that collection Pacific Seafood discovered that Mr. Obradovich's cell phone contained "very few text messages from before April 2023," suggesting that almost all his text conversations had been manually deleted approximately a month after the filing of this action. *Id.*, Ex. 1 at 21.

***Tyson Yeck***—Tyson Yeck is Pacific Seafood's Vice President of Corporate Key Accounts. Mr. Yeck has regularly communicated about setting ex vessel prices for Dungeness crab. *See, e..g. id.*, Ex. 17 . On March 15, 2023, Mr. Yeck was issued a litigation hold notice by Pacific Seafood but Pacific Seafood again failed to collect his documents until May 13, 2025. During that collection, Pacific Seafood discovered that Mr. Yeck's cell phone contained no text messages from before June 2023, three months after the first complaint was filed—again suggesting that at least some of Mr. Yeck's messages were deleted shortly after learning of the original complaint. *Id.*, Ex. 1 at 22.

Plaintiffs did not learn about these preservation issues until June 12, 2026, when Pacific Seafood responded to Plaintiffs' Third Set of Interrogatories, which asked about efforts to collect text message and other communications. *See* Gross Dec., ¶ 3, Ex. 1. In fact, during the parties' February 3, 2025 Rule 26(f) conference, Pacific Seafood affirmatively represented that a preservation instruction had been issued to all relevant employees, and failed to mention any preservation issues whatsoever. Dkt. 274 (Rule 26(f) Report). In the intervening year and four months of discovery, Pacific Seafood did not raise these issues at any point—including through six

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

successive Joint Case Management Statements—until forced to do so in response to Plaintiffs' Interrogatories, an omission all the more egregious given the previous preservation issues that had arisen with Pacific Seafood. *See* Dkt. 66 at 2 (noting "Pacific Seafood [had] represent[ed] that it has fully complied with its preservation obligations. Hopefully that's true."). It wasn't.

### B. Nor-Cal

On March 20, 2023, Plaintiffs sent a preservation demand to Nor-Cal, addressed to Kevin Lee in his capacity as CEO and CFO, describing the case, outlining the types of documents and communications that Nor-Cal and its employees and representatives were obligated to preserve, including but not limited to text messages with other buyers concerning ex vessel prices for Dungeness crab, and providing notice that subpoenas would be served soon. Gross Dec. Ex., 18. Shortly thereafter, in June 2023, as well as in June, 2024, Plaintiffs served both Mr. Lee and Nor-Cal with subpoenas seeking, *inter alia,* communications concerning ex vessel prices of Dungeness crab and the commercial ex vessel market, none of which they responded to. *Id.*, Exs. 9, 10, 13.

On January 30, 2026, Plaintiffs met and conferred with Nor-Cal about the gaps in their ESI production. *Id.*, ¶ 29. In a follow-up letter responding to Plaintiffs' questions, Nor-Cal stated that its counsel had failed to pass Plaintiffs' preservation notices onto their clients, and Nor-Cal's custodians had been deleting messages "on an almost daily basis" since Plaintiffs' notices had been sent. *Id.*, Ex. 19. In particular, Nor-Cal has been unable to produce messages from Vicky Nowlin, a Nor-Cal representative who worked closely with Mr. Lee, or from Todd Kirkland, a custodian Nor-Cal identified as having relevant ESI. *Id.* Plaintiffs have since learned that counsel for Nor-Cal had only told Ms. Nowlin and Mr. Kirkland to preserve documents relevant to this action once, orally, sometime in 2025. *Id.* Further, Nor-Cal's responses to Plaintiffs' Third Set of Interrogatories show that Nor-Cal did not make any effort to capture and preserve any text messages until April 2026. Gross Dec., Ex. 20. Nor-Cal's proffered excuse for these failings is that Ms. Nowlin and Mr. Kirkland used "flip phones." *Id.*, Ex. 20.

Ms. Nowlin engaged in highly relevant text message communications. Most notably, Ms. Nowlin closely coordinated with Hallmark (another Spoliating Defendant). On February 28, 2023, for example, Ms. Nowlin texted Mr. Lee "Hallmark paying 2.50 for crab tomorrow[,]"

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

demonstrating advance knowledge of Hallmark's pricing moves that could not have come from crabbers reporting prices other Buyers were paying. *Id.*., Ex. 21. And in other exchange, Ms. Nowlin advised that Confidential Fish Buyer # 1, Ozzie Gregario, was paying a higher price than Nor-Cal and Hallmark at the Port of Brookings. . Mr. Lee responded, "U do your best please. Make sure you let hallmark know the problem. Why we have to paying 3.75. Because that idiot paying 4.00. We don't want boat go over to him." *Id.*, Ex. 22. Mr. Kirkland's messages are completely unavailable as a result of his almost daily deletions. *Id.*, ¶ 34.

### C. <u>Hallmark</u>

Hallmark has failed to take any steps to preserve, let alone collect, relevant communications from Mike Ryder, who formerly worked as Hallmark's dock manager in the Port of Brookings, and terminated him from the company without even obtaining contact information sufficient to facilitate a third-party subpoena. Mr. Ryder was Hallmark's Port Manager for the Port of Brookings, Oregon. Gross Dec. Ex. 23. On June 28, 2026, counsel for Hallmark informed Plaintiffs that Mike Ryder left Hallmark on April 24, 2025, "doesn't text," and was never given a preservation letter. Gross Dec., ¶ 35. The representation that Mr. Ryder "doesn't text" was apparently based on an oral conversation with Scott Adams—another Hallmark employee, who is referenced by name in the operative complaint. *Id.*; *see also* 6AC, ¶¶ 264-265, 395, 589.

