Stuart G. Gross (SBN 251019)
Jan W. Jorritsma (SBN 326772)
Travis H.A. Smith (SBN 331305)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628

*Attorneys for Plaintiffs and the Proposed Classes*
[additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **BRAND LITTLE**, **ROBIN BURNS,** and **CHERRY FISHERIES INC.**, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>**PACIFIC SEAFOOD PROCUREMENT, LLC; PACIFIC SEAFOOD PROCESSING, LLC; PACIFIC SEAFOOD FLEET, LLC; PACIFIC SEAFOOD DISTRIBUTION, LLC; PACIFIC SEAFOOD USA, LLC; DULCICH, INC.; PACIFIC SEAFOOD – EUREKA, LLC; PACIFIC SEAFOOD – CHARLESTON, LLC;  PACIFIC SEAFOOD – WARRENTON, LLC; PACIFIC SEAFOOD – NEWPORT, LLC; PACIFIC SEAFOOD – BROOKINGS, LLC; PACIFIC SEAFOOD – WESTPORT, LLC; PACIFIC SURIMI – NEWPORT LLC; BLUE RIVER SEAFOOD, INC.; SAFE COAST SEAFOODS, LLC; SAFE COAST SEAFOODS WASHINGTON, LLC; OCEAN GOLD SEAFOODS, INC.; NOR-CAL SEAFOOD, INC.; KEVIN LEE; AMERICAN SEAFOOD EXP, INC.; CALIFORNIA SHELLFISH COMPANY,** | Case No. 3:23-cv-01098-AGT<br><br>**SIXTH AMENDED CLASS ACTION COMPLAINT**<br><br>Judge:  Honorable Alex G. Tse<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**INC.; ROBERT BUGATTO ENTERPRISES, INC.; ALASKA ICE SEAFOODS, INC.; LONG FISHERIES, INC.; CAITO FISHERIES, INC.; CAITO FISHERIES, LLC; SOUTHWIND FOODS, LLC; FISHERMEN'S CATCH, INC.; GLOBAL QUALITY FOODS, INC.; GLOBAL QUALITY SEAFOOD LLC; OCEAN KING FISH INC.; BORNSTEIN SEAFOODS, INC.; ASTORIA PACIFIC SEAFOODS, LLC; DA YANG SEAFOOD INC.; GREAT OCEAN SEAFOOD, INC.; PACIFIC DREAM SEAFOOD, INC.; JOHN CAITO; JOSEPH CAITO; JAMES CAITO; JEANETTE CAITO; and DOES 37-60,**

Defendants.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 2

PARTIES ............................................................................................................................. 4

I.      Plaintiffs ................................................................................................................ 4

II.     Defendants ............................................................................................................. 5

        A.    Pacific Seafood Defendants ......................................................................... 5

        B.    Safe Coast Defendants .............................................................................. 11

        C.    Ocean Gold Defendant ............................................................................. 12

        D.    Nor-Cal Defendants .................................................................................. 13

        E.    ASE Defendant .......................................................................................... 14

        F.    Hallmark Defendants ................................................................................ 14

        G.    Fathom Defendants .................................................................................... 15

        H.    Caito Defendants ....................................................................................... 16

        I.    Fishermen's Catch Defendant .................................................................... 19

        J.    Global Quality Defendants ........................................................................ 20

        K.    Ocean King Defendant .............................................................................. 20

        L.    Bornstein Defendants ................................................................................ 21

        M.    Da Yang Defendants .................................................................................. 21

        N.    Pacific Dream Defendant .......................................................................... 25

        O.    Doe Defendants ......................................................................................... 25

III.    Agents and Co-Conspirators ............................................................................... 25

JURISDICTION, VENUE, AND COMMERCE ............................................................. 27

INTRADISTRICT ASSIGNMENT ................................................................................. 27

FACTUAL ALLEGATIONS ........................................................................................... 28

I.      Pacific NW Area Ex Vessel Dungeness Crab Industry ...................................... 28

II.     Defendants' Price-Fixing Cartel ........................................................................ 31

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

A.   Defendants' Cartel Arose Out of a Marked Increase in Dungeness Ex Vessel Prices Being Paid to Crabbers in the Pacific NW Area that Started in 2006/2007 Season and Continued Through the 2014/15 Season ................................................................. 31

B.   Defendants Have Agreed to Allow Pacific Seafood to Set the Opening Price, which Has Resulted in Delayed Opening and a Lower Opening Price, which Is the Price at which a Large Portion of the Season's Catch Is Traditionally Sold and Which Sets the Baseline Price for the Remainder of the Season ................................................................. 35

C.   After the Opening, Defendants Closely Coordinate With One Another on Ex Vessel Prices ................................................................. 45

D.   Defendants Have Consolidated Their Control of the Pacific NW Area Ex Vessel Dungeness Crab Market by Purchasing and in Many Cases Shutting Down Erstwhile Competitors, Entering Into Exclusivity Arrangements with Port Operators, and Limiting Non-Cartel Members' Access to Hoists ................................................................. 53

E.   To Eliminate Price Pressure Formerly Created by Out of Port Buyers, Defendants Have Agreed to Buy and Sell "Out the Back Door" ................................................................. 58

F.   Defendants Aggressively Coerce Compliance by Each Other and by Other Buyers with the Agreed Upon Pricing ................................................................. 61

G.   In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Crabbers who Sell Crab Ex Vessel for Prices Higher than the Cartel Price ................................................................. 77

III.   Buyers Who Are Not Part of the Cartel, Nonetheless, Generally Obey Its Pricing Dictates in Order to Avoid Retaliatory Actions by Defendants ................................................................. 81

IV.   Da Yang Is a Member of the Cartel ................................................................. 81

A.   Da Yang Is a Frequent Participant in the Remarkably Numerous Calls that Occur Amongst Cartel Members ................................................................. 81

B.   Da Yang's Representatives Regularly Communicate with Other Cartel Members in Order to Fix the Ex Vessel Prices Paid to Crabbers ................................................................. 84

ANTITRUST INJURY ................................................................. 102

DELAYED DISCOVERY/FRAUDULENT CONCEALMENT ................................................................. 108

CLAIMS FOR RELIEF ................................................................. 110

FIRST CAUSE OF ACTION ................................................................. 110

SECOND CAUSE OF ACTION ................................................................. 111

THIRD CAUSE OF ACTION ................................................................. 113

FOURTH CAUSE OF ACTION ................................................................. 114

FIFTH CAUSE OF ACTION......................................................................................114

SIXTH CAUSE OF ACTION ....................................................................................115

SEVENTH CAUSE OF ACTION ..............................................................................116

PRAYER FOR RELIEF .................................................................................................116

DEMAND FOR JURY TRIAL .......................................................................................117

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Plaintiffs Brand Little ("Little"), and Robin Burns ("Burns"), and Cherry Fisheries Inc. ("Cherry Fisheries") (collectively, "Plaintiffs") on behalf of themselves and all others similarly situated (collectively, the "Class"), allege, on information and belief based upon the investigation of counsel, except where based on personal knowledge, against Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood – Eureka, LLC; Pacific Seafood – Charleston, LLC,  Pacific Seafood – Warrenton, LLC, Pacific Seafood – Newport, LLC, Pacific Seafood – Brookings, LLC, Pacific Seafood – Westport, LLC, and Pacific Surimi – Newport LLC, which collectively do business and are commonly known as a single entity named "Pacific Seafood" (collectively, "Pacific Seafood"), Blue River Seafood, Inc.; Safe Coast Seafoods, LLC; Safe Coast Seafoods Washington, LLC, which collectively do business and are commonly known as a single entity named "Safe Coast" (collectively, "Safe Coast"), Ocean Gold Seafoods, Inc. ("Ocean Gold"), Nor-Cal Seafood, Inc. "Nor-Cal"), Kevin Lee, American Seafood Exp, Inc. ("ASE"), California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc., which collectively do business and are commonly known as a single entity named "Hallmark" (collectively, "Hallmark"), Alaska Ice Seafoods, Inc. and Long Fisheries, Inc., which collectively do business and are commonly known as a single entity named "Fathom Seafood" (collectively, "Fathom Seafood"), Caito Fisheries, Inc., Caito Fisheries, LLC, and Southwind Foods, LLC, which collectively do business and are commonly known as a single entity named "Caito" (collectively, "Caito"), Fishermen's Catch, Inc. ("Fishermen's Catch"), Global Quality Foods, Inc., Global Quality Seafood LLC, which collectively do business and are commonly known as a single entity named "Global Quality Seafood" (collectively, "Global Quality"), Ocean King Fish Inc. ("Ocean King"), Bornstein Seafoods, Inc. and Astoria Pacific Seafoods, LLC, which collectively do business and are commonly known as a single entity named "Bornstein" (collectively, "Bornstein"), Da Yang Seafood Inc. ("Da Yang"), Pacific Dream Seafood, Inc. ("Pacific Dream"), John Caito, Joseph Caito, James Caito, and Jeanette Caito (collectively, "Caito Siblings"), as well as Does 37-60, (collectively, "Defendants"), as follows:

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

1

...

**INTRODUCTION**

1. Plaintiff Brand Little, Cherry Fisheries, and the Class are the approximately 1,400 independent commercial crabbers who land Dungeness crab in California, coastal Washington (which excludes Puget Sound), and Oregon (collectively the "Pacific NW Area"). Plaintiff Robin Burns was married to one of those crabbers, Kenny Burns, who died in 2021 after years spent earning his living from the sea.

2. Over the decades, the Dungeness crab fishery has become the most important fishery for Pacific NW Area commercial fishers and the families and communities that depend on them.

3. In the mid-2000s, the prices paid by Defendants and other buyers to Pacific NW Area crabbers for their crab—what is referred to in the fishing industry and herein as the "ex vessel price," which means the price off the boat—started to climb as increased demand for Dungeness crab in Asia and elsewhere translated into higher ex vessel prices.

4. Defendants are effectively middlemen between crabbers and consumers who enjoy the crab that the crabbers risk their lives to catch and deliver to the port.

5. They do not risk their lives on the Pacific Ocean in 12 foot long-period winter swells bearing down from the Bering Sea. They do not go into debt to pay for million-dollar boats and hundreds of thousands of dollars of gear. They do not catch the crabs.

6. Rather, for the most part, Defendants simply write a check to crabbers, have someone truck or fly the crabs to another middleman buyer or retail outlet customer like a grocery store or restaurant.

7. Nonetheless, in advance of the 2015/16 Pacific NW Area Dungeness crab season, Defendants decided to form a cartel of Pacific NW Area Dungeness crab buyers that had the purpose and effect of driving down the ex vessel price of Dungeness crab in the Pacific NW Area, so that the Defendants could earn higher profits. . . so the middlemen can make even more money than the people doing the work and risking their lives.

8. As in detail alleged herein, Defendants, led by Pacific Seafood, have created a pricing cartel that has artificially fixed, depressed, and controlled the ex vessel price paid to

...

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

crabbers in the Pacific NW Area since the beginning of the 2015/16 season, through the employment of a variety of means, including, without limitation:

a. agreeing not to compete with each other on the price offered to crabbers at the opening of the Dungeness crab season, instead, giving Pacific Seafood the authority to set that price for all Defendants at artificially low levels;

b.  agreeing to delay the opening of some Dungeness crab seasons until later in the year when consumer demand would be lower and cause less upward pressure on early-season prices, which in turn set a benchmark and starting point for prices that would be paid for the rest of the season;

c. coordinating the ex vessel prices they pay to crabbers in the Pacific NW Area as the season progresses;

d. policing compliance by Defendants and other buyers with the artificially low ex vessel price set by the cartel; and

e. agreeing not to purchase Dungeness crab directly from crabbers in ports where they lack a presence but rather, instead, to acquire such crab "out the backdoor" from their fellow Defendants with a presence in the port (thereby eliminating what had previously been one of the principal drivers of in-season price increases).

9. These allegations are based *inter alia* on text messages and other documents produced by Defendants, detailed records from the California, Washington, and Oregon Departments of Fish and Wildlife, and percipient information provided by industry participants, including an individual whose recent entrance into the Pacific NW Area Dungeness crab ex vessel market was met first by concerted attempts by Defendants to bring the new entrant into their pricing cartel and, when that failed, with threats and retaliation.

10. Defendants' actions as alleged herein constitute a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 in violation of the California Cartwright Act, Cal. Bus. and Prof. Code, §§ 16720, *et seq*., and California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200, *et seq.*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

3

11.     Plaintiffs, on behalf of themselves and those similarly situated, respectfully seek remedies for this illegal conduct including compensation for their injuries suffered as a result and appropriate injunctive relief.

**PARTIES**

**I.     Plaintiffs**

12.     Plaintiff **BRAND LITTLE** ("Little") is an individual residing in Auburn, California. Little has been a commercial fisherman since 2004 and fishes for Dungeness crab, black cod, salmon, and other species in the waters off the coast of California, landing fish from his fishing vessel, the Pale Horse and his previous vessels, in various California ports, including San Francisco and Crescent City. In addition to his fishing business, Mr. Little operates a seafood retail business that operates at farmers markets and through which he sells both fish he has caught himself and fish purchased from other sources, including Pacific Seafood. During the proposed class period of January 1, 2016 to the present (the "Class Period"), Mr. Little sold Dungeness crab ex vessel to Defendant Pacific Seafood-Eureka, LLC, Unnamed Co-conspirator #1, and Unnamed Co-conspirator #2 in the Pacific NW Area. This includes sales to Defendant Pacific Seafood-Eureka, LLC during the 2018/19 Dungeness crab season, sales to Unnamed Co-conspirator #1, in four of the last five seasons, and Unnamed Co-conspirator #2, in the 2023/24 season. Prior to Pacific Seafood's acquisition of Pezzolo Seafood, in 2022, during the period of January 2021 through February 2022, Little sold crab to Pezzolo Seafood. After Pacific Seafood acquired Pezzolo, he agreed to sell his Dungeness crab to Pacific Seafood, as Pezzolo's successor in interest, during the 2022/2023 season. However, like some other members of the Class, Little was made the subject of a group boycott by Pacific Seafood when he refused this season to comply with Pacific Seafood with regard to ex vessel prices. In reaction to statements by Little protesting Pacific Seafood's manipulation of the Dungeness crab market and refusal to offer a price during negotiations, Pacific Seafood's General Manager for Processing Southern Division, Joe Cincotta, made clear that Pacific Seafood would not purchase crab (or anything else) from him; Pacific Seafood also instructed other fish buyers in the Pacific NW Area not to purchase crab from Little.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

During the Class Period, Plaintiff Little caught and sold Dungeness crab ex vessel in the Pacific NW Area at ex vessel prices that were artificially depressed by Defendants' unfair and illegal anticompetitive activities.

13.     Plaintiff **ROBIN BURNS** ("Burns") is an individual residing in Eureka, California. Plaintiff Burns' late husband, Kenneth Burns, was a life-long fisherman who fished for Dungeness crab, in addition to other species, throughout California and Oregon up until his passing in September of 2021. Ms. Burns stands in the place of her late husband and asserts the claims contained herein on his behalf. During the Class Period, Kenneth Burns sold Dungeness crab in the Pacific NW area to: Defendant Ocean Gold Seafoods, Inc. in the 2015/16 season; Defendant Robert Bugatto Enterprises, Inc. in the 2017/18 season; Defendant Pacific Seafood – Eureka LLC in the 2016/17, 2018/19, and 2019/20 seasons; Defendant Nor-Cal Seafood Inc. in the 2019/20 season, and Defendant American Seafood Express Inc. in the 2020/21 season. During the Class Period until his death in September of 2021, Mr. Burns caught and sold Dungeness crab ex vessel in the Pacific NW Area at ex vessel prices that were artificially depressed by Defendants' unfair and illegal anticompetitive activities.

14.     Plaintiff **CHERRY FISHERIES INC**. ("Cherry Fisheries") is an Oregon corporation which operates two fishing vessels, the Four Winds and the Stormy C.  During the Class Period, Cherry Fisheries sold Dungeness crab ex vessel to Defendant Pacific Seafood - Warrenton, LLC and Pacific Dream Seafood, Inc. This includes sales to Defendant Pacific Seafood – Warrenton, LLC during the 2017-2018 and 2019-2020 Dungeness crab seasons, and sales to Defendant Pacific Dream Seafood, Inc. during the 2022-2023, 2023-2024, and 2024-2025 Dungeness crab seasons.

## II. Defendants

### A.     Pacific Seafood Defendants

15.     Defendant **PACIFIC SEAFOOD PROCUREMENT, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Procurement is Defendant Dulcich, Inc. Pacific Seafood

Procurement, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "procurement of fresh and frozen seafood products."

16. Defendant **PACIFIC SEAFOOD PROCESSING, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Processing is Defendant Dulcich, Inc. Pacific Seafood Processing, in its most recent annual report filed with the Oregon Secretary of State, describes its business as the "purchase, manufacture, and sale of seafood products." Pacific Seafood Processing, LLC is the sole owner of a number of limited liability companies associated with particular processing plants that Pacific Seafood has acquired in the NW Pacific Area, including: Pacific Seafood - Brookings, LLC; Pacific Seafood - Charleston; Pacific Seafood - Eureka, LLC; Pacific Seafood - Newport, LLC; Pacific Seafood -Warrenton, LLC; Pacific Seafood – Westport, LLC; and Pacific Seafood – Woodland, LLC.

17. Defendant **PACIFIC SEAFOOD FLEET, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Fleet is Defendant Dulcich, Inc. Pacific Seafood Fleet, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "ownership of commercial fishing vessels."

18. Defendant **PACIFIC SEAFOOD DISTRIBUTION, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Distribution is Defendant Dulcich, Inc. Pacific Seafood Distribution, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "distribution of fresh and frozen seafood products." Pacific Seafood Distribution is the sole member of a number of limited liability companies in the NW Pacific Area, including: Pacific Seafood – Los Angeles, LLC; Pacific Seafood – Portland, LLC; Pacific Seafood – Seattle, LLC;

19. Defendant **PACIFIC SEAFOOD USA, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood USA is Defendant Dulcich, Inc. Pacific Seafood USA, in its most

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

recent annual report filed with the Oregon Secretary of State, describes its business as "domestic sale of fresh and frozen seafood products."

20. Defendant **DULCICH, INC**. is an Oregon corporation with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The president and 100% owner of Dulcich, Inc. is Frank Dulcich.

21. Defendant **PACIFIC SEAFOOD – EUREKA, LLC** is a California limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood-Eureka is Defendant Pacific Seafood Processing, LLC. During the relevant time period, all ex vessel purchases of Dungeness crab before 2019 by Pacific Seafood from class members in California were conducted through Pacific Choice Seafood Company, the predecessor in interest to Pacific Seafood-Eureka. During the relevant time period, all ex vessel purchases of Dungeness crab during or after 2019 by Pacific Seafood from class members in California were conducted through Pacific Seafood-Eureka.

22. Defendant **PACIFIC SEAFOOD – CHARLESTON, LLC** is an Oregon limited liability company with a principal place of business of 63501 Boat Basin Road, Charleston, OR. The sole member of Pacific Seafood Charleston is Defendant Pacific Seafood Processing, LLC. Pacific Seafood - Charleston, LLC in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing and distribution." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in Winchester Bay, Brookings, and Charleston, Oregon were conducted through Pacific Seafood – Charleston, LLC.

23. Defendant **PACIFIC SEAFOOD – WARRENTON, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Warrenton is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Warrenton, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in Astoria, Garibaldi, and Pacific City, Oregon were conducted through Pacific Seafood – Warrenton, LLC.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

24.     Defendant **PACIFIC SEAFOOD – NEWPORT, LLC** is an Oregon limited liability company with a principal place of business of 623 SW Bay Blvd, Newport, OR. The sole member of Pacific Seafood Newport is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Newport, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "purchase, manufacture, and sale of seafood products." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in Newport and Depoe Bay, Oregon were conducted through Pacific Seafood – Newport, LLC.

25.     Defendant **PACIFIC SEAFOOD – BROOKINGS, LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Seafood Brookings is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Brookings, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "seafood processing." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in Brookings, Oregon were made through Pacific Seafood – Brookings, LLC.

26.     Defendant **PACIFIC SEAFOOD – WESTPORT, LLC** is a Washington limited liability company with a principal place of business of 1980 N. Nyhus St., Westport, WA. The governing entity of Pacific Seafood Westport is Defendant Pacific Seafood Processing, LLC. Pacific Seafood Westport, in its most recent annual report filed with the Washington Secretary of State, describes its business as "seafood processing and distribution." During the relevant time period, all ex vessel purchases of Dungeness crab by Pacific Seafood from class members in Washington were made through Pacific Seafood – Westport, LLC.

27.     Defendant **PACIFIC SURIMI – NEWPORT LLC** is an Oregon limited liability company with a principal place of business of 16797 SE 130th Ave., Clackamas, OR. The sole member of Pacific Surimi Newport is Defendant Pacific Seafood Processing, LLC. Pacific Surimi Newport, in its most recent annual report filed with the Oregon Secretary of State, describes its business as "manufacture and sale of surimi seafood products." During the relevant time period,

ex vessel purchases of Dungeness crab by Pacific Seafood from class members in various Oregon ports were made through Pacific Surimi – Newport, LLC.

28. Does 1 through 7 are substituted with Defendants Pacific Seafood - Eureka, LLC, Pacific Seafood - Charleston, LLC, Pacific Seafood - Warrenton, LLC, Pacific Seafood - Newport, LLC, Pacific Seafood - Brookings, LLC, Pacific Seafood - Westport, LLC, Pacific Surimi - Newport LLC.

29. Defendants Pacific Seafood Procurement, LLC, Pacific Seafood Distribution, LLC, Pacific Seafood Processing, LLC, Pacific Seafood USA, LLC, Dulcich, Inc., Pacific Seafood - Eureka, LLC, Pacific Seafood - Charleston, LLC, Pacific Seafood - Warrenton, LLC, Pacific Seafood - Newport, LLC, Pacific Seafood - Brookings, LLC, Pacific Seafood - Westport, LLC, Pacific Surimi - Newport LLC, collectively and through wholly owned subsidiaries do, and/or have done during the relevant period, business and are commonly known as a single entity referred to by their employees, customers, and suppliers (including Dungeness crab fishers) as "Pacific Seafood," "Pacific Choice," "Choice," and "No Choice." The defendants described in the paragraph are collectively referred to herein as "Pacific Seafood."

30. When doing business with crabbers, other fishers, and the public, the various entities making up Pacific Seafood present themselves as a single vertically integrated company. Pacific Seafood's website, www.pacificseafood.com, accordingly describes itself as a single "family owned" company, "employing more than 3,000 team members across 41 facilities in 11 states." It further states "Pacific Seafood manages all parts of the supply chain from harvesting/fishing to processing, and distribution." The website also touts the breadth of Pacific Seafood's footprint in the seafood industry—listing more than 40 species sold by it.

31. Pacific Seafood was started in 1941 by the grandfather of Frank Dulcich, who ultimately owns and controls all the named Pacific Seafood-related Defendants.

32. Pacific Seafood refuses to participate in industry rankings that have traditionally been conducted by fishing industry publications, such as SeafoodSource, or to publicly provide information regarding its sales. However, in 2012, it was identified by the Portland Business Journal as the nation's largest seafood company with revenues of more than $1 billion that year.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

33.     Since 2012, Pacific Seafood has only grown larger, engaging in an aggressive acquisition strategy that has included—in addition to the former Dungeness crab processing companies discussed below—acquisitions of, and/or substantial investments in, by Pacific Seafood entities or Mr. Dulcich himself, large former competitors, such as Defendant Ocean Gold, Inc. and American Seafood, as well as smaller companies, such as Keltic Seafood, with an apparent focus on seafood processors.

34.     Thus, while the same article from 2012 cited above describes Pacific Seafood as employing 2,500 people at seven locations, Pacific Seafood's website now describes it as employing 3,000 people at 41 locations. And the same Portland business journal reported that, in 2021, Pacific Seafood "enjoyed record profits."

35.     Following his acquisition of Pacific Seafood from his family in 1994, Mr. Dulcich's mother was forced to sue him to receive the money promised in the transaction and other family members sued him alleging fraud and other financial misconduct.

36.     Among those in the seafood industry not related to Mr. Dulcich, he and Pacific Seafood have become known for brazen and ruthless anticompetitive tactics. In particular, Mr. Dulcich and Pacific Seafood have used their size and ability to withstand substantial discrete losses to inflict significant financial consequences on those who do things contrary to Mr. Dulcich's or Pacific Seafood's desires or instruction.

37.     Indeed, Mr. Dulcich has been clear for years about his ambitions and his methods. Mr. Dulcich is known to instruct his managers to "use and abuse" rival companies and "kill our allies last." He has also been explicit about his willingness to use unfair and illegal practices to achieve his aims. When a crabber complained to Dulcich about Pacific Seafood's cheating on the agreed-upon price for Dungeness crab, Dulcich responded: "I'm going to fuck you on the price or fuck you on the weight, which one do you want?"

38.     This attitude has resulted in repeated litigation by fishers and competing fish processors against Pacific Seafood, including one, *Whaley v. Pac. Seafood Grp.*, No. 1:10-CV-3057-MC (D. Or.) ("*Whaley*"), in which—following certification of a litigation class—the class's Sherman Act (§§ 1 & 2) were resolved, in 2012, through a settlement that required Pacific

Seafood to take certain actions and refrain from others for a period of five years.

39.    It has also resulted in successful criminal prosecutions of Pacific Seafood for both environmental crimes and theft from fishers, as well as thousands of cited regulatory violations.

40.    Pacific Seafood's principal representatives in the Pacific NW Dungeness crab ex vessel market include Frank Dulcich, Dan Obradovich, Rick Harris, Brett Hester, John Moody, and Joe Cincotta.

**B.    Safe Coast Defendants**

41.    Defendant **BLUE RIVER SEAFOOD, INC.** is a California corporation with a principal place of business of 25447 Industrial Blvd., Hayward, CA. Chris Lam is Blue River Seafood's Chief Executive Officer and Chief Financial Officer. Ha Lam is the company's Secretary.

42.    Defendant **SAFE COAST SEAFOODS, LLC** is a California limited liability company with a principal place of business of 25447 Industrial Blvd., Hayward, CA. Safe Coast Seafood's manager and CEO is Christopher Lam.

43.    Defendant **SAFE COAST SEAFOODS WASHINGTON, LLC** is a Washington limited liability company with a principal place of business of 25447 Industrial Blvd., Hayward, CA. Safe Coast Seafood Washington's Governor is Christopher Lam.

44.    Defendant Blue River Seafood, Inc., which does business as Pucci Foods, owns 100% of Safe Coast Seafood and Safe Coast Seafood Washington.

45.    Blue River Seafood, Inc., Safe Coast Seafood, LLC, and Safe Coast Seafood Washington, LLC, collectively, do, and/or have done during the relevant period, business as Safe Coast, Safe Coast Seafood, Safe Coast Seafood WA, Jessie's Ilwaco Fish Co Inc, Pucci Foods, and Pucci, and are collectively referred to herein as "Safe Coast."

46.    Confidential Buyer Informant #1 has done frequent business with Safe Coast during the relevant period. The checks he receives from Safe Coast in the course of such business are from Pucci Foods.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

47. Safe Coast's principal representatives in the Pacific NW Dungeness crab ex vessel market include its General Manager, Max Boland, who also worked in that position for Safe Coast's predecessor in interest, Alber Seafood. Safe Coast acquired Alber Seafood in early 2021.

48. Safe Coast's Max Boland described Pucci Foods as Safe Coast's parent in an exchange with Confidential Fish Buyer #1.

49. Jessie's Ilwaco Fish Co Inc. went into receivership in 2020, after which landings stopped. Following the receivership, Safe Coast started making landings in Ilwaco, WA, in 2021.

50. Before going into receivership, Jessie's Ilwaco Fish Co Inc. received a substantial investment from Frank Dulcich.

51. During the relevant time period, ex vessel purchases of Dungeness crab by Safe Coast from class members in Crescent City and San Francisco, California were made through Safe Coast Seafood, LLC.

