Stuart G. Gross (SBN 251019)
Jan W. A. Jorritsma (SBN 326772)
Travis H. A. Smith (SBN 331305)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628

*Attorneys for Plaintiffs and the Proposed Classes*
[additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **BRAND LITTLE, ROBIN BURNS, AND CHERRY FISHERIES INC.,** Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> **PACIFIC SEAFOOD PROCUREMENT, LLC,** et al., <br><br> Defendants. | Case No. 3:23-cv-01098-AGT <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DIMSISS SIXTH AMENDED COMPLAINT** <br><br> Date:    October 2, 2026 <br> Time:    10:00 a.m. <br> Judge:   Honorable Alex G. Tse <br> Courtroom: A, 15th Floor |

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ...................................................................................................................... 10

I.      Plaintiffs Allege Facts This Court Already Held Plausibly Allege Participation in Defendants' Price Fixing Conspiracy ................................................................... 10

       A.   Da Yang's Kyle Horgan Discussed Retaliation Against Independent Buyer Ozzie Gregorio for Paying More Than the Cartel Price ............................................ 11

       B.   Da Yang Participated in the 2023/2024 Season Buyers' Meeting Regarding the Need to Keep Prices Paid to Crabbers Down ................................................ 12

       C.   Da Yang Agreed to Specific Price Movements with Other Buyers Corroborated by Subsequent Price Activity ........................................................................... 13

II.     Further, The Frequency of Communications Between Da Yang And Other Defendants Supports Their Participation in the Price Fixing Conspiracy ................................ 16

III.    Plaintiffs Have Identified Additional Plus Factors That Support Their Allegations Against The Da Yang Defendants ................................................................................. 18

IV.    The Totality of the Circumstances Strongly Supports the Inference that Da Yang Defendants Participated in the Price Fixing Conspiracy ........................................ 20

V.     Plaintiffs Also Adequately Allege Da Yang's Participation In An Illegal Agreement To Share Pricing Information ................................................................................. 21

CONCLUSION .................................................................................................................. 22

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## **TABLE OF AUTHORITIES**

### **CASES**

*Am. Column & Lumber Co.*, 257 U.S. 377 (1921)...................................................................17

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)..........................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................8, 9

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)..................................21

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ..................................................9

*Erickson v. Pardus*, 551 U.S. 89 (2007) ..................................................................................8

*Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895
   (E.D. Cal. 2024) ...........................................................................................................16, 18

*Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813 (9th Cir. 2023) .....................................17

*In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp.3d 1031 (N.D. Cal. 2021) ...........................21

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009).............................8

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008).....................................................8

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL
   309192 (N.D. Cal. Jan. 21, 2014) ...........................................................................................8

*In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186 (9th Cir. 2015)...........18, 19

*In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758 (D. Minn. 2025) ............................................22

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896
   (N.D. Cal. 2008)....................................................................................................................17

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) .....................................8, 20

*Interstate Cir., Inc. v. U.S.*, 306 U.S. 208 (1939)......................................................................9

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000).........................2, 8, 19

*Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752 (1984) .................................................9

*Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp.3d 1108 (S.D. Cal.
   2022) ...........................................................................................................................16, 18

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960).............9, 13

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Real Est. Exch., Inc. v. Zillow, Inc.*, No. C21-0312 TSZ, 2023 WL 5278115 (W.D. Wash. Aug. 16, 2023) ....................................................................................................9

*Ross v. Citigroup, Inc.*, 630 F.App'x 79 (2d Cir. 2015) ........................................... 16, 18

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022)................................... 8

*United States v. Container Corp. of Am.*, 393 U.S. 333 89 S. Ct. 510, 21 L. Ed. 2d 526 (1969) ..................................................................................................................22

*United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150 (1940) ........................... 9, 20

*W. Penn Allegheny Health Sys., Inc. v. UPMC ("W. Penn")*, 627 F.3d 85 (3d Cir. 2010) ...................................................................................................................... 8, 9

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

iii

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**INTRODUCTION**

This is now the fourth time this Court has been asked to assess whether Plaintiffs plausibly allege that a Buyer participated in Defendants' price fixing conspiracy to suppress and stabilize the ex vessel price paid to Crabbers for Dungeness crab. Three times before, this Court denied a motion to dismiss on that question, holding that allegations of coordinated pricing communications, efforts to enforce a common price among Buyers, and parallel pricing conduct corroborated by the coordinated communications gave rise to a reasonable inference of participation in the conspiracy. Dkts. 242, 339.

When Da Yang itself first moved to dismiss the allegations against it in the Third Amended Complaint, this Court found the allegations at that time supported only a "tacit agreement to exchange pricing data," thus falling just short of a plausible agreement to match particular prices. Dkt. 483 at 2. Discovery has since filled that gap. The Sixth Amended Class Action Complaint ("Complaint" or "6AC") alleges that Da Yang's Kyle Horgan[1] participated in and encouraged retaliation against an independent Buyer, Ozzie Gregorio, for refusing to accept the cartel's price; that Mr. Horgan confirmed his attendance at the very December 2023 Buyers' meeting this Court already held gave rise to an inference of conspiracy; and that Da Yang's principal pricing representatives, Chang Lee and Mr. Horgan, repeatedly solicited "the" prevailing ex vessel price from competitors, received answers, and then moved Da Yang's own prices to match—on at least one occasion in a direction contrary to Da Yang's own economic self-interest. 6AC ¶¶ 509-616. These are precisely the kinds of allegations this Court previously found sufficient to support a reasonable inference of participation in the conspiracy when made against other Defendants.

The Complaint also includes two additional categories of allegations relevant to Da Yang's motion. First, an analysis of telephone records shows that Da Yang's pricing personnel were in

---

[1] While Mr. Horgan is purportedly an employee of Great Ocean, not Da Yang, Mr. Horgan holds himself out to the public, including government entities, as "Domestic Sales Manager at Da Yang Seafoods" regularly communicates with Crabbers (defined below) and others, including with respect to setting prices, on behalf of Da Yang, and directly participates in price setting activities on behalf of Da Yang. *See, e.g.,* 6AC ¶¶ 142-146, 264, 269-271, 539-544, 549, 549 n. 10, 550. Furthermore, the 6AC alleges, in detail, that Great Ocean and Da Yang, operate as a single enterprise, with Kyle Horgan's conduct an important element thereof. *See id.* ¶¶ 134-46.

sustained, direct contact with their counterparts at nearly every other Defendant Buyer throughout the Class Period—tens of thousands of calls that Da Yang does not, and cannot, explain as ordinary competitor conduct. 6AC ¶¶ 505-08. Second, Plaintiffs allege additional plus factors, including a common motive to suppress the price paid to Crabbers and repeated instances of Da Yang's pricing moving against its own economic self-interest immediately following contact with a competitor. *Id*. ¶¶ 516, 530, 557-59, 561-62, 584-85. Together with the pricing communications described above, these allegations move well beyond the "mere price curiosity" this Court previously found insufficient, Dkts. 242 at 8, 483 at 2, and firmly into the territory of plausible participation in an agreement to fix prices.

