David J. Aveni (SBN 251197)
david.aveni@wilsonelser.com
John R. Danos (SBN 210964)
john.danos@wilsonelser.com
Colin V. Quinlan (SBN 332225)
colin.quinlan@wilsonelser.com
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, California 90071
Telephone: (213) 443-5100

Attorneys for Defendant Da Yang Seafood Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Brand LITTLE, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>PACIFIC SEAFOOD PROCUREMENT, LLC, et al.,<br><br>Defendants. | Case No. 3:23-cv-01098-AGT<br><br>**DEFENDANT DA YANG SEAFOOD INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SIXTH AMENDED COMPLAINT [DKT #779]**<br><br>Date: October 2, 2026<br>Time: 10:00 a.m.<br>Location: 450 Golden Gate Avenue<br>Courtroom A, 15th Floor<br><br>Judge Alex G. Tse |

# TABLE OF CONTENTS


Page

I. INTRODUCTION ....................1

II. THE SIXTH AMENDED COMPLAINT FAILS TO ALLEGE A PRICE FIXING CONSPIRACY AS TO DA YANG ....................2

A. Plaintiffs Fail To Plausibly Allege That Da Yang Entered Into The Alleged Agreement ....................2

1. There Are No Allegations To Support That Da Yang Policed Compliance As To Other Buyers ....................3

2. There Are No Allegations To Support That Da Yang Allowed Pacific Seafood To Set Da Yang's Price At The Start Of Each Season ....................5

3. Plaintiffs' Own Allegations Refute Any Claim That Da Yang Was Coordinating Prices To Keep Prices Artificially Low ....................6

B. The Alleged Phone Call Logs Do Not Demonstrate A Price Fixing Conspiracy ....................10

C. There Are No Other "Plus Factors" ....................11

D. The "Totality Of The Circumstances" Refutes Any Claim That Da Yang Participated In A Price Fixing Conspiracy ....................12

E. Conspiracies Plaintiffs Have Not Pleaded Cannot Save The Sixth Amended Complaint As To Da Yang ....................13

III. CONCLUSION ....................13

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*In re Cal. Bail Bond Antitrust Litig.*,
511 F.Supp.3d 1031 (N.D. Cal. 2021) ....................9

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ....................13

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) ....................2, 6

*Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co.*,
28 F.4th 42 (9th Cir. 2022) ....................9

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ....................2

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420-YGR, 2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan 21, 2014) ....................2

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F.Supp.2d 1109 (N.D. Cal. 2008) ....................9

*Toscano v. PGA*,
258 F.3d 978 (9th Cir. 2001) ....................2

**Federal Statutes**

Sherman Act ....................13

Defendant Da Yang Seafood Inc. ("Da Yang") respectfully submits this Reply in support of its Motion to Dismiss ("Motion") (Dkt. #779).

## I. INTRODUCTION

In their Opposition to Da Yang's Motion, Plaintiffs argue that the Sixth Amended Complaint ("SAC") alleges facts sufficient to demonstrate that Da Yang engaged in three aspects of the alleged conspiracy, namely that Da Yang: (1) participated in retaliation against a buyer (Ozzie Gregorio) "for refusing to accept the cartel's price"; (2) attended a state-sanctioned meeting between buyers and crabbers to discuss opening day prices; and (3) asked other buyers about "prevailing" prices and then matched the prices that were prevailing in the marketplace. (Opp. p. 1.) As to the first, the only facts pleaded as to Da Yang are that Great Ocean's Kyle Horgan texted an employee of another buyer about social media posts that accused the other buyer of criminal conduct, and Mr. Horgan also texted an employee of another buyer ostensibly complaining about Mr. Gregorio, although the basis of the complaint is not revealed in the texts. There are ***no*** alleged facts to demonstrate that Da Yang engaged in any retaliatory conduct as to Mr. Gregorio or any other buyer.

