CHARLES H. SAMEL (SBN 182019)
charles.samel@stoel.com
EDWARD C. DUCKERS (SBN 242113)
ed.duckers@stoel.com
STOEL RIVES LLP
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
Telephone: 415.617.8900

MATTHEW D. SEGAL (SBN 190938)
matthew.segal@stoel.com
MICHELLE J. ROSALES (SBN 343519)
michelle.rosales@stoel.com
STOEL RIVES LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone: 916.447.0700

TIMOTHY W. SNIDER (OSBN 034577, admitted *pro hac vice*)
timothy.snider@stoel.com
ALEX T. VAN RYSSELBERGHE (OSBN 174836, admitted *pro hac vice*)
alex.vanrysselberghe@stoel.com
ALEXANDRA CHOI GIZA (OSBN 214485, admitted *pro hac vice*)
alexandra.giza@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380

*Attorneys for Pacific Seafood Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAND LITTLE, ROBIN BURNS, and CHERRY FISHERIES, INC., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFIC SEAFOOD PROCUREMENT, LLC, et al.,<br><br>Defendants. | Case No. 3:23-cv-01098-AGT<br><br>**PACIFIC SEAFOOD DEFENDANTS' OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION FOR AN ADVERSE INFERENCE AS A SANCTION AGAINST CERTAIN DEFENDANTS FOR SPOLIATION OF EVIDENCE**<br><br>Date: August 28, 2026<br>Time: 10:00 a.m.<br>Judge: Honorable Alex G. Tse<br>Courtroom: A, 15th Floor |

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..... 1
II. BACKGROUND ..... 3
  A. Case History ..... 3
  B. Pacific's Collections ..... 5
  C. Pacific's Responses to Plaintiffs' Interrogatories, Set Three ..... 7
  D. Pacific's Subsequent Collections ..... 8
III. PLAINTIFFS' CASE AND THIS MOTION ..... 8
IV. LEGAL STANDARD ..... 13
V. ARGUMENT ..... 13
  A. Plaintiffs fail to show ESI was lost and cannot be restored or replaced. ..... 13
    1. ESI can be restored or replaced through ongoing collections. ..... 14
    2. ESI can be restored or replaced through ongoing discovery ..... 14
  B. Plaintiffs fail to show that Pacific did not take reasonable steps. ..... 15
  C. There is no evidence that Pacific intended to deprive Plaintiffs of evidence. ..... 18
  D. Plaintiffs fail to establish prejudice. ..... 21
  E. An adverse inference instruction is improper. ..... 25
VI. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*AliveCor, Inc. v. Apple, Inc.*,
No. 21-CV-03958-JSW, 2023 WL 4335293 (N.D. Cal. June 2, 2023) .......... 18, 19

*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) .......... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 11

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) .......... 11

*Colonies Partners, L.P. v. County of San Bernardino*,
No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020), *report and recommendations adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020) .......... 19

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) .......... 11

*Doe LS 340 v. Uber Tech., Inc.*,
710 F. Supp. 3d 794 (N.D. Cal. 2024) .......... 16

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) .......... 11

*Fourth Dimension Software v. DER Touristik Deutschland GmbH*,
No. 19-cv-05561-CRB, 2021 WL 5919821 (N.D. Cal. Dec. 15, 2021) .......... 21

*Freidig v. Target Corp.*,
329 F.R.D. 199 (W.D. Wis. 2018) .......... 18

*Gregory v. State of Montana*,
118 F.4th 1069 (9th Cir. 2024) .......... 18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
639 F. Supp. 3d 944 (N.D. Cal. 2022) .......... 18

*Honey Bum, LLC v. Fashion Nova, Inc.*,
63 F.4th 813 (9th Cir. 2023) .......... 9, 11, 24

*Li v. Merck & Co., Inc.*,
No. 23-cv-03347-JSW (TSH), 2025 WL 2162949 (N.D. Cal. July 30, 2025) .......... 15

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page**

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
328 F.R.D. 543 (N.D. Cal. 2018) ........ 13, 14, 15

*Painter v. Atwood*,
No. 2:12-cv-1215, 2014 WL 1089694 (D. Nev. Mar. 18, 2014) ........ 14, 23

*Porter v. City & Cnty. of San Francisco*,
No. 16-CV-03771-CW(DMR), 2018 WL 4215602 (N.D. Cal. Sept. 5, 2018) ........ 19

*Quality Auto Painting Ctr. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) ........ 12

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
No. 17-cv-02824-JST (KAW), 2022 WL 16637990 (N.D. Cal. Nov. 2, 2022), *report and recommendations adopted*, 2023 WL 4311255 (N.D. Cal. Apr. 10, 2023) ........ 17, 19

*Sanchez v. Jiles*,
No. CV 10-09384 MMM, 2012 WL 13005996 (C.D. Cal. June 14, 2012) ........ 15

*Smahi v. STMicroelectronics, Inc.*,
789 F. Supp. 3d 690 (N.D. Cal. 2025) ........ 2

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ........ 9

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ........ 18

*Wisk Aero LLC v. Archer Aviation Inc.*,
No. 3:21-cv-02450-WHO, 2023 WL 2277112 (N.D. Cal. Feb. 28, 2023) ........ 1, 21, 22

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ........ 25

**Statutes**

Sherman Act ........ 11

**Rules**

Fed. R. Civ. P. 37(e) ........ passim

Fed. R. Civ. P. 37(e)(1) ........ 13, 21, 22

Fed. R. Civ. P. 37(e)(2) ........ 13

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page**

Rule 26(f) ........................................ 20

**Other Authorities**

Sedona Conference, *The Sedona Principles, Third Edition* ........................................ 18

## I. INTRODUCTION

This is the second time Plaintiffs have rushed to court to allege spoliation without evidence. Dkts. 65, 66 (denying spoliation motion that was based only on a photo of a truck taking paper from a Pacific facility to a shredding facility). Here, Plaintiffs claim that Pacific Seafood ("Pacific") intentionally "permanently destroyed" "highly relevant" evidence on its custodians' personal cell phones. The entire basis for Plaintiffs' motion is Pacific's Responses to Plaintiffs' Interrogatories—which, contrary to Plaintiffs' suggestion, Pacific *expressly invited*. Pacific transparently answered Plaintiffs' questions about Pacific's collections of electronically stored information ("ESI") for each of its custodians and provided what it knew at the time, one year before the discovery cutoff, about collections from its custodians' personal phones.

Pacific made clear that "collections are ongoing" and Pacific "continues to work with its custodians" to collect ESI. Pacific also advised that, if Plaintiffs wanted to take further discovery on the issue, Pacific would cooperate. But rather than waiting for Pacific's remaining collections, taking further discovery, or even conferring with Pacific, Plaintiffs hurried to file this Motion—almost a year before discovery closes, and with no trial date *even set*—seeking a broad jury instruction that Pacific intentionally destroyed text messages and *mandating* that jurors find the messages would have supported Plaintiffs' still-undefined conspiracy case.

Plaintiffs offer none of the evidence needed to justify such a severe, case-altering sanction. Courts do not find spoliation, let alone grant requests for mandatory adverse instructions, at the drop of a hat. Federal Rule of Civil Procedure ("Rule") 37(e) requires careful consideration of numerous fact-intensive elements, including which specific categories of documents likely existed but are lost, whether they can be recovered and replaced, whether reasonable steps were taken to preserve them, whether they were destroyed intentionally, and whether the loss actually prejudices the moving party. Those considerations each demand "specifics" and evidence that Plaintiffs make no effort to provide. *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-cv-02450-WHO, 2023 WL 2277112, at *4 (N.D. Cal. Feb. 28, 2023) (Rule 37(e) movant "should provide some 'specifics to support' a finding of prejudice"); *see also*

*Smahi v. STMicroelectronics, Inc.*, 789 F. Supp. 3d 690, 695 (N.D. Cal. 2025) (declining to find spoliation where numerous factual questions remained on multiple Rule 37(e) issues).