Mr. Adams's representation that Mr. Ryder "doesn't text" is false. On May 5, 2023, for example, Nor-Cal's Kevin Lee texted with Mr. Ryder to complain about the price competition that Ozzie Gregorio was creating by offering higher prices and to coordinate elimination of that competition, Mr. Ryder, apparently without first being asked, texted Mr. Lee, "Triple g Ozzie is in port paying $4.75[.]"Mr. Lee, in response, state "Don't let boat go to them[.]" To which, Mr. Ryder replies, "I won't[.]" Further down, Mr. Lee responds, "U help me Trying get all craber there. Kick him out[.]" *Id.* Mr. Ryder replies "Ok[.]" Later Mr. Lee complains, "Because him . I have to paying Trinidas 4.50 today[.] I only paying 3.75 Trinidas Last few pickup." Gross Dec., Ex. 24. And, in another exchange between them, Mr. Lee confirmed "[t]he same as every year, that we working together." *Id.*, Ex. 25. Mr. Adams's assertion that Mr. Ryder "doesn't text" is particularly incredible, because discovery from Nor-Cal's Kevin Lee shows that Mr. Adams and Mr. Lee

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

***discussed Mr. Lee speaking with Mr. Ryder.*** On April 8, 2020, for example, Mr. Adams texted Mr. Lee "Do you want to buy crab in Brookings?" Further down, Mr. Lee responded, "I've been buying 1 day a week. I'll let Mike know so talk to him on deliveries after today." *Id*., Ex. 26.

Following the June 28, 2026 meet and confer, Hallmark informed Plaintiffs that Mr. Ryder had left the company over a year ago and Hallmark refused Plaintiffs' request that Hallmark attempt to collect documents from his device. *Id*, Ex. 27. Plaintiffs then requested Mr. Ryder's physical address so that Plaintiffs could subpoena Mr. Ryder to ascertain what text communications, if any, had been preserved on his device. *Id.*, ¶ 36. Hallmark has represented it does not have a physical address for Mr. Ryder, providing only a P.O. Box, making service of a subpoena impracticable. *Id*.

This is the second time Hallmark has allowed one of its custodians to depart without first taking measures to collect or preserve their relevant text messages. *See* Dkt. 334. On December 2, 2023, Crystal Adams left her position as an assistant plant manager with Hallmark. Gross Dec., Ex. 23 at 12. According to Hallmark's counsel, she subsequently traded in her phone and transferred no data from her old phone to her new phone and claimed that she generally only texted with crabbers, rather than other buyers*. See id.*, Ex. 28 at 1 & Ex. 29. Ms. Adams is specifically alleged to have retaliated against crabbers that sell crab for higher prices to non-cartel buyers, *see* 6AC, ¶¶ 492-6, and texted with crabbers in connection with such actions, *see* Gross Dec., Ex. 30. Thus, while her claim that she didn't text with other buyers is false, *see id.*, Ex. 31, even if true, highly relevant text messages between her and crabbers were lost when she chose to delete them.

**D. <u>Bornstein</u>**

On August 19, 2024, Bornstein identified Marco Vargas, at the time a General Manager, as a custodian for whom they were preserving documents. *Id.*, Ex. 32 at 1. Nonetheless, Mr. Vargas factory reset his company phone, on or around February 13, 2025, before leaving the company. *Id.*, Ex. 33 at 2. On November 21, 2025, Plaintiffs asked Bornstein to confirm whether Mr. Vargas was a current or former employee and to collect Mr. Vargas's text message communications. *Id.*, Ex. 34 at 1-2. Bornstein did not disclose the preservation issues with Mr. Vargas's company phone and, instead, advised Plaintiffs to subpoena Mr. Vargas directly since he was no longer a Bornstein

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

employee. *Id.*, Ex. 35 at 2. Plaintiffs duly served a subpoena on Mr. Vargas on January 21, 2026.[2] *See Id,* Ex. 36. In his Responses and Objections, served on April 14, 2026, Mr. Vargas advised that he had no responsive text message communications because he was no longer in possession of his company phone. *Id.*, Ex. 37. Afterwards, Plaintiffs renewed their request to Bornstein that it produce responsive text messages from Mr. Vargas's company device. *Id.,* Ex. 38. In response, Bornstein advised Plaintiffs for the first time that "the device had been reset prior to its return to Bornstein in connection with Mr. Vargas's departure. As a result, no text messages from Mr. Vargas's company-issued phone are available to be produced." *Id.*, Ex. 33 at 2. In response to Plaintiffs' request for additional information about the steps Bornstein took to preserve Mr. Vargas's data, Bornstein refused to provide any information about its collection or preservation efforts, citing attorney client and attorney work product privilege. *Id.* at 1; Ex. 39.

Mr. Vargas engaged in highly relevant communications with individuals outside of Bornstein. An exchange between Safe Coast's Max Boland and Nor-Cal's Kevin Lee discusses speaking with Mr. Vargas and is reproduced in Plaintiffs' 6AC, for instance. 6AC, ¶ 321 ("Mr. Boland then texted Mr. Lee inquiring: "When did Bornstein go to 3.75? What are you at for cook?" Mr. Lee replied: "I just talked to marco [at Bornstein] this morning he said starting today 3.75 but nothing to cook today."). Internal Bornstein text message threads also indicate that Mr. Vargas had conversations about ex vessel pricing with other Spoliating Defendants. [redacted] Gross Dec., Ex. 40. And Mr. Vargas also communicated with crabbers about pricing. [redacted] *Id.*, Ex. 41.