52. During the relevant time period, ex vessel purchases of Dungeness crab by Safe Coast from class members in Ilwaco, Nahcotta, Bay Center, Chinook, and Westport, Washington, and Newport and Astoria, Oregon were made through Safe Coast Seafood Washington., LLC.

53. Does 8, 9, and 10 are substituted with Safe Coast Seafood, LLC and Safe Coast Seafood Washington, LLC.

**C.     Ocean Gold Defendant**

54. Defendant **OCEAN GOLD SEAFOODS, INC.** is a Washington corporation with a principal place of business of 1804 N Nyhus St, Westport, WA. Ocean Gold Seafoods, Inc. does, and/or has done in the relevant period, business as Ocean Gold and is referred to herein as "Ocean Gold."

55. The 2012 settlement of the *Whaley* case—which alleged *inter alia* that Pacific Seafood and Ocean Gold conspired to fix ex vessel prices of Pacific whiting—prohibited Pacific Seafood, during the five years of the settlement's term, from renewing an agreement by which Pacific Seafood acted as the exclusive marketer of Ocean Gold's seafood products and required an existing agreement to be amended to remove Pacific Seafood's control over Ocean Gold's ex vessel pricing. These prohibitions ended in 2017, and Ocean Gold's website now states: "Our

markets are primarily international in Eastern Europe and Asia. Our marketing partner, ***Pacific Seafoods, manages the sales piece of our business***."

56.     Ocean Companies Holding Co., LLC, a Washington LLC, lists Frank Dulcich as its governor, the principal office address is 16797 SE 130th Ave, Clackamas, OR, and the email address is legal@pacificseafood.com. Ocean Companies Holding Co., LLC owns 49% of Ocean Gold.

57.     Ocean Gold's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Mark Rydman.

58.     During the relevant time period, Ocean Gold made ex vessel purchases of Dungeness crab from class members in Crescent City, Fields Landing, Trinidad, Vallejo, and San Francisco, California. Ocean Gold also made ex vessel purchases from class members in Westport, Washington and Charleston, Astoria, and Newport, Oregon.

59.     Doe 11 is substituted with Ocean Gold Seafoods, Inc.

**D.     Nor-Cal Defendants**

60.     Defendant **NOR-CAL SEAFOOD, INC.** is a California corporation with a principal place of business of 2810 E 7th St., Oakland, CA.

61.     Defendant **KEVIN LEE** is a California resident residing in the Eastern portion of the San Francisco Bay Area in California. Kevin Lee founded Nor-Cal Seafood, Inc. with his wife, Kathy Lee, in 1992 and has since that time controlled and directed operations of the company.

62.     Nor-Cal Seafood, Inc. and Kevin Lee collectively do, and/or have done in the relevant period, business as Nor-Cal and are collectively referred to herein as "Nor-Cal."

63.     Nor-Cal's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Kevin Lee.

64.     During the relevant time period, Nor-Cal made ex vessel purchases of Dungeness crab from class members in Brookings, Gold Beach, and Port Orford, Oregon and Crescent City, Trinidad, Eureka, Shelter Cove, Half Moon Bay, Alameda, San Francisco, Bodega Bay, Emeryville, Oakland, Fort Bragg, and Marshall, California.

65. Plaintiff Brand Little issued a subpoena to Nor-Cal, on June 12, 2024, pursuant to this Court's order, Dkt. 61, and served it on Nor-Cal's counsel who represented he was authorized to accept service of it. Nor-Cal did not respond to the subpoena, despite several attempts by Plaintiff to elicit a response, resulting in the Court's issuance of an order compelling Nor-Cal's compliance with the subpoena, on August 13, 2024, Dkt. 73. Despite having been served the order, Nor-Cal still has not responded to the subpoena and is in contempt of the Court's order.

66. At a gathering held on or around August 14, 2024, Nor-Cal's principal Kevin Lee bragged at a social gathering that he just "sold" Nor-Cal to evade liability from the instant lawsuit. He stated further that he did so because this was what others in the group recommended he do and what others had done, citing Pacific Seafood and Caito as examples.

67. Does 12 and 13 are substituted with Nor-Cal Seafood, Inc. and Kevin Lee.

**E.    ASE Defendant**

68. Defendant **AMERICAN SEAFOOD EXP, INC.** is a California corporation with a principal place of business of 2029 Ingalls St., San Francisco, CA.

69. American Seafood Exp, Inc.'s predecessor in interest is American Seafood Express, LLC. American Seafood Exp does, and/or has done in the relevant period, business as ASE and is referred to herein as "ASE."

70. ASE's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Kevin Zheng.

71. During the relevant time period, ASE made ex vessel purchases of Dungeness crab from class members in Crescent City, Eureka, Pittsburg, Half Moon Bay, San Francisco, and Fort Bragg, California.

72. Doe 14 is substituted with American Seafood Exp, Inc.

**F.    Hallmark Defendants**

73. Defendant **CALIFORNIA SHELLFISH COMPANY, INC.** is a California corporation with a principal place of business of 505 Beach Street, Suite 200, San Francisco, CA.

74. Defendant **ROBERT BUGATTO ENTERPRISES, INC.** is a California corporation with a principal place of business of 835 Highway One, Bodega Bay, CA.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

75. Robert Bugatto Enterprises, Inc. lists Eugene Bugatto as CEO and Michael Bugatto as Secretary. California Shellfish Company, Inc. lists Eugene Bugatto as CEO and Michael Bugatto as Secretary, and is the registered owner of Hallmark Fisheries and Point Adams Packing. California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc. collectively do, and/or have done during the relevant period, business as Hallmark Seafood, Point Adams Packing, and The Tides and are collectively referred to herein as "Hallmark."

76. Hallmark's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Scott Adams and Crystal Adams.

77. During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in Charleston, Newport, Brookings, Port Orford, and Winchester Bay, Oregon through Hallmark Fisheries.

78. During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in Astoria, Oregon through Adams Point Packing Co. – Hammond.

79. During the relevant time period, Hallmark made ex vessel purchases of Dungeness crab from class members in Bodega Bay, California through Robert Bugatto Enterprises, Inc. and Trinidad and Crescent City through California Shellfish Company Inc.

80. Does 15 and 16 are substituted with California Shellfish Company, Inc. and Robert Bugatto Enterprises, Inc.

**G. Fathom Defendants**

81. Defendant **ALASKA ICE SEAFOODS, INC**. is a Washington corporation with a principal place of business of 1690 Marine View Dr. Ste C, Tacoma, WA. Cody Mills and Solon Fowler are two of three governors of Alaska Ice Seafood, Inc. listed with the Washington Secretary of State. The contact email and physical address listed with the Washington Secretary of State for Alaska Ice Seafood, Inc. are accounting@fathomseafood.com and 1690 Marine View Dr. Ste C, Tacoma, WA.

82. Defendant **LONG FISHERIES, INC.** is an Oregon corporation with a principal place of business of 63469 Kingfisher Rd., Coos Bay, OR, and an official mailing address of

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1690 Marine View Dr. Ste C, Tacoma, WA. Cody Mills and Solon Fowler are listed with the Oregon Secretary of State as Long Fisheries, Inc.'s President and Secretary, respectively.

83. Fathom Seafood is registered as a DBA for Alaska Ice Seafood, Inc. with the Washington Department of Revenue. Long Fisheries is registered as a DBA for both Alaska Ice Seafood, Inc. and Fathom Seafood with the Washington Department of Revenue.

84. Alaska Ice Seafood, Inc. and Long Fisheries collectively do, and/or have done during the relevant period, business as Fathom Seafoods and are collectively referred to herein as "Fathom" and "Fathom Seafood."

85. Fathom Seafood's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Nick Mareno and Cody Mills.

86. During the relevant time period, Fathom Seafood made ex vessel purchases of Dungeness crab from class members in Bodega Bay, and Crescent City, California and Westport, Quillayute, Bellingham Bay, Blaine, Bay Center, Port Angeles, Chinook, and Bay City, Washington through Fathom Seafood, Inc.

87. During the relevant time period, Fathom Seafood made ex vessel purchases of Dungeness crab from class members in Charleston, Brookings, Port Orford, and Winchester Bay, Oregon through Long Fisheries, Inc.

88. During the relevant time period, Fathom Seafood made ex vessel purchases of Dungeness crab from class members in Westport, Tacoma, and Tokeland, Washington through Alaska Ice Seafood, Inc.

89. Does 17 and 18 are substituted with Alaska Ice Seafood, Inc. and Long Fisheries, Inc.

**H.  Caito Defendants**

90. Defendant **CAITO FISHERIES, INC.** is a California corporation with a principal place of business of 19400 S Harbor Dr., Fort Bragg, CA.

91. Defendant **CAITO FISHERIES, LLC** is a California limited liability company with a principal place of business of 20644 Fordyce Avenue, Carson, CA.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

92.    Defendant **SOUTHWIND FOODS, LLC** is a California limited liability company with a principal place of business of 20644 Fordyce Avenue, Carson, CA

93.    Southwind Foods, LLC purchased Caito Fisheries, including all its subsidiary entities, in or around April of 2023, within a month or two of Plaintiff's filing his initial class action complaint alleging anti-trust violations in the Dungeness crab fishery in which Caito has long been a significant player, and while the Pacific NW Area Dungeness crab season was still in full swing. Southwind Foods, LLC and Caito Fisheries Inc. collectively do, and/or have done in the relevant period, business as Caito and are referred to herein as "Caito."

94.    Caito Fisheries, Inc. sold all (or almost all) of its assets, including but not limited to real property, equipment, inventory, intellectual property, related to the commercial fishing industry, and transferred certain liabilities, to Southwind Foods, LLC for approximately $▮▮▮▮▮▮; and following the sale, Caito Fisheries, Inc. ceased all activities related to the purchase, processing and sale of commercial seafood.

95.    Following Southwind Foods, LLC's purchase of the Caito Fisheries, Inc. business, John Caito and Caito Fisheries, Inc. employees Mike Freels, Ray Bemis, Mike Gutierrez, Jose Martin Soto, and Anthony Caito continued working for Caito Fisheries, now owned by Caito Fisheries, LLC, a wholly-owned subsidiary of Southwind Foods, LLC.

96.    John Caito told Confidential Buyer Informant #1 that the sale to Southwind was done in reaction to the filing of the instant case.

97.    During the relevant time period, Caito made ex vessel purchases of Dungeness crab from class members in Crescent City, Eureka, San Francisco, and Fort Bragg, California. Ex vessel purchases up to and including May 8, 2023 were made through Caito Fisheries Inc., and ex vessel purchases beginning on January 17, 2024 were through Caito Fisheries LLC.

98.    Does 19, 20, and 21 are substituted with Caito Fisheries, Inc., Caito Fisheries, LLC, and Southwind Foods, LLC, respectively.

99.    Defendant **JOHN CAITO** is a California resident and is secretary of Caito Fisheries, Inc. as well as a joint-owner of Caito Fisheries, Inc. along with his siblings Joseph Caito, James Caito and Jeanette Caito. He was one of Caito's principal representatives of Caito in

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the Pacific NW Area Dungeness crab ex vessel market both before and after Southwind's purchase of Caito.

100. Defendant **JOSEPH ("JOE") CAITO** is a California resident and is Chief Executive Officer of Caito Fisheries, Inc., as well as a co-owner of Caito Fisheries along with his siblings John Caito, James Caito and Jeanette Caito. He was one of Caito's principal representatives of Caito in the Pacific NW Area Dungeness crab ex vessel market both before and after Southwind's purchase of Caito.

101. Defendant **JAMES ("JIM") CAITO** is a California resident and is the Chief Financial Officer of Caito Fisheries, Inc., and a joint owner of Caito Fisheries, Inc., along with his siblings John Caito, Joseph Caito and Jeanette Caito. James Caito participated in the day-to-day operation of Caito both before and after Southwind's purchase of Caito.

102. Defendant **JEANETTE CAITO** is a California resident and is the Assistant Secretary of Caito Fisheries, Inc., and a joint owner of Caito Fisheries, Inc., along with her siblings John Caito, Joseph Caito and James Caito.

103. John Caito, Joseph Caito, James Caito and Jeanette Caito, referred to herein as the "Caito Siblings," were at all times during the Class Period the sole owners and directors of Caito Fisheries, Inc., and have operated Caito Fisheries, Inc. as a closely-held corporation since or around 1975, after taking over the family company from their father that same year. During the Caito Siblings' time operating the company, they have controlled all aspects of the business, and each had knowledge of, and authorized, the conduct of the other siblings, as well as other Caito agents and employees, in operating the business, including the price-fixing conduct alleged herein. The Caito Siblings operated Caito Fisheries, Inc. without adequate observation of corporate formalities, and have used company assets for personal use, including by not limited to the use and, following the sale to Southwind Foods, LLC, ownership, of no less than 8 vehicles.

104. On or around March 13, 2023, Plaintiff Little sent each of the Caito Siblings a preservation letter, notifying them of their obligations to preserve records relating to this action, which was initiated on March 13, 2023, and alleged, inter alia, Sherman Act section 1 price-fixing violations by ex vessel buyers in the Pacific NW Area, a group that includes Caito Fisheries, Inc.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

105. In the first week of April, 2023, Plaintiff Little served each of the Caito Siblings with a subpoena for records related to the Action, and each Caito Sibling served a response, objecting to each request while demonstrating familiarity with the Complaint, on April 12, 2023.

106. Following the sale of its business and assets to Southwind Foods, LLC, which was completed after this Action was commenced and after the Caito Siblings had notice of the Action and the claims relevant to Caito Fisheries, Inc., the Caito Siblings caused Caito Fisheries, Inc. to transfer all or a significant majority of the sale proceeds to themselves.

107. Caito Fisheries, Inc. has refused to provide information concerning what happened to the funds from the sale to Southwind Foods, LLC. Caito Fisheries, Inc. has refused to produce any financial records that post-date the sale to Southwind Foods, LLC, despite Plaintiffs specific requests concerning the status of the sale proceeds, while also refusing to substantively answer interrogatories concerning those same funds.

108. Does 33 through 36 are substituted with John Caito, Joseph Caito, James Caito, and Jeanette Caito, respectively.

**I.    Fishermen's Catch Defendant**

109. Defendant **FISHERMEN'S CATCH, INC**. is a California corporation with a principal place of business of 31 Marina Blvd, Pittsburg, CA.

110. Fishermen's Catch, Inc. does, and/or has done in the relevant period, business as Fishermen's Catch and is referred to herein as "Fishermen's Catch."

111. Fishermen's Catch's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Peter Nguyen and Leon Gavin.

112. During the relevant time period, Fishermen's Catch made ex vessel purchases of Dungeness crab from class members in Berkeley, Crescent City, Bodega Bay, and Orick, California, and Brookings and Astoria, Oregon.

113. Doe 22 is substituted with Fishermen's Catch, Inc.

**J.    Global Quality Defendants**

114.    Defendant **GLOBAL QUALITY FOODS, INC.** is a California corporation with a principal place of business of 100 Big Break Road, Oakley, CA. Its initial registration address was 3524 Investment Blvd, Hayward, CA.

115.    Defendant **GLOBAL QUALITY SEAFOOD LLC** is a California limited liability company with a principal place of business of 3524 Investment Blvd, Hayward, CA.

116.    Global Quality Foods, Inc. and Global Quality Seafood LLC, collectively do, and/or have done in the relevant period, business as Global Quality Seafood and are referred to herein as, collectively, "Global Quality."

117.    Global Quality's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Tuan Phan.

118.    During the relevant time period, Global Quality made ex vessel purchases of Dungeness crab from class members in Crescent City and Half Moon Bay, California through Global Quality Foods Inc. until March 2021.

119.    During the relevant time period, beginning in December 2021, Global Quality made ex vessel purchases of Dungeness crab from class members in Crescent City, San Francisco, and Half Moon Bay, California through Global Quality Seafood LLC.

120.    Does 23 and 24 are substituted for Global Quality Foods, Inc. and Global Quality Seafood LLC, respectively.

**K.    Ocean King Defendant**

121.    Defendant **OCEAN KING FISH INC.** is a California corporation with a principal place of business of 2165 Yates Ave, Commerce, CA.

122.    Ocean King Fish Inc. does, and/or has done in the relevant period, business as Ocean King and is referred to herein as "Ocean King."

123.    Ocean King's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include George Lay.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

124. During the relevant time period, Ocean King made ex vessel purchases of Dungeness crab from class members in San Francisco, Eureka, Morro Bay, Crescent City, Bodega Bay, Fort Bragg, Ventura, Alameda, Half Moon Bay, and Berkeley, California.

125. Doe 25 is substituted with Ocean King Fish Inc.

**L.    Bornstein Defendants**

126. Defendant **BORNSTEIN SEAFOODS, INC**. is a Washington corporation with a principal place of business of 1001 Hilton Ave, Bellingham, Washington.

127. Defendant **ASTORIA PACIFIC SEAFOODS, LLC** is a Washington corporation with a principal place of business of 1001 Hilton Ave, Bellingham, Washington. Bornstein Seafoods, Inc. is listed as the governor of Astoria Pacific Seafoods, LLC.

128. Bornstein Seafood, Inc. and Astoria Pacific Seafood, LLC collectively do, and/or have done in the relevant period, business as Bornstein and Bornstein Newport and are collectively referred to herein as "Bornstein."

129. Bornstein's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Andrew Bornstein and Mike Shirley.

130. During the relevant time period, Bornstein made ex vessel purchases of Dungeness crab from class members in Astoria, Brookings, Garibaldi, and Newport, Oregon and Ilwaco, Washington through Bornstein Seafoods Inc.

131. During the relevant time period, Bornstein made ex vessel purchases of Dungeness crab from class members in Astoria, Oregon through Astoria Pacific Seafoods, LLC.

132. Does 28 and 29 are substituted with Bornstein Seafoods Inc. and Astoria Pacific Seafoods, LLC, respectively.

**M.    Da Yang Defendants**

133. Defendant **DA YANG SEAFOOD INC.** ("Da Yang Seafood") is a Washington corporation with a principal place of business of 45 Pier 2 Building A, Astoria, Oregon. Da Yang alternatively lists its principal place of business as 7312 NE 120th Pl, Kirkland, Washington.

134. Defendant **GREAT OCEAN SEAFOOD, INC**. ("Great Ocean Seafood") is an Oregon corporation with a principal place of business of 45 Pier 2, Building A, Astoria, Oregon,

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the same address as Da Yang Seafood. Great Ocean Seafood is commonly owned and controlled with, and operates as a single enterprise with, Da Yang Seafood, as alleged below.

135. Da Yang Seafood's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include YYuan Wang, Chang Lee, and Kyle Horgan. Chang Lee and Kyle Horgan act for both Da Yang Seafood and Great Ocean Seafood.

136. Da Yang Seafood and Great Ocean Seafood operate and hold themselves out as a single, integrated business enterprise. Da Yang Seafood and Great Ocean Seafood each participated in the conduct alleged herein through the acts of their shared representatives, including Chang Lee and Kyle Horgan.

137. Great Ocean Seafood and Da Yang Seafood are commonly owned and controlled sister companies, both part of the LungSoon Ocean Group, which presents Da Yang Seafood and Great Ocean Seafood together under a single combined logo bearing the name "Great Ocean Da Yang Seafoods LTD."[1]

138. Chih Yuan Wang is the Chief Executive Officer of the LungSoon Ocean Group and serves as the President of both Da Yang Seafood and Great Ocean Seafood.[2]

139. Da Yang Seafood and Great Ocean Seafood do not operate or hold themselves out as separate enterprises. Da Yang Seafood's own website used the names "Da Yang" and "Great Ocean" interchangeably for the same business. The homepage was headed "Da Yang Seafood – Why Great Ocean" and described Da Yang Seafood's affiliated fishing vessels, its factory in Oregon, and its sourcing network as Great Ocean Seafood's. A second page, headed "Great Ocean – Da Yang Seafood," used the same combined Da Yang Seafood/Great Ocean Seafood

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

---

[1] LungSoon Ocean Group, "Our Companies," https://www.lungsoon.com/our-companies.html (last visited June 29, 2026).

[2] Or. Sec'y of State, Da Yang Seafood, Inc., Amended Annual Report (filed Dec. 21, 2025), https://records.sos.state.or.us/ORSOSCMSearch/Search/RecordViewer.aspx?uri=13513845 (last visited June 29, 2026); Or. Sec'y of State, Great Ocean Seafood, Inc., Amended Annual Report (filed Aug. 18, 2025), https://records.sos.state.or.us/ORSOSWebDrawer/Recordhtml/11853343 (last visited June 29, 2026).

logo and listed the same customer testimonial, Astoria, Oregon address, and telephone and fax numbers as the Da Yang Seafood page.[3]

140. Da Yang Seafood and Great Ocean Seafood share the same business address. The annual reports filed with the Oregon Secretary of State list the same address in Astoria, Oregon,[4] which is the same address listed on the Da Yang Seafood and Great Ocean Seafood webpages.[5] Great Ocean Seafood does not maintain its own office space, independent of Da Yang Seafood.

141. Chang Lee acts on behalf of both Da Yang Seafood and Great Ocean Seafood. Mr. Lee is the signatory on, and is identified as the "Plant Manager" in, the annual reports that both Da Yang Seafood and Great Ocean Seafood filed with the Oregon Secretary of State.[6] Mr. Lee is also a principal representative of Da Yang Seafood in the Pacific NW Area Dungeness crab ex vessel market and engages in the conduct alleged herein on Da Yang Seafood's behalf.

142. Kyle Horgan is employed by Great Ocean Seafood and acts on behalf of both Great Ocean Seafood and Da Yang Seafood in the Pacific NW Area Dungeness crab ex vessel market. Da Yang Seafood and Great Ocean Seafood direct and control Mr. Horgan's conduct in the Pacific NW Area Dungeness crab ex vessel market. Mr. Horgan refers to himself in communications as "Domestic Sales Manager at Da Yang Seafoods," including in correspondence with government officials and fellow commercial fishing industry participants.

143. Great Ocean Seafood buys and re-sells Dungeness crab, predominantly crab that Da Yang Seafood purchase ex vessel, and Mr. Horgan conducts that business on behalf of the Da Yang Seafood/Great Ocean Seafood enterprise.

144. Mr. Horgan's only work email address is on Da Yang Seafood's domain because Mr. Horgan performs his work for the Da Yang Seafood/Great Ocean Seafood enterprise, and Da

---

[3] Internet Archive, archived version of www.dayangseafoods.com (Sept. 7, 2025), https://web.archive.org/web/20250907090841/https://dayangseafoods.com/ (last visited June 29, 2026); Internet Archive, archived version of www.dayangseafoods.com/great-ocean.html (Aug. 7, 2025), https://web.archive.org/web/20250807041148/http://www.dayangseafoods.com/great-ocean.html (last visited June 29, 2026).

[4] *See supra* n.2.

[5] *See supra* n.3.

[6] *See supra* n.2.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Yang Seafood holds Mr. Horgan out as its representative, including in its dealings with government agencies.

145.    Mr. Horgan regularly participates in the enterprise's ex vessel pricing activity and engages in related communications, on its behalf, with other Dungeness crab ex vessel buyers and crabbers. In conducting the enterprise's crab business, Mr. Horgan communicates about Dungeness crab prices with crabbers and supposedly competing ex vessel buyers, including principals and employees of other Defendants, and coordinates internally regarding the enterprise's pricing. Throughout, Da Yang Seafood and Great Ocean Seafood operated as one, and the buyers Mr. Horgan engaged with understood him to be acting for the Da Yang Seafood/Great Ocean Seafood enterprise.

146.    Through the conduct of their shared representatives Chang Lee and Kyle Horgan, Da Yang Seafood and Great Ocean Seafood participated in the coordination of ex vessel Dungeness crab prices alleged herein. The acts and communications of Chang Lee and Kyle Horgan in the Pacific NW Area Dungeness crab ex vessel market, including those alleged herein, were undertaken within the scope of their authority and on behalf of Da Yang Seafood and Great Ocean Seafood, and are attributable to each.

147.    In the alternative, Da Yang Seafood and Great Ocean Seafood are alter egos of one another. Da Yang Seafood and Great Ocean Seafood are under common ownership and actual common control and are operated as a single enterprise, such that recognizing their separate corporate forms would permit each to evade liability for conduct it directs and from which it benefits. Plaintiffs reserve the right to pursue an alter ego or veil-piercing theory, and related discovery, as the evidence may warrant.

148.    During the relevant time period, Da Yang Seafood made ex vessel purchases of Dungeness crab from class members in Astoria, Brookings, Garibaldi, and Newport Oregon through Da Yang Seafoods.

149.    Does 30 and 31 are substituted with Da Yang Seafood and Great Ocean Seafood, respectively. Da Yang Seafood and Great Ocean Seafood are collectively referred to herein as "Da Yang."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**N.      Pacific Dream Defendant**

150.    Defendant **PACIFIC DREAM SEAFOOD, INC.** is a Washington corporation with a principal place of business of 1793 Northshore Drive, Bellingham, Washington. Pacific Dream alternatively lists its principal place of business as either 505 Ork Rock Rd, Winchester Bay, Oregon or 116 O Ave, Anacortes, Washington.

151.    Pacific Dream has done business during the relevant period as Pacific Dream Seafoods.

152.    Pacific Dream's principal representatives in the Pacific NW Area Dungeness crab ex vessel market include Jonathan Mark, Nathaniel Mark, James Lackey, Joel Smith, Jerrod Goodin, Fredrick Goodin, Austin Sterkel, Stefan Berryman, Jamie Gregory, Michael Mahlman, Savannah McDowell, Elixandro Marin, Richard Reed, Andrea Rios, Jose Rivas, Jamie Torpey, Eric Zurcher.

153.    During the relevant time period, Pacific Dream made ex vessel purchases of Dungeness crab from class members in Crescent City, Eureka, and Princeton-Half Moon, California and Astoria, Charleston, Depoe Bay, Florence, Garibaldi, Newport, Pacific City, Port Orford, Winchester Bay, Oregon and Anacortes, Bellingham Bay, La Conner, Westport, Washington through Pacific Dream Seafood Inc.

154.    Doe 32 is substituted with Pacific Dream Seafood, Inc.

**O.      Doe Defendants**

155.    Does 33-60 are defendants whose true names are unknown to Plaintiff. Each of these fictitiously named defendants is in some way liable to Plaintiff for the occurrences and injuries alleged in this complaint.

**III.     Agents and Co-Conspirators**

156.    Various co-conspirators, some known and some unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

157.    Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein throughout the Pacific NW Area and in this District.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

158.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

159.    At all relevant times, other known and unknown individuals and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the court of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objections of the scheme to benefit Defendants and themselves through the manipulation of ex vessel Dungeness crab prices.

160.    Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's, corporation's, or other entity's business or affairs.

161.    The officers, agents, employees, or representatives operated under the explicit and apparent authority of their principals.

162.    Each Defendant, and its respective subsidiaries, affiliates, and agents operated as a single unified entity.

163.    Individuals alleged to have engaged in misconduct in violation of the laws listed herein are alleged to have done so on behalf of all members of their corporate family. Individuals within the companies and customers did not know or did not distinguish between the corporate affiliations of different individuals. Each Defendant's entities and their agents all affirmatively and collectively represent themselves as one respective corporate family, rather than separate subsidiaries and parents.

164.    Various persons, businesses, or fictitious persons not named as Defendants herein may have participated as co-conspirators in the scheme alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as defendants at a later date.

**JURISDICTION, VENUE, AND COMMERCE**

165.   The Court has jurisdiction over Plaintiffs' claims for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367.

166.   This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction. Plaintiffs suffered antitrust injury within this jurisdiction.

167.   Venue is appropriate within this District under 28 U.S.C. §1391 because, at all relevant times, Defendants transacted business within this District, and the interstate trade and commerce described hereinafter was and is carried out, in substantial part, in this District.