Da Yang's motion does not seriously grapple with these allegations. Instead, it recasts Plaintiffs' well-pled facts as innocent efforts to "confirm" and "match" market prices, and argues that the frequency of its communications with competitors cannot matter because Plaintiffs cannot describe the substance of every phone call. Dkt. 779 at 8, 17. But that is not the standard on a motion to dismiss, and it is not this Court's role at the pleading stage to credit Da Yang's alternative, purportedly innocent explanation over the reasonable inference of conspiracy that arises from Plaintiffs' well-pled allegations, taken as a whole. Because the Complaint plausibly alleges Da Yang's participation in Defendants' price fixing conspiracy—individually, and considering the totality of the circumstances—Da Yang's Motion to Dismiss should be denied.

## BACKGROUND[2]

This case arises out of a conspiracy to suppress and stabilize the price wholesale Dungeness crab buyers ("Buyers") pay to commercial fisherman ("Crabbers") at the boat, or "ex vessel" in California, Oregon, and Washington, excluding the Puget Sound (collectively the "Pacific NW Area"). 6AC, ¶¶ 8, 10, 186-616, 643, 653, 660, 667, 675. Buyers are middlemen between Crabbers and direct-to-consumer retailers. *Id.*, ¶ 4. Their profit comes from the margin between the price they pay to Crabbers versus the retail market price for Dungeness crab and the volume of crab they

---

[2] The facts stated in this Background section are taken from the 6AC. For purposes of this Motion, all factual allegations in the 6AC are taken as true. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000) (cleaned up).

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

are able to purchase and resell. *See id.*, ¶¶ 6-7, 195, 198, 209, 483-84. Thus, Buyers can increase their margins by minimizing the amounts they pay to Crabbers and/or by maximizing the volume of crab they sell to retailers. *See id.*, ¶¶ 195, 198, 209.

Dungeness crab is fished for a limited season, usually between approximately December and July, or some years early fall. *Id.*, ¶¶ 173-176. Dungeness crab is a sought-after product, *id.*, ¶ 171, and there is a fixed supply of crab in the ocean in any given season, *id.*, ¶ 173. Typically, supply and demand both peak around the season opener, when the largest supply of crab is available to be caught, *id.*, and demand is driven by the winter holidays, *id.*, ¶¶ 172, 175. Throughout the season, however, both domestic "live" or "fresh cooked" markets, and the substantial international export market continue to drive demand, while supply steadily diminishes. *Id.*, ¶¶ 172, 187.

Some Buyers process the crab they purchase before reselling, while others sell crab "live," "fresh cooked," or for export. *Id.*, ¶¶ 178,186-89, 193-95. But the product offered by Crabbers is fungible; there is no discernible distinction between crab caught in California as compared to Oregon or Washington, nor between crab offered by any given Crabber. *Id.*, ¶ 171. Consequently, in a competitive market, Buyers should be in direct competition with each other to purchase the largest share of a given season's catch, limited only by what they can feasibly resell. *Id.*, ¶¶ 455-56. And that competition between Buyers to obtain a larger share of a limited supply should naturally operate to increase the prices Buyers offered to Crabbers ex vessel. *Id.* In fact, this is precisely how the ex vessel Dungeness crab market worked prior to 2015/16. *Id.*, ¶¶ 201-05, and how it functions in the Puget Sound market, which, for a variety of reasons, including significant participation by tribal buyers, has escaped Defendants' price fixing cartel. *Id.*, ¶¶ 205-06, 241. Beginning in 2015/16, however, the Defendant Buyers agreed to fix the amount they pay Crabbers, both to suppress the price offered at the season opener, when demand is the highest, and to stabilize prices—including to control increases in price—as supply dwindles during the season. *Id.*, *passim*; *accord* Dkt. 242 (finding that Plaintiffs had alleged plausible price fixing conspiracy amongst Defendant Buyers).

Altogether, Defendants control the ex vessel Dungeness crab price using "a variety of means, including, without limitation" (a) agreements not to compete with each other on the price

offered at the season, including by permitting Pacific Seafood to set the season price, (b) "agreeing to delay the opening of some Dungeness crab seasons until later in the year when consumer demand would be lower[,]" (c) coordinating with each other about the ex vessel prices they pay to crabbers throughout the season, (d) policing other cartel members' compliance with their agreement and enforcing the fixed price against non-cartel Buyers, and (e) selling Dungeness crab "out-the-back-door" to other cartel Buyers from ports where that Buyer does not have a presence, to limit the number of Buyers competing for Dungeness crab at a given port. *Id.* ¶ 8. Defendant Buyers conceal the full scope and the true purpose of these activities and other activities, which they undertake in furtherance of their cartel. *Id.*, ¶¶ 455-80, 635-41.

In terms of absolute numbers, cartel members make up a small minority of the total number of Buyers in the Pacific NW Area; however, independent Buyers are invariably Davids to the cartel's Goliath. There were 239 licensed Buyers for the 2023/24 season, but Defendants collectively comprise two-thirds of the total market share, while the smallest 218 Buyers comprised just 12 percent of the overall market. *Id.*, ¶ 179. And, through a combination of coercion, inducements, and structural advantages, Defendants enforce their pricing scheme against non-cartel members. *Id.*, ¶¶ 385-454.

Da Yang is a member of the cartel. *See, e.g., id.*, ¶¶ 146, 264, 269-76, Among other things, it (a) agreed not to compete on price at the season opener, *e.g. id.*, ¶¶ 268-76, 532-33, 539-52, (b) coordinated the prices it paid with the prices being paid by other cartel Buyers throughout the season, *id.*, ¶¶ 507, 509-616, (c) complied with another cartel Buyer's enforcement of the price fixing arrangement, *e.g. id.*, ¶¶ 515-20, and (d) encouraged retaliation against independent Buyers who paid higher prices, *e.g. id.*, ¶¶ 590-99. This list is far from exhaustive.

Against this backdrop, Plaintiffs first initiated this lawsuit on March 13, 2023 against various Pacific Seafood entities, alleging, *inter alia,* that Pacific Seafood entered into "coercive combinations with other Dungeness crab wholesale buyers[]" in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Dkt. 1 ("Original Complaint") at ¶ 4.