As to the second supposed element of the conspiracy, Plaintiffs admit that buyers and crabbers are allowed to discuss opening prices at the state-sanctioned meeting that Mr. Horgan allegedly attended. Their true complaint appears to be that another buyer texted Mr. Horgan about its planned opening price after the meeting. However, Mr. Horgan did not agree to that price or reveal Da Yang's price in response. Da Yang did not match that price at the opening, and, in fact, Da Yang did not buy any crab whatsoever until weeks later and at a different price.

Finally, Plaintiffs complain that Da Yang allegedly engaged in the very behavior that the Court already held is not price fixing – matching market prices. Plaintiffs add volume to their allegations against Da Yang in the Sixth Amended Complaint but not substance. The additional allegations, primarily additional text messages, at most demonstrate the exact same conduct that the Court previously ruled is insufficient to state a price fixing claim. Da Yang and another buyer text to try to confirm an increase in prices in the market, and then Da Yang increases its prices (typically to the top of the market). Far from evidencing efforts to unlawfully suppress prices, the

texts, at most, demonstrate efforts to keep apace with increasing prices in the marketplace.

Courts require plaintiffs to allege enough factual matter to evidence that an agreement was made by an individual defendant because, among other reasons, "discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Here, none of the factual allegations supports a reasonable inference that Da Yang made a conscious commitment to participate in the alleged conspiracy, and Plaintiffs' conclusory allegations to the contrary are simply unreasonable inferences and unwarranted deductions, which should be ignored in their entirety. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420-YGR, 2014 U.S. Dist. LEXIS 7516, at *64 (N.D. Cal. Jan 21, 2014); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## II. <u>THE SIXTH AMENDED COMPLAINT FAILS TO ALLEGE A PRICE FIXING CONSPIRACY AS TO DA YANG</u>

Plaintiffs' Opposition essentially makes two arguments. First, it argues that the Sixth Amended Complaint adequately alleges facts sufficient to demonstrate that Da Yang consciously agreed to participate in the alleged conspiracy. It does not; the alleged facts demonstrate the opposite. Second, Plaintiffs request that, based on the volume of allegations, the Court find that Plaintiffs have adequately alleged Da Yang did *something* wrong, whatever that something might be. On this second argument, the Court should not engage in a pleading fishing expedition. It is Plaintiffs' burden to plead enough factual matter to support that Da Yang made a "conscious commitment to a common scheme designed to achieve an unlawful objective," not the Court's burden to try to divine what, if anything, Da Yang did wrong. *Toscano v. PGA*, 258 F.3d 978, 983 (9th Cir. 2001).

### A. Plaintiffs Fail To Plausibly Allege That Da Yang Entered Into The Alleged Agreement

As explained in its Motion, Plaintiffs allege that Defendants entered into a price-fixing agreement with five material terms: (a) allowing Pacific Seafood to set the price that all Defendants would pay at the start of each crabbing season; (b) delaying the crab season in certain

years to when demand would be lower, setting lower starting price points for the rest of the season; (c) coordinating the prices they pay throughout the season to keep prices artificially low; (d) policing compliance by each other and other buyers with the artificially low prices they set; and (e) not purchasing crab directly from crabbers in ports where a Defendant does not have a presence; instead only purchasing crab in that port from another Defendant (what Plaintiffs call "out the backdoor" purchases). (SAC ¶ 8.) In its Opposition, Plaintiffs implicitly concede that they have not alleged that Da Yang participated in two of the alleged parts of the "agreement": (b) delaying the crab season or (e) "out the backdoor purchases."

Instead, Plaintiffs only argue that Da Yang participated in policing compliance by other buyers despite no allegations of any conduct by Da Yang in such regard. Second, Plaintiffs argue that Da Yang engaged in the first term of the conspiracy (allowing Pacific Seafood to set the season opening price for everyone) because Da Yang attended a meeting about season opening prices even though Da Yang did not purchase any crab at the start of that season and, thus, could not have been part of an agreement to allow Pacific Seafood to set a season opening price. Finally, to support its claim that Da Yang was engaged in an effort to artificially lower prices in season, Plaintiffs continue to point to the same types of text messages that the Court previously found insufficient (Dismissal Order, Dkt. #600 at 2-3), asking the Court to ignore the plain meaning of the texts and accept absurd interpretations instead.