Perhaps best illustrating the failures of Plaintiffs' Motion, Pacific has, just in the few weeks since Plaintiffs filed it, collected over 160,000 additional text messages from Ashton Meier for the period Plaintiffs claimed Meier intentionally "destroyed" messages. *See* Declaration of Timothy Snider ("Snider Decl.") ¶ 32. Pacific has also newly located scores of gigabytes of messaging data in other custodians' cloud storage accounts that Pacific's previous vendor did not collect, which Pacific is working with a new technician to obtain. *Id.* ¶¶ 32–35. Other parties have and continue to produce text messages that also fill potential "gaps" in custodians' productions. The Court cannot issue orders having a significant effect on the merits of the case on a record that is actively developing and still many months (possibly years) from completion.

Plaintiffs usher this Motion to the Court at a very telling time in this case. Over a year and a half into discovery, and three years into the litigation, Plaintiffs have now received hundreds of thousands of text messages produced by Defendants, which Plaintiffs have repeatedly promised will show direct evidence of price-fixing. They do not. Plaintiffs instead cite communications that mention prices or price-following (and in many cases, active free-market competition, by Plaintiffs' own standards), none of which is illegal. To backfill this evidentiary hole, Plaintiffs now seek a jury instruction that would effectively *create* direct evidence by instructing jurors to infer that any missing text messages would have shown the "conspiracy" that Plaintiffs still refuse to define in response to Defendants' discovery. Plaintiffs, moreover, rush to secure that sanction long before the parties have finished investigating critical issues, like what (if any) messages truly are missing and cannot be restored or found in other productions, whether any such text messages are actually important to the case and not mitigated by other evidence, the reasons that any such ESI cannot be collected, and all other Rule 37(e) factors.

Pacific takes its preservation and discovery responsibilities seriously. Pacific has expended significant resources to preserve evidence and turn over every stone to ensure that every responsive message is collected. And Pacific continues to collect ESI that Plaintiffs' claim is "destroyed." Plaintiffs' Motion is baseless and should be denied.

## II. BACKGROUND

### A. Case History

Plaintiffs originally filed this case on March 13, 2023, near the end of the 2022–23 Dungeness crab season. Dkt. 1. The Complaint originally named only Pacific and alleged a monopsony theory. *Id.* Although the complaint included a fallback price-fixing claim, Plaintiffs' theory was not the horizontal conspiracy Plaintiffs later switched to allege, but rather that Pacific used its market position to pressure or coerce other buyers not to pay higher prices. *Id.*

The same day it was served, on March 15, 2023, Pacific issued a litigation hold to pertinent employees. *See* Snider Decl. ¶ 3. The hold expressly covered potential custodians' personal cell phones and text messages. *Id.* ¶ 4. Pacific also implemented all available backend preservation for company-controlled ESI data, including email. *Id.* Employees receiving the hold notices, including each that is the subject of the Motion, reported understanding their duties. Declaration of Ashton Meier ("Meier Decl.") ¶ 4; Declaration of Dan Obradovich ("Obradovich Decl.") ¶ 3; Declaration of Tyson Yeck ("Yeck Decl.") ¶ 4–5; Declaration of Brian McLarrin ("McLarrin Decl.") ¶ 3; Declaration of Joe Cincotta ("Cincotta Decl.") ¶ 3; Snider Decl. ¶ 9.

On May 15, 2023, Pacific moved to dismiss the complaint. Dkt. 21. On June 23, 2023, discovery against Pacific was stayed. Dkt. 38. A year later on May 21, 2024, this Court granted Pacific's Motion to Dismiss. Dkt. 59. The Court allowed leave to amend and permitted Plaintiffs to take limited discovery of third parties, but maintained the stay of discovery as to Pacific. Dkt. 61. Although no claims were pending against it, Pacific maintained its litigation holds and other measures to preserve potentially relevant data. Snider Decl. ¶ 5.

On July 8, 2024, after learning that there was a paper-shredding truck outside of Pacific's Eureka processing plant, Plaintiffs filed a letter motion accusing Pacific of spoliation. Dkt. 65. The Court denied the motion, noting that Plaintiff "hasn't offered evidence supporting that Pacific has destroyed documents responsive" to the targeted discovery permitted at that time. Dkt. 66.

The case changed significantly on August 21, 2024, when Plaintiffs filed an amended complaint to drop their monopsony theory and allege a coast-wide and decade-long horizontal price-fixing case with multiple new Defendants. Plaintiffs claimed they had "direct evidence" of

an agreement to fix prices. Dkt. 218. On November 1, 2024, Pacific again moved to dismiss. Dkt. 189. Discovery remained stayed. Pacific continued its preservation measures, including suspending records retention policies and using backend preservation measures. Snider Decl. ¶ 5.

On January 17, 2025, the Court denied Pacific's motion based on Plaintiffs' claims of direct evidence of price-fixing, Dkt. 242, and the stay on discovery was lifted a month later, Dkt. 259. On February 21, 2025, Plaintiffs served Pacific with their first set of document requests and, before Pacific could respond, served an amended set. Snider Decl. ¶ 7. Pacific timely responded on April 10, 2025, and agreed to confer with Plaintiffs on the scope of productions. *Id.* ¶ 7, Ex. A. Pacific's and Plaintiffs' counsel held several multi-hour videoconferences in May and June 2025, discussing the scope of Plaintiffs' requests, including which Pacific employees would be considered relevant custodians for collection purposes. *Id.* ¶ 9. Pacific's counsel also spent significant time interviewing Pacific employees about their job duties and activities regarding ex vessel Dungeness crab. *Id.* Through that extensive process, Pacific and Plaintiffs ultimately agreed to a list of 16 custodians. *Id.* ¶ 13.

Pacific simultaneously began collecting ESI from custodians in April and May 2025. *Id.* ¶ 10. To date, Pacific has collected and processed over 3.5 Terabytes of ESI in this case, which includes 1.2 million text messages from custodians. *Id.* ¶¶ 12, 26. Pacific has produced over 163,000 responsive text messages and more than 55,000 documents totaling almost 500,000 pages to Plaintiffs and the parties, and Pacific expects to produce over 200,000 emails to Plaintiffs in the coming weeks. *Id.* ¶ 26. Other Defendants, likewise, have collected and produced at least tens of thousands of text messages. *Id.* ¶ 37. Significant additional defendant productions are forthcoming and are being produced now. *Id.* Third-party discovery also remains active and ongoing. *Id.*

Meanwhile, Plaintiffs obtained extensive phone records from Verizon and other carriers for most custodians in the case. *Id.* ¶ 39. This includes hundreds of pages of records detailing years of call log history for Pacific's custodians (including all custodians subject to this Motion), which show call times, durations, locations, and participants. *Id.*

Fact discovery remains open until June 9, 2027. Dkt. 742. Pacific and other Defendants continue to collect, review, and produce documents, including text messages and other ESI. Snider Decl. ¶ 41. To date, Plaintiffs have taken no depositions. *Id.* ¶ 30.

**B. Pacific's Collections**

As noted, Pacific began collecting from custodians' personal phones in April and May 2025. *Id.* ¶ 10. Pacific retained an outside e-discovery vendor specifically for personal cell phone collections and used collection methods that included ModeOne, iCloud collections, advanced logical imaging, and full file system imaging. *Id.* ¶¶ 17–18. Conducting these collections involved considerable expense to Pacific and logistical coordination for its employees. *Id.* ¶¶ 16, 42. Pacific also collected emails for custodians from company-controlled cloud servers and archived servers. *Id.* ¶ 12. Those email collections date back years and, for all custodians, well before the filing of this lawsuit. *Id.*

Pacific's initial phone collections returned over 1.2 million text messages. *Id.* ¶ 26. For most custodians, their individual collections yielded text messages predating the lawsuit by months or years. *Id.* ¶ 18. For some custodians, however, Pacific's vendor's collections did not obtain text messages dating back to the date Pacific issued litigation holds in March 2023. *Id.* Some custodians' earliest text messages were from April 2023 (reflecting one month of "missing" ESI), and others were later. *Id.* None of the first-available message dates were coordinated. They were random across these custodians.