## LEGAL STANDARD

The duty to preserve attaches as soon as a party is on notice that litigation is likely. See *Laub v. Horbaczewski*, 2020 WL 7978227, at *19 (C.D. Cal. Nov. 17, 2020). Rule 37(e) of the

[2] This followed further delays where Bornstein's counsel first agreed to accept service of the subpoena on Mr. Vargas's behalf, and then insisted on formal service. *See* Gross Dec., Ex. 44

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Federal Rules of Civil Procedure governs the loss of electronically stored information ("ESI") and provides the framework for relief. Sanctions are available when ESI "'that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery.'" *Jones v. Riot Hosp. Grp., LLC*, 95 F.4th 730, 735 (9th Cir. 2024) (quoting Fed. R. Civ. P. 37(e)).

If that occurs, the rule provides two tiers of relief. Under Rule 37(e)(1), "upon finding prejudice to another party from loss of the information," the court "may order measures no greater than necessary to cure the prejudice." Under Rule 37(e)(2), if a court finds that the party "acted with the intent to deprive another party of the information's use in the litigation," it may "presume that the lost information was unfavorable to the party," and may "instruct the jury that it may or must presume the information was unfavorable to the party," or may dismiss the action or enter default judgment. Under the latter, a separate showing of prejudice is not required. *Jones*, 95 F. 4th at 736; Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 Amendment ("Subdivision (e)(2) does not require any further finding of prejudice."). Proof of spoliation is by a preponderance of the evidence. *Youngevity Int'l Corp. v. Smith*, 2020 WL 7048687, at *2 (S.D. Cal. July 28, 2020).

Conduct is "culpable," warranting a mandatory inference instruction, if the non-moving party "acted with the intent to deprive another party of the information's use in litigation." *See Skyline Advanced Tech. Serv's.*, 2020 WL 13093877, at *11 (N.D. Cal. July 14, 2020). Such intent is shown "'when the evidence shows or it is reasonable to infer, that…a party purposefully destroyed evidence to avoid its litigation obligations.'" *Id.* (quoting *Porter v. City & Cty. of San Francisco*, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018)) (emphasis added). Relevant factors supporting a reasonable inference of intent include, *inter alia*, "'the timing of the destruction, the method of deletion (e.g., automatic deletion vs. affirmative steps of erasure), selective preservation, the reason some evidence was preserved, and, where relevant, the existence of institutional policies on preservation.'" *Dish Network L.L.C. v. Jadoo Tv, Inc.*, 2022 WL 11270394, at *3 (quoting *Laub*, 2020 WL 7978227, at *6). Upon such a showing, a mandatory inference instruction is appropriate where it cures the spoliation and no lesser remedy would be adequate. See *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *13 (C.D. Cal. 2021). Where the Court finds prejudice but not

intent, Rule 37(e)(1) authorizes "measures no greater than necessary to cure the prejudice," including precluding the spoliating party from relying on the absence of the destroyed evidence, permitting evidence and argument regarding the loss, and awarding fees. *See Lopez v. Apple, Inc.*, 2024 WL 4561320 (N.D. Cal. July 17, 2024). Where reasonable minds could disagree on intent, the Court may submit that question to the jury under a conditional adverse-inference instruction. *See Dish*, 2022 WL 11270394, at *4; *Aramark*, 2021 WL 864067, at *16.

## ARGUMENT

### I. Defendants' Lost and Destroyed Evidence After Their Obligation To Preserve Arose

"'A party must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence.'" *Morehead v. City of Oxnard*, , 2023 WL 8143973, at *3 (C.D. Cal. Oct. 4, 2023) (quoting *Sanders v. Los Angeles Cnty.*, 2019 WL 12831725, at *2 (C.D. Cal. Aug. 1, 2019)). Spoliation of evidence is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation.'" *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (quoting *Hernandez v. Garcetti*, 68 Cal. App. 4th 675, 680 (1998)). To establish that spoliation has occurred, the moving party must "show that categories of irreplaceable relevant documents were likely lost[.]" *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 553 (N.D. Cal. 2018). There is no question that spoliation has occurred here.

#### A. Pacific Seafood

Pacific Seafood's obligation to preserve documents arose, at the latest, on March 16, 2023, when it was served with the original complaint. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). Nonetheless, highly relevant documents were lost or destroyed by multiple custodians over several years following that date:

- Joseph Cincotta destroyed relevant text messages in October, 2024, when his phone ended up in Humboldt Bay, without he or Pacific Seafood having made backups or taken any other step to preserve these messages. His subsequent messages were then routinely deleted through April 22, 2025, when, for the first time, Pacific Seafood attempted to collect his relevant text message communications and learned he had put in place a 30-day auto-delete setting. Because iPhones

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

store message history "forever" by default, this required an affirmative step by Mr. Cincotta to change the setting in or around October, 2024, when he configured his new phone.

- Brett Hester destroyed relevant text messages in November 2024, when he replaced his phone without making a backup or migrating his data.
- Brian McLarrin had his phone set to automatically delete relevant text messages, until April 22, 2025, when Pacific Seafood, for the first time, tried to collect text messages from his phone.
- Ashton Meier destroyed relevant text messages, in April 2024, when he factory reset his existing phone, without making any backup or taking any other perseveration measures.
- Dan Obradovich and Tyson Yeck manually deleted almost all their text message communications, shortly after the filing of the original complaint.

The "incomplete and spotty," *Anheuser-Busch, Inc. v. Nat. Beverage Distributor*s, 69 F.3d 337, 354 (9th Cir. 1995), discovery that Plaintiffs have received about these individuals' text messages show they were involved in highly relevant conversations, which were contained on their devices. Accordingly, a significant category of highly relevant text messages involving key Pacific Seafood custodians were permanently lost, well after it was obligated to preserve, but during a time in which it appears to have never checked whether "even a single [] custodian was at all in compliance" with its litigation hold. *Apple Inc. v. Samsung Electronics Co.*, 881 F. Supp. 2d 1132, 1147–48(N.D.Cal.2012)(finding that such a failure was "more than sufficient to show willfulness"); *see also MGA Ent., Inc. v. Harris*, , 2023 WL 2628225, at *4 (C.D. Cal. Jan. 5, 2023)("A company cannot merely instruct its employees to not delete files and call it a day; it must take meaningful steps to ensure that its preservation and retention policies are carried out.")