168.   Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

169.   By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the members of the proposed Classes (as defined below). Defendants, directly and through their agents, engaged in activities affecting multiple states, that were designed to fix prices, unreasonably restrain trade, and adversely affect competition in ex vessel Dungeness crab market.

**INTRADISTRICT ASSIGNMENT**

170.   Pursuant to Civil Local Rule 3.2 (c) and (d), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because a substantial part of the events giving rise to the claim occurred in San Francisco County. Furthermore, several Defendants maintain facilities and execute operations within this Division.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**FACTUAL ALLEGATIONS**

**I.    Pacific NW Area Ex Vessel Dungeness Crab Industry**

171.    Dungeness crab is a species of shellfish that is found only in the eastern North Pacific Ocean. Dungeness crabs are prized for their size and sweet meat. A classic commodity product, Dungeness crab is fungible, with no meaningful difference between crab landed by one crabber or another (or, for that matter, resold by one buyer or another).

172.    They are traditionally enjoyed fresh all along the West Coast, especially around the holidays (Thanksgiving, Christmas, the Western New Year, and Chinese New Year) when demand is highest and which traditionally corresponds with the opening of the seasons in the Pacific NW Area. In the past two decades, a very substantial portion of the catch is also exported live to Asian markets, particularly China, but also Korea, Vietnam and other countries.

173.    Commercial Dungeness crab fishing requires a permit (in California, technically a "registration"), which is tied to a specific vessel and allows crabbers to have a certain number of traps on that vessel. Rather than being organized by quotas that limit the total amount a crabber can catch, the Dungeness crab fishery is what is known as a "derby" fishery: crabbers are entitled to use the maximum number of crab traps allowed by their vessel permit to catch as many Dungeness crabs as possible during the season.[7] Because the total amount of Dungeness crab available to catch is limited and decreases throughout the season, this arrangement incentivizes crabbers to go out as soon as the season opens, when there is also the highest volume of Dungeness crab. Missing the early days of a given season can therefore have serious ramifications on a crabber's bottom line for that season.

174.    The Dungeness crab season for most of the Pacific NW Areas opens on December 1, unless delayed. However, in California's District 10 (aka Central California), the season starts on November 15, unless delayed.

175.    The November 15 opening date in Central California has meant that fresh Dungeness crab has long been available and has been a highly desirable product for Thanksgiving

---

[7] Overfishing of the species has been successfully managed since the 1980s by limiting commercial crabbers to only male crabs.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

and Christmas, as well as for New Year's and Chinese New Year's. Dungeness crab has therefore become a staple on these holidays, and non-export demand for fresh Dungeness crab is at its highest in November and December. This synergy means that consumer demand for fresh Dungeness crab has traditionally peaked at the same time as supply.

176.    The Dungeness crab season for all regions in the Pacific NW Area has historically closed in the summer or very early fall.

177.    Those who buy Dungeness crab directly from fishers for resale, (i.e., ex vessel), are required to hold a fish buyer or receiver license from the state in which they make ex vessel purchases.

178.    Once purchased, Defendants and other buyers resell Dungeness crab either live, fresh cooked, frozen (often in sections), or canned. While freezing or canning crab prevents spoilage, in terms of taste and texture, frozen and canned Dungeness crab are inferior products compared with live or fresh cooked Dungeness crab. When given the choice, consumers strongly prefer live or fresh cooked Dungeness crab to frozen or canned.

179.    During the 2023/24 season, approximately 55,650,00 lbs. of Dungeness crab was purchased in the Pacific NW Area, by 239 licensed fish buyers, for a total reported price of approximately $207 million. However, a vast majority of the crab was (and every season is) purchased by a small subset of these buyers. During the 2023-24 season, a group of 21 buyers purchased approximately 88% of the total crab landed in the Pacific NW Area by volume, while the remaining 218 buyers accounted for the remaining 12%; and this group of 218 small buyers includes many crabbers who are technically required to "purchase" crab they landed from themselves before selling the crabs to consumers, restaurants, and other retail purchasers.

180.    By way of contrast, during the 2023/24 season, Pacific Seafood, alone, directly purchased ex vessel 19.4% of the total crab landed in the Pacific NW Area by volume. Its co-defendants Ocean Gold, Bornstein, Safe Coast, Hallmark, Caito, Fathom, Nor-Cal, ASE, Ocean King, Fishermen's Catch, Da Yang, and Pacific Dream directly purchased ex vessel approximately 8.8%, 6.6%, 5.2%, 3.9%, 2.7%, 2.5%, 2.3%, 1.8%, 1.6%, 1.2%, 2.5%, and 4.8% of the total crab landed in the Pacific NW Area by volume, respectively.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

181.   These figures do not include "out-the-backdoor" transactions in which Defendants purchase from other buyers who themselves have made the purchase ex vessel from crabbers. For example, Unnamed Co-Conspirator #1 operated, in 2023/24 as a front for Defendant Fishermen's Catch, which took all of the crab purchased by it. In this capacity, Unnamed Co-Conspirator #1 purchased 1.28% of the total crab landed in the Pacific NW Area by volume during the 2023/24 season. When this is added to the crab that Fishermen's Catch directly purchased ex vessel from Pacific NW Area crabbers, its total market share increases to 2.48%.

182.   Most of the largest buyers, including Defendants Bornstein, Caito, Hallmark, Ocean Gold, Pacific Seafood, Safe Coast, and Da Yang are members of the West Coast Seafood Processors Association ("WCSPA"). The WCSPA describes itself as an industry trade group that represents the interests of members that process seafood in California, Oregon, and Washington.

183.   At the beginning of the season, when a large volume of crab is landed in a short period, most crabbers have no choice but to sell to one or more of the Defendants, as most of the smaller buyers do not have the capacity to purchase the quantities landed. Thus, as a result of market consolidation and Defendants' restricting access to many of the ports under their control, smaller, non-cartel member buyers cannot purchase enough crab to allow the season to open, even if they decided to bear the risk of crossing Pacific Seafood and the other Defendants.

184.   A delayed opener reduces or eliminates the availability of reasonably priced live crab during the period of peak domestic consumer demand, which benefits the processor Defendants in two ways. First, it eliminates competition during this period of peak demand that its frozen crab would otherwise have from superior live crab, allowing the processor Defendants to sell more of such frozen crab and at higher prices. Second, it keeps ex vessel Dungeness crab prices at an artificially low price by ensuring that crab won't be landed when domestic consumer demand is highest, allowing the processor Defendants to artificially create a buy-low sell-high situation that benefits only them.

185.   While Defendants that don't process crab don't reap the benefits of selling frozen crab while consumers are clamoring for holiday crab, they do greatly benefit from the suppressed ex vessel prices. And because a delayed opener denies the crabbers vital income before and during

the holidays, a delay increases financial pressure on crabbers, making them more likely to go out for a lower opening price—which establishes a baseline for prices throughout the season—and continue crabbing even when the prices remain depressed, because at a certain point some money is ultimately better than no money.

## II.   Defendants' Price-Fixing Cartel

### A.   Defendants' Cartel Arose Out of a Marked Increase in Dungeness Ex Vessel Prices Being Paid to Crabbers in the Pacific NW Area that Started in 2006/2007 Season and Continued Through the 2014/15 Season

186.   For decades, the Pacific NW Area's ex vessel Dungeness crab market was dominated by processors, who canned or froze the crab, with a limited volume of crab being sold live and fresh-cooked to restaurants, grocery stores, and the like.

187.   Beginning in the late 1990s and accelerating in the mid-2000s, the market began to shift driven, in large part, by demand in Asia and the opening of live export markets there, with a greater and greater amount of crab being purchased ex vessel in the Pacific NW Area to sell live and fresh cooked.

188.   While Pacific Seafood, who in August 2023 built a new facility in Shanghai to distribute live Dungeness crab, and other traditional processors are now significantly involved in the live export market, this was not the case in the early years of the market's transition.

189.   Rather, a new set of buyers – including Nor-Cal, Ocean King, and ASE, who primarily purchased Dungeness crab ex vessel in the Pacific NW Area to sell live in China and elsewhere came into the market.

190.   The effect of the entrance of these new purchasers into the Pacific NW Area ex vessel market was to raise ex vessel prices, just as basic economic theory would predict.

191.   Prior to this shift, when the Pacific NW Area ex vessel market was dominated by processors, ex vessel prices stayed in a narrow band of around $1.35 to $2 a pound.

192.   Starting in or around the 2006/07 season, ex vessel prices started climbing in the Pacific NW Area, as these new market entrants began competing to purchase Dungeness crab ex vessel from crabbers.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

193.     Of particular importance in this dynamic were the roles played by what are sometimes referred to in the industry as "white van" buyers and the independent hoists that served them.

194.     These white van buyers, including Nor-Cal, Ocean King, and ASE, would drive their eponymous refrigerated white vans to various ports throughout the Pacific NW Area and purchase crab directly (i.e., ex vessel) from crabbers in those ports, paying the operators of independent hoists in those ports to offload the crab from the crabbers' boats.

195.     As independent hoist operators were paid according to the weight of the crab offloaded by the buyers, they had a strong financial incentive to encourage white van buyers to make ex vessel purchases using the operator's hoist and for crabbers to sell to the white van buyers. Thus, independent hoist operators would actively solicit white van buyers to come to their hoists, letting them know which boats were scheduled to come in when, and with how much crab. The white van buyers, in turn, would then compete with each other to secure the crab scheduled to be landed, calling the crabbers while they were still on the water and out-bidding each other for the crabbers' load.

196.     Crabbers being who they are and dock talk being what it is, what a crabber was paid for a load of crab was soon widely known among other members of the fleet, who then demanded a similar price from the same or different buyers, thus raising market. In other words, the Pacific NW Area Dungeness crab ex vessel market behaved as economic theory would predict a free market would.

197.     Thus, by the 2014/15 season, ex vessel prices for Dungeness crab had climbed significantly in the Pacific NW Area, with crabbers getting as much as $14/lb.

198.     The increase in ex vessel prices, in turn, decreased the profit of buyers. As a result, in advance of the 2015/16 season it was agreed among Defendants that they would limit the amount that they paid for Dungeness crab in the Pacific NW Area ex vessel and work together to suppress the ex vessel price for Dungeness crab in the Pacific NW Area more generally.

199.     At or around the time that this agreement was made, one long-time crabber was told by George Lay of Ocean King, who had paid him $11 to $14/lb. during the 2014/15 season,

that Nor-Cal's Kevin Lee and ASE's Kevin Zheng both told Mr. Lay that he had paid the crabber too much the previous season.

200.    Thereafter, Ocean King brought its ex vessel Dungeness crab prices much more closely in line with those of other Defendants, Unnamed Co-Conspirator #1, and Unnamed Co-Conspirator #2, relative to the prices Ocean King paid before.

201.    In the 2013-2014 and 2014-2015 seasons, Ocean King paid an average ex vessel price for Dungeness crab in the Pacific NW Area of $6.19/lb. and $6.57/lb., respectively, which was $1.76/lb. and $1.69/lb. more than the average ex vessel price paid per pound for Dungeness crab in the Pacific NW Area by other Defendants and Unnamed Co-Conspirators # 1 and 2, in those seasons.

202.    But following Ocean King's Lay's discussions with Nor-Cal's Lee and ASE's Zheng, the ex vessel prices paid by Ocean King for Dungeness crab in the Pacific NW Area became much more in line with that paid by Nor-Cal, ASE, and other Defendants and Unnamed Co-Conspirators # 1 and 2.

203.    In the following season, 2015/16, ex vessel price paid by Ocean King for Dungeness crab in the Pacific NW Area, was, on average, $0.19/lb. *less* than the average ex vessel price paid by other Defendants and Unnamed Co-Conspirators # 1 and 2 during that season for Dungeness crab in the Pacific NW Area. And from the 2015-2016 season through the 2023-2024 season, the average ex vessel price paid by Ocean King for Dungeness crab in the Pacific NW area was $0.01/lb. *less* than the average price paid by other Defendants and Unnamed Co-Conspirators # 1 and 2.

204.    Once the 2015/16 season was underway, the same crabber whom Ocean King's Lay told about his discussion with Nor-Cal's Lee and ASE's Zheng was pointedly told by Ocean Gold's Gerald Schlaupitz while unloading a load of crab: "Heard you did well in Morro Bay last year. You will never see that price again."

205.    Mr. Schlaupitz's (informed) prediction was correct. As a result of Defendants' agreement to artificially depress ex vessel prices in the Pacific NW Area, the price growth previously seen in the market had been reversed. And now, as shown on the graph below, ex

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

vessel prices in the Pacific NW Area, when adjusted for inflation, have fallen back to a level below the prices being paid in 2001.

206.    In contrast and as also shown on the graph below, ex vessel prices for Dungeness crab in the Puget Sound ex vessel market—which for a variety of reasons, including extensive participation in the market by tribal-owned buyers, has escaped Defendants' control and manipulation—have continued to grow and with it the delta between what buyers in Puget Sound pay ex vessel for Dungeness crab and what buyers in the Pacific NW Area pay ex vessel for exactly the same product.



GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**B.**       **Defendants Have Agreed to Allow Pacific Seafood to Set the Opening Price, which Has Resulted in Delayed Opening and a Lower Opening Price, which Is the Price at which a Large Portion of the Season's Catch Is Traditionally Sold and Which Sets the Baseline Price for the Remainder of the Season**

207.     Critical to Defendants' conspiracy to artificially fix, control, and suppress ex vessel prices in the Pacific NW Area has been their agreement, during the conspiracy period, to allow Pacific Seafood to set the opening ex vessel price for Dungeness crab in the Pacific NW Area, rather than offering competing opening prices. Indeed, Defendants not only refuse to pay any amount higher than the price dictated by Pacific Seafood but they will also refuse to even state a price until Pacific Seafood has stated what the price is.

208.     The lack of competition results in both (a) an artificially lower opening price at which a large portion of Dungeness crab caught in the season is sold and (b) the establishment of an artificially depressed baseline for prices throughout the season. And, several times, it has delayed the opening of Dungeness crab season in some or all of the Pacific NW Area crab fishery. This, in turn, eliminates the ability of crabbers to sell ex vessel during the holiday season (*i.e.,* when consumer demand for crab is traditionally highest), which further decreases ex vessel prices.

209.     As Defendants well know, they could pay at least approximately $5-7/lb. ex vessel to crabbers at the opening of crab seasons in the Pacific NW Area, and still make a significant profit. Thus, basic economic logic would predict that, in an unmanipulated market, Defendants would compete with each other by offering crabbers higher ex vessel prices until this threshold was met.

210.     However, as a result of their illegal agreement not to compete with each other on opening price, Defendants have forced crabbers to accept far less than that, reaping huge illegal profits on crabbers' backs during the opening days of the season and beyond.

211.     Indeed, these illegal excess profits, in combination with the risks posed by punishments (discussed herein) that Defendants impose on those who refuse to obey their pricing dictates, are so significant that Defendants have, on several occasions in recent years, delayed the opening of the season. Thus, instead of offering a fair ex vessel opening price that would allow

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

35

both them and crabbers to make a living, crabbers have lost the opportunity to sell Dungeness crab during periods of peak demand when prices otherwise would and should have been at their highest.

### 1. 2019/20 Pacific NW Area Dungeness Crab Season

212. In a text exchange on January 1, 2020—the day after the Dungeness crab season opened in ports north of the Mendocino County line—Fathom's Nick Mareno indicated to Bornstein's Andrew Bornstein that Fathom had secured the purchase of a load of crab from a boat in Crescent City on the following Monday and asked Mr. Bornstein, a representative of Borstein (a supposed competitor of Fathom), "What's price doing? Hearing Pacific is raising to $3.25."

213. In response, Mr. Bornstein did not tell Mr. Mareno that he was not comfortable or allowed to discuss pricing with the representative of a competitor, but rather responded, "It's 3.00 still and will be Monday." To this, Mr. Mareno responded, "Roger."

214. Three days later, Mr. Mareno texted back Mr. Bornstein to ask, "Still sounding like $3 boat price?" And to this, Mr. Bornstein responded, "Yup. Don't think anyone is gonna fish until tmrw at the earliest."

215. Later the same day, Mr. Mareno complained to Mr. Bornstein, "Getting blasted on that $3 price…" "Might not work." To this, Mr. Bornstein responds, "I'm a hard pass on any dock price over 3.00."

216. Mr. Bornstein then tells Mr. Mareno, "Pacific Seafood had 2 boats sell to a live guy in Newport today at 3.50 and they were just notified that they lost their bottom fish and shrimp markets and don't call for bait. Pacific Seafood is playing hard ball at 3.00."

217. All of the Defendants were playing the same agreed-upon hardball: none of them paid more than $3 at the opening of any portion of the Pacific NW Area Dungeness crab fishery in the 2019/20 season.

218. Pacific Seafood took notice when any buyer appeared to be backing away from the agreement to stick with Pacific Seafood's opening price. In an internal email on December 26, 2019, Rick Harris, the General Manager of Pacific Seafood, explicitly discussed the cracks that

were forming in the agreement as opening day receded. "We may get 10 – 15,000 to cook tomorrow morning if we don't lose that to others at $3.25. Won't know until tonight. Caito is waffling big time. Bet they go to $3.25 before the day is out if not, tomorrow." The fact that Caito was "waffling" after sticking to Pacific Seafood's opening price for 10 days shows that Caito wasn't just following Pacific Seafood's lead; it had committed to doing so.

### 2.    2020/21 Pacific NW Area Dungeness Crab Season

219.    At the start of the 2020/21 season, Defendants' conspiracy effectively blocked the Pacific NW Area crab season from opening until mid-January of 2021, substantially after the holiday season of peak demand. As state officials in California, Oregon, and Washington gave the green light to open the fishery in December of 2020, virtually all of the crabbers remained tied up in port, as Pacific Seafood stuck firm to an opening ex vessel price under $3/lb. Even without adjusting for inflation, this opening price was lower than what California crabbers received over twenty years before at the opening of the 1999/00 season, but, with the exception of Nor-Cal, which surreptitiously purchased crab in a relatively little-used port in Northern California, all of the other Defendants toed Pacific Seafood's line.

220.    In a series of texts sent between January 8, 2021 and January 15, 2021, Ocean King's George Lay and Bornstein's Andrew Bornstein discussed the price fixing arrangement amongst cartel members and coordinated their response to demands by crabbers for higher ex vessel prices.

221.    On January 8, 2021, Mr. Lay texted: "Good morning Andrew. I just heard the fleet is going to be asking for $2.75 from you."

222.    In response, Mr. Borstein responded in part, "If we refuse are there other buyers who would pay that much?"

223.    Mr. Lay responded in part, "I know they are also bringing it to pac [Pacific Seafood] as well as hallmark (which is really one in the same). At the moment pac is still at $2.50." Mr. Lay further let him know that Ocean King and other SF buyers were willing to pay $2.75/lb, but that some crabbers were demanding $3/lb.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

224.    Soon thereafter, Mr. Lay followed up with Mr. Bornstein to let him know that Pacific Seafood, in fact, was at $2.75/lb. as well, which Mr. Bornstein indicated was already known by him. Mr. Bornstein then texted Mr. Lay to confirm that Bornstein was offering $2.75 as well.

225.    For Pacific Seafood, this strategy made economic sense. Pacific Seafood knew that crabbers wouldn't accept such a low price. By refusing to move off its low price, Pacific Seafood kept the fishery closed, allowing it to sell frozen crab from the prior season before during the peak of consumer demand (the holiday season) without troublesome competition from far more desirable fresh caught crab.

226.    For the other Defendants, it made no economic sense to toe Pacific Seafood's line, *absent their overarching agreement to fix ex vessel prices*. In December 2020, the wholesale price of live Dungeness crab in the Pacific NW Area (i.e. the price that buyers sold to grocery stores, restaurants, and the like) was approximately $11/lb.; and once the season finally opened, prices stayed high, bouncing back to approximately $11/lb. in March 2021, and climbing to approximately $13.50/lb. in May 2021.

227.    As a matter of comparison, the wholesale price of live Dungeness crab in the Pacific NW Area, in both March and May of 2020, was approximately $7.70.

### 3.    2021/22 Pacific NW Area Dungeness Crab Season

228.    During the 2019/20 season, Pacific Seafood punished Nor-Cal for its failure to comply with Pacific Seafood's opening price dictates, reneging on a previous agreement to purchase a very large amount of crab from Nor-Cal, forcing it to sell the crab at a significant loss.

229.    Thus, at the start 2021/22 season, Nor-Cal, like other Defendants, got in line with Pacific Seafood on opening price.

230.    Accordingly, in late November of 2021 in advance of the opening of the season, a crabber texted Nor-Cal's Kevin Lee in an attempt to negotiate a price with him, stating: "PAC choice [Pacific Seafood]. 4.75. Nor cal 5 or better."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

231. In response, Mr. Lee refused to engage, instead responding: "Hihi" "NorCal just a little boy . Ha ha." "Will Matching the big boss."

232. When the crabber responded, "If Frank [Dulcich] is big boss we have a problem," Mr. Lee responded, "Ha ha ha."

233. Leading up to and during the 2021/22 season, Pacific Seafood's Frank Dulcich was in direct and frequent communication with other buyers. By way of example, Dulcich and Caito's John Caito had text conversations on more than 25 different days between October 30, 2021, and April 22, 2022.

234. In almost every single one of these conversations, Dulcich and Caito set up a phone call, often at Dulcich's insistence. For example, on October 30, 2021, Dulcich texted Caito: "John When can you and I talk next week…" to which Caito responded: " Hi Frank I'm available any time next week, whatever works best for you."

235. Then, on January 25, 2021, Dulcich texted only "Call at 3:05." Caito responded only with "Okay."

### 4. 2022/23 Pacific NW Area Dungeness Crab Season

236. As one long-time crabber put it, at the beginning of the 2022/23 season, Pacific Seafood and the other Defendants went into "full-on attack mode" to crush the price of Dungeness crab, seeking to "drive the boot right in."

237. Prior to the opening of the 2022/23 season, Pacific Seafood, instead of stating a low-ball ex vessel price, refused to state any price at all; and all the Defendants were similarly mum.

238. For many weeks in advance of the season, during the period in which buyers in other years would be discussing the opening ex vessel prices with boats whose crabs they were trying to secure, Pacific Seafood's Joe Cincotta was in Eureka but refused to even discuss a price with crabbers who tried, nor would any other buyer.

239. And the same was true in other ports in the Pacific NW Area, neither Pacific Seafood nor any other Defendant would even discuss an opening price. The other Defendants'

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

representatives, when asked by crabbers what opening price they were willing to pay, simply demurred, saying that they would not state a price until Pacific Seafood did.

240. Pacific Seafood, for its part, claimed that the reason it was not willing to state a price was that there was no demand for live or fresh cooked crab. That was demonstrably false.

241. In December of 2022, demand for live Dungeness crab was so high that Pacific Seafood and other ex vessel buyers were selling live crab to their customers for approximately $14/lb. And in Puget Sound—which because of significant tribal involvement and other factors has not fallen within the ambit of Defendants' conspiracy—crabbers were receiving as much as $10.50/lb. ex vessel from buyers there.

242. Indeed, in December of 2022, Fathom—which joined other Defendants in refusing to offer an opening price to crabbers in the Pacific NW Area—purchased ex vessel from crabbers in Puget Sound almost 15,000 lbs. at $10/lb. and over 18,000 lbs. at $9.75.

243. Nonetheless, despite this high consumer demand and the significant profits that they could earn if they had live or fresh cooked crab to sell, Defendants refused to offer a price, with non-Pacific Seafood Defendants and other buyers stating that, while they wanted the crab, they could not offer a price until Pacific Seafood offered one, which it refused to do.

244. On or around December 23, 2022, the California Department of Fish and Wildlife announced that the Dungeness crab season for California ports would open, on December 31, 2022, with crabbers allowed to set their traps on December 28, 2022. Nonetheless, neither Pacific Seafood nor any other Defendant would even discuss an opening price.

245. Having already missed Thanksgiving and Christmas and the time around it, when domestic consumer demand for live and fresh cooked crab is at its highest, crabbers were infuriated by the prospect that because Pacific Seafood and the other Defendants would not even offer them a price for crab, the fleet would stay tied up, unable to catch and deliver crab to eager consumers looking to celebrate the Western and Chinese New Year. Thus, the fleet in San Francisco, and elsewhere in District 10, which includes the Bay Area, began discussing taking the extraordinary step of going out on an "open ticket," *i.e.*, without any commitment from any buyer to take their crab at any price.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

246. On December 27, 2022, Pacific Seafood's Joe Cincotta held a meeting with crabbers in San Francisco at which it again declined to give a price for Dungeness crab, asking them what they were hearing from the fleet. He was informed that Half Moon Bay and Bodega Bay had decided to just go fishing on an open ticket.

247. When Mr. Cincotta heard what the fleet was doing, his response was "You mean to tell me that for the first time in the history of this fishery, in horrible weather, and with half the gear, this fleet has decided to go fishing on an open ticket?"

248. When the crabbers responded that they'd be going out as well, Mr. Cincotta said, "We'll do everything we can to try to help you out if we can sell them. It might only be a $1 or something though."

249. Once the crabbers were out on the water, Nor-Cal very briefly offered boats $5/lb., but *instructed them to keep it secret.* However, over the course of the day, Nor-Cal withdrew the offer and dropped the price it was offering to that being paid by other Defendants, claiming it was because people had been too public about it—in other words, other cartel members had discovered Nor-Cal was cheating on their price-fixing agreement and threatened Nor=Cal with retaliation.

250. Crabbers in ports north of Bodega Bay in the Pacific NW Area did not follow the lead of their colleagues to the South. Rather, despite having been given the same green light to fish by the state, they remained tied up for two weeks, while Pacific Seafood stated $2.25/lb. was the maximum they'd pay. No other Defendant broke ranks.

251. Nor-Cal's Kevin Lee—who had very briefly paid crabbers $5/lb. at the opening of the season in San Francisco before "too many people found out"—had clearly learned his lesson.

252. On January 9, 2023, a crabber texted Mr. Lee, inquiring, "Any price offers for CC [Crescent City]?"

253. In response, Mr. Lee responded, "No idea yet. I'm waiting big boss give out price." To this the crabber responded, "I remember when you were big boss. Those were the days." Mr. Lee replied, "Ha ha ha."

254. Three days later, on January 12, 2023, the crabber texted Mr. Lee again, asking,

"What are you offering. Really hard to do business like this."

255. In response, Mr. Lee said, "I know. I just matching what ever price."

256. Finally, on or around January 13, 2023, Pacific Seafood offered to pay $3.00/lb. for the first 400,000 lbs. with the price then dropping to $2.25, giving the crabbers twelve hours to accept the deal. Having now been waiting for months to go fishing, the deal was accepted.

257. For context, twelve years before, at the opening the 2010/11 season in Northern California, Pacific Seafood paid crabbers $3/lb. ex vessel, without adjusting for inflation.

258. And in January of 2023, while Pacific Seafood and the other Defendants were insisting that crabbers in the northern portion of the Pacific NW Area accept Pacific Seafood's offer of $2.25/lb. ex vessel, buyers were selling live Dungeness crab caught elsewhere to their customers for approximately $8/lb.; and crabbers in Puget Sound were getting as much as $7/lb. ex vessel. Fathom (who was part of the cartel refusing to offer Pacific NW Area crabbers more than $2.25/lb.) was, at the time, paying as much as $6/lb. ex vessel in Puget Sound.

### 5. 2023/24 Pacific NW Area Dungeness Crab Season

259. In November of 2023, Safe Coast's Max Boland sent a series of texts to Confidential Buyer Informant #1—who, as discussed elsewhere herein, had run afoul of Defendants during the 2022/23 season by not obeying their pricing dictates—informing Confidential Buyer Informant #1 that Pacific Seafood would set the ex vessel price paid at the opening of Pacific NW Area's 2023/24 Dungeness crab season, and the price would likely be between $1.85/lb. and $2.00/lb., but maybe as high as $2.25/lb.