After filing the Original Complaint, Plaintiffs issued pre-litigation subpoenas to several other large Buyers. In response to those subpoenas, Plaintiffs obtained text messages showing tacit

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

agreement to coordinate price activity, explicit price coordination, and efforts to retaliate against Buyers who did not participate in Defendants' cartel. *See* 6AC, *passim*. Accordingly, on August 21, 2024, Plaintiffs filed their First Amended Complaint ("FAC"), alleging, *inter alia*, that certain Defendants (the "FAC Defendants") participated in an illegal price fixing conspiracy to suppress and stabilize the ex vessel price of Dungeness crab. *See* Dkt. 81 at ¶¶ 158-402.

On November 1, 2024, the FAC Defendants moved to dismiss for failure to state a plausible claim for relief, and various other supposed technical defects. Dkt. 189; *see also* Dkts. 199, 200, 205. They argued that Plaintiffs came "nowhere close to plausibly alleging a nine-year, *coastwide* price fixing conspiracy involving the participation of 34 Defendants . . . ." *Id.* at 2 (emphasis in original). They further asserted that the allegations in the FAC amounted to "one-off text messages between some Defendants, a handful of disconnected phone calls and meetings, and lengthy and random anecdotes of a newly discovered 'Confidential Buyer Informant # 1." *Id.*

This Court disagreed. Dkt. 242. It held that the FAC was "based on pleaded facts plausibly supporting that Pacific Seafood fixed the price that it and other major buyers paid crabbers." *Id.* at 1. In doing so, the Court identified six categories of allegations that supported the existence of a price fixing conspiracy. First, "text messages in which buyers indicated that Pacific Seafood would set the price for Dungeness crab." *Id.* (citing FAC, ¶¶ 198-99, 217, 225). Second, "a meeting at which Pacific Seafood and other buyers 'expressed a uniform position [that] they did not want to offer crabbers more than $2.50/lb. as an opening ex vessel price." *Id.* (citing FAC, ¶ 228). Third, an "email from Pacific Seafood to other buyers, 'instructing them to keep the ex vessel price at or below $3/lb." *Id.* at 2 (citing FAC, ¶ 349). Fourth, a meeting, "during which Pacific Seafood and other buyers discussed the ex vessel price they planned to offer and complained about a buyer, [Ozzie Gregorio], who was offering a higher price." *Id.* (citing FAC, ¶ 334-36). Fifth, "Buyer's attempts to coerce [Ozzie Gregorio] to match Pacific Seafood's price." *Id.* (citing FAC, ¶ 296, 301, 308). And sixth, "Buyer's efforts to retaliate against [Ozzie Gregorio] after he didn't adopt the group's price." *Id.* (citing FAC, ¶ 320, 342, 398). The Court concluded that "[t]hese and other allegations" plausibly alleged an illegal agreement to fix prices, although the Court did not

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

expressly reach the other categories of allegations included in the FAC and briefed by Plaintiffs in their opposition to the FAC Defendants' Motion to Dismiss. *Id.*

Separately, this Court considered whether Plaintiffs adequately alleged that each individual Defendant ***participated*** in the conspiracy. Again, the Court highlighted specific allegations that were sufficient to support an inference of participation in the cartel. These included, first, the fact a group of Defendants "'told [Ozzie Gregorio] their agreed ex vessel price in Cresent City was $2.25/lb.'" *Id.* at 5 (quoting FAC, ¶ 281). Second, that Bornstein representatives "called and texted [Ozzie Gregorio] to inform him of the 'cooked price' for Dungeness crab." *Id.* (quoting FAC ¶ 301). Third, that a Safe Coast representative "sent a series of text messages to [Ozzie Gregorio], informing him that Pacific Seafood would set the ex vessel price paid at the opening of the 2023/24 Dungeness crab season." *Id.* (citing FAC, ¶ 223-25). Fourth, that Nor-Cal's Kevin Lee "called [Ozzie Gregorio] and asked him to 'participate' by bringing down the ex vessel price he was paying." *Id.* at 6 (quoting FAC, ¶ 308-10). Fifth, that a group of Defendants "'expressed a uniform position'" on the price to be offered to crabbers at the 2023/24 season opener. *Id.* (citing FAC, ¶ 228). Sixth, that a Fathom representative and "Pacific Seafood representatives orchestrated an effort to deny [Ozzie Gregorio] access to the public hoist in Charleston, Oregon[.]" *Id.* (citing FAC, ¶ 317-22). Seventh, that a Safe Coast representative told Mr. Gregorio Buyers were upset with him "'for broadcasting to crabbers a higher opening price than what Pacific Seafood and the other big buyers wanted and that there would be repercussions.'" *Id.* (quoting FAC, ¶ 335). And eighth, that Pacific Seafood and Ocean Gold conveyed to other Buyers they would purchase their competitors' crab "'as long as no one sold to or bought from [Ozzie Gregorio].'" *Id.* at 6-7 (quoting FAC, ¶ 342).

The Court found, however, that Plaintiffs had not adequately alleged participation by the South Bend Defendants or Ocean King. As to Ocean King, a text message asking if Bornstein intended to adopt Pacific Seafood's price was held to show mere "price curiosity," but the Court granted Plaintiffs leave to amend. *Id.* at 8. Plaintiffs then filed a Second Amended Complaint, Dkt. 242 ("SAC"), adding additional allegations regarding Ocean King's participation in the cartel. In particular, Plaintiffs alleged that George Lay of Ocean King agreed to lower the price Ocean King

paid to crabbers after ASE and Nor-Cal complained to Mr. Lay about the prices Ocean King was paying at the time. SAC, ¶ 166-169. Plaintiffs also alleged that in January 2021 Ocean King and Bornstein agreed not to pay more than $5/lb. for ex vessel Dungeness crab and exchanged subsequent messages confirming compliance with that arrangement. *Id.*, ¶ 239, 240-56. Separately, Plaintiffs included new allegations showing that Ocean King's pricing activity moved in parallel with the other Defendants following the 2014/15 season. *E.g. id.*, ¶¶ 166-172.

Ocean King again moved to dismiss, arguing, "the SAC cherry-picks three text exchanges between Ocean King and Defendant [Bornstein] and mischaracterizes them as efforts to fix prices." Dkt. 288 at 2. This Court disagreed, Dkt. 339, finding Ocean King's discussion of the maximum price to be paid to crabbers, corroborated by price data showing compliance with the agreed-upon cap, sufficiently alleged participation in the conspiracy. *Id.* at 1-2.