### 1. There Are No Allegations To Support That Da Yang Policed Compliance As To Other Buyers

The Sixth Amended Complaint contains no allegations of conduct by Da Yang to enforce the supposed cartel's required pricing. Plaintiffs do not contend otherwise in their Opposition. Rather, they point to a few texts by Kyle Horgan of Great Ocean to an employee at Fathom and one at Pacific Seafood that, fairly reading the colloquial nature of the messages, amount to sympathy over the fact that Ozzie Gregorio was making public accusations against those other buyers. Based solely on those texts, Plaintiffs ask the Court to make the wildly unsupported leap to conclude that not only was Da Yang part of a price-fixing cartel (which Plaintiffs' own allegations refute as discussed below in Section II.A.3) but that Da Yang had secretly been part of

the actions that Mr. Gregorio accused Fathom and Pacific Seafood of taking. Frankly, Plaintiffs urge an outrageous interpretation of the quoted texts.

First, Plaintiffs point to Mr. Horgan's texts to Mr. Mareno of Fathom in which Mr. Horgan forwards screenshots of social media posts accusing *Fathom* and *Pacific Choice* of a "criminal agenda," based on an alleged closure of the port hoist in Charleston, Oregon. (SAC ¶ 590.) Mr. Mareno responds, "he's 100% talking about us," while denying the allegations. (*Id.* ¶ 592.) In their Opposition, Plaintiffs ask the Court to interpret the word "us" to mean "Fathom and Da Yang," despite no indication that is what Mr. Mareno meant. (Opp. p. 11.) The natural, obvious interpretation of "us" is "Fathom" or, at most, "Fathom and Pacific Choice" (the two entities accused of wrongdoing in the forwarded posts). There are no allegations that Da Yang had any involvement with the Charleston hoist, had any ability to impact the status of the Charleston hoist, or even had any knowledge of the issue other than the forwarded social media posts. Yet, Plaintiffs ask the Court to interpret Mr. Moreno's "us" to mean: (1) Da Yang was part of a price-fixing cartel; (2) Da Yang wanted to punish Mr. Gregorio for not abiding by the cartel's prices; (3) Da Yang had control over the Charleston hoist; and (4) Da Yang helped close the hoist to retaliate against Mr. Gregorio. The two letters of "us" cannot bear such weight. Even Plaintiffs' own Confidential Fish Buyer Informant #1 was not claiming that Da Yang was involved. (SAC ¶ 590.)

Second, Plaintiffs point to another text from Mr. Horgan *of Great Ocean* that simply says "Go get Ozzie!!!" (Opp. p. 11.) There are no allegations in the Sixth Amended Complaint providing any context for that statement or as to what the statement supposedly meant. Pacific Seafood's employee responds with admittedly colorful language, and Mr. Horgan responds, "There's a long list, but you're the first in line." (SAC ¶ 596.) After the Pacific Seafood employee responds that there won't be anything left of Mr. Gregorio when he's done with him, Mr. Horgan responds, "I don't doubt [that] at all." (SAC ¶ 598.) First of all, there's no indication that either person was speaking on behalf of their employers or that this was not a personal issue. After all, the Pacific Seafood employee does not say that Pacific Seafood plans to do anything; he says "I," not "we" or "Pacific Seafood." Second, Mr. Horgan does not indicate that Great Ocean or Da Yang had taken or would take any action with respect to Mr. Gregorio, and there are no

allegations that Da Yang actually did take any action with respect to Mr. Gregorio.