Pacific directed its vendor to perform follow-up collections from the same or secondary devices, and to search for data in cloud storage accounts, to exhaust all sources of data. *Id.* ¶ 19. For each custodian, Pacific continued to investigate whether there was a permanent loss of text messages (and, if so, the scope of any such loss), or whether ESI was recoverable from custodians directly or from other sources. *Id.* Pacific sought second opinions about the completeness of the prior collections. *Id.* Pacific also directed its vendor to conduct additional collections, image some phones, analyze some custodians' older phones, and inspect custodians' cloud accounts to ensure all available ESI was collected. *Id.* Notably, those efforts resulted in the collection of many additional texts. *Id.*

Pacific continued to investigate whether texts were available from six custodians: Ashton Meier, Dan Obradovich, Tyson Yeck, Brian McLarrin, Joe Cincotta, and Brett Hester. *Id.* ¶¶ 19–25. Those custodians had widely varying roles and responsibilities at Pacific. Only one of the six custodians has ever had authority to set ex vessel crab prices (and only after Fall 2023, *see* Meier Decl. ¶ 3), and multiple custodians do not participate in price negotiations (*see, e.g.*, Obradovich Decl. ¶ 6; Yeck Decl. ¶ 3). Each custodian also had widely varying circumstances regarding the dates during which their messages had not yet been collected and the circumstances related to their personal phones and collections:

- **Ashton Meier:** Meier's messages initially dated back to April 2024 (one year and one month after this lawsuit was filed), when collected. Pacific learned that Meier replaced his phone in April 2024, and it initially appeared that ESI may not have been preserved through backup and transfer processes. Snider Decl. Ex. D at 11, 20–21.
- **Dan Obradovich:** Obradovich's personal phone messages were collected back to April 2023 (one month after this lawsuit was filed). *Id.* at 12. His phone's settings saved messages "forever" and he used the same cell phone as when the lawsuit was filed. Obradovich Decl. ¶ 4.
- **Tyson Yeck:** Yeck's personal phone messages were collected back to June 2023 (less than three months after this lawsuit was field). Snider Decl. Ex. D at 12. His phone's settings saved messages "forever" and he used the same cell phone as when the lawsuit was filed. Yeck Decl. ¶ 5.
- **Brian McLarrin:** McLarrin's personal phone messages dated back to April 2024. Snider Decl. Ex. D at 12. When Pacific's vendor initially collected from McLarrin in April 2025, it discovered that a one-year preservation setting was active on his recently-replaced cell phone. *Id.* at 19–20. McLarrin was unaware of the setting and disabled it . *Id.* Pacific's vendor attempted to collect data from McLarrin's iCloud and imaged his phone, but reported no additional ESI at that time. Snider Decl. ¶ 23.
- **Joe Cincotta:** Cincotta's personal phone text messages went back to March 2025 (30 days before the collection). Snider Decl. Ex. D at 12. Cincotta's lost his personal phone in Humboldt Bay around October 2024 while he was working on the dock. *Id.* at 16–17. Cincotta did not tell Pacific about the incident. Cincotta Decl. ¶ 5. His wife obtained a replacement cell phone for him at the Verizon store that same month. *Id.* ¶ 6. Cincotta did not know why his text messages only went back to March 2025, and did not manually delete any messages or change any settings that would have resulted in deletions. *Id.* ¶ 8. Pacific's counsel believed a 30-day retention may have been activated on his new cell phone, but is still investigating. Snider Decl. Ex. D at 12.
- **Brett Hester:** Hester's personal phone text messages went back to November 2024. *Id.* at 11. Hester replaced his personal phone in November 2024, and text messages were collected back to that date from his new phone. *Id.* at 18. Hester also kept his old phone for collection. *Id.* at 19. When Pacific arranged to collect Hester's old phone, however, Hester reported he was unable to locate it. *Id.* Hester then quit his

job with Pacific, and has not returned counsel's calls for further collection efforts of cloud backups or from his prior cell phone. Snider Decl. ¶¶ 25, 36.

Pacific also reviewed communications from other custodians, other Defendants' custodians, and third parties to determine whether older text messages with these custodians were available from other sources. *Id.* ¶¶ 37–38. Pacific found numerous threads involving Meier, Obradovich, Yeck, McLarrin, Cincotta, and Hester from other persons with whom they texted that predate their specific collections. *Id.* This includes 1:1 threads with other Pacific custodians, group chat threads involving multiple Pacific employees (where most employees' internal work-related text messaging occurs), and threads produced by other Defendants and third parties. *Id.* Each custodian also has emails going back years before March 2023. *Id.*

### C. Pacific's Responses to Plaintiffs' Interrogatories, Set Three

On April 12 and 16, 2026, Plaintiffs notified Pacific that certain Pacific custodians' text-message productions did not include messages prior to certain dates, and asked whether Plaintiffs should expect further productions and why text messages started on certain dates. *Id.* ¶ 27, Ex. B. On April 20 and 22, 2026, Pacific answered that it was continuing to review messages obtained from Meier, Obradovich, Yeck, McLarrin, Cincotta, and Hester, but that Pacific would cooperate with Plaintiffs to the extent Plaintiffs intended to "conduct discovery concerning the start date of custodian text message productions." *Id.* ¶ 28, Ex. C.

On April 30, 2026, Plaintiffs served Plaintiffs' Interrogatories to All Defendants, Set Three, seeking information on (among other things) the number and timing of Defendants' ESI collections, the methods of collection, the date ranges of ESI collected from each custodian, and the reason why no earlier ESI was collected from each custodian. *Id.* Pacific timely answered on June 12, 2026, providing detailed and transparent responses. *Id.* ¶ 29. Pacific described its preservation efforts, its collection work with an outside vendor, and what collections Pacific had done (or attempted to do) for each custodian. *Id.* Ex. D. Pacific explained that, to date, text messages collections from personal phones of Meier, Obradovich, Yeck, McLarrin, Cincotta, and Hester did not include texts certain dates. *Id.* Pacific also disclosed findings from its investigations to date, including about settings on some custodians' phones and the process some

custodians had taken to upgrade and replace their phones, which could have affected the collection of ESI. *Id.* For each custodian, Pacific made clear that "Discovery continues and Pacific's collections are ongoing," that Pacific "continues to work with its custodians" to identify additional sources of ESI "from which additional collections can be performed," and that Pacific reserves the right to supplement its response. *Id.*

**D. Pacific's Subsequent Collections**

As part of its continuing investigation and collection, Pacific retained Michael Yasumoto, a senior forensic examiner, to evaluate prior cell phone collections for custodians subject to the Motion, and to determine whether any further ESI may be available on custodians' personal phones or other available sources. *Id.* ¶ 31. Yasumoto examined the collections and found that Pacific's prior vendor did not collect all available ESI. Yasumoto Decl. ¶¶ 10, 16, 20.

Yasumoto uncovered several additional sources of ESI. Yasumoto conducted another collection of Meier's personal phone that resulted in collecting text messages from as far back as February 20, 2013, including over 160,000 text messages from before April 29, 2024 (i.e., the period before which Plaintiffs allege Meier intentionally "destroyed" messages). *Id.* ¶ 6; Mot. at 13. Yasumoto also discovered that several custodians—including at least Meier, McLarrin, Obradovich, and Yeck—had significant quantities of messaging data stored in their iCloud accounts that Pacific's prior vendor did not collect. For instance, Yasumoto discovered that almost 95% of Meier's messaging data, 85% of McLarrin's messaging data, over 95% of Obradovich's messaging data, and almost 97% of Yeck's messaging data were in their respective iCloud accounts and not on their physical iPhones. Yasumoto Decl. ¶¶ 7, 10, 13, 19. At Pacific's request, Yasumoto is devising a forensically sound method for collecting the data, which will result in the collection of additional messaging data and may include text messages predating those initially collected and which Plaintiffs claim were intentionally deleted. *Id.* ¶¶ 8, 11, 17, 22.

## III. PLAINTIFFS' CASE AND THIS MOTION

Plaintiffs allege that Pacific, other Defendants, and potentially hundreds of unnamed buyers have been participating in a *per se* unlawful coast-wide price-fixing conspiracy for the past 11 years. (Mot. at 3:3–6; SAC ¶¶ 8, 198, 207, 650.) Although Plaintiffs have refused to

define the conspiracy in discovery, Plaintiffs have baldly claimed throughout that they have evidence of "communications that, on their face, evidence price fixing amongst Defendants." Dkt. 701 at 14:12–13; *see also id.* at 6:2–3, 11–12; 15:3–4. They have provided no such evidence, however, to the Court.

Direct evidence of price fixing is not merely any communication between competitors about prices—it instead must be "smoking-gun evidence that 'establishes, without requiring any inferences' the existence of a conspiracy" or agreement. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) (citation omitted). Such evidence "usually take[s] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010).