### B. <u>Nor-Cal</u>

Nor-Cal's obligation to preserve documents arose, at the latest, on June 1, 2023 when it received a subpoena seeking relevant text message communications related to the ex vessel prices for Dungeness crab. *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) ("[T]he duty to preserve is triggered 'not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.'") (quoting *Morford v. Wal–Mart Stores, Inc.*, 2011 WL 635220, at *3 (D.Nev. Feb. 11,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

2011)). Nonetheless, Vicky Nowlin and Todd Kirkland deleted *all of* their text messages "on almost a daily basis" over a period of over three years after service of the subpoena. Notably, Nor-Cal failed to make any effort to preserve relevant communications during that time, and counsel failed to even convey to custodians the preservation letter sent by Plaintiffs' counsel. The sum of Nor-Cal's efforts to preserve these documents appears to have been a single oral conversation sometime in 2025. And failure to take any steps to preserve ESI, as is the case with Nor-Cal, is itself sufficient to show willful destruction. *See Apple.*, 881 F. Supp. 2d at 1147–48.

**C. <u>Hallmark</u>**

Hallmark was on notice of its obligation to preserve Mike Ryder's and Crystal Adams' text messages by, at the latest, May 31, 2023, when it received a subpoena. *See Surowiec*, 790 F. Supp. 2d at 1007. Despite this, it relied on a single conversation between Scott Adams and counsel to conclude that Mr. Ryder "didn't text," and failed to preserve or collect Mr. Ryder's messages, and it made no effort to collect or preserve Ms. Adams' text messages. Now, both have left Hallmark, Ms. Adams' having deleted all her text messages upon departure, and Hallmark unwilling to seek Mr. Ryder's text messages or even to provide a last known physical address that might facilitate service of a third-party subpoena on Mr. Ryder. Consequently, their messages are lost.

**D. <u>Bornstein</u>**

Bornstein's duty to preserve also arose, at the latest, on May 31, 2023, when it received a subpoena. *Surowiec*, 790 F. Supp. 2d at 1007. Nonetheless, it evidently made no effort to preserve or backup Mr. Vargas's text message communications, and Mr. Vargas affirmatively factory reset his company phone when he left the company in February 2025—six months after Bornstein was named as a defendant—wiping all existing data. It subsequently concealed this fact for over a year, choosing instead to resist Plaintiffs' discovery efforts to avoid detection of their spoliation issues.

The "incomplete and spotty" discovery that remains still shows that all of these individuals—with the exception of Mr. Kirkland for whom no text messages exist—engaged in communications in furtherance of Defendants' price-fixing conspiracy. *See* Background *supra*.

Courts in the Ninth Circuit have found spoilation in far less egregious circumstances. *See Apple*, 888 F. Supp 2d at 999 (failure to issue a litigation hold notice or otherwise preserve relevant

evidence for twelve months after its duty to preserve arose warranted adverse inference instruction); *In re Cathode Ray Tube Antitrust Litig.*, 2023 WL 5667882, at *3 (N.D. Cal. Jan. 27, 2023) (failure to suspend automatic email deletion policy warranted adverse inference). Spoliation should be clearly be found here with regards to all of the Spoliating Defendants.

## II. Plaintiffs Are Prejudiced By The Spoliation Of These Documents

"If spoliation is shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation" because that party "is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing.'" *Apple*, 888 F. Supp. 2d at 998 (cleaned up); *see also Youngevity*, 2020 WL 7048687, at *3 (once spoliation is shown, the burden shifts to the spoliating party). "The prejudice inquiry looks to whether the [spoliating party's] actions impair [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quoting *U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)). The Ninth Circuit has instructed that a party is prejudiced by spoliation where it is "forced to rely on incomplete and spotty evidence" at trial. *Anheuser-Busch, Inc*, 69 F.3d at 354. In short, the prejudice to the moving party depends on the relevance of the information that has been lost, and the ease with which the moving party can mitigate that loss through other discovery. *See, e.g., Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1236 (N.D. Cal. 2022).

Here, Defendants' spoliation prejudices Plaintiffs because the lost documents are (1) highly relevant to Plaintiffs' price fixing allegations, and (2) the loss of these documents cannot be mitigated through discovery from other Defendants or other custodians. Plaintiffs are thus forced to proceed to trial with an "incomplete and spotty" record of relevant communications about price setting and price coordination between Defendants. *See Anheuser-Busch, Inc*, 69 F.3d at 354.