260. When Confidential Buyer Informant #1's suggested to Mr. Boland that an ex vessel price in the range of $3/lb. was justified, Mr. Boland stated: "3 does not work 1.85-2.00 is the number and that is where PAC [Pacific Seafood] will be."

261. When Confidential Buyer Informant #1 protested that $1.85-$2/lb. was not high enough to get most crabbers to go fishing, Mr. Boland replied: "PAC will make the decision. Could be as high as 2.25."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

262. At around the same time in or around November 2023, Confidential Buyer Informant #1 had a conversation with Caito's John Caito. During that conversation, Mr. Caito told Confidential Buyer Informant #1 that Caito would not set an opening ex vessel price until Pacific Seafood did.

263. And, in early to mid-December of 2023, in advance of the opening of any portion of the Pacific NW Area's Dungeness crab fishery, Pacific Seafood's Brett Hester called Confidential Buyer Informant #1 and told him that the opening ex vessel price was going to be less than $2/lb.

264. At approximately the same time, Confidential Buyer Informant #1 attended a meeting that included representatives of Pacific Seafood (Dan Bradovich and John Moody), Bornstein (Mike Shirley and Marco Vargas), Fathom (Nick Mareno, Hallmark (Scott Adams) and Safe Coast (Chris Lam and Xia Zhao), Da Yang (Kyle Horgan), Living Pacific Seafood LLC (Lillian Gustafson and Geoff Molfino), and Seawater Seafood Company (Bret Hamrick). At that meeting, Defendants' representatives expressed a uniform position they did not want to offer crabbers more than $2.50/lb. as an opening ex vessel price.

265. During the meeting, Dan Obrador claimed that the reason the price needed to be that low was that Pacific Seafood had one million pounds of frozen Dungeness crab in the freezers, thus there was no demand and the ex vessel price had to be low. Bornstein's Mike Shirley and Hallmark's Scott Adams concurred that they "need to keep the price down."

266. The same claim that it had one million pounds in the freezer and that there was no demand for crab was also used by Pacific Seafood in its price negotiations with crabbers. However, in fact, Safeway had already paid for the one million pounds, and was just keeping it in Pacific Seafood's freezer temporarily. Thus, while technically true that Pacific Seafood had one million pounds in the freezer, that fact had no bearing on demand for crab, which, in fact, was very high.

267. Indeed, in mid-December 2023, buyers were getting $9-$10/lb. for live crab and $19/lb. for whole cooked crabs from customers like Whole Foods, Safeway and Costco, and paying crabbers in Puget Sound upwards of $7.75/lb. ex vessel.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**6.    2024/25 Pacific NW Area Dungeness Crab Season**

268.    Price fixing between Defendants in the Pacific NW Area's ex vessel Dungeness crab market continued into the 2024/25 season.

269.    In December 2024, Da Yang's Kyle Horgan texted Fathom's Cody Mills stating: "Let's talk Monday when a price is confirmed. I still haven't heard anyone else coming out with a price." Mr. Mills responded: "Price is coming out[.] Pacific [Seafood] offered $4.25 and boats said no." When Mr. Horgan responded incredulously, "WHAT," Mr. Mills replied: "Boats want $4.75." Mr. Horgan then retorts: "Fentanyl Fantasies[.] First they were fine with 4.25 then 4.50 and now 4.75."

270.    A short while later, on January 9, 2025, Fathom's Mr. Mills texted Da Yang's Mr. Horgan: "I keep hearing that Pacific [Seafood] is coming out at $5 in Northern California. Not confirmed though." A day later, Mr. Mills asked Mr. Horgan: "Have you heard any more on pricing?" Mr. Horgan replied, "I haven't."

271.    Less than a week later, Fathom's Mr. Mills texted Da Yang's Mr. Horgan: "Yo, have you guys announced a price? Let me know what's up when you talk to Chang [Lee of Da Yang]. Let's work together!"

272.    Various ports in the Pacific NW Area north of the Mendocino County line opened prior to the new year, but ports south of the Mendocino County line remained closed by the California Department of Fish and Wildlife because of whale issues. For much of this period, Defendants refused to offer an opening price to crabbers south of the Mendocino County line, despite being actively engaged in buying in ports north of the Mendocino County.

273.    Finally, at almost the last minute before crabbing was allowed to begin south of the Mendocino County line, Defendants offered ex vessel prices to the crabbers that were substantially below what was being paid north of the line.

274.    On the morning of January 1, 2025, prior to the opening of the Dungeness crab season in areas south of the Mendocino County line, Safe Coast's Max Boland sent a text message to Pacific Dream's Jerod Goodin: "Sorry missed you[r] call up at 3:00 took a nap. SF asking 5.75.

I told them 4.50 when asked. The Tides in Bodega [*i.e.* Hallmark] gave them a 3.50-3.75 price. Fishermen met, then came back with 5.75. I think the market will fall in line with 4.50."

275.    Later that same day, Boland wrote Goodin: "I hear two buyers paying 6.25 in NP [i.e., Newport, OR, where the season had already opened]. SF settled for 5.00." Mr. Goodin replied: "Yes I heard SF $5.  People are still pay[ing] higher up here.  We will see what happens."

276.    Indeed, Defendants who purchased crab in ports south of the Mendocino County line, when the area opened in on January 5, all paid at or near $5/lb, as did Unnamed Co-Conspirator #1.

### C.    <u>After the Opening, Defendants Closely Coordinate With One Another on Ex Vessel Prices</u>

277.    Defendants' price coordination isn't limited to the opening of the season, rather it continues as the season progresses.

278.    As discussed elsewhere herein, prior to the formation of Defendants' cartel, Nor-Cal, ASE, Ocean King, and other live buyers would drive the price up as the season progressed, in large part, by having refrigerated "white vans" drive to various ports and actively soliciting crab from crabbers thereby offering higher ex vessel prices, which, in turn, forced other buyers in the visited ports to increase their prices and more generally raising the ex vessel market price in the Pacific NW Area.

279.    That no longer occurs. Rather, now, Nor-Cal, ASE, Ocean King, and the other Defendants, instead, share information and coordinate their price offers in order to minimize the extent to which ex vessel prices rise as the season goes on.

280.    Texts between Ocean King's George Lay and Bornstein's Andrew Bornstein from 2021 demonstrate how this is done in real time.

281.    On January 14, 2021, Mr. Lay texted Mr. Bornstein to let him know that some buyers in San Francisco had raised their offered ex vessel prices to $3/lb., asking: "What are you doing with your boats down there?"

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

282.    When Mr. Borstein responded with non-price related information, Mr. Lay followed up, "Will you be matching the price?" And Mr. Lay further told Mr. Bornstein that he was likely to "get a call from Ben soon so I'd like to know what to tell him."

283.    Mr. Borstein then reply, "More than likely." But he qualified that making clear that he would not explicitly tell crabbers that Bornstein would match and would not pay more than $5/lb.

284.    To this, Mr. Lay responded, "Exactly. I agree. I haven't said a word to my boats. It's unnecessary, they aren't even close to filling up and won't be coming in anyways. The guys in Sf are off their rockers."

285.    The next day, Mr. Lay followed up with Mr. Bornstein, "Well, it's going crazy here. $4/lb yesterday."

286.    Consistent with Ocean King Lay's and Mr. Bornstein's stated agreement not to pay more than $5/lb. ex vessel, *no Defendant*, including Ocean King and Bornstein, nor Un-named Co-conspirator #1 or #2, paid more than $5/lb. ex vessel for Dungeness crab in the Pacific NW Area for the entirety of January 2021. In contrast, during the same period, various non-Defendant buyers paid substantially over $5/lb. ex vessel for Dungeness crab in the Pacific NW Area.

287.    A similar exchange occurred between Mr. Lay and Mr. Bornstein in January of 2024.

288.    This time, Mr. Bornstein opened up the discussion of ex vessel prices, asking: "Do you have a dock price down there?" To this, Mr. Lay responded that he was offering $3/lb. in Crescent City but did not have a price yet for Central California.

289.    Mr. Bornstein responded, "Dang. We're at 3.50 and I have boats up my ass saying the live guys are offering 4.00." To this, Mr. Lay responded: "No way. Don't believe them." "Boats wanted $3.50. But we didn't give that for eureka/cc and we are not going to give that for sf either."

290.    Apparently reflecting the effect that Confidential Buyer Informant #1's offers to buy crab at high prices were having in on prices in Oregon, discussed below, Mr. Bornstein then responded: "Newport is 4.00 today and someone is offering my Astoria guys $3.85…"

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

291.  After a further discussion of ex vessel prices, Mr. Lay confirmed to Mr. Bornstein, "I'll give you any information I get."

292.  The next day, Ocean King's Lay and Mr. Bornstein pick back up their discussion of ex vessel prices, with Mr. Lay asking, "How did the price go up there." And Mr. Bornstein responding, "Pacific and live guys went to 4.00."

293.  Mr. Lay then asked, "Any feed back on the cook side?" To this Mr. Bornstein responded, "Cook needs to get down as soon as possible. Maybe 3.00 dock plus ? For a lift fee? I'll go ask my trucker what a rate to their is…"

294.  Mr. Lay responded: "Agreed. Let me know as we are going to set a price. Pac hasn't come out with one yet. Which is a bit odd."

295.  The next day, Mr. Bornstein followed up, "Got a price down there yet?" And to this Mr. Lay responded: "Good morning Andrew $3.25 to the boats."

296.  In March 2024, Ocean King's Mr. Lay sent a text message to Bornstein's Andrew Bornstein inquiring, "Hey Andrew! What's the price now and out of which dock?"

297.  Mr. Lay responded: "It would be out of astoria next week. No idea what the price for live is next week, it was 4.25 to the boat and 4.75 on the truck last week. We cleaned everyone up on Monday and now everyone was blown in for a week."

298.  Mr. Bornstein then responded: "I see. Same thing here. … boats get out again on Sunday or Monday. We are $4 to the boat. Let's check in again come Monday? I'll have a better idea."

299.  Mr. Lay then conveyed his agreement by sending a thumbs up emoji.

300.  A few days later, Mr. Lay wrote to Mr. Bornstein: "Hey Andrew. How's it looking like so far?"

301.  Mr. Bornstein responded: "What do you need it on the truck for today to make it work? Some boats are hearing live price is down."

302.  Mr. Lay then replied: "Yeah it is. Every year after Chinese new years it comes to a big slow down. We are not pushing our boats to go out either. What about $4.50? … Think you'll be able to confirm today?"

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

303. Mr. Bornstein then answers, "Trying need a few more," to which Mr. Lay responds, "Ok. Standing by."

304. In another example, on December 11, Cody Mills of Fathom texted Kyle Horgan of Da Yang asking if he'd heard about the "crazy fucking price Hallmark put out." Mr. Horgan asked for an update, and Mr. Mills replied that Hallmark was offering "$4[.00/lb] cook[ed] and $6[.00/lb] live."

305. Similarly, communications between Safe Coast and Pacific Dream further demonstrate how Defendants exchanged pricing information in order to coordinate ex vessel Dungeness crab prices.

306. In February of 2023, Safe Coast's Max Boland told Pacific Dream's Jonathan Mark via text message that Safe Coast was losing crab boats in the Pacific NW Area. In other words, boats that were formerly selling to Safe Coast were, instead, selling to other buyers, something that usually, if not always, results from those other buyers offering higher ex vessel prices to the boats. Mr. Mark replied: "Losing boats to who? Isn't Bornstein 1.75 next door to you?" (At the time, Bornstein and Safe Coast had the largest buying operations in Ilwaco, which were next door to each other.)

307. Mr. Boland replied: "I raised the price in Ilwaco, Crescent City and SF Pier. We were paying 2.00, boats were shopping. I don't think Bornstein paying 1.75. If so, boats would have left. I'm off the market with Frozen sections and whole cooks. Catch is slowing boats are stacking out, so raise the price." Mr. Mark then responded: "I totally understand it."

308. Safe Coast's Boland's sharing of this information with Pacific Dream's Mark does not make economic sense absent an agreement to fix ex vessel prices, as absent such an agreement, Pacific Dream's Mark could have, and would likely have, used the information provided by Safe Coast's Boland to Pacific Dream's advantage, including by taking for itself some of Safe Coast's boats and thus increasing the crab that it had available to sell, thus increasing its profits.

309. Further demonstrative of Defendants' pattern and practice of coordinating amongst each other the ex vessel prices that they pay, generally, and the ex vessel prices they pay for

Dungeness crab specifically, in July of 2022, Safe Coast's Max Boland and Pacific Dream's Mark exchange a series of text messages regarding ex vessel Dungeness crab prices in British Columbia.

310. Mr. Boland sent a text message to Pacific Dream's Jonathan Mark: "No price set yet from what I am hearing." Mr. Mark replied: "I'm hearing No price either."

311. A few days later, Mr. Boland sent a text message to Mr. Mark: "Good morning. I am hearing the boat price 3.50C. I am hearing the cooked being offered into the bay at 5.50 del. 3.50 translates to about 2.71 US. I am being offered 5.70 on live. Too high." Rather than replying by text, Mr. Mark replied: "I'll call you today."

312. Later that same night, presumably after Mr. Boland and Mr. Mark had spoken by phone, Mr. Boland texted Mr. Mark asking: "What are you hearing? Did you buy?" Mr. Mark replies: "Not buying any cook yet. Call you tomorrow."

313. On January 13, 2025, as similar exchange occurred between Safe Coast's Boland and Pacific Dream's Austin Sterkel regarding ex vessel prices in the Pacific NW Area Dungeness crab market. Mr. Boland texted Mr. Sterkel: "Have you heard any scuttle regarding a price up here?" Sterkel replied that he hadn't but "I'll let you know if I hear anything."

314. Further examples of Defendants' price coordination once the season begins in the Pacific NW Area Dungeness crab market come from exchanges between Safe Coast and Da Yang and internal discussions between Safe Coast employees concerning those exchanges.

315. In an internal Safe Coast text message from February 28, 2023, Boland wrote: "Da Yang heard we raised the price and Dana called to confirm."

316. On March 15, 2023, an internal Safe Coast text message from Safe Coast's Xia Zhao states: "Boats kept telling me Dayang paying $3.5 for live, I called Dayang, Dayang said 'they are saying Ilwaco is paying $3.5." The next day, Safe Coast's principal Chris Lam writes: "Have Max [Boland] call his contact at Dayang."

317. In another example, on February 22, 2024, Safe Coast's Max Boland sent a text message to Da Yang's Chang Lee asking: "Are you paying 3.90 for cooking crab?" Mr. Lee responded, "No. Live $3.90" and "Cook $3.50 to the boat." "Same here!" Mr. Boland replied.

318.    Mr. Lee then informed Mr. Boland: "I heard westport live $3.80, newport live $4.10-$3.90. So our live buyer is at $3.90. Confirmed cook price went up yesterday morning to $3.50. Borstein."

319.    Mr. Boland then responded: "We raised here yesterday morning. They [Bornstein] may have followed."

320.    A couple days later, on February 24, 2024, in an internal text message between Safe Coast employees, Xia Zhao informed colleagues regarding what she had learned from Da Yang about Bornstein's crab prices: "Just talked to Chang [Lee] (I'm at Dayang)….Borstein is $3.75 for cook today." Another Safe Coast employee then asked: "Are we going to stay at 3.5 for cook?" Boland replied: "If Bornstein is true I think we move to 3.75." Safe Coast's Chris Lam then replied: "Ok. Let's find out to see if Borstein is true."

321.    Mr. Boland then texted Mr. Lee inquiring: "When did Bornstein go to 3.75? What are you at for cook?" Mr. Lee replied: "I just talked to marco [at Bornstein] this morning he said starting today 3.75 but nothing to cook today."

322.    Mr. Boland later tries to confirm: "Are you going to 3.75 for cook?" Mr. Lee replied: "Im not really sure. … If the market price 3.75, then will match."

323.    When Boland reports this information to his colleagues at Safe Coast, Safe Coast's Chris Lam—who, at the time, had not long been involved in the Pacific NW Area's Dungeness crab ex vessel market—asked: "Aren't they [Bornstein and Da Yang] competitors? Why would he [Marco at Bornstein] tell Chang [Lee at Da Yang]?"

324.    It does not appear that Mr. Boland or any of the other Safe Coast employees on this text string responded to Mr. Lam's question by text, likely not wanting to put into writing that the reason why Borstein would share this information with Da Yang is that they were part of the price-fixing cartel of which Safe Coast was also a member and so Bornstein trusted Da Yang not to use this information to Bornstein's competitive disadvantage but rather to further their price fixing agreement.

325.    Further evincing that membership, the next morning, Da Yang's Chang reported to Safe Coast's Boland: "We are still cook $3.50. Sounds like warrenton still $3.50."

326. [Add pricing allegations]

327. Similarly, Anthony DeLima of Hallmark and John Caito "checked in" on one another's prices in a text exchange on January 20, 2021, to ensure that the other was paying the agreed-upon price. Mr. DeLima reached out to John Caito first, asking: "Did you pay 5.00 in the city yesterday and today?" Mr. Caito responded "No , $4:50 in the city and $4:00 in crescent city, eureka and fort Bragg."

328. Mr. DeLima then said: "People are saying you guys are paying five bucks just wanted to confirm." After some additional exchanges, Mr. Caito put the question back to Mr. DeLima: "Are you paying $4.50?" To which Mr. DeLima responded "Yes sir."

329. In addition to making sure that other members of the cartel are paying the same price in the first place, members of the cartel police one another's retroactive payments to crabbers. On January 21, 2024, for example, Safe Coast's Max Boland instructed Southwind's Sal Perri not to make retroactive payments to crabbers, texting: "Do not retro!!!"

330. This specific instruction was designed to "hold the line" against pressure by John Caito and others, who were trying to get other buyers to make retroactive payments to crabbers in order to level the playing field and ensure that other buyers did not have a competitive edge over them on the sell side. Later, on January 21, 2024, Boland texted Chris Lam, the owner of SafeCoast: "[John] Caito came over pissed off. We are going to retro. We do not retro…Noyo called and said you will have to pay, I said no. We won't."

331. Both the fact that John Caito attempted to force other buyers to raise the price retroactively, and the fact that Safe Coast reached out to other buyers and told them not to do so, evidences the fact that Defendants had previously agreed to pay the same price as one another.

332. Beyond their own prices, buyers frequently exchange information about other what other buyers are paying and commit to doing the same.

333. For example, after discussing prices with John Caito on April 27, 2018, Kevin Lee texted "Let me find out more tomorrow with other buyers. Wildplanet drop 6.50 today."

334. On a separate occasion, Mr. Lee texted John Caito on February 4, 2022: "Let u known price Sunday. I'm hearing price go up 6.30."

335. These conversations are more than just information sharing. That they are part of an agreement to fix prices.

336. This is indicated, *inter alia,* by text from Kevin Lee to a crabber on December 26, 2021: "Are you still fish for me this year? I'm putting thing together. Let me know please thanks." He followed up with: "We going to paying same as Caito's paying." Such a statement would make no sense in the absence of an agreement to fix prices, as it would put Mr. Lee on the hook for whatever price Caito elected to pay, no matter how high. The only way it makes sense is if the parties have agreed to fix the price. Similarly, on the morning of January 17, 2021, Safe Coast's Max Boland shared pricing information for several competitors with Caito's Joseph Caito: "Tides [Hallmark] at 4.50. Pezzolo going to 4.50. Here we go!" To which Joseph Caito's immediate response was "Got it thanks Max I guess we're paying 450."

337. Landing records from San Francisco and Bodega Bay—locations at which Safe Coast, Caito, Hallmark, and Pezzolo (which was acquired by Pacific Seafood the following year) operated at that time—show that each of these companies paid exactly $4.50/lb. and, with only minor variation, from the date of this exchange until the end of January. Moreover, while some non-defendant buyers paid more during this period for crab landed in these ports, Defendants Ocean King, Nor-Cal, ASE, and the Unnamed Co-Conspirator (which, at the time, sold almost exclusively to Defendant Fishermen's Catch) also uniformly paid $4.50/lb. for crab until the end of January.

338. These types of discussions extend not only throughout crab season but beyond. In one text from Da Yang's Kyle Horgan to Fathom's Cody Mills during the summer months, Mr. Horgan wrote: "Let's game plan crab season and have some open brainstorm for this next year."

339. These types of exchanges demonstrate not only that Defendants were constantly sharing pricing information but coordinating the prices they were offering to crabbers in response thereto.

340. Moreover, as alleged in more detail *infra,* in many cases, Defendants won't even bother to directly purchase from crab ex vessel from crabbers, but, instead, will just purchase the crab "out the backdoor" of one of their co-conspirators, eliminating the ex vessel price competition that their independent ex vessel purchases would otherwise have created.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

341.    Thus, for example, in February of 2022, a crabber who had sold to Kevin Lee of Nor-Cal for many years texted to tell him that he had a load of about 7,000 lbs. Mr. Lee asked how much the crabber wanted for the load and was told $7.00/lb. In response, Kevin Lee texted that $6.00/lb. was the dock price, and then ceased communications, rather than negotiate with the crabber as he would have done in the past. Later the crabber told his friend who operated the hoist at the Lucas Wharf in Bodega Bay about this exchange with Kevin Lee. In response, his friend told him that the reason Mr. Lee felt no need to negotiate with the crabber as he had in the past was that he could buy all the crab he wanted out of the back door from Hallmark at the Tides in Bodega Bay at or around the dock price.

342.    In another example from January of 2025, Safe Coast's Max Boland sent a text message to Pacific Dream's Jonathan Mark asking: "If you're paying 6.25, and I pay a dime over to get a boat to come in, can you pay me 0.50 over the cost?  Mr. Mark agreed, replying: "Yes." Therefore, instead of paying the crabber the higher price of $6.85 per pound, which Safe Coast ultimately paid Pacific Dream and which, if paid to the crabber, would have increased the ex vessel prices Defendants had to pay in the market, Defendants were able to keep ex vessel prices artificially suppressed by purchasing Dungeness crab from each other.

343.    As these examples demonstrate, "out the back door" purchases thus enable Defendants to acquire the Dungeness crab they need without it affecting the agreed-upon ex vessel price.

**D.    Defendants Have Consolidated Their Control of the Pacific NW Area Ex Vessel Dungeness Crab Market by Purchasing and in Many Cases Shutting Down Erstwhile Competitors, Entering Into Exclusivity Arrangements with Port Operators, and Limiting Non-Cartel Members' Access to Hoists**

**1.    Pacific Seafood**

344.    In a process that began over 40 years ago, Pacific Seafood has acquired numerous companies that formerly participated as buyers in the Pacific NW Dungeness crab ex vessel market or the landing and/or processing assets of those companies, in many cases eliminating the acquired landing and processing capacity.

345.    As a result, Pacific Seafood now is by far the largest ex vessel buyer in the Pacific

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

NW Area, there are fewer substantial ex vessel buyers in the Pacific NW Area, and fewer independent hoists in Pacific NW Area ports that out-of-port or "white van" buyers can utilize to purchase crab directly from crabbers, ex vessel.

346.    Its first acquisition was of Pacific Coast Seafood, in 1983, which operated a crab processing plant in Warrenton, Oregon.

347.    This was followed by its acquisition of Pacific Choice Seafood, in 1986, which operated a crab processing plant in Eureka, California.

348.    This was followed by its acquisition of Pacific Choice Seafood, in 1990, which operated a crab processing plant in Charleston, Oregon.

349.    Thereafter, Pacific Seafood acquired Washington Crab Processors, in 1993, which operated a crab processing plant in Westport, Washington.

350.    Then, in 2001, Pacific Seafood acquired the processing and distribution assets of Eureka in 2001. Eureka Fisheries operated processing plants from Fort Bragg, California to Neah Bay, Washington, as well as important refrigeration plants, and hoists in Eureka, Bodega Bay, and the East San Francisco Bay Area. Eureka Fisheries provided Dungeness crab processing and hoist services to fish buyers in facilities throughout the Pacific NW Area. Pacific Seafood ended this practice and shut down many of the assets acquired from Eureka Fisheries, including the hoists.

351.    This was followed by a series of further acquisitions of erstwhile processing competitors in the 2010s and 2020s.

352.    In the mid to late 2010s, Pacific Seafood took a 49% interest in Ocean Gold, and entered into contracts with it that gave Pacific Seafood control over its ex vessel pricing and sell side of its business

353.    Ocean Gold's large processing facility, the largest on the west coast, and freezing plant in Westport, Washington, has the capacity to store 20-25 million pounds of product at any given time.

354.    Then, in 2018, Pacific Seafood purchased North Coast Fisheries, a company formerly operating in Santa Rosa, California, which had substantial Dungeness crab processing

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

capacity and would frequently purchase crab from other buyers that it would then process and freeze. Rather than continue to operate the business or incorporate the facilities into its own business, however, Pacific Seafood shut down North Coast's processing facilities and routed all of North Coast's former accounts through Pacific Seafood's other processing facilities.

355.    Subsequently, in 2022, Pacific Seafood purchased Pezzolo's Seafood, one of the last remaining seafood processors that could handle Dungeness crab and had any appreciable freezer capacity in San Francisco. Pezzolo Seafood, moreover, had the only significant processing capacity (i.e., cooking) in Central California and would engage in contract processing for other buyers and crabbers who, like Brand, also sell direct to consumer. This cooking capacity for permitting and other reasons is very difficult for another company to establish. When Pacific Seafood acquired Pezzolo Seafood, it did not shut down its processing capacity, but it ceased to provide contract processing to other buyers.

356.    Pacific Seafood also currently leases a portion of a Fishermen's Terminal facility, a fish processing facility in Eureka which was funded by federal Economic Development Agency grant money. Pacific Seafood attempted to buy the facility, despite the intended public use and benefit, but the City of Eureka backed out after the public learned of the plan to sell a facility worth approximately $8 million to Pacific Seafood for $1.5 million.

357.    Pacific Seafood does not use the Fishermen's Terminal facility to process crab or other seafood and does not permit others to use the processing facilities. Instead, Pacific Seafood uses it for storage related to Coast Seafoods, an oyster and shellfish business owned by Pacific Seafood.

### 2.    Ilwaco Landing Fishermen

358.    Ilwaco Landing Fishermen was founded by Mike Shirley and Scott Kastengren in 2015 and operated as a seafood buyer and distributor with bases of operation in Garibaldi, Oregon and Ilwaco, Washington. In 2017, Ilwaco Landing Fishermen merged with Fishpeople Seafood, and the new entity continued to purchase ex vessel Dungeness crab under the Fishpeople Seafood name and operate its existing facilities, including the processing warehouse in Ilwaco Landing. Fishpeople Seafoods was acquired by Bornstein Seafoods Inc. on or around February 25, 2022.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

359. Prior to the acquisition by Bornstein, Mike Shirley, running operations at Fishpeople, made a significant purchase of ex vessel crab and processed it in hopes of selling it to retail accounts for a substantial profit. Mr. Shirley was unable to sell the crab, because the accounts he'd planned to sell to were approached by Bornstein Seafoods and Pacific Seafood, who undercut Mr. Shirley's prices. Unable to sell all the crab, for which a significant financial outlay had been made, Mr. Shirely was forced to sell the crab at a loss, to Hallmark Fisheries. The loss incurred by Fishpeople, and Mr. Shirley personally, precipitated the sale to Bornstein.

360. Shortly after Bornstein acquired Fishpeople, including the facility on Ilwaco Landing and the associated pier and hoist, Mike Shirley went to work as Manager for Bornstein in Ilwaco, a position he still occupies.

361. After Bornstein's acquisition of Fishpeople and its facilities in Ilwaco, Bornstein and Safe Coast are now the only entities with a presence in Ilwaco.

**3.    Trinidad**

362. The dock and hoist in Trinidad, California are operated by the Trinidad Rancheria. The Rancheria controls which buyer can take the crab unloaded in Trinidad. Ocean Gold and Nor-Cal Seafood have an agreement with the Rancheria whereby they are the only buyers that can unload any significant amount, and they get to set the ex vessel price of crab unloaded there. Ocean Gold pays the tribe approximately $1 million each season for this exclusivity agreement. During the 2022/23 season, as part of its deal where it paid the Rancheria $1 million, Ocean Gold set the ex vessel price at $2.25/lb.