On September 2, 2025, Plaintiffs then filed a Third Amended Complaint, Dkt. 394 ("TAC"), adding Da Yang as a defendant. The TAC included exchanges between Da Yang's Kyle Horgan and Fathom's Cody Mills discussing Pacific Seafood's pricing, TAC, ¶¶ 237-239, and similar exchanges about Hallmark's prices. *Id.*, ¶ 272. Plaintiffs also alleged that Da Yang had called Safe Coast to confirm its price movements, *id.*, ¶ 283, discussed prices offered to crabbers with Safe Coast, *id.*, ¶ 293, and exchanged messages with Fathom's Mr. Mills about their "game plan crab season[.]" *Id.*, ¶ 294.

Da Yang moved to dismiss, Dkt. 483, and this Court determined that Da Yang's messages reflected, "a tacit agreement to exchange pricing data" but did not sufficiently support an inference of an agreement to "'match[] particular prices.'" Dkt. 600 at 2 (quoting Opposition to Motion to Dismiss TAC, Dkt. 507 at 11). Accordingly, the Court dismissed the allegations against Da Yang with leave to amend and permitted Plaintiffs to proceed with discovery. *Id.* Since then, Plaintiffs filed a further amended complaint alleging additional facts learned during the course of that discovery. *See* 6AC.

Now, Da Yang moves to dismiss the 6AC, now arguing that it "merely expands on Plaintiffs' earlier, insufficient allegations that, at most, Da Yang shared pricing information with other buyers and changed its prices based on changes in the market price." Defendant Yang's

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Motion to Dismiss the 6AC, Dkt. 779, at 8. Da Yang further contends that new allegations regarding the frequency of communications between Da Yang and other Defendants do not support Plaintiffs' claims because the details of those phone conversations are not known. *Id.* None of these arguments have merit.

## LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must merely move beyond the conceivable and allege "'enough facts to state a claim to relief that is plausible on its face.'" *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *9 (N.D. Cal. Jan. 21, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (a Rule 12(b)(6) motion should be denied "so long as the plaintiff alleges facts to support a theory that is not facially implausible"). "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what…the claim is and the grounds upon which it rests." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1141 (N.D. Cal. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted). A court must deny a Rule 12(b)(6) motion even if the complaint establishes only a "nonnegligible probability that the claim is valid;…the probability need not be as great as such terms as 'preponderance of the evidence' connote." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

"In ruling on such a motion, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Knevelbaard Dairies*, 232 F.3d at 984. The court must further refuse invitations by defendants to ignore, or accept the defendants' recasting of, the plaintiff's allegations. *Id*. at 989-90. And the court does "not consider the [defendant's] competing facts at the pleadings stage." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1121 (9th Cir. 2022). There is no special or "'heightened'" pleading standard in antitrust cases. *W. Penn Allegheny Health Sys., Inc. v. UPMC ("W. Penn")*, 627 F.3d 85, 98 (3d Cir. 2010) (quoting *Twombly*, 550 U.S at 569 n. 14). Rather, pleading an antitrust conspiracy only "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made" and "to raise a reasonable expectation that discovery will reveal evidence of

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

illegal agreement." *Twombly*, 550 U.S. at 556–57. And "[t]he contract, combination, or conspiracy element of a Section 1 claim is not particularly demanding." *Real Est. Exch., Inc. v. Zillow, Inc.*, No. C21-0312 TSZ, 2023 WL 5278115, at *6 (W.D. Wash. Aug. 16, 2023).

For purposes of Section 1 of the Sherman Act, an illegal agreement consists of a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A § 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'") (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). Accordingly, "an agreement [is] sometimes also referred to as a 'conspiracy' or 'concerted action,'" *W. Penn*, 627 F.3d at 99 (quoting *Twombly*, 550 U.S. at 553); and it is actionable, whether "tacit or express," *Twombly*, 550 U.S. at 553. "[N]o formal agreement is necessary." *Am. Tobacco*, 328 U.S. at 809; *see also U.S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948) ("It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement."); *Interstate Cir., Inc. v. U.S.*, 306 U.S. 208, 227 (1939) (same). All that is required is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.*, 465 U.S. at 764.

The unlawful objective charged in a *per se* claim under the Sherman Act and state antitrust laws, price-fixing, encompasses a broad range of activities. "When the term 'fix prices' is used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable per se under the Sherman Act." *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960). In other words, any combination and conspiracy is per se illegal if it results in "an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). This includes an agreement among competitors to pay "the fair going market price." *Id.* (noting further, "in terms of market operations stabilization is but one form of manipulation.").

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

9

**ARGUMENT**

This Court already found, first, that Plaintiffs plausibly alleged the existence of a price fixing conspiracy to suppress and stabilize the ex vessel price of Dungeness crab in the Pacific Northwest Area, Dkt. 242 at 1, and second, that the allegations regarding Da Yang in the TAC supported an inference of "a tacit agreement to exchange pricing data." Dkt. 483 at 2. The only question here is whether Plaintiffs now sufficiently allege Da Yang's participation in that illegal price fixing conspiracy. In the 6AC, Plaintiffs allege facts about Da Yang's text message communications that this Court previously recognized, with respect to similar communications, give rise to a reasonable inference of participation in the conspiracy. Plaintiffs add to these allegations additional facts about the overwhelming frequency of communications between Da Yang and other Defendants as well as parallel pricing behavior by Da Yang and other cartel members—both factors that courts regularly find support an inference of participation in a price fixing conspiracy. Altogether, the totality of the facts alleged are more than sufficient to support a plausible inference of Da Yang's involvement in the cartel. For all these reasons, Plaintiffs respectfully request that Da Yang's Motion to Dismiss be denied.

**I.    Plaintiffs Allege Facts This Court Already Held Plausibly Allege Participation in Defendants' Price Fixing Conspiracy**

By now, this Court has addressed in at least three separate opinions the types of allegations about communications that are sufficient on their own to state a claim for participation in the price fixing conspiracy. *See* Dkts. 242, 339, 483. In ruling on Defendants' motion to dismiss the FAC, the Court held that (1) efforts to recruit Ozzie Gregorio into the cartel, Dkt. 242 at 5-6, (2) threats, and participation in efforts to retaliate against Mr. Gregorio for his refusal to participate, *id.* at 6-7, and (3) an agreement between Buyers at the to present "'a uniform position,'" *id.* at 6 (quoting FAC, ¶ 228), about the need to keep the 2023/2024 season opener price down, *id.* at 6, all supported a reasonable inference that a defendant participated in the conspiracy. In considering Ocean King's motion to dismiss, the Court further held that an agreement that prices should not exceed 5/lb., corroborated by pricing activity in line with that agreement, plausibly alleged participation in the cartel. Dkt. 339 at 1-2. Conversely, the Court held that inquiries about or knowledge of competitors

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

prices do not, *on their own*, sufficiently support a Section 1 price fixing claim. Dkts. 242 at 8, 483 at 2.