In sum, Plaintiffs do not allege that Da Yang took *any* action to police the supposed cartel pricing or to retaliate against any buyer who did not follow it. Instead, their Opposition admits that, at most, one employee of Great Ocean texted an employee of Fathom about actions Fathom was being accused of taking and also texted an employee of Pacific Seafood about that employee's anger with Mr. Gregorio, the cause of which is not alleged. Neither does nor can demonstrate Da Yang's agreement to or involvement in a price fixing conspiracy.

**2. There Are No Allegations To Support That Da Yang Allowed Pacific Seafood To Set Da Yang's Price At The Start Of Each Season**

Plaintiffs' Opposition confirms that, at best, they can point to one set of allegations to argue that they have adequately pleaded that Da Yang allowed Pacific Seafood (or anyone else for that matter) to set Da Yang's opening day prices. (Opp. p. 12.) Plaintiffs allege that Kyle Horgan, on behalf of Da Yang, attended the Oregon Department of Agriculture-sanctioned meeting of crabbers and buyers where, as Plaintiffs allege, buyers are permitted to discuss opening day prices. (SAC ¶¶ 539, 540.) During that meeting, unnamed "Defendants'" representatives represented that they "need to keep the price down" and would "only offer $2 or $2.50/lb." (*Id.* ¶ 542.) Confidential Fish Buyer Informant #1 said he was going to offer $3.25, and after an allegedly heated exchange involving someone from Pacific Seafood, the buyers offered the crabbers $2.75 at the meeting, which the crabbers rejected. (*Id.* ¶¶ 543, 544.) At this point, all of the conduct occurred at the state-sanctioned meeting where buyers and crabbers are allowed to discuss opening prices; Plaintiffs do not allege that anything illegal occurred.

Instead, Plaintiffs allege that the problem is the post-meeting communications between buyers. (*Id.* ¶ 545.) Specifically, Plaintiffs point to text messages between Fathom's Mr. Moreno and Mr. Horgan of Great Ocean. (*Id.* ¶¶ 546-549.) However, in none of those messages does Mr. Horgan agree to a price or even tell Mr. Moreno a price that Da Yang intends to offer. (*Id.*) Mr. Moreno allegedly tells Mr. Horgan the price that Fathom will offer, the price Bornstein was offering, and Pacific Seafood's price. (*Id.* ¶¶ 548, 550.) Yet all Mr. Horgan allegedly says in response is, "I'm still drafting what I'm going to say to my fleet." (*Id.* ¶ 549.) He does not agree

to offer the same price as any of the other buyers or tell Mr. Moreno any price Da Yang intends to offer. Plaintiffs allege that half a dozen Defendants offered a price between $3.00 and $3.10 when the season opened. (*Id.* ¶ 551.) But Da Yang did not offer an opening price because it did not buy any crab at opening and did not buy any crab until weeks later at a higher price. (*Id.* ¶ 552.)

Plaintiffs' argument that this set of allegations can allow the Court to conclude that Da Yang allowed Pacific Seafood or the supposed cartel to set Da Yang's opening day price is tortured in the extreme. Plaintiffs argue that because Da Yang was allegedly at the state-sanctioned meeting at which the buyers offered the crabbers $2.75, which was rejected, that Da Yang was then part of an agreed-upon conspiracy to later offer between $3 and $3.10 on opening day despite the fact that Da Yang never agreed to offer a price in that range, did not in fact offer a price in that range, and did not even buy any crab until weeks after the opening, only doing so then at a higher price. Plaintiffs argue that Da Yang nonetheless benefitted from the opening day price between $3 and $3.10 because those prices established a "baseline" impacting later prices. (Opp. p. 13.) But that would be theoretically true for every buyer, including so-called "independent," non-defendant buyers. For example, if a buyer did not exist at the opening and was only formed weeks later, it would theoretically benefit from the opening day price under Plaintiffs' argument despite the fact that it was impossible for that newly formed buyer to have been part of any agreement to fix opening day prices.

Courts should not give any credit to "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall*, 629 F.3d at 998. Yet, that is all that Plaintiffs offer here – that a representative of Da Yang attended a state-sanctioned meeting, which somehow meant it was part of a conspiracy to later offer a different opening price to which Da Yang never agreed and that Da Yang never offered.