Hundreds of thousands of text messages have been produced so far by Pacific and other Defendants, including messages between buyers, with crabbers, and internal company messages for each Defendant going back years before the lawsuit was filed. Despite this enormous volume of evidence—which includes text messages Plaintiffs call "the most important category of documentary evidence in this case," Mot. at 15—no "smoking-gun evidence" has emerged that "'establishes, without requiring any inferences' the existence of a conspiracy." *Honey Bum*, 63 F.4th at 822. Plaintiffs instead resort to calling any text message relating to crab prices "direct evidence" in the hope that, if Plaintiffs repeat the mischaracterization enough times, it will stick.

Perhaps the best examples of this are found in Plaintiffs' Motion itself. For instance, Exhibit 11 is a text message thread in which Hester reports to Meier that a competitor just raised its ex vessel price from $5.50/lb to $6/lb, and a crabber who was originally selling to Pacific for $5.75 was now going to sell to the competitor; so, Meier authorized Hester to raise Pacific's price to $6.00 to avoid losing the crabber to the competition. Mot. at 4, Ex. 11. Plaintiffs speculate—without contextualizing or corroborating evidence—that Pacific is anticompetitively "buying out crab to squeeze out independent 'white van' live buyers." Mot. at 4. On the contrary, this could not be a better illustration of the "free market" that Plaintiffs allege existed "before" the cartel:

> Crabbers being who they are and dock talk being what it is, what a crabber was paid for a load of crab was soon widely known among other members of the fleet, who then demanded a similar price from the same or different buyers, thus raising market. In other words, the Pacific NW Area Dungeness crab ex vessel market behaved as economic theory would predict a free market would.

SAC ¶ 196. Exhibit 11 demonstrates this perfectly. Hester learned (seemingly from a crabber or from "dock talk") "what a crabber was paid" or was at least offered "for a load of crab" by a competitor; the crabber "then demanded a similar price from" Pacific; and Pacific responded by matching that price, "thus raising market." *See* Meier Decl. ¶ 8. "In other words," Pacific "behaved as economic theory would predict" Pacific would in "a free market." As this Court said in a related context, "Plaintiffs read into the messages more than is in them." Dkt. 600 at 2.

If this is Plaintiffs' best evidence more than three years into the case, out of hundreds of thousands of messages produced, Plaintiffs' case has problems. *Accord* Ex. 15 (Meier tracking competitors' higher prices and telling dockworkers that Pacific "may have to move to 6.25 in warrenton"). Plaintiffs cannot have it both ways, characterizing what their pleadings called free-market competition as, now, anticompetitive "squeez[ing] out" of competitors.

Yet Plaintiffs cite only the same kinds of messages, containing merely price information, discussing competitors' prices, and sometimes waiting for and following others' prices—but never any *agreement* to *fix* prices. *See, e.g.*, Meier Decl. ¶ 8 (discussing Mot. Exs. 11, 15, 16); *see also* Dkt. 701 (quoting numerous messages); *accord* Dkts. 572-6 (tracking and following competitors' prices); 572-8 (tracking competitors' prices); 714-8 (same); 801-4 (same); 801-5 ("word is on the street" that buyers were raising prices); 801-6 ("[b]oats keep telling" what other buyers are paying, and observing "[t]here are rumors everyday").[1] Defendants have never denied they watch each others' prices as they compete for crab (which is not unlawful) and that many text messages show this. As Plaintiffs' own percipient witnesses confirm, crabbers regularly communicate with each other about what buyers are paying, and communicate those prices to buyers to try to push prices up. *See, e.g.*, Snider Decl. Ex. E (Paddy Davis deposition) at 58:23–

[1] *See also* SAC ¶¶ 212–16, 221–24, 230–32, 260–61, 268–71, 274–75, 281–85, 288–304, 306–07, 310–13, 315–23, 325, 327–28, 333–35, 510, 515, 521, 525, 527, 531–32, 534, 536–37, 554–56, 558, 560–61, 563–64, 566, 568, 570–76, 578–80, 582–84, 600, 602–11.

59:19, 60:21–61:7, 210:24–211:11; Ex. F (John Atkinson deposition) at 50:5–51:13, 52:11–53:8; Ex. G (Robert Bohannon deposition) at 96:8–18, 97:11–14, 99:23–101:12; Ex. H (Timothy Calvert deposition) at 79:10–17, 109:25–110:17, 112:7–19, 114:8–18; Ex. I (John Tarantino deposition) at 67:24–68:8, 80:23–81:8. Crabbers expect buyers to verify with each other what crabbers are telling them. *See id.* Ex. E at 178:8–12; Ex. G at 99:23–100:12.

None of this is illegal, and it certainly is not direct evidence of price fixing because all of it requires an inference to conclude there was an agreement. *Honey Bum*, 63 F.4th at 822. Text messages about competitors' prices are not direct evidence of price fixing. As this Court observed, even "agreements to exchange pricing data do not themselves constitute *per se* violation of the Sherman Act," Dkt. 600 at 2 (quoting *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 n.13 (9th Cir. 1990)), and "[m]atching market prices isn't price fixing" either, Dkt. 600 at 3 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007)). Price verification among buyers about market prices, too, is not unlawful and not proof of any pre-existing *per se* unlawful conspiracy. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("The fundamental difficulty with the class's argument regarding price verifications is that it assumes a conspiracy first, and then sets out to 'prove' it. However, a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly."). *See, e.g.*, SAC ¶¶ 215 (buyer might be a "hard pass" on price), 223, 229, 475 (buyer discussing what other buyers might be "willing to pay"), 223 ("buyers discuss what 'crabbers were demanding'"). On the contrary, such talk is commonplace in this and many other industries. As one of Plaintiffs' key witnesses testified, "it would be one thing to be talking about price, but . . . a whole different ballgame if you were colluding to drop the price or control the price." Snider Decl. Ex. E at 178:13–21.

Similarly, text messages showing buyers waiting for Pacific to offer a price (*see* SAC ¶¶ 251–255, 260–263), and then matching it, are not evidence of a prior *per se* unlawful agreement to fix prices. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 48 (9th Cir. 2022) (follow-the-leader competition is "more consistent with conscious parallelism" than price-fixing). Rather, "[f]ollowing the example set by a

competitor, without agreeing to do so in advance, is textbook 'price leadership'—a practice [many courts] have repeatedly stated is insufficient to establish the existence of an agreement." *Quality Auto Painting Ctr. v. State Farm Indem. Co.*, 917 F.3d 1249, 1264 (11th Cir. 2019). As such, messages like Safe Coast's Max Boland telling Cincotta, "I told him I would not commit to a price unless PAC came out with one," Mot. Ex. 9, do not show an antecedent agreement to fix prices—let alone the multi-party, multi-year, multi-port conspiracy Plaintiffs say they will prove.

The lack of evidence underscores the absurdity of the overarching conspiracy that Plaintiffs allege (and refuse to explain in discovery). It is impossible, if Plaintiffs' allegations were true, that there would not be even a single reference to the multi-party, multi-year cartel. That means either there was no conspiracy or that a handful of the numerous discovery custodians across all Defendants selectively deleted exactly all direct evidence and missed nothing—which is as implausible as it sounds. Indeed, the notion that all direct evidence of a multi-year, multi-company conspiracy existed in a small handful of messages on *these particular six* custodians' phones—and *only* their phones, such that any relevant messages are found nowhere else—is preposterous. Of Pacific's custodians, only Meier has ever had authority to set prices, and the recent additional collection of messages from his phone supplies messages going back to long before he had that authority. Meier Decl. ¶ 8. Cincotta, Hester and McLarrin, on the other hand, have never had pricing authority. *See* Cincotta Decl. ¶ 2; McLarrin Decl. ¶ 2; Meier Decl. ¶ 8. Yeck and Obradovich—who, together, are missing less than four months of messages, and who still have gigabytes of data left to collect in the cloud—do not even participate in crab pricing negotiations, Obradovich Decl. ¶ 6, or have not since years before this lawsuit, Yeck Decl. ¶ 3.