Text message communications between Buyers and between Buyers and Crabbers are the most important category of documentary evidence in this case. They are crucial to establishing a complete picture of the price-fixing agreements in place and the activities in furtherance thereof. *See RG Abrams Ins. v. Law Offices of C.R. Abrams*, 342 F.R.D. 461, 507–08 (C.D. Cal. 2022) (agreeing that destroyed texts "may be the only documentary evidence of the conspiracy Plaintiffs

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

allege to have occurred," finding the spoliation "'threatened to distort the resolution of the case'" because "any number of text messages could have revealed conspiratorial discussions among the Defendants") (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 960 (9th Cir. 2006)); *see also In re Google Play*, 664 F. Supp. 3d at 994 (finding prejudice because "relevant, substantive business communications were made on Chat that plaintiffs will never see, to the potential detriment of their case"). Texts are particularly important as they show, in real time, how Defendants coordinate the prices they are paying, and will pay, crabbers (as well as, in some circumstances, whether they will offer a price at all) and work to recruit and retaliate against Buyers who diverge from their price fixing scheme. Indeed, this Court held that reproductions of these messages in prior iterations of the operative complaint plausibly alleged a price-fixing conspiracy. *See* Dkt. 242 at 1–2, 5–7.[3] Moreover, a general knowledge that certain individuals were engaging in such communications cannot replace specific information about the timing and substance of the individual messages exchanged, which can, in turn, be lined up with price movements showing the causal result of the messages. The exact wording of these messages is equally important to show agreement between Defendants that they move their prices in concert. And finally, individual messages are important to show the mechanics of the price fixing conspiracy at issue. Mr. Lee's assertion to Mr. Ryder that they are "working together" the same as every season, for example, does not replace messages about the ***mechanics*** of that cooperation, which would have been exchanged between Ms. Nowlin and Mr. Kirkland, on the one hand, and Mr. Ryder, on the other.

Text messages are also uniquely important because discovery has shown they are in fact the most common means by which Defendants communicated with each other, other Buyers, and with crabbers. *See* 6AC, *passim*; Gross Dec., ¶ 16. Further, text message communications are more valuable evidence than testimony or phone records because they create a contemporaneous written record of the parties' exchange. Deposition testimony about, for example, conversations between employees of Buyers is necessarily limited by imperfect recollections and witnesses' natural reluctance to testify to activities adverse to their interests. *Cf. Est. of Schuck v. Cnty. of San Diego*,

[3] Communications from buyers to crabbers are also relevant because they show efforts to conceal price cheating, and refute the theory that crabbers, not buyers, dictate market prices for crab.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

2025 WL 2180987, at *8 (S.D. Cal. Aug. 1, 2025), *report and recommendation adopted*, 2025 WL 3033407 (S.D. Cal. Oct. 9, 2025) (testimony could not replace spoliated video evidence); *see also Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1313 (11th Cir. 2023) ("[D]eposing workers well after an event is not a perfect substitute for reviewing their contemporaneous text messages.")

And the prejudice caused by the loss of the messages cannot be mitigated through discovery from other parties or other custodians. First, Plaintiffs cannot recover communications ***between*** the spoliating individuals through additional discovery. The partial discovery of Nor-Cal's Kevin Lee's text messages demonstrates the problem. Mr. Lee's messages show Hallmark's Mike Ryder was "working together" with Nor-Cal and Mr. Lee. Gross Dec., Ex. 25. Other messages show that Nor-Cal's Vicky Nowlin knew Hallmark's intended prices a day in advance, and was instructed by Kevin Lee to explain Nor-Cal's pricing decisions to Hallmark. *Id.*, Ex. 22. This conduct, and the details of the arrangement go to the core of the price fixing conspiracy at issue in this litigation. But messages between Mr. Ryder and Ms. Nowlin, where, for example, they would have discussed and agreed upon the 2.50 price, are completely unavailable through discovery because both their messages are lost. *Cf.* Gross Dec. Ex. 25. That is exactly the kind of loss courts find incurable: where "some of the [spoliating parties] have spoliated text messages over the same time periods,…it is not possible to obtain text messages that may have been exchanged between them during these periods because both the sender and receiver have lost all text messages." *Youngevity*, 2020 WL 7048687, at *4; *see also Hunters Capital, LLC v. City of Seattle*, 2023 WL 184208, at *7 (W.D. Wash. Jan. 13, 2023) (loss incurable where the spoliating party "has not recovered any deleted text messages exchanged directly between" the two spoliating custodians); *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("Plaintiffs are unable to recover text messages that the two individuals sent only to each other."). And produced text messages and other evidence indicate that all of the Spoliating Defendants were directly in contact with one another and took actions to fix ex vessel prices together. *See, e.g.,* Dkt. 714 at 11-20 & Dkt. 714-1 to 714-22. So, to the extent Mr. Ryder, who was instrumental in coordinating with Nor-Cal, also coordinated with, for example Pacific Seafood's Mr. Cincotta or Mr. Hester, or Bornstein's Mr.

Vargas, those messages are completely lost. Multi-participant internal Bornstein chats show that, for example, Mr. Vargas was receiving information about Hallmark's pricing offers. *See* Background *supra.* But Plaintiffs do not have any of the messages where Mr. Vargas obtained that price information, or details about what Mr. Vargas offered in return. As a result, Plaintiffs are completely deprived of discovery into communications between the spoliating individuals at Pacific Seafood, Nor-Cal, Hallmark and Bornstein, to say nothing of the communications between these spoliating individuals and representatives of non-Defendant Buyers, who Plaintiffs allege were participants (coerced and otherwise) in the Defendants price-fixing conspiracy, *see, e.g.,* 6AC, ¶¶ 259-264, 385-447, 451-452.

This is not a small issue. For the 2023/24 season, the Spoliating Defendants accounted for 32.2% of the total crab buyer market share. *Id.*, ¶ 64. That accounts for nearly half of the total market share of the Defendant Buyers for that season. *Id.* Thus, except where a completely different cast of employees engaged in the price setting, Plaintiffs are missing a complete record of the price fixing activities of nearly half the conspiracy by market share.