363. Confidential Buyer Informant #1 has been prevented from unloading crab in Trinidad, for which he would pay above what Ocean Gold and Nor-Cal offer, during recent seasons because of the agreement that Ocean Gold and Nor-Cal have with the Rancheria.

364. Pursuant to the exclusivity agreement with the Rancheria, Ocean Gold buys nearly all of the ex vessel crab in the early part of the season, and once it is done, or if it is unable to take available crab, Kevin Lee of Nor-Cal comes in to take the remaining crab. During the relevant period, over 95% of the crab in Trinidad was landed by Ocean Gold and Nor-Cal in each year except in the 2020/21 season, when they combined to land 86% of the total volume.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

365.     Prior to Ocean Gold being the sole early-season buyer, Hallmark Fisheries had exclusive access to crab landed in Trinidad, with Nor-Cal playing the same secondary role it plays currently with Ocean Gold.

**4.     Eureka**

366.     In Eureka, California, prior to approximately 2016, the public hoist was run by Humboldt Seafood Unloaders ("HSU"). HSU's owner, Manuel Silveira, was aggressive in bringing in multiple live buyers from outside Eureka, including Nor-Cal Seafood, ASE, Next Seafood (managed at that time by Peter Nguyen, who is the current buyer for and owner of Fishermen's Catch) and Ocean King, among others, to buy from Eureka crabbers. Mr. Silveira would coordinate the buyers' arrival in port with the return of crabbers with loads of crab. Mr. Silveira would charge a poundage fee, a price per pound he unloaded with the hoist, for crab landed in Eureka. A standard practice among hoist operators.

367.     In or around 2016, the City of Eureka terminated HSU's lease and pushed them out of the main harbor area to a distant and dilapidated dock, a move that was orchestrated by Pacific Seafood and Bill Carvalho, who ran Wild Planet Seafood, which, along with Pacific Seafood, already had a presence in Eureka. Wild Planet leased the hoist from the City after HSU was moved out.

368.     Wild Planet Seafood sold its Dungeness crab business to South Bend Products in early 2020, and thereafter South Bend took over the lease of the hoist and related facilities on the dock. South Bend has since limited the buyers it unloads crab for, charging prohibitively expensive unloading fees to non-favored buyers.

369.     South Bend leases a portion of the Fishermen's Terminal facility, but – like the facility's other tenant, Pacific Seafood – South Bend does not use the processing capacity, instead using the facility for storage.

370.     In addition to the public hoist in Eureka, there's a private hoist in Fields Landing, in the southern portion of Humboldt Bay, that Ocean Gold controls, and is the only buyer allowed to unload crab there.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**E.    To Eliminate Price Pressure Formerly Created by Out of Port Buyers, Defendants Have Agreed to Buy and Sell "Out the Back Door"**

371.    While Defendants were limiting the amount and type of buyers that could access a given port by dominating key infrastructure, such as hoists, Defendants agreed that, instead of traveling up to ports where they did not have a presence and driving ex vessel prices up by purchasing crab directly from crabbers there, they would, instead, simply buy "out of the back door" from other cartel member buyers with a presence in the port.

372.    As discussed elsewhere herein, before implementation of this part of Defendants' agreement, white van buyers, such as Nor-Cal, Ocean King, and ASE, played a significant role in driving up the market price for Dungeness crab. The agreement amongst Defendants to instead buy and sell from each other "out the back door" has eliminated this price pressure by allowing former white van buyers to fill their supply needs without having to compete with their cartel co-members on ex vessel prices.

**1.    South Bend**

373.    In or around February of 2020, South Bend Products acquired Wild Planet Seafood's Dungeness crab business and took over Wild Planet's lease of the public hoist in Eureka, California. As the City of Eureka's "Designated Public seafood Unloader" South Bend Products controls operation of the only hoist in Eureka. South Bend has infrastructure in place at the hoist to unload crab for both the live market and processing.

374.    South Bend lands significant amounts of crab in Eureka, landing over 50% of the port's total volume during the 2024 season. South Bend does not keep the crab it lands for itself, rather South Bend sells it all directly to other buyers "out the back door." Other buyers, primarily Nor-Cal and ASE, provide South Bend with their own totes prior to the crab being landed, whereafter the crab is loaded directly into those totes and loaded into a waiting Nor-Cal or ASE truck. Prior to 2020, both Nor-Cal and ASE regularly landed crab under their own names in Eureka. But after 2020 those landings ceased except for a small handful of low-volume Nor-Cal landings in June and July of 2023. If South Bend does not sell its landed crab to Nor-Cal or ASE, it sells to Southern California Seafood or Ocean King.

**2.      Caito**

375.      Caito Fisheries purchased significant amounts of ex vessel crab, buying under Caito Fisheries Inc., from crabbers in San Francisco, Fort Bragg, Eureka, and Crescent City for at least the last 25 years. Caito Fisheries was acquired by Southwind Foods in the Spring of 2023. Caito Fisheries has continued to buy ex vessel crab, as Caito Fisheries LLC, since its acquisition by Southwind.

376.      Caito Fisheries landed approximately 420,913 pounds of crab in Eureka (25.7% of the port's total landings) and 918,178 pounds of crab in San Francisco (24.3% of the port's total landings) in 2024. The crab landed by Caito in Eureka and San Francisco amounts to approximately 88% of the total crab Caito Fisheries landed in California in 2024. Caito sold a significant portion of this crab "out the back door" to Ocean Gold, instead of processing it and selling it to any of its retail accounts. In both ports, Caito Fisheries was observed on multiple occasions landing crab and loading it into Ocean Gold totes which were then put on Ocean Gold's trucks and transported out of the landing port.

377.      On or about August 7, 2024, John Caito contacted Confidential Buyer Informant #1 and told him that Caito Fisheries, and by extension Southwind, had an agreement with Pacific Seafood whereby Ocean Gold would receive a significant portion of the Dungeness crab that Caito Fisheries lands in California in the upcoming seasons, just as in 2024. In exchange for Caito Fisheries securing increased volumes of ex vessel crab for Ocean Gold, Pacific Seafood would give Caito Fisheries increased control over the California groundfish market, via near-exclusive access to the volume that Pacific Seafood now controls. Specifically, Pacific Seafood agreed to direct the fishers currently selling groundfish to Pacific Seafood to sell their fish to Caito.

378.      Caito also purchased and sold "out the back door" to other buyers. Among these was Kevin Lee of Nor-Cal Seafood. On April 28, 2018, Kevin Lee texted John Caito: "Confirm crab price 6.50 for tomorrow," to which Mr. Caito responded: "I told the boat the price, he will let me know what he wants to do, I will let you know later, he has 1500 pounds."  Shortly thereafter, Mr. Caito texted: "just talked to the boat. He will be unloading tomorrow at 11:00. Please have the truck here. Thank you." The landing records demonstrate that Caito purchased just over 1,500

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

pounds of Dungeness crab the following day, while Nor-Cal had no landing there in that timeframe, corroborating that Nor-Cal, instead of competing with Caito for the crab, purchased it from Caito out-the-backdoor.

### 3.   San Francisco

379.   Unnamed Co-conspirator #1 purchases a large portion of the total amount of crab landed in San Francisco and transfers almost all of it out the back door to Peter Nguyen, who currently owns and runs Fishermen's Catch, but who formerly bought for Global Quality and before that was with Next Seafood.

380.   Indeed, Mr. Nguyen dictates the ex vessel price that Unnamed Co-conspirator #1 pays to crabbers, including Plaintiff Little—with Unnamed Co-conspirator #1's representative literally telling Mr. Little and other crabbers that he'd like to pay them more, but Mr. Nguyen has directed him to pay a lesser amount, which he does.

### 4.   Crescent City

381.   There are 12 hoists in Crescent City, and each is effectively controlled by cartel members who coordinate to control the ex vessel price that is paid for any crab unloaded in the port.

382.   Global Quality controls 2 hoists, Safe Coast controls 2 hoists, Fishermen's Catch controls 2 hoists, Pacific Seafood controls 2 hoists, Caito controls 2 hoists, and LCZ Unloaders controls two hoists, with on that exclusively serving Nor-Cal and one exclusively serving ASE.

383.   In February of 2023, which was early in the season following a delayed opening, Confidential Buyer Informant #1 made arrangements with numerous boats in Crescent City, California to purchase ex vessel crab for $2.45/lb. The buyers that were already present and active in Crescent City – Global Quality, Fishermen's Catch, Safe Coast, Pacific Seafood, Nor-Cal, ASE, and Caito – all told Confidential Buyer Informant #1 their agreed ex vessel price in Crescent City was $2.25/lb., and told Confidential Buyer Informant #1 to stay away.

384.   Wes Taylor, who runs the LCZ Unloaders hoists for Nor-Cal and ASE, and Leon Gavin, who runs the Fishermen's Catch hoists, told Confidential Buyer Informant #1 that the group of buyers didn't want him to come in with a higher price, and therefore they would charge

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

him an exorbitant unloading fee if he offered to pay crabbers anything more than the $2.25/lb. ex vessel price that the cartel had set. This effectively prevented Confidential Buyer Informant #1 from buying crab in Crescent City for an ex vessel price that was higher than what the cartel members there had agreed to pay; exactly the result those cartel members desired.

**F.    Defendants Aggressively Coerce Compliance by Each Other and by Other Buyers with the Agreed Upon Pricing**

**1.    During the 2022/23 and 2023/24 Seasons, a New Buyer Sought to Capture Market Share by Offering Higher Prices; Defendants Sought to Bring Him into the Cartel and When This Failed Inflicted Repeated Punishments**

385.    In the 2022/23 and 2023/24 seasons, when, as one crabber put it, Defendants were seeking to "drive the boot right in," a new significant buyer, Confidential Buyer Informant #1, sought to make inroads into the Pacific NW Area Dungeness crab ex vessel market. And he did so by offering higher ex vessel prices to crabbers. Confidential Buyer Informant #1's reasoning was simple: if he offered a higher price, he got the crab.

386.    Defendants greeted his arrival first with efforts to bring him into their cartel. When that failed, Defendants threatened him. And when that failed, Defendants took actions aimed at destroying his fish-buying business.

**a.    January 2023: Nor-Cal's Kevin Lee and Pacific Seafood's Frank Dulcich Solicited Confidential Buyer Informant #1 to Participate in Cartel, Then Punished him When He Refused**

387.    On or around January 13, 2023, Confidential Buyer Informant #1 was called by Frank Dulcich of Pacific Seafood and Kevin Lee of Nor-Cal, and told that if he agreed to only pay an ex vessel price of $2.25/lb. to crabbers in the various ports in Oregon and California he serviced, Nor-Cal would buy all of Confidential Buyer Informant #1's excess crab at $3/lb.

388.    After the call, Kevin Lee texted Confidential Buyer Informant #1 to relay a threat from Frank Dulcich: small buyers come and go, and that it's easy for a buyer like Pacific Seafood to take a loss of $1 million to teach a guy a lesson. After Confidential Buyer Informant #1 refused the offer, a large number of Confidential Buyer Informant #1's retail accounts in the

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

San Francisco Bay Area that had pre-ordered crab pulled out of their agreements to buy from him after Nor-Cal sold them crab at less than $2/lb.

389.    During the period in which this occurred, Nor-Cal was paying at least $3/lb. ex vessel for Dungeness crab; more than a dollar less than what Nor-Cal charged Confidential Buyer Informant #1's retail accounts.

390.    These retail accounts that were sold Dungeness crab by Nor-Cal at $2/lb. included at least the following: Lucky's Seafood Market; California Fish Market SF; Seafood Center SF; Fresh Meat Seafood SF; Liangs Seafood; Long Ling Supermarket Oakland; New Century Seafood Market; and San Bruno Market.

391.    Around the same time in January of 2023, Nor-Cal's Kevin Lee called Confidential Buyer Informant #1's uncle, who had long been involved in the commercial fishing industry, hoping to get him to convince Confidential Buyer Informant #1 to drop the ex vessel price he was offering. Kevin Lee told Confidential Buyer Informant #1's uncle that it was too early in the season for such high prices, and that Confidential Buyer Informant #1 was screwing things up for Nor-Cal and the other cartel members.

**b.    In Early 2023, Safe Coast's Max Boland Tried to Get Confidential Buyer Informant to Toe the Cartel's Line on Ex Vessel Prices Set by Pacific Seafood**

392.    In early 2023, Max Boland of Safe Coast told Confidential Buyer Informant #1 that Safe Coast won't pay an ex vessel price for Dungeness crab higher than what Pacific Seafood's Frank Dulcich wants paid.

393.    Once Boland found out Confidential Buyer Informant #1 was paying crabbers more than the ex vessel price that Pacific Seafood had set, Boland called Confidential Buyer Informant #1 and warned him that Confidential Buyer Informant #1 wouldn't be able to offer those prices in Crescent City because the port was "locked down" by people working with Pacific Seafood.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**c.      February/March 2023: In Response to Confidential Buyer Informant #1's Publicized Offer of a Higher Ex Vessel Price, Multiple Cartel Members Told Confidential Buyer Informant #1 to Lower His Ex Vessel Price**

394.    In and around February/March of 2023, Confidential Buyer Informant #1 posted in a Facebook group frequented by crabbers and buyers in the Pacific NW Area that he was paying between $3.00 and $3.50 per pound ex vessel for Dungeness crab.

395.    In response, Scott Adams of Hallmark Fisheries called and told him to stop offering $3 to $3.50 per pound ex vessel for Dungeness crab—which was substantially above the ex vessel price of around $2.50/lb. that Hallmark, Pacific Seafood and others were offering—and drop his price.

396.    Pacific Seafoods' Brett Hester, Nor-Cal's Kevin Lee, also called him and told him to stop offering $3 to $3.50 and drop his price.

**d.      April/May 2023: More Cartel Members Tell Confidential Buyer Informant to Lower His Ex Vessel Price**

397.    In the period of April/May 2023, Confidential Fish Buyer #1 was paying $4/lb. ex vessel.

398.    In response to the problems this created for the cartel, the following representatives of Defendants called and told Confidential Fish Buyer that he was screwing things up for everyone else and needed to lower the ex vessel price he was offering: Max Boland of Safe Coast, John Caito of Caito, Nick Mareno of Fathom Seafood, and Brett Hester of Pacific Seafood.

**e.      July/August 2023: Pacific Seafood Interfere in Confidential Informant's Effort to Establish a Buyer Operation in Eureka**

399.    In and around July and August of 2023, Pacific Seafood intervened in Confidential Buyer Informant #1's efforts to secure a lease on facilities on the Eureka, CA waterfront in retaliation for his failure to obey the cartel's ex vessel pricing dictates and to hinder his ability to offer higher ex vessel prices to crabbers.

400.    This included aggressive petitioning of city staff by Pacific Seafood's legal team to deny or limit the lease sought by Confidential Buyer Informant #1.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

401.   As a result of this pressure, the terms of Confidential Buyer Informant #1's lease agreement for the facility he took on in the summer of 2023 limited his use of the public hoist in Eureka from 9 am-4 pm. Due to the nature of the fishery, this is untenable, as crabbers come in at all hours, and can't wait around.

402.   Simultaneously with this pressure, Pacific Seafood employees spread unfounded rumors about Confidential Buyer Informant #1 to area crabbers in order to dissuade them from doing business with him. This includes one instance in which a Pacific Seafood employee confronted Confidential Buyer Informant #1 in front of Eureka-area crabbers and falsely claimed that Confidential Buyer Informant #1 lacked the right to use the premises in Eureka to which Confidential Buyer Informant #1 holds a lease and that Confidential Buyer Informant #1was homeless.

**f.      August 2023: Bornstein's Andrew Bornstein and Mike Shirley Offer Confidential Buyer Informant Significant Benefits if He Joins the Cartel in the up Coming Season**

403.   On or around August 8-11, 2023, Confidential Buyer Informant #1 received a call from Mike Shirley and Andrew Bornstein of Bornstein Seafood and several follow-up texts. These Bornstein representatives offered to buy from Confidential Buyer Informant #1 300,000 – 400,000 pounds of albacore at $2500/ton ($500 over the market at that time) and as much black cod as Confidential Buyer Informant #1 had (knowing that Confidential Buyer Informant #1 was getting large quantities of black cod from fishers), in exchange for Confidential Buyer Informant #1 getting crabbers to accept a lower price for crab during the first 28 days of the 2023/24 season, which they referred to euphemistically as a "cooked price."

404.   This constituted a request by these representatives of Bornstein that Confidential Buyer Informant not offer a price above that offered by the cartel during the first 28 days of the 2023/24 season, which is how Confidential Buyer Informant #1 understood the request.

405.   After Confidential Buyer Informant #1 refused, Bornstein took actions to punish him for his refusal.

> **g.    Early/Mid-December 2023: Pacific Seafood's Brett Hester Threatened Confidential Buyer Informant #1 After He Did Not Comply With Pacific Seafood's Opening Price Instruction**

406.    As discussed elsewhere herein, in early to mid-December of 2023, Pacific Seafood's Brett Hester called Confidential Buyer Informant #1 and told him that the opening ex vessel price for the 20223/24 season was going to be less than $2/lb.

407.    Instead of complying with that dictate, soon after the first portion of the Pacific NW Area's Dungeness crab fishery opened for the season, Confidential Buyer Informant #1 posted to a Facebook group frequented by buyers and crabbers in the Pacific NW Area that he was paying $3.75/lb. for crab ex vessel, which was substantially above what Pacific Seafood and other Defendants were paying.

408.    In response, Mr. Hester sent Confidential Buyer Informant #1 a series of texts that started with a picture of Confidential Informant #1's post advertising the $3.75 ex vessel price offer, followed by "Damnit man," a picture of Confidential Buyer Informant #1's facility in Eureka, and a series of emojis that suggested a threat of violence.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111



h.    **Late December 2023: Nor-Cal's Kevin Lee Again Sought to Bring Confidential Buyer Informant #1 into the Cartel**

409.    On or around December 25, 2023, Kevin Lee of Nor-Cal Seafoods called Confidential Buyer Informant #1. Confidential Buyer Informant #1 was in his car with three of his

employees and his brother when the call came in; and he took the call on the car's speaker phone, resulting in these persons hearing the contents of the call.

410. Kevin Lee asked Confidential Buyer Informant #1 to "participate," by bringing down the ex vessel price he was paying. At this point, Confidential Buyer Informant #1 had already purchased approximately one million pounds for $3.75 - $4.00 per pound.

411. Mr. Lee, more specifically, told Confidential Buyer Informant #1 to keep the price the same as Nor-Cal's, and that they could help each other out in this and other ways, like making sure the other always has the crab or fish he needs.

412. Mr. Lee further told Confidential Buyer Informant #1 that Hallmark was doing the same with Nor-Cal, matching ex vessel prices and taking care of each other.

      i.       **December 2023/January 2024: Pacific Seafood Instructs Other Defendants Not to Do Business With Confidential Buyer Informant #1**

413. In and around the end of December 2023 and the beginning of January 2024, Confidential Buyer Informant #1 was buying large quantities of Dungeness crab at ex vessel prices higher than that dictated by the cartel.

414. Around the same time, representatives of Fishermen's Catch, Hallmark, and Global Quality Seafood, to whom Confidential Buyer Informant #1 was selling crab, told Confidential Buyer Informant #1 that they were getting calls from high-level individuals at Pacific Seafood, including Frank Dulcich, asking them not to do business with Confidential Buyer Informant #1.

415. At or around the time of these calls, Confidential Buyer Informant #1 was informed that Caito, who prior to the season's opening had agreed to purchase a very large amount of crab from Confidential Buyer Informant #1, had reneged on the deal. Instead, Caito had purchased the crab from Hallmark. Previously, Hallmark employees had sought from Confidential Buyer Informant #1 information about where he was selling all his crab.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**j.      Early-January 2024: Confidential Buyer Informant #1 Is Threatened by Cartel Members for Raising Ex Vessel Prices and Has Business Deals Interfered With as Punishment**

416.    On or around January 3, 2024, Max Boland of Safe Coast drove to Port Charleston, where Confidential Buyer Informant #1 was purchasing crab, to meet with him.

417.    In the meeting, Mr. Boland told Confidential Buyer Informant #1, in the presence of Confidential Buyer Informant #1's employees and brother, that Frank Dulcich had called Mr. Boland asking why Confidential Buyer Informant #1 was raising the price, and stating that "[Confidential Buyer Informant #1] is going to end up in trouble."

418.    Mr. Boland also told Confidential Buyer Informant #1 that Pacific Seafood, Ocean Gold, and Hallmark were angry about the higher ex vessel price Confidential Buyer Informant #1 was paying crabbers.

419.    Around this same time, Confidential Buyer Informant #1 got a call from Nick Mareno of Fathom Seafood. In the call, Mr. Mareno pushed Confidential Buyer Informant #1 to tell him to whom Confidential Buyer Informant #1 was selling crab and for how much. Confidential Buyer Informant #1 refused to share this information. Mr. Mareno then told Confidential Buyer Informant #1 that if he didn't bring his ex vessel prices down, there would be "repercussions."

420.    Soon after this call, Mr. Mareno called Global Quality, Fishermen's Catch, and Safe Coast in an effort to get them to stop buying from Confidential Buyer Informant #1 so that Confidential Buyer Information #1 would not have anywhere to sell his crab and would be forced out of the market, thus eliminating the pressure Confidential Buyer Informant #1 was putting on the artificially low ex vessel price agreed upon by Defendants.

421.    Soon after the call from Mr. Mareno, Confidential Buyer Informant #1 learned that Caito Fisheries, who had agreed to buy a large quantity of crab from Confidential Buyer Informant #1, had instead bought that crab from Ocean Gold.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**k.    January 2024: Defendants Take a Series of Actions in Charleston, OR to Punish Buyer Informant #1 and Drive Him Out of Port**

422.    At around the same time in early January 2024, Pacific Seafood and Fathom pressured the Charleston, Oregon harbormaster, Ray Dyer, to deny Confidential Buyer Informant #1 use of the public hoist.

423.    Nick Mareno of Fathom falsely told Mr. Dyer that the crabbers didn't want Confidential Buyer Informant #1 in the port, when in reality Confidential Buyer Informant #1's efforts to buy more crab at higher prices were creating significant benefits to the crabbers.

424.    Ultimately, as a result of Mr. Mareno's pressure, the public hoist was shut down for 48 hours.

425.    At the time the hoist was shut down, two boats waiting to be unloaded had 130,000 lbs. of crab to sell to Confidential Buyer Informant #1. These boats had previously only sold to Pacific Seafood, but because Confidential Buyer Informant #1 was offering a far better price, they decided to instead sell to Confidential Buyer Informant #1.

426.    However, because Confidential Buyer Informant #1 couldn't unload the crab, and the crabbers had nowhere else to turn, Pacific Seafood bought the crab for less than what Confidential Buyer Informant #1 had agreed to pay the two boats, using its private hoist at the port to unload the crab.

427.    In addition to these two large boats that Confidential Buyer Informant #1 was denied from unloading, there were 5-6 smaller boats ready to sell approximately 100,000 lbs. total to Confidential Buyer Informant #1. When Confidential Buyer Informant #1 was shut out of the hoist, those crabbers were forced to sell to Fathom and Hallmark for substantially less per pound than what Confidential Buyer Informant #1 was offering.

428.    In addition to the longtime Pacific Seafood boats that were about to sell to him in Charleston, about 50% of Newport boats were ready to work with Confidential Buyer Informant #1. In order to stymie that trend, Pacific Seafood started reaching out to Confidential Buyer Informant #1's live customers and telling them that Pacific Seafood would service them by setting up live stations everywhere.

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

429.    Following the closure of the public hoist, there was an uproar from crabbers who wanted to sell their crab to Confidential Buyer Informant #1, as well as engagement by state elected officials and the Oregon Dungeness Crab Commission. Harbormaster Dyer ultimately relented, reopened the public hoist, and allowed Confidential Buyer Informant #1 access approximately 48 hours after he had shut it down.

430.    However, once reopened, Confidential Buyer Informant #1 was only able to use the public hoist if he paid, in addition to the hourly rate of $27, a per pound surcharge of $0.10 for all crab he off-loaded (which was reduced to $0.09 after more protest from crabbers), make a $2,000 deposit and pay $120 per month for a business license. Confidential Buyer Informant #1 is unaware of any other buyers being required to pay these fees to use the public hoist.

431.    Once the public hoist was reopened and Confidential Buyer Informant #1 and his crew were again unloading crab, the public hoist was tampered with. Potentially serious injury, or death, was only avoided because Confidential Buyer Informant #1 and his crew saw the issue and stopped the hoist before it began the next loading process. In addition to the tampering with the hoist, the brake lines of the old forklift that Confidential Buyer Informant #1 had to use were tampered with, making the use of the already sub-par forklift even more unsafe and inefficient. Earlier, Confidential Buyer Informant #1 had arranged to use a nearly new forklift but was prevented from doing so, without explanation, by Harbormaster Dyer.

432.    Once Confidential Buyer Informant #1 was able to get live crab off boats and was loading it into trucks, Oregon state police showed up and blocked access to the parking lot where Confidential Buyer Informant #1's trucks were parked, awaiting live crab, blocking their ability to depart despite not issuing any citation or providing any reason for their actions. As a result, Confidential Buyer Informant #1 lost 4,000 lbs. of crab that died on the dock because they couldn't be loaded on the trucks in time.

433.    Nick Mareno of Fathom, who Confidential Buyer Informant #1 understands is close to Oregon state police, was seen in his car making a phone call shortly before the police showed up.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

434.    Soon thereafter, on January 5, 2024, nails were placed under the tires of a truck holding crab belonging to Confidential Buyer Informant #1 and one of his customers parked in Charleston. The nails caused the tires of the truck to flatten, which in turn caused a delay that resulted in the loss of approximately 2,000 lbs. of live crab.

435.    These various actions prevented Confidential Buyer Informant #1 from making ex vessel purchases at a higher price, while simultaneously resulting in sales to Defendants at lower ex vessel prices. It also resulted in Confidential Buyer Informant #1 terminating his buying in Charleston on or around January 6, 2024, leaving crabbers there to sell principally to Hallmark, Pacific Seafood, and Fathom, with Fathom, in particular, purchasing a large volume of crab ex vessel after Confidential Buyer Informant #1 left Charleston at a lower price than that which Confidential Buyer Informant #1 had been paying crabbers.

### l.    Mid/Late-January 2024: Representatives of Defendants and Other Co-Conspirators Met at San Francisco's Pier 45 and Devised a Plan to Run Confidential Buyer Informant #1 Out of Business

436.    On and around January 20, 2024, Max Boland of Safe Coast, Tony of Global Quality, Peter Nguyen of Fishermen's Catch, Frank Dulcich of Pacific Seafood, Mr. Bugatto of Hallmark, and representatives of Unnamed Co-conspirators #1 and #2 met at Pier 45 in San Francisco.

437.    After the meeting, Max Boland told Confidential Buyer Informant #1 that the group was upset with Confidential Buyer Informant #1 for broadcasting to crabbers a higher opening price than what Pacific Seafood and the other big buyers wanted, and that there would be repercussions.

438.    Following the January 20, 2024 meeting, Defendants who were at the meeting all took actions to undercut Confidential Buyer Informant #1's accounts, reneged on agreements to buy crab from Confidential Buyer Informant #1, and stopped paying Confidential Buyer Informant #1 for crab he had already delivered to them.

439.    Specifically, Confidential Buyer Informant #1 had already made ex vessel purchases of over 75,000 lbs. of crab at $3.75/lb. that Global Quality had agreed to buy from him for around $4.00/lb. After the January 20th Pier 45 meeting, however, Global Quality reneged on the deal,

pursuant to the agreement among the other buyers to punish Confidential Buyer Informant #1 for raising the price earlier in the season. This resulted in Confidential Buyer Informant #1 having to sell the crab at a loss to Ocean Gold and Safe Coast, for $3.00/lb., $.75 less than what Confidential Informant Buyer #1 had paid ex vessel for the crab.