In the 6AC, Plaintiffs include 107 paragraphs alleging text message communications between Da Yang and other Defendant Buyers and non-Defendant Buyers about price fixing activity, encompassing exactly the kinds of communications this Court already found evidenced participation in the conspiracy. *See* 6AC, ¶¶ 509-616.

### A. Da Yang's Kyle Horgan Discussed Retaliation Against Independent Buyer Ozzie Gregorio for Paying More Than the Cartel Price

In its Opinion and Order denying the FAC Defendants' Motion to Dismiss, Dkt. 242, this Court held the allegation that "Fathom Seafood's Nick Mareno and Pacific Seafood's representatives orchestrated an effort to deny [Ozzie Gregorio] access to the public hoist in Charleston, Oregon, after [Mr. Gregorio] refused to match their ex vessel price" supported the reasonable inference that Fathom and Pacific Seafood participated in the price fixing conspiracy. *Id.* at 6 (citing FAC, ¶¶ 317–33).

In the 6AC, Plaintiffs allege that Da Yang's Kyle Horgan sent Mr. Mareno a screenshot of a Facebook message posted by Mr. Gregorio describing those same efforts. 6AC, ¶¶ 590-91. In response, "Fathom's Mareno, while claiming that what [Mr. Gregorio] said was not true, acknowledged that "he's 100% talking about us" and described the actions he had taken to get [Mr. Gregorio] kicked out Charleston." 6AC, ¶ 592. Mr. Mareno's statement that "he's 100% talking about us" to Mr. Horgan supports the reasonable inference that Mr. Horgan participated in those efforts to drive Mr. Gregorio out of Charleston.

In the same opinion, the Court also found allegations that Pacific Seafood and Ocean Gold representatives conveyed to "'other Buyers that they would take everyone's crab, as long as no one sold to or bought from [Mr. Gregorio][,]'" sufficient to support an inference that Pacific Seafood and Ocean Gold were enforcing the cartel's pricing. Dkt. 242 at 6 (quoting FAC, ¶ 342). In the 6AC, Plaintiffs allege Mr. Horgan encouraged a senior Pacific Seafood representative to "go get Ozzie," 6AC, ¶ 594, to which the Pacific Seafood employee responded, "[l]ike to curb stomp that fuck." *Id.*, ¶ 595. Again, this supports a reasonable inference that Da Yang's Mr. Horgan (a) had

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

an expectation that Buyers would abide by the cartel's agreed upon pricing; and (b) actively encouraged Pacific Seafood to retaliate against Mr. Gregorio for failing to do so.

**B.     Da Yang Participated in the 2023/2024 Season Buyers' Meeting Regarding the Need to Keep Prices Paid to Crabbers Down**

In evaluating the FAC, the Court also held that the allegation that a group of Defendants "'expressed a uniform position'" during a December 2023 meeting that they would not offer crabbers more than $2.50/lb. at the 2023/2024 season opener supported the reasonable inference those Defendants were members of the conspiracy. Dkt. 242 (citing FAC, ¶ 228). In the 6AC, Plaintiffs allege Da Yang's Kyle Horgan texted with Fathom's Nick Mareno to confirm he would be in attendance at that same December 2023 meeting, 6AC, ¶¶ 539-543, *see also id.*, ¶ 264 (adding allegations that identify Mr. Horgan and the above referenced senior Pacific Seafood employee, as participants in the meeting), supporting the reasonable inference that Da Yang was among the Buyers presenting their "uniform position." That is corroborated by Mr. Horgan's contemporaneous text messages with Fathom's Nick Mareno, in which Mr. Mareno described a conversation with a non-Defendant Buyer where Mr. Mareno told the non-Defendant Buyer it was "immature to post a $3.10 price" and told the non-Defendant Buyer he (Fathom) would not offer a price above $2.50/lb. *Id.*, ¶¶ 546-47. In the same conversation, Mr. Mareno shared his announcement regarding pricing to Crabbers fishing for Fathom, to which Mr. Horgan responded, "[v]ery well said . . . ." *Id.*, ¶¶ 548-549.

Recognizing that this is a specific allegation of exactly the conduct the Court has already held demonstrates participation in the cartel, Da Yang now argues that the Court should ignore it, because Plaintiffs do not allege that Da Yang made purchases at the open of the 2023/2024 season. Dkt. 779 at 16. But as alleged in the 6AC, Defendants' agreement not to compete on the season opening price "results in both (a) an artificially lower opening price at which a large portion of Dungeness crab caught in the season is sold *and (b) the establishment of an artificially depressed baseline for prices throughout the season.*" 6AC, ¶ 208; *see also id.*, ¶ 207. Whether or not De Yang made purchases on opening day, the company participated in a meeting at which Defendants "concurred . . . in the 'need to keep the price down' and agreed that they could only offer $2 or

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

$2.50/lb" at the 2023/2024 season open. *Id.*, ¶ 542. Da Yang then benefited from that arrangement two weeks later, when it began making purchases at a price now set from the artificially depressed baseline, "in close alignment with Fathom, Pacific Seafood, Bornstein, Hallmark, Nor-Cal, Living Pacific, as well as Fisherman's Catch and Safe Coast[.]" *Id.*, 552. That is price fixing. *Plymouth Dealers' Ass'n of N. Cal.*, 279 F.2d at 132 ("A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable per se under the Sherman Act.").

### C.   Da Yang Agreed to Specific Price Movements with Other Buyers Corroborated by Subsequent Price Activity

In the SAC, Plaintiffs alleged that Bornstein's Andrew Bornstein texted Ocean King's George Lay, advising that Bornstein would "more than likely" match prices being paid in the San Francisco area, but would not exceed a price of $5/lb. Mr. Lay responded, "Exactly. I agree. . . ." SAC, ¶¶ 234-237. And subsequent pricing activity shows Ocean King and Bornstein abided by price cap, along with other Defendant Buyers . *Id.*, ¶ 239. The Court held that these allegations, "plausibly support a finding that Ocean King and other defendants agreed not to pay crabbers more than a fixed price[.]" Dkt. 339 at 2.

The 6AC details a litany of analogous exchanges between Da Yang and other Defendant Buyers.  Most recently, in December 2024, Da Yang's Kyle Horgan exchanged text messages with Fathom's Cody Mills about the prices Buyers were planning to offer at the season opener. *Id.*, ¶ 604. Over the following weeks, Mr. Horgan and Mr. Mills continued to regularly discuss pricing. *Id.*, ¶ 605-08. And in mid-January, Mr. Mills texted Mr. Horgan in the same thread, writing, "Yo, have you guys announced a price? Let me know what's up when you talk to Chang [Lee of Da Yang]. Let's work together!" *Id.*, ¶ 609 (alteration in original). Consistent with that agreement to "work together," Mr. Mills and Mr. Horgan then continued to exchange price information and Fathom and Da Yang paid identical or near-identical ex vessel prices to Crabbers throughout the 2024/2025 season, and made price changes within, at most, a few days of each other. *Id.*, ¶ 610-16. At minimum, Da Yang's text messages with Fathom about "work[ing] together" when discussing ex vessel Dungeness crab prices, followed by consistent parallel conduct between Fathom and Da

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Yang raises the same reasonable inference of participation in the price fixing conspiracy as Ocean King's messages with Bornstein about not paying more than 5/lb., followed by consistent adherence to that cap. *See* Dkt. 339 at 2.