### 3. Plaintiffs' Own Allegations Refute Any Claim That Da Yang Was Coordinating Prices To Keep Prices Artificially Low

As Da Yang demonstrates in its Motion, Plaintiffs' allegations and the alleged text messages show nothing more than Da Yang attempting to confirm increases in market price and then increase its own price to the top of the market. This is what happened over and over again

based on Plaintiffs' own allegations. The Court has already ruled that such conduct is insufficient as a matter of law to state the alleged claims. (Dismissal Order, Dkt. #600, p. 3 ["Matching market prices isn't price fixing."].)

Plaintiffs' Opposition implicitly concedes that this is the case. Instead, it offers contorted, illogical interpretations of a few text strings that plainly do not mean what Plaintiffs claim they mean. But the Court should not even reach the issue of how to interpret a few specific text messages. When the bulk of the allegations clearly demonstrate conduct that the Court has already ruled is permissible, a *reasonable* inference cannot be made that Da Yang was engaged in the opposite conduct based on a few ambiguous text exchanges.

Plaintiffs' tortured reading of the alleged text messages is exemplified in the first texts they cite in their Opposition. (Opp. p. 14.) In this exchange, Mr. Moreno of Fathom texts Mr. Lee[1] of Da Yang, "Chang, what is the boat price for cooker crabs now?" Mr. Lee responds, "I think the same $3.25?" Mr. Moreno confirms receiving the response, "Yes ok." (SAC ¶ 563.) According to Plaintiffs, Mr. Moreno was asking Mr. Lee for the conspiracy's cooker crab price. (Opp. p. 14.) "Mr. Lee proposed a price in the form of a question, and then Mr. Moreno agreed to that price." (*Id.*) According to Plaintiffs, it was an "inquiry, offer, and acceptance" between the "Defendant Buyers to reach an agreed fixed price." (Opp. p. 14.) Alternatively, accepting the plain meaning of the texts, Mr. Moreno asked if Mr. Lee knew the going rate for cooker crabs; Mr. Lee responded that he wasn't sure but maybe $3.25; and Mr. Moreno confirmed receiving a response. Such a simple interpretation is confirmed by the next paragraph of the Sixth Amended Complaint where Mr. Lee then asked if the "Newport live price" was $3.50, and Mr. Moreno responded, "I heard $3.50." (SAC ¶ 564.) If Da Yang is a member of a cartel setting prices across the region, why the need to ask for the going rate in specific ports and why are the cartel members unsure of the price the cartel has set? The answers are simple. That's not what a plain reading of these texts suggests. Rather, they are simply efforts to keep up with market price fluctuations.

---

[1] The Sixth Amended Complaint sometimes refers to Da Yang's Chang Lee as "Mr. Chang" as opposed to "Mr. Lee." There is another "Mr. Lee" referenced in the Sixth Amended Complaint – Kevin Lee. For purposes of this Reply, Da Yang refers to Chang Lee as "Chang Lee" or "Mr. Lee," and Kevin Lee is not relevant to or mentioned in this Reply.

Plaintiffs offer a similarly tortured interpretation of the word "the" in some of the texts, urging the Court to read texts asking about "the live price to the boat in Winchester bay?" to demonstrate that there is a single price agreed upon by the cartel (*i.e.*, "the" price). (Opp. p. 15.) Of course, what the use of the word "the" really does is undermine Plaintiffs' entire argument. For example, in the Winchester Bay text, Mr. Lee isn't asking Mr. Ferguson for Pacific Dream's price in Winchester Bay to coordinate prices; he's asking about *the* market price, *the* going rate, what crab is being sold for in that area. Otherwise, the text exchange makes no sense. If the meaning of the texts really is, as Plaintiffs argue, Da Yang asking Pacific Dream what price they and the cartel agreed upon, there would have been no reason for Mr. Ferguson to respond with both "the price" in Winchester and with a different price in Garibaldi. (SAC ¶ 521.) That response does make sense, however, if the individuals texting understand that the texts are simply trying to get a sense of where the market price is.