Plaintiffs want this case to be about spoliation because they have nothing else. But the reality is that any missing texts, at most, would have contained more of the same lawful communications found in the other custodians' collections. To the extent anything remains missing after all collections are complete, and after all other supposed "cartel members" produce their text messages with these custodians, Plaintiffs cannot show that whatever might remain "missing" would matter. Plaintiffs' Motion should be denied.

## IV. LEGAL STANDARD

Rule 37(e) governs sanctions related to ESI. As amended in 2015, it provides two categories of discretionary sanctions if ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." First, the Court, "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, the Court, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," may "presume that the lost information was unfavorable to the party" or "instruct the jury that it may or must presume the information was unfavorable." Fed. R. Civ. P. 37(e)(2).

In other words, "Rule 37(e) essentially functions as a decision tree." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018). "The threshold inquiry is whether ESI has been 'lost,' which in turn requires a showing (a) that discoverable ESI existed when a duty to preserve arose but was not preserved due to a party's negligent failure to take reasonable steps to preserve it and (b) that it cannot be restored or replaced." *Id.* "Only if this threshold requirement is met can the court proceed to impose non-dispositive measures to cure any resulting prejudice." *Id.* The more severe sanctions listed in Rule 37(e)(2) are only available with proof of a party's illicit motive. *Id.*

## V. ARGUMENT

### A. Plaintiffs fail to show ESI was lost and cannot be restored or replaced.

Plaintiffs make blanket accusations that six Pacific custodians "destroyed" and "permanently lost" "highly relevant documents" based on Pacific's answers in its Interrogatory Responses detailing its ESI collections. But Rule 37(e) is not triggered merely because ESI may be missing from one custodian's device. *See Oracle*, 328 F.R.D. at 552 (denying sanctions where ESI lost from one custodian had been obtained from other sources). Rather, the threshold requirement for a motion for sanctions under Rule 37(e) is a finding that ESI is lost and "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). The movant must show the information is genuinely unavailable and cannot be obtained from other sources. *See*

*Oracle*, 328 F.R.D. at 552. Speculation of what might have existed is insufficient. *Painter v. Atwood*, No. 2:12-cv-1215, 2014 WL 1089694, at *4–5 (D. Nev. Mar. 18, 2014). Plaintiffs fail to make this threshold showing.

**1. ESI can be restored or replaced through ongoing collections.**

Plaintiffs brought this Motion despite Pacific stating in its Interrogatory Responses that "collections are ongoing" and Pacific "continues to work with its custodians" to identify additional sources from which to collect text messages. Pacific meant what it said. In the time since Pacific answered Plaintiffs' Interrogatories, Pacific has recovered years of text messages for Meier that predate what was obtained in prior collections, and uncovered many gigabytes of messaging data stored in cloud accounts that Pacific' prior vendor did not collect, including for Meier (66.9 gigabytes), Obradovich (62.5 gigabytes), Yeck (27 gigabytes), and McLarrin (20.1 gigabytes), and potentially more. *Id.* ¶¶ 6–7, 10, 13, 19. Pacific is still working to access those sources of additional ESI, which may restore additional messages.

These additional collected text messages—and the possibility of collecting more—demonstrate the profound insufficiency of Plaintiffs' Motion on the nascent record before this Court. At this time, Pacific's collection efforts are not over, and evidence will continue to surface in discovery. The Court should deny Plaintiffs' Motion for this reason alone.

**2. ESI can be restored or replaced through ongoing discovery.**

Plaintiffs also ignore that ongoing discovery from Pacific's other custodians and other Defendants will continue to restore or replace any "lost" evidence from these custodians' cell phones. Plaintiffs allege a coast-wide conspiracy in which at least 16 defendant groups, each with many employees, supposedly exchanged text messages to facilitate the conspiracy. By the very nature of text messages, every relevant message thread will have at least two sources (or more, in group chats): the sender and the receiver(s). Here, because Plaintiffs have named so many Defendants, each of which has numerous custodians, any relevant messages that cannot be collected from a custodian in this Motion will likely be found in further discovery.[2]

[2] To date, other Defendants have already produced many texts with the custodians subject to this Motion predating March 2023 when a preservation duty arose. *See* Snider Decl. ¶ 38 (chart showing text restoration). For instance, Mark Rydman of Ocean Gold and Max Boland of Safe

Moreover, Defendants are in the process of producing hundreds of thousands of emails in response to Plaintiffs' requests (Pacific anticipates producing 200,000 emails in the next few weeks, Snider Decl. ¶ 16), including emails between Defendants; Plaintiffs then will take at least 75 depositions of Defendants' employees, plus more depositions of entities and third parties. Dkt. 701. This massive quantity of emerging evidence may also serve to "replace" any evidence found in an alleged missing text message. Fed. R. Civ. P. 37(e); *see Oracle*, 328 F.R.D. at 552.

As such, it is neither sensible nor fair to consider issues of spoliation until *at least* all document discovery and depositions are complete. Courts have declined to award Rule 37(e) sanctions based on spoliation arguments pointing to the loss of data from only one custodian's device, where duplicate data is available elsewhere. *See Oracle*, 328 F.R.D. at 553 (denying motion for sanctions under Rule 37(e) where missing reports "can be reproduced" through other witnesses); *Li v. Merck & Co., Inc.*, No. 23-cv-03347-JSW (TSH), 2025 WL 2162949, at *5 (N.D. Cal. July 30, 2025) ("Merck's motion never addressed whether the missing documents, if they were deleted, cannot be restored or replaced through additional discovery. Communications, after all, are with other people. And it sounds like the other people were either at Merck or Merck subpoenaed them."); *Sanchez v. Jiles*, No. CV 10-09384 MMM (OPx), 2012 WL 13005996, at *14 (C.D. Cal. June 14, 2012) (considering availability of other sources or types of evidence). Until the full universe of available evidence is understood, any prior conclusion that relevant ESI is lost "permanently"—and not replaceable—is entirely speculative.

**B. Plaintiffs fail to show that Pacific did not take reasonable steps.**

Plaintiffs cannot satisfy Rule 37(e) merely by showing ESI is "lost." Plaintiffs must also establish that a party "failed to take reasonable steps" to preserve that ESI. Fed. R. Civ. P. 37(e). Plaintiffs make no effort to meaningfully analyze Pacific's steps to preserve ESI.

Critically, Rule 37 only requires "reasonable steps," not perfection. *Oracle*, 328 F.R.D. at 549–50; Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment ("perfection in

---

Coast—who both appear to have full productions of texts going back years—have already restored text message threads with Joe Cincotta. In fact, Plaintiffs prove this themselves, quoting "lost" messages in their Motion that were recovered from other participants. *See* Mot. Exs. 16, 17, 42. Messages available from other custodians are not "lost." *Oracle*, 328 F.R.D. at 552.

preserving all relevant [ESI] is often impossible"). As this Court has recognized, "[o]rganizations need not 'preserve every email or electronic document' because '[t]o require such broad preservation would cripple organizations that almost always are involved in litigation, and make discovery even more costly and time-consuming.'" Dkt. 66 at 2 (quoting *Doe LS 340 v. Uber Tech., Inc.*, 710 F. Supp. 3d 794, 802 (N.D. Cal. 2024)). The Advisory Committee's Notes to rule 37 highlight several factors to use when evaluating a party's reasonable steps: (1) a party's "good-faith operation of an electronic information system"; (2) a "party's sophistication with regard to litigation"; (3) "the extent to which a party knew of and protected against such risks"; and (4) whether the information is "destroyed by events outside the party's control." Importantly, Rule 37(e) focuses on whether a "party" failed to take reasonable steps to preserve ESI, not whether a party's individual employee did so. Fed. R. Civ. P. 37(e).

The same day the Complaint was served, Pacific issued litigation hold notices to employees relevant to Plaintiffs' lawsuit. Snider Decl. ¶ 3. Pacific issued second and third litigation holds reminding custodians of their obligations after Plaintiffs changed their theory of the case. *Id.* ¶¶ 8, 15. Pacific also took all efforts in its control to preserve ESI in its possession, including by taking backend steps to preserve all custodians' emails, and to suspend auto-delete policies. *Id.* ¶ 4; *see* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment.