Crucially, the spoliating custodians—with the exception of Kirkland for whom no texts have been recovered—are all individuals Plaintiffs can identify as having actually engaged in price fixing with other Buyers. *See* Background, *supra*. Plaintiffs have a penumbra of text message communications with non-spoliating Defendants and internal communications within the Spoliating Defendants that show there is a missing body of relevant communications by and between the spoliating individuals. *Id.*; *see also Jones*, 95 F.4th at 735 (affirming dismissal based on "ample circumstantial evidence that Jones intentionally destroyed a significant number of text messages and collaborated with others to do so"). This fact is compounded by "the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." *Apple Inc.*, 888 F. Supp. 2d at 989 n.9. In short, consistent with the messages Plaintiffs have received in discovery, common sense dictates that the individuals who have spoliated their text message communications are the ones most likely to have other messages where they coordinate prices with their competitors as well.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Second, Plaintiffs cannot replace ***internal*** communications between spoliating individuals. Pacific Seafood, in particular, has six custodians involved in price setting who spoliated their text messages. Communications between, for example, Brett Hester and Joe Cincotta would be a likely source for messages showing Pacific Seafood organizing efforts to coordinate prices across buyers and to coerce other Buyers into paying the agreed-upon price. And Mr. Hester and Mr. Cincotta have texted each other after November 2024 (the earliest date for which any of their text messages are available from either custodian). [redacted] *Id.* But all communications between them prior to November 2024 are completely unavailable.

Third, Plaintiffs must rely on an incomplete list of relevant contacts from each Defendant. To Defendants' continual chagrin, Plaintiffs have amended their list of relevant crabber and buyer contacts for purposes of document searches multiple times for exactly this reason. Gross Dec., ¶ 59. No Defendant has identified a complete list of the relevant external buyer and crabber contacts with whom their employees communicated. *Id.* Plaintiffs have had to compile a list iteratively based on the documents received in discovery. *Id.*, ¶ 60. The loss of text message communications from eleven custodians, representing four Defendants, who collectively hold nearly half the conspiracies' market share, significantly hampers the effort to identify the names of individuals that all Defendants communicated with about price. *See Youngevity*, 2020 WL 7048687, at *4 (loss could not be cured where spoliating parties "have not disclosed the identity of third parties who they may have exchanged messages with during the spoliating windows," so those third parties "cannot be deposed").

Fourth, communications sent to crabbers are relevant to Plaintiffs' claims. Among other things, these communications may show efforts to conceal cheating on the price-fixing conspiracy, by telling crabbers not to tell anyone the price they had been paid; or they may tie a price offer to prior coordination between buyers. Those communications are effectively lost from the spoliating individuals. Prejudice is not cured by the theoretical availability of messages from "third parties to

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

whom Plaintiff [] did not send Rule 45 subpoenas," *Paisley Park*, 330 F.R.D. at 235, and even "subpoenaing the cell phone carriers would be a futile act," *RG Abrams*, 342 F.R.D. at 506–07, as the carriers have confirmed they do not have records of texts sent or received, Gross Dec., ¶ 63.

Finally, even the discovery Plaintiffs receive from non-spoliating Defendants is necessarily limited by deletions that occurred before the duty to preserve arose and reviewer error. Safe Coast's production of communications between Max Boland and Joe Cincotta, for example, does not ensure that Plaintiffs have the same record they would have received if Mr. Cincotta produced his own records. For example, in one exchange between the two men, Mr. Cincotta sent what appears to a screenshot of a text message to Mr. Boland, which Mr. Boland responded: "Price setting. Isn't that illegal? One of my fisherman, after I showed him the text. Tell him to suck my dick. These guys are a dime a dozen." Gross Dec., Ex. 43. Because Plaintiffs' efforts to get a copy of the apparent screenshot from Safe Coast have been unsuccessful, Mr. Cincotta's spoliation means this likely highly incriminating piece of evidence has been lost. Accordingly, the complete loss of text message communications from eleven highly relevant custodians prevents Plaintiffs from uncovering a complete record of those communications as well.

Altogether, "the loss of an entire source of documents significantly hampers plaintiffs' ability to prepare and prosecute their case." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d at 1077. And this prejudice far exceeds the prejudice in cases where the Ninth Circuit has affirmed even case-dispositive spoliation sanctions. *See, e.g., Jones*, 95 F.4th at 735.

## III. <u>Defendants Intentionally Deprived Plaintiffs of Relevant Information</u>

Here, "'the evidence shows [or] it is reasonable to infer, that ... [the Spoliating Defendants] purposefully destroyed evidence to avoid [their] litigation obligations.'" *Skyline Advanced Tech. Serv's.*, 2020 WL 13093877, at *11 (quoting *Porter*, 2018 WL 4215602, at *3). Intent under Rule 37(e)(2) "is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones*, 95 F.4th at 735. Courts have found, however, that a party acted "with intent to deprive" within the meaning of Rule 37(e)(2), where there was a "'brazen failure to take reasonable steps to preserve'" relevant documents. *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 340 (D. Ariz. 2022) (quoting *Edwards v. Junior State of Am.*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Found.*, 2021 WL 1600282, at *8 (E.D. Tex. Apr. 23, 2021)). Thus, in *Fast*, the Court found a custodian "acted with intent to deprive" when she "unsent" a Facebook message to a relevant individual after her duty to preserve arose, notwithstanding her claim that the message was "intended for her husband." *Id*. at 341. Evidence of selective deletion strongly supports an inference of intent to deprive as well, even where the moving party cannot show that every message deleted was deleted intentionally. *See Jones*, 95 F.4ths at 735-36 (affirming intent finding where the plaintiff "affirmatively selected certain text messages for deletion while otherwise preserving text messages sent around the same time," notwithstanding that the forensic specialist "could not confirm that every deletion of a text message was intentional or quantify the intentional deletions" (quoting 22022 WL 3682031, at *10)). Intent to deprive can also be inferred from the timing of deletions. *See Est. of Schuck*, 2025 WL 2180987, at *9 (court "'infers from the timing of the deletion of emails and texts that Defendants intended to deprive Plaintiffs of such information'") (quoting *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *11 (C.D. Cal. Feb. 27, 2020), *report and recommendation adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020)). Finally, efforts to conceal or delay discovery of spoliation is evidence of an intent to deprive. *See Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 11108111, at *2 (N.D. Cal. June 1, 2021) (finding willful spoliation where "delays in discovery and Defendants' maneuvering . . . [were] part of a concerted effort by [Defendants] and their counsel to conceal [one defendant's] evidentiary spoliation").