440.   Global Quality additionally owes Confidential Buyer Informant #1 approximately $200,000 and has refused to engage with Confidential Buyer Informant #1 or return his calls since the January 20th meeting.

441.   Fishermen's Catch similarly owes Confidential Buyer Informant #1 approximately $100,000 and, since the January 20th meeting, is not responding to Confidential Buyer Informant #1's attempts to collect.

442.   Safe Coast also owes Confidential Buyer Informant #1 approximately $20,000 as the result of underpayments. Specifically, Safe Coast has refused to pay the prices it has previously negotiated with Confidential Buyer Informant #1, only paying the ex vessel price that Confidential Buyer Informant #1 paid ex vessel to crabbers for the crab, and not the amount stated on the bill of lading when Confidential Buyer Informant #1 delivers the crab to it.

443.   Since the January 20th meeting, Safe Coast's Mr. Boland has also required that Confidential Buyer Informant #1 meet him in an alley when selling Safe Coast crab, so that no one would see him buying from Confidential Buyer Informant #1, which would get Safe Coast in trouble with other members of the cartel.

444.   More generally, after the January 20th meeting, Pacific Seafood and Ocean Gold broadcast to other buyers that they would take everyone's crab, as long as no one sold to or bought from Confidential Buyer Informant #1.

445.   Subsequently, Southern California Seafood, previously one of Confidential Buyer Informant #1's biggest customers, told Confidential Buyer Informant #1 that it would be working exclusively with Pacific Seafood from here on out.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**2.      Other Buyers Have Also Been Threatened by Defendants About Breaking Ranks on Price and Have Been Punished for Doing So**

  a.  **Early-January 2023: Nor-Cal and Unnamed Co-conspirator #1 Dropped the Ex Vessel Prices They Were Offering After Being Warned By Defendants to Toe the Line**

446.   As discussed elsewhere herein, when crabbers went out in District 10 on an open ticket, Nor-Cal, after briefly offering $5/lb., withdrew the offer after it was threatened by Defendants for doing so, a threat whose effectiveness was clearly increased by the punishment that Pacific Seafood had previously meted out on Nor-Cal, as discussed elsewhere herein.

447.   Unnamed Co-conspirator #1's principal representative was delivered a similar threat by Pacific Seafood's Joe Cincotta. In January of 2023, Unnamed Co-conspirator #1's ex vessel price was higher than that being paid by Pacific Seafood. To correct this, Pacific Seafood's Joe Cincotta paid Unnamed Co-conspirator #1's principal representative a visit and pointedly told him Pacific Seafood was only paying $2.25 ex vessel. He got the message and Unnamed Co-conspirator #1 lowered the price it was offering as well.

  b.  **Mid-January 2023: Pacific Seafood Flooded the Sell-Side Markets of Non-Compliant Buyers with Cheap Crabs**

448.   Once Defendants successfully brought ex vessel prices down to $2.25/lb. in the Pacific NW Area in mid-January 2023—an ex vessel price barely seen in California for over a decade—Pacific Seafood made sure that buyers in Central California who had not complied with Defendants' "no price" and then later "$2.25/lb." dictates were punished for their lack of compliance.

449.   Pacific Seafood shipped at least six truckloads, approximately 200,000 lbs. of fresh, whole cooked crab from points north, and sold them to central California buyers' customers at a price of $3.99 to $4.50/lb. This price was not only way below what buyers had been selling to those customers, but it was substantially below these buyers' costs for fresh, whole cooked crab when the substantial weight loss associated with processing and the cost of processing are factored in.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

450.    Pacific Seafood also sold large volumes of live crab into the Chinese market for $4.50, free on board. This was, again, not only way below the price at which other buyers were selling live crab into the Chinese market, but also significantly below their costs.

### c.    Late-December 2023: Pacific Seafood Sent Buyers, Including Non-Cartel Members, a Warning About Paying Over the Ex Vessel Price Set By It

451.    On or around December 25, 2023, when Nor-Cal's Kevin Lee sought to convince Confidential Buyer Informant #1 to toe the line on the ex vessel price set by the cartel, Pacific Seafood sent an email to a number of buyers, including Anna Svedise of Anna's Seafood, instructing them to keep the ex vessel price at or below $3/lb.

452.    The email to Ms. Svedise warned her, in a threatening manner, not to continue her practice of paying ~$.50 over the "dock price" (*i.e.*, the price set by Pacific Seafood and other cartel members). As a result, Anna's Seafood, unlike previous seasons, didn't come up to Eureka a single time; and crabbers from Eureka who in past seasons had regularly sold to Anna's Seafood, sold to cartel members, including South Bend, for the artificially low price of $2.25-2.50/lb.

### d.    Pacific Seafood Uses Its Dominance in Other Areas of Seafood to Enforce Compliance with the Cartel's Dungeness Crab Pricing Dictates

453.    Pacific Seafood also punishes non-compliant crab buyers on the sell-side by denying non-compliant crab buyers access to other fish products whose supply Pacific Seafood controls.

454.    As a result of Pacific Seafood's self-vaunted vertically integrated dominance of the West Coast's supply of fish products, it is for many other types of fish and fish products effectively the only source. And most Dungeness crab buyers do not limit themselves to Dungeness crab, but rather sell to their customers a wide range of fish, many types of which they do not directly purchase ex vessel from fishers, but rather from other suppliers, often Pacific Seafood. Thus, other fish buyers are dependent on Pacific Seafood for such products and related lines of business. And if those buyers do not toe the line with regards to ex vessel pricing of Dungeness crab, Pacific Seafood can and will deny them access to such products in retaliation.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

### 3. As a Result, When Defendants and Other Buyers Pay Ex Vessel Prices Above the "Fixed Price" They Seek to Hide that Fact, Which Doesn't Make Economic Sense Absent a Price-Fixing Agreement

455. Absent the market manipulation alleged herein, buyers would be in competition with each other for available crab. Thus, basic economic logic would dictate that, if a buyer had sell-side demand that justified offering a higher price, he or she would widely publicize his or her offer to pay a higher ex vessel price to crabbers to lure more crabbers to sell to him or her. Economic logic would also predict that the increased sell-side demand created by such publication of his or her offer to pay more would, in turn, allow the buyer to ultimately lower his or her offered price, increasing his or her profits.

456. This is especially the case in a situation such as that presented by buyers in the Pacific NW Area Dungeness crab market where, like the product that crabbers are selling to them (freshly caught Dungeness crab), there is no meaningful difference between buyers beyond price. As the saying goes, all money is green.

457. Accordingly, critical to Confidential Buyer Informant #1's strategy to capture market share in the Pacific NW Area has been to widely broadcast his willingness to pay higher ex vessel prices for crab than Defendant cartel members.

458. Defendants, on the other hand, do the exact opposite: they actively hide when they pay crabbers ex vessel prices that are higher than the price fixed by the cartel.

459. While this does not make basic economic sense in a free market, it makes complete sense in the context of a price-fixing cartel. In a price-fixing cartel, there is always a strong incentive by cartel members to cheat, so as to both gain the benefit of the artificially depressed price created by the cartel but also to gain some advantage on their fellow cartel members. As another saying goes, there is no honor amongst thieves. And for this reason, as alleged elsewhere herein, Defendants aggressively seek to police compliance with their agreed-upon pricing and to punish non-compliance.

460. This dynamic has resulted in Defendants commonly hiding instances where they have paid ex vessel prices in violation of the price set by the cartel.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

461.    The most simplistic tactic that Defendants use to hide their cheating is to simply put a lower price on the official landing record of a sale than what they pay the crabber, generally splitting the payment into two checks: one for the lower price on the landing record, and one for the amount above this.

462.    Nor-Cal commonly uses this tactic to hide its cheating on the fixed ex vessel price.

463.    For example, on February 11, 2021, a crabber texted Nor-Cal's Kevin Lee, "Hi Kevin, [Redacted] said that you would pay $5.00 plus $1.00 bonus per pound. When he unloaded Larry wrote $5.00 plus .50 bonus. Just making sure that it was supposed to be total of $6.00 per pound. Thanks, [Redacted]."

464.    In response, Mr. Lee responded, "Yes . I changed here."

465.    California Department of Fish and Wildlife landing records show that Nor-Cal entered $5/lb. as the purchase price for the referenced transaction on February 10, 2021.

466.    ASE also has, for many years, paid crabbers in a similar way: one check for the price on the official landing receipt, and one check for an additional amount.

467.    Ocean Gold is also known to enter lower ex vessel prices on landing receipts than what was actually paid to the crabber.

468.    Confidential Buyer Informant #1 was recently told by an Ocean Gold worker that Ocean Gold was entering prices on landing receipts that were $1/lb. less than what was paid, which made the worker nervous he would get in trouble for doing so.

469.    Another tactic to hide cheating is to pay crabbers a "bonus" later in or at the end of the season, which is also sometimes referred to as a "retro."

470.    Pacific Seafood, which paid Plaintiff Little such a "bonus" when he was crabbing for them, and Hallmark are among the Defendants who frequently use this tactic.

471.    In a text exchange between Fathom's Nick Mareno and Bornstein's Andrew Bornstein from January 1, 2020, Mr. Mareno expressed his concern that Pacific Seafood was going to cheat on the agreed-upon cartel opening price of $3.00/lb., by making (and promising) a retroactive payment of an additional $.25/lb.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

472. Mr. Mareno stated, "I got 30k-$40k coming into crescent [city] tomorrow… Just worried about Pacific retro." "Retro to $3.25."

473. In response, Mr. Bornstein said, "Always a risk."

474. An additional tactic used by Defendants to hide their cheating on the fixed ex vessel price is to pay the crabbers the fixed ex vessel price, but then give bait at no charge, which would otherwise cost the crabber a substantial amount.

475. Thus, in a text message between Mr. Lee and a crabber last season, Mr. Lee indicated that he was willing to pay more than the fixed ex vessel price but could not pay it directly for fear it would be discovered; thus, he offered instead to give the crabber bait of an equivalent value.

476. Defendants also frequently will publicly say that they are paying one ex vessel price but, in fact, pay more.

477. Buyers will also simply refuse to put in writing or publicly state the ex vessel price they are offering, so as to avoid discovery of their cheating on the agreement to fix prices.

478. Thus, for example, when Plaintiff Little texted the principal representative of Unnamed Co-conspirator #2, during the 2023/24 season to ask what price Unnamed Co-conspirator #2 would pay for a load of crab that Mr. Little was looking to sell, the principal representative of Unnamed Co-conspirator #2 responded, "Bring them over."

479. Mr. Little responded, "lol. Is that the only way to find out?"

480. To this, the principal representative of Unnamed Co-conspirator #2 responded with a laughing face emoji.

**G.    In Order to Defend Their Cartel Pricing, Defendants Threaten and Punish Crabbers who Sell Crab Ex Vessel for Prices Higher than the Cartel Price**

481. In response to this sort of price cheating by their fellow cartel members and to prevent non-cartel members from disrupting their agreement to fix ex vessel prices at an artificially low level, Defendants punish crabbers who sell to other buyers by refusing to purchase crab and other fish from such "disloyal" crabbers.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

482. This tactic has the additional salutary effect for Defendants of assisting them in maintaining their share of the ex vessel market without the need to raise ex vessel prices to a level disallowed by the cartel.

483. In a competitive market, Defendants would have to use the carrot of higher ex vessel prices to maintain market share—as the "service" they perform for crabbers (buying their crab) is fundamentally fungible because, again, all money is green. Basic economic logic predicts that, if Defendants competed with each other, they would end up in a "race to the top," offering higher and higher ex vessel prices in competition with one another, and squeezing their profit margins (essentially the inverse of the "race-to-the-bottom" problem that often leads *sellers* of commodity products to enter into price-fixing arrangements).

484. By agreeing to fix prices at an artificially low level, Defendants have fixed this "race-to-the-top" problem and protected their profit margin, but they have lost the carrot that could otherwise be used to ensure that they have Dungeness crab to sell as a profit. In reaction, they have replaced this carrot with a stick, punishing disloyal crabbers who stray from them.

### 1. Pacific Seafood

485. As discussed elsewhere herein, the season for Dungeness crab in the Pacific NW Area is only open for certain months of the year, which is the case with many other fisheries, as well. As a result, commercial fishers generally maintain a portfolio of different fisheries in order to allow them to generate income throughout the year. When fishers discuss selling any of their product to Pacific Seafood, they are told that, if they want Pacific Seafood to buy one of their species, they are going to have to sell all of their species to Pacific Seafood. For some fishers—particularly those who harvest coldwater shrimp, the Pacific NW Area ex vessel market for which Pacific Seafood entirely controls—the risk of not complying with this requirement can be existential, as there are essentially no other purchasers for this species in the Pacific NW Area. Thus, if a fisher wants to sell his or her coldwater shrimp *at all*, they need to agree to sell their Dungeness crab to Pacific Seafood exclusively.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

486. Pacific Seafood uses the power this gives them over crabbers to prevent those who have agreed to sell it crab at the artificially low price set by the cartel from going to a non-cartel member (or cheating cartel member) who is offering a higher price and to make an example of those crabbers that violate this dictate.

487. In a January 4, 2020 text to Fathom's Nick Mareno, Bornstein's Andrew Bornstein described how Pacific Seafood used this technique to make an example out of two crabbers who sold to non-cartel members (or cheating cartel members) who were paying more than the $3/lb. that the cartel had fixed as the opening price for the 2019/20 Pacific NW Area Dungeness crab season. He said, "Pacific [Seafood] Newport had 2 boats sell to a live guy in Newport today at 3.50 and they were just notified that they lost their bottom fish and shrimp markets and don't call for bait. Pacific is playing hardball at 3.00."

488. Pacific Seafood will, moreover, initiate boycotts of non-compliant crabbers by other cartel members, effectively blackballing those crabbers in retaliation for having sold to a non-compliant buyer at a higher price or refusing to accept the cartel price.

489. As discussed elsewhere herein, when Pacific Seafood's Joe Cincotta told San Francisco crabbers who agreed to sell to Pacific Seafood in the 2022/23 season that Pacific Seafood would try to help them out by paying maybe $1/lb., Plaintiff Little reacted in anger telling him, in part, that Pacific Seafood should "take their thumb off" the market "and let it play its course." Mr. Cincotta replied that "our boats don't talk bad about us," and in retaliation Pacific Seafood made clear that it would not purchase crab (or anything else) from Plaintiff Little and instructed other fish buyers not to purchase crab from him either.

### 2.   Hallmark

490. Hallmark and Nor-Cal have for several years been the dominant buyers of Dungeness crab landed in Port Orford, Oregon, purchasing, on average approximately 93% of the Dungeness crab landed there during the period from 2016 to present. Hallmark, moreover, is virtually the only buyer of black cod in the port.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

491.   Hallmark uses the leverage this creates over crabbers in Port Orford to pressure them to exclusively sell Dungeness crab to it and to punish crabbers who sell to non-cartel members (and cheating cartel members) who offer higher ex vessel prices.

492.   During the 2021/22 Dungeness crab season, a long-time Port Orford crabber and black cod fisher, having learned that a non-Defendant buyer, in Charleston, Oregon was paying substantially more than Hallmark and Nor-Cal were paying in Port Orford and motored the approximately 60 nautical miles there to sell his crab to that buyer.

493.   Later, in advance of the 2022/23 Dungeness crab season, the crabber spoke by phone with Crystal Adams of Hallmark, who expressed her anger at him for having sold the non-Defendant buyer the previous season and told him that he either had to sell everything to Hallmark or Hallmark would buy nothing from him, which was particularly problematic on the black cod side.

494.   Then, at the beginning of the 2022/23 season, Hallmark and Nor Cal were only offering the cartel price of $2/lb. ex vessel in Port Orford and kept their prices artificially low for the season.

495.   In contrast, Confidential Buyer Informant #1 was publicly advertising on a Facebook group frequented by crabbers and buyers that he was offering substantially more, and so the crabber sold a significant amount of crab to him, instead of Hallmark or Nor-Cal.

496.   When Hallmark found out, the crabber was told by Chrystal Adams that because of his disloyalty Hallmark would not purchase anything from him, including black cod.

497.   At the beginning of the 2023/24 season, Hallmark sought to apply this strategy more broadly when Confidential Buyer Informant #1 came to Port Orford and started paying crabbers substantially more than the cartel-set ex vessel price being offered by Hallmark and Nor-Cal.

498.   In response, Hallmark threatened crabbers that if they sold to Confidential Buyer Informant #1, Hallmark wouldn't buy any crab from them and that Confidential Buyer Informant #1 wouldn't be able to buy all of their crab, leaving them nowhere to sell it. When this threat did not successfully discourage crabbers from taking the higher ex vessel price being offered by

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Confidential Informant #1, Hallmark shut the doors of its Port Orford facility from 12/21 to 1/7, during a period of traditionally high demand and landings in the fishery.

### 3.  Ocean Gold

499.  Ocean Gold applied the same strategy when crabbers in Charleston, Oregon began taking up Confidential Buyer Informant #1 on his offer of higher ex vessel prices.

500.  It told all the crabbers that if they didn't stop buying from Confidential Buyer Informant #1, they'd close their doors, and crabbers would be left without a market because Confidential Buyer Informant #1 wouldn't be able to buy all their crab. When this threat didn't work, on December 23, 2023, Ocean Gold stopped purchasing crab in Charleston, Oregon, and did not restart purchasing crab there during the rest of the season.

## III.  Buyers Who Are Not Part of the Cartel, Nonetheless, Generally Obey Its Pricing Dictates in Order to Avoid Retaliatory Actions by Defendants

501.  The measures described herein that Defendants take to enforce compliance with their pricing dictates amongst themselves are also applied against non-cartel members, as the experience of Confidential Buyer Informant makes clear.

502.  Moreover, most other buyers buy a far smaller quantity of Dungeness crab in the Pacific NW Area ex vessel than Defendants.

503.  As a result, these buyers are particularly vulnerable to actions like selling below-cost crab to their customers and the other retaliatory actions by Defendants described herein.

504.  Thus, the overwhelming bulk of these buyers keep their heads down and toe the line on ex vessel prices set by Pacific Seafood and its co-defendants.

## IV.  Da Yang Is a Member of the Cartel

### A.  Da Yang Is a Frequent Participant in the Remarkably Numerous Calls that Occur Amongst Cartel Members

505.  A quantitative analysis that Plaintiffs have conducted of carrier phone records confirm, despite the shortcomings in the data on which it is based, that Defendants' representatives are in regular communication with each other, as well as with representatives of the un-named co-

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

conspirators and Confidential Informant #1, many with extraordinary frequency. And representatives of Da Yang are no exception.

506.    The analysis also evidences how the cartel operates through a web of communications amongst representatives of Defendants, including Da Yang, and other buyers, in which such representatives if not directly in contact with one another are in contact with other buyer representatives who are, thus, allowing the cartel to fix ex vessel prices throughout the Pacific NW Area.

507.    Examples of frequent telephonic interlocutors include, without limitation:

- **Da Yang's Chang Lee** and Dana Ferguson of Safe Coast, Pacific Dream, and Ocean Logistics, **17,134 calls**;

- Dana Ferguson of Safe Coast, Pacific Dream, and Ocean Logistics and ASE's Kevin Zheng, **6,265 calls**;

- ASE's Kevin Zheng and Fathom's Nick Mareno, **553 calls**;

- Fathom's Nick Mareno and **Da Yang's Kyle Horgan**, **70 calls**;

- Fathom's Nick Mareno and Fishermen's Catch's Peter Nguyen, **1612 calls**;

- Fishermen's Catch's Peter Nguyen and **Da Yang's Chang Lee**, **26 calls**;

- Fishermen's Catch's Peter Nguyen and Global Quality Seafood's Tuan ("Tony) Pham, **3,950 calls**;

- Global Quality Seafood's Tuan ("Tony) Pham and Nor-Cal's Kevin Lee, **2,782 calls**;

- Nor-Cal's Kevin Lee and Hallmark's Scott Adams, **3,481 calls**;

- Nor-Cal's Kevin Lee and **Da Yang's Chang Lee**, **374 calls**;

- **Da Yang's Kyle Horgan** and Hallmark's Scott Adams, **87 calls**;

- Hallmark's Scott Adams and Mike Freels of Caito Fisheries Inc. (then Southwind/Caito Fisheries LLC), **100 calls**;

- Mike Freels of Caito Fisheries Inc. (then Southwind/Caito Fisheries LLC) and Bornstein's Colin Bornstein, **2,952 calls**;

- Bornstein's Colin Bornstein and Fathom's Cody Mills, **139 calls**;

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

- Fathom's Cody Mills and **Da Yang's Kyle Horgan**, **629 calls**;

- Fishermen's Catch's Peter Nguyen and Nor-Cal's Kevin Lee, **2,090 calls**;

- Fishermen's Catch's Peter Nguyen and Safe Coast's Max Boland, **248 calls**;

- Safe Coast's Max Boland and **Da Yang's Chang Lee**, **96 calls**;

- Safe Coast's Max Boland and **Da Yang's Kyle Horgan**, **36 calls;**

- Safe Coast's Max Boland and Pacific Seafood's Joe Cincotta, **145 calls**;

- Pacific Seafood's Joe Cincotta and Ocean Gold's Anthony Dierks, **106 calls**;

- Ocean Gold's Anthony Dierks and Mike Freels of Caito Fisheries Inc. (then Southwind/Caito Fisheries LLC), **234 calls**;

- Mike Freels of Caito Fisheries Inc. (then Southwind/Caito Fisheries LLC) and Nor-Cal's Robin Creed, **828 calls**;

- Nor-Cal's Robin Creed and Fathom's Nick Mareno, **118 calls**;

- Fathom's Nick Mareno and **Da Yang's Chang Lee**, **284 calls**;

- **Da Yang's Chang Lee** and Bornstein's Mike Shirely, **579 calls**;

- Bornstein's Mike Shirely and Pacific Seafood's Brian Bourdeau, **149 calls**;

- Bornstein's Mike Shirely and Dana Ferguson of Safe Coast, Pacific Dream, and Ocean Logistics and ASE's Kevin Zheng, **127 calls**;

- Safe Coast's Dana Ferguson and Ocean King's George Lay, **162 calls**;

  Ocean King's George Lay and Fishermen's Catch Peter Nguyen, **230 calls**;

- **Da Yang's Kyle Horgan** and Pacific Seafood's Tyson Yeck, **53 calls**;

- ASE's Kevin Zheng and Pacific Dreams Jerod Goodin, **368 calls**;

- Pacific Dream's Jerod Goodin and **Da Yang's Chang Lee**, **1,086 calls**;

- **Da Yang's Chang Lee** and ASE's Kevin Zheng, **181 calls**;

- Pacific Dream's Jerod Goodin and **Da Yang's Kyle Horgan**, **35 calls**;

- Bornstein's Darren Freels and Pacific Seafood's Charlie Kirschbaum, **39 calls**;

- Pacific Seafood's Charlie Kirschbaum and **Da Yang's Kyle Horgan**, **32 calls**;

- **Da Yang's Kyle Horgan** and Bornstein's Mike Shirley, **22 calls**;

- Pacific Seafood's George Sargent and Ocean Gold's Kyle Lambert, **75 calls**;

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

- Ocean Gold's Kyle Lambert and **Da Yang's Kyle Horgan**, **18 calls**;

- Fishermen's Catch' Peter Nguyen and Bornstein's Colin Bornstein, **30 call**;

- Bornstein's Colin Bornstein and **Da Yang's Kyle Horgan**, **17 calls**;

- Max Boland of Safe Coast and Alber's and Southwind's Sebastiano Galletti, **170 calls**;

- Southwind's Sebastiano Galletti and **Da Yang's Kyle Horgan**, **15 calls**;

- **Da Yang's Chang Lee** and Pacific Dream's Jonathan Mark, **30 calls**;

- Pacific Dream's Jonathan Mark and Pacific Seafood's John Moody, **117 calls**;

- Pacific Seafood's John Moody and **Da Yang's Kyle Horgan**, **12 calls**;

- Pacific Seafood's Frank Dulcich and Hallmark's Gene Bugatto, **25 calls**;

- Hallmark's Eugene Bugatto and **Da Yang's Kyle Horgan**, **10 calls**;

- **Da Yang's Chang Lee** and Bornstein's Marco Vargas, **26 calls**;

- Pacific Seafood's Juan Delgado and **Da Yang's Chang Lee**, **21 calls**;

- ASE's Kevin Zheng and Xia Zhao of Safe Coast and West Coast Seafood, **766 calls**;

- Xia Zhao of Safe Coast and West Coast Seafood and **Da Yang's Chang Lee**, **24 calls**;

- Fathom's Nick Mareno and Fishermen's Catch's Kara Chau, **156 calls**; and

- Fishermen's Catch's Kara Chau and Da Yang's Change Lee, **10 calls**.

508.    In total, the analysis shows **128,668 calls** amongst just a selection of approximately 80 representatives of Defendants, Unnamed Co-conspirator #1, Unnamed Co-conspirator #2, and Confidential Informant #1 (Ozzie Gregorio).

**B.    Da Yang's Representatives Regularly Communicate with Other Cartel Members in Order to Fix the Ex Vessel Prices Paid to Crabbers**

509.    Da Yang's representatives are also frequent participants in text messages with Defendants and other cartel members that have the purpose and effect of fixing the prices paid to crabbers in the Pacific Northwest Area for Dungeness crab.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**Da Yang and Safe Coast (February 2023)**

510.   In an internal Safe Coast text message from February 28, 2023, Safe Coast's Max Boland wrote others at Safe Coast: "Da Yang heard we raised the price and Dana [Ferguson] called to confirm." Dana Ferguson, at the time, was working as a contractor for Pacific Dream.

511.   Prior to Mr. Ferguson's helpful call to a supposed competitor to confirm the prices being paid to crabbers, Da Yang, Safe Coast, and Pacific Dream were in rough alignment on prices, with Da Yang paying between $2.30 and $2.45, Safe Coast paying between $2.45 and $2.50, and Pacific Dream paying $2.60.

512.   After the call, Da Yang, Safe Coast, and Pacific Dream brought themselves into perfect alignment, all three paying $2.50 for crab that would be cooked and $3.00 for crab that would sold live, with the exception of one transaction by Pacific Dream for $2.60.

513.    Many other Defendants' prices were in line with Da Yang and Safe Coast during this time, while various non-Defendants paid more. ASE was paying $2.50 on Feb. 26 and 28; and then it raised its price to $2.75 on March 3. Fathom was paying $2.60 on Feb. 26 and 27, and then increased to $3.00 on March 2. Hallmark was paying $2.00 between Feb. 26 and 28, and on March 1 raised its prices to $2.50. Caito was paying $2.25-$2.30 on February 26-27, and raised to $2.50 on March 2.

514.   And generally, Defendants kept their prices as $3,00 or below the first week of March. On the other hand, many non-Defendant buyers were paying more: Monterey Fish Company was paying $4; L & C Seafood was paying $3.25; One Ocean was paying between $3.25 and $3.50; Jolly Roger Seafood was paying $3.10; and O M Seafood Co. was paying between $3.35 and $3.75.

**Da Yang and Safe Coast (March 2023)**

515.   On March 15, 2023, an internal Safe Coast text message from Safe Coast's Xia Zhao to others at Safe Coast states: "Boats kept telling me Dayang paying $3.5 for live, I called Dayang, Dayang said 'they are saying Ilwaco [aka Safe Coast] is paying $3.5." The next day, Safe Coast's principal Chris Lam writes: "Have Max [Boland] call his contact at Dayang."

516.    After the phone call from Safe Coast's Max Boland to Da Yang to coordinate prices, Da Yang dropped its price from $3.10/lb, as of March 15, to $2.25 for crab that would cooked and $2.60 for crab that would be sold live, while Safe Coast kept consistent its "cooked" price of $2.75 and "live" price of $3.25.[8] This is despite pressure from the crabbers on both Defendants to increase prices.