Plaintiffs further allege that Fathom and Da Yang engaged in similar conduct together in the 2023/2024 season. *See id.*, ¶¶ 554-585. In an exchange in February 2024 between Fathom's Nick Moreno and Da Yang's Chang Lee, Mr. Moreno asked Mr. Lee for the "cooker crab" price. Mr. Lee responded, "I think same, $3.25?" And Mr. Moreno replied, "[y]es, ok[.]" The fact that Mr. Moreno asked for the "cooker crab" price, Mr. Lee proposed a price in the form a question, and then Mr. Moreno agreed to that price supports the inference that this exchange was part of the process of inquiry, offer, and acceptance between Defendant Buyers to reach an agreed fixed price. That interpretation is further corroborated by the parties' conduct. "[L]andings records show that Defendants Da Yang, South Bend, Bornstein, Pacific Seafood, Safe Coast, Ocean Gold, Caito, Nor-Cal, and ASE all continued to hold at $3.25 per pound for cooker crabs during this period." *Id.*, ¶ 585.

Da Yang's communications with other Defendants support the same inference. In March 2024, for example, "Da Yang's Chang Lee texted Pacific Dream's Jonathan Mark, to ask whether the "[l]ive price [was] still $4.50 to the boat?" 6AC, ¶ 600. Mr. Mark responded that the live price was "4.00 at the moment." *Id.* The same day, "Defendants Da Yang Fathom, Hallmark, Nor-Cal, Ocean Gold, Pacific Seafood, Safe Coast, Caito, and others all moved to prices near or at $4.00 per pound[.]" *Id.*, ¶ 601. Da Yang's immediate conformity to the $4/lb. price provided by Mr. Mark and the parallel behavior of other Defendants supports a reasonable inference that Defendants had a prior agreement to move prices in concert. That inference is especially plausible because alternative explanations are inadequate. Da Yang could not have been moving prices in response to pressure from Crabbers, because Crabbers would have been pressuring Da Yang to increase, not decrease price. And, in this exchange, Mr. Lee is asking for confirmation that the price was stable at $4.50/lb., suggesting he was unaware of any other market conditions that would drive the price down to $4.00/lb. when he texted Mr. Mark.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

A similar exchange in April 2023 between Mr. Lee and Dana Ferguson, then a contractor for Pacific Dream, follows the same pattern. *See id.*, ¶ 521-524. Mr. Lee texted Ms. Ferguson, asking, "what s the live price to the boat in Winchester bay? 3.15?" *Id.*, ¶ 521. Ms. Ferguson responded "the price" was $3.25 "here" (in Winchester Bay), and $3.15/lb. in Garibaldi, Oregon. *Id.* Consistent with that exchange, Da Yang and other Defendants held below the $3.25 price point for all transactions the following day. *Id.*, ¶ 522. Again, Da Yang's requests to its competitors to confirm "***the*** live price," and subsequent conformity with the prices reported shows an agreement to move prices in concert. *Id.*, ¶ 521 (emphasis added). Absent such an agreement, it would make no sense for Da Yang to request and immediately abide by "the" price provided by businesses who ostensibly compete with Da Yang on price for a share of the Dungeness crab landings—whether or not that price was higher or lower than the price Da Yang had been offering previously.

Another exchange, from March 2023, shows enforcement of this tacit understanding between Defendant Buyers. *See Id.*, ¶ 515-520. There, Safe Coast employees discussed internally that they heard Da Yang was paying $3.50/lb. for live crab. *Id.*, ¶ 515. Safe Coast's principal, Chris Lam, then instructed Safe Coast's Max Boland to "call his contact at Dayang." *Id.* Immediately following that phone conversation, Da Yang dropped its price to $2.60/lb. for live crab, *id.*, ¶ 516, in line with the prices paid by other Defendants. *Id.*, ¶ 517-20. Likewise, in February 2024, when Pacific Dream increased its price to $4.50/lb., Fathom reached out to a Buyer group chat that included Da Yang, and another Buyer confirmed, "Yes live $4.50 now[.]" *Id.*, ¶ 580.

Further, Da Yang received unsolicited pricing information from its competitors. *Id.*, ¶¶ 525-30. It then made purchases in line with those prices, even as independent Buyers were paying as much as 57% more than the price Da Yang discussed with other Defendants and paid to Crabbers. *Id.*, ¶¶ 526-28. The fact Da Yang held to these prices even though market pressure was driving the prices offered by independent buyers significantly higher supports the inference that Da Yang was acting in accordance with an agreement to pay agreed-upon prices, just as the fact Ocean King and Bornstein held their prices below 5/lb., even as independent buyers began offering significantly higher prices supports the inference Ocean King is a member of the price fixing conspiracy. *See* Dkt. 339 at 2.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

15

In its motion, Da Yang argues that Plaintiffs fail to state a claim because, in the text messages described, its representatives were merely "trying to confirm" "prices had risen" and matching the "market price." Dkt. 779 at 17. At trial, a jury will decide whether that alternative explanation of Da Yang's communications with its competitors is credible, or even plausible. Among other things, the jury may struggle to understand how it explains instances where Da Yang agreed to *lower* its price. *E.g.* 6AC, ¶¶ 515-520. On a motion to dismiss, however, it certainly does undermine the reasonable inference that these communications show an effort to set and enforce fixed ex vessel prices.

In short, individually, Da Yang's communications with other Buyers track exactly the kinds of exchanges this Court already found to be sufficient on their own to allege participation in a price fixing conspiracy. Taken together, they provide overwhelming support for the proposition that it is at least plausible that Da Yang participated in the conspiracy to fix ex vessel Dungeness crab prices.

The messages discussed here are just examples. There are numerous other exchanges described in the 6AC that follow exactly this pattern. *See* 6AC, ¶¶ 509-616. Moreover, each of these isolated messages is described in the context of broader efforts to fix prices between multiple Defendants across entire seasons, with corresponding purchase pricing information that provides additional context.