Confirming the disingenuous nature of their interpretations of the alleged texts, Plaintiffs rely on the exchange between Da Yang's Chang Lee and Pacific Dream's Jonathan Mark where Mr. Lee asked if the live price was still $4.50, and Mr. Mark responded that it was "4.00 at the moment." (Opp. p. 14.) As demonstrated in Da Yang's Motion, the other texts exchanged between Mr. Lee and Mr. Mark at the time show that Da Yang was offloading boats for Pacific Dream and loading the crab into Pacific Dream's trucks. Declaration of John Danos Ex. 1 at Da Yang 002651-002653 (3/8/24 portion of text string). Because Da Yang was taking possession of the crab from the crabber, it had to fill out the fish ticket, which includes the price paid. *Id.* at 002652. In their Opposition, Plaintiff's argue that "Da Yang's immediate conformity to the $4/lb price provided by Mr. Mark … supports a reasonable inference that Defendants had a prior agreement to move prices in concert." (Opp. p. 14.) However, Plaintiffs' allegation in the Sixth Amended Complaint is much more careful because they know that is not what happened. In the Sixth Amended Complaint, they merely allege that this supposed "agreement to *reduce* prices is reflected in the landings records" of Da Yang. (SAC ¶ 601.) That is because, based on the other text messages at the time between Mr. Lee and Mr. Mark, it is clear that they are discussing the Pacific Dream price that will go on Da Yang's fish ticket as the offloader of the crab for Pacific

Dream.

Aside from badly misinterpreting the alleged texts, Plaintiffs' Opposition also misstates Plaintiffs' own allegations and invents allegations that are not in the Sixth Amended Complaint. For example, Plaintiffs argue a supposed phone call between Safe Coast and Da Yang resulted in Da Yang dropping its price "in line with prices paid by other Defendants." (Opp. p. 15.) However, that is not what the allegations in the Sixth Amended Complaint show. Plaintiffs allege that crabbers kept telling Safe Coast that Da Yang was paying $3.50 for live crab (more than Safe Coast) and that Max Boland should call Da Yang to confirm. (SAC ¶ 515.) Plaintiffs allege that there was in fact a phone call. (*Id.* ¶ 516.) As it turns out, Da Yang had been paying $3.10, not $3.50 as the crabbers were claiming to Safe Coast, and then lowered its price to $2.60 after the supposed call with Safe Coast. (*Id.*) Safe Coast, on the other hand had been paying $3.25, higher than Da Yang's $3.10, and kept its price at $3.25 after the phone call with Da Yang. (*Id.*) Far from the alleged phone call bringing Da Yang's price in line with Safe Coast's as argued in the Opposition, the two buyers' prices diverged even more following the supposed call, going from a 5% difference to a 20% difference. (*Id.*) That does not and cannot provide a reasonable inference that the two buyers agreed during the alleged phone call to fix prices between them.

The central flaw in Plaintiffs' Opposition and the Sixth Amended Complaint itself is that Plaintiffs seek to reverse the pleading burden. They must allege "sufficient factual matter, taken as true, to plausibly suggest that an illegal agreement was made." *Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co*., 28 F.4th 42, 46 (9th Cir. 2022). Yet, what they are asking the Court to do is to assume that an illegal agreement was made and then engage in mental gymnastics to somehow make the contradictory alleged factual matter fit into that agreement. Worse yet, Plaintiffs must demonstrate "a conscious decision" by Da Yang to join the alleged conspiracy. *In re Cal. Bail Bond Antitrust Litig*., 511 F.Supp.3d 1031, 1047 (N.D. Cal. 2021) (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1117 (N.D. Cal. 2008)). Yet, they ask the Court to ignore Da Yang's express and clear refusal to

do so[2] in favor of illogical interpretations of other texts. When specifically asked if Da Yang would match a specific price, Mr. Lee responded, "I'm not really sure. … ***If the market price 3.75, then will match***." (SAC ¶ 575 [emphasis added].) No matter how voluminous, additional allegations of Da Yang seeking to determine market price and then match the market (typically at the top end) does not state a cognizable claim against Da Yang.