As for employees' personal phones, Pacific lacked the ability to take backend steps to preserve or back up data that Pacific did not own and over which it had no direct control. Snider Decl. ¶ 4. *See* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (reasonable steps analysis examines what is "outside the party's control"). Pacific accordingly issued a litigation hold to relevant employees, expressly noting that employees were obligated to preserve ESI on their personal phones. Snider Decl. ¶¶ 3–4, 8, 15. The custodians at issue all received the litigation hold, understood it applied to their personal phones, and have cooperated with multiple and continuing collections from their personal devices. Meier Decl. ¶¶ 4, 7; Obradovich Decl. ¶¶ 3, 5; Yeck Decl. ¶¶ 4, 6; McLarrin Decl. ¶¶ 3, 6; Cincotta Decl. ¶¶ 3, 7; Snider Decl. ¶¶ 9–10.

Plaintiffs do not dispute that most Pacific custodians followed these holds. Pacific has already collected what appear to be full text message collections for most of its 16 custodians.

Snider Decl. ¶ 18. When counsel met with employees about the case, employees reported that they understood the hold and were complying with it. *Id.* ¶ 9. Pacific had no reason to believe its employees were not following its instructions, and there is no evidence to the contrary. *See* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 Amendment (reasonable steps analysis examines "the extent to which a party knew of and protected against such risks").

Plaintiffs' entire theory that Pacific failed to take "reasonable steps" appears to be that Pacific failed to collect data from its custodians' personal phones in March 2023 immediately after this case began. But Plaintiffs cite no authority—and Pacific has found none—requiring a party to perform *collections* immediately after a suit is filed to take sufficiently "reasonable steps" to preserve ESI. On the contrary, courts consistently find that it is enough to do what Pacific did here: issue litigation holds, take backend preservation steps like suspend auto-delete policies, and periodically check with custodians to confirm they are aware of their duties. *See, e.g.*, *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-cv-02824-JST (KAW), 2022 WL 16637990, at *9 (N.D. Cal. Nov. 2, 2022) (movant "does not adequately explain why Greenpeace's reliance on the messages being retained is not reasonable, particularly in the absence of any evidence in the record that such reliance was not warranted"), *report and recommendation adopted*, 2023 WL 4311255 (N.D. Cal. Apr. 10, 2023). Plaintiffs themselves did not begin collecting ESI until Fall 2024, and for Plaintiff Cherry Fisheries, well into 2026. Snider Decl. Ex. J at 5.

Moreover, Plaintiffs did not issue their first discovery requests to Pacific until almost two years after filing the case—in March 2025. *Id.* ¶ 7. Prior to that time, discovery was stayed, Dkt. 30, and for some time—after Pacific won its first motion to dismiss—there were *no* claims against Pacific, Dkt. 59. Immediately after receiving Plaintiffs' discovery requests, and while the parties were still negotiating an agreed list of custodians and search terms, Pacific collected text messages from the six custodians at issue in April and May 2025. Snider Decl. ¶ 10. Plaintiffs' suggestion that Pacific should have collected all data from individuals' personal phones during the years in which discovery was stayed and Plaintiffs' claims were either dismissed or in flux is unfounded: Doing so that early would have required collecting "every" electronic document, "irrespective of relevance" to cover what would later become relevant to Plaintiffs' eventual

theory. Dkt. 66 at 2 (quoting *Doe LS 340*, 710 F. Supp. 3d at 802); Sedona Conference, *The Sedona Principles, Third Edition*, 19 Sedona Conf. J. 1, 126–27 (2018) (party may "avoid collecting ESI that is neither relevant nor responsive"). Pacific could not have anticipated that Plaintiffs would drop their monopsony theory and allege a new horizontal price-fixing claim encompassing different evidence. *See Sedona Principles*, 19 Sedona Conf. J. at 103 ("[A] party should not be faulted with the benefit of hindsight if claims are modified or expanded, requiring an adjustment of the preservation obligations."). Pacific reasonably preserved ESI through litigation holds, backend retention, and custodian follow-up. Because Plaintiffs make no showing otherwise, they cannot meet their burden to show a lack of reasonable steps under Rule 37(e).

**C. There is no evidence that Pacific intended to deprive Plaintiffs of evidence.**

Adverse inference sanctions—including the specific jury instruction Plaintiffs seek here—are available only if Plaintiffs prove that *Pacific* destroyed evidence specifically "with the intent to deprive another party of the information's use in the litigation." *Gregory v. State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024); *see also AliveCor, Inc. v. Apple, Inc.*, No. 21-CV-03958-JSW, 2023 WL 4335293, at *5 (N.D. Cal. June 2, 2023) (even gross negligence does not establish intent to deprive sufficient to support an adverse inference under Rule 37(e)(2)."). In evaluating intent, courts consider circumstantial evidence like: (i) the timing of the loss; (ii) the method of loss; (iii) whether the party deleted evidence selectively; (iv) whether the party had institutional policies in place to preserve ESI; (v) whether the party made efforts to recover the lost data; and (vi) whether the deletion occurred under suspicious or unexplained circumstances. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 977–78 (N.D. Cal. 2022). Recovery efforts, even if unsuccessful, "indicate a lack of intent to deprive." *Id.* at 978.

Importantly, Rule 37(e) focuses on the intent of the *party*—not individual employees. Fed. R. Civ. P. 37(e). An employee's destruction of evidence, in violation of company policy, is not automatically a bad-faith act by the company. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 873 (7th Cir. 2015); *Freidig v. Target Corp.*, 329 F.R.D. 199, 210 (W.D. Wis. 2018). Employee intent is imputed to an employer only in egregious circumstances, such as a legally sophisticated principal-level actor repeatedly deleting text messages and an email account despite

knowing he was under a litigation hold. *See, e.g.*, *Colonies Partners, L.P. v. County of San Bernardino*, No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444, at *10 (C.D. Cal. Feb. 27, 2020), *report and recommendation adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020).

Plaintiffs do not even attempt to make this showing. Plaintiffs present no evidence—literally none—that it was Pacific's intention to deprive Plaintiffs of relevant evidence. Plaintiffs have not deposed a single custodian. Snider Decl. ¶ 30. Plaintiffs merely speculate about custodians' intent from information in Pacific's Interrogatory Responses. Mot. at 21–22.

Moreover, Plaintiffs fully ignore the intent of the actual party at issue: Pacific. Plaintiffs offer nothing to show that *Pacific* had any corporate intent to destroy evidence. The evidence resoundingly shows otherwise. Pacific implemented extensive preservation measures that included multiple litigation holds, backend retention protocols, and meetings between counsel and key custodians. Snider Decl. ¶ 3–4, 6, 8–9, 15. The alleged losses (none in fact confirmed) were text messages from *personal* phones—which are not in Pacific's possession or control. Two suspected losses (Cincotta and McLarrin) occurred through inadvertent auto-deletion mishaps[3] and exchanges of personal phones that they believed at the time would not result in a loss of data because of standard backup procedures, and did without advising Pacific. Courts have repeatedly held that passive failures to halt auto-deletion do not show intent absent extraordinary circumstances, especially where the loss was non-selective, occurred on personal accounts, and happened outside any pressure to produce documents. *See, e.g.*, *Resolute Forest Prods., Inc.*, 2022 WL 16637990, at *8; *Porter v. City & Cnty. of San Francisco*, No. 16-CV-03771-CW(DMR), 2018 WL 4215602, at *4 (N.D. Cal. Sept. 5, 2018); *AliveCor, Inc.*, 2023 WL 4335293, at *5.

In addition, on learning of the suspected loss, Pacific has done everything possible to recover evidence rather than keep evidence "lost." *See* Snider Decl. ¶¶ 19–26, 31–42 (detailing

[3] Plaintiffs know that these issues are common. One of Plaintiffs' counsel's own clients in this case—Paddy Davis, a percipient witness putative class member subpoenaed by Defendants—was under subpoena and, according to counsel, accidentally switched his message retention settings from "forever" to "30 days," deleting almost all messages on his phone. Snider Decl. Ex. K at 1–2. Davis has no iCloud backups. *Id.* That occurred while Plaintiffs' counsel represented Davis, Davis was under subpoena, and counsel was presumably discussing data retention with him. *Id.*

Pacific's efforts and expenses to collect and recover ESI); Yasumoto Decl. ¶¶ 3, 6–24 (same). A party does not expend such resources to recover evidence—and actually recover it—if the party's intent is to destroy messages. Pacific is motivated to discover this evidence because, as noted, it will further show competition and support its defenses. *See* Mot. Exs. 11, 13, 15.[4]

The record thus is wholly lacking of the extraordinary evidence needed to find Pacific's intent to destroy text messages evidence. To the extent any evidence was lost, it was inadvertent.