In this case, the Spoliating Defendants acted through a mix of affirmative destruction of relevant evidence, brazen failure to preserve relevant messages, suspiciously timed purges of their cellular devices, and obfuscation of the document destruction after it occurred.

Pacific Seafood's Joe Cincotta, Brett Hester, and Ashton Meier each destroyed or wiped their existing cellular devices in late 2024, over a year and a half after Pacific Seafood was named as a Defendant in this action, but soon after the filing of the FAC, which focused on communications (and, in particular, text messages) between Buyer representatives. Mr. Cincotta's phone ended up in Humboldt Bay in October 2024, two months after Plaintiffs filed their FAC. Mr. Hester replaced his phone without backups or data migration a month later, in November 2024.

And Mr. Meier wiped his phone completely and gave it to his daughter earlier that year, in April 2024. *Compare with RG Abrams Ins.*, 342 F.R.D. at 508-09 (trading in cell phones after litigation began and failing to disclose for months showed intent to deprive); *Lee v. Cnty. of Los Angeles*, 2025 WL 2505484, at *8 (C.D. Cal. Aug. 29, 2025), *reconsideration denied*, 2025 WL 3211209 (C.D. Cal. Oct. 14, 2025) (finding "intent to deprive" where defendant upgraded employee cellular devices without preserving data on the existing devices). In all cases, Messrs. Cincotta, Hester, and Meier did not have backups saved, and, in the case of Messrs. Hester and Meier elected not to migrate or backup any of the existing text messages. Mr. Cincotta then changed default settings on his new device to select a 30-day auto-delete function, ensuring that none of his messages were preserved until 30 days prior to Pacific Seafood's first collection attempt, on April 22, 2025. *Compare with Lopez v. Apple, Inc.*, 2024 WL 4561320 (N.D. Cal. July 17, 2024) (failure to suspend automatic deletion and narrowing of ESI retention policies warranted submitting question of intent to deprive to the jury). Additionally, Messrs. Obradovich and Yeck manually deleted substantially all their text messages in mid-2023, more than three months after filing of the original complaint. And Mr. McLarrin used a 30-day auto delete setting continuously until April 2025. Altogether, Pacific Seafood's spoliation comprises affirmative acts to delete or destroy relevant evidence, selective deletion, and suspicious timing combined with the lack of any reasonable efforts taken to back up preserve or transfer data and no effort to bring the matter to Plaintiffs' attention.

Nor-Cal's Vicky Nowlin manually deleted her text messages "almost on a daily basis" for nearly two years while this litigation was pending, and while Plaintiffs were actively seeking discovery from Nor-Cal, and despite a preservation instruction from Nor-Cal's counsel (which, itself, was over half a year too late). *Compare with Leon*, 464 F.3d at 959 (affirmatively deleting files and writing over data was intentional spoliation). That is a "brazen disregard" for their preservation obligations. Nor-Cal knew that Plaintiffs sought these communications for years before finally changing their deletion practices. And an "almost on a daily basis" deletion practice cannot possibly be the result of an inadvertent failure to change a setting. It would (1) be unmistakable to the individuals that this was occurring; and (2) would require routine, manual deletion of text messages that Nor-Cal knew Plaintiffs were seeking in discovery.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Hallmark, too, showed a "brazen disregard" for its preservation obligations by failing to collect from Mike Ryders phone for years, ultimately allowing him to leave the company without any effort to backup, collect, or otherwise preserve his communications and doing the same with regards to Crystal Adams' text messages as she walked out the door. *See Lee*, 2025 WL 2505484, at *8 (finding "intent to deprive" where employer failed to preserve data on employees' cellular devices); *RG Abrams*, 342 F.R.D. at 508–09 (intent shown where phones were traded in after litigation began and the loss was concealed for months). And Hallmark's reliance on Scott Adam's assertion that Mr. Ryder "doesn't text" is particularly galling, given that Mr. Adam texted with Mr. Lee *about* talking to Mr. Ryder. *See Fast*, 340 F.R.D. at 340 (spoliators inability to give a credible explanation for the spoliation weighs in favor of finding of "intent to deprive"). Further, Hallmark has frustrated any effort to obtain third-party discovery by failing to obtain, or at least refusing to provide to Plaintiffs, any physical address for Mr. Ryder upon his departure. Hallmark also neglected to advise Plaintiffs that Mr. Ryder was departing or that they had failed to collect and preserve relevant text messages, and has refused to even make a request to Mr. Ryder that he provide access to his phone. *See Proofpoint, Inc.*, 2021 WL 11108111, at *2 ("discovery maneuvering" to conceal spoliation showed intent to deprive).

Finally, Bornstein allowed Marco Vargas to wipe cell phone when he left the company, years after it was on notice of its preservation obligations, and six months after it was named a defendant in this action. *Welter v. Hurt*, 2025 WL 1843263 (C.D. Cal. Apr. 1, 2025) (deletion of Google Workspace without backups showed "intent to deprive"). Affirmatively wiping ESI from a device after a party is on notice of its obligation to preserve is clear evidence of intent to deprive. *See Leon*, 464 F.3d at 959 (affirmatively deleting files and writing over data on a laptop to remove "personal" files from a device with potentially relevant information was intentional spoliation). Bornstein then sent Plaintiffs on a wild goose chase in an apparent effort to conceal their preservation issues. Despite knowing that Mr. Vargas had factory reset his company phone, Bornstein first advised Plaintiffs they needed to take third-party discovery, then responded—through the same counsel—that Mr. Vargas did not have possession of that device, and only revealed the destruction of his relevant messages after months of questions from Plaintiffs. *See*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Proofpoint, Inc.*, 2021 WL 11108111, at *2.