517.    Other Defendants also resisted any pressure from crabbers to raise prices.

518.    ASE paid $3.00 on virtually all of its purchases between March 7 and 31.

519.    Bornstein briefly raised its prices from $3.00 to $3.25 for live and $2.50 to $2.75 for cooked between March 9 and 17, but then lowered its prices back to $2.50 and $2.25 for the rest of the month.

520.    Fathom was paying $3.25 from March 8-14, and then started lowering its prices, going back down as low as $2.50 on March 17 and paying between $2.65 and $1.75 for the rest of the month.

### Da Yang and Pacific Dream (April, 2023)

521.    On April 10, 2023, Da Yang's Chang Lee messaged Dana Ferguson, who was working as a contractor for Pacific Dream at the time, asking "what s the live price to the boat in Winchester bay? 3.15?" Ms. Ferguson responded, "3.15 Garibaldi I think 3.25 here[.]" Mr. Lee thanked him for the information.

522.    Consistent with this exchange, on April 11, 2023, Da Yang, along with Defendants Bornstein, Nor-Cal, Pacific Seafood, Hallmark, ASE, Global Quality, and former Defendant South Bend all held at or below this $3.25 price cap.

523.    On April 18, 2023, Mr. Lee asked Mr. Ferguson whether the live price was $4.00 or $4.25, and Mr. Ferguson answered $4.25. Da Yang had already paid $4.25 on April 16 and continued to pay $4.25 on April 20 and April 22.

---

[8] All crab that is sold ex vessel should be alive or only very recently perished; and no crab sold ex vessel has been previously cooked. Thus, when buyers, crabbers, and others in the ex vessel Dungeness crab industry refer to a "cooked" price versus a "live" price, they are referring what the crab will ultimately be used for by the buyer, i.e., the crab will processed (aka cooked) or the crab sill be sold live.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

524. Da Yang continued to coordinate price moves with other Defendants throughout April, 2023. Consistent with Mr. Chang's and Mr. Ferguson's conversation, Da Yang held prices at $4.25 through April 20, 2023, with other Defendants, including Pacific Dream, Fathom, Global Quality, Nor-Cal, and Bornstein also making purchases at or below this price.

**Da Yang and Living Pacific (April 2023)**

525. On April 11, 2023, Living Pacific's Geoff Molfino sent an unsolicited message to Da Yang's Chang Lee, stating, "Pacific Newport and Westport are currently $3.50 to the boat." The fact that he shared his information without any request from Da Yang strong suggests there was a prior agreement to do so.

526. And that makes sense in the context of a price fixing cartel seeking to cap price increases as supply pressure increases. The natural inference is that this conversation reflects an agreement to cap price increases as supply pressure drove up prices throughout April. As is typical, prices in April 2023 steadily increased as the supply of crab steadily diminished throughout the season. By April 12, small independent buyers were paying as much as $5.50/lbs. But Defendant buyers, including Da Yang, Fathom, Pacific Seafood, Nor-Cal, Hallmark, ASE, Caito, Global Quality, Safe Coast, Fisherman's Catch, former Defendant South Bend, all held at or below $3.50/lb.

527. This arrangement continued in further exchanges in April 2023. On April 13, 2023, Mr. Lee texted Mr. Molfino "Hi Geoff live price still 3.50? I just heard ilwaco $4, not sure if true." Mr. Molfino responded, "Newport and Winchester are $3.75 so far. I hear Safe Coast and Jolly Rogers in Westport are around $4. Not sure why . . ." Mr. Lee then stated: "Dana [Ferguson] said pac dream still 3.50" and "I guess we will pay 3.75 tomorrow. Not much crab for us."

528. Thus, as supply-side pressure on prices mounted – a fact reflected in Mr. Chang's statement there was "[n]ot much crab for us" – Defendants continued to act in concert to limit price increases. On or around April 13, 2023, prices offered by small, independent buyers reached $6.00 per pound. At the same time, in the exchange above, Mr. Chang – on behalf of Da Yang – was communicating with Mr. Molfino – on behalf of Living Pacific – about the agreed-upon market price offered by the Defendant conspirators. So, while non-conspirators were paying as much as

$6.00/lbs., Defendant buyers, including Nor-Cal, Safe Coast, Pacific Seafood, Bornstein, Fathom, Hallmark, and former Defendant South Bend, all made purchases at or below the $3.75/lbs. price Mr. Chang and Mr. Molfino discussed that same day, as did Living Pacific.

529.    On April 22, 2023, Mr. Lee followed up again, asking Mr. Molfino whether the Newport live price was $4.25 to the boat. Mr. Molfino replied, "we started there today. Pacific and Seawater have offered $5."

530.    After receiving confirmation from that Pacific Seafood was moving to $5.00/lb., Da Yang, along with Defendants Fathom, Safe Coast, Pacific Dream, Ocean Gold, former Defendant South Bend, Fisherman's Catch, and others all began making purchases at the same $5.00/lbs. price point.

**Da Yang and Pacific Dream, Safe Coast, and Living Pacific**
**(December 2023 & January 2024)**

531.    On December 12, 2023, Da Yang's Chang Lee messaged Jerod Goodin of Pacific Dream informing him that Hallmark was buying ex vessel Dungeness crab for $3/lb. and Living Pacific was offering $3.10/lb., to which Mr. Goodin responded: "I heard same thing. We are going to $3 for live."

532.    That same day, Da Yang's Lee also messaged Xia Zhao of Safe Coast informing her that he heard Hallmark had offered $3/lb., Living Pacific Seafood had offered $3.10/lb., and Pacific Dream had offered $3/lb. for ex vessel Dungeness crab. Ms. Zhao replied that she heard Hallmark actually offered $4/lb. for live ex vessel Dungeness crab and that Living Pacific Seafood and Seawater Seafood both offered $3.10/lb. Ms. Zhao said this information was confirmed by Safe Coast's Max Boland and further noted that "Pacific and Bornsetein will have their price come out this afternoon." After some further exchanges, Ms. Zhao confirmed that Safe Coast would "probably going be $3.10 like living pacific [seafood] and seawater [seafood]." Mr. Lee thanked Ms. Zhao and the two agreed to meet in person in Newport later that week.

533.    Together, these messages reflect an agreement between buyers not to offer prices higher than $3.10 for the 2023 season opening. This agreement is corroborated by landings records reflecting that Defendants, including Pacific Dream, Pacific Seafood, Nor-Cal, Fathom, Ocean

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Gold, Safe Coast, Living Pacific, and Bornstein abided by this price cap. And tellingly, a handful of independent small buyers opened at higher prices, showing that this $3.10 price cap was not dictated by market conditions.

534. At the same time, Da Yang was also coordinating with Pacific Dream and Living Pacific regarding the "to the truck" prices that buyers use when they sell crab to each other out the backdoor. On January 4, 2024, Da Yang's Chang Lee messaged Mr. Molfino of Living Pacific asking: "Live price still $3.60 to the boat ? What is price to the truck ?" Mr. Moflino responded, "$3.70 boat." Having received an incomplete response from Mr. Molfino, Mr. Lee then messaged Dana Ferguson of Pacific Dream confirming the ex vessel price for Dungeness crab was $3.60/lb. and asking what the price was "to the truck." Mr. Ferguson confirmed "We are there," and then added that he believed the price to the truck "[h]as to be 4.50 to 4.65 I think."

535. Just as Da Yang, Pacific Dream, Safe Coast and other Defendants had been coordinating on price at the season opening, this message reflects a continued intent to adjust ex vessel prices in concert. The "to the truck" prices Mr. Ferguson refers to are the prices at which buyers resell crab to other buyers. The fact that Da Yang and Pacific Dream were coordinating on these prices is further reflects their intention to avoid price competition.

**Da Yang and Safe Coast, Pacific Dream, and Living Pacific (December 2023)**

536. On December 20, 2023, Da Yang's Chang Lee messaged Xia Zhao of Safe Coast informing her that the Dungeness crab season was "very slow" and that he heard ex vessel prices had risen to $3.75/lb. in Newport. Ms. Zhao responded "I'm not sure what happened last night, still figuring [it] out. Price suddenly jumped last night. I heard pacific seafood is at $3.85 and living pacific matched. I'm at $3.9 now."

537. That same day, Da Yang Lee messaged Geoff Molfino of Living Pacific stating: "Hi geoff. I just heard cook $3 to the boat and live $3.75 to the boat ?" Shortly thereafter, following a text message exchange with Austin Sterkel of Pacific Dream wherein Mr. Sterkel told Mr. Lee "Sounds like Pac went to 3.85," Mr. Lee reached back out to Mr. Molfino and added: "I just heard pac choice live $3.85 to the boat," to which Mr. Molfino responded "true," thus confirming what Mr. Lee had previously heard from Ms. Zhao (Safe Coast) and Mr. Sterkel (Pacific Dream).

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

538.   Da Yang matched this price when it began making purchases in January, 2024. After this exchange with Safe Coast, Da Yang opened with an average price per pound of $3.90 (reflecting an ex vessel price of $4.00 for crab that would be sold live and an ex vessel price of $3.00 for crab that would be sold cooked). Buyers across the market offered the exact same price. During the late December 2023/early January 2024 period, Pacific Seafood, Nor-Cal, Pacific Dream, Living Pacific, Fathom, Hallmark, Safe Coast, Fishermen's Catch, and Bornstein all making purchases at $4/lb. for "live" and $3/lb. for "cooked". Landing records reveal that virtually every buyer making purchases at this time was offering exactly these prices.

### Da Yang and Fathom (December 2023)

539.   On December 10-11, 2023, Mr. Horgan attended, on Da Yang's behalf, a meeting of crabbers and buyers organized by the Oregon Department of Agriculture. The minutes of the meeting issued by the Oregon Department of Agriculture under the "Attendees" heading reads, *inter alia*, "Da Yang Seafoods (Kyle Horgan)."[9]

540.   Oregon law provides very narrow antitrust immunity for buyers to discuss opening prices, which is limited to discussions that occur only at the meeting itself under the supervision of the Oregon Department of Agriculture. That immunity explicitly does not extend to discussions between buyers before and after the meeting, with post meeting letters specifically admonishes buyer representatives to not engage in such communications.

541.   On December 10, 2023, Mr. Horgan confirmed to Fathom's Nick Mareno that he would "be at price negotiations today," and that he was "[d]riving there now."

542.   As alleged elsewhere herein, Defendants' representatives during the meeting concurred during the meeting in the "need to keep the price down" and agreed that they could only offer $2 or $2.50/lb.

543.   Confidential Fish Buyer Informant #1, who was also in attendance, told the other buyers that the offer was "bullshit" and that he was going to offer $3.25. Certain Defendants'

_____

[9] Mr. Horgan is regularly included on various communications by governmental agencies, as Da Yang's representative, concerning issues related to the Pacific NW Area's Dungeness crab fishery.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

representatives reacted to this with anger, including Pacific Seafood's John Moody who challenged Confidential Fish Buyer Informant #1 to a physical fight, going so far as to ask him to go outside.

544.    Ultimately, buyers in attendance in the meeting (except Confidential Fish Buyer Informant #1) offered the crabbers an opening price of $2.75, which the crabbers rejected.

545.    Notwithstanding the admonishment to buyer representatives not to speak with each other regarding ex vessel prices following the meeting, Mr. Horgan and Mr. Mareno, did exactly this in a series of text messages, on December 12-13, 2023.

546.    Early in the morning of December 12, Fathom's Nick Mareno texted Da Yang's Kyle Horgan to complain about a call that he had received from Lilli Gustafson of the non-defendant buyer Living Pacific, regarding the opening price that Fathom intended to offer. Fathom's Mareno then related a conversation between him and Geoff Molfino of Living Pacific that appears to have also occurred after the commission meeting. Mareno states: "I told Geoff earlier it was way to immature to post a $3.10 price. I told him without a cook offer and before Quinault I wouldnt post and price above 2.50. She [Ms. Gustafson] took that as Im offering 2.50."

547.    He then described efforts that Ms. Gustafson engaged in to convince Mr. Mareno to also offer an opening price of $3.10, accusing him of "being manipulated and buying into the big guys narrative."

548.    The next day, December 13, 2023, Mr. Mareno shared with Da Yang's Horgan the announcement that he had just sent to the crabbers fishing for Fathom, in which he told them that Fathom intended to offer an opening price of $3.10 for crab for the live market, but not offering a price for crab destined for the cooked or processed market.

549.    Da Yang's Horgan responded, "Very well said. I'm still drafting what I'm going to say *to __my fleet__* (emphasis added), by which he meant the crabbers fishing for Da Yang.[10]

---

[10] Mr. Horgan regularly communicates with crabbers on behalf of Da Yang and he addresses issues related to Da Yang's ex vessel dealings with crabbers. A quantitative analysis of text messages revealing almost 750 text message conversations (defined by 24 hour slices) between identified crabbers and Mr. Horgan, during the period of just April 18, 2024 through April 1, 2026. These messages include, without limitation, messages related to Da Yang's payments to crabbers, including Mr. Horgan's intercession with Chih Yuan Wang—President of Da Yang

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

550.    For the remainder of the text string, they discussed the other price offers that other buyers had made. Fathom's Horgan indicated that had that he believed that that Bornstein, which is a processor and so buys crab for cooking, had offered price lower than Pacific Seafood. Fathom's Mareno, corrected him, indicating that Bornstein was offering $2.50 and that the information came from Mike Shirley at Bornstein. He further indicates that this is the same price being offered by Pacific Seafood, stating, "My whole cook customer disappeared after Pacific came out at 2.50."

551.    Ultimately, when the season opened three days later on December 16, Fathom, Pacific Seafood, Bornstein, Hallmark, Nor-Cal, and Living Pacific paid either $3.00 or $3.10, while certain other non-Defendant buyers paid as much as $4.00.

552.    Da Yang did not make any ex vessel purchases until January 3, 2024, but when it did, the ex vessel price Da Yang paid was in close alignment with Fathom, Pacific Seafood, Bornstein, Hallmark, Nor-Cal, Living Pacific, as well as Fisherman's Catch and Safe Coast, all of whom (including Da Yang) paid between 3.50 and 3.75, with the except of payment of $3.00 by Pacific Seafood to one crabber.

553.    Confidential Informant #1 and two other non-Defendant buyers paid $4.00.

### Da Yang, Safe Coast, Pacific Dream, Fathom, Living Pacific, and South Bend (January & February 2024)

554.    On January 3, 2024, Da Yang's Chang Lee messaged Brock Orton of South Bend that he just heard that the ex vessel price for Dungeness crab intended for cooking/processing was $3.50/lb. at both Pacific Seafood and Bornstein. Mr. Orton responded: "I heard 3$ for cook is what pacific offered. 3.50 I believe is the live crab price." Mr. Lee later messaged again: "Sounds like Live price still $3.60 to the boat," to which Mr. Orton responded: "Yes that's what I'm hearing also

Seafood, President of Great Ocean Seafood and Chief Executive Officer of their corporate parent, LungSoon Ocean Group—concerning such issues. In one related exchange with a crabber, the crabber asked Mr. Horgan whether getting timely payment was "something [Mr. Horgan] could talk to chih about." Mr. Horgan responded, "Absolutely makes sense and I have brought it up already. That's why I'm tracking that payments are being made today and then in two weeks time on Monday the 24th payments will be made again." Mr. Horgan later continues, "Things are slowly happening. We got the ACH payment done and now my next project is payments and consistency on them. Trying to take care of **_our Da Yang fleet_** as best I can[.]" (emphasis added).

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

anywhere 3.50-3.80 for live but I know for sure at our dock in eureka pac choice offered 3 $ to the boa tfor cook market."

555.    That same day, Mr. Lee messaged Dana Ferguson, at the time working for Pacific Dream, that he heard Pacific Seafood and Borstein were now offering $3.50/lb. for cooked Dungeness crab, to which Mr. Ferguson responded that that was the live ex vessel price but he wasn't sure about the cooked price, so "Let me make a call." Later that same say, Mr. Ferguson confirmed: "Just got a text saying yes 3.50 straight price all crab."

556.    Mr. Lee then messaged Geoff Molfino at Living Pacific about the $3.50 price and asking him if it was correct. Mr. Molfino said he was "checking," but before he could confirm Mr. Lee texted back: "Dana [Ferguson at Pacific Dream] just texte[d] me back 'Just got a text saying yes 3.50 straight price all crab." Mr. Molfino then wrote, "seems high for cooked ??" to which Mr. Lee responded: "Too high to do sections. We think this only works for fresh whole cooks," to which Mr. Molfino responded: "I agree."

557.    In the three days after this exchange, Defendants, including Bornstein, Hallmark, Nor-Cal, Pacific Seafood, and Fishermen's Catch, and Da Yang, completed 50 transactions at exactly the $3.50 agreed-upon price point. Pacific Dream and Living Pacific each made purchases at $3.60/lb. for crab to be sold live.

558.    On January 4, 2024, Mr. Lee asked Mr. Molfino whether the live price was still $3.60 and asked for the truck price (the price that Defendants use to sell to each other). Mr. Molfino responded, "$3.70 boat[.]"

559.    Consistent with this exchange, Defendants Pacific Seafood, Da Yang, Fathom, Living Pacific, Pacific Dream, and Hallmark, held to the $3.70 price cap.

560.    On February 1, 2024, Da Yang's Chang Lee messaged Brock Orton of South Bend telling him that he heard the price "to the boat," i.e. the ex vessel price, for cooking Dungeness crab had risen to $3.25/lb. Mr. Orton responded: "We want to be 3, that's the first I've heard of 3.25. Where did you hear that price?  Did another processor issue it?" Mr. Lee responded: "Pac dream said he heard $3.25" and that Marco [Vargas] of Bornstein also confirmed "That['s what [he] heard too." Later, Mr. Orton confirmed: "I'm hearing that also."

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

561.    In parallel, On February 2, 2024, Da Yang's Chang Lee messaged Xia Zhao of Safe Coast asking: "Hi xia, What is the newport live price to the boat ?"  Ms. Zhao responded: "Yesterday was $5. I don't have crabs today that I have no price[.] I can ask around." She later writes: "I don't think there is a price in Newport today. No one is offloading."  Mr. Lee then replied: "I see.  I just heard from pac[ific]dream Westport $3.60 to the boat."  Mr. Zhao then tried to clarify if this was the ex vessel price for Dungeness crab earmarked for resale live or for cooking/processing, to which Mr. Lee said that was the live price, while the cook price was $3.25/lb. – which Mr. Lee confirmed in a separate message with Brock Orton of South Bend. Mr. Zhao then replied to Mr. Lee: "Yeah, we probably going to announce $3.25 soon."

562.    Landings records show that in the three days following this exchange, almost all purchases were at the $3.25/lbs. agreed-upon price, including 396 defendant transactions. Defendants Da Yang, Bornstein, Caito, ASE, Fishermen's Catch, Nor-Cal, Pacific Seafood, Safe Coast, and South Bend all made purchases at exactly this price.

563.    On February 13, 2024, Fathom's Nick Moreno messaged Da Yang's Lee, asking "Chang, what is boat price for cooker crabs now?" Mr. Lee responded, "I think same $3.25?" Mr. Moreno confirmed he agreed to that price, responding, "Yes ok[.]"

564.    Later the same day, Mr. Lee then asked Mr. Moreno, "Hi nick, Newport live price $3.50 to the boat? Or lower?" Mr. Moreno responded, "I heard $3.50."

565.    Once again, landings records show Defendants' purchases were clustered around these prices. Defendants cooked purchases held at $3.25/lbs., while Da Yang's live price dropped from $3.65 on February 13, 2024 to $3.50 on February 15 and 16, 2024. This was in line with the prices offered by other Defendants.

566.    On February 15, 2024 Mr. Lee texted Mr. Moreno again, writing "Sounds like astoria and warrenton cook still $3.25[.]" Mr. Moreno responded that he would "check around this morning" and confirm.

567.    Consistent with this exchange, landings records show that Defendants Da Yang, South Bend, Bornstein, Pacific Seafood, Safe Coast, Ocean Gold, Caito, Nor-Cal, and ASE all continued to hold at $3.25 per pound for cooker crabs during this period.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

568.    On February 21, 2024, Da Yang's Chang Lee texted Fathom's Nick Mareno and two others, "Astoria & Warrenton Cook went up to $3.50 to the boat. Today. 2/21[.]" Mr. Mareno responded, "Copy that. I've heard the same." He then followed up with "Do you have any cook crabs to sell?" Notably, Mr. Lee reported this information on his own, not in response to a question from anyone in the thread, evidencing a prior agreement to share pricing information.

569.    Following this exchange, Da Yang, Bornstein, Nor-Cal, Ocean Gold, Pacific Seafood, Safe Coast, and ASE each made purchases at exactly $3.50 per pound.

570.    On February 22, 2024, Safe Coast's Max Boland also sent a text message to Da Yang's Lee asking: "Are you paying 3.90 for cooking crab?" Mr. Lee responded, "No. Live $3.90" and "Cook $3.50 to the boat." "Same here!" Mr. Boland replied.

571.    Mr. Lee then informed Mr. Boland: "I heard westport live $3.80, newport live $4.10-$3.90. So our live buyer is at $3.90. Confirmed cook price went up yesterday morning to $3.50. Borstein."

572.     Mr. Boland then responded: "We raised here yesterday morning. They [Bornstein] may have followed."

573.     A couple days later, on February 24, 2024, in an internal text message between Safe Coast employees, Xia Zhao informed colleagues regarding what she had learned from Da Yang about Bornstein's crab prices: "Just talked to Chang [Lee] (I'm at Dayang)….Borstein is $3.75 for cook today." Another Safe Coast employee then asked: "Are we going to stay at 3.5 for cook?" Boland replied: "If Bornstein is true I think we move to 3.75." Safe Coast's Chris Lam then replied: "Ok. Let's find out to see if Borstein is true."

574.    Safe Coast's Boland then texted Da Yang's Lee inquiring: "When did Bornstein go to 3.75? What are you at for cook?" Mr. Lee replied: "I just talked to marco [Marco Vargas at Bornstein] this morning he said starting today 3.75 but nothing to cook today."

575.    Mr. Boland later tries to confirm: "Are you going to 3.75 for cook?" Mr. Lee replied: "Im not really sure. … If the market price 3.75, then will match."

576.    When Boland reports this information to his colleagues at Safe Coast, Safe Coast's Chris Lam—who, at the time, had not long been involved in the Pacific NW Area's Dungeness

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

crab ex vessel market—asked: "Aren't they [Bornstein and Da Yang] competitors? Why would he [Marco at Bornstein] tell Chang [Lee at Da Yang]?"

577.    It does not appear that Mr. Boland or any of the other Safe Coast employees on this text string responded to Mr. Lam's question by text, likely not wanting to put into writing that the reason why Borstein would share this information with Da Yang is that they were part of the price-fixing cartel of which Safe Coast was also a member and so Bornstein trusted Da Yang not to use this information to Bornstein's competitive disadvantage but rather to further their price fixing agreement.

578.    Further evincing that membership, the next morning, February 25, Da Yang's Chang Lee reported to Safe Coast's Boland: "We are still cook $3.50. Sounds like warrenton still $3.50."

579.    In parallel, Mr. Lee was coordinating the "live" price with other buyers as well. On February 23, 2024, Fathom's Nick Mareno texted Mr. Lee "What is the price in Astoria now?" Mr. Lee responded "Live $4.10 today. I heard Garibaldi $4.10."

580.    Later that same day, in the same iMessage thread with Da Yang's Chang Lee and other buyer representatives, Mr. Mareno informed Mr. Lee and the rest of the group "Hearing PDS just raised to 4.50." Another chat participant confirmed, "Yes live $4.50 now[.]"

581.    The price coordination effected through these communications is evident in the records of the prices paid during this period by Da Yang, Safe Coast, Bornstein and other Defendants.

582.    Between February 20 and 24, 2024, Da Yang, Safe Coast, Bornstein, Hallmark, Caito, ASE, Fisherman's Catch, and Nor-Cal paid a "live" price in the range of $3.90 to $4.50, and a "cooked" price in the range of $3.25-$3.50.

583.    On February 25 and 26, Da Yang paid a "live" price of between $4.10 and $4.50, exactly as discussed in its exchanges with Fathom and other competitors, and a "cooked" price of $3.60. Safe Coast (except for one purchase at $4.55) and Pacific Seafood also paid a live price of $4.50 during this period.

584.    Da Yang was also coordinating with South Bend during this period. On February 21, 2024, South Bend's Brock Orton messaged Chang Lee of Da Yang and asked if he had heard

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

that, as of that day, the price for ex vessel Dungeness crab intended for cooking/processing would be $3.50/lb. Mr. Lee responded: "I have not heard.  But I heard newport and Westport was already $3.50. Let me check with warrenton [i.e., Pacific Seafood-Warrenton]." A couple minutes later, Mr. Lee wrote Mr. Orton again: "Just talked to Bornstein. Yes $3.50 starting today."  An hour later, Mr. Lee clarified: "Hi brock. Pac coast in warrenton [i.e., Pacific Seafood-Warrenton] still $3.25 as of now but he thinks it will go up to $3.50 to match. He said No other choice." Mr. Orton confirmed that his company, South Bend, would also be moving to $3.50/lb: "Yes we went to 3.50 don't want the fisherman getting excited ripping my rear !"

585.    After this exchange, Defendants Da Yang, South Bend, Bornstein, Hallmark, Nor-Cal, Ocean Gold, Pacific Seafood, Safe Coast, Caito, and ASE all adopted the $3.50/lbs. price.

### Da Yang and Fathom (January 2024) & Da Yang and Pacific Seafood (May 2024)

586.    On December 21, 2023, in reaction to Confidential Fish Buyer Informant #1's posting in a facebook group frequented by members of the Pacific Northwest Area Dungeness crab ex vessel market an offer to crabbers of $3.75/lb., Pacific Seafood's Brett Hester sent Confidential Informant #1 a text message that threatened him and his facility with physical harm, in retaliation for offering higher ex vessel prices to crabbers than those that the cartel had agreed to offer, and various other representatives of members of the cartel took other efforts to persuade or coerce Confidential Fish Buyer Informant #1 into lowering his the ex vessel price to that being paid by cartel members.

587.    In late December, Pacific Seafood's PAC EMPL #1, in an internal text message with other Pacific Seafood representatives, including PAC EMPL #2, reacted to information that Confidential Fish Buyer Informant #1 was seeking to attain bait from Pacific Seafood, indicated that he would "throw the bait off the dock" before he sold it to him, a sentiment that his fellow Pacific Seafood persons shared.

588.    And, in January of 2024, Fathom and Pacific Seafood took efforts to stymie Confidential Fish Buyer Informant #1's efforts to pay crabbers higher ex vessel prices in Charleston, ultimately resulting in Confidential Fish Buyer Informant #1 having to leave

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Charleston, Oregon on January 6, 2024, forcing Charleston crabbers to sell at a depressed price to Fathom, Pacific Seafood, and Hallmark.

589.    On December 15 2023, Hallmark's Scott Adams had complained to Nor-Cal's Kevin Lee that Hallmark didn't have much crab to sell Nor-Cal out the backdoor because "Heard that Ozzie guy got some of our Port Orford boats. Guys bad news." To which Mr. Lee responded, in part, "Stupid guy." And, on January 5, 2024, Mr. Lee—after hearing from Vicky Nowlan, Nor-Cal's dock manager in Port Orford (which is about 1 hour south of Charleston) that Confidential Fish Buyer Informant #1 was paying boats there $.50/lb. more than Hallmark—told Ms. Nowlan, "U do anything u can . U let me know. I don't want our boat & hallmark boat go to him".

590.    On January 7, 2024, the day after Confidential Fish Buyer Informant #1 had been run out of Charleston, Da Yang's Kyle Horgan sent Fathom's Nick Mareno the following screenshots of message posted by Confidential Fish Buyer Informant #1 in a private facebook group frequented by members of the Pacific Northwest Area's ex vessel Dungeness crab  industry and



comments thereto:

591. Da Yang's Horgan below the screenshots wrote Fathom's Mareno, "This Ozzie guy, man..." "Wanted to give you a heads up".