## II. Further, The Frequency of Communications Between Da Yang And Other Defendants Supports Their Participation in the Price Fixing Conspiracy

Courts consistently recognize that "[e]vidence of a high level of inter-firm communications," in and of itself, constitutes circumstantial evidence of an antitrust conspiracy. *Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp.3d 1108, 1127 (S.D. Cal. 2022) (citing *Ross v. Citigroup, Inc.*, 630 F.App'x 79, 82 (2d Cir. 2015)). This is particularly true where, as here, those communications involve the sharing of non-public information about pricing and purchasers' (or here sellers') negotiation tactics amongst horizontal competitors. *Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895, 913 (E.D. Cal. 2024); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal.

Gross Klein PC
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

2008) ("the exchange of price information alone can be sufficient to establish combination or conspiracy").

Plaintiffs' analysis of carrier phone records shows that Da Yang's principal pricing representatives, Chang Lee and Kyle Horgan, were in direct, sustained telephonic contact with their counterparts at nearly every other Defendant buyer throughout the Class Period. 6AC ¶¶ 505-08.[3] Mr. Lee alone spoke with Dana Ferguson—who worked at various times for Safe Coast, Pacific Dream, and Ocean Logistics—17,134 times; he spoke with Pacific Dream's Jerod Goodin 1,086 times, and with Nor-Cal's Kevin Lee 374 times. *Id*. ¶ 507. Mr. Horgan, in turn, spoke with Fathom's Cody Mills 629 times and with Hallmark's Scott Adams 87 times. *Id*. In total, the analysis identifies 128,668 calls among a network of roughly 80 individuals representing Defendants, the Unnamed Co-Conspirators, and Confidential Informant #1—with Da Yang's representatives appearing throughout that network, not at its periphery. *Id*. ¶ 508.

This volume of direct, competitor-to-competitor contact is itself probative of Da Yang's participation in the conspiracy. Da Yang offers no innocent, competitively neutral explanation for tens of thousands of calls between its own pricing personnel and the pricing personnel of the buyers with whom it was ostensibly competing for Crabbers' business—nor could it. As the Supreme Court noted, "[g]enuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals." *Am. Column & Lumber Co.*, 257 U.S. at 410. And unlike the "standard fare" of ordinary trade-association contact that the Ninth Circuit has held cannot alone support an inference of conspiracy, Da Yang's calls with its competitors were atypical, sustained, and directed specifically at the two individuals—Mr. Lee and Mr. Horgan—who set Da Yang's own ex vessel prices. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 823 (9th Cir. 2023) ("Atypical communications between alleged coconspirators can constitute a plus factor because such communications provide the opportunity for parties to come to (and enforce) an illicit agreement."). This frequency of contact is corroborated by, and supplies context for, the content-specific text messages described above and throughout the Complaint, in which Da Yang and its

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

---

[3] This is in addition to very numerous text messages between these Da Yang representatives and the representatives of other buyers, only some of which were discussed in the 6AC. 6AC, ¶ 509.

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED COMPLAINT; Case No. 3:23-cv-01098-AGT

17

competitors discussed the very pricing information those calls evidently facilitated. *See* 6AC ¶¶ 510-616. To now claim that those prices were the product of independent business decisions, as opposed to collusion, strains credulity.

### III.   Plaintiffs Have Identified Additional Plus Factors That Support Their Allegations Against The Da Yang Defendants

The Ninth Circuit distinguishes permissible parallel conduct from impermissible conspiratorial conduct by looking for certain plus factors—*i.e.*, "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1194 (9th Cir. 2015). As discussed above, the sheer number and frequency of communications between Da Yang and its horizontal competitors is itself a plus factor indicative of concerted action. *Persian Gulf*, 632 F. Supp. 3d at 1127 (citing *Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015)). Other commonly alleged plus factors include a common motive to conspire and parallel actions taken against the alleged conspirators' own economic self-interest. *Id*. Both are present here as well.

*Common motive.* Plaintiffs allege that Defendants, including Da Yang, shared a common motive to suppress the ex vessel price paid to Crabbers below the price that would prevail in a competitive market, thereby increasing their own margins on resale. 6AC ¶ 8. That shared financial incentive, combined with the communications and pricing patterns described above, "creates a strong inference of a plausible price-fixing agreement." *Flannery*, 727 F. Supp. 3d at 912.

*Actions against self-interest.* On several occasions, Da Yang's prices moved in a direction that supply and demand alone cannot explain, immediately after Da Yang confirmed pricing information with a competitor. In March 2023, for example, after a call between Da Yang and Safe Coast that Plaintiffs allege was "to coordinate prices," Da Yang's price for live crab dropped from $3.10 to $2.60 per pound—even as crabbers pressured Da Yang to raise its price. 6AC ¶ 516. A buyer facing upward pressure from its own suppliers has no unilateral, competitive reason to cut the price it is willing to pay; the most plausible explanation for a coordinated price decrease in the face of that pressure is an agreement not to compete on price. *Cf. Persian Gulf*, 632 F. Supp. 3d at

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1127 (plus factors include "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators").

*Parallel pricing outcomes reflected in landing records.* Evidence that Da Yang's communications with its horizontal competitors aligned with price movements reflected in landing records strongly supports the inference that Da Yang participated in the price fixing conspiracy. Time and again, Da Yang's communications with a single competitor were followed within days —sometimes hours—by a cluster of Defendants, including Da Yang, converging on the identical price. After Da Yang confirmed that Pacific Seafood was moving to $5.00/lb. in April 2023, Da Yang and a group of other Defendants "all began making purchases at the same $5.00/lbs. price point." 6AC ¶ 530. In January 2024, following a similar exchange, "Defendants, including Bornstein, Hallmark, Nor-Cal, Pacific Seafood, and Fishermen's Catch, and Da Yang, completed 50 transactions at exactly the $3.50 agreed-upon price point." *Id.* ¶ 557. The same pattern recurred at $3.70/lb. days later (*id.* ¶¶ 558-59), at $3.25/lb. in early February (*id.* ¶¶ 561-62), and again at $3.50/lb. later that month (*id.* ¶¶ 584-85). Non-Defendant buyers, who were not part of these communications, did not exhibit this lockstep pricing—to the contrary, the 6AC repeatedly alleges that independent buyers paid meaningfully more than Da Yang and its horizontal competitors during the very same windows. *See, e.g., id.* ¶¶ 513-14, 526, 528, 551, 553. Precise, repeated convergence on identical prices, immediately following direct contact with the competitors who are converging, "is largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments*, 798 F.3d at 1194.