**B. The Alleged Phone Call Logs Do Not Demonstrate A Price Fixing Conspiracy**

Recognizing that, at best, they only allege parallel conduct by Da Yang, which is as consistent with independent action (moving prices with the market) as with conspiracy (agreeing to fix prices), Plaintiffs recognize that they must also allege "plus factors," which are "economic actions and outcomes that are largely incompatible with unilateral conduct but largely consistent with explicitly coordinated action." *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). In their Opposition, Plaintiffs point to their call log allegations as demonstrating a "plus factor," as supposedly evidencing "a high level of inter-firm communications" with competitors sharing non-public pricing information. (*See* Opp. p. 16.) Of course, the problem for Plaintiffs is that the call log allegations demonstrate no such thing.

The call logs are from individuals' cell phones. There are no allegations regarding when the calls were made. Were the calls during crab season? Were the calls even during business hours (as opposed to personal calls made outside of business hours)? There are no allegations about the subject matter of the calls. There's no reason to believe a high proportion of the calls were even about Dungeness crab. In fact, the allegations undermine that the calls were in furtherance of the alleged conspiracy. For example, the most alleged calls (by a significant margin) in Paragraph 507 of the Sixth Amended Complaint were between Da Yang's Chang Lee and Dana Ferguson who, during the alleged time period, worked for two different defendants and a non-defendant. Given the fact that one of Mr. Ferguson's employers during the period is not alleged to have been in the price-fixing conspiracy, the reasonable inference is his calls with Mr. Lee were not in furtherance of the alleged conspiracy. That's the problem with these allegations

[2] Da Yang denies that there was a conspiracy by any Defendants or at all.

in the Sixth Amended Complaint. Plaintiffs are asking the Court to determine there are sufficient factual allegations to subject a corporate defendant to expensive, time-consuming antitrust litigation based on alleged calls an individual made that may or may not have been on behalf of the corporate defendant.

**C. There Are No Other "Plus Factors"**

Recognizing the weakness of their phone log allegations, Plaintiffs argue that they have alleged other "plus factors," but such argument is baseless. First, Plaintiffs argue that Da Yang shared a "common motive" with the other Defendants. (Opp. p 18.) That supposed common motive, however, is nothing more than a claim that buyers prefer to pay lower prices to increase their margins on resale. (*Id.*) That's simply a universal statement of business: businesses prefer lower costs and higher profit margins.

Second, Plaintiffs argue that Da Yang acted against its own self-interest. (Opp. p. 18.) Their example, again, is the supposed call with Safe Coast in March 2023 to fix prices. (*Id.*) Prior to the alleged call, Safe Coast's price was $3.25 and Da Yang's was $3.10. (SAC ¶ 516.) After the call, their prices diverged further with Safe Coast's alleged price remaining $3.25 while Da Yang dropped its price to $2.60. (*Id.*) It is difficult to see what this set of allegations is meant to prove other than the fact that Safe Coast and Da Yang were *not* fixing prices between them.

Finally, Plaintiffs recycle their arguments that the alleged text message communications combined with pricing data demonstrate price-fixing behavior. Again, Plaintiffs are asking the Court to read far more into Plaintiffs' own factual allegations than what exists in the Sixth Amended Complaint. Plaintiffs argue that "Da Yang confirmed that Pacific Seafood was moving to $5.00/lb in April 2023," and Da Yang and a group of Defendants all set their prices at $5/lb. (Opp. p. 19.) But that is not what is actually alleged. The actual allegation is that Mr. Lee of Da Yang asked Mr. Molfino of Living Pacific whether the live price in Newport was $4.25. (SAC ¶ 529.) Mr. Molfino responded that the price had, in fact, started at $4.25 that day but that "Pacific and Seawater" had already started offering $5. (*Id.*) Then, in the face of the rapidly rising price, Da Yang had to ***increase*** its price to the new $5/lb market reality. (*Id.* ¶ 530.) It is the exact opposite conduct from what one would expect if Da Yang was coordinating with other

Defendants to suppress prices, particularly if Pacific Seafood was leading that suppression charge.