- **Ashton Meier:** Meier did not intentionally or manually delete relevant text messages, was not instructed to delete anything, and did not instruct anyone else to do so. Meier Decl. ¶ 5. After receiving the hold, his phone was set to retain all messages. *Id.* When he upgraded his phone, he performed a direct device-to-device transfer, following on-screen prompts to transfer and preserve all data. *Id.* ¶ 6. He verified that all data had transferred before factory-resetting his old phone. *Id.* He has cooperated with multiple collection efforts, including providing his phone and iCloud credentials for forensic review. *Id.* ¶ 7. This cooperation has yielded over 160,000 additional text messages going back well before the original Complaint was filed. Yasumoto Decl. ¶ 6.
- **Dan Obradovich:** Obradovich did not intentionally or manually delete relevant text messages, was not instructed to delete anything, and did not instruct anyone else to do so. Obradovich Decl. ¶ 4. He still uses the same phone he used when he received the litigation hold. *Id.* His phone was set to retain all messages "forever" and he has never changed that setting. *Id.* Obradovich has cooperated with Pacific's collection efforts, providing his phone for collection in April 2025 and again in July 2026. *Id.* ¶ 5.
- **Tyson Yeck:** Yeck did not intentionally or manually delete relevant text messages, was not instructed to delete anything, and did not instruct anyone else to do so. Yeck Decl. ¶ 5. The phone collected from Yeck was the same phone he used when he received the litigation hold. *Id.* ¶ 6. That phone was set to retain all messages "forever," and he never changed that setting. *Id.* ¶ 5. Yeck has cooperated with collection efforts by providing his phone for collection in May 2025 and again in August 2026, and providing his iCloud credentials for forensic review. *Id.* ¶ 6.
- **Brian McLarrin:** McLarrin did not intentionally or manually delete relevant text messages, was not instructed to delete anything, and did not instruct anyone else to do so. McLarrin Decl. ¶ 4. He replaced his phone in March 2025 because the prior phone stopped holding a charge and would not turn on. *Id.* ¶ 5. He obtained the new phone at Verizon, worked with a Verizon employee to transfer prior content, and believed his messages had transferred or were backed up in iCloud. *Id.* When Pacific's vendor later discovered a one-year retention setting, McLarrin did not know the setting existed, had not

[4] Plaintiffs falsely insinuate that Pacific wrongfully withheld "preservation issues" at the parties' Rule 26(f) conference on February 3, 2025, before collections began. Pacific had no reason to know of any preservation issues then, and Pacific's custodians at the time were not aware of any issues. Since first learning about potential issues, Pacific has continuously followed up with subsequent investigation and collection, which has been successful in turning up evidence to this day. Snider Decl. ¶ 19. Pacific has also upheld its promise to "cooperate fully" with Plaintiffs' inquiries about the status of Pacific's text message productions. *See id.* ¶¶ 28–29, Ex. D.

intentionally enabled it, and would not have known how to check it. *Id.* ¶ 6. He has cooperated with all cell phone, iCloud, and follow-up collection efforts. *Id.*

- **Joe Cincotta:** Cincotta did not intentionally or manually delete relevant text messages, was not instructed to delete anything, and did not instruct anyone else to do so. Cincotta Decl. ¶ 8. His prior phone was accidentally lost when it slipped from his hand and fell into Humboldt Bay while he was working on the dock. *Id.* ¶ 5. His wife obtained a replacement phone from Verizon, and Cincotta did not set it up himself. *Id.* ¶ 6. Cincotta is not technologically sophisticated and does not know why text messages on his phone only went back 30 days from the date of collection, and he has cooperated with all phone and iCloud collection efforts. *Id.* ¶¶ 7–8.
- **Brett Hester:** Pacific issued Hester a litigation hold in March 2023. Snider Decl. Ex. D at 18. Hester replaced his personal phone in November 2024 without Pacific's knowledge, and kept his old phone collection. *Id.* When Pacific attempted to collect his prior phone, Hester did not produce it. *Id.* at 19. Hester later left employment at Pacific while further investigation was ongoing to locate other sources of any missing ESI. Snider Decl. ¶ 36. Pacific's counsel has tried multiple times to contact Hester, but Hester has not responded. *Id.* Pacific continues to pursue ways to secure Hester's cooperation. *Id.*

This sworn testimony provides no basis to find intent to deprive Plaintiffs of evidence—let alone Pacific's corporate intent to do so. Plaintiffs offer no evidence capable of rebutting it, relying on only speculation about the timing of certain losses. Plaintiffs fail to establish intent as needed for an adverse inference sanction.

### D. Plaintiffs fail to establish prejudice.

Where a movant fails to show intent, courts may order only "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Plaintiffs cite the wrong standard for assessing prejudice. Mot. at 15 (stating outdated and extra-jurisdictional rule that "once spoliation is shown, the burden shifts to the spoliating party"). Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other." *Wisk Aero LLC*, 2023 WL 2277112, at *4 (citation omitted). "However, the moving party should provide some 'specifics to support' a finding of prejudice." *Id.* (quoting *Fourth Dimension Software v. DER Touristik Deutschland GmbH*, No. 19-cv-05561-CRB, 2021 WL 5919821, at *10 (N.D. Cal. Dec. 15, 2021)). The fact that evidence is missing is not itself dispositive of prejudice—courts consider, among other things, "the importance of the information to the case" and whether other evidence or witness memory mitigates the prejudice. *Id.* (citation omitted).

Here, Plaintiffs advance only broad and sweeping generalizations and make no effort to provide "specifics to support" prejudice regarding any particular custodian. But to order a remedy "no greater than necessary to cure the prejudice," Fed. R. Civ. P. 37(e)(1), this Court must analyze what specifically is missing, whether it is material, and whether any prejudice is mitigated by other evidence. *Wisk Aero LLC*, 2023 WL 2277112, at *4.

Plaintiffs cannot even show what is missing, where Pacific's collections and Defendants' productions continue. Regardless, the facts specific to each custodian provide no basis to find that Plaintiffs are prejudiced by the potential absence of some text messages. Few of Pacific's custodians ever communicated with so-called "cartel members" or crabbers about prices; almost none had pricing authority (except for Meier, whose messages are being recovered); some did not participate in crab pricing negotiations at all; many custodians have only short "gaps" in their collections; and most importantly, Plaintiffs have identified not one text message from *any* custodian containing "direct evidence" of price fixing. Specifically:

- **Ashton Meier:** Meier was not involved in the procurement or processing of West Coast Dungeness crab, including determining ex vessel prices, until Fall 2023. Meier Decl. ¶ 3. His existing messages show competition, not price fixing, *id.* ¶ 8, and more are being collected, Yasumoto Decl. ¶¶ 6–8, including from time periods before any preservation obligation arose.
- **Dan Obradovich:** Obradovich's text message collection begins in full one month after a preservation obligation arose in March 2023, Snider Decl. Ex. D at 12, and it is not likely that any text messages relevant to Plaintiffs' claims existed in that "missing" period. Obradovich worked on sales and category management, providing input on product needs and economics, and he did not even communicate with crabbers by text. Obradovich Decl. ¶¶ 1–2, 6. Outside attending one Oregon state-sponsored negotiation in December 2023, he did not negotiate Dungeness crab prices with crabbers. *Id.* ¶ 6. He also did not communicate with other buyers about ex vessel prices; his contacts concerned finished products, resale, custom processing, or personal matters. *Id.* ¶¶ 7–9. He does not know or has never communicated with most other individuals identified in the Motion who allegedly lost messages (Kevin Lee, Vicki Nowlin, Todd Kirkland, Mike Ryder, or Marco Vargas). *Id.* ¶ 10. He has communicated with Crystal Adams in relation to the Oregon Dungeness Crab Commission ("ODCC"), but not when she worked at Hallmark. *Id.*
- **Tyson Yeck:** Yeck's text message collection begins in June 2023, less than three months after a duty to preserve arose. Snider Decl. Ex. D at 12. Any missing messages from that period would not be relevant to this case. Since 2021, Yeck has not been involved in Dungeness crab procurement or processing, has no role in ex vessel prices, and has not been involved in negotiations with crabbers. Yeck Decl. ¶ 3. He has never texted with other buyers about ex vessel crab prices. *Id.* ¶ 8. He does not know and never

communicated with most other individuals identified in the Motion who allegedly lost messages (Lee, Nowlin, Kirkland, Ryder, and Vargas). *Id.* ¶ 9. He has communicated with Crystal Adams by email regarding the ODCC. *Id.*