In all, each Defendant has engaged in a mix of affirmative acts to destroy relevant documents, disregard for their obligations to preserve relevant text messages, and attempts to obscure their preservation issues. Pacific Seafood adds to the mix a suspicious clustering of deletions and destructions of messages around the filings of the original case and FAC. In these circumstances, the evidence overwhelmingly supports the inference that all Spoliating Defendants acted intentionally.

## IV. **An Adverse Inference is the Proper Remedy**

An adverse inference instruction is the proper remedy for spoliation where it mitigates the loss of relevant information, and no lesser sanction would do so adequately. *Aramark Mgmt., LLC v. Borgquist*, , 2021 WL 864067, at *13 (C.D. Cal. 2021). In fashioning the appropriate sanction, the most important consideration is the prejudice to the moving party. *See In re Napster,* 462 F.Supp.2d at 1077. When the evidence lost is "among the most important evidence in this case" and "irretrievably lost, it is not clear what other measures would suffice to cure the prejudice to Plaintiffs." *Aramark Mgmt., LLC*, 2021 WL 864067, at *13. And when a spoliating party has acted with the intent to deprive, the Court may "presume that the lost information was unfavorable to the party" and "instruct the jury that it may or must presume the information was unfavorable." Fed. R. Civ. P. 37(e)(2)(A)–(B).

Here, the prejudice to Plaintiffs is substantial. *See* Section II, *supra*. Plaintiffs have lost the most important category of direct documentary evidence of price fixing from ten custodians known to have engaged in price fixing (as well as one for whom not texts exist), representing four Defendants, who collectively hold roughly half of Defendants' overall market share. *Id.* Plaintiffs thus respectfully submit at trial the Court should instruct the jury, for each Spoliating Defendant:

> [Defendant]'s employee(s) [Name(s)] have deleted, lost, and/or destroyed relevant text message communications. [Defendant] did so by deleting, destroying, or failing to preserve relevant documents after it knew it had an obligation to do so. In your deliberations, you must assume that the evidence destroyed was harmful to their employer in this litigation.

This is consistent with the remedies taken by other courts. *See, e.g.*, *Lee*, 2025 WL 2505484, at *21 (imposing irrebuttable adverse-inference where the employer wiped its custodians' phones after

receiving a preservation notice); *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 994 (N.D. Cal. 2023) (finding in a Sherman Act price-fixing case that Google "intended to subvert the discovery process" and Chats were lost "with the intent to deprive another party of the information's use in the litigation"). And, in fact, is a less severe sanction than courts have imposed in similar circumstances. *See, e.g., Skyline Advanced Tech. Servs.*, 2020 WL 13093877 at *11 (willful destruction of laptop warranted dispositive sanction).

Evidentiary sanctions short of an adverse inference cannot remedy the spoliation that has occurred here. Limiting instructions, for example, cannot make up the gap in the ***affirmative evidence*** of price coordination and pricing agreements between Buyers that the missing text messages would provide.

Alternatively, if the Court is unable conclude whether some of the Spoliating Defendants acted purposefully with regards to some or all of their spoliating custodians, the question of intent should be submitted to the jury with a conditional adverse-inference instruction. *See Dish*, 2022 WL 11270394 at *4 (imposing, under Rule 37(e)(1), an adverse-inference instruction modeled on CACI 204, under which the jury determines "whether the destruction was intentional and whether the [evidence] was unfavorable"); *Lopez v. Apple, Inc.*, 2024 WL 4561320 (N.D. Cal. July 17, 2024) (submitting intent to the jury where "reasonable minds could disagree" whether the failure to preserve was intentional); *Aramark*, 2021 WL 864067, at *16 (same). In that case, Plaintiffs request that the same instruction to the jury above be given conditioned on an intent finding by the jury: if the jury finds that a Spoliating Defendant destroyed evidence with the intent to deprive another party of its use, the jury must assume the destroyed evidence was unfavorable to that Defendant. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (jury "may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive").

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit the Court should grant Plaintiffs' Motion and enter an order requiring that the jury be instructed to adopt the proposed adverse inference against the Spoliating Defendants.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Dated: July 22, 2026

Respectfully submitted,

By: */s/ Stuart G. Gross*

Stuart G. Gross (SBN 251019)
Jan W. A. Jorritsma (SBN 326772)
Travis H.A. Smith (SBN 331305)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628
*sgross@grosskleinlaw.com*
*jjorritsma@grosskleinlaw.com*
*tsmith@grosskleinlaw.com*

Matthew W. Ruan (SBN 264409)
*Samantha Gupta (admitted pro hac vice)*
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
*mruan@fklmlaw.com*
*sgupta@fklmlaw.com*

Matthew S. Weiler (SBN 236052)
Raymond S. Levine (SBN 348030)
**SCHNEIDER WALLACE COTTRELL KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100
mweiler@schneiderwallace.com
*rlevine@schneiderwallace.com*

Todd R. Gregorian (SBN 236096)
Jonathan G. Tamimi (SBN 305493)
**FENWICK & WEST LLP**
One Front Street, Floor 33
San Francisco, CA 94111
(415) 875-2300
*tgregorian@fenwick.com*
*jtamimi@fenwick.com*

*Counsel for Plaintiffs and the Proposed Classes*