592. Fathom's Mareno, while claiming that what Confidential Fish Buyer Informant #1 said was not true, acknowledged that "he's 100% talking about us" and described the actions he had taken to get Confidential Fish Buyer Informant # 1 kicked out Charleston.

593. Fathom's Mareno and Da Yang's Horgan then continued the thread complaining about Confidential Fish Buyer Informant # 1.

594. Exactly four months later, Da Yang's Kyle Horgan sent a text message to Pacific Seafood's PAC EMPL #1, which read "Go get Ozzie!!!"

595. PAC EMPL #1 responded, in part, "Like to curb stomp that fuck".

596. Mr. Horgan responded, "There's a long list, but you're first in line".

597. PAC EMPL #1 replied, "Won't be anything left of that cunt when I'm done".

598. Mr. Horgan responded, "I don't doubt they at all".

599. In May of 2024, the California Department of Justice was actively investigating the acts of retaliation inflicted by Defendants on Confidential Informant #1 (aka Ozzie Gregorio) as a result of his offering to crabbers a higher ex vessel price than the cartel, including the incidents that occurred that January in Charleston.

## Da Yang and Pacific Dream (March 2024)

600. On March 6, 2024, Da Yang's Chang Lee texted Pacific Dream's Jonathan Mark "Hi jon. Live price still $4.50 to the boat?" Mr. Mark responded, "Good morning Chang, 4.00 at the moment."

601. This agreement to *reduce* prices is reflected in the landings records. Defendants Da Yang Fathom, Hallmark, Nor-Cal, Ocean Gold, Pacific Seafood, Safe Coast, Caito, and others all moved to prices near or at $4.00 per pound on March 6, 2024.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**Da Yang and Fathom (December 2024/January 2025)**

602.    On December 11, 2024, Cody Mills of Fathom texted Kyle Horgan of Da Yang asking if he'd heard about the "crazy fucking price Hallmark put out." Mr. Horgan asked for an update, and Mr. Mills replied that Hallmark was offering "$4[.00/lb] cook[ed] and $6[.00/lb] live."

603.    Two days later, on December 13, 2024, Da Yang's Kyle Horgan texted Fathom's Cody Mills stating: "Let's talk Monday when a price is confirmed. I still haven't heard anyone else coming out with a price." Mr. Mills responded: "Price is coming out[.] Pacific [Seafood] offered $4.25 and boats said no." When Mr. Horgan responded incredulously, "WHAT," Mr. Mills replied: "Boats want $4.75." Mr. Horgan then retorts: "Fentanyl Fantasies[.] First they were fine with 4.25 then 4.50 and now 4.75."

604.    On December 18, 2024, Da Yang's Kyle Horgan messaged Cody Mills of Fathom asking: "Meeting go okay today?" Mr. Mills responded: "Yeah sorry didn't get back to you today. We are scrambling.  Pds fucked up and lost their two biggest boats to Hallmark so they panic and raised the price to $5.60." Mr. Horgan replied: "$5.60 for live?"  Mr. Mills then said: "Looks like that was a mistake.  Tenshi is telling their boats they aren't buying over $4.75 and when at that china market is break even at best. Nothing going cooked." Mr. Horgan replied: "Copy copy. Wow[.]  Insane stuff."  Later that same day, Mr. Mills wrote again to Mr. Horgan: "Nick [Mareno of Fathom] is sticking to the 4.75 for now.  Pds called and said they fucked up and let his emotions get the best o[f] him to raise the price."  Mr. Horgan responded: "Oh wow. Big to say that."  Mr. Mills later added: "I think Newport might go to $5 for live tonight.  Will see.  Safecoast paid one boat $5 today.  We paid $4.75 today for live." Mr. Horgan then agreed to the same price: "I will pay $4.75 to cook at this point.  But I don't want that getting out."  And even later that same day, Mr. Mills and Mr. Horgan exchanged more messages with Mr. Mills stating that it "[s]ounds like California opening first week January hopefully" and Mr. Horgan adding "people are assuming pac [Pacific Seafood] and Southwind are going to get all the Cali crab" and "[t]he only thing that would cause the price to drop is living coming to a screeching hault [sic]."  The two erstwhile competitors also discussed when they thought Astoria would open and what pricing should be for sections versus live Dungeness crab.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

605.    On December 19, 2024, Da Yang's Horgan texted Fathom's Mills "Green light on project fuck fuck games[.]" Mr. Mills responded, "I'll call you right back."

606.    Later in the same thread, Mr. Mills texted "Game time. Our teams plan is to talk to the boats late tonight while they are working. When pds never answers their phones. And Nick [Mareno of Fathom] is on the dock right now." Mr. Horgan responded, "You're definitely going to cause a big wave hahaha[.]"

607.    That evening, Mr Mills texted, "Fucking dock price up again. Shit is wild." He continued, "Everyone is starting retros. Also wild." Mr. Horgan responded that was "insane" and Mr. Mills elaborated, "We had cooked agreed in Newport. Now its live price or no price."

608.    A short while later, on January 9, 2025, Fathom's Mills texted Da Yang's Horgan: "I keep hearing that Pacific [Seafood] is coming out at $5 in Northern California. Not confirmed though." A day later, Mr. Mills asked Mr. Horgan: "Have you heard any more on pricing?" Mr. Horgan replied, "I haven't."

609.    Less than a week later, Fathom's Mr. Mills texted Da Yang's Mr. Horgan: "Yo, have you guys announced a price? Let me know what's up when you talk to Chang [Lee of Da Yang]. Let's work together!"

610.    And on January 28, 2025, Fathom's Nick Mareno texted Da Yang's Chang Lee asking whether Da Yang was only going to purchase live crabs going forward, and whether the price would be "7.50?"

611.    On January 29, 2025, Fathom's Nick Mareno messaged Chang Lee of Da Yang inquiring: "Did price go up today?" Mr. Lee responded: "I do not know. I have not heard anything." Mr. Mareno then added: "I keep hearing pricing rumors. Borstein 7.50. live 7.75."

612.    During this period, Fathom and Da Yang did, in fact, work together.

613.    Starting on 12/17/24, Da Yang paid $5.60/lb. ex vessel for Dungeness crab in Oregon, and, starting on 12/19/24, Fathom also paid $5.60/lb. ex vessel for Dungeness crab in in Oregon.

614.    In fact, consistent with Mr. Mills' statement that they had a price "agreed" in Newport, landings records show that Da Yang, Fathom, and Safe Coast (all three of which were in

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

regular communication) made purchases at prices clustered between $5.60 and $5.70 per pound during this period.

615.    Da Yang and Fathom then continued in close alignment during January of 2025, both paying between $6/lb. and $6.25/lb., until the last third of January at which point they both increased the amount they were paying to $7/lb., with Da Yang changing its prices on 1/20/25 and Fathom changing its prices on 1/23/25.

616.    And in January, 2025, following the exchange between Fathom's Mr. Mareno and Da Yang's Chang Lee, Da Yang did in fact adopt the agreed-upon $7.50 per pound price they had discussed.

## ANTITRUST INJURY

617.    During the Class Period, Defendants' anticompetitive conduct had the following effects, among others, throughout the Pacific NW Area:

    a.   competition has been restrained or eliminated with respect to ex vessel prices paid to crabbers for Dungeness crab;

    b.   crabbers have been deprived the benefits of free and open competition for the purchase of their product;

    c.   ex vessel prices paid for Dungeness crab in the Pacific NW Area have been fixed, lowered, stabilized, or maintained at artificially depressed levels; and

    d.   commercial crabbers were paid artificially depressed ex vessel prices for their sales of Dungeness crab.

618.    The purpose and effect of this anticompetitive course of conduct was to exclude competition and to lower, fix, or maintain the purchase price for ex vessel Dungeness crab throughout the Pacific NW Area. As a direct and foreseeable result, during the Class Period, Plaintiffs and the proposed Class were paid lower prices for the Dungeness crab they sold ex vessel than they would have been paid in an unrestrained market.

619.    As noted above, ex vessel sales of Dungeness crab in Puget Sound have been largely unaffected by Defendants' conspiracy because that geographic area is dominated not by Defendants but by tribal nation market participants. As the table and graph below demonstrate, contrary to what

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

would be expected if the Pacific NW Area were an unmanipulated market free from anticompetitive restraints, the divergence in prices between those paid in the Pacific NW Area and those paid in Puget Sound widens during the conspiracy period—*i.e.*, beginning with the 2015/2016 season.

<u>Price Difference Between Ex Vessel Dungeness Crab Prices</u>
<u>Paid in Pacific NW Area vs. Puget Sound ($/lb)</u>

|  | Pacific NW Area | Puget Sound | Difference | % Difference |
|---|---|---|---|---|
| *Pre-Conspiracy Period (2010-2015)\** | $2.86 | $3.72 | $0.87 | 30.3% |
| *Post-Conspiracy Period (2016-2024)\** | $3.63 | $5.01 | $1.38 | 38.1% |

*Year is defined as November of previous year through October to account for crab seasons.



Average Inflation-Adjusted Price for Ex-Vessel Dungeness Crab - Pacific NW vs. Puget Sound

Source: Fish Ticket Data from California, Oregon, Washington States' Departments of Fish and Wildlife; CPI Series Federal Reserve Bank of St. Louis

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

620.    The artificial suppression of ex vessel Dungeness crab prices in the Pacific NW Area affected not only sales made to Defendants but also those sales made to non-conspiring ex vessel purchasers. This is because non-conspiring ex vessel purchasers are disincentivized from offering higher prices for Dungeness crab under cover of Defendants' fixed, artificially depressed prices. As a result, all sellers of ex vessel Dungeness crab in the Pacific NW Area—whether the transaction involves Defendants or non-Defendant purchasers—suffered harm during the Class Period.

621.    By reason of the antitrust violations alleged herein, Plaintiffs and the proposed Class have sustained injury to their businesses or property, and as a result have suffered damages. Such injuries, which result from the price effects caused by Defendants' conduct, are precisely the type that the antitrust laws were intended to forestall.

## CLASS ACTION ALLEGATIONS

622.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) on behalf of themselves and as representatives of a class of other commercial crabbers (the "Sherman Act Class") defined as follows:

> All persons who, during the Class Period, made ex vessel sales of Dungeness crab caught off the coast of, or landed in, California, Oregon, and/or coastal Washington (not including Puget Sound), on their own behalf, seeking damages and injunctive relief for violations of § 1 of the Sherman Act.

623.    Plaintiffs Brand Little and Robin Burns bring this action on behalf of themselves and as representatives of a class of crabbers under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) (the "California Class") defined as follows:

> All persons who, during the Class Period, made ex vessel sales of Dungeness crab caught off the coast of, or landed in, California, Oregon, and/or coastal Washington

(not including Puget Sound), on their own behalf, seeking damages and injunctive relief for violations of California state law.

624.    Plaintiff Cherry Fisheries brings this action on behalf of itself and as representatives of a class of crabbers under Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2), and (b)(3) (the "Oregon Class") defined as follows:

> All persons who, during the Class Period, made ex vessel sales of Dungeness crab caught off the coast of, or landed in, California, Oregon, and/or coastal Washington (not including Puget Sound), on their own behalf, seeking damages and injunctive relief for violations of Oregon state law.

625.    Excluded from the proposed Classes are : Defendants; any of their officers, directors, or employees; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; any federal, state, or local governmental entities; any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

626.    The members of the proposed Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to join their individual claims.

627.    Plaintiffs' claims are typical of the members of the proposed Classes. Plaintiffs and all members of the proposed Classes were injured by the same wrongful conduct by Defendants. Defendants' anticompetitive conduct deprived Plaintiffs and the members of the proposed Classes of the benefits of competition that would have raised ex vessel prices for Dungeness crab. Although the precise number of such individuals is unknown to Plaintiffs, Plaintiffs believe that the number of members in the proposed Classes is, at minimum, in the thousands, and that the members reside or are located throughout Oregon, Washington, and California, including in this District.

628.    Plaintiffs will fairly and adequately protect and represent the interests of the proposed Classes. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other proposed Class members.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

629.   **The Sherman Act Class.** Common questions of law and fact exist as to all members of the Sherman Act Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the members of the Class, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Sherman Act Class include, but are not limited to:

a.   whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, lower, maintain, or stabilize the ex vessel price of Dungeness crab in the Pacific NW Area;

b.   the duration of the combination or conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance thereof;

c.   whether such combination or conspiracy violated Section 1 of the Sherman Act;

d.   whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs and other members of the Sherman Act Class;

e.   whether Defendants caused Plaintiffs and the members of the Sherman Act Class to suffer damages in the form of lower prices received in connection with the ex vessel sale of their Dungeness crab to Defendants, their co-conspirators, and other ex vessel buyers;

f.   the effect of Defendants' combination or conspiracy on ex vessel Dungeness crab prices in the Pacific NW Area;

g.   the appropriate measure of class-wide damages for the Sherman Act Class; and

h.   the propriety of declaratory and injunctive relief.

630.   **The California Class.** Common questions of law and fact also exist as to all members of the California Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the California Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the California Class include, but are not limited to:

a. whether Defendants have illegally combined to fix and suppress the ex vessel price for Dungeness crab in California and to control when the season for Dungeness crab opens in violation of the California Cartwright Act;

b. whether Defendants coerced other Dungeness crab buyers to combine in this way;

c. whether the means employed by Defendants to coerce that combination included implicitly and explicitly threatening or retaliating against non-compliant buyers;

d. whether the foregoing and other conduct by Defendants violates the California Cartwright Act and/or the California Unfair Competition Law;

e. whether Defendants' actions alleged herein caused injury to Plaintiffs and the California Class members by causing them to receive artificially depressed ex vessel prices for Dungeness crab during the Class Period;

f. the appropriate measure of damages; and

g. the propriety of declaratory and injunctive relief.

631. **The Oregon Class.** Common questions of law and fact also exist as to all members of the Oregon Class. Defendants' anticompetitive activities commonly implicated and were generally applicable to all the Oregon Class members, thereby making class-wide adjudication and relief appropriate. Such questions of law and fact common to the Oregon Class include, but are not limited to:

a. whether Defendants have illegally combined to fix and suppress the ex vessel price for Dungeness crab in Oregon and to control when the season for Dungeness crab opens in violation of Oregon Antitrust Law, Or. Rev. Stat. § 646.725, *et seq.*, and/or Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605 *et seq.*;

b. whether Defendants coerced other Dungeness crab buyers to combine in this way;

c. whether the means employed by Defendants to coerce that combination included implicitly and explicitly threatening or retaliating against non-compliant buyers;

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

d. whether the foregoing and other conduct by Defendants violates the Oregon Antitrust Law, Or. Rev. Stat. §646.725, *et seq.* and/or Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605 *et seq.*;

e. whether Defendants' actions alleged herein caused injury to Plaintiffs and the Oregon Class members by causing them to receive artificially depressed ex vessel prices for Dungeness crab during the Class Period;

f. the appropriate measure of damages; and

g. the propriety of declaratory and injunctive relief.

632. Plaintiffs are more than adequate representatives of the Sherman Act, California, and Oregon Classes, and their chosen class counsel (the undersigned) are more than adequate attorneys. Plaintiffs have the incentive, and are committed, to prosecuting this action for the benefit of the proposed Classes. Plaintiffs have no interests that are antagonistic to those of the proposed Classes. Plaintiffs have retained counsel highly experienced in antitrust and class action litigation.

633. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action.

634. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### DELAYED DISCOVERY/FRAUDULENT CONCEALMENT

635. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and other Class Members.

636. Plaintiffs and other Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaging in the illegal and unlawful conduct as alleged herein until shortly before this litigation was commenced.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Specifically, Plaintiffs only discovered the identity of the presently identifiable participants in Defendants' scheme to fix prices, from which all of Plaintiffs' and other Class Members' claims derive, when information was provided by Confidential Buyer Informant #1 after the filing of the instant action and documents were produced by certain Defendants.

637. Nor could Plaintiffs and other Class Members, in the exercise of reasonable diligence, have discovered the violations earlier than that time because Defendants secretly engaged in their wrongdoing, concealing the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

638. For example, Defendants substantially memorialized their agreements concerning pricing orally and via text messages sent and received on the personal devices of Defendants' employees, principals, and owners. Furthermore, these discussions were held in private in order to prevent discovery of the conspiracy by members of the class. And Defendants have, by and large, aggressively resisted Plaintiffs' efforts to gain access to records of these discussions through discovery in this litigation, including, in the case of Nor-Cal, simply ignoring a subpoena issued by Plaintiff Little for the communications and an order by this Court ordering its compliance.

639. Furthermore, Defendants affirmatively sought to mislead Plaintiffs and other Class Members into believing that there was price competition between them and, by extension, to hide the existence of the conspiracy from Plaintiffs and other Class Members, and provided false explanations to Class Members for their actions, including without limitation that the ex vessel prices for Dungeness crab offered by them in the Pacific NW Area were the result of external market conditions and that they allowed Pacific Seafood to set the opening price for the Dungeness crab season for factors unrelated to their conspiracy and agreement.

640. Plaintiffs and other Class Members could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' active and purposeful concealment of their unlawful activities.

641. As a result of Defendants' fraudulent concealment of their wrongful acts, Plaintiffs' delayed discovery of those wrongful acts, and the continuing nature of Defendants'

conspiracy, Plaintiffs asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and other Class Members.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Unlawful Agreements in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Against All Defendants on Behalf of Plaintiffs and the Sherman Act Class)**

642.    Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

643.    Beginning no later than the start of the Class Period and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

644.    This agreement, understanding, and conspiracy has included concerted action and undertakings by Defendants and their co-conspirators with the purpose and effect of: (a) fixing, lowering, and stabilizing ex vessel prices for Dungeness crab in the Pacific NW Area at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators with regards to ex vessel Dungeness crab prices in the Pacific NW Area.

645.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, lowering, and stabilizing of ex vessel prices of Dungeness crab in the Pacific NW Area.

646.    The acts done by Defendants and their co-conspirators as part of, and in furtherance of, their agreement, understanding, and conspiracy were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

647.    The unlawful agreement, understanding, and conspiracy among Defendants and their co-conspirators has had the following effects, among others:

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

a.  competition in the Pacific NW Area among Defendants, their co-conspirators, and other ex vessel buyers of Dungeness crab has been suppressed, restrained, and eliminated;

b.  ex vessel prices for Dungeness crab have been fixed, lowered, maintained, and stabilized at artificially low levels throughout the Pacific NW Area; and

c.  those who sold Dungeness crab ex vessel in the Pacific NW Area have been deprived of the benefits and free and open competition.

648.    As a result, during the Class Period, Plaintiffs and the members of the Sherman Act Class have received lower prices for their Dungeness crab from Defendants, their co-conspirators, and other ex vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

649.    Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiffs and the members of the Sherman Act Class have suffered injury to their property.

650.    Defendants' contract, combination, and conspiracy is a *per se* violation of Section 1 of the Sherman Act.

651.    Plaintiffs and the members of the Sherman Act Class will continue to be subjected to Defendants' scheme alleged herein and will continue to suffer injury unless Defendants' unlawful conduct is enjoined.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Combination in Restraint of Trade in Violation of the California Cartwright Act, Cal. Bus. and Prof. Code Sections 16720, *et seq.***
**(Against All Defendants on Behalf of Plaintiffs Little, Burns, and the California Class)**

652.    Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

111

653.    Defendants have entered into an unlawful combination in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce.  Each Defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, stabilize, and maintain ex vessel prices for Dungeness crab throughout the Pacific NW Area, including in California.

654.    The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, maintain, and stabilize ex vessel prices for Dungeness crab in California. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and fixing, lowering, and stabilizing the ex vessel price of Dungeness crab in California.

655.    Defendants' combination and conspiracy had the following purpose and effects: (1) ex vessel price competition for Dungeness crab was restrained, suppressed, and eliminated throughout California; (2) ex vessel Dungeness crab prices in California were fixed, lowered, maintained, and stabilized at artificially low levels; and (3) crabbers have been deprived of free and open competition in the ex vessel Dungeness crab market in California. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. These anticompetitive effects outweigh any beneficial effect on competition.

656.    As a result, during the Class Period, Plaintiffs and the members of the California Class have received lower prices for their Dungeness crab from Defendants, their co-conspirators, and other ex vessel buyers than they otherwise would have received in the absence of Defendants' unlawful agreement, understanding, and conspiracy, in an amount according to proof at trial.

657.    Thus, as a direct and proximate result of Defendants' combination and conspiracy as alleged herein, Plaintiffs and the members of the California Class have suffered injury to their property

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Violation of the California Unfair Competition Law,
Cal. Bus and Prof. Code § 17200, *et seq*.
(Against All Defendants on Behalf of Plaintiffs Little, Burns, and the California Class)**

658.     Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

659.     Defendants have intentionally and wrongfully engaged and continue to engage in the practices above, which are unlawful, fraudulent, and/or constitute unfair competition within the meaning of section 17200 of the California Business and Professions Code.

660.     These practices include but are not limited to:

a.     Defendants' combination and agreement to fix, lower, maintain, and stabilize ex vessel Dungeness crab prices in California, and to control when the Dungeness crab season opens; and

b.     Defendants' efforts to police and enforce their combination and agreement, and to punish or coerce compliance from those ex vessel Dungeness crab purchasers who have not joined Defendants' combination and conspiracy.

661.     The purpose and effect of these practices is to harm competition and suppress ex vessel prices for Dungeness crab in California.

662.     Plaintiffs and the members of the California Class suffered harm as a direct and proximate result of Defendants' practices as described above.

663.     The practices alleged above are unfair, irrespective of the violation of any other law, and constitute unfair competition within the meaning of section 17200 of the California Business and Professions Code. They are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and the harm caused by such practices—including in the form of artificially depressed ex vessel prices for Dungeness crab—greatly outweighs any possible utility therefrom.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## FOURTH CAUSE OF ACTION

**Violation of the Oregon Antitrust Law, Or. Rev. Stat. §646.725, *et seq*.**
**(Against All Defendants on Behalf of Plaintiff Cherry Fisheries, Inc and the Oregon Class)**

664.    Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

665.    Defendants' combinations or conspiracies had the following effects: (1) price competition for ex vessel Dungeness crab was restrained, suppressed, and eliminated throughout the State of Oregon; (2) ex vessel Dungeness crab prices in the State of Oregon were depressed, fixed, maintained, and stabilized at artificially low levels; and (3) individuals have been deprived of free and open competition.

666.    During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

667.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §646.725 et seq.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Or. Rev. Stat. §646.725 et seq.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

**Violation of the Oregon Unlawful Trade Practices Act,**
**Or. Rev. Stat. §646.605 *et seq*.**
**(Against All Defendants on Behalf of Plaintiff Cherry Fisheries and the Oregon Class)**

668.    Plaintiffs reallege and incorporate by reference all the allegations above as though fully set forth herein.

669.    Defendants have intentionally and wrongfully engaged and continue to engage in the practices above, which are unlawful, fraudulent, and/or constitute unlawful practices within the meaning of section 646.605, *et seq.*, of the Oregon Revised Statutes.

670.    These practices include, but are not limited to:

a.    Defendants' actions taken with the purpose and/or effect fixing of ex vessel prices paid of their combination and agreement to fix, lower, maintain, and

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT

114

stabilize ex vessel Dungeness crab prices in Oregon, and to control when the Dungeness crab season opens;

    b.  Defendants' factual misrepresentations concerning ex vessel price of Dungeness crab offered to crabbers, made in furtherance of their combination and agreement to fix, lower, maintain, and stabilize ex vessel Dungeness crab prices in Oregon, and to control when the Dungeness crab season opens; and

    c.  Defendants' deceptive conduct to police and enforce their combination and agreement, and to punish or coerce compliance from those ex vessel Dungeness crab purchasers who have not joined Defendants' combination and conspiracy.

671.    The purpose and effect of these practices is to harm competition and suppress ex vessel prices for Dungeness crab in Oregon.

672.    Plaintiff and the members of the Oregon Class suffered harm as a direct and proximate result of Defendants' practices as described above.

673.    The practices alleged above are unfair, deceptive and unlawful, irrespective of the violation of any other law, and constitute unlawful practices within the meaning of section 646.605, *et seq.* of the Oregon Revised Statutes.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION

**For Declaratory Relief Under 28 U.S.C. § 2201**
**(Against All Defendants on Behalf of Plaintiff and All Classes)**

674.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

675.    Plaintiffs and the members of the Sherman Act, California, and Oregon Classes, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 of the Sherman Act, California's Cartwright Act and Unfair Competition Law, and Oregon's Antitrust Law and Unlawful Trade Practices Act.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

**For Fraudulent Transfer Under the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439, *et seq*.**

**(Against Caito Fisheries, Inc., John Caito, Joseph Caito, James Caito and Jeanette Caito on Behalf of Plaintiffs and All Classes)**

676. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

677. Caito Fisheries, Inc. is indebted to Plaintiffs and the Class, in an amount to be proven at trial, based on its liability arising from its participation in the price fixing and other improper and anticompetitive conduct of Defendants in the Pacific NW Area ex vessel Dungeness crab market.

678. Following the sale of Caito Fisheries, Inc.'s business and assets to the Southwind Defendants, which occurred after this Action commenced, the Caito Siblings caused Caito Fisheries, Inc. to transfer a significant portion of the sale proceeds to the Caito Siblings.

679. The transfer of these funds away from Caito Fisheries, Inc. to the Caito Siblings was done with knowledge of Caito Fisheries, Inc.'s liability in connection with this Action, and was intended to hinder collection by Plaintiffs and the Class of any judgment issued against Caito Fisheries, Inc. in this Action.

680. The transfer involved a significant portion of Caito Fisheries, Inc.'s assets, and is being concealed from Plaintiffs and the Class.

681. The transfer of funds away from Caito Fisheries, Inc. to the Caito Siblings has damaged Plaintiffs and the Class by reducing the assets available to satisfy the claims of Plaintiffs and the Class against Caito Fisheries, Inc.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, prays for judgment and further relief as follows:

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1.      Determining that this action may be maintained as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, certifying each of the four proposed Classes, and directing that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Classes, and appoint Plaintiff as the named representatives of the Classes;

2.      Awarding Plaintiff and the Classes treble damages in an amount to be determined at trial, plus interest in accordance with law;

3.      Award Plaintiff and the Class injunctive relief including an order barring Defendants from continuing to engage in the illegal combinations with other ex vessel buyers of Dungeness carab alleged herein;

4.      Entering judgments against Defendants in favor of Plaintiff and the Classes;

5.      Entering judgment voiding all transfers of funds from Caito Fisheries, Inc. to the Caito Siblings that took place following the initiation of this Action, or in the alternative, entering a money judgment against the Caito Siblings;

6.      Awarding Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

7.      Awarding such further additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Dated: June 29, 2026

By:                 */s/ Stuart G. Gross*

Stuart G. Gross (SBN 251019)
Travis H.A. Smith (SBN 331305)
Jan W. Jorritsma (SBN 326772)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628
*sgross@grosskleinlaw.com*
*tsmith@grosskleinlaw.com*
*jjorritsma@grosskleinlaw.com*

Matthew W. Ruan (SBN 264409)
Samantha Gupta (admitted pro hac vice)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
*mruan@jjlmlaw.com*
*sgupta@jjlmlaw.com*

Matthew S. Weiler (SBN 236052)
Raymond S. Levine (SBN 348030)
**SCHNEIDER WALLACE COTTRELL KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100
mweiler@schneiderwallace.com
*rlevine@schneiderwallace.com*

Todd R. Gregorian (SBN 236096)
Jonathan G. Tamimi (SBN 305493)
**FENWICK & WEST LLP**
One Front Street, Floor 33
San Francisco, CA 94111
(415) 875-2300
*tgregorian@fenwick.com*
*jtamimi@fenwick.com*

*Counsel for Plaintiffs and the Proposed Classes*

SIXTH AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-cv-01098-AGT