Nonetheless, Da Yang's motion attempts to characterize these allegations as nothing more than Da Yang "matching market prices," and argues that such matching is lawful conscious parallelism. Dkt 779 at 17-18. As an initial matter, that is not what Plaintiffs allege, and Da Yang's attempts to ignore and recast Plaintiffs' well-pled allegations must be rejected. *Knevelbaard*, 232 F.3d at 984. Moreover, even if this were a case involving a highly concentrated oligopolistic market, conscious parallelism explains how parallel pricing can result from unilateral business decisions by a small handful of interdependent participants anticipating the reactions of their competitors to similar market pressures without the need for inter-firm communication. *In re*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

*Musical Instruments*, 798 F.3d at 1194; *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015) (holding that where oligopolists decide "—***without any communication with the leader***—to raise their prices, there would be no conspiracy" and that this would constitute lawful conscious parallelism) (emphasis added). Noncompetitive prices (or in a case involving buyers, artificially depressed prices) can therefore emerge simply from oligopolists watching and matching each other, without any communication or agreement at all. But where, as here, there is direct evidence of competitor communications, the concept of conscious parallelism is inapposite insofar as such conduct is removed from the realm of oligopolistic interdependence and placed squarely within the realm of unlawful express or tacit agreement. Moreover, as indicated above, an agreement among competitors to pay "market prices" is just as illegal as any other form of price-fixing. *Socony–Vacuum*, 310 U.S. at 223. Tellingly, Da Yang fails to cite a single case—because there is none—dismissing an antitrust complaint at the pleading stage for failing to plausibly distinguish conscious parallelism from concerted action where the complaint pleads explicit discussions of prospective prices between horizontal competitors. Regardless, even if this case relied exclusively on parallel pricing—which for all the reasons discussed above it decidedly does not—Plaintiffs allege plus factors plausibly showing that the parallel conduct at issue is the result of concerted action, not unilateral business decisions.

IV.   **The Totality of the Circumstances Strongly Supports the Inference that Da Yang Defendants Participated in the Price Fixing Conspiracy**

Da Yang's core argument is essentially that Plaintiffs fail to allege the existence of an explicit, written document where Da Yang agrees to accept each of the terms and conditions of participation in the illegal price fixing conspiracy at issue. Dkt. 779 at 17-19. It asserts "there are no…allegations" that Da Yang expressly agreed to a price ceiling or to matching the price set by Pacific Seafood. *Id.* at 18. Factually, the messages described in paragraphs 6AC, ¶¶ 509-616 do explicitly capture details of the arrangement between Da Yang and other Defendants to fix prices. But legally, that is not what Plaintiffs are required to allege. It is bedrock antitrust law that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

U.S. 690, 699 (1962) (cleaned up); *accord, e.g., In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp.3d 1031, 1041 (N.D. Cal. 2021) (*"*courts [should not] indulge antitrust defendants who move to dismiss by tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). As Judge Posner observed in an opinion reversing a district court's order granting the defendants' *motion for summary judgment*, only in the rarest of cases do you have evidence of price-fixing that requires no inferences, as such evidence would effectively be "an outright confession," obviating the need for trial. *In re High Fructose Corn Syrup Antitrust Litig.* ("*High Fructose*"), 295 F.3d 651, 662 (7th Cir. 2002). Thus, "most cases are constructed out of a tissue of [ambiguous] statements and other circumstantial evidence." *Id.*; *accord id.* at 663 (finding that a smattering of ambiguous statements by competitors that could be interpreted as an orientation to work together, rather than to compete, were, in combination with other circumstantial evidence, "enough to enable a reasonable jury to infer [an] agreement to fix prices.").

Even if the Court found that each of Da Yang's text messages, *viewed in isolation*, fell short an explicit, written agreement to join an illegal price fixing cartel, taken together they provide strong support for the inference that Da Yang agreed to participate in the conspiracy. Plaintiffs allege that Da Yang agreed to "work together" with other Defendants on ex vessel pricing, shared pricing information and solicited updates from other Defendants about "the" ex vessel price at a given time, moved its prices to match the prices shared by other Buyers, even when there was no apparent market explanation to do so, and engaged in thousands of phone conversations with other cartel members while the Dungeness crab season was ongoing. In addition to the support for the inference that Da Yang participated in the conspiracy that each of these allegations provides individually, the totality of these circumstances provides yet more basis to conclude that it is at the very least plausible that Da Yang was a member of the cartel.

V.    **Plaintiffs Also Adequately Allege Da Yang's Participation In An Illegal Agreement To Share Pricing Information**

Finally, even absent proof of an agreement to fix prices, information exchanges can themselves constitute a standalone violation of Section 1 of the Sherman Act where they lead to anticompetitive effects. *See United States v. Container Corp. of Am.*, 393 U.S. 333, 334, 89 S. Ct.

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

510, 511, 21 L. Ed. 2d 526 (1969); *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 867 (D. Minn. 2025), *reconsideration denied*, No. 18-1776, 2026 WL 674230 (D. Minn. Mar. 10, 2026). Plaintiffs have asserted a claim for violation of Section 1 of the Sherman Act, and intend to maintain all legal theories that support that claim, including the existence of a price sharing arrangement. And even limited the allegations in the TAC, this Court has recognized that Plaintiffs' allegations were sufficient to support an inference of "a tacit agreement to share price information." Dkt. 483 at 2. That remains true.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit the Da Yang Defendants' Motion to Dismiss the Sixth Amended Complaint should be DENIED.

Respectfully Submitted,

Dated: August 10, 2026                    GROSS KLEIN PC

By:    */s/ Stuart G. Gross*
         STUART G. GROSS

Stuart G. Gross (SBN 251019)
Travis H. A. Smith (SBN 331305)
Jan W. Jorritsma (SBN 326772)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
(415) 671-4628
*sgross@grosskleinlaw.com*
*tsmith@grosskleinlaw.com*
*jjorritsma@grosskleinlaw.com*

Matthew W. Ruan (SBN 264409)
Samantha Gupta (*admitted pro hac vice*)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
*mruan@jjlmlaw.com*
*sgupta@jjlmlaw.com*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Matthew S. Weiler (SBN 236052)
Raymond S. Levine (SBN 348030)
**SCHNEIDER WALLACE COTTRELL
KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
(415) 421-7100
*mweiler@schneiderwallace.com*
*rlevine@schneiderwallace.com*

Todd R. Gregorian (SBN 236096)
Jonathan G. Tamimi (SBN 305493)
**FENWICK & WEST LLP**
One Front Street, Floor 33
San Francisco, CA 94111
(415) 875-2300
*tgregorian@fenwick.com*
*jtamimi@fenwick.com*

*Counsel for Plaintiffs and the Proposed
Classes*

GROSS KLEIN PC
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFFS' OPPOSITION TO DEFENDANT DA YANG SEAFOOD INC.'S MOTION TO DISMISS SIXTH AMENDED
COMPLAINT; Case No. 3:23-cv-01098-AGT

23