**D. The "Totality Of The Circumstances" Refutes Any Claim That Da Yang Participated In A Price Fixing Conspiracy**

Ironically, Plaintiffs ask the Court to view the allegations against Da Yang in their totality, which is exactly what Da Yang is asking the Court to do. (*See* Opp. p. 21.) Plaintiffs' Sixth Amended Complaint and Opposition repeatedly attempt to focus the Court on out-of-context text messages, encouraging the Court to assume a conspiracy and contort the plain meaning of those texts in isolation to somehow fit the assumed conspiracy. The Court should instead consider the allegations in their totality and decide what reasonable inferences can be drawn from them. If the Court does so, the Court will conclude what Mr. Lee of Da Yang expressly stated: Da Yang's prices were based on market factors, not a conspiracy.

In the example that Plaintiffs repeatedly rely upon in their Opposition, Safe Coast was offering $3.25/lb, and crabbers were telling it that Da Yang was offering $3.50, obviously attempting to get Safe Coast to raise its price. (SAC ¶ 515.) Safe Coast first wanted to confirm that what it was being told by crabbers was correct. (*Id.*) It turns out that the crabbers were incorrect; Da Yang was only offering $3.10/lb, less than Safe Coast. (*Id.* ¶ 516.) Thus, Safe Coast kept its price at $3.25, and its price and Da Yang's price further diverged after the alleged confirming phone call. (*Id.*)

This is the pattern demonstrated over and over again. A text exchange starts with a phrase along the lines of "I just heard" followed by another location or buyer offering a higher price. (*See, e.g.*, SAC ¶¶ 527, 536, 537, 554, 560, 564, 571, 608.) Then, when that higher price that is already being offered by others is confirmed, Da Yang increases its prices to the top end of the market. (*See, e.g.*, SAC ¶¶ 527-530 [Da Yang repeatedly raising its prices in quick succession to keep up with the top end of the market].) Nowhere does one see the reverse: Da Yang and another buyer never discuss prices currently being paid in the marketplace and then agree to jointly offer lower prices to try to depress the market price.

### E. Conspiracies Plaintiffs Have Not Pleaded Cannot Save The Sixth Amended Complaint As To Da Yang

Finally, Plaintiffs urge the Court to find that some type, any type of illegal agreement has been alleged as to Da Yang regardless of whether it is the actual agreement that Plaintiffs allege Defendants entered in their Sixth Amended Complaint. In particular, Plaintiffs urge the Court to find that Da Yang entered into an illegal "price sharing arrangement" because the Court already found "the Plaintiffs' allegations were sufficient to support an inference of a 'tacit agreement to share prices.'" (Opp. p. 22.) However, as the Court already held, "agreements to exchange pricing data do not themselves constitute a *per se* violation of the Sherman Act. (Dismissal Order, Dkt. #600, p. 2, quoting *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig*., 906 F.2d 432, 447 n. 13 (9th Cir. 1990).) Nothing in the Sixth Amended Complaint should change the Court's prior analysis and determination that Plaintiffs have failed to allege an antitrust violation by Da Yang.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Da Yang respectfully requests that the Court dismiss all claims pleaded against it in the Sixth Amended Complaint with prejudice. This is Plaintiffs' *Sixth* Amended Complaint made with the benefit of voluminous discovery from Defendants. They should not be granted further leave to amend.

Dated: August 17, 2026

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

By: */s/ John Danos*
David J. Aveni
John R. Danos
Colin V. Quinlan

Attorneys for Defendant
Da Yang Seafood Inc.