- **Brian McLarrin:** McLarrin's text messages begin in April 2024, Snider Decl. Ex. D at 12, but Plaintiffs have not shown any missing text messages after March 2023 would be prejudicial. McLarrin managed Charleston operations and coordinated dock activity, but he has no authority to set ex vessel prices. McLarrin Decl. ¶ 2. He recalls texting with, at most, 19 of the crabbers identified by Plaintiffs as relevant to this case, and many communications concerned shrimp, logistics, weather, fishing conditions, deliveries, services, or community matters. *Id.* ¶ 7. Any price-related texts reflect what crabbers report that competitors are paying in an effort to pressure Pacific to match or beat them. *Id.* ¶ 9; *e.g.*, Mot. Ex. 14. McLarrin texts with only a few individuals who work for other buyers, and primarily discusses pre-season crab testing and operational logistics—not prices. McLarrin Decl. ¶¶ 8–9. He does not know or has never communicated with most other individuals identified in the Motion who allegedly lost messages (Lee, Nowlin, Kirkland, Ryder, and Vargas). *Id.* ¶ 10.
- **Joe Cincotta:** Cincotta's text message collection begins in March 2025. Snider Decl. Ex. D at 12. Cincotta managed California processing operations, but has no authority to set ex vessel Dungeness crab prices. Cincotta Decl. ¶ 2. He recalls texting with no more than 10 listed crabbers, only sporadically. *Id.* ¶ 10. His external buyer contacts are few and mostly about non-price issues, including family, cooking crab, offloading, ice access, groundfish, king crab, and operational issues. *Id.* ¶¶ 11–12. He has never communicated with the other individuals identified in Plaintiffs' Motion who allegedly lost messages (Lee, Nowlin, Kirkland, Ryder, Adams, and Vargas). *Id.* ¶ 13. Many texts including Cincotta have been produced by other custodians and Defendants. Snider Decl. ¶¶ 37–38.
- **Brett Hester:** Hester's text messages begin in November 2024. Snider Decl. Ex. D at 11. Hester managed Pacific docks, including Brookings, but did not have authority to set prices. Meier Decl. ¶ 8. Pacific's evidence shows he texted with only some crabbers and buyers, and many texts concerned non-price operational issues. Snider Decl. ¶ 36.

Clearly, any evaluation of "prejudice" requires a custodian-by-custodian analysis. Plaintiffs make no effort to perform that analysis and, therefore, cannot satisfy their burden on their Motion.

Plaintiffs also assume that any loss of custodians' messages is prejudicial because lost messages "between the spoliating individuals" "cannot be mitigated through discovery from other parties . . . through additional discovery." Mot. at 16–17. But Plaintiffs make no effort to actually show that any messages "between the spoliating individuals" exist in the first place. *See also Painter*, 2014 WL 1089694, at *4–5 (plaintiffs may not speculate that lost evidence existed in the first place). They do not, as confirmed by Pacific's custodians' testimony. *See supra*. Plaintiffs also are wrong that "internal communications" at Pacific "between spoliating individuals" cannot be replaced. Mot. at 19. The vast majority of Pacific's internal messages

exist on group threads, which can be restored by numerous other Pacific custodians. Meanwhile, Plaintiffs make no effort to assess which specific internal 1:1 threads between Pacific custodians ever existed and therefore could be lost, and if so, whether they are relevant. Plaintiffs do not attempt, for instance, to assess whether Hester and Yeck (who had drastically different roles at Pacific) might have ever texted 1:1 before June 2023, when Yeck's text message collection begins. The discovery record shows they have never texted even *once*. Snider Decl. ¶ 36. Plaintiffs simply assume they did and argue, without evidence, that the jury should assume the same and assume the text messages would be supportive of their claims.

Even if some 1:1 threads did exist between certain custodians, like Cincotta and Hester, Plaintiffs still fail to explain how such texts would have helped Plaintiffs' claims. Plaintiffs allege that text messages facilitate the conspiracy with *other* buyers, but Hester and Cincotta were both employed by Pacific and they had no authority to set prices. Plaintiffs do not explain how missing 1:1 threads between Hester and Cincotta would show the inter-defendant "conspiracy," where both necessarily must involve other persons to facilitate it. Hester's and Cincotta's 1:1 threads could never evidence a conspiracy with so many other alleged participants.

Ultimately, Plaintiffs fail to show that *any* missing text messages would have supported—let alone contained direct or even material evidence—of a conspiracy. Mot. at 24. As discussed, none of the existing messages cited by Plaintiffs are "direct documentary evidence of price fixing." Contrary to Plaintiffs' mischaracterizations, the messages show price competition on their face. *E.g.*, Meier Decl. ¶ 8; McLarrin Decl. ¶ 11. That is the opposite of direct evidence. *Honey Bum*, 63 F.4th at 822. With such immense volumes of messages already produced, and relatively few messages from six custodian collections "missing" (many of which are being collected and subject to further recovery efforts, *see* Yasumoto Decl. ¶ 6–8, 11, 17, 22), there is no basis to conclude that any missing messages would show a conspiracy. Plaintiffs cannot just assume that missing messages would have supported their case and instruct jurors that they *must* construe any missing messages that way when no evidence supports that conclusion.

**E. An adverse inference instruction is improper.**

Plaintiffs, in seeking any adverse inference jury instruction—a mandatory one, no less—seek one of "the most severe sanctions a court can administer." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993–94 (N.D. Cal. 2012) (citation omitted); *id.* (cautioning that such inferences "should [not] be imposed casually" and collecting cases affirming that such sanctions are "harsh," "drastic," "extreme," and "not to be given lightly"). Indeed, as one court put it:

> In practice, an adverse inference instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome. The *in terrorem* effect of an adverse inference is obvious. When a jury is instructed that it may "infer that the party who destroyed potentially relevant evidence did so 'out of a realization that the [evidence was] unfavorable,'" the party suffering this instruction will be hard-pressed to prevail on the merits.

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219–20 (S.D.N.Y. 2003) (cleaned up).

There is no evidence here to support a finding of spoliation in the first place, let alone any basis for a mandatory adverse inference sanction. Moreover, were the Court to find that spoliation has occurred (a showing Plaintiffs have not made), any discussion of jury instructions as a sanction is extremely premature. The discovery cut-off deadline is almost one year away. The parties are just beginning fact depositions and Plaintiffs have not noticed a single deposition of the 75 that they anticipate taking. Briefing on class certification is not expected to occur for almost two years and there will undoubtedly be dispositive motion practice. Yet, Plaintiffs ask the Court to craft a jury instruction in isolation years before any conceivable trial.[5] Plaintiffs' request is highly improper and shows that Plaintiffs need this case to be about the spoliation of text messages because they have nothing else.[6]

## VI. CONCLUSION

For all the reasons above, Plaintiffs' Motion should be denied.

---

[5] Plaintiffs' alternative proposal, to submit "the question of intent" to the jury "with a conditional adverse-inference instruction," Mot. at 25, is likewise misguided as Plaintiffs have not deposed a single Pacific employee to establish a testimonial basis to present the issue to the jury.

[6] Plaintiffs' broad instruction would affect other Defendants, as proving a conspiracy against one participant implicates other alleged participants. Plaintiffs' instruction would thus sanction Defendants who Plaintiffs do not allege spoliated evidence.

DATED: August 19, 2026

STOEL RIVES LLP

*/s/ Timothy W. Snider*

CHARLES H. SAMEL
charles.samel@stoel.com
EDWARD C. DUCKERS
ed.duckers@stoel.com
TIMOTHY W. SNIDER (admitted *pro hac vice)*
timothy.snider@stoel.com
MATTHEW D. SEGAL
matthew.segal@stoel.com
MICHELLE J. ROSALES
michelle.rosales@stoel.com

*Attorneys for Pacific Seafood Defendants*